## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; and THE DOOR,<br><br>*Plaintiffs*,<br><br>v.<br><br>Todd LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Sirce E. OWEN, in her official capacity as Acting Director, Executive Office of Immigration Review; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>*Defendants*. | Case No. 1:25-cv-6366<br><br>**COMPLAINT** |

## INTRODUCTION

1.     This case challenges the Trump Administration's sweeping, unprecedented campaign of targeting noncitizens at their immigration court proceedings by denying them the right to seek relief from removal in the courtroom and summarily arresting them as they exit. To facilitate its goal of "mass deportations," the Administration has reversed longstanding procedural and substantive protections that ensured noncitizens would be able to access immigration courts and fairly litigate their right to remain in the United States. Now, hundreds, if not thousands, of noncitizens in 8 U.S.C. § 1229a removal proceedings (commonly referred to as "full removal proceedings") are dutifully attending their immigration hearings across the country only to have the government summarily dismiss those proceedings, abruptly arrest and detain them, and seek

1

their immediate removal. These profoundly unfair practices undermine the rule of law and the integrity of immigration courts by effectively turning mandatory court hearings into traps.

2.      The Plaintiffs—African Communities Together ("ACT") and The Door—work for and with noncitizens in removal proceedings. The harms to their noncitizen members are immediate and severe. The dismissal of full removal proceedings denies noncitizens the opportunity to seek critical forms of relief from removal, including asylum. Further, these arbitrary and unprecedented arrests at immigration courthouses are traumatic; family members are physically separated from each other with no notice simply because their loved one went to court. As a result, Plaintiffs' members are now terrified to attend their upcoming immigration court hearings. These practices have also frustrated The Door's core mission and forced The Door to divert resources to address the harms to their members.

3.      At the center of these efforts are two new policies that the Administration has implemented to devastating effect: (1) a U.S. Immigration and Customs Enforcement ("ICE") policy that abandons restrictions ICE had previously adopted to protect noncitizens' access to the courts by broadly authorizing arrests at immigration courthouses ("ICE Courthouse Arrest Policy"), and (2) an Executive Office of Immigration Review ("EOIR") policy that encourages Immigration Judges ("IJs") to depart from the agency's own regulations and Immigration Court Practice Manual by summarily dismissing noncitizens' full removal proceedings without any meaningful process ("EOIR Dismissal Policy").

4.      These policies are unlawful. For decades, federal officials have avoided making civil arrests at courthouses for reasons recognized at common law and incorporated into the Immigration and Nationality Act ("INA"): such arrests chill access to the courts and impede the fair administration of justice. The ICE Courthouse Arrest Policy, which departs from prior agency

policy restricting such arrests, is unreasoned and contrary to law. The EOIR Dismissal Policy similarly departs from internal agency rules and regulations grounded in core procedural due process protections without any reasoned explanation for doing so. Because these policies contravene the INA and the agencies' own regulations and policies in violation of the Administrative Procedure Act ("APA") and the U.S. Constitution, Plaintiffs respectfully request this Court set aside and vacate Defendants' unlawful changes in policy and remedy the substantial harms that follow.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which confers jurisdiction to consider federal questions. This case arises under the Fifth Amendment to the United States Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.; and the INA. The United States has waived sovereign immunity from this suit under the APA. 5 U.S.C. § 702.

6.      Venue is proper because Defendants are officers or employees of the United States acting in their official capacities and Plaintiffs reside in this District, *see* 28 U.S.C. § 1391 (e)(1)(C); and because a substantial part of the events giving rise to the claims in this action took place in this District, *see* 28 U.S.C. § 1391(e)(1)(B).

## PARTIES

7.      Plaintiff ACT is a membership-based non-profit organization incorporated in the State of New York dedicated to empowering African immigrants and helping them integrate into the United States. ACT's mission is to help African immigrants integrate socially, advance economically, and engage civically in the United States, including by providing noncitizen members with free, high-quality immigration legal services.

8.      ACT has thousands of African immigrant members across three chapters: one in New York, one in the Washington D.C. metro area, and one in Pennsylvania. One of the ways members join ACT is by meeting with ACT intake staff and filling out a membership form. During the intake process, ACT staff ask new members what services they need and give them the opportunity to provide information about their immigration status. Members set ACT's priorities and shape ACT's work in a variety of ways, including by attending monthly membership meetings and joining committees that run ACT's advocacy campaigns. ACT offers a variety of free services to its members, including immigration legal services, assistance with health insurance and public school enrollment, support in applying for identification, and referrals for food and housing.

9.      ACT's members include noncitizens in removal proceedings. As a result of Defendants' actions, at least one ACT member was arrested by ICE after attending a master calendar hearing in his immigration case. Many other ACT members are at risk of having their immigration court proceedings dismissed and being arrested and detained at their immigration court appearances. These members have standing to sue in their own right, and their individual participation in this matter is not necessary.

10.      Plaintiff The Door is a membership-based, non-profit organization incorporated in the State of New York and based in New York City. The Door's mission is to empower New York City's diverse population of disconnected youth by providing them with free comprehensive services, including legal assistance, education, career development, health care, mental health counseling and crisis intervention, and housing support. Young people join The Door by meeting with a membership counselor and signing a membership agreement and remain members until they turn twenty-five years old, unless their membership is terminated for violating The Door's rules

as set forth in the membership agreement. Joining The Door gives members access to its comprehensive services, as well as The Door's space and community.

