**NYCLU**
ACLU of New York

August 7, 2025

**Via ECF**
The Honorable P. Kevin Castel
United States District Judge
United States District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:   *African Communities Together et al. v. Lyons et al.*, 25-cv-06366-PKC
              Pre-Motion Letter and Joint Proposed Briefing Schedule

Dear Judge Castel:

      We represent Plaintiffs—African Communities Together ("ACT") and The Door—and their members in this case challenging the government's unprecedented campaign of targeting noncitizens at their immigration court proceedings, depriving them of their right to seek relief from removal in regular proceedings, and subjecting them to immediate arrest. We write pursuant to this Court's Rule 3(A) to respectfully request permission to file a motion to stay the arrest and dismissal policies Plaintiffs challenge pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 705. Many of Plaintiffs' members have hearings scheduled in the coming days and weeks and now face an impossible choice: attend court and risk immediate arrest, detention, and deportation—or stay home and be ordered removed *in absentia*. This unlawful dilemma, and the uncertainty it creates for individuals attempting to comply with the law, underscores the urgent and irreparable harm at stake. Given these circumstances and Plaintiffs' strong likelihood of success on the merits, we also respectfully request that the Court waive further pre-motion filing requirements and permit Plaintiffs to file their motion immediately.

      **Subject to the Court's permission, the government does not object to Plaintiffs' request to proceed directly to briefing, and the parties have agreed on the following briefing schedule: Plaintiffs file their motion on Monday, August 11; Defendants file their opposition on or before Wednesday, August 20; and Plaintiffs file their reply on or before Monday, August 25.**

    **I.**    **BACKGROUND**

      Plaintiffs challenge two unlawful policies under the APA: (1) a U.S. Immigration and Customs Enforcement ("ICE") policy that abandons restrictions on courthouse arrests that ICE had previously adopted to ensure access to the courts and broadly authorizes arrests at immigration courthouses ("ICE Courthouse Arrest Policy"); and (2) an Executive Office of Immigration Review ("EOIR") policy encouraging Immigration Judges ("IJs") to depart from the agency's own regulations and policy to expediently dismiss noncitizens' regular removal proceedings without any meaningful process ("EOIR Dismissal Policy").

Specifically, the ICE Courthouse Arrest Policy reverses a decades-long policy that largely prohibited Department of Homeland Security ("DHS") agents, including ICE and Customs and Border Protection ("CBP") agents, from conducting civil immigration arrests in and around immigration courthouses. In formally memorializing and enacting this policy, the previous administration recognized that courthouse arrests would deter noncitizens from attending mandatory court proceedings and disrupt the proper functioning of courts and the fair administration of justice. *See* ECF 1 ¶¶ 18–37. However, ICE's new policy abandons the previous policy while failing to even acknowledge, much less account for, the agency's prior reasoning for prohibiting such arrests. *Id*. ¶¶ 21, 37.

Similarly, the EOIR Dismissal Policy expands the circumstances under which IJs may dismiss full removal proceedings. The new policy instructs IJs to permit DHS attorneys to make motions to dismiss orally; for IJs to decide such motions from the bench without additional documentation, briefing, or a response from noncitizens; and for IJs to permit dismissal on evidence of "changed circumstances"—a broad term that the policy does not define. *See id*. ¶¶ 38–47. However, this policy directly contravenes 8 C.F.R. § 1003.23(a), which requires that such motions be made "in writing" and "state with particularity the grounds therefor," and EOIR's own rules, which require that such motions be submitted at least fifteen days in advance of the hearing, Immigration Court Practice Manual, Chapter 3 §§ 3.1(b), (b)(1)(A), (b)(1)(B), *available at* https://www.justice.gov/eoir/reference-materials/ic/chapter-3/1. Further, the EOIR Dismissal Policy misrepresents DHS's burden by omitting key language from the governing regulation: "changed circumstances of *the case*," 8 C.F.R. § 239.2(a)(7), which requires that the changes warranting dismissal must relate to the specific individual's immigration case. As a result, IJs are now permitting DHS attorneys to make oral motions to dismiss noncitizens' full removal proceedings, with no advance notice or written papers, based on DHS's vague assertions that "changed circumstances" warrant dismissal, without requiring that DHS identify any changes pertaining to the individual's case. Making matters worse, the individuals targeted under this policy are often unrepresented and, therefore, unable to meaningfully challenge DHS's dismissal motion.

