**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; and THE DOOR,<br><br>     *Plaintiffs*,<br><br>v.<br><br>Todd M. LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; Sirce E. OWEN, in her official capacity as Acting Director, Executive Office of Immigration Review; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>     *Defendants*. | Case No. 25-cv-06366 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY EFFECTIVE DATE OF AGENCY ACTION OR PRESERVE STATUS OR RIGHTS**

<u>TABLE OF CONTENTS</u>

PAGE NO.

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

LEGAL STANDARD ............................................................................................................... 8

ARGUMENT .......................................................................................................................... 9

    I.     Plaintiffs Are Likely to Succeed on the Merits. ................................................. 9

        A.    Claims Against the ICE Courthouse Arrest Policy
              Are Likely to Succeed. ............................................................................ 10

            i.    The ICE Courthouse Arrest Policy Is Arbitrary
                and Capricious. ............................................................................. 10

                1.    The ICE Courthouse Arrest Policy is arbitrary
                      and capricious because it is a reversal in position
                      that the agency has failed to adequately explain. ................... 10

                2.    The ICE Courthouse Arrest Policy is arbitrary
                      and capricious because it fails to consider
                      important aspects of the problem and reasonable
                      alternatives. ........................................................................... 12

            ii.    The ICE Courthouse Arrest Policy Is Ultra Vires. ............................ 13

        B.    Claims Against the EOIR Dismissal Policy Are Likely to Succeed ................ 16

            i.    The EOIR Dismissal Policy Violates the *Accardi* Doctrine. .............. 16

                1.    Accardi applies to EOIR's regulations and
                      practice manual because they are binding
                      policies protecting individual rights. ....................................... 17

                2.    The EOIR dismissal policy violates the
                      Accardi doctrine by contradicting agency
                      regulations and internal guidance .......................................... 19

            ii.    The EOIR Dismissal Policy Is Arbitrary and Capricious. ................. 20

    II.    Absent a Stay, Plaintiffs Will Experience Irreparable Harm .......................... 22

    III.    The Balance of Equities and the Public Interest Strongly Favor a Stay ...................... 24

CONCLUSION ..................................................................................................................... 25

TABLE OF AUTHORITIES

PAGE NO.

**Cases**

*Abdi v. Duke,*
    280 F. Supp. 3d 373 (W.D.N.Y. 2017) .........................................................................17

*Al Otro Lado, Inc. v. Mayorkas,*
    No. 23-CV-1367, 2024 WL 4370577 (S.D. Cal. Sept. 30, 2024) .................................17

*Am. Farm Lines v. Black Ball Freight Serv.,*
    397 U.S. 532 (1970) .....................................................................................................17

*Amadei v. Nielsen,*
    348 F. Supp. 3d 145 (E.D.N.Y. 2018) ...........................................................................9

*Augustin v. Sava,*
    735 F.2d 32 (2d Cir. 1984) ...........................................................................................18

*Barker v. Wingo,*
    407 U.S. 514 (1972) .....................................................................................................22

*Beechwood Restorative Care Ctr. v. Thompson,*
    494 F. Supp. 2d 181 (W.D.N.Y. 2007) .........................................................................20

*Bennett v. Spear,*
    520 U.S. 154 (1997) .......................................................................................................9

*Bridges v. Wixon,*
    326 U.S. 135 (1945) .....................................................................................................23

*Calderon v. Sessions,*
    330 F. Supp. 3d 944 (S.D.N.Y. 2018) ...........................................................................21

*Damus v. Nielsen,*
    313 F. Supp. 3d 317 (D.D.C. 2018) ...............................................................................17

*De Jesus Martinez v. Nielsen,*
    341 F. Supp. 3d 400 (D.N.J. 2018) .......................................................................... 21, 23

*De La Mota v. U.S. Dep't of Educ.,*
    No. 02-CV-4276, 2003 WL 21919774 (S.D.N.Y. Aug. 12, 2003) .................................9

*DHS v. Regents of the U. of California,*
    140 S. Ct. 1891 (2020).......................................................................................... 11, 13

*Doe v. ICE,*
    490 F. Supp. 3d 672 (S.D.N.Y. 2020)....................................................................... 14, 16

*Dwelle v. Allen,*
    193 F. 546 (S.D.N.Y. 1912) ........................................................................................15

*Encino Motorcars v. Navarro,*
    579 U.S. 211 (2016) ....................................................................................10, 11, 21

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...................................................................................................10

*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons,*
    954 F.3d 118 (2d Cir. 2020) .......................................................................................16

*Freytag v. C.I.R.,*
    501 U.S. 868 (1991) ...................................................................................................15

*Hernandez v. Sessions,*
    872 F.3d 976 (9th Cir. 2017) .....................................................................................22

*I.N.S. v. Lopez-Mendoza,*
    468 U.S. 1032 (1984) .................................................................................................15

*Kapps v. Wing,*
    404 F.3d 105 (2d Cir. 2005) .......................................................................................18

*Lamb v. Schmitt,*
    285 U.S. 222 (1932) ...................................................................................................15

*Larned v. Griffin,*
    12 F. 590 (C.C.D. Mass. 1882) ..................................................................................14

*Long v. Ansell,*
    293 U.S. 76 (1934) .....................................................................................................15

*Make the Rd. New York v. Pompeo,*
    475 F. Supp. 3d 232 (S.D.N.Y. 2020)........................................................................23

*Martinez v. McAleenan,*
    385 F. Supp. 3d 349 (S.D.N.Y. 2019)........................................................................23

*Mata Velasquez v. Kurzdorfer,*
    No. 25-CV-493, 2025 WL 1953796 (W.D.N.Y. July 16, 2025) ....................................6

*Matter of Andrade Jaso & Carbajal Ayala,*
    7 I&N Dec. 557 (BIA 2019) ........................................................................................20

*Matter of G-N-C-,*
    22 I&N Dec. 281 (BIA 1998) ......................................................................................20

*Matter of S-O-G- & F-D-B-*,
    27 I&N Dec. 462 (A.G. 2018) ....................................................................20

*Montilla v. Immigr. & Naturalization Serv.*,
    926 F.2d 162 (2d Cir. 1991) ..............................................................passim

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .............................................................................passim

*Nat. Res. Def. Council v. U.S. Dep't of Energy*,
    362 F. Supp. 3d 126 (S.D.N.Y. 2019) ...........................................................9

*New York v. ICE*,
    466 F. Supp. 3d 439 (S.D.N.Y. 2020) ................................................. 14, 16

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................................25

*Padilla v. Kentucky*,
    559 U.S. 356 (2010) ...................................................................................23

*Pasquantino v. United States*,
    544 U.S. 349 (2005) ...................................................................................13

*Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    337 F. Supp. 3d 308 (S.D.N.Y. 2018) .........................................................24

*Printz v. U.S.*,
    521 U.S. 898 (1997) ...................................................................................11

*R.F.M. v. Nielsen*,
    365 F. Supp. 3d 350 (S.D.N.Y. 2019) .........................................................21

*Rosales-Mireles v. U.S.*,
    138 S. Ct. 1897 (2018) ...............................................................................22

*SAM Party of N.Y. v. Kosinski*,
    987 F.3d 267 (2d Cir. 2021) .......................................................................24

*Saravia v. Sessions*,
    280 F. Supp. 3d 1168 (N.D. Cal. 2017) .......................................................11

*Singh v. U.S. Dep't of Just.*,
    461 F.3d 290 (2d Cir. 2006) ................................................................. 16, 17

*Smith v. Resor*,
    406 F.2d 141 (2d Cir. 1969) .......................................................................17

*State v. U.S. Immigr. & Customs Enf't*,
  431 F. Supp. 3d 377 (S.D.N.Y. 2019) ............................................................14, 15, 16

*Stewart v. Ramsay*,
  242 U.S. 128 (1916) .......................................................................................................15

*Texas v. Biden*,
  646 F. Supp. 3d 753 (N.D. Tex. 2022) ..........................................................................9

*United States v. Bastide-Hernandez*,
  39 F.4th 1187 (9th Cir. 2022) ......................................................................................15

*United States v. Caceres*,
  440 U.S. 741 (1979) .......................................................................................................18

