**DECLARATION OF BETH BALTIMORE, DEPUTY DIRECTOR, THE DOOR'S LEGAL SERVICES CENTER**

I, Beth Baltimore, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am the Deputy Director of the Door's Legal Services Center. I previously served as the Director of Pro Bono and Civil Legal Initiatives and Pro Bono Managing Attorney at The Door's Legal Services Center and have worked at The Door since January 2021.

2. As part of the leadership team of The Door's Legal Services Center, I am responsible for shaping many of the legal team's organizational priorities, supervising staff and projects, and fundraising.

3. I have personal knowledge of the facts contained in this declaration including the organization's mission, core activities, programmatic work, staffing, and membership.

**The Door's Structure, Mission, and Activities**

4. The Door is a New York-based 501(c)(3) nonprofit corporation founded in 1972. The Door's mission is to empower New York City's diverse population of disconnected youth by providing them with the tools they need to become successful. At The Door, young people between the ages of 12 and 24 can access free comprehensive services, including health care, education, mental health counseling and crisis intervention, legal assistance, high school equivalency and college preparation services, career development, housing support, arts, sports and recreational activities, and nutritious meals. The Door has two youth centers, one in Manhattan and one in the Bronx, and two housing sites on the Lower East Side of Manhattan. We also have a 24-hour drop-in center for runaway and homeless youth. The Door specializes in representing and working with young people who are unhoused.

5. As part of its mission to provide its members with comprehensive services, The Door provides its growing membership of noncitizen young people with legal assistance in their

1

immigration cases to help them secure any immigration benefits or humanitarian immigration relief for which they are eligible. The Door accomplishes this in several ways. Attorneys at The Door's Legal Services Center provide full representation to many members in removal proceedings before immigration courts, as well as members seeking to regularize their status through the filing of affirmative humanitarian applications. The Door also holds a weekly drop-in legal clinic (the "Drop-In Legal Clinic") where attorneys provide limited-scope assistance and advice to members regarding their immigration cases and offer referrals to other non-profit legal service providers.

**The Door's Membership**

6. The Door is a membership-based organization that serves over 9,000 youth annually, the majority of whom reside in New York City.

7. Young people join The Door by meeting with a staff or intern from the membership team and signing a membership agreement in which they agree to uphold three non-negotiable rules: no physical fights, no harassment/threats/bullying, and no possession of weapons in The Door's space. The Door's membership agreement is attached hereto as Exhibit A. Individuals who join The Door remain members until they turn 25, unless their membership is terminated, which can happen if they break one of the three non-negotiable rules in The Door's membership agreement.

8. The Door maintains a database of its members. Joining The Door gives members access to our comprehensive services and programs, as well as The Door's space and community. Non-members are not allowed inside The Door's space unless they are accompanying a Door member or staff of The Door, and do not have access to The Door's services, except for a few

2

limited programs that are open to non-members, such as The Door's drop-in center for runaway and homeless youth.

9. Members can also join The Door's Youth Council, a group of active Door members who receive training and support in developing workforce, leadership, and organizing skills, while representing the voice of young people at The Door and giving back to The Door community. Youth Council activities include attending weekly meetings and skill-building workshops, planning community events, and gathering feedback from other Door members.

10. The Door's membership is composed primarily of low-income and working-class young people, including many who are unhoused, lack familial support, and/or face significant economic hardship. These realities shape both the needs of our members and the services we provide.

11. Many Door members seek referrals for legal services to adjust their immigration status when they first meet with a membership counselor to join The Door. Door members are referred to the Legal Services Center and are also provided with lists of other non-profit legal service providers in New York City. Many Door members have pending applications for various forms of immigration relief, such as asylum and Special Immigrant Juvenile Status (SIJS).

12. Because of concerns for our members' privacy and because their trust in The Door is crucial to our mission and work, The Door does not share our membership information with third parties, including government agencies.

13. Many of The Door's noncitizen members are in removal proceedings. As a result of the government's new policies encouraging Immigration Judges ("IJs") to summarily dismiss noncitizens' regular removal proceedings without meaningful process (the "Dismissal Policy") and broadly authorizing U.S. Immigration and Customs Enforcement ("ICE") to make arrests at

immigration courthouses (the "Courthouse Arrest Policy"), many of our members are now at risk of having their removal proceedings dismissed, causing them to lose the opportunity to seek relief from removal, and being arrested and detained when they attend mandatory immigration court proceedings.

14.     Colleagues and immigration advocates observing immigration court hearings have reported to me that the number of noncitizens failing to appear at their immigration hearings since these two policies went into effect has increased significantly, causing orders of removal *in absentia* to be entered against them.

