# DECLARATION OF HON. JENNIFER A. DURKIN

I, Jennifer A. Durkin, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

## I. Background

1. I was appointed as an Immigration Judge in July 2023 and served at the Varick Immigration Court in New York City until July 23, 2025, when I was terminated because the Department of Justice decided not to convert me to permanent status at the end of my two-year probationary period.

2. I have practiced immigration law my entire career. From 2022 to 2023, I was Deputy Attorney-in-Charge of the Immigration Law Unit at the Legal Aid Society in New York. From 2020 to 2022, I was a supervising attorney at the Legal Aid Society on the New York Immigrant Family Unity Project, representing detained immigrant New Yorkers facing removal. From 2005 to 2020, I was in private practice as a partner at several firms and represented noncitizens before EOIR; U.S. Citizenship and Immigration Services; and the Department of State. From 1999 to 2005, I worked at various private law firms as an associate.

3. I graduated from the University of California Los Angeles School of Law in 1999 and am a member of the State Bar of California and the District of Columbia Bar.

4. I provide this declaration based on my personal knowledge and experience and review of publicly available information.

## II. EOIR Dismissals Policy and ICE Courthouse Arrests

5. As an Immigration Judge at the Varick Street courthouse, I completed over 1,500 cases, most of which involved non-detained respondents.

6. Starting in late May 2025, there was a dramatic increase in motions to dismiss made by DHS attorneys in the cases I was presiding over.

7. My understanding is that these oral motions were being made pursuant to a new policy that the Department of Justice announced via email on May 30, 2025, which is publicly available and I have reviewed. The policy explained that there had been two new developments in non-detained cases over the last few weeks: (1) DHS was carrying out enforcement actions in EOIR spaces and (2) DHS attorneys were moving to dismiss currently pending cases. In light of these developments, and to ensure expeditious consideration of cases, IJs were instructed to permit DHS attorneys to make oral motion to dismiss, without the requirement of additional documentation or briefing, and to issue

oral rulings the same day from the bench. IJs were also instructed to review the new DHS courthouse enforcement guidance, and were provided additional information about the regulatory authority under which DHS would make such motions and expedited removal proceedings.

8. Many of the cases I oversaw were subject to the new dismissals policy. Typically, the DHS attorney would indicate the number of dismissal motions that they intended to make at the beginning of a Master Calendar docket, which most immigration judges hold once a week. These dockets consist of master calendar hearings, which are similar to a criminal arraignment or a case status conference in civil litigation. The vast majority of cases on the Master Calendar dockets are pro se, or unrepresented, Respondents. That is because of a procedure called Case Flow Management which is usually triggered if an attorney enters an appearance on a case. If Case Flow is triggered, the case would be taken off any upcoming Master Calendar docket and the assigned immigration judge would issue written scheduling orders.

9. When a certain respondent's name was called, the DHS attorney would make an oral motion to dismiss, citing 8 C.F.R. § 239.2(a)(7) and reciting the text of that provision, which permits DHS to cancel a Notice to Appear if "[c]ircumstances of the case have changed after the notice to appear was issued to such an extent that continuation is no longer in the best interest of the government." I would then ask the DHS attorney if they wanted to make any further arguments in support of the dismissal motion, and typically they had nothing to more to add.

10. Then, I would summarize to the respondent what DHS was seeking and explain the consequences of dismissing their full removal proceedings. I would ask the respondent if they had any questions, answer them, and then ask if they would like their case to be dismissed or if they would rather that their case remain active before the Court for a decision on their pending application for relief.

11. I would then render my decision. During the first week, since these oral dismissal motions were so unexpected, I simply issued an oral decision. In subsequent weeks, I would summarize my decision on the record and through the interpreter and then also provide respondents with a written decision. I denied all such motions that came before me, explaining that DHS chose to initiate full removal proceedings via service of a Notice to Appear, respondents had attended anywhere from one to three court hearings in their cases, and had already filed for asylum by the time DHS made its motion. In light of these factors and the absence of any additional arguments form DHS, I did not find that the agency had established "that circumstances of the case have changed." While there was further reasoning in my decisions, this was the general basis for my denials.

12. DHS made motions to dismiss only in cases where respondents were not represented.

13. The new dismissals policy was a drastic departure from EOIR regulations and the Immigration Court Practice Manual ("ICPM") and typical DHS practice. In accordance with EOIR regulations and the ICPM, most motions are typically made in writing by the moving party in advance of the hearing. The opposing party is then granted ten days to respond to the motion. Then the IJ will then issue a written decision on the motion. Occasionally, oral motions may be entertained, but the general policy is to ask the non-moving party if they would like ten days to respond to the oral motion. If they requested time to respond, I would not rule on the oral motion, sometimes ask that the motion be made in writing, and allow the opposing party ten days to reply.

14. Concurrent with the new dismissals policy, ICE expanded its presence in the courthouse and started conducting arrests there. ICE officers would be waiting outside the courtroom to arrest respondents as they left their hearings. There is one main waiting area at the Varick Immigration Court and it is very long and narrow with only one method of egress. The main hallways between the elevators and the entrance to the waiting room are also fairly narrow, so the large presence of officers in the hallways and waiting room was very apparent. Court staff would tend to update the IJs who were presiding over Master Calendar Hearings, so that we knew whether and how many enforcement agents were outside. ICE never sat in my courtroom, but it is my understanding that they did sometimes sit in the courtrooms of other IJs. As far as I am aware, no arrests were carried out inside the courtrooms themselves.

15. As a result of the dismissals and ICE arrests in courthouses, I started to notice that more respondents were not showing up for their hearings, leading to an increase in *in absentia* removal orders and motions to appear virtually. The presence of ICE officers conducting arrests in courthouses also created fear amongst respondents and their families and general chaos for the public, court staff, and judges. The dismissals policy also disrupted my work and management of my docket because the master calendar docket began taking more time to complete, as each oral motion to dismiss would take at least 15 minutes or more to get through. Typically, each master calendar hearing takes between five to seven minutes, not including any group pro se rights advisals.

Date: August 11, 2025

_____
Hon. Jenifer A. Durkin (former)