## Declaration of Rosanna Eugenio

I, Rosanna Eugenio, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Legal Director of the New York Immigration Coalition (NYIC), a member-led coalition of over 170 immigrant and refugee organizations representing the collective interests of approximately 4 million New Yorkers. The NYIC works to transform the lives of all New Yorkers by strengthening and building our members' power, organizing and educating our communities and the public, and using our collective voice to advocate for opportunity and justice.

2. The NYIC advocates for laws and policies to improve the lives of immigrants and all New Yorkers, particularly those that live in lower income communities; leverages the political power of immigrant communities by engaging in voter outreach and mobilization for key local, state, and federal elections; cultivates a new generation of immigrant civic leaders and community organizers by offering fellowships and leadership programs; provides multilingual informational materials on a range of issues; works with ethnic and mainstream media to relay important and often time-sensitive updates to immigrant communities; offers workshops and presentations on immigration law and other issues that affect immigrants on a daily basis; provides guidance to community groups, advocates, and legal providers on how to better serve their constituents; and on a limited basis, provides direct services.

3. I have worked at the NYIC since March 11, 2024, and served as the Legal Director since August 2024. I also serve as the NYIC's representative on the Steering Committee for our partner organization, Immigrant ARC (I-ARC), a coalition of immigration legal advocates that works on increasing access to justice and access to counsel for all immigrant New Yorkers. I have been practicing law since August 2012, and my entire experience is within the immigration law context. I have appeared before the New York Immigration Courts in non-detained cases, the Board of Immigration Appeals (BIA), and USCIS.

4. This declaration is based on my firsthand experience and recollection as a legal observer at the New York Immigration Court located at 26 Federal Plaza and information on June 2, 2025, and those collected from fellow observers that were part of our group that day. This was the second observation that I participated in since becoming aware that U.S. Immigration and Customs Enforcement (ICE) was arresting individuals attending their regularly scheduled immigration court hearings. My first observation was on May 29, 2025, via WebEx of Immigration Judge (IJ) James McCarthy's courtroom, when members of the I-ARC Steering Committee were alerted to imminent detentions of individuals attending their court hearings.

5. On June 2, 2025, I led a group of staff from NYIC and a partner organization to observe master calendar hearings at the immigration court at 26 Federal Plaza, New

York, NY. Our group arrived at the 12th floor of the building and looked for judges with master calendar hearing dockets, which are posted daily on a wall in the hallway. We identified that IJs Michael McFarland and Lena Golovnin were conducting master calendar hearings. We circled the floor looking for these courtrooms. In the hallway, we noticed about eight or more plainclothes ICE officers standing in the hallway – half were near IJ McFarland's courtroom on one side of the hallway, the other half were near IJ Golovnin's courtroom on the other side of the hallway. Another group of ICE officers was posted in the middle by the elevator banks on the 12th floor.

6. Our entire group initially sat in IJ McFarland's room because IJ Golovnin's room was very full. Eventually IJ Golovnin allowed me and another person to observe hearings in her courtroom. We sat in the front of the room to the side of the Respondent's table.

7. Altogether, our group witnessed the Department of Homeland Security (DHS) move to dismiss the removal proceedings of six individuals, three in IJ McFarland's courtroom and three in IJ Golovnin's courtroom. ICE officers arrested all six after their court hearings. They were also all *pro se*. I personally observed three of these cases from IJ Golovnin's courtroom; the staff from our partner organization in the other courtroom observed the other three.

8. During my observation, I identified two people sitting in the front left corner of the room who appeared to be ICE officers in plainclothes. They spoke to each other in English while everyone else in the room needed an interpreter. The IJ at one point asked everyone who was there for their court hearing to raise their hand; these two did not, and neither did I and my fellow observer. At one point during the hearing, the IJ interrupted to warn all present in the courtroom to put their phones away. I saw one of the ICE officers in the room ignore that warning several times. From where I was sitting, I could see her look down at her phone in her hands. At one point, to assist the court take pleadings, my fellow observer and I offered to walk around the room and help Respondents locate their Notice to Appear. As I was walking, I saw the phone in the officer's hands. I quietly stated that there were no phones in the courtroom and that mine were off and in my bag. There are also signs around the room instructing to turn off all cell phones and pagers while court is in session. After assisting with locating the Notice to Appear, I returned to my seat. Several times, the same officer looked around before using the phone in her hands. She would periodically catch my glance when she did this and stop, but I would notice her look down at her hands and lap consistent with someone looking down at their phone. Based on this repeated behavior with the phone, and reports of communication between the plainclothes officers in the courtrooms and those in the hallway, I believe she was communicating with the officers outside the room.

9. From my observation in IJ Golovnin's courtoom, DHS sought dismissal for only the three men that ICE ultimately detained and no one else. During the master calendar hearing and on the record, IJ Golovin confirmed for which Respondents she had asylum applications from. I can confirm based on my conversations with the men during breaks that at least two of the three men submitted asylum applications.

10. In each case, DHS had provided no advance notice of its motion and made an oral motion to dismiss in court. The motion consisted of stating that the Department was seeking dismissal based on 8 C.F.R. § 239.2(a)(7). There was no further justification or individualized basis for the motion. There wasn't even a reading of 8 C.F.R. § 239.2(a)(7) so that the interpreter could interpret to the Respondents what the regulation says. The IJ provided a brief explanation to the Respondents that the Department was moving to dismiss their case. At no point was there acknowledgement that there were ICE officers in the hallway seeking to detain these men or that they would not be able to pursue their asylum applications if their cases were dismissed.

