# DECLARATION OF DEBORAH FLEISCHAKER

I, Deborah Fleischaker, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

## I. Background

1. I began working on immigration enforcement issues in 2011, when I was a career employee at the U.S. Department of Homeland Security's (DHS) Office for Civil Rights and Civil Liberties (CRCL). I was employed by CRCL from March 2011 until September 2021. I spent one year (May 2019 - May 2020) on a temporary detail to Senator Patrick J. Leahy's Judiciary Committee staff. I spent an additional four months on a temporary detail at the DHS Office of Policy and three months at U.S. Immigration and Customs Enforcement (ICE). I worked on immigration issues in all these temporary assignments.

2. Between September 2021 and November 2023, I was employed as a political appointee by DHS's ICE. I was an Assistant Director at ICE and headed the Office of Regulatory Affairs and Policy from September 2021 to November 2022. From November 2022 until November 2023, I served as the Acting ICE Chief of Staff.

3. As the Assistant Director for the Office of Regulatory Affairs and Policy, I spearheaded policy and regulatory initiatives for the agency, with a significant focus on immigration enforcement, detention, and removal. In that position, I worked on a number of enforcement and detention policies, including Secretary Alejandro Mayorkas' immigration enforcement priorities; the DHS sensitive locations and courthouse enforcement policies; and policies relating to the detention of pregnant people, crime victims, and parents.

4. As the Acting ICE Chief of Staff and senior agency political appointee, I oversaw agency-wide activities, including the approximately $8 billion budget and 8,000 employees across law enforcement and immigration services. This included significant work on immigration enforcement, detention, and removals. In my role, I collaborated extensively with the leadership of ICE Enforcement and Removal Operations (ERO).

5. I provide this declaration based on my personal knowledge and experience as well as my review of the documents referenced below.

6. Based on my experience, I have been asked to assess the government's new guidance regarding civil immigration enforcement in or near courthouses and its new policy of arresting noncitizens who appear for their hearings in immigration court.

7. I have reviewed the following documents related to these policies:

   - ICE Directive Number 11072.1: Civil Immigration Enforcement Actions Inside Courthouses (Jan. 18, 2018) (hereinafter, "2018 Directive"), *available at* https://www.ice.gov/doclib/foia/policy/directive11072.1.pdf.

- Memorandum for U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) RE Civil Immigration Enforcement Actions in or near Courthouses (Apr. 27, 2021) (hereinafter, "2021 Guidance"), *available at* https://www.ice.gov/sites/default/files/documents/ciEnforcementActionsCourthouses2.pdf.

- ICE Policy No. 11072.3, Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses (Jan. 21, 2025) (hereinafter "2025 Interim Guidance"), *available at* https://www.ice.gov/doclib/foia/policy/11072.3_CivilImmEnfActionsCourthouses_01.21.2025.pdf.

- ICE Policy No. 11072.4, Civil Immigration Enforcement Actions In or Near Courthouses (May 27, 2025) (hereinafter, "2025 Guidance"), *available at* https://www.ice.gov/doclib/foia/policy/11072.4.pdf.

8. I am also familiar with ICE's new practice of arresting individuals in immigration court, based on public reporting and public statements by the Trump Administration.

## II.    The 2021 Courthouse Guidance

9. In April 2021, Secretary Mayorkas directed ICE and U.S. Customs and Border Protection (CBP) to limit civil immigration enforcement actions in or near courthouses. Following this directive, Acting Director of ICE Tae Johnson and Acting CBP Commissioner Troy Miller issued a memorandum to ICE and CBP personnel setting forth the circumstances in which civil immigration enforcement actions may be carried out in or near a courthouse.[1]

10. This guidance was designed to balance access to the courts and the fair administration of justice with legitimate civil immigration enforcement interests. It was motivated in part to respond to the civil immigration enforcement at state and federal courthouses under the prior administration.[2] As Secretary Mayorkas explained upon announcing the new guidance: "Ensuring that individuals have access to the courts advances the fair administration of justice, promotes safety for crime victims, and helps to guarantee equal protection under the law . . . .The expansion of civil immigration arrests at courthouses during the prior administration had a chilling effect on individuals' willingness to come to court or work cooperatively with law enforcement. Today's guidance is the latest step in our efforts to focus our civil immigration enforcement resources on threats to homeland security and public safety."[3]

---

[1] Press Release: *DHS Announces New Guidance to Limit ICE and CBP Civil Enforcement Actions In or Near Courthouse*, U.S. Dep't of Homeland Security, Apr. 27, 2021, https://www.dhs.gov/archive/news/2021/04/27/dhs-announces-new-guidance-limit-ice-and-cbp-civil-enforcement-actions-or-near.

