# DECLARATION OF AUDREY GILLIAM
**Attorney at the Northwest Immigrant Rights Project**

1. My name is Audrey Gilliam and I am a supervising attorney with the Removal Defense Unit of the Northwest Immigrant Rights Project (NWIRP). NWIRP is a nonprofit organization that provides immigration legal services to low-income immigrants in Washington state. The Removal Defense Unit focuses on representation before the Seattle Immigration Court and is located in NWIRP's Seattle office at 615 Second Avenue, Suite 400, Seattle, WA 98104. I have been practicing immigration law for more than 12 years, and I represent noncitizens before the Immigration Court, Board of Immigration Appeals (BIA), and Ninth Circuit Court of Appeals. I have represented individuals appearing before the Seattle Immigration Court for nine years. This declaration is based on my firsthand observations at the Seattle Immigration Court and information collected from NWIRP colleagues and community volunteers.

2. The Seattle Immigration Court is located in a federal building at 915 Second Avenue in Seattle, Washington. There are nine Immigration Judges (IJs). Seattle IJs have courtrooms on the fifth, sixth, seventh, and eighth floors of the federal building.

3. Early on May 20, 2025, NWIRP received reports from colleagues in the Washington chapter of the American Immigration Lawyers Association (AILA) that Immigration and Customs Enforcement (ICE) agents would begin arresting noncitizens at the Seattle Immigration Court that day.

4. Three NWIRP attorneys went to the Seattle Immigration Court and ascertained that DHS Office of the Principal Legal Advisor (OPLA) attorneys were indeed orally moving for dismissal of certain cases. These motions were made at master calendar hearings. If the IJ granted the motion for dismissal, a plainclothes ICE officer in the courtroom appeared to send a message on their phone to alert ICE officers waiting near the courtroom. A group of plainclothes ICE officers then gathered in the hallway outside of the Immigration Court to arrest the individual. During the arrests, the ICE officers did not identify themselves as law enforcement and several covered their faces with balaclavas or masks.

5. NWIRP attorneys and legal advocates quickly organized to provide people appearing before the Seattle Immigration Court with information about the ICE arrests and their rights. From the morning of May 20, 2025, until approximately June 26, 2025, at least four (and sometimes as many as 15) NWIRP staff were at the Seattle Immigration Court each day. As capacity allowed, NWIRP staff were stationed near the two federal building main entrances, in four Immigration Court waiting rooms, and in the hallways outside of Immigration Courts hearing master calendar dockets. NWIRP staff spoke briefly with

individuals appearing for master calendar hearings and provided them with Know Your Rights (KYR) information about the potential for dismissal of their case and detention. NWIRP staff escorted individuals to and from their Court hearings. NWIRP staff also observed master calendar dockets. AILA attorneys and community members joined these efforts starting May 21, 2025.

6. Since approximately June 27, 2025, community volunteers have staffed the Immigration Court accompaniment and KYR work organized by NWIRP.

7. I have spent many days at the Seattle Immigration Court advising noncitizens of their rights, escorting people to and from their hearings, and observing master calendar dockets since the ICE arrests began.

8. From about May 20, 2025, until about June 10, 2025, NWIRP staff and I saw a heavy law enforcement presence in the Seattle Immigration Court. This is outside the norm. Between two and four armed and uniformed DHS police officers patrolled the federal building. I saw these officers near the federal building entrance on the fourth floor and in the hallway outside of the Immigration Courts on the fifth, sixth, seventh, and eighth floors. A large group of plainclothes ICE officers were also at the federal building, starting May 20, 2025. At times, these officers wore masks or balaclavas to cover their faces. I saw plainclothes ICE agents sitting on the benches inside the Immigration Court during master calendar hearings, appearing to send messages on their phone. My colleagues and I also saw the plainclothes ICE agents in the federal building elevator and in the hallway outside of the fifth, sixth, seventh, and eight-floor Immigration Courts, waiting to arrest people.

9. At least 37 noncitizens were subjected to same-day dismissal of removal proceedings and apparent arrest by ICE at the Seattle Immigration Court in May and June 2025. NWIRP staff and community volunteers reported that ICE arrested four people on May 20, five people on May 21, one person on May 27, three people on May 28, one person on May 29, two people on May 30, two people on June 2, five people on June 3, seven people on June 4, three people on June 5 and four people on June 10.

