## DECLARATION OF NEW YORK CITY COMPTROLLER BRAD LANDER

*I, Brad Lander, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.*

1. I am New York City Comptroller. The Comptroller functions as the chief financial and accountability officer of the City of New York and promotes the wellbeing of all New Yorkers by providing independent oversight of City government.
2. I am keenly aware of the economic contributions immigrants make to New York City and the importance of immigration to our local economy. In fact, my office has published reports on the economic contributions of immigrant New Yorkers, and the economic benefits of access to immigration legal services.
3. In addition, my office has recommended that the City of New York invest additional resources in immigration legal services based on the growing number of New Yorkers that appear in immigration court without an attorney.
4. In late May 2025, my Office began hearing reports of arrests in immigration courthouses in New York City. In light of these unprecedented arrests, I decided to visit immigration courts to see firsthand how the new federal policy shifts were impacting New Yorkers and frustrating their ability to obtain legal services and pursue their asylum claims.
5. I have observed immigration court proceedings on nine different occasions, each time for about two to three hours. I continue to observe immigration court proceedings nearly every week. I have witnessed an increasing unpredictability in how immigration judges rule on motions to dismiss made by the Office of the Principal Legal Advisor ("OPLA"). Over time, I have witnessed fewer motions to dismiss. Immigration judges ("IJ") often grant and schedule a subsequent hearing, including to hear the merits of an individual's asylum application, but the ultimate outcome remains unpredictable to the respondents as Immigration and Customs Enforcement ("ICE") and other federal agents wait immediately outside the courtroom doors. IJs grant future hearings dates to *pro se* respondents to allow them time to find legal representation, even though, based on their line of sight from the bench, they would be able to see federal agents right outside the open courtroom doors, and further would be able to see federal agents detain respondents as they exit the courtroom regardless of the outcome of the hearing. I have witnessed an evolution in the aggressiveness of enforcement tactics: from arresting only individuals with approved motions to dismiss, to only those who had a motion to dismiss, to respondents regardless of the disposition of their case. Given these practices, I've also witnessed an increase in court observations by every day New Yorkers.

### *Observation of Immigration Court on June 5, 2025*

6. My first visit to immigration court was on June 5, 2025. As part of Immigration ARC's Friend of the Court program, I went to 290 Broadway, New York, NY to observe master calendar hearings before IJ James M. McCarthy. I went for the purpose of witnessing proceedings and accompanying respondents outside the building after their hearings.

1

7. During this first visit, I witnessed OPLA's Assistant Chief Counsel ("ACC") move to dismiss several unrepresented families' cases. No reasons were articulated as to why the ACC moved to dismiss the cases of some families and not others.
8. As a result of these motions to dismiss, I witnessed a young single father with a two-year-old child in the courtroom have his case dismissed. As I walked him and his child outside the building to the subway station, he was utterly terrified of being arrested and separated from his son.
9. In another case, the ACC moved to sever the asylum case of a husband and wife. The ACC did not offer any reason why this was appropriate. While IJ McCarthy granted the motion to dismiss for the husband, he gave the wife a date to appear in court to present her asylum claims. This decision left the family vulnerable to separation, as the husband was at risk of being arrested post-dismissal, even though his wife's asylum case was allowed to continue.
10. I also accompanied two parents who had their cases dismissed. The parents were present in court, but their two children were in school. I walked with them to the subway station, as they were terrified of being arrested and leaving their children stranded at school.

*Observation of Immigration Court on June 12, 2025*

11. I returned to observe immigration court proceedings at 26 Federal Plaza, New York, NY on June 12, 2025. I was in the courtroom of IJ Tiesha Peal. IJ Peal directed that the courtroom be locked at certain point and did not allow any other court observers into the courtroom. I accompanied an individual from the courtroom to outside the building. This individual was provided insufficient interpretation in Arabic and did not understand the outcome of his proceedings. I had to call a friend to provide impromptu interpretation because there was no help offered to this individual, who lacked legal counsel.

*Observation of Immigration Court on June 20, 2025*

12. On June 20, 2025, I went to observe master calendar hearings at 290 Broadway. Several respondents who appeared both *pro se* and with legal representation did not receive adequate interpretation for their hearings. Each time a motion to dismiss was made, I witnessed the ACC offering only "changed circumstances" as the justification for moving to dismiss cases, without stating any specific facts that constituted "changed circumstances" in those particular cases. I observed one married couple – a husband and pregnant wife – have their asylum case severed. The husband's case was dismissed, while the wife was given a future date to appear in court. The husband was arrested by masked plainclothes federal agents as soon as we stepped outside the courtroom. His wife was distraught and confused and asked whether the agents were going to kill him.

