**DECLARATION OF GILLIAN ROWLAND-KAIN**
**INTERIM DIRECTOR OF PROGRAMS FOR IMMIGRANT ARC**

*I, Gillian Rowland-Kain, make the following statements on behalf of Immigrant Advocates Response Collaborative (I-ARC). I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I am the Interim Director of Programs at the Immigrant Advocates Response Collaborative ("I-ARC"), a 501(c)(3) nonprofit organization based in New York. I-ARC is a coalition of over eighty immigration legal service providers that work to increase access to justice and legal counsel for all immigrant New Yorkers.

2. Our membership expands across New York State and requires organizations to have attorneys or Department of Justice accredited representatives on staff to join. Our members work on a wide range of legal issues, including humanitarian relief, family-based petitions, naturalization, and adjustment of status. We facilitate coordination and communication among legal providers, respond to new enforcement trends, and challenge harmful immigration policies through collective advocacy.

3. In my role, I oversee the Legal Access and Membership and Capacity teams. I manage the daily operations of the programs team and serve as the primary liaison between the team and organizational leadership. I also lead I-ARC's rapid response efforts and other legal access programs such as the Friend of the Court initiative.

4. I submit this declaration in support of Plaintiffs' request for preliminary injunctive relief, to provide information based on my direct observations and I-ARC's records about the harms caused by ICE's courthouse arrest and dismissal practices in New York.

**I-ARC's Work Assisting Pro Se Respondents in New York Immigration Courts**

5. In March 2023, I-ARC launched its Friend of the Court ("FOTC") program to provide assistance to *pro se* respondents appearing in New York immigration courts. I-ARC launched this program after its member organizations received large quantities of Notices to Appear for individuals they had never met and could not contact to inform of upcoming court appearances. The FOTC program ensures non-detained noncitizens who are appearing in immigration court for the first time have access to legal help, orientation, and referrals when they appear before an immigration judge ("IJ").

6. Our volunteers assist *pro se* respondents by explaining court procedures and even enabling them to communicate with the court by advising the court of information helpful to respondents' cases and facilitating attendance at future hearings.

1

7.  Since March 2023, we have operated our program two days a week at 290 Broadway court on Thursdays and 201 Varick Street court on Tuesdays. There is a designated room in each of these courts where we store our materials and conduct private consultations with respondents and their families. Since May 21st, 2025, our team has collected data on seven individuals in which ICE moved to dismiss proceedings, and subsequently arrested three individuals as a result.

**Escalation in ICE Arrests and Case Dismissals**

8.  Government lawyers (or DHS attorneys) have historically been the only ICE personnel in court. Until late May 2025, it was extremely rare to see ICE officers conducting arrests within the courthouse.

9.  On or about May 21, 2025, we began receiving reports from member organizations of ICE officers arresting individuals at t290 Broadway, 201 Varick Street, and Buffalo immigration courts.

10. I-ARC's members noted that government lawyers were moving to dismiss removal proceedings pursuant to Section 240 of the INA, thereby depriving the noncitizen respondent of the opportunity to continue pursuing pending claims for asylum or other immigration relief. Our members also reported that the government lawyers appeared to be coordinating internally before they moved to dismiss, allowing ICE officers to target individuals as they exited courtrooms.

11. Member organizations reported that four *pro se* individuals were detained at the Buffalo immigration court, and an additional four *pro se* individuals were detained at 290 Broadway on May 21, 2025.  ICE sought to detain these individuals and pursue immediate removal.

12. On May 29, 2025, I was present at 290 Broadway to lead our FOTC program before IJ James M. McCarthy. I observed counsel for the government move to dismiss the Section 240 removal proceedings of four individuals, and ICE ERO officers arrested and detained three of those individuals after their court hearings.

    That morning, before the hearings began, the Clerk of Court told me that four respondents on the master calendar docket would have their full removal proceedings dismissed. I asked if the dismissals were connected to planned arrests, and the clerk confirmed that ICE officers were stationed by the elevators. This exchange made clear that ICE ERO had informed the immigration court *ex parte* that it intended to seek the dismissal of respondents' Section 240 removal cases, place them in expedited removal, and detain them.

13. IJ McCarthy heard seven cases on the morning of May 29, 2025. In all of the cases I-ARC assisted, the respondents were unrepresented and proceeded *pro se*.

