## **DECLARATION OF SIOMARA M. UMANA**

1. My name is Siomara M. Umana and I am a supervising attorney at Make the Road New York. I am based in our Brentwood office, located at 1090 Suffolk Ave, Brentwood, NY 11717 and specialize in immigration cases including representation of noncitizen clients before the immigration courts and U.S. Citizenship & Immigration Services. I am admitted as an attorney in New York State. I am fluent in Spanish.

2. On May 29, 2025, I was present on the 5th floor of the Varick Immigration Court in Manhattan with two and later three colleagues to provide assistance to *pro se* individuals attending their master calendar hearings. I had learned that agents from Immigration & Customs Enforcement (ICE) were arresting individuals at their court hearing, something that I had never experienced in my career, after ICE attorneys moved to dismiss their removal proceedings.

3. My colleagues and I were present in courtroom four, before Immigration Judge Lucy Billings. Throughout the morning, we spoke with and collected information for 13 individuals who were present and appeared before the judge that morning. One of the individuals had his two children with him as they were also part of his case. Of these individuals, only one was represented by an attorney; the attorney appeared via Webex.

4. Of those 13 individuals, I witnessed the ICE attorney present in court, move for dismissal in seven cases. The Immigration Judge directed ICE to file its motion in writing and none of the motions were granted.

5. Of the seven individuals for whom a motion to dismiss was made, all were subsequently detained by ICE in or immediately outside the courtroom, including the person being represented by an attorney. ICE agents also detained two individuals whose cases were not subjected to a motion to dismiss. In total, my colleagues and I witnessed firsthand nine individuals get detained.

6. My colleagues and I collected "A numbers" (DHS-issued identification numbers) for all of the individuals detained and for whom the government moved to dismiss proceedings. Among the seven individuals I observed face a motion to dismiss, all of them already had an application for asylum filed with the court. In fact, everyone in court that morning had a pending I-589 filed with court.

7. The experience of interacting with and observing individuals who are in removal proceedings and fully compliant with their obligation to attend court and seek relief and who are then suddenly forcibly detained, without any explanation or consideration for their individual circumstances was deeply upsetting and unjust.

8. The individuals targeted for these actions were not provided any explanation about what was happening and, because they were immediately detained, will not have an opportunity to oppose DHS's motion to dismiss. The heavy ICE presence was also terrifying. In the course of the morning, ICE agents hovered outside of the lobby, and towards the end of the morning hearings, plainclothes ICE agents began to walk in and out of the courtroom.

9. The Immigration Judge repeatedly asked the agents why they were entering her courtroom and if they would leave her courtroom and close the doors. The agents did not heed her request. Witnessing their disregard for the immigration judge, and their willingness to carry out detentions even inside the courtroom after directed not to, made me concerned for the safety of all individuals present, including myself and my colleagues, particularly as I was 33 weeks pregnant on that day.

10. The entire experience was abhorrent, and not the usual courtroom decorum we witness in immigration courts. I also heard a court staff member state the situation "is getting out of hand and out of control."

11. One colleague reported that as he was accompanying a noncitizen to the elevators after his hearing had concluded, ICE officers detained the noncitizen and immediately wedged themselves in between the noncitizen and my colleague while telling him to step back and not to interfere. They rushed the noncitizen down the hallway and into an elevator without any sort of explanation about why he was being detained or where they were taking him.

12. Another colleague, an Immigrant Justice Corps Legal Fellow seeking to be admitted into the New York Bar, had an emotional breakdown following the chaotic scene caused by the 14 ICE agents in the courtroom.

13. Since May 29, 2025, I have made several attempts to ascertain the location of some of the individuals detained. Over 24 hours later, the ICE locator still did not list a location for most people we saw detained. I filed a Form G-28 (an administrative notice

of appearance with ICE) and emailed ICE ERO in New York City to ascertain the location of one woman detained. An ICE officer responded by first saying she was still in New York City and then, less than five minutes later, another ICE officer responded saying she was in transit.

14. Three individuals detained were subsequently calendared on the detained docket at the Varick Immigration Court, which would have meant they got pro bono representation through a New York-based provider network. However, when I logged in to observe their Webex hearings on the day of their first master calendar hearing, I observed the immigration judge change the venue in the cases to other courts. The change meant they no longer qualify for free representation under a New York-based universal representation program for detained noncitizens called the New York Family Immigrant Unity Project (NYIFUP), because they had now been transferred out of the New York City area. Unfortunately, in other words, the change-of-venue left them without a means to access representation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: July 31, 2025
Suffolk, NY

Siomara M. Umana