𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔆𝔬𝔲𝔯𝔱
𝔖𝔬𝔲𝔱𝔥𝔢𝔯𝔫 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔑𝔢𝔴 𝔜𝔬𝔯𝔨

AFRICAN COMMUNITIES TOGETHER
and THE DOOR,

                                        Plaintiffs,

            - against -

TODD LYONS, in his official capacity as
Acting Director, U.S. Immigration and
Customs Enforcement; KRISTI NOEM,
in her official capacity as Secretary of          NO. 1:25-CV-6366 (PKC)
the United States Department of
Homeland Security; SIRCE E. OWEN, in
her official capacity as Acting Director,
Executive Office of Immigration
Review; and PAMELA BONDI, in her
official capacity as Attorney General,
U.S. Department of Justice,

                                        Defendants.

---

**BRIEF FOR AMICUS CURIAE CITY OF NEW YORK
IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY**

---

                                    MURIEL GOODE-TRUFANT
                                    *Corporation Counsel*
                                    *of the City of New York*
RICHARD DEARING                     Attorney for Amicus Curiae
DEVIN SLACK                         100 Church Street
GEOFFREY E. CURFMAN                 New York, New York 10007
JAMISON DAVIES                      212-356-2490
    *of Counsel*                    jdavies@law.nyc.gov

August 18, 2025

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................ii

PRELIMINARY STATEMENT  AND INTEREST OF AMICUS CURIAE .................1

ARGUMENT ...........................................................................................3

    THE BROADER PUBLIC INTEREST AND THE EQUITIES WEIGH IN
    FAVOR OF STAYING THE CHALLENGED POLICIES ................................3

    A.  The fear of immigration enforcement at immigration courthouses can
        drive people out of the legal immigration system. ...................................4

    B.  Detentions carried out at immigration courthouses undermine local
        governance. ...........................................................................10

        1. Courthouse detentions dissuade immigrants from participating in all
            manner of judicial proceedings. .........................................................10

        2. Immigration courthouse detentions can also deter residents from
            interacting with government more broadly. ...................................17

CONCLUSION .......................................................................................21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*City of Chicago v. Sessions,*
  888 F.3d 272 (7th Cir. 2018) ...............................................................19

*Matter of McCabe v. 511 W. 232nd Owners Corp.,*
  2024 N.Y. LEXIS 1991 (N.Y. Ct. App. 2024)......................................20

*Nat. Res. Def. Coun. v. U.S. Dep't of Energy,*
  362 F. Supp. 3d 126 (S.D.N.Y. 2019) ...................................................3

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ..................................................................................3

**Statutes**

5 U.S.C. § 705.........................................................................................1, 3

8 U.S.C. § 1229a(b)(5) ...............................................................................4

**Other Authorities**

*African Communities Together v. Lyons,* No. 25-cv-6366,
  Complaint, ECF No. 1 (S.D.N.Y. Aug. 1, 2025) ........................... 15, 16

Alisha Roa et al., *Key Facts on Health Care Use and Costs Among
  Immigrants,* Kaiser Family Foundation (Sept. 23, 2024),
  available at https://tinyurl.com/4mdvkjfj (created Aug. 14, 2025)..................17

American Civil Liberties Union, *Freezing Out Justice: How
  immigration arrests at courthouses are undermining the justice
  system* (May 3, 2018), available at https://perma.cc/UR85-
  GQNY (created July 23, 2025)............................................................14

Associated Press, *Migrant family sues over US detention in what
  may be first challenge to courthouse arrests involving kids,* CNN
  (June 27, 2025), available at https://perma.cc/VK6F-P8XT
  (created Aug. 12, 2025) .................................................................7, 11

Austen C. Jefferson and Steve Kastenbaum, *Can NY stop ICE from
  arresting immigrants at federal courthouses?,* City & State, New
  York (May 30, 2025) available at https://perma.cc/9QSA-HTXE
  (created June 12, 2025) .........................................................................4

Avery Lea Rogers, *Immigrants fear being 'disappeared,' Wisconsin
  attorney says,* Wisconsin Public Radio (June 25, 2025),
  available at https://tinyurl.com/26zahepr (created Aug. 14,
  2025).......................................................................................................9

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Brooke A. Lewis, *HPD Chief Announces Decrease in Hispanics Reporting Rape and Violent Crimes Compared to Last Year*, HOUSTON CHRON. (Apr. 6, 2017), available at https://perma.cc/SF5E-KA4N (created Mar. 16, 2020)....................................19

Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation*, N.Y. TIMES (June 3, 2018), available at https://tinyurl.com/3ws99c4r (created Aug. 18, 2025) ....................................................................................................15

Dan Clark, *Immigrants are being arrested at NY courthouses, top judge says*, TIMES UNION (Feb. 13, 2025), available at https://tinyurl.com/ypvkzrw2 (created Aug. 14, 2025) ....................................12

Eduardo Cuevas, *'Escalation:' Federal agents now detaining people with active immigration cases*, USA TODAY (July 18, 2025), available at https://perma.cc/8EHX-7MKC (created Aug. 14, 2025)........................................................................................................8

Emily Baumgaertner Nunn et al., *Migrants Are Skipping Medical Care, Fearing ICE, Doctors Say*, N.Y. TIMES (May 8, 2025), available at https://tinyurl.com/ycy6w2fk (created Aug. 14, 2025)......................................................................................................18

Gloria Rebecca Gomez, *ICE resumes courthouse arrests in Phoenix, but with new tactics amid opposition*, AZ MIRROR (May 28, 2025), available at https://tinyurl.com/mwdwfbka (created Aug. 14, 2025) ..............................................................................................7, 11

Gwynne Hogan, *Arrests Nearly Halt a Immigration Court. One Reason: Fewer People Are Showing Up*, THE CITY (Aug. 15, 2025), available at https://perma.cc/R342-2RXU (created Aug. 15, 2025) ......................................................................................................7

Gwynne Hogan, *ICE Agents Arrest at Least Seven Immigrants as Courthouse Blitz Continues*, THE CITY (May 29, 2025), available at https://perma.cc/3RMZ-SWMM (created June 12, 2025) ...........................4

Haidee Chu and Gwynne Hogan, *NYC is the Nation's Capital of Immigration Courthouse Arrests, New Data Analysis Shows*, THE CITY (Aug. 11, 2025), available at https://perma.cc/AD29-EWQW (created Aug. 11, 2025) ...........................................................4