11.    As part of its mission, The Door provides its noncitizen members with legal assistance in their immigration cases to help them secure any immigration benefits or humanitarian immigration relief for which they are eligible. The Door accomplishes this in several ways, including by employing attorneys who provide full-scope representation to members in removal proceedings. The Door also runs a weekly drop-in legal clinic where attorneys provide limited-scope assistance and advice to members regarding their immigration cases.

12.    Defendants' actions have impaired The Door's core activities by forcing The Door to divert resources from providing full-scope representation in order to respond to its members' new needs as a result of the ICE Courthouse Arrest Policy and the EOIR Dismissal Policy. Defendants' actions have also frustrated and will continue to frustrate The Door's mission of helping noncitizen members obtain immigration relief by arbitrarily terminating members' removal proceedings, arresting and detaining them, and causing them to lose the opportunity to secure immigration benefits or humanitarian immigration relief.

13.    Moreover, at least one member of The Door has had his removal proceedings dismissed and been arrested and detained at his master calendar hearing. Many more Door members have upcoming hearings in pending removal proceedings and are therefore at risk of experiencing the same harm. These members have standing to sue in their own right and their individual participation in this matter is not necessary.

14.    Defendant Kristi Noem is sued in her official capacity as the Secretary of Department of Homeland Security ("DHS"). In this capacity, she directs each of the component agencies within DHS, including ICE. In her official capacity, Defendant Noem is responsible for

the administration of the immigration laws pursuant to 8 U.S.C. § 1103. Defendant Noem is one of the DHS Defendants.

15.    Defendant Todd Lyons is sued in his official capacity as Acting Director of ICE. In this capacity, Defendant Lyons is responsible for the enforcement of the immigrations laws in the interior of the United States, the implementation of enforcement policies, and oversight of DHS lawyers who appear before the immigration courts. Defendant Lyons is one of the DHS Defendants.

16.    Defendant Sirce E. Owen is the Acting Director of the EOIR. She is sued in her official capacity. In that capacity, Defendant Owen is responsible for setting policy as it pertains to EOIR and for overseeing the immigration courts. Defendant Owen is one of the DOJ Defendants.

17.    Defendant Pamela Bondi is sued in her official capacity as the Attorney General of the United States. In this capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and oversees EOIR. Defendant Bondi is one of the DOJ Defendants.

## STATEMENT OF FACTS

### *ICE Overturns Longstanding Policy Restricting Civil Immigration Arrests in Or Near Immigration Courts.*

18.    For decades, DHS agents—including at ICE and Customs and Border Protection ("CBP")—largely refrained from conducting civil immigration arrests at immigration courthouses, out of recognition that such arrests could deter noncitizens from attending mandatory court proceedings and disrupt the proper functioning of courts and fair administration of justice. When noncitizens do not attend their removal hearings, they receive a final order of removal *in absentia*,

leaving them with only a narrow and time-consuming path to reopen their proceedings which in turn administratively burdens the courts.

19.    This longstanding policy and practice was formalized on April 27, 2021, when then-Acting Directors of ICE and CBP circulated a memorandum to both agencies titled, "Civil Immigration Enforcement Actions in or near Courthouses." Memorandum from Tae Johnson, Acting Dir. of U.S. Immigr. & Customs Enf't & Troy Miller, Acting Comm'r of U.S. Customs and Border Prot., *Civil Immigration Enforcement Actions in or near Courthouses* (Apr. 27, 2021) ("April 27, 2021 ICE Memo"). The April 27, 2021 ICE Memo prohibited agents from conducting "civil immigration enforcement action . . . in or near a courthouse," including immigration courts, except under certain narrow circumstances. *Id.*

20.    Specifically, ICE was only permitted to conduct such arrests "if (1) [the immigration enforcement action] involve[d] a national security threat, or (2) there [was] an imminent risk of death, violence, or physical harm to any person, or (3) it involve[d] hot pursuit of an individual who poses a threat to public safety, or (4) there [was] an imminent risk of destruction of evidence material to a criminal case." *Id.* at 2. "In the absence of hot pursuit," ICE was only authorized to civilly arrest an individual "in or near a courthouse" on public safety grounds if "(1) it is necessary . . . because a safe alternative location for such action does not exist or would be too difficult to achieve the enforcement action at such a location, and (2) the action has been approved in advance by a Field Office Director, Special Agent in Charge, Chief Patrol Agent, or Port Director." *Id*.

21.    One of the core principles underlying the April 27, 2021 ICE Memo was that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses, and as a result, impair the fair administration of justice." *Id.* at 1. Consistent

with this policy, ICE largely refrained from executing civil immigration arrests at immigration courthouses during the years it was in effect.

22.    Following DHS's directive, on December 11, 2023, EOIR circulated a memorandum to all staff with the subject line, "Operating Policies and Procedures Memorandum 23-01: Enforcement Actions in or Near OCIJ Space." Memorandum from Sheily McNulty, Chief Immigr. Judge, *Operating Policies and Procedures Memorandum 23-01: Enforcement Actions in or Near OCIJ Space* (Dec. 11, 2023) ("December 11, 2023 EOIR Arrest Memo"). This memorandum concurred that immigration officials were prohibited from carrying out enforcement actions in or near the courthouses, echoing DHS's concerns that such arrests may chill noncitizens' access to the courts and interfere with the administration of justice.