Following the adoption of these two policies, the government has aggressively implemented a new enforcement initiative at immigration courthouses in New York and throughout the country. This initiative specifically targets people who are in full removal proceedings, who are pursuing asylum and/or other relief before an IJ. These proceedings are the primary forum through which individuals assert statutory and constitutional defenses to removal and seek forms of relief such as asylum, cancellation of removal, and adjustment of status. Noncitizens in these proceedings are entitled to critical procedural safeguards, including the right to present evidence, examine witnesses, be represented by counsel, receive a written decision, and seek judicial review. *See* 8 U.S.C. §§ 1229a(b)(4)(B), 1252(a)(2)(D); 8 C.F.R. §§ 1003.37, 1240.13(a).

The campaign requires that (1) DHS attorneys move—often orally and without advance written notice or any showing of individualized "changed circumstances"—to dismiss noncitizens' full removal proceedings; and that (2) ICE agents—in coordination with DHS attorneys—station

themselves throughout immigration court, including in the hallways, elevator banks, or even in courtrooms, so that they can immediately arrest and detain individuals at their court hearings. *See* ECF 1 ¶¶ 48–54. Many of the agents carry out these arrests in plain clothes, masked, and refuse to identify themselves, heightening fear and confusion for families and counsel. *See id*. ¶¶ 48–54. ICE's and EOIR's new policies have transformed immigration courthouses into sites of uncertainty and terror: noncitizens, like Plaintiffs' members, who seek to comply with their legal obligations and attend their mandatory court hearings, now risk arrest, detention, loss of employment, separation from family members, and deportation. *Id.* ¶¶ 55–74.

## II.     PLAINTIFFS ARE ENTITLED TO A STAY OF THESE TWO UNLAWFUL POLICIES UNDER 5 U.S.C. § 705

The APA authorizes district courts to "postpone" agency actions "to the extent necessary to prevent irreparable injury," or to otherwise issue a stay "to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "Courts . . . routinely stay already-effective agency action under Section 705." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (citing, *inter alia*, *West Virginia v. EPA*, 577 U.S. 1126 (2016) (mem. op.)). To obtain relief under § 705, Plaintiffs must show that (1) they will likely succeed on the merits, (2) they will likely suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) postponement is in the public interest. *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 149 (S.D.N.Y. 2019) (noting the standard for a stay of agency action under § 705 is the same standard as a preliminary injunction). Plaintiffs meet all the requirements for the requested relief here.

### A. Plaintiffs and their members face immediate and irreparable harm.

The government's implementation of the ICE Courthouse Arrest Policy and EOIR Dismissal Policy is causing irreparable harm to Plaintiffs and their noncitizen members, since without a stay, they face the prospect of detention, family separation, and removal, as well as the loss of their right to pursue pending claims for immigration relief. Every day that these policies remain in place, noncitizens face a Catch-22: they must choose between facing arrest and dismissal of their removal proceedings or risking an *in absentia* removal order for failing to attend their mandatory hearings. *See* ECF 1 ¶¶ 55, 67

Plaintiffs' motion will be supported by declarations, exhibits, and the government's own data and public statements demonstrating that the scale of the harm caused by the challenged policies is massive and growing; civil immigration arrests in immigration courts and removal proceeding dismissals are now occurring at unprecedented rates throughout the country, with New York City at the epicenter. At least two members of Plaintiffs ACT and The Door[1] have already been arrested and detained despite their pending asylum applications, and one of them has had his removal proceedings dismissed. These members now face potential deportation. Cumulatively, Plaintiffs have at least seven additional members with in-person immigration court hearings this

---

[1] Plaintiffs intend to file declarations prepared by these organizational Plaintiffs that lay out in full detail how their members have been impacted by this abrupt change in policy.

week and next. Without immediate relief, many of them will be prevented from litigating their right to remain in the United States and will lose access to adjudication of their asylum, cancellation of removal, or adjustment-of-status claims. Instead, they will face immediate arrest, detention, and imminent deportation under a truncated process that offers far fewer protections than full removal proceedings.