*United States v. Texas*,
  507 U.S. 529 (1993) .......................................................................................................13

*Velazquez-Hernandez v. ICE*,
  500 F. Supp. 3d 1132 (S.D. Cal. 2020) ................................................................14, 16

*Velesaca v. Decker*,
  458 F. Supp. 3d 224 (S.D.N.Y. 2020) ......................................................................9, 22

*Wanrong Lin v. Nielsen*,
  377 F. Supp. 3d 556 (D. Md. 2019) ........................................................................21, 22

*West Virginia v. EPA*,
  577 U.S. 1126 (2016) ......................................................................................................9

*Woodby v. I.N.S.*,
  385 U.S. 276 (1966) .......................................................................................................23

*You, Xiu Qing v. Nielsen*,
  321 F. Supp. 3d 451 (S.D.N.Y. 2018) ...........................................................................25

*Zhang v. Slattery*,
  840 F. Supp. 292 (S.D.N.Y. 1994) ...............................................................................17

**Statutes**

5 U.S.C. § 705 ..............................................................................................................passim

5 U.S.C. § 706 .....................................................................................................13, 16, 20

8 U.S.C. § 1226 ......................................................................................................13, 15

8 U.S.C. § 1229 ..................................................................................................................4

8 U.S.C. § 1229a ................................................................................................ 15, 19, 21

8 U.S.C. § 1252 ....................................................................................................... 19

8 U.S.C. § 1357 .................................................................................................. 13, 15

### Regulations

8 C.F.R. § 1003.23 ............................................................................................ 4, 18, 19

8 C.F.R. § 1003.37 .................................................................................................. 19

8 C.F.R. § 1236.1 .................................................................................................... 11

8 C.F.R. § 1239.2 ...................................................................................................... 4

8 C.F.R. § 1240.13 .................................................................................................. 19

8 C.F.R. § 239.2 ................................................................................................. passim

## INTRODUCTION

This case challenges the government's sweeping, unprecedented campaign targeting and arresting noncitizens at their immigration court proceedings and depriving them of their right to seek relief from removal in such proceedings. To facilitate its goal of "mass deportations," the government has cast aside longstanding procedural and substantive protections that ensured noncitizens could access the courts and fully litigate their right to remain in the United States. Noncitizens across the country in removal proceedings pursuant to 8 U.S.C. § 1229a ("full removal proceedings"), who are dutifully complying with their legal obligations, face an inescapable catch-22: they must choose between facing arrest and dismissal of their removal proceedings when they go to court or risking an *in absentia* removal order for failing to attend their mandatory hearings.

At the center of these efforts are two unlawful policies: (1) a U.S. Immigration and Customs Enforcement ("ICE") policy abandoning restrictions ICE had previously adopted to ensure access to the courts and broadly authorizing arrests at immigration courthouses ("ICE Courthouse Arrest Policy") and (2) an Executive Office of Immigration Review ("EOIR") policy encouraging Immigration Judges ("IJs") to depart from the agency's own regulations and the Immigration Court Practice Manual to expediently dismiss noncitizens' regular removal proceedings without any meaningful process ("EOIR Dismissal Policy").

These new policies undermine the rule of law and the integrity of immigration courts. They also violate the Administrative Procedure Act ("APA") in several ways. First, the Courthouse Arrest Policy is arbitrary and capricious. It completely reverses a decades-long agency policy that generally prohibited arrests at the immigration courts and recognized that courthouse arrests would deter noncitizens from attending mandatory court proceedings and disrupt the fair administration of justice. It does so while failing to adequately explain the reversal and consider all aspects of the problem and reasonable alternatives, as required. The policy is also contrary to the law, as it violates the common

1

law privilege against courthouse arrests. Second, the EOIR Dismissal Policy is arbitrary and capricious because it violates the agency's own regulations and guidance, which require that motions to dismiss be made in writing, submitted at least fifteen days in advance of the hearing, and based on "changed circumstances of the case"—not changes in the federal government's enforcement priorities.

Plaintiffs—African Communities Together ("ACT") and The Door—move to stay Defendants' unlawful policies pursuant to 5 U.S.C. § 705. They are likely to succeed on the merits and satisfy all other requirements for relief: without a stay, their noncitizen members face the irreparable harms of detention, family separation, and removal, as well as the loss of their right to pursue pending claims for immigration relief; and the public interest weighs heavily in favor of halting the escalating consequences of these policies across New York and the nation.

## BACKGROUND

### ICE Overturns Longstanding Policy Restricting Civil Immigration Arrests in Or Near Immigration Courts.

For decades, Department of Homeland Security ("DHS") agents—including ICE and Customs and Border Protection ("CBP")—largely refrained from conducting civil immigration arrests at immigration courthouses. *See* Decls. of Deborah Fleischaker ¶¶ 9–19, 29; Gillian Rowland-Kain ¶ 19; Sarah M. Burr ¶ 33; Rachel Levenson ¶ 5; Audrey Gilliam ¶¶ 8, 19. This longstanding policy and practice was formalized on April 27, 2021, in a memorandum circulated to ICE and CBP, which prohibited ICE and CBP agents from conducting "civil immigration enforcement action . . . in or near a courthouse," including immigration courts, except in certain narrow circumstances. Belsher Decl. Ex. 1 ("April 27, 2021 ICE Memo"). The memo explained that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses, and as a result, impair the fair administration of justice." *See also* Fleischaker Decl. ¶ 10–19, 35–36.

In early 2025, DHS reversed course. On or around January 21, 2025, ICE rescinded the April 27, 2021 ICE Memo and issued a memorandum to all ICE employees that broadly permits "ICE

2

officers or agents [to] conduct civil immigration enforcement actions in or near courthouses when they have credible information that leads them to believe the targeted alien(s) is or will be present at a specific location, and where such action is not precluded by laws imposed by the jurisdiction in which the enforcement action will take place." Belsher Decl. Ex. 3, at 2. The memorandum defines "targeted aliens" so broadly that any noncitizen in immigration court, including those attending mandatory hearings, is at risk of civil arrest. *See id.* at 2-3; Fleischaker Decl. ¶ 23.

On May 27, 2025, the Acting Director of ICE circulated a revised and finalized version of the January 21, 2025 Memo. Belsher Decl. Ex. 4 ("ICE Courthouse Arrest Memo"). The finalized ICE Courthouse Arrest Memo is substantively the same as the January 21, 2025 ICE Memo with one notable expansion: it purports to allow ICE to conduct civil immigration arrests at courthouses even if such arrests would violate local or state law.[1] *Compare* Belsher Decl. Ex. 3, at 2 *with* Ex. 4, at 2.

Though the January 21, 2025 ICE Memo and finalized ICE Courthouse Arrests Memo reverse the April 27, 2021 ICE Memo, they do not even mention, much less account for, how expanding civil immigration enforcement to immigration courts will chill noncitizens' access to courts and impede the fair administration of justice—a concern the agency previously recognized for decades. *See generally* Belsher Decl. Ex. 4, at 1; Fleischaker Decl. ¶ 21. Instead, the new memoranda assert that enforcement at or near courthouses "can reduce safety risks to the public, targeted alien(s), and ICE officers and agents" because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband." *Id.* The memoranda also assert that such enforcement is required "when jurisdictions refuse to cooperate with ICE, including when such

---

[1] Of note, EOIR has long agreed that limiting arrests in immigration courts is necessary to protect rights and ensure safety, the fair administration of justice, and the clear delineation of roles between EOIR and DHS. *See* Burr Decl. ¶¶ 24–29. EOIR previously issued a memorandum, dated September 30, 1996, encapsulating an agreement between the INS (the predecessor agency to ICE) and EOIR to limit civil immigration arrests inside courtrooms. *See id.* ¶¶ 24–26. Another December 11, 2023 memorandum concurred in the April 27, 2021 ICE Memo limiting arrests in or near immigration courthouses. *See id.* ¶¶ 27–29. Only in January 2025 did EOIR reverse course after ICE did. *See id.* ¶¶ 30–32.

jurisdictions refuse to honor immigration detainers and transfer aliens directly to ICE custody." *Id.*

*EOIR Authorizes IJs to Dismiss Full Removal Proceedings in Violation of Substantive and Procedural Requirements.*

DHS simultaneously directed its attorneys to move to dismiss large categories of noncitizens' full removal proceedings, subjecting those noncitizens to arrest by ICE agents patrolling immigration courthouses. EOIR in turn issued a new policy expanding the circumstances under which IJs may dismiss full removal proceedings contrary to rules and regulations requiring notice, an opportunity to be heard, and grounds specific to the noncitizen's case.