15.     Our immigrant Door members will face devastating consequences if deported, including separation from their families and friends, the loss of their jobs and homes, and persecution, physical and psychological harm, and even death. Many Door members fled their home countries because of conflict, violence, abuse, or persecution, and would be exposed again to these conditions if deported.

**The Door's Core Activities Before the Government Implemented the Courthouse Arrest and Dismissal Policies**

16.     The Door has long engaged in core activities supporting young people who are not United States citizens and who are seeking immigration relief, including by providing them with legal advice and representation.

17.     The Door's Legal Services Center is a program within The Door established in 1992. Legal Services Center attorneys, employed by The Door, provide legal and case management services to members in need of immigration and other civil legal assistance. The Legal Services Center makes holistic representation available to noncitizen members so that they can pursue various forms of immigration relief, such as SIJS, asylum, Temporary Protected Status

(TPS), U and T non-immigrant status, adjustment of status and work authorization, among other forms of relief.

19. The Legal Services Center's Detained Minors Project represents unaccompanied children detained by HHS's Office of Refugee Resettlement (ORR) in multiple New York-area facilities, serving up to 350 children at a time. We service two short-term ORR shelters, Children's Village and Abbott House, including providing unaccompanied children with Know Your Rights (KYR) trainings and legal screenings. We also provide representation to youth who are placed in two ORR-funded long-term foster care programs, JCCA and Cayuga, and our attorneys appear as friend of the court on the detained juvenile docket.

19. Additionally, The Door's Legal Services Center represents unaccompanied child members and young adult members in removal proceedings in New York and in their applications for immigration relief.

20. Providing full scope representation to individual members is the core work of the Legal Services Center staff. We enter into full representation of these members and remain as their attorneys throughout each step of their case.

21. Since around 2013, The Door's Legal Services Center has hosted the Drop-In Legal Clinic once a week. The majority of Drop-In Legal Clinic attendees live in shelters or are unstably housed.

22. Over the past few years, we have met hundreds of young people through the Drop-In Legal Clinic who are in search of quality advice and representation in their immigration cases. Young people who come to the clinic are screened for eligibility for immigration relief, given KYR information, and advised on their immigration cases. If these young people are not already Door members, they become members after their visit to the Drop-In Legal Clinic.

23. Prior to the implementation of the government's new policies in May 2025, Door members appearing *pro se* in immigration proceedings would typically attend hearings in their cases in person, without any fear of being arrested by ICE agents. We advised them that it was important to appear at all hearings because failing to appear would most likely lead to entry of a removal order against them *in absentia*. Door members generally followed our advice, as they did not fear being arrested at court.

**The Government's Courthouse Arrest and Dismissal Policies Have Injured The Door's Ability to Engage in its Core Activities and Frustrated The Door's Mission**

24. The government's Courthouse Arrest and Dismissal Policies have forced The Door to divert resources from its core activity of providing full scope representation to members in immigration proceedings in order to respond to the Policies and impeded The Door's mission of assisting our noncitizen members with their immigration cases.

*Diversion of Resources Impeding The Door's Core Activity of Providing Full Scope Representation*

25. Since May 2025, when the Courthouse Arrest and Dismissal Policies were implemented, the sheer number of people seeking legal advice at the Drop-In Legal Clinic has increased dramatically, so much so that we are not able to meet with everyone who comes to the clinic and have had to tell some people to come back at a later date. We have had to schedule additional times to meet with Drop-In Legal Clinic attendees to accommodate everyone with advice and support for their upcoming immigration court hearings. The increased volume and urgency of Door members' need for legal assistance relating to the Courthouse Arrest and Dismissal Policies has required The Door to bring more staff to the Drop-In Legal Clinic, taking these staff away from their pre-existing work providing direct, full-scope representation of members. We have been forced to divert resources from other Door activities in order to provide

prompt legal advice and assistance to our members at the Drop-In Legal Clinic and to meet the increased demand for urgent, high-stakes legal services in response to the government's new policies.

26. In addition, the type of services requested at the Drop-In Legal Clinic since May 2025 has changed *and* the new services required are more time-consuming and intensive than the services previously sought at the clinic. We have seen a dramatic increase in the number of extremely fearful members coming to the clinic for advice about how to handle their upcoming immigration hearings in light of the government's new policies. Since May 2025, the majority of Door members attending the Drop-In Legal Clinic have expressed extreme fear of going to immigration court due to the risk that they will be arrested. Door staff have also received panicked calls and requests for assistance from members who are terrified to attend their court appearances. We regularly hear reports from Door members whose friends have been detained by ICE during a routine court appearance.