11. The IJ set a deadline of June 4, 2025 for DHS to send the Respondents a written motion, and set a hearing date of June 17, 2025 for the Respondents to return to the court. When DHS made the motion, IJ Golovnin asked for the motion in writing. The Assistant Chief Counsel (ACC) questioned the IJ about what the basis was for not allowing just an oral motion. The IJ responded that the Respondents are entitled to respond, and that she would like the Respondents to be able to talk to an attorney. She stated that this was the "fair way to do it." I noted that the ACC did not identify herself during any of the proceedings that I observed, but I could see a last name from the Webex that was logged in the room and identified her as ACC Teng.

12. After DHS had indicated they were moving to dismiss the three cases, I observed another plainclothes ICE officer enter the courtroom and stand in the back near the exit door. From my earlier observations of the cell phone usage by the plainclothes ICE officer sitting in the courtroom, it appeared to me that there was communication about the oral motion to the officers in the hallway via this phone. The IJ did not immediately hear the motion but called for a break so that the other Respondents could leave the courtroom. The third plainclothes officer remained near the doorway. We had a brief opportunity to speak to the three Respondents whose cases were reset for June 17th. We escorted the men to the hallway where they were swarmed by ICE officers near the closest elevator bank. Multiple officers tried to get us to interpret for them because they did not speak Spanish and could not communicate with the men. We did not assist them. More officers arrived including at least one who did speak Spanish. I witnessed the men being taken into the elevators with hands placed behind their backs. The ICE officers blocked off the elevator with his body and stated something to the effect of the elevators now being a "restricted area."

13. In IJ McFarland's courtroom, members of our group observed ACC Wilson from DHS make an oral motion to dismiss for all three of the men they later observed were detained in the hallway. The group reported that some of the officers wore gaiters covering their faces. In each instance, IJ McFarland denied the Motion to Dismiss and DHS reserved appeal. One of the Respondent's detained is a 20-year-old youth eligible for Special Immigrant Juvenile Status (SIJS)—a form of immigration relief for youth. Our group was able to obtain contact information for a family member who informed me that the young man was on track with his process and has a pending case in family court to obtain a predicate order for his SIJS application. He permanently ages out of SIJS eligibility in less than a month. Another Respondent observed by the group was a

man from Georgia whose case was re-set by the IJ because there was no Georgian interpreter. DHS moved to dismiss this case anyway with no regard to the fact that there was no interpreter to properly inform the Respondent about what was happening in a language that he speaks and understands. The other Respondent observed detained by our group disclosed that he had broken his leg and was unable to work. He stated he has a U.S. citizen spouse.

14. The observation of June 2, 2025 was consistent with news and other witness accounts of ICE detaining individual complying with their court hearings. While initially I understood ICE to be targeting people whose cases were dismissed by the court, the events my group witnessed reflect a disregard for case posture, the IJ decision, and the normal course of removal proceedings. In my experience, it would be highly unusual, if not unacceptable, to make any legal argument before the IJ by simply citing a regulation and not supporting or justifying the argument with any facts about the specific case. It is especially important to ensure that standards are upheld when the government is represented by sophisticated legal counsel and the Respondent is *pro se*.

15. There was a thousand-yard stare in the eyes of the men I witnessed detained and a physical and emotional defeat in their body language that I will never unsee. They all came to court believing they were doing everything they needed to do to present their case before the judge. There was nothing about their circumstances that wasn't true a month ago or a year ago. But when there isn't even acknowledgement that there were ICE officers in the room, using their cell phones to communicate with a swarm of other ICE officers in the hallway specifically looking to detain these individuals because they were in court complying with their obligations to attend, it's hard to see fairness. I'm reminded that one of our most basic duties as attorneys is candor to the tribunal, professionally to each other, and to the people who we ultimately serve. I want to believe that I am safe in court, but the way ICE officers in plainclothes physically cordoned off the entire floor and swarmed in the hallways was intimidating. I want to be able to truthfully tell members of the community that they are safe to attend court, but the truth is that they are not.

16. In addition to my court observation on June 2, 2025, I currently represent an individual who was detained as a result of this new courthouse arrest policy. On May 21, 2025, he attended his required hearing at the 290 Broadway immigration court, appearing *pro se*. At the hearing, the IJ granted ICE's request to dismiss my client's asylum proceeding. But my client did not understand or consent to the dismissal. Immediately upon leaving the courtroom, he was arrested by multiple plainclothes ICE agents. After his arrest, my client has been moved at least ten times between detention facilities throughout the country, including in New York, New Jersey, Texas, and Louisiana. He is currently detained in the Orange County Jail in Goshen, New York. During transfers between facilities, my client was repeatedly placed in the same dirty clothes and underwear he was wearing when he was arrested. On multiple occasions, his legal team has not been able to locate or communicate with him for several days during and after transfers, depriving him of meaningful access to counsel.

17. After two weeks in detention and multiple transfers wearing dirty clothes, my client developed a fungal skin infection on his legs and genitals and a painful, swollen mass on his testicle. He was referred for imaging to further examine the mass and prescribed cream for his skin infection, but he has only been sporadically provided with his prescribed medication and never received the imaging recommended by a doctor. In short, my client's life was completely upended by his courthouse arrest. He is now enduring physical and psychological distress with no apparent end in sight. He is suffering daily, and I worry his body may continue to deteriorate as a direct result.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 31, 2025

_____
Rosanna Eugenio