[2] These enforcement actions were governed by the 2018 Directive.

[3] *Id*.

11. The 2021 Guidance, in articulating its "Core Principle", recognized that "[t]he courthouse is a place where the law is interpreted, applied, and justice is to be done." "[A]s law enforcement officers and public servants," ICE and CBP officers thus bear "a special responsibility to ensure that access to the courthouse—and therefore access to justice, safety for crime victims, and equal protection under the law—is preserved." 2021 Courthouse Guidance at 1.

12. The Guidance sought to balance two competing interests: instances where "there may be legitimate need to execute a civil immigration enforcement action in or near a courthouse" with the fact that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair administration of justice." *Id*.

13. The Guidance balanced these interests by laying out "when and how civil immigration enforcement actions can be executed in or near a courthouse so as not to unnecessarily impinge upon the core principle of preserving access to justice." *Id.* The Guidance permits such actions only when warranted based on an identified and/or imminent threat to national security or public safety: that is, if (1) the action "involves a national security threat; or (2) there is an imminent risk of death, violence, or physical harm to any person; or (3) the action involves hot pursuit of an individual who poses a threat to public safety; or (4) there is an imminent risk of destruction of evidence material to a criminal case." *Id*. at 2.

14. The Guidance also permits an enforcement action against an individual who poses a threat to public safety "in the absence of hot pursuit," if: "(1) it is necessary to take the action in or near the courthouse because a safe alternative location does not exist or would be too difficult to achieve the enforcement action at such a location, and (2) the action has been approved in advance by a Field Office Director, Special Agent in Charge, Chief Patrol Agent, or Port Director." *Id*.

15. Finally, the Guidance provides that, "to the fullest extent possible, an enforcement action in the courthouse will be taken in a non-public area, outside of public view, be conducted in collaboration with courthouse security personnel, utilize the courthouse's non-public entrances and exits, and be conducted at the conclusion of the judicial proceeding that brought the individual to the courthouse." *Id*.

16. The Guidance applies to any civil immigration enforcement action in or near a courthouse that involves an enforcement encounter between ICE or CBP personnel and an individual other than a courthouse official or employee. Examples of enforcement actions include civil apprehensions, service of subpoenas, searches, seizures, interviews, and surveillance. *Id*.

17. The Guidance does not apply to criminal immigration enforcement actions. *Id*.

18. The Guidance defines a "courthouse" to include "any municipal, county, state,

federal, tribal, or territorial courthouse, including immigration courts." *Id*. The Guidance defines "near" the courthouse as "in the close vicinity of the courthouse, including the entrance and exit of a courthouse, and in adjoining or related areas such as an adjacent parking lot or transportation point (such as a bus stop right outside a courthouse)." *Id*.

19. The Guidance also requires that ICE and CBP personnel receive training on the Guidance and provides for the internal reporting of planned or executed civil immigration enforcement actions in or near courthouses. *Id*.

### III.    The 2025 Courthouse Guidance

20. ICE's 2025 Guidance departs almost completely from the guidance on courthouse enforcement actions previously adopted by DHS. Because the 2025 Interim Guidance is substantially identical to the final guidance, I focus on the final Guidance here.

21. First and foremost, the 2025 Guidance does not even acknowledge the competing interests that DHS sought to balance in its previous guidance: namely, the instances where there is a legitimate need for an enforcement action in or near a courthouse and the reality that such enforcement actions may chill individuals from accessing the courts and interfere with the fair administration of justice. Likewise, the Guidance offers no explanation for why ICE decided to stop limiting its enforcement actions to ensure they do not impinge unnecessarily on access to justice. The 2025 Guidance simply ignores the importance of ensuring that courthouses remain open to all.

22. Second, as explained above, the 2021 Guidance primarily sought to balance these competing interests by prohibiting courthouse enforcement actions except when justified based on an identified and/or imminent threat to national security or public safety. The 2025 Guidance abandons this approach. Instead, it provides that ICE officers or agents may conduct a courthouse enforcement action whenever they have "credible information that leads them to believe the targeted alien(s) is or will be present at a specific location." 2025 Guidance at 2.