10. I personally saw ICE arrest three people directly after their Immigration Court hearing. On May 21, 2025, I observed a group master calendar hearing in which the IJ dismissed the removal proceedings of three noncitizens over their objection. Each person told the IJ that they wanted to continue with their case in Court. When the IJ asked if they had "any other objections" to the DHS motion for dismissal, they said that they wanted to pursue their asylum applications. Even though the IJ noted that only two of the three had asylum applications pending at the time, the IJ nonetheless ordered dismissal, and I escorted the

group out of the courtroom. I then saw a group of five to seven plainclothes ICE agents waiting in the hallway. Some of the ICE agents had their faces covered. The ICE agents stood close together in a bunch and blocked the exit, which I found intimidating. The ICE agents lined the noncitizens up against the wall outside of the Immigration Court waiting room and led all three to a room or stairwell behind a closed door.

11. I also saw ICE arrest a fourth person on May 21, 2025. The noncitizen had appeared for a master calendar hearing earlier that morning and had been walking in the hallway outside of the Immigration Court, apparently talking on the phone with his lawyer. (I understand that this man's attorney had appeared at the master calendar hearing remotely, and I had given him a NWIRP KYR flyer about the ICE arrests to pass along to his attorney.) I saw a group of five to seven plainclothes ICE agents, some with their faces covered, approach the man and attempt to line him up against the wall outside of the Immigration Court waiting room. The man tried to walk away from the ICE agents, and they grabbed his arms. He struggled with the agents, and they shoved him against the wall. The man saw me and my NWIRP colleagues in the hallway and shouted "*ayuda, licenciada*!" in Spanish, among other things that I could not hear well. The English translation is "help, attorney!" But, there was nothing that I could do. ICE moved him, by force, into a room or stairwell behind a closed door.

12. On May 30, 2025, ICE arrested two people in the Immigration Court waiting room while they tried to file affirmative asylum applications online post-dismissal of removal proceedings. A NWIRP staff member observed the master calendar hearings of each noncitizen, a man and a woman, who had both previously filed their asylum applications with the Immigration Court. In the man's case, the DHS OPLA attorney orally moved for dismissal. The man asked for additional time to consult an attorney. The IJ told him that the DHS had authority to request dismissal and that he could pursue his asylum application affirmatively with U.S. Citizenship and Immigration Services (USCIS), and then dismissed his case. The DHS OPLA attorney also orally moved to dismiss the woman's case. The woman strongly objected to dismissal. She told the IJ that she was afraid to return to her country and that she was a good person who had not committed any crimes or done anything wrong. She was emotional and tearful. The IJ dismissed removal proceedings over her objection, saying that his decision was "not a deport order." The IJ also told the woman that she could pursue her asylum application with USCIS.

13. After the IJ dismissal orders, NWIRP staff and community volunteers met with the man and the woman in the waiting room of the Immigration Court. Each noncitizen said that they were afraid to return to their country and wanted to apply for asylum affirmatively. NWIRP staff and community volunteers started helping the man and woman to file *pro se* asylum applications online. NWIRP staff soon observed approximately eight plainclothes

ICE officers, all wearing masks, standing in the hallway around the corner from the Immigration Court waiting room. One or two of these plainclothes ICE officers were always in eyesight of the waiting room entrance. NWIRP staff continued their work on the asylum applications, based on their understanding that ICE would not make an arrest in the Immigration Court waiting room.

14. After approximately thirty or forty minutes, the group of plainclothes ICE officers quickly entered the waiting room, blocking the entrance, and called the first names of the man and the woman whose cases had been dismissed and who were both close to finishing and submitting their asylum applications online with USCIS. One officer grabbed the woman's arm and said, "you're coming with us." NWIRP staff asked that the ICE officer be respectful, but could do nothing to prevent the arrest. Multiple officers grabbed the man's arms and forced him to drop the papers he was holding. These were the first two arrests made inside a waiting room at the Seattle Immigration Court.

15. Also on May 30, 2025—and while NWIRP staff and community volunteers were working on the affirmative asylum applications in the waiting room—other NWIRP staff members accompanied a young adult in his late teens to the elevator. The IJ had continued the teenager's case to October 2025, giving him a notice of his newly scheduled hearing. As the teenager walked toward the elevator, five or six of the plainclothes ICE officers swarmed around him and NWIRP staff. The ICE officers pushed a NWIRP attorney out of the way and grabbed the teen's arms, demanding his name. The NWIRP attorney repeatedly said, "He has another hearing in October, he has another hearing in October," until the ICE officers grabbed the teenager's hearing notice without his permission and, after reviewing it, let him go and walked away. The teenager was trembling and shocked, and a NWIRP staff member accompanied him to the exit of the federal building.