*Observation of Immigration Court on June 26, 2025*

13. On June 26, 2025, I observed master calendar hearings before IJ McCarthy at 290 Broadway. Although IJ McCarthy denied motions to dismiss and scheduled future asylum hearings for several respondents, masked plainclothes federal agents still arrested approximately half a dozen respondents. On this occasion, young people, women, and LGBTQ individuals were also targeted for arrest after their hearings. The agents asked one woman her name after attempting to arrest her. After she provided her name, they released her. I believe this was because they realized they had targeted the wrong individual. They immediately arrested a woman walking directly behind her after confirming her name.
14. During this visit, I witnessed two brothers in their early twenties appear before IJ McCarthy. They stated that they had paid someone whom they believed was an immigration attorney to prepare their asylum application but were scammed and robbed of their money. As a result, they appeared before the judge without legal representation. They stated a fear of returning to their home country because their father was assassinated. IJ McCarthy scheduled a hearing, allowing them time to find an attorney. However, when they left the courtroom, masked plainclothes federal agents arrested them as they cried and begged not to be detained.
15. On this occasion, I also witnessed masked plainclothes federal agents arrest individuals who had appeared before other IJs at 290 Broadway. These individuals were arrested even though those IJs had denied the government's motions to dismiss and scheduled asylum hearings. I asked the federal agents how it was possible that they could arrest an individual when the judge had denied the motion to dismiss and continued their asylum claims, but the agents refused to answer. I asked how the agents could ensure that these individuals being arrested would be able to attend their future court dates, but the agents refused to provide any explanation.

*Observation of Immigration Court on July 8, 2025*

16. On July 8th, 2025, I observed master calendar hearings in 290 Broadway with a group of faith leaders. On this occasion, I did not witness the ACC make motions to dismiss in any of the cases I observed. Rather, the IJ presiding over the hearings of about four or five *pro se* respondents gave everyone a later date to allow for time to find legal representation. Most of the respondents were arrested immediately upon exiting the courtroom.
17. I asked the federal agents, some of whom did not wear masks, how it could be that they could have warrants for individuals' arrests in advance of knowing the disposition of their hearings. The agents refused to answer. I also asked how the agents could ensure whether respondents could return for their court dates if they are detained, and the agents refused to answer.
18. On the same day, I went to 26 Federal Plaza to observe master calendar hearings. However, by the time I arrived, I walked into an empty courtroom and the IJ informed me that hearings for the day had been adjourned due to an internet outage in the building.

19. As the group exited the building, we came across a mother with her young daughter who was desperately looking for her partner for about an hour. She learned eventually that he had been arrested earlier without her even knowing. The family was distraught and the young daughter, about six years old, suffered an anxiety attack.

*Observation of Immigration Court on July 16, 2025*

20. On July 16, 2025, I observed master calendar hearings in 26 Federal Plaza in IJ Theodora N. Kouris's Courtroom. IJ Kouris granted two respondents future hearings on their asylum applications and scheduled the hearings for July 2029. However, as soon as the hearing was concluded, these individuals were arrested and detained by masked plainclothes federal agents. I asked the agents whether the warrants they had for these individuals' arrests reflected the fact that they had just been granted hearings; they did not answer. Other individuals similarly granted future hearing dates were not detained. I was not aware of any reason for the difference in treatment.
21. I observed one young man who appeared *pro se* but had with him a lengthy asylum application which he submitted to IJ Kouris. He attended his hearing with his two older sisters who are U.S. citizens. Upon exiting the courtroom, masked plainclothes federal agents began shouting at and shoving observers, press, my staff and me. The sisters of this young man and someone who was helping them with interpretation were trying to say goodbye to him before being arrested when the agents swarmed them, threw his sister to the ground, and shouted that they were "obstructing." After he was arrested, I spoke with his family for an extended period. They were sobbing, blaming themselves for insisting that he show up to his court hearing. They also had scratches and bruises from the federal agents shoving them onto the floor.

*Conclusion*

22. ICE's arrests in the immigration court appear to be based on scant justification and ever-shifting reasons. The respondents I have spoken with have expressed extreme fear of returning to their home countries, confusion over the legal process and their rights, and desperation to remain in their communities with their families. Different IJs have issued different rulings under what appear to be similar circumstances, making the outcomes appear to be unpredictable and inconsistent. Based on my observations set forth above, I have noticed a progressive increase in arrests and unnecessary aggressiveness and violence from federal agents directed at respondents, their families, observers, and press. I have also observed that arrests occur irrespective of the outcomes of hearings. The vast majority of respondents who appeared in person for their hearings were *pro se* and nearly every arrest I witnessed was of someone who lacked legal representation.

Executed on August 8, 2025 in New York, NY.

4

Brad Lander
New York City Comptroller