14. In four of the seven cases heard that day, the government attorney orally moved to dismiss the respondents' ongoing Section 240 removal proceedings. In all four cases, the government had not provided advanced notice of its intention to move to dismiss to the respondents. , IJ McCarthy asked if government counsel had submitted a written motion to dismiss; she replied "no." The IJ then asked if there was a reason she did not do so, and the government counsel replied, "no," and the IJ did not press the matter further. Instead, the IJ asked for the grounds for the motion to dismiss. The government counsel stated only that it was no longer in the best interest of the government to continue removal proceedings. In one query, the IJ asked the government counsel what circumstances had changed, and she simply replied, "circumstances." The government attorney did not inform any of the respondents of the government's intention to detain them or to place them in expedited removal.

15. In all four cases, the IJ had set merits hearings in late 2026 or early 2027, indicating that each individual had presented a prima facie case for asylum, withholding of removal, or protection under the Convention Against Torture.

16. Three of the four individuals whose proceedings the government moved to dismiss had asylum applications pending in the immigration court. The one respondent without a filed asylum application intended to file but had been involved in a serious motorcycle accident and needed more time to prepare his application after being hospitalized for an extended period. Each of four individuals appeared *pro se* and were extremely nervous and concerned about their cases.

17. After the hearing, ICE officers—who had stationed themselves in the elevator and lobby areas of the courthouse—arrested the three respondents whose proceedings the government had moved to dismiss. The officers were waiting in the lobby with both printed photos and photos on their phones of the respondents. The ICE officers separated the respondents, brought them to a corner where they zip-tied their hands, and escorted them to a confined area of the building in an unknown location. While I was in the lobby, a male respondent from a different courtroom who was attempting to exit was also arrested, and yelled, "Film this! I have family in the Bronx."

18. Since May 29th, I-ARC has continued to witness the detention of *pro se* respondents. I-ARC organized our Steering Committee, made up of fourteen non-profit legal service providers and pro-bono law firm representatives, to determine how we, as a coalition, could be responsive to the needs of *pro se* individuals when lawfully appearing for their scheduled immigration hearings. The following week, additional reports continued to be

shared amongst the I-ARC networks of further arrests at all three of the New York City Immigration Courts and the Buffalo Immigration Court.

19. On June 3rd, I-ARC launched a volunteer Court Observation Project that operates virtually and in person every weekday at all three of the New York City Immigration Courts and the Buffalo immigration court. Since that date, 121 individual volunteers have conducted daily observations of master calendar hearings, both in person and via WebEx, before 59 different immigration judges. Between June 3rd and July 3rd, observers recorded 131 OPLA motions to dismiss out of 1,134 individual cases where observers answered this question.

20. On June 5th, we assisted four *pro se* respondents in proceedings in which the government moved to dismiss the noncitizens' full removal proceedings. One was a married couple in their late 50s, both had filed for asylum, and both were in proceedings together. The government moved to dismiss only the husband's case, and they both broke down into tears in front of the IJ. Another was a single father accompanied by his three-year-old son who had been brought to court due to the father's inability to find childcare support; he also had a pending asylum application and objected to the government's motion to dismiss his Section 240 removal proceedings. The final respondent was a single male from Senegal who spoke Wolof. On this date, the IJ granted the government's motions to dismiss without providing the ten-day period for the noncitizens to respond.

21. In my FOTC capacity, when I asked if the respondents could have time to respond to the motion, the IJ said that after reviewing President Trump's executive order—not citing a specific Executive Order—he determined it was enough to demonstrate that circumstances had changed and he did not need to give the respondents time to respond to the motions to dismiss. The IJ did not explain that the respondent faced potential arrest and detention or placement in expedited removal.

**Systemic Patterns in ICE's Courtroom Arrests, Dismissals, and Deprivation of Process**

22. In addition, through both our FOTC Project and our Court Observation Project, I-ARC staff and volunteers have witnessed the following:

    a. Frequent presence of ICE agents at all three of the New York City immigration courts and the Buffalo immigration court. Groups of sometimes as many as 30 ICE agents, both in plain clothes and in uniform with bullet proof vests, often masked (including in full balaklavas), often armed, stationed throughout the court building, some inside the courtroom itself, others just outside the courtroom entrances or near the elevator banks, waiting to arrest people coming out of their hearings.