Hamed Aleaziz *et al.*, *How ICE Is Seeking to Ramp Up Deportations Through Courthouse Arrests*, N.Y. TIMES (May 30, 2025), available at https://tinyurl.com/4nt2vaas (created Aug. 14, 2025)...................8

iii

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Hamutal Bernstein, et al., *Adults in Immigrant Families Report
Avoiding Routine Activities Because of Immigration Concerns*,
Urban Institute, July 2019, available at https://perma.cc/57TX-
WGNU ...................................................................................................17

Heidi Glenn, *Fear Of Deportation Spurs 4 Women To Drop
Domestic Abuse Cases In Denver*, NATIONAL PUBLIC RADIO (Mar.
21, 2017), available at https://perma.cc/4C33-KBLR (created
July 23, 2025)........................................................................................15

Immigrant Defense Project, *Safeguarding the Integrity of Our
Courts: The Impact of ICE Courthouse Operations in New York
State* (2019), available at https://perma.cc/F8R8-DP3Z (created
July 23, 2025)............................................................................. 12, 13, 14

Jeff Abbott, *ICE courthouse arrests are leading migrants to avoid
their hearings, observers say*, EL PASO TIMES (Aug. 6, 2025),
available at https://perma.cc/HB7Q-GKJC (created Aug. 18,
2025).......................................................................................................8

Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear:
Deportation.*, N.Y. TIMES (Apr. 30, 2017), available at
https://perma.cc/EA59-JCDC (created Mar. 16, 2020)...................19

Jesus R. Torres et al., *COVID-19 Vaccine Uptake in Undocumented
Latinx Patients Presenting to the Emergency Department*, JAMA
Netw. Open, 2024;7;(4):e248578 (Apr. 26, 2024), available at
https://tinyurl.com/3d6seubu (created Aug. 14, 2025)...................18

Kathleen Roche, et al., *Impacts of Immigration Actions and News
and the Psychological Distress of U.S. Latino Parents Raising
Adolescents*, J. ADOLESCENT HEALTH (2018), available at
https://perma.cc/VZ22-RYY8 (created Aug. 18, 2025)...................17

*Lopez Contreras v. Oddo*, No. 25-cv-00162, Petition for Writ of
Habeas Corpus, ECF No. 1 (W.D. Pa. May 29, 2025).........................5

Luis Ferré-Sadurní and Ashley Cai, *Trump's Immigrant Crackdown
in New York: More Arrests, Longer Detention*, N.Y. TIMES (Aug.
4, 2025), available at https://tinyurl.com/yn5ktnp2..........................5

Luis Ferré-Sadurni, *Inside a Courthouse, Chaos and Tears as Trump
Accelerates Deportations*, N.Y. TIMES (June 12, 2025), available
at https://tinyurl.com/2v773rrx (created Aug. 14, 2025)...................8

Marisa Gerber, *Low wages, lousy shifts, little room for
advancement: Immigrant workers describe on-the-job
discrimination*, L.A. TIMES (Oct. 19, 2023), available at
https://perma.cc/LDC2-ZTHC (created June 12, 2025)...................11

iv

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Martha Bellisle, *Volunteers flock to immigration courts to support migrants arrested in the hallways*, Associated Press (July 20, 2025), available at https://tinyurl.com/rj6fcfts (created Aug. 14, 2025)..................................................................................................7

Matthew Lisiecki and Gerard Apruzzese, *Proposed 2024 Mass Deportation Program Would Socially and Economically Devastate American Families*, Center for Migration Studies (Oct. 9, 2024), available at https://perma.cc/FCU8-6FCT (created Aug. 15, 2025) ...............................................................................13

Mayor de Blasio, Health Officials Declare End of Measles Outbreak in New York City (Sept. 3, 2019), available at https://tinyurl.com/34wra5mb (created Aug. 14, 2025) ...................................18

Mayor's Office of Immigrant Affairs, *2023 Annual Report on New York City's Immigrant Population and Initiatives of the Office* ("MOIA 2023 Report"), available at https://perma.cc/G94T-ZQLD (created June 12, 2025) ...............................................................3

Mayor's Office of Immigrant Affairs, *2024 Annual Report on New York City's Immigrant Population and Initiatives of the Office*, available at https://perma.cc/2V9U-5EP6 (created June 12, 2025)...................................................................................................3

Mayor's Office of Immigrant Affairs, *State of our Immigrant City: Mayor's Office of Immigrant Affairs Annual Report for Calendar Year 2020*, available at https://perma.cc/3826-M9T7 (created June 12, 2025)..................................................................................4

Memorandum from John Morton, Director of U.S. Immigration and Customs Enforcement, on Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (June 17, 2011), available at https://perma.cc/X5GY-3ZZB (created Aug. 12, 2025) ....................................16

Memorandum from Sheila McNulty, Chief Immigration Judge, on Operating Policies and Procedures Memorandum 23-01: Enforcement Actions in or Near OCIJ Space to All Assistant Chief Immigration Judges, Immigration Judges, Court Administrators, and Court Personnel (Dec. 11, 2023), available at https://perma.cc/5J3Z-Q5ZZ (created July 16, 2025)........................................9

Memorandum from Sirce E. Owen, Acting Director of EOIR on the Cancellation of Operating Policies and Procedures to All of EOIR (Jan. 28, 2025), available at https://perma.cc/S9CB-FP96 (created July 16, 2025) .........................................................9

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Memorandum from Tae Johnson, Acting Director of U.S.
Immigration and Customs Enforcement & Troy Miller, Acting
Comm'r of U.S. Customs and Border Protection, on Civil
Immigration Enforcement Actions in or near Courthouses to ICE
& CBP (Apr. 27, 2021), available at https://perma.cc/KJJ2-
7JNW (created July 16, 2025) ............................................................................9

Milena Malaver et al., *ICE agents in Miami find new spot to carry
out arrests: Immigration court*, MIAMI HERALD (May 26, 2025),
available at https://tinyurl.com/2wrccmf3 (created Aug. 14,
2025)......................................................................................................................11

Miriam Jordan, *"We're Petrified": Immigrants Afraid to Seek
Medical Care for Coronavirus*, N.Y. TIMES (Mar. 18, 2020),
available at https://perma.cc/PGQ9-8QB4 (created Mar. 24,
2020)......................................................................................................................19