23.    These policies largely aligned with the common-law privilege against courthouse arrests. The privilege prohibits civil arrests of individuals traveling to, attending, or returning from judicial proceedings, as well as civil arrests in or around courthouses. It serves to ensure that parties and witnesses are not deterred from attending such proceedings and promotes the fair administration of justice.

24.    Immigration courts are within the scope of the privilege. Congress created immigration courts with a mandate to impartially adjudicate noncitizens' claims in removal proceedings within the confines of numerous procedural and substantive safeguards.

25.    Not only have noncitizens relied on immigration courts to abide by their statutory mandate when seeking immigration relief, but they have also relied on the government's longstanding policy of refraining from conducting arrests at immigration courts in planning their daily lives and compliance with legal obligations.

26.    The actions of the Trump Administration have upended the normal operation of immigration courts. Prior to taking office, President Trump and his incoming administration promised to conduct mass arrests of noncitizens across the United States by "tak[ing] the handcuffs off ICE" for "light speed" immigration enforcement and deportations.[1] Consistent with this promise, the day after President Trump took office—January 21, 2025—DHS reversed course, issuing a new memorandum that expanded ICE's authority to conduct civil immigration arrests in and around courthouses.

27.    This new memorandum, issued to all ICE employees, rescinded the April 27, 2021 ICE Memo and was titled, "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses." Memorandum from Caleb Vitello, Acting Dir. of U.S. Immigr. & Customs Enf't, *Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses* (Jan. 21, 2025) ("Interim ICE Arrest Guidance"). The Interim ICE Arrest Guidance permits ICE officers to "conduct civil immigration enforcement actions in or near courthouses when they have credible information that leads them to believe the targeted alien(s) is or will be present at a specific location, and where such action is not precluded by laws imposed by the jurisdiction in which the enforcement action will take place." *Id.* at 2.

28.    The policy defines "targeted aliens" very broadly, "including but not limited to:" (1) "[n]ational security or public safety threats;" (2) "[s]pecific aliens with criminal convictions;" (3) "[g]ang members;" (4) "[a]liens who have been ordered removed from the United States but have failed to depart;" and/or (5) "[a]liens who have re-entered the country illegally after being

---

[1] AFP, *Trump administration plans mass arrests of undocumented immigrants next week, incoming 'border czar' says*, FORTUNE (Jan. 18, 2025), https://fortune.com/2025/01/18/trump-administration-mass-arrests-undocumented-immigrants-ice-raids-border-czar/; Nick Miroff, et al., *Deportation at 'light speed': How Trump's crackdown could unfold*, WASH. POST (Jan. 16, 2025), https://www.washingtonpost.com/immigration/interactive/2025/trump-immigrants-mass-deportations/.

removed." Further, the policy permits ICE to arrest other noncitizens, including "family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding," on a "case-by-case basis." *Id.*

29.    While the policy cautions that "ICE officers and agents should generally avoid enforcement actions in or near courthouses, or areas within courthouses that are wholly dedicated to non-criminal proceedings (e.g., family court, small claims court)," it nonetheless permits such arrests when operationally necessary or where there is approval from the Field Office Director or the Special Agent in Charge. *Id.* at 3. In practice, there appears to be no limit on who ICE will arrest at immigration courthouses.

30.    ICE issued the Interim ICE Arrest Guidance on the same day DHS rescinded limitations on DHS agencies, including ICE, relating to arrests of noncitizens in or near "sensitive" locations, such as churches and schools.[2] Around this same time, Acting DHS Secretary Benjamine Huffman issued a directive deputizing Department of Justice ("DOJ") law enforcement agencies to conduct immigration enforcement, a move characterized by the Secretary as "essential to fulfilling President Trump's promise to carry out mass deportations."[3] And President Trump ordered DHS to maximize the deputization of state and local law enforcement for immigration enforcement to assist with the administration's goals of deporting an unparalleled number of noncitizens.[4]

---

[2] Press Release, Dep't of Homeland Sec., *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse Humanitarian Parole* (Jan. 21, 2025), https://perma.cc/D8BR-6U2H; Memorandum from Benjamine C. Huffman, Acting Sec'y of DHS, to Caleb Vitello, Acting Director of ICE & Pete R. Flores, Senior Official Performing the Duties of the Comm'r of CBP, *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025), https://perma.cc/935P-UKBK.
[3] Press Release, Homeland Sec., *Statement from a DHS Spokesperson on Directive Expanding Immigration Law Enforcement to Some Department of Justice Officials* (Jan. 23, 2025), https://perma.cc/6DNQ-EA5C.
[4] Protecting the American People Against Invasion, THE WHITE HOUSE (Jan. 20, 2025), https://perma.cc/Y3DJ-BUCM.

31.    Following suit, EOIR also radically shifted its stance on courthouse arrests to mirror the Interim ICE Arrest Guidance. Three days after DHS rescinded its policy, on January 28, 2025, the Acting Director of EOIR issued a memorandum with the subject line, "Operating Policies and Procedures Memorandum 23-01: Enforcement Actions in or Near OCIJ Space to All Assistant Chief Immigration Judges, Immigration Judges, Court Administrators, and Court Personnel," cancelling the December 11, 2023 EOIR Memo and informing IJs that courthouse arrests would now be permissible given DHS's new guidance. Memorandum from Sirce E. Owen, Acting Dir. of Exec. of Immgr. Rev., *Cancellation of Operating Policies and Procedures Memorandum 23-01* (Jan. 28, 2025) ("January 28, 2025 EOIR Arrest Memo").