Courts routinely find that irreparable harm flows from the threat of immigration detention, *see Velesaca v. Decker*, 458 F. Supp. 3d 224, 240–41 (S.D.N.Y. 2020) ("Several courts in this circuit have . . . concluded that the deprivation of an alien's liberty is, in and of itself, irreparable harm."), family separation, *see Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232, 268 (S.D.N.Y. 2020) (finding that "indefinite family separation" has been "recognized . . . as a form of irreparable injury"), removal, *see Woodby v. I.N.S.*, 385 U.S. 276, 286 (1966) (explaining the "immediate hardship of deportation"), and the loss of ability to pursue immigration relief due to dismissal of proceedings, *see Calderon v. Sessions*, 330 F. Supp. 3d 944, 958 (S.D.N.Y. 2018) (holding unlawful the government's attempt "to strip [non-citizens'] right to engage in an immigration process made available to [them]"). Plaintiffs' requested stay is thus appropriate "to prevent irreparable injury" and to "preserve [their] status or rights pending conclusion of" this litigation. 5 U.S.C. § 705.

### B. <u>Plaintiffs are likely to succeed on the merits of their claims.</u>

#### 1. The ICE Courthouse Arrest Policy violates the APA because it is arbitrary and capricious and contrary to law.

The Courthouse Arrest Policy is arbitrary and capricious because it (1) completely departs from prior agency policy without any reasoned explanation and without considering important reliance interests, and (2) fails to consider important aspects of the problem as well as reasonable alternatives. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (agency changing position must "show that there are good reasons for the new policy" and balance those good reasons against "engendered serious reliance interests"); *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 57 (1983) (an agency action is arbitrary and capricious when the agency has, *inter alia*, "entirely failed to consider an important aspect of the problem" and did not articulate a "rational connection between the facts found and the choice made" (cleaned up)).

ICE's prior policy generally prohibited civil arrests at immigration courthouses to ensure that noncitizens were not chilled from accessing the courts and to protect the fair administration of justice. The government has now completely abandoned that policy and has provided *no* explanation of why it has done so, in violation of the APA. *See* ECF 1 ¶¶ 21, 26–29, 35–37. ICE has further failed to balance its reasons for the new policy against the "engendered serious reliance interests" of noncitizens and court officials who have long relied on the expectation that noncitizens could appear in immigration court to vindicate their rights and interests without risk of civil arrest. *Encino*, 579 U.S. at 222 (cleaned up). Noncitizens have long attended immigration court without having to make arrangements in their daily lives in case of arrest—including decisions concerning childcare, elder care, employment, healthcare and much more—while courts

have set deadlines, managed their dockets, and ensured decorum with an understanding that arrests would not affect these judicial practices. *See id*. ¶¶ 21, 26–29, 35–37.

Similarly, ICE has violated the APA by failing to consider important aspects of the problem: namely, how its new policy will chill access to immigration courts and impede the fair administration of justice. *State Farm*, 463 U.S. at 52, 54 (explaining that to engage in "reasoned decisionmaking," agencies must "look at the costs as well as the benefits" flowing from their actions). The agency has further failed to consider reasonable alternatives, as the APA requires, such as conducting arrests away from immigration courthouses. *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1912 (2020) ("when an agency rescinds a prior policy its reasoned analysis must consider the alternative[s] that are within the ambit of the existing [policy]" (cleaned up)).

Finally, the ICE Courthouse Arrest Policy violates the longstanding common law privilege against courthouse arrests. 5 U.S.C. § 706(2)(C); *see also* ECF 1 ¶¶ 23–25. "[I]t is patently clear that English common law provided a privilege against any civil arrests in and around courthouses, and also against civil arrests of witnesses and parties necessarily traveling to and from the courthouse." *State v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 388 (S.D.N.Y. 2019). American common law incorporated—and expanded—this privilege. *See, e.g.*, *id.* at 389–90. As recognized by the Supreme Court, the privilege at English and American common law alike served the same core purpose—the fair administration of justice—by ensuring (1) that parties and witnesses were not deterred from coming forward and (2) that courts operate properly, with decorum and order. *State*, 431 F. Supp. 3d at 391–92; *Stewart v. Ramsay*, 242 U.S. 128, 129–30 (1916) (explaining object of the privilege was the fair administration of justice). "[T]he proper test [for application of the privilege] is . . . whether the privilege will promote the purposes of justice." *Dwelle v. Allen*, 193 F. 546, 548–49 (S.D.N.Y. 1912).