The Immigration and Nationality Act ("INA") provides that once full removal proceedings are initiated under Section 1229a, "a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229(a)(3). Once removal proceedings commence, jurisdiction vests with an IJ to "resolve or dispose of a case through an order of dismissal or an order of termination." 8 C.F.R. § 1239.2(b). To move to dismiss full removal proceedings, a DHS attorney must do so "in writing" and "state[] with particularity the grounds" for their request. 8 C.F.R. § 1003.23(a). EOIR has instructed that any filings pertaining to non-detained noncitizens' master calendar hearings—a scheduling hearing in immigration court—must abide by specific timing requirements to ensure noncitizens have notice and an opportunity to respond, including to challenge the dismissal of their proceedings. Belsher Decl. Ex. 5 (discussing in subsections 3.1(b)(1)(A)–(B)). Because a failure to "timely respond" renders a motion "unopposed," an IJ may extend the time for a noncitizen to respond. *See* 8 C.F.R. § 1003.23(a).

In addition to these procedural requirements, DHS attorneys may move to dismiss full removal proceedings only on the enumerated grounds laid out in 8 C.F.R. § 239.2(a). 8 C.F.R. §§ 239.2(c), 1239.2(c). If DHS seeks dismissal on the basis that "continuation is no longer in the best interest of the government," it must also show that the "[c]ircumstances of *the case* have changed after

the notice to appear was issued to such an extent" that it warrants dismissal. 8 C.F.R. § 239.2(a)(7) (emphasis added); Burr Decl. ¶ 20 (noting that "changed circumstances" within the meaning of the regulation would include, for example, a change in the noncitizen's legal status).

On May 30, 2025, EOIR issued guidance to IJs instructing them to disregard these long-established substantive and procedural rules. Belsher Decl. Ex. 12 ("EOIR Dismissal Memo"); Burr Decl. ¶¶ 11–17; Durkin Decl. ¶ 7. The memo informed IJs that DHS had begun "carrying out enforcement actions in or near EOIR space" and moving to dismiss pending cases due to the government's new enforcement priorities and case backlog reduction efforts. Belsher Decl. Ex. 12. Given these "recent developments," and to "ensure the expeditious adjudication of cases," the memo advises that "DHS Motions to Dismiss may be made orally and decided from the bench. No additional documentation or briefing is required." *Id.* Further, it instructs that "[g]enerally, if DHS has met the regulatory burden, the oral motion to dismiss may be granted. A 10-day response period is not required." *Id.* Crucially, the EOIR Dismissal Memo states that DHS's regulatory burden is met pursuant to "INA 239.2(a)(7)" [*sic*] (8 C.F.R. § 239.2(a)(7)) if the agency can prove that "circumstances have changed to such an extent that continuation is no longer in the best interest of the government." *Id.* The EOIR Dismissal Memo misrepresents DHS's regulatory burden by omitting key language— "changed circumstances of *the case*," *id.*—impermissibly expands the grounds upon, and circumstances under which, IJs may terminate full removal proceedings, and strips noncitizens of their procedural rights to written notice and an adequate opportunity to respond.

### The Government Begins an Aggressive Campaign to Implement the New Policies.

Following the creation of these two policies, the government has aggressively implemented a new enforcement initiative at immigration courthouses nationwide, with New York at its epicenter. This initiative specifically targets noncitizens in full removal proceedings who are pursuing asylum and/or other relief before an IJ and is disproportionately directed at *pro se* noncitizens. *See* Belsher

Decl. Exs. 7, 13; Fleischaker Decl. ¶ 32; Rowland-Kain Decl. ¶¶ 11, 13–16, 18, 20, 22(k), 23; Eugenio Decl. ¶¶ 7, 14, 16; Gilliam Decl. ¶¶ 9–14, 23–24; Durkin Decl. ¶¶ 7–12.

The initiative has two major components. *First*, during immigration court hearings,[2] DHS attorneys move—often orally and without advance written notice or any showing of individualized "changed circumstances"—to dismiss those full removal proceedings, on the grounds that such proceedings are no longer in the best interests of the government. Belsher Decl. Ex. 13 at 1–3; Levenson Decl. ¶ 7, 9–10, 13, 15, 22, 29; Eugenio Decl. ¶¶ 7, 9-11; Umana Decl. ¶ 4; Cortes Decl. ¶ 7, 8; Burr Decl. ¶¶ 16–17; Rowland-Kain Decl. ¶ 22(g); Lander Decl. ¶ 12; Fleischaker Decl. ¶ 30; Durkin Decl. ¶ 9; *see* ECF 1 ¶¶ 48–50. Pursuant to the EOIR Dismissal Policy, IJs permit DHS attorneys to do so, frequently adjudicating these motions on the spot without allowing the noncitizen to file a written opposition, and often granting these motions without requiring DHS to identify case-specific changed circumstances and without regard to pending applications for relief from removal. Belsher Decl. Ex. 13, at 2; Rowland-Kain Decl. ¶¶ 14, 20–21, 22(f); *see, e.g.,* Eugenio Decl. ¶ 10; Levenson Decl. ¶¶ 7, 17–18, 21, 24; Gilliam Decl. ¶¶ 9–10, 12; Lander Decl. ¶¶ 5, 7, 9, 22. However, IJs rarely inform noncitizens before them that terminating their proceedings will subject them to arrest and potential rapid deportation. Rowland-Kain Decl. ¶¶ 21, 22(g), (h); Eugenio Decl. ¶ 10. The DOJ has made clear that IJs must grant these motions or risk termination. *See* Belsher Decl. Exs. 14, 15.

*Second*, pursuant to the new ICE Courthouse Arrest Policy, ICE officers—in coordination with DHS attorneys—station themselves in immigration court, including in hallways and courtrooms, so that they can immediately arrest individuals after their court hearings. Fleischaker Decl. ¶¶ 26–27; Durkin Decl. ¶ 14; Rowland-Kain Decl. ¶¶ 17, 22(a)–(e), 27; Eugenio Decl. ¶ 5. Upon leaving the courtroom, noncitizens are forcefully grabbed and arrested, often by masked agents in plain clothes who refuse to identify themselves and often fail to confirm the identities of the people they are seizing.

[2] Or after arrest. *See, e.g., Mata Velasquez v. Kurzdorfer*, No. 25-CV-493, 2025 WL 1953796, at *3 (W.D.N.Y. July 16, 2025).

*See* Belsher Decl. Exs. 13, 16; Rowland Kain Decl. ¶¶ 17, 22(a)–(e), 27; Eugenio Decl. ¶ 12; Fleischaker Decl. ¶¶ 26, 28; Lander Decl. ¶¶ 12-15, 20-21; Gilliam Decl. ¶¶ 4, 8, 10–11, 14, 17; Levenson Decl. ¶ 11. Critically, ICE is now arresting individuals *irrespective* of whether or not the IJ dismisses their full removal proceedings. Belsher Decl. Ex. 13 at 2; Lander Decl. ¶¶ 13, 15; Fleischaker Decl. ¶ 30; Rowland-Kain Decl. ¶¶ 22(e), 25; Umana Decl. ¶¶ 4–5; Cortes Decl. ¶¶ 7–8.