27. In short, The Door has needed to change the nature of the services we provide, because The Door has been required to devote significant additional time and resources to advising its members about the risk that they will have their removal proceedings dismissed and/or be arrested at immigration court. The new services The Door now has to provide in response to the Courthouse Arrest and Dismissal Policies are set forth below.

28. ***Developing New Know Your Rights Materials and Screening Protocols.*** The Door's legal team has needed to develop new know-your-rights materials in the languages most spoken by our members and devote time and resources to screening members for courthouse arrest and/or dismissal vulnerability in order to provide those at risk with personalized advice. The screening process is time intensive, as it involves collecting information about members' entry to

the United States, whether they are involved in removal proceedings, whether they have an upcoming hearing date, whether they have any pending applications for relief, and a variety of other detailed pieces of information. Because a member's circumstances could change at any time, Door staff must repeat these screenings each time they interact with a member; otherwise, staff could miss a key detail that could render a member significantly more vulnerable to the new policies.

29. ***Preparing Motions for Remote Appearances.*** The Door's legal team has needed to devote time and resources to assisting members with drafting and filing motions to appear remotely, via Webex, at their upcoming immigration court hearings to protect them from being arrested when they attend. Door staff have also needed to develop materials to assist *pro se* members with making motions to appear remotely on their own behalf. Because it is so dangerous for noncitizens to go to immigration court, and *pro se* motions generally must be filed in person, Door staff must also go to court to file these motions on members' behalf, which takes additional time and resources. If a member does not make a motion to appear remotely, they face the impossible choice of either appearing and likely having their removal proceedings dismissed and being arrested and detained, or not attending court and losing the ability to pursue their asylum case or other relief from removal. In order to meet our members' needs for assistance drafting and filing motions to appear remotely, we have had to schedule additional clinics, where Door staff prepare *pro se* motions and conduct KYR presentations for members, in addition to our pre-existing weekly Drop-In Legal Clinic.

30. ***Advising Members about Responding to New Policies.*** The Door's legal team has also been forced to devote increased time and resources to advising noncitizen members about specific legal procedures that may impact their removal proceedings. For example, The Door's

8

legal team has needed to explain to members who have upcoming hearings what it means for the government to make a motion to dismiss; why opposing the government's motion to dismiss may protect them from courthouse arrest; and how to oppose such a motion. Because most members have had little to no formal education, let alone legal education, it takes significant time and effort to adequately explain these legal processes in a way that is understandable and actionable for Door members. Door staff have needed to closely monitor changes to immigration law and practice and adjust the legal services we offer young people to be responsive to current needs – even if that means making changes on a day-by-day basis.

31. Door staff at the Drop-In Legal Clinic often cannot help every member who needs to make a motion to appear remotely during the clinic hours, so staff are forced to schedule meetings with members during non-clinic hours. The time required to undertake all of the above-mentioned projects—including filing motions in person on behalf of Door members, developing new KYR resources, dealing with the increased volume of members seeking advice about how to respond to the government's new arrest and removal policies—all take Door staff away from working on their individual cases, the core work of the Legal Services Center staff that The Door was able to do before the government implemented the Courthouse Arrest and Dismissal Policies.

*Frustration of The Door's Mission of Helping Members Secure Immigration Relief*

32. Door attorneys represent members in removal proceedings in immigration court and in filing affirmative humanitarian relief applications. The Courthouse Arrest and Dismissal Policies will cause these Door members to be arrested and detained and to have their immigration court proceedings dismissed, causing them to lose the opportunity to secure immigration relief.

33. As one specific example, the Courthouse Arrest and Dismissal Policies will thwart Door attorneys' prior and ongoing efforts to help their members obtain SIJ status. The Door

9

prepares and files SIJS petitions on behalf of hundreds of its members each year. SIJ status is only available to people who reside in the United States both at the time the petition is filed and at the time USCIS decides the petition. By implementing its new policies, the government will deport Door members with meritorious pending or future SIJS petitions. As a result, those members will lose the opportunity to obtain SIJ status because they will be outside of the United States when USCIS decides their petition.

34. The Courthouse Arrest Policy will further frustrate The Door's mission because it is likely that at least some noncitizen members who are arbitrarily arrested and detained under that Policy will be transported to detention facilities located outside of New York City. This will make it impossible for The Door to provide comprehensive services to these noncitizen members, as The Door is only able to provide its holistic services to members who are physically located in or near New York City, and detention will make it impossible for members to access The Door's in-person services, including health care services.