23. Moreover, "targeted aliens" are defined very broadly. The term includes not only individuals who are considered national security or public safety threats, but also individuals who have been ordered removed from the United States but have failed to depart, and individuals who have reentered the country illegally after being removed. *Id*. And this list is not exhaustive. The 2025 Guidance places no limits on the categories of noncitizens whom ICE may subject to an enforcement action in or near a courthouse. Indeed, as explained in Section IV, *infra*, ICE is regularly arresting people outside these categories at immigration courthouses.

24. The 2025 Guidance additionally explicitly authorizes collateral arrests and provides that ICE may subject "[o]ther aliens" encountered in a courthouse enforcement action—such as "family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding"— to an enforcement action "on a case-by-case basis considering the totality of the circumstances," a term that is undefined. *Id*.

25. In effect, the 2025 Guidance gives almost complete discretion to ICE officers and agents to pursue enforcement actions in or near courthouses, with little to no regard for protecting access to justice, the fair administration of court proceedings, and individuals' ability to comply with their legal obligations.

### IV.  ICE's Unprecedented Arrests at Immigration Courts

26. ICE's arrests over the past few months at immigration courts in New York City and across the country are in keeping with this new approach to civil immigration enforcement.

27. ICE officers are stationing themselves outside the courthouse buildings, inside the courthouse hallways, and inside the courtrooms so that they can arrest and detain individuals who appear for their court hearings.

28. The officers are dressed in plain clothes and sometimes masked.

29. These actions—which appear to be driven by the Trump administration's imposition of a daily quota of 3,000 ICE arrests—are unprecedented. I am not aware of any concerted effort by the agency in the past to arrest large numbers of individuals when they attend their immigration court hearings.

30. These ICE arrests are part of a coordinated effort by the agency. In immigration court hearings, DHS is orally moving to dismiss their removal proceedings under 8 U.S.C. § 1229a, with no advance notice, on the grounds that there are "changed circumstances" such that the proceedings are no longer in the best interests of the government, without identifying any specific changes in the individual's facts and circumstances. If the immigration judge grants the government's motion to dismiss, ICE agents generally detain the individual. And even if an immigration judge denies the motion to dismiss, the individuals are often arrested and detained.

31. These enforcement actions radically break with past agency policy and practice, as reflected in the 2021 Guidance.

32. First, ICE's strategy of arresting individuals at immigration court, especially those who are actively complying with their immigration obligations (and thus pose no flight risk), undermines access to justice and the fair and efficient administration of legal proceedings. Advancing the rule of law calls for incentivizing compliance with legal process. ICE's courthouse arrests do the opposite: they chill individuals who have been complying with their legal obligations from coming to court and participating in their removal proceedings. The result is that many individuals will not appear for court and will receive *in absentia* removal orders, instead of a removal order or grant of relief at the conclusion of a fulsome legal proceeding.

33. Second, in addition to undermining access to justice, this strategy is counter to the agency's interests in efficiency and finality. It is likely to have the perverse effect of

extending, rather than shortening, the completion of removal proceedings, since individuals who are subject to *in absentia* removal orders can move to reopen those orders at a later time.

34. Third, these enforcement actions depart from the agency's previous focus on protecting public safety. Although the 2025 Guidance refers to public safety concerns, *see* 2025 Guidance at 1, ICE's new policy and practices do not seriously focus on ensuring public safety. In contrast to the 2021 Guidance, ICE is not prioritizing threats to national security or public safety, but instead targeting people who are simply seeking to comply with their court proceedings and lack any criminal history. In effect, ICE is now targeting the "lowest hanging fruit"—people who they know will be attending their court hearing on a specific date—to effectuate an "easy arrest" that will count toward a daily arrest quota. The new arrest initiative is focused on numbers—not public safety.

35. Moreover, the situation that has been created at the immigration courts could explode at any moment. With families being separated on the spot with no warning, people are desperate. Immigration judges too have described feeling unsafe and traumatized.

36. In sum, ICE's arrest initiative departs from prior agency policy by undermining, instead of advancing, access to justice, the fair and efficient administration of court proceedings, and public safety. Indeed, by arresting people to meet a numerical quota, rather than for public safety or national security reasons, the government is *creating* a public safety risk.

Executed on this 6th day of August, 2025 in Washington D.C.

DocuSigned by:

**Deborah Fleischaker**

8AA70A96D4E74C5...

Deborah Fleischaker