16. On June 2, 2025, masked plainclothes ICE officers appeared to take video and/or photos of NWIRP staff providing information to and accompanying noncitizens at the Seattle Immigration Court, including shoving a camera in the face of a NWIRP attorney. One of the NWIRP attorneys subjected to ICE's surveillance reported that she felt distressed and scared after this interaction. It is unclear why ICE officers took video and/or photos of NWIRP staff, and I do not know what ICE will do with this footage.

17. ICE arrests at the Seattle Immigration Court have caused severe physical and emotional hardship for noncitizens and their family members. On June 5, 2025, a group of masked (and mostly plainclothes) ICE officers arrested a woman whose case had been dismissed by the IJ. NWIRP staff observed that the woman attended her master calendar hearing in person while her attorney appeared by phone. The attorney waived interpretation,

although it appeared that the woman did not speak much English. As such, neither the IJ nor DHS OPLA attorney explained to the woman in a language that she could understand what had happened in her case. The ICE officers did not appear to explain anything, either. Instead, the ICE officers swarmed around the woman after her hearing in a manner that NWIRP staff found intimidating, and led her to the elevator. Before the woman entered the elevator, she fell to the ground. It seemed like she had fainted and was unconscious because she was barely moving. The ICE officers then dragged the woman's limp body into the elevator. The ICE officers did not try to revive the woman after she fainted. They did not immediately administer critical medical aid. The NWIRP staff member who witnessed this arrest was shocked, horrified, and crying.

18. At least one couple was also forcibly separated by ICE's arrests at the Seattle Immigration Court. On May 27, 2025, a NWIRP attorney spoke with a couple before their master calendar hearings. The couple was scheduled for hearings on the same day. But, because they were not married, they had separate cases. The IJ dismissed the man's case, but did not dismiss his female partner's case. And ICE arrested the man directly after his hearing. The man who was detained had the only copy of the couple's apartment and car keys. Because of the suddenness of his detention, he did not have time to pass the keys to his partner. She later told a NWIRP attorney that she could not get inside her apartment. She was also unable to retrieve their family car from the parking garage. And, worst of all, the partner was pregnant and was now forced to have her baby alone in the United States, without the financial and emotional support of the baby's father.

19. Before May 21, 2025, I had never seen ICE arrest anyone at the Seattle Immigration Court. NWIRP has confirmed that almost all of the 37 noncitizens arrested at the Seattle Immigration Court were transferred to the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington. NWIRP believes that those who were not transferred to NWIPC were likely released shortly after arrest for unknown reasons.

20. NWIRP has attempted to follow up with each unrepresented person who was subjected to same-day dismissal and arrest and detained in DHS custody. Many feared returning to their country, and had already applied for asylum or planned to apply. However, after being detained, almost all of the noncitizens with whom NWIRP spoke gave up on their case and accepted a deportation order. Many noncitizens told NWIRP staff that ICE's lack of transparency and failure to communicate made them feel hopeless and desperate. People were detained for weeks without being provided any information about their case status. Repeated requests for information were ignored by ICE deportation officers. NWIRP staff also commonly heard that—even though the noncitizen still feared persecution and torture in their country—the combination of the stress of the sudden

arrest at the Immigration Court, the harsh and overcrowded conditions at the NWIPC, and the likelihood of lengthy detention was too much to bear.

21. However, E.C.M. is one client who decided to fight her case. NWIRP currently represents her. E.C.M. was arrested at the Seattle Immigration Court post-dismissal of removal proceedings on May 20, 2025.

22. E.C.M. is a citizen of El Salvador. She entered the United States without inspection in May 2024, was placed in removal proceedings, and applied for asylum. E.C.M. told her NWIRP attorney that she has a deep fear of returning to El Salvador. She was severely beaten by gang members, resulting in a large bruise on one of her breasts, which she reports has since developed into a growth. MS-13 gang members also raped E.C.M. at the end of 2023 and are still looking for her.

23. As noted above, E.C.M. appeared *pro se* at a master calendar hearing at the Seattle Immigration Court on May 20, 2025. A NWIRP attorney observed E.C.M.'s hearing. DHS OPLA attorneys orally moved to dismiss E.C.M.'s removal proceedings. When they moved for dismissal, the DHS OPLA attorney did not state that they would be placing E.C.M. in expedited removal proceedings post-dismissal or that there were ICE officers outside of the courtroom, waiting to arrest her if she accepted dismissal. E.C.M. objected initially, but ultimately agreed to dismissal. Before agreeing, E.C.M. asked the IJ if she would have problems with Immigration if her case was dismissed. In response, the IJ stated that there would be no risk that the Immigration Court would enter an order of removal, and that if the DHS wanted to bring her back to Immigration Court, they would need to start all over again. The IJ then asked E.C.M. again if she would agree to dismissal. Upon the IJ's advisals and second round of questioning, E.C.M. acquiesced and the IJ granted dismissal.