4

b.  Our court observers have witnessed more than 160 arrests of respondents at all 4 New York courthouse locations. ICE ERO presence is most frequent at 26 Federal Plaza and Varick Street.

c.  We have also witnessed violent arrests. One member of our FOTC team witnessed ICE ERO agents throw a noncitizen against the wall. Another witnessed ICE ERO agents screaming and shoving an elected official's staff.

d.  Plainclothes ICE ERO agents have hovered around I-ARC's pro bono meeting spaces adjacent to the courtroom, intimidating volunteers and respondents, and interfering with attorney-client relationships.

e.  ICE agents have arrested people leaving their hearings regardless of whether their Section 240 removal proceedings were dismissed by the IJ and regardless of whether the noncitizen had an application for asylum or other relief pending before the IJ.

f.  Government attorneys moved to dismiss cases, and immigration judges granted those motions, even when the person had a pending asylum application, objected to dismissal and/or pleaded with the IJ for the chance to continue fighting their case and shared how fearful they are of being sent to their home country.

    i.  From our court observation project data, out of 131 dismissal motions recorded between June 3rd and July 3rd, respondents had asylum applications pending with the immigration court *more than half the time*, both when ICE OPLA attorneys made the motion (63%) and when the IJ granted that motion (55%).

g.  Government attorneys and immigration judges frequently did not give unrepresented individuals the full and accurate picture about what will happen to their cases – and their liberty – as a result of ICE's motions, including:

    i.  not being forthcoming with unrepresented individuals about what dismissal means for their case;

    ii. not sharing that ICE ERO officers are waiting outside the courtroom door to arrest them;

    iii. not sharing that ICE intends to place that person in "expedited removal" when their case is dismissed;

    iv. not sharing that if a noncitizen is placed in expedited removal, the person will lose the rights they have in Section 240 removal proceedings to a full and fair hearing before an impartial IJ, to challenge the government's evidence against them, and to present their own evidence and witnesses on their behalf; and

     v.  not providing (or not requiring ICE OPLA attorneys to provide) a cogent reason for seeking dismissal or how circumstances have changed in that person's case.

   h.  Some IJs have misled unrepresented individuals about whether they can continue to pursue an asylum application after dismissal, assuring them that they would still be able to apply affirmatively with USCIS. This misrepresentation happened even when the respondent objected to dismissal on the record because they wanted to keep defending their asylum application before the IJ.

   i.  While some ICE OPLA trial attorneys cited little in the way of justification for their motions to dismiss, citing only "circumstances" or "resources," others stated that since the January 21, 2025 Federal Register Notice purporting to expand the scope of who can be subjected to expedited removal was issued after the Notice to Appear was issued for a particular respondent, DHS now had the opportunity to make an informed decision in choosing how to process a case.

   j.  In one case, the OPLA attorney added an argument that the respondent does not qualify for asylum on the basis of his filed asylum application alone, stating both that the application did not demonstrate nexus and that, based on the date of entry, the Circumventing Lawful Pathways rule applies. The respondent, in his 20s, was visibly upset, he was clutching his stomach and had to go to the bathroom twice. He repeatedly asked for more time to talk with an attorney or his father. The IJ did not grant more time, encouraged the respondent to take Voluntary Departure, and ruled that the asylum application had been abandoned.

   k.  The vast majority of respondents who faced OPLA motions to dismiss were unrepresented. Of the 131 such motions we observed, only 9% were represented by counsel.

23. We observed many unrepresented individuals whose cases were dismissed by IJs over their objections, even when they shared why they are afraid they would be killed or persecuted if forced to return and begged to continue fighting their case before the courts with spouses, young children, and other loved ones here in the U.S.

24. In one such case reported by our observers, a pro se respondent told the IJ that he had all the evidence and other documents translated that IJ had ordered. He had made a motion to consolidate his case with that of his son (who was before a different IJ), but the motion was not in English. Respondent very eloquently explained he wanted to continue his process, that he was afraid that he could not return and wanted to see his asylum through. He said he wanted to join his case with his son. The IJ still dismissed and told him he had a month to file an appeal This individual was arrested leaving the courtroom.

25. We also observed many cases where ICE arrested people leaving the courtrooms even when the IJ did not dismiss their cases. We saw several such cases where these ICE arrest practices separated husbands and wives.