N.Y. State Unified Court System, *Family Court Caseload Activity*,
available at https://tinyurl.com/2ufbv9xf (created Aug. 14, 2025)
...............................................................................................................................11

New York City Commission on Human Rights, *Mediation*, available
at https://perma.cc/P6RQ-6RUZ (created Aug. 13, 2025) ..............................20

New York City Commission on Human Rights, *Steps in the
Complaint Process*, available at https://perma.cc/8U6H-LWAM
(created Aug. 13, 2025)......................................................................................20

New York City Criminal Court, *Court Information by County*,
available at https://tinyurl.com/4cwjxyrt (created Aug. 14, 2025)..................12

New York City Department of Social Services, *Universal Access to
Legal Services: A Report on Year Six of Implementation in New
York City* (Winter 2023), available at https://perma.cc/QK74-
GKEC (created June 12, 2025) .........................................................................11

New York City Family Court, *Information by County*, available at
https://tinyurl.com/ydsrhtxt (created Aug. 14, 2025) ......................................12

New York City Housing Court, *Locations*, available at
https://tinyurl.com/57aw4auw (created Aug. 14, 2025) ..................................12

Nik Theodore, *Insecure Communities: Latino Perceptions of Police
Involvement in Immigration Enforcement* (May 2013), available
at https://perma.cc/3UG3-UN9L (created Mar. 16, 2020)...............................19

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Physicians for Human Rights, *Consequences of Fear: How the Trump Administration's Immigration Policies and Rhetoric Block Access to Health Care* (Apr. 2025), available at https://perma.cc/PBE5-HXR6 (created Aug. 13, 2025) ...................................18

Reuven Blau, *'They've Gone Off the Map': Fear Drives Immigrants Away From Clinics*, THE CITY (Aug. 12, 2025), available at https://tinyurl.com/ybzdktcy (created Aug. 14, 2025).....................................18

Rommel H. Ojeda, *Rumors and Fear Drives Immigrants to Skip Court — A Decision With Heavy Costs*, DOCUMENTED (Mar. 10, 2025), available at https://perma.cc/7HRW-RKCZ (created July 22, 2025) .........................................................................................................9

Roxanne P. Kerani & Helena A. Kwakwa, *Scaring Undocumented Immigrants is Detrimental to Public Health*, 9 AM. J. PUB. HEALTH (Sept. 2018), available at https://tinyurl.com/3xtm6yd7 (created Aug. 14, 2025) .............................................................................17

Supreme Court of the State of New York, New York County, *Overview*, available at https://tinyurl.com/ydwnt78m (created Aug. 14, 2025) ................................................................................13

*Toaquiza v. Joyce*, Amended Petition for Writ of Habeas Corpus, ECF No. 23 (S.D.N.Y. July 7, 2025) ......................................................6

*Toaquiza v. Joyce*, Stipulation and Order, ECF No. 39 (S.D.N.Y. July 22, 2025) ............................................................................................7

Tom Dart, *Fearing deportation, undocumented immigrants wary of reporting crimes*, THE GUARDIAN, Mar. 23, 2017, available at https://perma.cc/E3PX-XAQH (created Mar. 16, 2020) .................................15

Tori Bedford, *Fear of Deportation Prompts Undocumented Immigrants to Resist COVID-19 Vaccine*, GBH (Jan. 7, 2021), available at https://tinyurl.com/mp3dfnjv (created Aug. 14, 2025)................................................................................................18

U.S. Citizenship and Immigration Services, *Special Immigrant Juveniles*, available at https://perma.cc/5GDM-JHYQ (created Aug. 14, 2025) ........................................................................................6

## PRELIMINARY STATEMENT
## AND INTEREST OF AMICUS CURIAE

The City of New York submits this amicus brief in support of plaintiffs' motion under 5 U.S.C. § 705 seeking a stay of (1) the policy of the U.S. Immigration and Customs Enforcement (ICE) scuttling restrictions on immigration courthouse arrests, and (2) the policy of the Executive Office of Immigration Review (EOIR) pushing immigration judges to dismiss noncitizens' removal proceedings without meaningful process. The City agrees with plaintiffs that these policies violate the Administrative Procedure Act on several different fronts (*see generally* Pls.' Mem. in Supp. of Mot. to Stay Effective Date of Agency Action or Preserve Status or Rights, ECF No. 23). Rather than repeat those points here, the City instead writes to underscore how the public interest and the equities weigh heavily in favor of a stay—to protect not only plaintiffs and their members, but also the broader communities in which the individuals targeted by these unlawful policies reside.

New York City has been the focus of the federal government's courthouse arrest campaign. Already, hundreds of City residents have been caught in a trap laid by immigration authorities at a courthouse in Manhattan, where federal, state, and local courthouses cluster within a few blocks. And this unlawful campaign now presents many other City residents with an impossible choice: risk detention by attending future court proceedings or run the same risk by not attending. To put it mildly, this undermines the public interest.

The courthouse arrest campaign will—by design—have an in terrorem effect, deterring City residents from participating in immigration proceedings and pursuing pathways to status available under federal law. This causes spillover effects that are known and well documented. State and local governments across the nation

experienced them firsthand when the prior Trump administration engaged in simi-lar (if less underhanded) tactics before the courts stepped in to correct course. Cre-ating a culture of fear around court appearances deters people from participating in judicial proceedings—not just immigration proceedings, but all manner of court proceedings that depend on cooperation from members of the public, whatever their status may be. Free access to courts is a pillar of the rule of law, but our judicial system cannot work as it should, as it must, if courthouses are used as traps for those who are simply following what the law requires. And if our residents decide not to appear in immigration court out of fear that they will face detention, many will with-draw from the community to evade immigration authorities, to the detriment of themselves and their communities.

To be clear, the City does not set immigration policy or decide who enters the country; those are matters for the federal government. But the City cannot respon-sibly govern by turning a blind eye to a basic reality: many immigrants without sta-tus, including large numbers of asylum seekers, call New York City home. These in-dividuals must, of necessity, engage with the City's government in important aspects of community life—everything from reporting crimes to police to alerting enforce-ment agencies to unsafe workplaces. That is for the greater good. The City cannot effectively govern—for the benefit of all New Yorkers—if an entire class of residents are driven into the shadows.