32.    By March 2025, the Trump Administration began to grow increasingly frustrated that the rate of deportations remained well below that which was needed to achieve one million deportations a year. The Administration's Border Czar, Tom Honan, told President Trump that the government "need[s] to increase the arrests," and that the arrest numbers were "not high enough."[5]

33.    In May 2025, as the number of deportations remained low, the government began to target noncitizens for arrest in places where they would be easy to locate, such as immigration courthouses, relying on ICE's newly expanded authority under the Interim ICE Arrest Guidance.

34.    During a meeting on May 21, 2025, the Trump Administration put intense pressure on federal law enforcement agencies to triple the number of daily arrests of noncitizens to at least 3,000 a day.

35.    Consistent with these directives, on May 27, 2025, the Acting Director of ICE circulated to all ICE employees a slightly revised and final version of the Interim ICE Arrest

---

[5] Hamed Aleaziz & Zolan Kanno-Youngs, *Trump Administration Is Frustrated Over Pace of Deportations*, N.Y. Times (Mar. 5, 2025), https://www.nytimes.com/2025/03/05/us/politics/trump-immigration-deportations-arrests.html.

Guidance, titled "Civil Immigration Enforcement Actions In or Near Courthouses." Memorandum from Todd M. Lyons, Acting Dir. of U.S. Immigr. & Customs Enf't, *Civil Immigration Enforcement Actions In or Near Courthouses* (May 27, 2025) ("ICE Courthouse Arrest Memo"). The final ICE Courthouse Arrest Memo is substantively the same as the Interim ICE Arrest Guidance, with one notable expansion: it removed a line limiting civil immigration arrests in courthouses "where such action is not precluded by laws imposed by the jurisdiction in which the enforcement action will take." *Compare* Interim ICE Arrest Guidance at 2, *with* ICE Courthouse Arrest Memo at 2. Thus, in its final form, the memo permits ICE to conduct civil immigration arrests at courthouses even if such arrests would violate local or state law.

36.     Following the adoption of the ICE Courthouse Arrests Memo, ICE began arresting noncitizens in record numbers, causing chaos both for families who were abruptly separated and for the noncitizens themselves, who were in many cases held incommunicado, unable to contact their loved ones for several days. Due to the increase in arrests and related overcrowding at many of its detention facilities, ICE has been detaining noncitizens swept up in immigration courthouse arrests in transitional holding facilities for prolonged periods—in some cases over a week—where they lack access to counsel and are in conditions wholly inadequate to safely and humanely detain people.

37.     Despite this predictable chaos, neither the Interim ICE Arrest Guidance nor final ICE Courthouse Arrest Memo discusses the concerns motivating ICE's prior policy: that civil immigration enforcement in and around immigration courts would chill noncitizens' access to courts and impede the fair administration of justice. Instead, the memoranda assert that enforcement at or near courthouses "can reduce safety risks to the public, targeted alien(s), and ICE officers and agents" and is required "when jurisdictions refuse to cooperate with ICE,

12

including when such jurisdictions refuse to honor immigration detainers and transfer aliens directly

to ICE custody." Interim ICE Arrest Guidance at 1; ICE Courthouse Arrest Memo at 1.

***EOIR Authorizes IJs to Dismiss Full Removal Proceedings in Violation of Substantive and Procedural Requirements.***

38.    To facilitate ICE's large-scale arrests at immigration courthouses, DHS

simultaneously directed its attorneys (hereinafter, "DHS attorneys") to move to dismiss large

categories of noncitizens' full removal proceedings. EOIR in turn issued a new policy expanding

the circumstances under which IJs may grant those motions to dismiss full removal proceedings.

39.    Noncitizens in full removal proceedings, governed by 8 U.S.C. § 1229a, have the

opportunity not only to challenge the charges of removability but also to apply for affirmative

relief, such as asylum or withholding of removal, so that they may remain in the United States.

Additionally, noncitizens in full removal proceedings have the opportunity to investigate and

prepare their cases, to retain and rely on the assistance of counsel, and to present and confront

evidence before IJs. 8 U.S.C. § 1229(b)(4). Following an IJ's decision, they also have the right to

bring an appeal before an administrative board and subsequently seek review by a federal circuit

court. *See* 8 U.S.C. § 1252(a); 8 C.F.R. §§ 1003.1(b), 1240.15.

40.    The INA provides that once full removal proceedings are initiated under Section

1229a, "a proceeding under this section shall be the sole and exclusive procedure for determining

whether an alien may be admitted to the United States or, if the alien has been so admitted, removed

from the United States." 8 U.S.C. § 1229a(3). Accordingly, noncitizens in full removal

proceedings rely on the fact that they will not be removed unless and until there is a final

determination of their removability by the agency or, where appealed, by a federal court.