The INA incorporates the privilege and applies it here. As the Supreme Court has explained, "statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *United States v. Texas*, 507 U.S. 529, 534 (1993) (cleaned up). Here, the privilege has long been incorporated into American common law, and the provisions of the INA that govern ICE's arrest authority, 8 U.S.C. § 1226(a) and 8 U.S.C. § 1357(a)(2), do not include a clear statement abrogating it. Thus, the privilege applies to constrain the exercise of ICE's civil arrest authority. Here, it specifically prohibits ICE from conducting civil immigration arrests in and around immigration courthouses because application of the privilege to such courts "will promote the purposes of justice," *Dwelle*, 193 F. at 548–49. *See* ECF 1 ¶¶ 36, 65–69, 72–74 (discussing harms of the ICE Courthouse Arrest Policy). As such, the ICE Courthouse Arrest Policy is "in excess of statutory jurisdiction" and violates the APA. 5 U.S.C. § 706(2)(C).

### 2. The EOIR Dismissal Policy violates the *Accardi* Doctrine and is arbitrary and capricious.

EOIR's Dismissal Policy is arbitrary and capricious because it (1) violates the agency's own regulations and guidance, (2) offers no reasoned explanation for the policy's significant

5

departure from the plain language and settled interpretation of the regulations, and (3) fails to consider the full impact of the new policy. First, "[u]nder deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)). An *Accardi* violation occurs when an agency's failure to follow its own rules implicates "individual interests." *Montilla v. I.N.S.*, 926 F.2d 162, 170 (2d Cir. 1991); *see, e.g.*, *Abdi v. Duke*, 280 F. Supp. 3d 373, 389 (W.D.N.Y. 2017) (ICE bound by internal directive intended to protect noncitizens' procedural rights).

Here, binding EOIR regulations and the Immigration Court Practice Manual govern the disposition of DHS motions to dismiss and provide noncitizens with procedural rights, including notice and a meaningful opportunity to contest the dismissal of their proceedings. Under these binding rules, the government may seek dismissal of full removal proceedings only on the specific grounds enumerated by regulation, including where "[c]ircumstances of the case have changed" such that "continuation is no longer in the best interest of the government," 8 C.F.R. § 239.2(a)(7); and that all pre-decision motions, such as motions to dismiss, must be submitted in writing, state the grounds for the motion with particularity, and give parties an opportunity to respond, 8 C.F.R. § 1003.23; Practice Manual §§ 3.1(b)(1)(A)–(B), 3.2. *See* ECF 1 ¶¶ 38–43. EOIR's Dismissal Policy directly contradicts these extant agency rules by allowing the government to make generalized motions to dismiss orally, denying noncitizens an opportunity to respond, and instructing IJs to dismiss proceedings without an individualized inquiry, *see id.* ¶¶ 44–51, in violation of the *Accardi* doctrine. The harm to individual rights is heightened here since full removal proceedings provide the primary forum through which individuals assert statutory and constitutional defenses to removal and seek relief from removal, including through asylum, and since noncitizens in these proceedings possess a panoply of procedural rights. *See* 8 U.S.C. §§ 1229a(b)(4)(B), 1252(a)(2)(D); 8 C.F.R. §§ 1003.37, 1240.13(a).