This campaign is unprecedented. The new initiative appears to be driven by the Trump Administration's imposition of a new daily quota of 3,000 ICE arrests. *See* Belsher Decl. Exs. 9, 10. As a result, civil immigration arrests in immigration courts and removal proceeding dismissals are now occurring at exponential rates, wreaking havoc on courts' ability to set deadlines, manage their dockets and ensure decorum. *See* Belsher Decl. Exs. 8, 13 at 1, 3; Fleischaker Decl. ¶ 29; Rowland-Kain Decl. ¶ 22(b). Within the first ten days of June alone, ICE arrested 495 people in New York City—more than twice the arrests it made in the area for all of June last year. Belsher Decl. Ex. 11. The arrests are also unprecedented in another respect: they target people once protected from immigration enforcement—noncitizens who have established ties to the United States and no criminal history. *Id.* (explaining that on May 28, 2025, non-criminal arrests made up 75% of ICE's New York City courthouse apprehensions); Fleischaker Decl. ¶ 34.

ICE's new policy has made immigration courthouses sites of uncertainty and terror. *See* Fleischaker Decl. ¶ 35; Durkin Decl. ¶ 15; Lander Decl. ¶¶ 10, 12, 19, 21-22; Rowland-Kain Decl. ¶ 33; Gilliam Decl. ¶ 26; Eugenio Decl. ¶ 15; Umana Decl. ¶ 8. Noncitizens across the country, including Plaintiffs' members, attending their mandatory hearings are now at risk of arrest, detention, loss of employment, family separation, medical care interruption, and even deportation for complying with legal obligations. Those relying on ICE's past policy and EOIR's rules are ambushed, unprepared to be immediately arrested—leaving their families and employers behind with no notice. Others who know the risks must make an impossible choice: participate in their ongoing immigration cases at their

own peril or live in the shadows with an *in absentia* order of removal hanging over them. Burr Decl. ¶ 34; Durkin Decl. ¶ 15; Rowland-Kain Decl. ¶¶ 29–32; Gilliam Decl. ¶¶ 27–31; Cortes Decl. ¶ 9.

*Plaintiffs and Their Members Face Irreparable Harms Flowing From the Challenged Policies.*

Plaintiff The Door is a membership-based organization with more than 9,000 members, many of whom are noncitizens in removal proceedings. Baltimore Decl. ¶¶ 6–13. The new policies have forced The Door to divert staff and resources from its core activity of providing full-scope immigration representation to members, frustrated its mission, and resulted in at least two members being detained. *Id.* ¶ 24–35. One member was detained after the government moved to dismiss his full removal proceeding despite his pending applications for asylum and Special Immigrant Juvenile Status. *Id.* ¶ 37. The Door has identified at least fifteen members with in-person hearings scheduled in August and September who could be subject to dismissal and courthouse arrests. *Id.* ¶ 35. Door members have told staff that they are terrified to attend court because of this risk. *Id.* ¶ 43.

Similarly, Plaintiff ACT is a membership-based organization with thousands of members across three chapters in New York, the D.C. metro area, and Pennsylvania, many of whom are noncitizens in removal proceedings. Konaté Decl. ¶¶ 5, 12. At least one member of ACT has been detained pursuant to the new policies. *Id.* ¶¶ 14, 16–23. He had a pending asylum application and was working after receiving employment authorization, but was arrested immediately after attending a court hearing and transferred from New York to a remote, overcrowded detention facility in Texas, where he lacks adequate medical care and is cut off from his family and attorney. *Id.* ¶¶ 16–2. ACT has identified at least three other members in full removal proceedings who are at imminent risk of arrest or dismissal under the challenged policies and have expressed fear and distress about attending their upcoming hearings in August 2025, October 2025, and February 2026. Konaté Decl. ¶¶ 24–43.

## LEGAL STANDARD

The APA authorizes district courts to "postpone" agency actions "to the extent necessary to

prevent irreparable injury," or to otherwise issue a stay "to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "Courts—including the Supreme Court—routinely stay already-effective agency action under Section 705." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (citing, *inter alia*, *West Virginia v. EPA*, 577 U.S. 1126 (2016) (mem. op.)). To obtain relief under § 705, Plaintiffs must show that (1) they will likely succeed on the merits, (2) they will likely suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) a stay is in the public interest. *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 149 (S.D.N.Y. 2019) (noting a stay under § 705 and a preliminary injunction have the same standard).

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on the merits of the four APA claims at issue here. First, the ICE Courthouse Arrest Policy (1) is arbitrary and capricious because it fails to provide an adequate explanation of a policy reversal and to consider all aspects of the problem or reasonable alternatives, and (2) is ultra vires because it instructs ICE agents to make arrests at immigration courthouses in violation of the common law privilege against courthouse arrests, which was incorporated into the INA. Second, the EOIR Dismissal Policy (1) violates the *Accardi* Doctrine, and (2) is arbitrary and capricious because it disregards the agency's own regulations and rules, failing to adequately explain a departure from the agency's prior regulations and rules, and failing to consider the impacts of this policy on noncitizens' ability to pursue statutory relief and fundamental rights.[3]

---

[3] As a threshold matter, these policies constitute "final agency action" reviewable under the APA because they "mark the 'consummation' of the agency's decisionmaking process" and alter legal rights. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The ICE Courthouse Arrests Policy is memorialized in the January 21, 2025 ICE Memo and the May 27, 2025 ICE Courthouse Arrest Memo. The EOIR Dismissal Policy provides instructions to IJs, who have proceeded to comply with these instructions. *See* Belsher Decl. Ex. 2; *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018); *De La Mota v. U.S. Dep't of Educ.*, No. 02-CV-4276, 2003 WL 21919774, at *8 (S.D.N.Y. Aug. 12, 2003) (identifying final agency action in the form of an email correspondence); *Velesaca v. Decker*, 458 F. Supp. 3d 224, 243 (S.D.N.Y. 2020). And those instructions have already altered noncitizens' legal rights in their removal proceedings as IJs have dismissed proceedings without basic process, *see infra*; Baltimore Decl. ¶ 3; Rowland-Kain Decl. ¶¶ 12–14.

**A.  Claims Against the ICE Courthouse Arrest Policy Are Likely To Succeed.**

The government's reversal of a decades-long policy that generally prohibited civil immigration arrests at immigration courthouses is arbitrary and capricious and not in accordance with law for three independent reasons: (1) the agency has not provided an adequate explanation of its policy reversal; (2) the policy fails to consider several important aspects of the problem as well as reasonable alternatives; and (3) the policy is without statutory authorization because the INA incorporates the common-law privilege against civil arrests at courthouses.

**i.  The ICE Courthouse Arrest Policy Is Arbitrary and Capricious.**

*1.  The ICE Courthouse Arrest Policy is arbitrary and capricious because it is a reversal in position that the agency has failed to adequately explain.*

Where an agency changes its previous position, it must (1) "display awareness that it is changing position," (2) "show that there are good reasons for the new policy," and (3) balance those good reasons against "engendered serious reliance interests." *Encino Motorcars v. Navarro*, 579 U.S. 211, 221–22 (2016); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (alteration to prior agency position can require "more detailed justification than what would suffice for a new policy created on a blank slate").

The ICE Courthouse Arrest Policy marks an abrupt reversal from ICE's former policy of restricting immigration court arrests to avoid "chill[ing] individuals' access to courthouses, and as a result, impair[ing] the fair administration of justice," Belsher Decl. Exs. 1, 3, 4; Fleischaker Decl. ¶¶ 20–22, 25–29, 31; Burr Decl. ¶¶ 33–34; Rowland-Kain Decl. ¶¶ 22(b), 29. Yet the government has failed to provide "good reasons for th[is] new policy," *Encino*, 579 U.S. at 221 (quotation marks and citation omitted). In fact, the government has provided *no* analysis of why it abandoned the rationale undergirding its prior policy. *See* Fleischaker Decl. ¶¶ 21, 25. And the Court may not infer the agency's reasoning from mere silence. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983). This failure to explain alone is arbitrary and capricious.

Instead, the ICE Courthouse Arrest Memo offers two demonstrably unreasonable justifications. First, ICE asserts that courthouse arrests "can reduce safety risks" during the arrest itself because individuals are screened for weapons and other contraband upon entering a courthouse. Belsher Decl. Ex. 4 at 1. But there is no basis to assume non-detained noncitizens who are appearing for their hearings present any kind of danger outside the courthouse. To the contrary, the government has, at some prior point, decided *not* to detain them because they were deemed to be neither a public safety threat nor a flight risk. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017) ("Release reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk."), *aff'd*, 905 F.3d 1137 (9th Cir. 2018); *see also* 8 C.F.R. § 1236.1(c)(8) (requiring noncitizen seeking release demonstrate they are neither a "danger to property or persons" nor a flight risk). This group is already by definition following the rules and complying with the government's process. *See* Fleischaker Decl. ¶¶ 32, 34. ICE has failed to explain why its prior policy endangered noncitizens, ICE agents, or the public such that this policy change is now necessary.