**The Door's Members Are Subject to the Government's Courthouse Arrest and Dismissal Policies**

35. The Door's members include noncitizens who are in full removal proceedings and have court appearances in the New York City immigration courts at 26 Federal Plaza, 201 Varick Street, and 290 Broadway in Manhattan. At least two Door members have been arrested and detained since the Policies went into effect, and at least fifteen Door members have upcoming in-person hearings between today and the end of September 2025.

36. Examples of members who have been affected or are at risk of being affected by the government's Courthouse Arrest and Dismissal Policies include:

37. The Door – John Doe 1 is a member of The Door and a noncitizen. He entered the United States alone at nineteen years old to seek asylum. He filed a timely *pro se* asylum

10

application with the court as well as a *pro se* I-360 SIJS application with USCIS. He is eligible for SIJS based on the death of his father and neglect by his mother. He appeared at his Master Calendar Hearing in June 2025 via Webex with the private immigration attorney he hired to represent him in removal proceedings. However, the IJ presiding over his case ordered him to appear in person. Later that day, John Doe 1 appeared for his case at 290 Broadway. The government moved for dismissal and the Immigration Judge dismissed the case over John Doe 1's objection. John Doe 1 was immediately arrested by ICE at 290 Broadway. He was transferred to 26 Federal Plaza, then Nassau County Correctional Facility, and finally to the Metropolitan Detention Center (MDC) in Brooklyn, New York, where he remains. When he was detained, he was terrified and confused, as no one explained what had happened in a language he understands. At MDC, the staff speak to him in English, a language he is learning but cannot converse in, so he is not able to respond or ask questions. Prior to being arrested, John Doe 1 was working hard to learn English so he could go on to earn his high school equivalency diploma. He was enrolled in two different language classes, one at The Door and one through the New York Public Library (NYPL). He has dreams of working in the medical field. When he was detained in June 2025, he lost access to his English classes, community, and all programming at The Door. John Doe 1 fears removal to a country where he faces harm. If he is removed from the United States prior to the adjudication of his SIJS application, he will forever lose the ability to obtain SIJS.

38. The Door – John Doe 2 is a member of The Door and a noncitizen. He entered the United States without family as a 19-year-old in order to seek asylum. He has a pending asylum application. John Doe 2 came to the Drop-In Legal Clinic in June 2025 because he was afraid to attend his upcoming immigration court appearance in July 2025 out of fear that he would be arrested while at court. The Door provided John Doe 2 with individualized advice and KYR

11

information, including regarding his risk of having his removal proceedings dismissed and being arrested, as well as how to oppose a motion to dismiss in immigration court. The Door assisted John Doe 2 with a *pro se* motion to permit a virtual appearance and filed the motion on his behalf. Prior to May 2025, The Door would not have had to counsel John Doe 2 about motions to dismiss in immigration court or help him make a motion to appear virtually. Although John Doe 2 is currently scheduled to appear virtually at his next hearing in August 2025, he may have future hearings scheduled at which he will be required to appear in person. John Doe 2 works in a restaurant and has a strong community of friends in New York. He attends English classes to improve his understanding of the language. He hopes someday to become a successful business owner.

39. **The Door – John Doe 3** is a member of The Door and a noncitizen. He entered the United States without family when he was 18 years old in order to seek asylum. He has a pending asylum application. A client of The Door's Legal Services Center alerted The Door in June 2025 that John Doe 3 had an upcoming immigration court appearance in July 2025 and was afraid that he would be arrested while at court. The Door provided John Doe 3 with individualized advice and KYR information, including regarding his risk of having his removal proceedings dismissed and being arrested, as well as how to oppose a motion to dismiss in immigration court. The Door assisted John Doe 3 with a *pro se* motion to permit a virtual appearance and filed the motion on his behalf. Prior to May 2025, The Door would not have had to counsel John Doe 3 about motions to dismiss in immigration court or help him make a motion to appear virtually. Although the motion was not decided in advance of his hearing, he appeared virtually and his case was continued until February 2026, when he will have an in-person hearing. John Doe 3 is enrolled in a transfer high school in Manhattan where his favorite subject is math. He has a close-knit community of

friends from school and the Guinean community in New York City. He hopes to find a career in a hospital or in the medical field that allows him to help others and give back to the community.