24. Plainclothes ICE officers arrested E.C.M. in the hallway outside of the Immigration Court. NWIRP met with E.C.M. on May 21, 2025, and filed a notice of appeal with the BIA that day.

25. Being arrested and detained has caused E.C.M. serious hardship. E.C.M. had planned to seek medical treatment in Seattle for the bruise / growth on her breast. Now that she is detained in DHS custody, it is unclear when or if E.C.M. will receive proper medical treatment. E.C.M. has told ICE that she is in pain, but they have not yet sent her to see a doctor. E.C.M. will also have a more difficult time preparing her immigration case while detained. There are medical records from El Salvador that support E.C.M.'s asylum claim, and she must now try to obtain them quickly from detention. And, finally, E.C.M. is worried about a car that she bought sometime before her Immigration Court hearing on

May 20, 2025. The car was parked in a parking lot outside of the Seattle Immigration Court for many days because ICE had not given the car keys to her relatives.

26. ICE arrests in the Seattle Immigration Court have caused significant fear, confusion, and distress in Washington's immigrant community. A noncitizen waiting for her master calendar hearing on May 21, 2025, saw plainclothes ICE officers arrest several people in the hallway outside of the Immigration Court and approached me, asking for advice. She told me that she did not have a lawyer and was scared. She asked if she should go to her hearing and if ICE would arrest her, too. I could not guarantee that this person would be safe during or after her Immigration Court hearing. I could only explain the consequences of not attending the hearing and her right to oppose and appeal dismissal.

27. Further, the ICE arrests—as well as the noticeable presence of ICE agents near the entrance to and in the hallways outside of the Immigration Court—appear to have already caused people to miss their Immigration Court hearings. Noncitizens who do not appear for their Immigration Court hearing can be issued removal orders *in absentia*. If the individual does not move to reopen the *in absentia* removal order—a process which requires legally complex arguments and, often, attorney assistance—the person can be removed from the United States without even seeing an IJ.

28. On the afternoon of May 20, 2025, I heard one IJ issue four *in absentia* removal orders. The same IJ issued either six and seven *in absentia* removal orders the following morning, on May 21. And, on the morning of May 27, a different IJ issued 13 *in absentia* removal orders. An AILA attorney who observed the hearing noted that both the IJ and the DHS OPLA attorney commented that there was an unusually large number of *in absentia* removal orders that day. NWIRP staff and volunteers continue to report high numbers of *in absentia* removal orders issued at the Seattle Immigration Court, including for one family who missed their final merits hearing—and their chance to win asylum—because they feared arrest and detention.

29. NWIRP has recently seen several cases in which bad actors took advantage of noncitizens' fear of attending Immigration Court hearings. This has created additional fear and distress for immigrant community members, financial harm and—in the worst case scenario—potential deportation. In one case, a person who described herself as an attorney told a noncitizen that she had filed a motion for the noncitizen to appear by WebEx for their master calendar hearing and that the IJ had granted the motion. A NWIRP attorney conducting an intake with this person noticed that the "approval" of the WebEx motion was obviously fake. The NWIRP attorney advised the noncitizen to attend the hearing—which was scheduled for the following day. The noncitizen attended and narrowly missed receiving an *in absentia* removal order.

30. In another case, a noncitizen did in fact receive an *in absentia* removal order as a result of what appeared to be a similar scam. This noncitizen paid several thousand dollars to a person who described themselves as an attorney for help with appearing by WebEx because they feared being arrested at Immigration Court. The alleged attorney told the noncitizen that they had filed a motion and that it was granted. However, it's not clear that any such motion was submitted, much less approved. The noncitizen missed their hearing and is now urgently seeking help with a motion to reopen removal proceedings.

31. The level of fear and distress expressed by immigrant community members in Washington state due to ICE arrests at the Seattle Immigration Court is unlike anything that I have seen in more than ten years of practicing immigration law. I am concerned about my clients' ability to prepare their cases while under such significant pressure. I worry, as well, about the individuals who are being driven into the shadows—I fear that an increasing number of people will not appear at their Immigration Court hearings or reach out to immigration law providers because they are afraid, overwhelmed, or hopeless.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 7, 2025

_____
Audrey Gilliam
Northwest Immigration Rights Project, Attorney
615 Second Avenue, Suite 400
Seattle, WA 98104
Ph.: (206) 957-8614
Email: audrey@nwirp.org

8