26. In one case, a husband and wife filed an asylum application together but were docketed separately. The TA moved to dismiss only the husband's case, not the wife's. The judge said he would reset the hearing at a later date to give the husband time to respond. The husband stated that he wants to continue fighting his asylum case before the judge. The judge said that he could continue with his asylum case "in another process" but asked if he wanted more time to consult with an attorney. The husband said yes, so the judge said he would consider the motion to dismiss at the next hearing. The judge then set the next hearing date for January of 2026. The TA objected and said he should only have 10 days to respond. The judge ultimately only gave the husband 10 days. The husband was detained leaving the courtroom.

27. On July 3, an I-ARC team member was observing at the courthouse at 26 Federal Plaza. Before hearings even began for the day, she observed approximately 10 ICE agents on the 12th floor with balaclavas, guns, vests, and full kit, as well as other ICE agents who just wore "police" t-shirts. They congregated right outside the courtrooms at either end of the hallway. They appeared to have camera teams as part of their group who were ready to video what they were about to do. The courtrooms that had master calendar hearings that morning were locked; clerks would come out to the main waiting area and call in respondents. The I-ARC team member witnessed several arrests. The ICE agents were aggressive, yelling, and grabbing people roughly. There was a cacophony of additional press as well as other people. It was quite scary in tight quarters in the hallway. One ICE agent got in someone's face, grabbed his arm, and demanded "What's your name, is this you?" When they determined it was the person they were looking for, a group of officers swarmed the person and the press swarmed after them. The whole group walked to the elevator bays and into the elevator. This was repeated several times. After one such arrest, a young man of about 20 was left behind in a state of shock and he just kept saying, "That was my brother. They took my brother."

28. Families can get caught in the chaos of courthouse enforcement even when they are not on ICE's arrest list. On June 30, a volunteer observer at 26 Federal Plaza watched ICE pull aside a Venezuelan family with young children the moment they stepped out of the courtroom. ICE took the father's photo to run facial recognition and checked his EAD. They were looking for a man with one name, and this father had a different name. ICE was shouting instructions at the family who did not understand English. The mom was screaming back "no somos delincuentes" and the kids cried hysterically. Eventually the family was allowed to leave.

29. Since the start of ICE courthouse arrests in the immigration court in May 2025, fear has dramatically chilled participation by the immigrant community in court hearings. This is

entirely unprecedented activity in New York's immigration courts. I-ARC has been active in immigration courts assisting pro se respondents with appearing for their initial master calendars two to three times a week since March 2023, for a total of one hundred and eighty three appearances, and until May 22, 2025, we had never seen an ICE agent inside the court building. As a result of ICE's actions, we have seen a stark decrease in the number of respondents we are able to help each week through our FOTC program due to lower attendance at hearings. We are routinely seeing dockets that have as many as forty *pro se* individuals scheduled with only five *pro se* respondents appearing in person. Prior to the policy change, a forty-person docket would typically have 30 to 35 *pro se* respondents appear in person.

30. On July 8, 2025, we assisted an IJ we do not normally assist with FOTC. The IJ's docket was three pages long, which translates to approximately 30 unrepresented *pro se* individuals; only five *pro se* respondents appeared in person. Of those five *pro se* respondents, ICE ERO agents waiting in the courtroom and coordinating with agents directly outside the courtroom door detained four of them. The IJ never mentioned to any of the *pro se* respondents that an ERO officer was waiting inside the courtroom with them and that they would be detained upon their exit of the courtroom; instead, the IJ reset cases for appearances in early 2027 via WebEx.

31. One volunteer court observer reported that at a single master calendar hearing on the juvenile docket, the IJ noted that 42 juvenile respondents did not show up in person. The IJ also noted that ICE ERO agents were in the courtroom.

32. Others observed several *pro se* respondents who attempted to appear for their hearings via WebEx without the court's prior permission and who said they were afraid to attend in person because of the arrests. While some judges permitted their appearance without a motion, multiple IJs we observed required these *pro se* respondents to appear in person or risk *in absentia* removal orders.

33. These dismissal and arrest practices have and continue to cause irreparable harm to noncitizens and their families who are simply fulfilling their legal obligations to attend their court hearings. These include separation from loved ones and trauma but also physical arrest and detention. In addition, dismissal of a respondent's pending 240 proceedings deprives that respondent of all the rights the law and regulations afford under those proceedings, including the right to challenge the government's evidence and present their own witnesses on their behalf, as well as the right to ultimately appeal to the federal courts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 7, 2025

Gillian Rowland-Kain