# ARGUMENT

## THE BROADER PUBLIC INTEREST AND THE EQUITIES WEIGH IN FAVOR OF STAYING THE CHALLENGED POLICIES

In determining whether to grant a stay under 5 U.S.C. § 705, this Court employs the familiar test governing preliminary injunctions, *Nat. Res. Def. Coun. v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 149 (S.D.N.Y. 2019), requiring the Court to decide whether relief is in the public interest and to balance the equities, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Both factors point in the same direction here, and they counsel in favor of staying the challenged policies.

Not long ago, America proudly called itself a nation of immigrants. However one feels about that label today, the fact remains that the federal governments' past policies and decisions have resulted in a large number of immigrants without status and asylum seekers living in our communities. They are our neighbors. Nowhere is that more true than in New York City, which is home to more than three million immigrants, nearly 40% of the City's total population.[1] Among them are those who are currently undocumented but who are pursuing legal status.[2] Also included are those fleeing violence and insecurity in their home countries, with more than 100,000 recently entering the City while seeking asylum.[3]

---

[1] Mayor's Office of Immigrant Affairs, *2024 Annual Report on New York City's Immigrant Population and Initiatives of the Office* ("MOIA 2024 Report") at 8, available at https://perma.cc/2V9U-5EP6 (created June 12, 2025).

[2] Mayor's Office of Immigrant Affairs, *2023 Annual Report on New York City's Immigrant Population and Initiatives of the Office* ("MOIA 2023 Report") at 10, available at https://perma.cc/G94T-ZQLD (created June 12, 2025).

[3] *See* MOIA 2023 Report at 24.

No matter how these people entered the country, the reality is that they are here, and they form part of our communities, as students, workers, employers, and more.[4] The City cannot pretend that these residents do not exist. To govern, the City must extend public safety, public health, and other public resources to all its residents, allowing them to continue contributing to our communities while here. Federal immigration enforcement actions carried out in and around courthouses severely hamper the City's ability to engage with these residents.

### A. The fear of immigration enforcement at immigration courthouses can drive people out of the legal immigration system.

For many, continued community participation begins with a willingness to follow the pathways to legal status available under federal law. Doing so requires applicants to consistently appear for proceedings at an immigration court, as those who fail to appear are subject to removal orders issued in absentia. *See* 8 U.S.C. § 1229a(b)(5). Yet members of the plaintiff-organizations in this action are among hundreds of people who dutifully appeared for their immigration hearings only to be arrested either in or outside an immigration courthouse.[5] These tactics risk

---

[4] *See* MOIA 2024 Report at 6, 10; Mayor's Office of Immigrant Affairs, *State of our Immigrant City: Mayor's Office of Immigrant Affairs Annual Report for Calendar Year 2020* at 32, available at https://perma.cc/3826-M9T7 (created June 12, 2025).

[5] *See* Haidee Chu and Gwynne Hogan, *NYC Is the Nation's Capital of Immigration Courthouse Arrests, New Data Analysis Shows*, THE CITY (Aug. 11, 2025) ("Capital of Immigration Courthouse Arrests"), available at https://perma.cc/AD29-EWQW (created Aug. 11, 2025); Gwynne Hogan, *ICE Agents Arrest at Least Seven Immigrants as Courthouse Blitz Continues*, THE CITY (May 29, 2025), available at https://perma.cc/3RMZ-SWMM (created June 12, 2025); Austen C. Jefferson and Steve Kastenbaum, *Can NY stop ICE from arresting immigrants at federal courthouses?*, CITY & STATE, NEW YORK (May 30, 2025) available at https://perma.cc/9QSA-HTXE (created June 12, 2025).

driving underground those who are otherwise inclined to follow the country's immigration laws, undermining the very system that those laws are designed to serve.

New York City has become the epicenter of this courthouse arrest campaign.[6] Recent reporting found that arrests at immigration courthouse buildings in New York City accounted for nearly 25% of all immigration courthouse detentions executed across the country between January and June 2025.[7] Federal officials are also far more likely to detain immigrants at immigration courthouses in the City compared with other parts of the country: 7% of all ICE arrests in the City have occurred at immigration courthouses, compared to only 0.5% nationwide.[8] And the sheer number of individuals detained is remarkable: in just a two-week period between late May and early June, federal officers arrested more than 130 people in a lower Manhattan immigration courthouse building.[9]

This campaign has taken a heavy toll on our residents. Consider Dylan Lopez Contreras, a 20-year-old immigrant from Venezuela who was detained at an immigration court in Manhattan after appearing for a routine asylum hearing.[10] Since arriving in New York City in May 2024, Dylan had enrolled in and was actively attending a public school in the Bronx, where he was learning English in a program

---

[6] *See* Luis Ferré-Sadurní and Ashley Cai, *Trump's Immigrant Crackdown in New York: More Arrests, Longer Detention*, N.Y. TIMES (Aug. 4, 2025), available at https://tinyurl.com/yn5ktnp2.

[7] *See* Chu and Hogan, *Capital of Immigration Courthouse Arrests*, *supra* note 5.

[8] *Id.*

[9] *Id.*

[10] *See Lopez Contreras v. Oddo*, No. 25-cv-00162, Petition for Writ of Habeas Corpus, ECF No. 1 at 1-2, 10 (W.D. Pa. May 29, 2025).

designed for older students like him.[11] He was also working part-time to support his family and was in the process of applying for Special Immigrant Juvenile Status (SIJS),[12] a pathway to permanent residency available to children under 21 years old who obtain a state-court order finding that they were abused, neglected, or abandoned.[13] Dylan's detention upended his SIJS proceedings, prevented him from continuing his education, and deprived his family of a critical source of income.

A similar story unfolded for Derlis Snaider Chusin Toaquiza, a 19-year-old immigrant from Ecuador whom agents arrested following a hearing on his asylum application.[14] Before he was detained, Derlis attended a public high school in Queens, where he was learning English and had joined the school's soccer team.[15] His hard work in the classroom earned him the school's "Most Improved" student award, which he was unable to receive in person because he was detained at an ICE facility during the awards ceremony.[16] Outside school, Derlis was the primary caregiver for his younger siblings, preparing their meals and getting them ready for school.[17] Derlis's contributions to his family and community came to a grinding halt

---

[11] *See id.* at 1, 10.

[12] *Id.* at 11-12.

[13] U.S. Citizenship and Immigration Services, *Special Immigrant Juveniles*, available at https://perma.cc/5GDM-JHYQ (created Aug. 14, 2025).

[14] *See Toaquiza v. Joyce*, Amended Petition for Writ of Habeas Corpus, ECF No. 23 at 1, 5, 7 (S.D.N.Y. July 7, 2025).