41.    However, there are certain circumstances in which a noncitizen's full removal

proceedings may be dismissed. Pursuant to 8 C.F.R. § 1003.23(a), in order to move to dismiss full

removal proceedings, a DHS attorney must do so "in writing" and "state with particularity the grounds" for their request. Further, in permitting a noncitizen to respond, an IJ "may set and extend time limits" for this briefing. *Id.* Given that a failure to "timely respond" amounts to an "unopposed" motion, a noncitizen must be given the opportunity to challenge the dismissal of their proceedings. *See id.*

42.    EOIR also requires that that any filings pertaining to non-detained noncitizens' master calendar hearings—a scheduling hearing in immigration court—"must be submitted at least fifteen (15) days in advance of the master calendar hearing if requesting a ruling at or prior to the hearing," and "the response must be submitted within ten (10) days after the original filing with the immigration court" unless "otherwise specified by the [IJ]." Immigration Court Practice Manual, Chapter 3 § 3.1(b), (b)(1)(A), (b)(1)(B).[6] If a filing is "submitted less than fifteen days prior to a master calendar hearing," a noncitizen must be given an opportunity to respond, including at the master calendar hearing. *Id.*

43.    In addition to these procedural requirements, DHS attorneys may only move to dismiss full removal proceedings on the enumerated grounds laid out in 8 C.F.R. § 239.2(a). *See* 8 C.F.R. § 1239.2(c). Although DHS attorneys may move to terminate the proceedings on the basis that "continuation is no longer in the best interest of the government," they must also show that the "[c]ircumstances of the case have changed after the notice to appear was issued to such an extent" that it warrants dismissal. 8 C.F.R. § 239.2(a)(7).

44.    Despite these long-established substantive and procedural rules, on May 30, 2025, Acting Regional Deputy Chief IJs Kevin Riley and Philip Taylor issued guidance to Assistant Chief IJs in the form of an email with the subject line "Guidance on Case Adjudication,"

_____

[6] *Available at* https://www.justice.gov/eoir/reference-materials/ic/chapter-3/1.

14

instructing them to disregard these requirements. Memorandum from Kevin Riley & Philip Taylor, Acting Reg'l Deputy Chief Immigr. Judges, *Guidance on Case Adjudication* (May 30, 2025) ("EOIR Dismissal Memo"). Issued just as the government dramatically increased arrests at immigration courthouses, the EOIR Dismissal Memo informs IJs that DHS is "carrying out enforcement actions in or near EOIR space" and moving to dismiss pending cases on account of the Administration's new enforcement priorities and case backlog reduction efforts. *Id.*

45.     Given these "recent developments," and to "ensure the expeditious adjudication of cases," the memo advises that "DHS Motions to Dismiss may be made orally and decided from the bench. No additional documentation or briefing is required." *Id.* Further, it instructs that "[g]enerally, if DHS has met the regulatory burden, the oral motion to dismiss may be granted. A 10-day response period is not required." *Id.* This guidance directly contradicts the procedural notice and opportunity to respond requirements laid out in 8 C.F.R. § 1003.23(a) and the Immigration Court Practice Manual.

46.     In addition, the EOIR Dismissal Memo states that DHS's regulatory burden is met pursuant to "INA 239.2(a)(7)" [*sic*] (8 C.F.R. § 239.2(a)(7)) if the agency can prove that "circumstances have changed to such an extent that continuation is no longer in the best interest of the government." *Id.* However, this omits key language from the cited regulation: "changed circumstances of *the case*." 8 C.F.R. § 239.2(a)(7) (emphasis added). By failing to provide this qualification, the memo suggests that *any* changed circumstances—such as new enforcement priorities or case backlogs—may warrant dismissal, rather than developments pertinent to the individual's immigration case. *See id.*

47.     Thus, in both obfuscating the scope of and minimizing the procedural requirements for motions to dismiss, the EOIR Dismissal Memo expands the grounds and circumstances under

which IJs may terminate an individual's full removal proceedings and thereby deny that individual the ability to contest their removal and seek immigration relief, including humanitarian relief such as asylum. While noncitizens can technically appeal their dismissals, noncitizens who are detained face significant challenges in doing so given lack of access to counsel, as well as the fact that they must remain detained during their proceedings.

***The Government Aggressively Implements Its Expanded Authority Under the New Policies.***

48.     Following the creation of these two policies, the government has aggressively implemented a new enforcement initiative targeting noncitizens in full removal proceedings at immigration courthouses. The initiative, occurring in both New York and throughout the country, has two major components.

49.     *First*, in immigration court hearings, DHS attorneys move to dismiss individuals' full removal proceedings, with no advance notice or written papers, during noncitizens' mandatory master calendar hearings. Relying on 8 C.F.R § 239.2(a)(7), DHS attorneys assert that "changed circumstances" warrant dismissal without identifying any changes specific to the individual's case.

50.     Pursuant to the EOIR Dismissal Policy, IJs permit DHS attorneys to move to dismiss orally, in court, without a written motion, and frequently adjudicate these motions on the spot without allowing the noncitizen to file a written opposition.

51.     Also pursuant to the EOIR Dismissal Policy, many IJs are granting these motions to dismiss without requiring DHS to identify case-specific changed circumstances and without regard to pending applications for relief from removal. IJs rarely inform those before them that dismissing their proceedings will subject them to arrest and potential rapid deportation. The DOJ has made clear that IJs must grant these motions or risk termination.

16

52.    *Second*, pursuant to the ICE Courthouse Arrest Policy, ICE officers—in coordination with DHS attorneys—station themselves in immigration court, including in the hallways or even in courtrooms, so that they can immediately arrest and detain individuals upon conclusion of their court hearings. As soon as noncitizens leave the courtroom, they are forcefully grabbed and arrested, often by masked agents in plain clothes. Officers refuse to identify themselves and often fail to confirm the identities of the individuals they are seizing. These arrests are chaotic and traumatic, with noncitizens and their loved ones pleading with ICE to release them.