Second, for many of the same reasons the EOIR Dismissal Policy is unlawful under the *Accardi* doctrine, it is also arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A). An agency disregarding its own regulations acts arbitrarily and capriciously. *See Beechwood Restorative Care Ctr. v. Thompson*, 494 F. Supp. 2d 181, 202 (W.D.N.Y. 2007) (collecting cases); *see also United States v. Schiller*, 81 F.4th 64, 71 (2d Cir. 2023) (acknowledging that an agency's failure to follow its own regulations or procedures is grounds for vacatur of agency action). EOIR's guidance is also arbitrary and capricious because the agency offered no reasoned explanation for this significant departure from the plain language and settled interpretation of 8 C.F.R. § 239.2(a)(7). *Encino Motorcars*, 579 U.S. at 221. Nor did EOIR consider the impact of its new policy on noncitizens' ability to pursue statutory relief—such as asylum, cancellation of removal, or adjustment of status—or the fundamental procedural rights that full removal proceedings are designed to protect. *See generally* 8 U.S.C. § 1229a; *Calderon v. Sessions*, 330 F. Supp. 3d 944, 958 (S.D.N.Y. 2018) (holding arbitrary and capricious an agency policy reversal that "attempt[s] to strip [noncitizens'] right to engage in an immigration process made available to [them]" and "provide[s] no explanation or justification" for such a reversal).

### C. All other factors strongly favor a stay of Defendants' actions.

The balance of equities and public interest, which merge when the Court considers a motion for preliminary relief against the government, *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021), favor the requested stay. The ICE Courthouse Arrest Policy and EOIR Dismissal Policy have caused innumerable harms to noncitizens and their families. The ICE Courthouse Arrest Policy is harmful not only to those arrested, but also to many more noncitizens who are deterred from showing up to immigration court for fear that they will be arrested, and who are consequently being ordered removed *in absentia*, even where they may have immigration relief available to them. Plaintiffs intend to file declarations in support of their motion that discuss in detail these harms.

Defendants not only cannot identify any countervailing interest that would outweigh the irreparable harm faced by noncitizens; the government also *shares* Plaintiffs' interests in the government upholding and fairly administrating the immigration laws. *Planned Parenthood of New York City, Inc. v. U.S. Dept. of Health and Human Services*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018); *You, Xiu Qing v. Nielsen*, 321 F. Supp. 3d 451, 469 (S.D.N.Y. 2018).

For all these reasons, since Plaintiffs' members will likely suffer irreparable harm in the absence of preliminary relief, Plaintiffs are likely to succeed on the merits of their claims, and the balance of the equities and public interest favor postponement, Plaintiffs are entitled to relief under section 705.

### III. EXPEDITED ADJUDICATION IS WARRANTED HERE

For the reasons explained above, Plaintiffs' motion to stay the two policies should be adjudicated on an expedited basis. To obviate the need for expedited briefing, Plaintiffs have asked the government to stipulate to stay the challenged policies in New York while briefing proceeds, and the government has declined to do so. Accordingly, without the Court's prompt intervention, noncitizens, including Plaintiffs' members, stand to not only lose their right to potential relief from removal, but also their liberty and the lives they have built in the United States. Given the urgent stakes in this case, Plaintiffs respectfully request that the Court waive any further pre-motion letter practice and permit them to file their section 705 motion immediately. The government does not object to this request and the parties jointly propose the briefing schedule discussed *supra*.

Dated: August 7, 2025
      New York, New York

Respectfully submitted,

| | |
|---|---|
| NEW YORK CIVIL LIBERTIES UNION FOUNDATION | AMERICAN CIVIL LIBERTIES UNION FOUNDATION |
| /s/ Elizabeth Gyori<br>Amy Belsher<br>Elizabeth Gyori<br>Wafa Junaid<br>Claire Molholm*<br>Thomas Munson<br>M. Porter**<br>Robert Hodgson<br>125 Broad Street, 19th Floor<br>New York, NY 10004<br>Tel: (212) 607-3300 | Noor Zafar<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>Tel: (212) 549-2500 |
| | AMERICAN CIVIL LIBERTIES UNION FOUNDATION |
| | Michael K.T. Tan<br>Hannah Steinberg**<br>Oscar Sarabia Roman**<br>425 California Street, Suite 700<br>San Francisco, CA 94104<br>Tel: (415) 343-0770 |
| EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP | MAKE THE ROAD NEW YORK |
| Katherine Rosenfeld<br>Samuel Shapiro<br>Emily Wanger<br>One Rockefeller Plaza, 8th Floor<br>New York, NY 10020<br>Tel: (212) 763-5000 | Harold Solis<br>Paige Austin<br>301 Grove Street<br>Brooklyn, NY 11237<br>Tel: (718) 418-7690 |
| * Admission pending<br>**Pro hac vice application forthcoming | *Counsel for Plaintiffs* |