ICE's second rationale—that this change is necessary "when jurisdictions refuse to cooperate with ICE, including when such jurisdictions refuse to honor immigration detainers and transfer aliens directly to ICE custody," Belsher Decl. Ex. 7, at 1—is not a reasoned justification. It suggests the new policy improperly seeks to retaliate against states that make the constitutionally protected choice not to "enforce federal law" using state resources. *See Printz v. U.S.*, 521 U.S. 898, 925 (1997). It further does not explain why the government must make these arrests at courthouses in particular.

Finally, ICE has failed to balance its reasons for the new policy against "engendered serious reliance interests." *Encino*, 579 U.S. at 222 (cleaned up); *DHS v. Regents of the U. of California*, 140 S. Ct. 1891, 1913–15 (2020). Specifically, those pursuing relief in immigration court, as well as court officials, have long expected that noncitizens could appear in immigration court to vindicate their rights and interests without risk of civil arrest. *See* Burr Decl. ¶ 34; Fleischaker Decl. ¶¶ 35–36; Cortes Decl. ¶ 6

(discussing how noncitizen arrested at hearing had not brought important prescription medication); Gilliam Decl. ¶¶ 18, 25 (discussing arrested noncitizens missed medical care, left cars in parking lots, and did not have time to give home keys to partner); Levenson Decl. ¶ 14 (discussing noncitizens "quickly text[ing] loved ones or ma[king] brief calls to say goodbye"). Noncitizens have relied on this expectation to attend court proceedings without making childcare, elder care, healthcare, and employment arrangements in the event of arrest. *See* Cortes Decl. ¶ 6; Gilliam Decl. ¶ 18, 25; Rowland-Kain Decl. ¶ 20. Courts have relied on this expectation to set deadlines, manage their dockets, and ensure decorum in their courts. *See* Fleischaker Decl. ¶¶ 32–33, 35; Burr Decl. ¶ 34; Eugenio Decl. ¶ 15; Umana Decl. ¶¶ 9–10. The new policy does not even acknowledge these "serious reliance interests," let alone take them "into account." *Fox Television Stations*, 556 U.S. at 515. As ICE has failed to adequately explain its reversal of prior policy, its new Courthouse Arrests Policy violates the APA.

> 2. *The ICE Courthouse Arrest Policy is arbitrary and capricious because it fails to consider important aspects of the problem and reasonable alternatives.*

Even when an agency explains the basis for its action, an agency action is still arbitrary and capricious when the agency has, *inter alia*, "entirely failed to consider an important aspect of the problem" and has not articulated a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation omitted). To engage in "reasoned decisionmaking," agencies must "look at the costs as well as the benefits" flowing from their actions. *Id.* at 52, 54.

Here too ICE has failed to consider how its Courthouse Arrest Policy will chill access to immigration courts and impede the fair administration of justice, including by disturbing immigration courts' dockets and decorum in courthouses. *See supra* Section I(A)(i)(1); Fleischaker Decl. ¶¶ 32–33, 35; Burr Decl. ¶ 34; Eugenio Decl. ¶ 15; Umana Decl. ¶¶ 9–10. The January 21, 2025 ICE Memo and ICE Courthouse Arrest Memo "offer[] no reason" for why these concerns—two of which were in the April 27, 2021 ICE Memo—are inapplicable, do not seriously undermine the reasoning of its new

Courthouse Arrests Policy, or could not be addressed through use of reasonable alternatives, such as conducting arrests elsewhere. *Regents*, 140 S. Ct. at 1912.

Such failure to consider is undoubtedly arbitrary and capricious. *Regents*, 140 S. Ct. at 1910–13 (holding DHS's decision to terminate Deferred Action for Childhood Arrivals arbitrary and capricious because DHS failed to consider one of its two defining features—forbearance of removal); *State Farm*, 463 U.S. at 46, 51 (holding traffic safety agency acted arbitrarily and capriciously by rescinding a standard that required car manufacturers to include passive restraints in vehicles because the agency "gave no consideration whatever to modifying the Standard to require that airbag technology be utilized" and "was too quick to dismiss the safety benefits of automatic seatbelts").

### ii.  The ICE Courthouse Arrest Policy Is Ultra Vires.

A court may also set aside an agency action that is "in excess of statutory jurisdiction, authority, [and] limitations, [and] short of statutory right." 5 U.S.C. § 706(2)(C). Here, the ICE Courthouse Arrest Policy violates the INA. Although the INA grants broad authority to ICE to arrest noncitizens during their removal proceedings, 8 U.S.C. §§ 1226(a), 1357(a)(2), such authorization is limited by the INA's incorporation of the common law—and specifically the privilege against courthouse arrests.

"[S]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *United States v. Texas*, 507 U.S. 529, 534 (1993) (cleaned up). This non-derogation canon of statutory interpretation applies so long as the common-law rule was well-established at the time of the statute's passage, the "purposes" of the common-law rule apply to the statutory context at issue, and the statute does not "speak[] directly to the question addressed by the common law." *Pasquantino v. United States*, 544 U.S. 349, 359 (2005) (cleaned up); *see also id.* at 360–62, 368–70.

"[I]t is patently clear that English common law provided a privilege against any civil arrests in and around courthouses, and also against civil arrests of witnesses and parties necessarily traveling to

and from the courthouse." *State v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 388 (S.D.N.Y. 2019). Blackstone's Commentaries on the Laws of England, "on which early U.S. courts heavily relied in incorporating English common law into" American state and federal law, provided:

> Suitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which includes their necessary coming and returning. And no arrest can be made . . . in any place where the king's justices are actually sitting.

*Id.* (quoting 3 William Blackstone, *Commentaries on the Laws of England* 289 (1768)). As this summary shows, the privilege applied to both (1) the person who is attending court upon business and (2) the physical courthouse and its environs.[4] *See e.g.*, *Ex Parte Jackson*, 15 Ves. Jun. 117, 699 (1808) (discussing the privilege as it attaches to persons); *Cole v. Hawkins*, 95 Eng. Rep. 396, 396, Andrews 275, 275 (1738) (discussing the privilege as it attaches to courthouses).

American common law incorporated—and expanded—the common law privilege. *See Doe v. ICE*, 490 F. Supp. 3d 672, 692–93 (S.D.N.Y. 2020); *Velazquez-Hernandez v. ICE*, 500 F. Supp. 3d 1132, 1144–45 (S.D. Cal. 2020). This includes applying the privilege to all official judicial proceedings that may affect court proceedings, such as depositions, even when they do not take place within a courthouse, *see, e.g.*, *Larned v. Griffin*, 12 F. 590, 590 (C.C.D. Mass. 1882) (privilege protects attendance at judicial proceedings, including "before arbitrators, commissioners, and examiners"), and extending it to service of process, *New York v. ICE*, 466 F. Supp. 3d 439, 445 (S.D.N.Y. 2020), *vacated on other grounds and remanded sub nom. New York v. ICE*, No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023).

As recognized by the Supreme Court in the decades before the INA's passage in 1952, the privilege at English and American common law alike served the same purpose—the fair administration of justice—by ensuring (1) that parties and witnesses were not deterred from coming forward and (2)

---

[4] *See also* Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 Yale L. J. Forum 410, 423 (2017).

that courts operated properly, with decorum and order. *State*, 431 F. Supp. 3d at 391–92; *see also, e.g.,* *Stewart v. Ramsay*, 242 U.S. 128, 129, 130 (1916) (discussing how the privilege's purpose is the fair administration of justice); *Long v. Ansell*, 293 U.S. 76, 83 (1934) (same). That is why "the proper test [for application of the privilege] is . . . whether the privilege will promote the purposes of justice." *Dwelle v. Allen*, 193 F. 546, 548–49 (S.D.N.Y. 1912); *see also Lamb v. Schmitt*, 285 U.S. 222, 228 (1932).