40. The Door – John Doe 4 is a member of The Door and a noncitizen. He entered the United States without family when he was 22 years old in order to seek asylum. He has a pending asylum application. John Doe 4 came to the Drop-In Legal Clinic seeking assistance because he is afraid to attend his upcoming immigration court appearance in August 2025 due to the risk that he will be arrested at the courthouse. The Door provided John Doe 4 with individualized advice and KYR information, including regarding his risk of having his removal proceedings dismissed and being arrested, as well as how to oppose a motion to dismiss in immigration court. The Door assisted John Doe 4 with a *pro se* motion to permit a virtual appearance and filed the motion on his behalf. The motion has not yet been decided. Prior to May 2025, The Door would not have had to counsel John Doe 4 about motions to dismiss in immigration court or help him make a motion to appear virtually. John Doe 4 is an involved member of The Door who regularly spends time at The Door and participates in Door programming.

41. The Door – John Doe 5 is a member of The Door and a noncitizen. He entered the United States without family when he was 19 years old in order to seek asylum. He has a pending asylum application and is pursuing SIJS *pro se*. John Doe 5 came to the Drop-In Legal Clinic because he was scared to attend his upcoming immigration court appearance in September 2025 due to his fear that he would be arrested while at the courthouse. The Door provided John Doe 5 with individualized advice and KYR information, including regarding his risk of having his removal proceedings dismissed and being arrested, as well as how to oppose a motion to dismiss in immigration court. The Door assisted John Doe 5 with a *pro se* motion to permit a virtual appearance and filed the motion on his behalf. The motion has not yet been decided. He does not

know what he will do if it is not decided before his hearing date. Prior to May 2025, The Door would not have had to counsel him about motions to dismiss in immigration court or help him make a motion to appear virtually. John Doe 5 is in an electrician job training program, enrolled in a program called Pathways to Graduation, which helps students earn their High School Equivalency Diploma, and has a strong community of friends in New York. He regularly spends time at The Door.

42.     The Door – John Doe 6 is a member of The Door and a noncitizen. He entered the United States without family as a 19-year-old in order to seek asylum. He has a pending asylum application. John Doe 6 came to the Drop-In Legal Clinic because he was scared to attend his upcoming immigration court appearance in August 2025 out of fear that he would be arrested while at court. The Door screened John Doe 6 for courthouse arrest risk and provided him with individualized advice and KYR information, including regarding his risk of having his removal proceedings dismissed and being arrested and how to oppose a motion to dismiss in immigration court. The Door assisted John Doe 6 with a *pro se* motion to permit virtual appearance and filed the motion on his behalf. The motion has not yet been decided. Prior to May 2025, The Door would not have had to counsel John Doe 6 about motions to dismiss in immigration court or help him make a motion to appear virtually. John Doe 6 currently works in food delivery. He hopes to pursue a career in construction.

43.     As these individuals demonstrate, Door members have been and will be harmed by the Courthouse Arrest and Dismissal Policies. Members have told Door staff they are terrified, anxious, and confused about the possibility of being arrested and detained while attending court appearances and losing the ability to seek immigration relief as a result of the government's policies.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in Brooklyn, New York.

_____
Beth Baltimore

Executed this 10th day of August 2025

# Exhibit A



## Membership Agreement

**Benefits to becoming a Door member:**
- Being a member of a community that values young people
- Access to **Free and Confidential** services to help you reach your goals
- Access to supportive staff members who will help guide you on your journey toward independence and adulthood
- Assistance when you age-out of The Door including connections to outside resources

**Non-Negotiable Rules**
1. No physical fights
2. No harassment/threats/bullying
3. No possession of weapons in the space

*Breaking one of these rules will result in an immediate limitation of Door privileges.*

**Community Expectations**
- No Vandalism
- No Substance Possession/Exchange/Use
- No Theft
- No Inappropriate Sexual Contact
- Gang identification is prohibited, this is a neutral space

*Breaking one of these expectations will result in an immediate reaction from staff.*

**Please keep in mind:**
- The Door is not responsible for any lost or stolen property.
- Children under 12 years old are not allowed in the space.
- No smoking in the space.

Information about me and the activities I participate in at The Door is available to all program staff. I understand that the purpose of sharing this information is to provide me with the best possible services and support. However, services I receive at the health center, in counseling, RHY case management, or in legal **are not shared** unless I give specific consent. The Door staff from these departments will discuss this additional consent if needed.

I _____ agree to uphold these three non-negotiable rules during my membership at The Door and will respect the Door's community expectations. By signing this agreement, I pledge to abide by the rules that are outlined above and have been reviewed by my Intake Counselor.

_____        _____
New Door Member's Signature                Date

_____        _____
Intake Counselor's Signature               Date