[15] *Id.* at 5-6.

[16] *Id.* at 6.

[17] *Id.*

following his detention in early June of this year. And though he was released the next month after posting a bond,[18] he and his family suffered during his detention.

Hundreds of other New York City residents were similarly affected. And although our residents have borne the brunt of these tactics, they have swept far more broadly, reaching courthouses across the country. In Los Angeles, a mother and her two young children were detained at an immigration courthouse after a judge granted the government's abrupt motion to dismiss their application for asylum.[19] Another mother and her child were detained just after leaving an immigration courthouse in Phoenix.[20] And a man in Seattle faced a similar fate after a judge dismissed his deportation case.[21] These are but a handful of examples among the hundreds of courthouse arrests that have occurred nationwide this year.

Immigration courthouse arrests like these come with significant costs. Since the federal government began arresting immigrants who show up for proceedings in immigration court, many immigrants have been dissuaded from appearing.[22] According to one report, on a single day in May this year, only one out of every three

---

[18] *Toaquiza v. Joyce*, Stipulation and Order, ECF No. 39 (S.D.N.Y. July 22, 2025).

[19] Associated Press, *Migrant family sues over US detention in what may be first challenge to courthouse arrests involving kids*, CNN (June 27, 2025), available at https://perma.cc/VK6F-P8XT (created Aug. 12, 2025) ("Migrant family sues over US detention").

[20] Gloria Rebecca Gomez, *ICE resumes courthouse arrests in Phoenix, but with new tactics amid opposition*, AZ MIRROR (May 28, 2025), available at https://tinyurl.com/mwdwfbka (created Aug. 14, 2025) ("ICE resumes courthouse arrests in Phoenix").

[21] Martha Bellisle, *Volunteers flock to immigration courts to support migrants arrested in the hallways*, ASSOCIATED PRESS (July 20, 2025), available at https://tinyurl.com/rj6fcfts (created Aug. 14, 2025).

[22] *See* Gwynne Hogan, *Arrests Nearly Halt at Immigration Court. One Reason: Fewer People Are Showing Up*, THE CITY (Aug. 15, 2025), available at https://perma.cc/R342-2RXU (created Aug. 15, 2025).

of the immigrants who had scheduled cases in a Los Angeles courtroom appeared for their hearing.[23] The following month, more than half of the immigrants who were required to appear at a courthouse in Manhattan did not make an appearance.[24] And at an immigration courthouse in Texas, nearly 90% of immigrants did not appear for their scheduled hearings on a day in July.[25]

Immigration attorneys and immigrants themselves have confirmed what these statistics imply. An attorney with the American Immigration Lawyers Association, which represents 17,000 immigration advocates nationwide, recently told reporters: "[s]o many people simply aren't showing up for their court dates" out of fear they will be detained.[26] Other advocates have similarly reported widespread fear among clients and other immigrants considering whether to appear for their

---

[23] Hamed Aleaziz *et al.*, *How ICE Is Seeking to Ramp Up Deportations Through Courthouse Arrests*, N.Y. TIMES (May 30, 2025), available at https://tinyurl.com/4nt2vaas (created Aug. 14, 2025) ("How ICE Is Seeking to Ramp Up Deportations").

[24] Luis Ferré-Sadurni, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, N.Y. TIMES (June 12, 2025), available at https://tinyurl.com/2v773rrx (created Aug. 14, 2025).

[25] Jeff Abbott, *ICE courthouse arrests are leading migrants to avoid their hearings, observers say*, EL PASO TIMES (Aug. 6, 2025), available at https://perma.cc/HB7Q-GKJC (created Aug. 18, 2025).

[26] Eduardo Cuevas, *'Escalation:' Federal agents now detaining people with active immigration cases*, USA TODAY (July 18, 2025), available at https://perma.cc/8EHX-7MKC (created Aug. 14, 2025).

hearings.[27] And immigrants have revealed that they decided not to appear or were considering whether to appear given the risk they could face arrest and detention.[28]

This is hardly a surprise; it is largely the point of the federal government's campaign. And until recently, the federal government itself openly recognized these very concerns. In guidance from which the agency now departs without any meaningful explanation, ICE formulated its courthouse detention policy based on the premise that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair administration of justice."[29] EOIR similarly explained in its own guidance that "permitting enforcement actions in or near" immigration courthouses "would disincentivize noncitizens from appearing for their hearings."[30]

Now, the government brushes aside concerns that courthouse detentions will deter appearances, claiming they are "vague" and "contrary to logic."[31] But the data

---

[27] *See* Avery Lea Rogers, *Immigrants fear being 'disappeared,' Wisconsin attorney says*, WISCONSIN PUBLIC RADIO (June 25, 2025), available at https://tinyurl.com/26zahepr (created Aug. 14, 2025).

[28] Rommel H. Ojeda, *Rumors and Fear Drives Immigrants to Skip Court — A Decision With Heavy Costs*, DOCUMENTED (Mar. 10, 2025), available at https://perma.cc/7HRW-RKCZ (created July 22, 2025).

[29] Memorandum from Tae Johnson, Acting Director of U.S. Immigration and Customs Enforcement & Troy Miller, Acting Comm'r of U.S. Customs and Border Protection, on Civil Immigration Enforcement Actions in or near Courthouses to ICE & CBP (Apr. 27, 2021), available at https://perma.cc/KJJ2-7JNW (created July 16, 2025).

[30] Memorandum from Sheila McNulty, Chief Immigration Judge, on Operating Policies and Procedures Memorandum 23-01: Enforcement Actions in or Near OCIJ Space to All Assistant Chief Immigration Judges, Immigration Judges, Court Administrators, and Court Personnel (Dec. 11, 2023), available at https://perma.cc/5J3Z-Q5ZZ (created July 16, 2025).

[31] Memorandum from Sirce E. Owen, Acting Director of EOIR on the Cancellation of Operating Policies and Procedures to All of EOIR at 1 (Jan. 28, 2025), available at https://perma.cc/S9CB-FP96 (created July 16, 2025).

outlined here shows that these concerns are well founded and already materializing around the country. Many immigrants are indeed forgoing appearances to avoid the risk of arrest inside the courthouse or immediately following their departure.