53.    ICE is arresting individuals *irrespective* of whether the IJ dismisses their full removal proceedings. As a result, even those with ongoing removal proceedings are being arrested by ICE, leaving them and their families confused on how to proceed with their case in light of their sudden arrest.

54.    This unprecedented initiative appears to be driven by the Trump Administration's imposition of a daily quota of 3,000 ICE arrests. As a result of these policies, civil immigration arrests in immigration courts and summary dismissals of full removal proceedings are now occurring at record rates throughout the country. For example, within the first ten days of June alone, ICE arrested 495 people in New York City—more than twice the arrests it made in the area for all of June last year. The arrests are also unprecedented in another respect: they target people once protected from immigration enforcement—noncitizens who have established ties to the United States and no criminal history.

***The Challenged Policies Inflict Numerous Harms on Plaintiffs.***

55.    These new policies have made immigration courthouses sites of uncertainty and terror. In attending their mandatory hearings, Plaintiffs' members are now at risk of arrest, detention, loss of employment, separation from family members, and deportation. These threats

undeniably chill Plaintiffs' members from appearing for those mandatory court proceedings, forcing them to make an impossible choice: either face these harms and attempt to participate in their ongoing immigration cases or live in the shadows with an *in absentia* removal order hanging over their heads. Further, without advance notice of the government's intent to dismiss their full removal proceedings, noncitizens are often unprepared to challenge DHS attorneys' motions and to fight to continue pursuing asylum and other immigration relief given IJs' swift adjudication of these motions. Thus, even though the circumstances of Plaintiffs' members' individual cases have not changed, they now stand to lose everything without any recourse.

56.    **The Door.** Defendants' new policies have directly interfered with The Door's core activities and frustrated its mission.

57.    The Door has long engaged in core activities supporting young people who are not U.S. citizens and who are seeking immigration relief, including by providing them with legal advice and representation. Attorneys at The Door's Legal Services Center provide full-scope representation to unaccompanied children and young adults in removal proceedings in New York and makes holistic representation available to noncitizen members so they can pursue various forms of immigration relief, such as Special Immigrant Juvenile Status ("SIJS") and asylum. The Door also holds a weekly drop-in legal clinic where attorneys provide limited-scope assistance and advice to members regarding their immigration cases.

58.    Since Defendants implemented the ICE Courthouse Arrest Policy and the EOIR Dismissal Policy, the number of people seeking urgent legal advice at The Door's drop-in legal clinic has increased so dramatically that The Door has to bring more staff to the clinic. As a result, these staff members must step away from their pre-existing work providing full scope representation for clients.

59.    In addition, the types of services most frequently requested at The Door's drop-in legal clinic since the new policies went into effect are different and more time-consuming than the services previously sought at the clinic. The Door has had to develop new Know Your Rights materials in the languages most spoken by its members and to devote time and resources to screening members for courthouse arrest and/or vulnerability to having their removal proceedings dismissed so it can provide those at risk with personalized advice. The Door's legal team has also had to devote additional time and resources to assisting members, who have upcoming immigration court hearings, draft and file motions to appear remotely at their hearings to protect them from being arrested when they attend. Because it is so dangerous for noncitizens to go to immigration court due to the risk of arrest, and *pro se* motions generally must be filed in person, The Door staff must physically go to court to file these motions on their members' behalf.

60.    As The Door staff often do not have time to help every member who needs to make a motion to appear remotely during clinic hours, staff are forced to schedule meetings with members during non-clinic hours to assist them with drafting and filing their motions. The Door has also had to schedule additional legal clinic hours solely for the purpose of helping members with motions to appear virtually at their upcoming immigration case hearings.

61.    Because of the increased time required to undertake all of these projects and respond to the increased demand for legal advice at The Door's drop-in clinic, The Door staff are pulled away from their preexisting work providing full representation to members—the core work The Door was engaged in before Defendants implemented their new policies.

62.    Additionally, because the EOIR Dismissal Policy prevents noncitizens from pursuing relief in their full removal proceedings, this policy frustrates The Door's mission of helping noncitizen members secure any immigration benefits or humanitarian immigration relief

19

for which they are eligible. For example, The Door attorneys prepare and file SIJS petitions on behalf of hundreds of Door members each year. SIJS classification is only available to people who reside in the United States both at the time that the petition is filed and at the time U.S. Citizenship and Immigration Services ("USCIS") decides the petition. Defendants' new policies will therefore result in the detention and eventual deportation of Door members with meritorious pending or future SIJS petitions who will lose the opportunity to obtain SIJ classification because they will be outside of the United States when USCIS grants their petition, undermining Door attorneys' prior and ongoing efforts to help members obtain SIJ classification.

63.    In addition, members of The Door have been personally harmed by the new policies.

64.    For example, one Door member, John Doe 1, is a twenty-one-year-old noncitizen who entered the United States at nineteen years old to seek asylum. He filed a timely asylum application as well as a SIJS application based on the death of his father and neglect by his mother. In June 2025, John Doe 1 attempted to attend his master calendar hearing remotely, but the IJ presiding over his case ordered him to appear in person. However, when he went to court for the hearing, the DHS attorney moved to dismiss his full removal proceedings, which the IJ granted over John Doe 1's objection. ICE immediately arrested John Doe 1 and detained him. He is now being held at the Metropolitan Detention Center (MDC). Before his arrest, John Doe 1 was enrolled in two different English classes with the goal of eventually earning his high school equivalency diploma. He dreamed of someday working in the medical field. Now, he fears he will be deported to a country where he faces harm. If he is removed from the United States before his SIJS application is adjudicated, he will forever lose the opportunity to obtain SIJS relief.