Not only has the common-law privilege against courthouse arrests long been incorporated into American common law, but applying it to civil arrests for civil immigration offenses in and around immigration courts—courts of law exercising judicial power—would also undoubtedly "promote the purposes of justice." *Dwelle*, 193 F. at 548–49; *see also I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) ("A deportation proceeding is a purely civil action"); 8 U.S.C. § 1229a(a)(1) ("An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien."); *United States v. Bastide-Hernandez*, 39 F.4th 1187, 1191–92 (9th Cir. 2022) (discussing how immigration courts' adjudicatory authority comes from the INA and Congress); *Freytag v. C.I.R.*, 501 U.S. 868, 890-91 (1991) (holding that the Tax Court—which, like immigration courts, was created by Congress—was a "'Cour[t] of Law' within the meaning of the Appointments Clause" because it "exercises a portion of the judicial power of the United States"). Specifically, applying the privilege would ensure that noncitizens are not deterred from appearing for required court proceedings, that immigration courts' dockets are not disturbed, and that the full purpose and functioning of regular removal proceedings are carried out. *See* Fleischaker Decl. ¶ 32–33; Burr Decl. ¶ 34; Durkin Decl. ¶ 15; Rowland-Kain Decl. ¶¶ 26–33; Umana Decl. ¶ 9–10; Gilliam Decl. ¶¶ 27–31; Baltimore Decl. ¶ 13–14, 43 (The Door's "[m]embers . . . are terrified, anxious, and confused about the possibility of being arrested and detained while attending court appearances"); Konaté Decl. ¶ 28–29, 34–35, 40–43 (discussing how ACT's members fear attending immigration court in person due to the ICE Courthouse Arrest Policy).

Finally, the plain language of 8 U.S.C. §§ 1226(a) and 1357(a)(2), which govern ICE's arrest

authority, evinces no indication of Congress "speak[ing] directly" to abrogate the common-law privilege against courthouse arrests. *Texas*, 507 U.S. at 534. Therefore, the INA incorporates the common-law privilege and constrains ICE officers' authority to conduct civil arrests at immigration courts because (1) the privilege was long-established in American common law when the INA passed; (2) the purpose of the privilege would be advanced by such limitations; and (3) the INA does not directly abrogate the privilege. *See Velazquez-Hernandez*, 500 F. Supp. 3d at 1143 (concluding that "the [INA provisions] on their face do not indicate that Congress intended to abrogate the common-law privilege"); *State*, 431 F. Supp. 3d at 392 (same); *Doe*, 490 F. Supp. 3d at 692 (same); *New York*, 466 F. Supp. 3d at 447 (same). Thus, arrests pursuant to the ICE Courthouse Arrest Policy are "in excess of statutory jurisdiction, authority, [and] limitations, [and] short of statutory right." 5 U.S.C. § 706(2)(C).

### B.  Claims Against the EOIR Dismissal Policy Are Likely To Succeed.

The EOIR Dismissal Policy, which authorizes IJs to summarily dismiss full removal proceedings without basis, notice, or an opportunity to be heard, violates foundational principles of administrative law. First, the policy runs afoul of the *Accardi* doctrine because it violates EOIR's own binding regulations. Second, the policy is arbitrary and capricious both because it deviates from EOIR's own guidance and because it constitutes an unreasoned departure from prior policy.

### i.  The EOIR Dismissal Policy Violates the *Accardi* Doctrine.

"Under deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)); *see also Singh v. U.S. Dep't of Just.*, 461 F.3d 290, 296 (2d Cir. 2006) ("[A]n administrative agency must adhere to its own regulations").

The Second Circuit has repeatedly found *Accardi* violations in the context of removal proceedings where the agency failed to comply with rules "govern[ing] individual interests." *Montilla*

*v. Immigr. & Naturalization Serv.*, 926 F.2d 162, 170 (2d Cir. 1991) (reversing deportation order because IJ failed to advise the noncitizen of his right to counsel pursuant to regulation); *Singh*, 461 F.3d at 296–97 (invalidating BIA decision denying a hardship waiver as the agency had "disregarded its own regulations," even where those regulations were purely administrative and not mandated by statute).

   1. *Accardi* applies to EOIR's regulations and practice manual because they are binding policies protecting individual rights.

  In applying *Accardi*, courts in this Circuit first consider whether the agency regulation or internal policy is binding upon the agency. "[The ambit of the *Accardi* doctrine] is not limited to rules attaining the status of formal regulations." *Montilla*, 926 F.2d at 167. Agency rules, whether codified or issued through internal guidance, are binding where they implicate important substantive and procedural rights. *See, e.g., Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538 (1970) (*Accardi* applies most forcefully where agency rules are "intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion"); *Abdi v. Duke,* 280 F. Supp. 3d 373, 389 (W.D.N.Y. 2017) (ICE bound by internal directive intended to protect noncitizens' procedural rights); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 336 (D.D.C. 2018) (same); *Al Otro Lado, Inc. v. Mayorkas*, No. 23-CV-1367, 2024 WL 4370577, at *8–9 (S.D. Cal. Sept. 30, 2024) (CBP bound by internal guidance that prescribed "substantive rules" and affected individuals' ability to pursue claims); *Zhang v. Slattery*, 840 F. Supp. 292, 294–5 (S.D.N.Y. 1994) (INS bound by internal parole guidelines because they affected "the rights of individuals" and established procedures "intended to benefit" persons seeking protection under immigration law). *Accardi* applies even when the rules exceed statutory or constitutional requirements or govern discretionary decisions. *Montilla,* 926 F.2d at 167; *Smith v. Resor*, 406 F.2d 141, 145 (2d Cir. 1969). Where these criteria are satisfied, the reviewing court must invalidate agency action or policy violating the agency's own rules. *Montilla*, 926 F.2d at 170; *see also Singh*, 461 F.3d at 296.

  Here, binding EOIR regulations and the Immigration Court Practice Manual govern the

disposition of DHS motions to dismiss and provide noncitizens with procedural rights, including notice and a meaningful opportunity to contest the dismissal of their proceedings. The EOIR Dismissal Policy directly implicates noncitizens' ability to pursue claims for relief under the INA. *See* Baltimore Decl. ¶¶ 13, 32–33, 37; Burr Decl. ¶¶ 32–39; Durkin Decl. ¶ 13.

Specifically, under binding EOIR regulations and rules, the government may seek dismissal of full removal proceedings only on the specific grounds enumerated by regulation, including where "[c]ircumstances of the case have changed" such that "continuation is no longer in the best interest of the government," 8 C.F.R. § 239.2(a)(7); and that all pre-decision motions, such as motions to dismiss, must be submitted in writing, state the grounds for the motion with particularity, and give parties an opportunity to respond, 8 C.F.R. § 1003.23; Practice Manual §§ 3.1(b)(1)(A)–(B), 3.2. *See supra* 4-5; ECF 1 ¶¶ 38–43. The fundamental rights implicated by the EOIR Dismissal Policy—notice and the opportunity to be heard—are not mere formalities, but are grounded in procedural due process and designed to safeguard fairness. *Kapps v. Wing*, 404 F.3d 105, 120 (2d Cir. 2005) ("The requirement that the government afford individuals an opportunity to be heard is among the most fundamental requirements of the Due Process Clause."); *see also Augustin v. Sava*, 735 F.2d 32, 37 (2d Cir. 1984) (the "elemental procedural protections [under the INA and its governing regulations] may well be required not only by the pertinent statutes and regulations but also by the due process clause of the Fifth Amendment."). As such, the *Accardi* doctrine applies to these EOIR regulations and rules. *See Montilla*, 926 F.2d at 168-69 (finding in context of immigration proceeding that *Accardi* requires agencies to follow agency rules implicating constitutional rights); *United States v. Caceres*, 440 U.S. 741, 749 (1979).