### B. Detentions carried out at immigration courthouses undermine local governance.

When the federal government arrests individuals appearing for immigration hearings, it affects not only the federal immigration system, but also local governance in the areas where those immigrants live and work. Immigrants who fear detention at an immigration courthouse may abstain from state and local judicial proceedings, leaving them exposed to deprivations those courts serve to protect against. And those who fail to appear for an immigration hearing will likely face an in absentia removal order, causing them to withdraw from the community altogether and fail to engage with public agencies that protect not just them, but also citizens and individuals with legal status.

### 1. Courthouse detentions dissuade immigrants from participating in all manner of judicial proceedings.

When federal authorities stoke a culture of fear around routine immigration appearances, deterrence will not stop at a single courthouse's doors. Targeted populations do not draw such fine lines when their liberty is at stake. So now that immigration authorities are deploying courthouse detention tactics across the

country,[32] it threatens to deter cooperation with judicial proceedings of all kinds, in federal, state, and local courthouses alike.

The implications run deep and wide. Many matters critical to the safety and wellbeing of City residents flow through the court system. Protecting rights to fair housing often entails proceedings in housing court.[33] Avoiding abuse or neglect by caregivers and recovering child support frequently requires appearances in family court.[34] Attempts to enforce wage protections and antidiscrimination laws often lead workers into the courts as well. And asylum seekers and immigrants, no less than citizens or permanent residents, face the types of deprivations our court system protects against.[35] If these residents fear that simply appearing in court to protect

---

[32] *See* Chu and Hogan, *Capital of Immigration Courthouse Arrests*, supra note 5 (discussing immigration courthouse detentions in New York City); Associated Press, *Migrant family sues over US detention*, *supra* note 19 (same with respect to Los Angeles); Gomez, *ICE resumes courthouse arrests in Phoenix*, *supra* note 20 (Phoenix); Milena Malaver et al., *ICE agents in Miami find new spot to carry out arrests: Immigration court*, MIAMI HERALD (May 26, 2025), available at https://tinyurl.com/2wrccmf3 (created Aug. 14, 2025) (Miami); Aleaziz et al., *How ICE Is Seeking to Ramp Up Deportations*, *supra* note 23 (discussing operations around the country).

[33] *See, e.g.*, N.Y. City Department of Social Services, *Universal Access to Legal Services: A Report on Year Six of Implementation in New York City* at 11 (Winter 2023), available at https://perma.cc/QK74-GKEC (created June 12, 2025) (reporting that more than 125,000 eviction petitions were filed in New York City housing courts between 2022 and 2023).

[34] *See* N.Y. State Unified Court System, *Family Court Caseload Activity*, available at https://tinyurl.com/2ufbv9xf (created Aug. 14, 2025) (showing that more than 150,000 cases were filed in family court in New York City during 2024 alone).

[35] *See, e.g.*, MOIA 2024 Report at 6; Marisa Gerber, *Low wages, lousy shifts, little room for advancement: Immigrant workers describe on-the-job discrimination*, L.A. TIMES (Oct. 19, 2023), available at https://perma.cc/LDC2-ZTHC (created June 12, 2025) (reporting results of survey finding that 47% of the working immigrants surveyed reported that employers did not pay them for all hours they worked or they faced discrimination and harassment because they were immigrants, among other forms of mistreatment).

their rights or the rights of others could expose them to detention and removal, our judicial system will suffer, and the City with it.

Immigrants have ample justification to fear enforcement at state and local courthouses. Between 2016 and 2018, immigration arrests executed at or around New York State and New York City courthouses climbed more than 1700%, reaching more than 200 incidents in 2018 alone.[36] And by February of this year, immigration authorities had resumed enforcement action in or near state and local courthouses, despite the protections contemplated by the common law privilege prohibiting civil courthouse arrests and measures like New York State's Protect Our Courts Act.[37]

What's more, in New York City, many state and local courthouses—including a housing court, a family court, and both the criminal and civil divisions of the New York County Supreme Court—are clustered just blocks from the federal immigration facilities in downtown Manhattan that are at the center of the latest round of courthouse arrests.[38] Their proximity to the location where hundreds of arrests have occurred itself deters participating in state and local proceedings.

---

[36] *See* Immigrant Defense Project, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* at 4-5 (2019), available at https://perma.cc/F8R8-DP3Z (created July 23, 2025) ("Safeguarding the Integrity of Our Courts").

[37] *See* Dan Clark, *Immigrants are being arrested at NY courthouses, top judge says*, TIMES UNION (Feb. 13, 2025), available at https://tinyurl.com/ypvkzrw2 (created Aug. 14, 2025).

[38] *See, e.g.*, New York City Housing Court, *Locations*, available at https://tinyurl.com/57aw4auw (created Aug. 14, 2025) (showing housing court for New York County located at 111 Centre Street in Manhattan, just two blocks from 26 Federal Plaza, the epicenter of courthouse arrests in New York City); New York City Family Court, *Information by County*, available at https://tinyurl.com/ydsrhtxt (created Aug. 14, 2025) (same with respect to New York County family court, located at 60 Lafayette Street in Manhattan); New York City Criminal Court, *Court Information by County*, available at

*(cont'd on next page)*

Past experience shows that immigrants do in fact disengage from local judicial proceedings when they fear courthouse arrests. One poignant example involves actions in housing court. In a 2019 survey covering advocates and legal service providers, 56% reported that their clients feared ICE would detain them if they were to file a housing court complaint.[39] As a result, many immigrants choose to continue living in "deplorable and unsafe conditions," as one attorney described, rather than confront their landlords in judicial proceedings.[40] And even those who do appear in housing court often "feel pressured to resolve [their] ... case[s] as quickly as possible," decline to seek advice of counsel, waive defenses and counterclaims, and sign judgment agreements with unjust terms, all in an effort to avoid ICE.[41]

Make no mistake: the victims will not be limited to immigrants without legal status. The vast majority of immigrants without status live in mixed-status households, meaning the household contains at least one U.S. citizen or one person with status.[42] When members of mixed-status households are deterred from enforcing basic housing protections, the whole household suffers. And unsavory landlords

---

https://tinyurl.com/4cwjxyrt (created Aug. 14, 2025) (same with respect to Supreme Court, New York County, Criminal Term, located at 100 Centre Street in Manhattan); Supreme Court of the State of New York, New York County, *Overview*, available at https://tinyurl.com/ydwnt78m (created Aug. 14, 2025) (same with respect to Supreme Court, New York County, Civil Term, located at 60 Centre Street in Manhattan).

[39] *See* Safeguarding the Integrity of Our Courts at 56-57.