65.    Other Door members are in full removal proceedings and have upcoming mandatory in-person-hearings, where they will risk having their cases dismissed and being arrested by ICE. One such member, John Doe 2, is a noncitizen who entered the United States at nineteen years old seeking asylum. He has a pending asylum application. John Doe 2 came to The Door's drop-in legal clinic seeking advice in June 2025, as he was afraid to attend an upcoming immigration court appearance due to the ICE Courthouse Arrest Policy. The Door helped him make a motion to appear virtually at his hearing. John Doe 2 is currently scheduled to appear virtually at his next hearing in August 2025, but he may have future hearings at which he will be required to appear in person. John Doe 2 works in a restaurant, attends English classes, and has a strong community of friends in New York.

66.    Another member, John Doe 3, is a noncitizen who entered the United States at eighteen years old in order to seek asylum. He has a pending asylum application. There is an in-person hearing scheduled in John Doe 3's immigration case in February 2026. John Doe 3 is enrolled in a transfer high school in Manhattan where his favorite subject is math. He hopes to pursue a career in the medical field that allows him to help others and give back to the community.

67.    Another Door member, John Doe 4, is a noncitizen who entered the United States when he was twenty-two years old in order to seek asylum. He has a pending asylum application. John Doe 4 has an upcoming immigration court appearance in August 2025 and fears that if he attends in person, he will be arrested by ICE. The Door helped John Doe 4 draft a *pro se* motion to permit a virtual appearance and filed the motion on his behalf. The motion has not yet been decided. If the motion is not granted before John Doe 4's upcoming appearance, he faces the prospect of attending the hearing and risking the dismissal of his case, arrest, and detention, or

risks not attending and almost certainly having an order of removal *in absentia* entered against him.

68.    Another Door member, John Doe 5, is a noncitizen who entered the United States at nineteen years old, seeking asylum. He has a pending asylum application and is also pursuing SIJS classification. John Doe 5 has an upcoming immigration court appearance in September 2025 and is afraid that he will be arrested and detained by ICE if he appears in person. The Door helped John Doe 5 draft a *pro se* motion to permit a virtual appearance and filed the motion on his behalf. The motion has not yet been decided. He does not know what he will do if it is not decided before his hearing date. John Doe 5 is in an electrician job training program and is also working toward earning his High School Equivalency Diploma.

69.    One other Door member, John Doe 6, is a noncitizen who entered the United States at nineteen years old in order to seek asylum. He has a pending asylum application. John Doe 6 came to The Door's drop-in legal clinic seeking assistance because he feared he would be arrested at his upcoming immigration court appearance in August 2025. The Door helped John Doe 6 draft a *pro se* motion to permit virtual appearance and filed the motion on his behalf. The motion has not yet been decided. John Doe 6 currently works in food delivery and hopes to pursue a career in construction.

70.    **ACT.** ACT's members have also been harmed by Defendants' policies.

71.    For example, one ACT member, John Doe 7, is a twenty-seven-year-old noncitizen who filed for asylum shortly after entering the United States. John Doe 7 went to court to attend a master calendar hearing in his immigration case in June 2025. After the proceeding concluded, he was arrested by ICE. He has been transported to Texas where he is currently being detained at the Joe Corley Detention Center. Before his arrest, John Doe 7 had begun building a stable life for

22

himself in New York. He had received his Employment Authorization Document and was working at Amazon, living with his uncle in the Bronx, and attending school. Now, John Doe 7 is separated from his family, languishing in detention in an overcrowded facility, and suffering from severe headaches and hallucinations. He has received no medical or mental health care while detained.

72.    Other ACT members are in removal proceedings and have upcoming hearings that they must attend in person, where they will risk having their cases dismissed and being arrested by ICE. One such member, John Doe 8, is a twenty-seven-year-old noncitizen who has an upcoming master calendar hearing in his removal proceedings in October 2025. He has filed a motion requesting permission to attend the hearing virtually, but the presiding IJ has not yet ruled on it. John Doe 8 feels constant, overwhelming fear that he will be arrested and detained by ICE when he attends his hearing. John Doe 8 is currently attending ESL classes to improve his English and working different jobs, including food delivery, to support himself.

73.    Another ACT member, Jane Doe 1, is a forty-two-year-old noncitizen who has a pending asylum application. ACT has provided Jane Doe 1 with assistance with her asylum case. Jane Doe 1 has an upcoming master calendar hearing in her removal proceedings scheduled to take place in person in August 2025. Jane Doe 1 filed a motion to appear at the hearing virtually, but it was denied. Jane Doe 1 experiences extreme anxiety when she thinks about going to court, as she fears she will be arrested and detained. She is currently working as a hairdresser, attending ESL classes, and studying to become a home healthcare aid.