Further, the EOIR Dismissal Policy threatens noncitizens' fundamental rights embedded in removal proceedings—namely, the right of to investigate and prepare their cases, retain and rely on the assistance of counsel, present evidence, cross-examine witnesses, receive a written decision, and

pursue judicial review. *See* 8 U.S.C. §§ 1229a(b)(4)(B), 1252(a)(2)(D); 8 C.F.R. §§ 1003.37, 1240.13(a). These proceedings are the primary forum through which individuals assert statutory and constitutional defenses to removal and seek relief from removal, including through asylum. Noncitizens have a vested interest in the procedural safeguards that full proceedings provide. By allowing dismissal without individualized inquiry, the EOIR Dismissal Policy undermines these procedural protections and deprives noncitizens of their right to a full and fair adjudication. In fact, the policy has already resulted in (i) the termination of cases with pending asylum applications, Rowland-Kain Decl. ¶¶ 16, 22(f), 24, 26; Baltimore Decl. ¶ 37; (ii) confusion for *pro se* respondents about whether they may continue pursuing relief, Rowland-Kain Decl. ¶ 30; and (iii) arrests that obstruct access to legal services and prevent continuation of removal proceedings, Baltimore Decl. ¶ 37; Rowland-Kain Decl. ¶ 24. For this reason as well, the EOIR Dismissal Policy also requires the application of *Accardi*.

> 2. *The EOIR dismissal policy violates the* Accardi *doctrine by contradicting agency regulations and internal guidance*

The EOIR Dismissal Policy departs from EOIR's written agency guidance in three separate ways. First, it provides that motions to dismiss "may be made orally", contradicting § 1003.23 and the Practice Manual, which require written and particularized pre-decision motions. Belsher Decl. Ex. 12. Second, it eliminates the opportunity to respond, allowing IJs to rule on motions to dismiss "from the bench" without the "10-day response period" mandated by EOIR guidance. *Id.*

Third, the guidance instructs that dismissal is proper where "circumstances have changed to such an extent that continuation is no longer in the best interest of the government." *Id.* But the guidance omits the regulation's language referring to "circumstances *of the case*," which effectively transforms an individualized, fact-based inquiry into a broad justification for dismissals based on generalized administrative priorities. *Compare id. with* 8 C.F.R. § 239.2(a)(7); *see also* Burr Decl. ¶ 20. Indeed, the accompanying guidance makes clear that the EOIR Dismissal Policy's shift was driven by "significant changes in [EOIR's] caseload" and the need to "meet the demands of the increasing

workload on the detained dockets" by reallocating judges from non-detained cases. Belsher Decl. Ex. 2; Burr. Decl. ¶ 20. This fundamentally misconstrues the regulation. In accordance with the regulation's plain text—"circumstances *of the case*"—the BIA has held that § 239.2(a)(7) demands a case-specific analysis. *Matter of S-O-G- & F-D-B-*, 27 I&N Dec. 462, 466-68 (A.G. 2018) (cleaned up) (emphasis added). As the Board explained, "the regulation presumably contemplates not just the automatic grant of a motion to [dismiss], but an informed adjudication by the [IJ]." *Matter of G-N-C-*, 22 I&N Dec. 281, 284 (BIA 1998). Similarly, in *Matter of Andrade Jaso & Carbajal Ayala*, the BIA underscored that dismissal under § 239.2(a)(7) must rest on factual developments in the individual's case. 27 I&N Dec. 557 (BIA 2019). There, the BIA found that "the series of actions by the respondents after applying for asylum," including "withdrawal of their asylum applications," "changed the circumstances in their case 'to such an extent that continuation [of the proceedings was] no longer in the best interest of the government.'" *Id.* at 558-59 (quoting 8 C.F.R. § 239.2(a)(7)). These decisions make clear that § 239.2(a)(7) cannot be invoked for generalized concerns like shifting enforcement priorities or docket size. Rather, there must be an individualized factual change or new evidence in the individual case to support dismissal. Accordingly, EOIR's departure from its internal regulations and guidance warrant judicial intervention because "the notion of fair play . . . precludes an agency from promulgating a regulation affecting individual liberty or interest, which the rule-maker may then with impunity ignore or disregard as it sees fit." *Montilla*, 926 F.2d at 164, 170.

### ii. The EOIR Dismissal Policy Is Arbitrary and Capricious.

For many of the same reasons the EOIR Dismissal Policy is unlawful under the *Accardi* doctrine, it is also arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A). First, it is arbitrary and capricious for EOIR to disregard its own binding regulations. Courts have consistently held that misstatements or departures from an agency's own binding regulations or rules render its action arbitrary and capricious. *Beechwood Restorative Care Ctr. v. Thompson*, 494 F. Supp. 2d 181, 202 (W.D.N.Y.

2007) (collecting cases). Here, as discussed above, the EOIR Dismissal Policy disregards the plain language of its regulations and manual. *See supra* 17-21. Because the policy misstates the plain language of § 239.2(a)(7), contradicts binding BIA decisions on that regulation, and ignores agency rules requiring notice and opportunity to respond to motions to dismiss, it is arbitrary and capricious.

Second, the EOIR Dismissal Policy is also arbitrary and capricious because the agency lacks a reasoned explanation for this sharp departure from the regulatory text of § 239.2(a)(7). The APA requires agencies to "provide a reasoned explanation" for its actions and "show that there are good reasons for the new policy." *Encino*, 579 U.S. at 221. An unexplained deviation from prior regulatory practice is arbitrary and capricious because it leaves courts unable to discern the basis for the agency's decision. *State Farm*, 463 U.S. at 57. The EOIR Dismissal Policy does not acknowledge that it is changing the regulatory standard or explain why an individualized, case-specific inquiry under § 239.2(a)(7) should be replaced with a broad policy tool to manage dockets. *See, e.g., R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 379 (S.D.N.Y. 2019) ("The agency's lack of a reasoned explanation for a policy that requires a departure from years of agency practice results in a rule that cannot carry the force of law." (internal quotation marks and citation omitted)).

Third, the policy fails to consider its impact on noncitizens' ability to pursue statutory relief— such as asylum, cancellation of removal, or adjustment of status—or the fundamental procedural rights that removal proceedings are designed to protect. The INA and its implementing regulations clearly contemplate that noncitizens will be able to seek relief through these proceedings. *See generally* 8 U.S.C. § 1229a. The EOIR Dismissal Policy "attempt[s] to strip [non-citizens'] right to engage in an immigration process made available to [them]" and the agency has "provided no explanation or justification" for such a reversal. *Calderon v. Sessions*, 330 F. Supp. 3d 944, 958 (S.D.N.Y. 2018); *see also De Jesus Martinez v. Nielsen*, 341 F. Supp. 3d 400, 410 (D.N.J. 2018); *Wanrong Lin v. Nielsen*, 377 F. Supp. 3d 556, 564 (D. Md. 2019). This change in policy "effectively use[s] [required immigration processes]

to lure [noncitizens] to [their] arrest" and "prevent[s]" them from pursuing rights and relief afforded to them by the INA. *Wanrong Lin*, 377 F. Supp. 3d at 564; *see also* Baltimore Decl. ¶ 37 (member with pending asylum and SIJS applications arrested after dismissal, jeopardizing eligibility for relief); Rowland-Kain Decl. ¶¶ 14–17, 22(e)–(j), 24, 26 (*pro se* asylum seekers' cases dismissed without notice or justification, followed by ICE arrests at court); Konaté Decl. ¶¶ 18–23 (asylum seeker arrested after hearing and transferred to detention facility out of state). Since the policy ignores "important aspects of the problem," including consequences for vulnerable people whom the statute was designed to protect, it is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

## II.    Absent a Stay, Plaintiffs Will Experience Irreparable Harm.

These unlawful policies are causing Plaintiffs and their members irreparable harm. Plaintiffs have at least nineteen members with upcoming hearings scheduled for the coming weeks and months, *see supra* at 8, who face the prospect of detention, family separation, and removal, as well as the loss of their right to pursue pending claims for immigration relief, if a stay is not granted.