[40] *Id.* at 58.

[41] *Id.* at 57-58.

[42] Matthew Lisiecki and Gerard Apruzzese, *Proposed 2024 Mass Deportation Program Would Socially and Economically Devastate American Families* at 3, Center for Migration Studies (Oct. 9, 2024), available at https://perma.cc/FCU8-6FCT (created Aug. 15, 2025) (finding 4.7 million mixed-status households across the United States but only 1.1 million households containing at least one undocumented resident and no U.S. citizens).

may exploit the situation even more broadly, as removing an entire class of city residents from the equation lowers the overall likelihood that basic housing requirements will be enforced across entire buildings or neighborhoods.

A similar problem arises in the context of abuse, neglect, and other proceedings in family courts. Advocates around New York reported that their clients decided not to pursue or withdrew family court actions—many associated with domestic violence—due to concerns over immigration enforcement.[43] In addition, of New York advocates surveyed in 2017, nearly half reported working with an immigrant who decided not to seek custody or visitation, and more than a third worked with immigrants who opted against seeking an order of protection, again out of fear of immigration authorities.[44]

These challenges are not unique to New York. In a survey of prosecutors from 19 states taken after an uptick in immigration enforcement actions at courthouses during the first Trump administration, more than 80% of the respondents reported that domestic violence had become underreported and more difficult to prosecute.[45] Immigration attorneys and advocates from all 50 states reported in the same survey that they had filed 40% fewer cases on behalf of immigrant survivors in 2017 compared to 2016, noting that their clients were returning to abusers so they could avoid appearing in court.[46] These challenges arose in cities across the country: from

---

[43] Safeguarding the Integrity of Our Courts at 27-29.

[44] *Id.* at 27-28.

[45] American Civil Liberties Union, *Freezing Out Justice: How immigration arrests at courthouses are undermining the justice system* at 2 (May 3, 2018), available at https://perma.cc/UR85-GQNY (created July 23, 2025).

[46] *Id.* at 2.

Houston, which experienced a 16% decline in domestic violence reports within the Hispanic community between 2016 and 2017,[47] to Denver, where the City Attorney noted that several women had elected to drop their domestic violence actions in 2017 out of fear that ICE agents would detain them at the courthouse.[48]

Individuals represented by the plaintiff-organizations illustrate the burdens that arise when immigrants fear participation in state and local proceedings like those designed to protect against domestic abuse. Two of these individuals have pending asylum applications and are pursuing SIJS,[49] which, as explained, requires an order from a family court adjudging them abused, neglected, or abandoned. If these individuals and others like them feel unable to attend court appearances out of fear that they will face detention, as one of them does here,[50] they will close themselves off from an opportunity to obtain legal status and to protect themselves from mistreatment at home, which is available through participation in state-level judicial proceedings.

---

[47] Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation*, N.Y. TIMES (June 3, 2018), available at https://tinyurl.com/3ws99c4r (created Aug. 18, 2025).

[48] Heidi Glenn, *Fear Of Deportation Spurs 4 Women To Drop Domestic Abuse Cases In Denver* ("Fear of Deportation"), NATIONAL PUBLIC RADIO (Mar. 21, 2017), available at https://perma.cc/4C33-KBLR (created July 23, 2025); Tom Dart, *Fearing deportation, undocumented immigrants wary of reporting crimes*, THE GUARDIAN (Mar. 23, 2017), available at https://perma.cc/E3PX-XAQH (created Mar. 16, 2020).

[49] *African Communities Together v. Lyons*, No. 25-cv-6366, Complaint, ECF No. 1 at 20, 22 (S.D.N.Y. Aug. 1, 2025).

[50] *Id.* at 22.

The former Director of ICE recognized these concerns in guidance issued to immigration officials during a previous administration.[51] The guidance stated that it was against ICE policy to remove individuals who were "in the midst of a legitimate effort to protect their civil rights or civil liberties."[52] And it directed officers to exercise appropriate discretion in pursuing enforcement actions against individuals who were victims of crimes or were pursing actions to protect their wellbeing, including those related to domestic violence, civil rights, and claims against a landlord or an employer.[53] Otherwise, the guidance recognized, officials may deter individuals from accessing critical protections available through the courts.[54]

The purposes underlying this policy dovetail with the mission of a municipal government. So long as immigrants pursuing lawful status reside in our community, the City must extend to them the basic protections that are available to anyone who lives or works within city limits. And municipalities cannot carry out their obligations to govern when faced with largescale barriers to community participation such as those addressed here.

---

[51] *See* Memorandum from John Morton, Director of U.S. Immigration and Customs Enforcement, on Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (June 17, 2011), available at https://perma.cc/X5GY-3ZZB (created Aug. 12, 2025).

[52] *Id.* at 2.

[53] *See id.*

[54] *Id.*

## 2. Immigration courthouse detentions can also deter residents from interacting with government more broadly.

Detaining individuals who appear for routine immigration hearings undermines local governance in ways that extend beyond deterring immigrants from participating in judicial proceedings. When immigrants pursuing lawful status fail to appear for their immigration hearings out of fear that they will face detention, they are likely to face an in absentia removal order and disengage from the community as a result, which can undermine the essential functions that local governments must perform.

Take healthcare as an example. Studies show that immigrants often avoid visiting a doctor or forgo other forms of healthcare due to fears related to immigration enforcement.[55] That is true not only of immigrants themselves: according to one study, 40% of Latino parents surveyed avoided medical care and other public services for their *children* due to fears related to immigration enforcement.[56] And

---

[55] Alisha Roa et al., *Key Facts on Health Care Use and Costs Among Immigrants*, KAISER FAMILY FOUNDATION (Sept. 23, 2024), available at https://tinyurl.com/4mdvkjfj (created Aug. 14, 2025); Hamutal Bernstein, et al., *Adults in Immigrant Families Report Avoiding Routine Activities Because of Immigration Concerns*, Urban Institute, July 2019, available at https://perma.cc/57TX-WGNU (finding that 6.3% of adults in immigrant families (and 8.4% of Latino adults in immigrant families) reportedly avoided visiting a doctor or clinic while sick because they worried they would be asked about their citizenships status); Roxanne P. Kerani & Helena A. Kwakwa, *Scaring Undocumented Immigrants Is Detrimental to Public Health*, 9 AM. J. PUB. HEALTH 1165-66 (Sept. 2018), available at https://tinyurl.com/3xtm6yd7 (created Aug. 14, 2025).