74.    One other ACT member, Jane Doe 2, is a forty-three-year-old noncitizen who came to the United States with her husband and their four children, who were three, five, nine, and eighteen years old when they entered the country. She and her family are in removal proceedings and have a pending application for asylum. Jane Doe 2 and her family have an upcoming master

calendar hearing in February 2026. When Jane Doe 2 went to court for a prior appearance, the IJ presiding over her case stated that individuals appearing *pro se* would not be permitted to appear virtually. As Jane Doe 2 and her family do not have an attorney, nor the funds to pay for one, she will need to attend her February 2026 hearing in person unless she is able to find free legal representation. Jane Doe 2 and her husband have experienced severe emotional and psychological distress about the prospect of going to court, getting arrested by ICE, and being separated from their children. Their anxiety has been so extreme that at times they can barely sleep at night. Jane Doe 2's children are in school in New York City, and her oldest child has been accepted to college to pursue a career in medicine.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A):
### The ICE Courthouse Arrest Policy Is Arbitrary and Capricious
### *Count Raised by All Plaintiffs Against All DHS Defendants*

75.     Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this Complaint as if fully set forth herein.

76.     The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

77.     The ICE Courthouse Arrest Policy is arbitrary and capricious because, in adopting it, Defendants have failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; entirely failed to consider important aspects of the problem or reasonable alternatives; and offered explanations for their decision that run counter to the evidence before the agency.

## SECOND CLAIM FOR RELIEF
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C); Immigration and Nationality Act**
**The ICE Courthouse Arrest Policy Exceeds Statutory Authority**
*Count Raised by All Plaintiffs Against All DHS Defendants*

78.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this Complaint as if fully set forth herein.

79.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

80.    The ICE Courthouse Arrest Policy violates the common law privilege against courthouse arrests incorporated into the INA.

## THIRD CLAIM FOR RELIEF
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C); *Accardi***
**The EOIR Dismissal Policy Violates the *Accardi* Doctrine**
*Count Raised by All Plaintiffs Against All DOJ Defendants*

81.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this Complaint as if fully set forth herein.

82.    "[G]overnment agencies are generally required to follow their own regulations." *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)).

83.    The EOIR Dismissal Policy violates the *Accardi* Doctrine because, in enacting it, Defendants violate their own regulations and rules.

## FOURTH CLAIM FOR RELIEF
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C); Immigration and Nationality Act**
**The EOIR Dismissal Policy Is Arbitrary and Capricious**
*Count Raised by All Plaintiffs Against All DOJ Defendants*

84.     Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this Complaint as if fully set forth herein.

85.     The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

86.     Among other reasons, the EOIR Dismissal Policy is arbitrary and capricious because, in adopting it, Defendants have disregarded their own regulations and rules and because they have failed to articulate a reasoned explanation for the new policy and entirely failed to consider important aspects of the problem.

## FIFTH CLAIM FOR RELIEF
**Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution (Procedural Due Process); Administrative Procedure Act 5 U.S.C. §§ 702, 706**
**The EOIR Dismissal Policy Violates Due Process**
*Count Raised by All Plaintiffs Against All DOJ Defendants*

87.     Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this Complaint as if fully set forth herein.

88.     The Fifth Amendment to the U.S. Constitution provides that "[n]o person . . . shall be . . . deprived of life, liberty, or property without due process of law." U.S. Const., amend. V.

89.     The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

90.     The EOIR Dismissal Policy authorizes and encourages the dismissal of proceedings without providing noncitizens with timely notice or a meaningful opportunity to be heard. The

resulting dismissals strip noncitizens of critical rights and procedural protections that are available in full removal proceedings under 8 U.S.C. § 1229a.

91.    The due process clause extends to all people, regardless of their citizenship status. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). And at its most basic level, it offers notice and an opportunity to respond to government actions. *E.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Because the EOIR Dismissal Policy deprives noncitizens of notice and a meaningful opportunity to be heard before depriving them of protected private interests, it violates the due process clause of the Constitution.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs hereby request that the Court:

a.    Assume jurisdiction over this case;

b.    Declare that the ICE Courthouse Arrest Policy is arbitrary and capricious and contrary to law;

c.    Vacate and set aside the ICE Courthouse Arrest Memo under 5 U.S.C. § 706(2);

d.    Exercise the Court's authority under 5 U.S.C. § 705 to provide relief pending review of the ICE Courthouse Arrest Policy;

e.    Declare that the EOIR Dismissal Policy is arbitrary and capricious, contrary to law, and contrary to constitutional right;

f.    Declare that the EOIR Dismissal Policy violates the Fifth Amendment to the U.S. Constitution;

g.    Vacate and set aside the EOIR Dismissal Policy under 5 U.S.C. § 706(2);

h.    Exercise the Court's authority under 5 U.S.C. § 705 to provide relief pending review of the EOIR Dismissal Policy;

i.    Award the Plaintiffs reasonable attorney's fees and costs; and

j.    Grant such other and further relief as the Court deems just and equitable.

Dated: August 1, 2025
    New York, New York

  Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
    /s/
Amy Belsher
Elizabeth Gyori
Wafa Junaid
Claire Molholm*
Thomas Munson
M. Porter**
Robert Hodgson
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3300

EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP
    /s/
Katherine Rosenfeld
Samuel Shapiro
Emily Wanger
One Rockefeller Plaza, 8th Floor New
York, NY 10020
Tel: (212) 763-5000

 * Admission pending
 **Pro hac vice application forthcoming

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
    /s/
Noor Zafar
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
    /s/
Michael K.T. Tan
Hannah Steinberg
Oscar Sarabia Roman
425 California St., Suite 700
San Francisco, CA 94104
Tel: (415) 343-0770

MAKE THE ROAD NEW YORK
    /s/
Harold Solis
Paige Austin
301 Grove Street
Brooklyn, NY 11237
Tel: (718) 418-7690

*Counsel for Plaintiffs*