First, these members will face irreparable harm if they are arrested at their immigration court proceedings. "[D]eprivation of an alien's liberty is, in and of itself, irreparable harm." *Velesaca v. Decker*, 458 F. Supp. 3d 224, 240–41 (S.D.N.Y. 2020) (internal quotation marks and citation omitted); *see also Rosales-Mireles v. U.S.*, 138 S. Ct. 1897, 1907 (2018) ("Any amount of actual jail time is significant[] and has exceptionally severe consequences for the incarcerated individual and for society which bears the direct and indirect costs of incarceration." (cleaned up)); *Barker v. Wingo*, 407 U.S. 514, 532 (1972) (detention has a "serious" "detrimental impact on the individual"); *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (unconstitutional detention is irreparable harm); *Velasquez v. Kurzdorfer*, No. 25-CV-493, 2025 WL 1953796, at *17 (W.D.N.Y. July 16, 2025) (finding in case of noncitizen arrested at immigration court that "there is no question that unlawful detention causes irreparable harm"). Moreover, as a result of their arrests, many will experience "indefinite family separation," which

"[c]ourts, including those within this Circuit, have recognized . . . as a form of irreparable injury." *Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232, 268 (S.D.N.Y. 2020); *see also Martinez v. McAleenan*, 385 F. Supp. 3d 349, 371 (S.D.N.Y. 2019) (same).

Second, Plaintiffs' members will also face irreparable harm if their removal proceedings are dismissed, as those proceedings permit them to seek relief from removal. *See, e.g., Woodby v. I.N.S.*, 385 U.S. 276, 286 (1966); *Bridges v. Wixon*, 326 U.S. 135, 152-54 (1945); *Montilla*, 926 F.2d at 170. Dismissal will prevent Plaintiffs' members from seeking immigration relief, including asylum and other humanitarian relief, and expose them to potential deportation—what the Supreme Court has "long recognized" is "a particularly severe 'penalty.'"[5] *Padilla v. Kentucky*, 559 U.S. 356, 365–66 (2010) (citing *Fong Yue Ting v. United States*, 149 U.S. 698, 740 (1893)); *see also De Jesus Martinez v. Nielsen*, 341 F. Supp. 3d 400, 408–09 (D.N.J. 2018) ("Denying [petitioner] the opportunity to complete the waiver process would constitute the ultimate irreparable harm—deportation.").

Further, as a direct result of the new policies, Plaintiff The Door has been forced to divert staff and resources from its core work of full-scope immigration representation of members to (1) meet increased demand at its Drop-In Legal Clinic; (2) develop new screening protocols to identify at-risk members; (3) create Know-Your-Rights materials; (4) prepare motions for remote appearances; and (5) provide emergency legal counseling to members on protecting their ability to pursue relief in ongoing proceedings. Baltimore Decl. ¶¶ 24–31. These policies also frustrate The Door's mission of helping noncitizen members secure immigration relief by foreclosing meritorious claims and cutting off The Door's services to members transferred outside of New York post-arrest. *Id.* ¶¶ 32–34.

### III.    The Balance of Equities and the Public Interest Strongly Favor a Stay.

---

[5] Detention similarly severely impairs noncitizens' ability to effectively litigate their removal case. *See Stack v. Boyle*, 342 U.S. 1, 4 (1951) (noting release "permits the unhampered preparation of a defense"); *Barker v. Wingo*, 407 U.S. 514, 533 (1972) (noting that a detained criminal defendant "is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense"); Alina Das, *Immigration Detention: Information Gaps and Institutional Barriers to Reform*, 80 U. Chi. L. Rev. 137, 157–58 (2013) (explaining how "detention itself makes such information acquisition relatively difficult for the noncitizen"). Thus, the ICE Courthouse Arrest Policy works in concert with the EOIR Dismissal Policy to cause irreparable harm to Plaintiffs' members by undermining their ability to litigate their removal.

The remaining factors decisively favor a stay. In evaluating a motion for preliminary relief against the government, "balancing of the equities merges into [the court's] consideration of the public interest." *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021). "It is evident that [t]here is generally no public interest in the perpetuation of unlawful agency action. . . . The inverse is also true: there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) (cleaned up).

Here, the public interest strongly favors a stay of ICE's policy of conducting immigration courthouse arrests, which is not only unlawful agency action, but has also caused innumerable harms to noncitizens and their families, including profound emotional and physical distress, the separation of families, loss of employment and income, disruption of medical care, and loss of caregiving. *See* Levenson Decl. ¶ 14 (describing "true panic and horror on . . . faces" of noncitizens, one of whom "appeared to have a panic attack"); *id.* at 19-20, 22–25 (describing the separation of families and couples, including a man from his pregnant wife and a man married to a U.S. citizen); Eugenio Decl. ¶ 15 (describing noncitizens who were suddenly detained and had "a physical and emotional defeat in their body language that I will never unsee"); Cortes Decl. ¶¶ 4, 6 ("people were in tears and shaking" and a family member "broke down in tears and expressed concern because [a detained individual] had not brought important prescription medication"); Gilliam Decl. ¶¶ 12, 15, 17–18, 20, 25, 26–31 (describing, *inter alia*, the separation of a man from his partner who was pregnant, and the arrest of a woman who looked like she had "fainted" and "was unconscious," but "ICE officers then dragged the women's limp body into the elevator" without trying "to revive" her).

The ICE Courthouse Arrest Policy is harmful not only to those arrested, but also to many more noncitizens who are not showing up to immigration court for fear that they will be arrested, and who are consequently being ordered removed *in absentia*, even where they may have immigration relief

available to them. *See* Rowland-Kain Decl. ¶ 29 (significant decrease in noncitizens who came to court in days following courthouse arrests); Gilliam Decl. ¶ 28 (noting "unusually large number of *in absentia* removal orders" following courthouse arrests). Bad actors have taken advantage of noncitizens' fears and have scammed noncitizens by pretending to be attorneys and charging noncitizens money for fake motions to appear virtually, leading noncitizens to miss their hearings. *See* Gilliam Decl. ¶¶ 29–30. And the policy disturbs the fair administration of justice, the proper functioning of immigration courts pursuant to the INA's mandate, and decorum in courthouses. *See* Fleischaker Decl. ¶ 32–33; Burr Decl. ¶ 34–35; Rowland-Kain Decl. ¶¶ 28–32; Umana Decl. ¶ 9–10; Gilliam Decl. ¶¶ 22–25; Lander Decl. ¶¶ 5, 11, 15, 17, 22. A stay of the policy would halt all of these harms.

The public interest also strongly favors preliminary relief against dismissals, as countless people living in the United States with their families, including U.S. citizen spouses and young children, are having their removal proceedings dismissed without any process or opportunity to pursue immigration relief, including asylum and other humanitarian relief. *See Nken v. Holder*, 556 U.S. 418, 436 (2009) (there is a public interest in preventing noncitizens "from being wrongfully removed, particularly to countries where they are likely to face substantial harm").

Defendants cannot identify any countervailing interest that would outweigh the irreparable harm faced by noncitizens here. Indeed, the government *shares* Plaintiffs' interests in upholding the fair administration of the immigration laws. *Cf. Nken*, 556 U.S. at 436; *see also You, Xiu Qing v. Nielsen*, 321 F. Supp. 3d 451, 469 (S.D.N.Y. 2018) ("The public interest is in enforcing *all* the immigration laws" and when the government's "actions have likely violated those laws[,] . . . the public interest also lies in preventing [the government's] further abuse").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion.

Dated: August 11, 2025
        New York, New York

Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION
    FOUNDATION

Amy Belsher
Elizabeth Gyori
Wafa Junaid
Claire Molholm*
Thomas Munson
M. Porter**
Robert Hodgson
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION

Noor Zafar
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION

Michael K.T. Tan
Hannah Steinberg**
Oscar Sarabia Roman**
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0770

EMERY CELLI BRINCKERHOFF ABADY WARD &
    MAAZEL LLP

/s/_____
Katherine Rosenfeld
Samuel Shapiro
Emily Wanger
One Rockefeller Plaza, 8th Floor
New York, NY 10020
Tel: (212) 763-5000

MAKE THE ROAD NEW YORK

Harold Solis
Paige Austin
301 Grove Street
Brooklyn, NY 11237
Tel: (718) 418-7690

* Admission pending
**Pro hac vice application forthcoming

*Counsel for Plaintiffs*