[56] Kathleen Roche, et al., *Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents*, J. ADOLESCENT HEALTH (2018), available at https://perma.cc/VZ22-RYY8 (created Aug. 18, 2025).

these challenges have already emerged in response to recent immigration enforce-

ment policies, affecting New York City no less than other parts of the country.[57]

When individuals forgo healthcare, it directly affects local governments and

strains local healthcare systems. Fears connected to immigration enforcement have

caused some immigrants—particularly those who are undocumented—to skip vac-

cination for diseases such as measles[58] and Covid-19,[59] which can require costly

governmental responses in the event of an outbreak.[60] Further, forgoing care often

means that individuals enter the healthcare system with more serious conditions,

placing heightened demands on emergency resources and public hospitals.[61] Local

governments cannot effectively promote public health when portions of their

---

[57] Reuven Blau, *'They've Gone Off the Map': Fear Drives Immigrants Away From Clinics*, THE CITY (Aug. 12, 2025), available at https://tinyurl.com/ybzdktcy (created Aug. 14, 2025); Emily Baumgaertner Nunn et al., *Migrants Are Skipping Medical Care, Fearing ICE, Doctors Say*, N.Y. TIMES (May 8, 2025), available at https://tinyurl.com/ycy6w2fk (created Aug. 14, 2025) ("Migrants are Skipping Medical Care").

[58] Nunn, *Migrants are Skipping Medical Care*, *supra* note 57.

[59] *See, e.g.*, Jesus R. Torres et al., *COVID-19 Vaccine Uptake in Undocumented Latinx Patients Presenting to the Emergency Department*, JAMA Netw. Open, 2024;7;(4):e248578 (Apr. 26, 2024), available at https://tinyurl.com/3d6seubu (created Aug. 14, 2025) (finding 13% of study participants, who consisted of undocumented and legal Latinx California residents, knew someone who was undocumented and decided not to receive the Covid-19 vaccine due to fear of deportation); Tori Bedford, *Fear Of Deportation Prompts Undocumented Immigrants To Resist COVID-19 Vaccine*, GBH (Jan. 7, 2021), available at https://tinyurl.com/mp3dfnjv (created Aug. 14, 2025) (reporting similar issues in Massachusetts).

[60] *E.g.*, Mayor de Blasio, Health Officials Declare End of Measles Outbreak in New York City (Sept. 3, 2019), available at https://tinyurl.com/34wra5mb (created Aug. 14, 2025) (explaining that New York City spent $6 million and dedicated more than 500 staff members in responding to the latest measles outbreak).

[61] Physicians for Human Rights, *Consequences of Fear: How the Trump Administration's Immigration Policies and Rhetoric Block Access to Health Care* at 10 (Apr. 2025), available at https://perma.cc/PBE5-HXR6 (created Aug. 13, 2025).

populations decide not to seek out healthcare due to concerns that they will face deportation.[62]

Concerns related to immigration enforcement can also cripple a city's ability to investigate or prosecute crime. Out of fear that police will ask about their immigration status or the status of people they know, 45% of Latinos have said in surveys that they are less likely to report a crime or offer information about crimes, whether as a witness or a victim.[63] As one concrete example, in Houston, the number of Latinos reporting rapes in 2017 dropped by 40% compared to the year before, even as non-Latino victims reported an increased number of rapes.[64] The result is plain. "[T]he failure to obtain … victim and witness cooperation could both hinder law enforcement efforts and allow criminals to freely target communities with a large undocumented population, knowing that their crimes will be less likely to be reported." *City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018). That is a harm that cascades across the entire community.

The same fears can undermine other City agencies that exist to protect our residents. As one example, the New York City Human Rights Commission enforces

---

[62] *See* Miriam Jordan, *"We're Petrified": Immigrants Afraid to Seek Medical Care for Coronavirus*, N.Y. TIMES (Mar. 18, 2020), available at https://perma.cc/PGQ9-8QB4 (created Mar. 24, 2020).

[63] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* (May 2013), available at https://perma.cc/3UG3-UN9L (created Mar. 16, 2020).

[64] Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation.*, N.Y. TIMES (Apr. 30, 2017), available at https://perma.cc/EA59-JCDC (created Mar. 16, 2020); Brooke A. Lewis, *HPD Chief Announces Decrease in Hispanics Reporting Rape and Violent Crimes Compared to Last Year,* HOUSTON CHRON. (Apr. 6, 2017), available at https://perma.cc/SF5E-KA4N (created Mar. 16, 2020).

the New York City Human Rights Law, which prohibits discrimination in employment, housing, and public accommodations, typically at levels more protective than state or federal law. *See, e.g.*, *Matter of McCabe v. 511 W. 232nd Owners Corp.*, 2024 N.Y. LEXIS 1991, at *16 (N.Y. Ct. App. 2024). But enforcement largely depends on individuals bringing complaints to the Commission, and the enforcement process often requires in-person interviews or mediation at the Commission's offices.[65] Those disinclined to participate in public life due to fears of immigration enforcement may well hesitate to come forward when they face discrimination. And the victims will not remain limited to those deterred from reporting violations: a system built on individual reporting cannot function properly when large segments of our population are unwilling to report the behavior our laws protect against.

\* \* \*

At bottom, enforcement actions carried out at immigration courthouses carry wide reaching implications not only for individual immigrants, but also for the localities where they reside. The public interest and equities weigh decisively in favor of granting plaintiffs a stay of the challenged policies.

---

[65] New York City Commission on Human Rights, *Steps in the Complaint Process*, available at https://perma.cc/8U6H-LWAM (created Aug. 13, 2025); New York City Commission on Human Rights, *Mediation*, available at https://perma.cc/P6RQ-6RUZ (created Aug. 13, 2025).

## CONCLUSION

This Court should grant plaintiffs' request for a stay and other relief.

Dated:    New York, New York
          August 18, 2025

Respectfully submitted,

MURIEL GOODE-TRUFANT
*Corporation Counsel*
*of the City of New York*
Attorney for Amici Curiae

By:    /s/ *Jamison Davies*
       JAMISON DAVIES
       Assistant Corporation Counsel

       100 Church Street
       New York, NY 10007
       212-356-2490
       jdavies@law.nyc.gov

RICHARD DEARING
DEVIN SLACK
GEOFFREY E. CURFMAN
JAMISON DAVIES
    *of Counsel*

21