UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AFRICAN COMMUNITIES TOGETHER, and THE DOOR,

          Plaintiffs,

      v.

TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; SIRCE E. OWEN, in her official capacity as Acting Director, Executive Office of Immigration Review; and PAMELA BONDI, in her official capacity as Attorney General, U.S. DEPARTMENT OF JUSTICE,

          Defendants.

25 Civ. 6366 (PKC)

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A STAY**

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2695/2721
Fax: (212) 637-0033
Email: jeffrey.oestericher@usdoj.gov
      tomoko.onozawa@usdoj.gov

JEFFREY S. OESTERICHER
TOMOKO ONOZAWA
Assistant United States Attorneys

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ....................................................................................................3

I.      Federal Statutory Removal and Arrest Authority .................................................3

II.     IJ Adjudication Procedures and the Case Adjudication Email ............................3

III.    ICE Civil Immigration Courthouse Arrest Policies ........................................5

        A.      Pre-2025 ICE Policies .......................................................................5

                1.      The March 2014 Guidance..........................................................5

                2.      The January 2015 Guidance.......................................................6

                3.      The January 2018 Directive .......................................................6

                4.       The April 2021 Guidance.........................................................7

        B.      2025 Courthouse Arrest Guidance ..................................................8

ARGUMENT ........................................................................................................9

I.      Legal Standards.......................................................................................... 9

II.     Plaintiffs Fail to State an APA Claim and Cannot Demonstrate a Clear Likelihood of
        Success on the Merits .................................................................................10

        A.      The 2025 Courthouse Arrest Guidance and Case Adjudication Email Are Not
                Subject to APA Review ...................................................................12

                1.      The 2025 Courthouse Arrest Guidance Is Unreviewable Under the
                        APA ..........................................................................................12

                2.      The Case Adjudication Email Is Unreviewable Under the APA..............13

                3.      Plaintiffs Cannot Bring a Claim Under *Accardi* ........................16

        B.      The 2025 Courthouse Arrest Guidance Is Not Arbitrary, Capricious, Or
                Contrary to Law ...........................................................................17

                1.      There Is No Common-Law Privilege Against Federal Immigration
                        Enforcement in and Around Courthouses...................................17

i

2.    The INA Cannot Be Read to Incorporate the Common-Law Privilege Against Courthouse Arrest. 21The INA Displaced any State Common-Law Privilege to the Contrary ........................................................................21

3.    The INA Displaced any State Common-Law Privilege to the Contrary ..22

4.    The 2025 Courthouse Arrest Guidance Is Not Arbitrary and Capricious .................................................................................................23

C.    The Case Adjudication Email Is Not Arbitrary, Capricious, Or Contrary to Law ..........................................................................................................25

III.    Plaintiffs Fail to Make a Strong Showing of Irreparable Harm........................................26

IV.    The Balance of Equities and Public Interest Weigh in Favor of the Government............27

V.    Plaintiffs' Motion for a Stay under Section 705 of the APA Is Moot ..............................28

VI.    Plaintiffs Should Be Required to Post a Bond ..................................................................30

CONCLUSION..................................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Able v. United States*,
    44 F.3d 128 (2d Cir. 1995)................................................................................. 10

*Adler v. U.S. Dep't of Justice*,
    No. 18 Civ. 2188, 2018 WL 4571677 (S.D.N.Y. Sept. 24, 2016) ........................... 25

*Americans for Immigrant Justice v. U.S. Dep't of Homeland Security*,
    Civil Action No. 22-3118 (CKK), 2023 WL 143876 (D.D.C. Feb. 1, 2023) ..................... 11, 14

*Arizona v. United States*,
    567 U.S. 387 (2012).................................................................................... 3

*Baker Botts LLP v. ASARCO LLC*,
    576 U.S. 121 (2015).................................................................................... 21

*Banco San Juan Int'l, Inc. v. Federal Reserve Bank of New York*,
    700 F. Supp. 3d 86 (S.D.N.Y. 2023)............................................................... 25

*Bennett v. Spear*,
    520 U.S. 154 (1997).................................................................................... 11

*Bionpharma Inc. v. CoreRx, Inc.*,
    582 F. Supp. 3d 167 (S.D.N.Y. 2022)............................................................. 27

*Borey v. Nat'l Union Fire Ins. Co.*,
    934 F.2d 30 (2d Cir. 1991)........................................................................... 26

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988).................................................................................... 11

*BST Holdings, LLC v. OSHA*,
    17 F.4th 604 (5th Cir. 2021) ........................................................................ 30

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971).................................................................................... 25

*Cobell v. Norton*,
    240 F.3d 1081 (D.C. Cir. 2001) ................................................................ 11, 14

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014).................................................................................... 19

*Damus v. Nelson,*
  313 F. Supp. 3d 317 (D.D.C. 2018) ....................................................... 16

*Diaz v. Rosen,*
  986 F.3d 687 (7th Cir. 2021) .............................................................. 16

*E. Air Lines, Inc. v. Civil Aeronautics Bd.,*
  261 F.2d 830 (2d Cir. 1958).................................................................. 9

*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons,*
  954 F.3d 118 (2d Cir. 2020) ............................................................. 16

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
  460 F.3d 13 (D.C. Cir. 2006) ....................................................... 10, 11

*Gardner v. United States,*
  246 F. Supp. 1014 (S.D.N.Y. 1965) ................................................. 20

*Gonzalez-Caraveo v. Sessions,*
  882 F.3d 885 (9th Cir. 2018) ............................................................. 14

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
  564 U.S. 915 (2011).......................................................................... 20

*Heckler v. Chaney,*
  470 U.S. 821 (1985)................................................................... 10, 13

*Herrera-Inirio v. INS,*
  208 F.3d 299 (1st Cir. 2000).............................................................. 22

*Huanga v. Decker,*
  599 F. Supp. 3d 131 (S.D.N.Y. 2022).............................................. 27

*In re Arthur Treacher's Franchise Litigation,*
  92 F.R.D. 398 (E.D. Pa. 1981)......................................................... 20

*J. Andrew Lange, Inc. v. FAA,*
  208 F.3d 389 (2d Cir. 2000).............................................................. 25

*J.S. v. New York State Dep't of Corrections,*
  76 F.4th 32 (2d Cir. 2023) ................................................................ 28

*Kamerling v. Massanari,*
  295 F.3d 206 (2d Cir. 2002)............................................................. 26

*Kansas v. Colorado,*
  533 U.S. 1 (2001)............................................................................. 20

*Lamb v. Schmitt,*
  285 U.S. 222 (1932) ................................................................. 19

*Landon v. Plasencia,*
  459 U.S. 21 (1982) ................................................................. 27

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State,*
  104 F.3d 1349 (D.C. Cir. 1997) ............................................. 12

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ............................................................... 10

*Lujan v. National Wildlife Federation,*
  497 U.S. 871 (1990) ......................................................... 11, 14

*Lunney v. U.S.,*
  319 F.3d 550 (2d Cir. 2003) ............................................ 14, 16

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ................................................................. 9

*Morgan v. Gonzales,*
  445 F.3d 549 (2d Cir. 2006) ................................................ 14

*Munaf v. Geren,*
  553 U.S. 674 (2008) ................................................................. 9

*New York v. ICE,*
  466 F. Supp. 3d 439 (S.D.N.Y. 2020) ................................... 7

*New York v. U.S. Dep't of Educ.,*
  477 F. Supp. 3d 279 (S.D.N.Y. 2020) ................................... 9

*Nken v. Holder,*
  556 U.S. 418 (2009) ......................................................... 27, 30

*Northern Light Technology, Inc. v. Northern Lights Club,*
  236 F.3d 57 (1st Cir. 2001) ................................................... 21

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004) ........................................................... 10, 11

*NRDC v. U.S. Dep't of Energy,*
  362 F. Supp. 3d 126 (S.D.N.Y. 2019) ................................. 28

*Page Co. v. MacDonald,*
  261 U.S. 446 (1923) ............................................................... 19

*Panjiva, Inc. v. U.S. Customs & Border Prot.*,
   342 F. Supp. 3d 481 (S.D.N.Y. 2018) ..................................................................... 11

*Pasquantino v. United States*,
   544 U.S. 349 (2005) ............................................................................................... 21

*Pavlo v. James*,
   437 F. Supp. 125 (S.D.N.Y. 1977) ......................................................................... 20

*Pennoyer v. Neff*,
   95 U.S. 714 (1878) ................................................................................................. 19

*Pereira v. U.S. Dep't of Justice*,
   No. 16-cv-2599 (NRB), 2016 WL 2745850 (S.D.N.Y. May 11, 2016) ................... 11

*Procunier v. Martinez*,
   416 U.S. 396 (1973) ............................................................................................... 27

*Rosenblatt v. American Cyanamid Co.*,
   86 S. Ct. 1 (1965) .................................................................................................. 20

*Ryan v. ICE*,
   974 F.3d 9 (1st Cir. 2020) .......................................................................... 7, 18, 21

*Salazar v. King*,
   822 F.3d 61 (2d Cir. 2016) .................................................................................... 12

*Samantar v. Yousuf*,
   560 U.S. 305 (2010) ............................................................................................... 21

*Sanusi v. Gonzales*,
   445 F.3d 193 (2d Cir. 2006) .................................................................................. 14

*Shaffer v. Heitner*,
   433 U.S. 186 (1977) ............................................................................................... 20

*Stewart v. Ramsay*,
   242 U.S. 128 (1916) ............................................................................................... 19

*Sussman v. Crawford*,
   488 F.3d 136 (2d Cir. 2007) .................................................................................. 10

*Tendo v. U.S.*,
   Case No. 2:23-cv-438, 2024 WL 3650462 (D. Vt. (Aug. 5, 2024) ......................... 16

*Texas v. Biden*,
   646 F. Supp. 3d 753 (N.D. Tex. 2022) ................................................................... 29

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) .................................................................... 30

*Textile Workers Union of America v. Lincoln Mills of Ala.,*
    353 U.S. 448 (1957) .................................................................................. 22

*Tucker Anthony Realty Corp. v. Schlesinger,*
    888 F.2d 969 (2d Cir. 1989) ................................................................ 26, 27

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.,*
    578 U.S. 590 (2016) ............................................................................ 11, 14

*United States v. Craft,*
    535 U.S. 274 (2002) ............................................................................ 18, 21

*United States v. Denedo,*
    556 U.S. 904 (2009) .................................................................................. 20

*Velesaca v. Decker,*
    458 F. Supp. 3d 224 (S.D.N.Y. 2020) ....................................................... 16

*Winter v. NRDC,*
    555 U.S. 7 (2008) ............................................................................... 10, 26

**Statutes, Regulations, and Rules**

5 U.S.C. § 701(a)(1) ......................................................................................... 13

5 U.S.C. § 701(a)(2) ......................................................................... 10, 14, 16

5 U.S.C. § 704 .................................................................................... 10, 11, 14, 16

5 U.S.C. § 705 .................................................................................... 2, 9, 28-30

5 U.S.C. § 706(2)(C) ....................................................................................... 18

8 U.S.C. § 1182 ................................................................................................... 1

8 U.S.C. § 1226 ............................................................................................ 1, 22

8 U.S.C. § 1226(a) .............................................................................. 3, 13, 21

8 U.S.C. § 1226(e) ........................................................................................... 13

8 U.S.C. § 1229(e) ........................................................................................... 23

8 U.S.C. § 1229a(b)(1) ....................................................................................... 3

8 U.S.C. § 1357(a)(2) .......................................................................... 3, 12, 23

8 U.S.C. § 1357(a)(3) ............................................................................................... 3

8 C.F.R. § 239.2(a) ................................................................................................... 4

8 C.F.R. § 239.2(a)(6) .............................................................................................. 5

8 C.F.R. § 239.2(a)(7) ......................................................................................... 5, 25

8 C.F.R. § 239.2(c) ................................................................................................... 4

8 C.F.R. § 287.5(c) ................................................................................................. 21

8 C.F.R. § 1003.0 ..................................................................................................... 3

8 C.F.R. § 1003.10(b) ............................................................................ 4, 14, 15, 17

8 C.F.R. § 1003.18 ............................................................................................. 4, 14

8 C.F.R. § 1003.23 ................................................................................................. 17

8 C.F.R. § 1003.23(a) .................................................................................... 4, 15, 17

8 C.F.R. § 1003.37 ................................................................................................... 4

8 C.F.R. § 1003.38(a) .................................................................................... 4, 16, 27

Fed. R. Civ. P. 65(c) .............................................................................................. 30

Defendants respectfully submit this memorandum of law in opposition to the motion of Plaintiffs African Communities Together and The Door (together, "Plaintiffs") to stay both a U.S. Immigration and Customs Enforcement ("ICE") guidance regarding civil immigration arrests in or around courthouses and an Executive Office of Immigration Review ("EOIR") guidance to immigration judges regarding adjudication of oral motions to dismiss removal proceedings.

## PRELIMINARY STATEMENT

Congress has codified in the Immigration and Nationality Act ("INA") the Executive Branch's constitutional and inherent authority to investigate, arrest, and detain aliens who are suspected of being, or found to be, unlawfully present in the United States to effectuate their removal. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1231, 1357. ICE has long exercised its arrest authority in and around courthouses given its strong interest in enforcing federal immigration laws. To that end, on May 27, 2025, ICE issued a memorandum titled Civil Immigration Enforcement Actions in or near Courthouses (the "2025 Courthouse Arrest Guidance"), which provided revised policy guidance for the exercise of ICE's discretionary arrest authority in or near federal, state, and local courthouses. *See* Declaration of Amy Belsher, dated August 11, 2025 ("Belsher Decl.") (ECF No. 24), Ex. 4. Per the 2025 Courthouse Arrest Guidance, ICE civil immigration enforcement actions in or around courthouses target, among others, aliens convicted of crimes, gang members, national security or public safety risks, aliens subject to final orders of removal, or aliens who have illegally reentered the country after being removed.

Plaintiffs' challenge to the 2025 Courthouse Arrest Guidance fails as a matter of law. As a threshold matter, the Guidance is not reviewable under the Administrative Procedure Act ("APA") because ICE's civil arrest authority is committed to agency discretion. As a result, there

is no meaningful standard by which a court can evaluate the appropriateness of ICE's discretionary choice of locations for targeted immigration enforcement actions.

Furthermore, the 2025 Courthouse Arrest Guidance is not arbitrary, capricious, or contrary to law. Contrary to Plaintiffs' claim, there is no common-law privilege against courthouse arrests that allegedly was incorporated into the INA upon its enactment in 1952. And the Guidance reasonably strikes a balance between ICE's legitimate interests in enforcing immigration law, protecting the safety of its officers, individuals subject to arrest and members of the public, and the goal of minimizing interference with judicial proceedings.

Plaintiffs' APA challenge to a May 20, 2025, email sent by two Regional Deputy Immigration Judges to Assistant Chief Immigration Judges providing information regarding adjudication of oral motions to dismiss removal proceedings (the "Case Adjudication Email") fares no better. The email is not subject to review under the APA because it does not constitute final agency action; it is not agency policy, it is not binding, and it does not reflect the conclusion of a decisionmaking process by which rights are impacted. Furthermore, decisions regarding how immigration judges manage their docket and adjudicate motions to dismiss are committed to agency discretion and not subject to review under the APA. Finally, the Case Adjudication Email is not arbitrary and capricious, and does not violate the *Accardi* doctrine, because it is consistent with the governing regulations and procedures for adjudicating motions to dismiss.

And as a procedural matter, Plaintiffs' motion to stay based on 5 U.S.C. § 705 should be denied because that section only applies, unlike here, to postpone the effective date of a forthcoming action (not to stay an action that has already occurred). Accordingly, the Court should deny Plaintiffs' motion for a stay.

## BACKGROUND

### I.    Federal Statutory Removal and Arrest Authority

The federal government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012); *see* U.S. Const. art. I § 8, cl. 4 (granting Congress the power to "establish an uniform Rule of Naturalization").  Pursuant to that authority, Congress has provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a).  Congress has also provided that "without [a] warrant," a federal officer may "arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any [] law or regulation [regulating the admission, exclusion, expulsion, or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest."  *Id.* § 1357(a)(2).  These statutes confer arrest authority that is generally plenary and unqualified.   Congress has limited the authority to search for aliens in certain specific locations, but none of those locations include courthouses.  *Id.* § 1357(a)(3), (e).

### II.    IJ Adjudication Procedures and the Case Adjudication Email

The Executive Office for Immigration Review ("EOIR") is an agency within the U.S. Department of Justice ("DOJ") that oversees the immigration courts and the Board of Immigration Appeals ("BIA").  *See* 8 C.F.R. § 1003.0; *see also* https://justice.gov/eoir/about-office (last visited on August 17, 2025).  EOIR is responsible for adjudicating immigration cases.  *Id.*  Its mission is to adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws.  Declaration of Sirce Owen, dated August 19, 2025 ("Owen Decl."), ¶ 1.  There are currently approximately 685 Immigration Judges ("IJs") in 72 immigration courts throughout the United States.  *Id.* ¶ 4.

The Immigration and Nationality Act ("INA") requires IJs presiding over removal proceedings to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses."  8 U.S.C. § 1229a(b)(1); *see also* 8 C.F.R. § 1003.10(b).  In deciding the individual cases before them, IJs "shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the [INA] and regulations that is necessary appropriate for the disposition . . . of such cases."  8 C.F.R. § 1003.10(b).

The Immigration Court is responsible for scheduling cases.  8 C.F.R. § 1003.18.  With respect to pre-decision motions, including motions to dismiss removal proceedings, "[u]nless otherwise permitted by the Immigration Judge, motions submitted prior to the final order of an Immigration Judge shall be in writing and shall state, with particularity the grounds therefore, the relief sought, and the jurisdiction."  8 C.F.R. § 1003.23(a).  The governing regulations further provide that after commencement of proceedings, a Department of Homeland Security ("DHS") attorney may move to dismiss removal proceedings on the grounds set forth in 8 C.F.R. § 239.2(a).  *See* 8 C.F.R. § 239.2(c); Complaint (ECF No. 1) ¶ 43.

IJ decisions may be rendered orally or in writing.  8 C.F.R. § 1003.37.  Oral decisions are stated by the IJ in the presence of the parties and a memorandum summarizing the oral decision is served on the parties.  *Id.*  Aliens have 30 days to file a notice of appeal with the BIA from an adverse decision by an IJ and may subsequently seek review by a federal circuit court.  *Id.* §§ 1003.1(b), 1003.3(a)(1), 1003.10(c) 1003.38, 1240.15; *see* Complaint ¶ 39.

On May 30, 2025, two Acting Regional Deputy Chief IJs sent an email to Assistant Chief IJs entitled "Guidance on Case Adjudication." Belsher Decl. Ex. 12.  In the email, the authors reported that there had been an increase in caseload in the detained docket and several developments with non-detained cases in the past few weeks, including that "DHS is carrying out

enforcement actions in or near EOIR space" and "DHS attorneys have moved to dismiss cases that are currently pending in court." *Id*. "Given the recent developments," the email stated that "the following guidance is provided to ensure the expeditious adjudication of cases." *Id.* Specifically, the email advised that "1. Cases should not be reset for Oral Decisions. Oral Decisions must be completed within the same hearing on the day testimony and arguments are concluded." *Id.* And "2. DHS Motions to Dismiss may be made orally and decided from the bench. No additional documentation or briefing is required." *Id.*

As information, the email advised that DHS motions to dismiss removal proceedings are regulatory based on 8 C.F.R. § 239.2(a)(6) [Notice to Appear improvidently issued] and 8 C.F.R. § 239.2(a)(7) [circumstances have changed to such an extent that continuation is no longer in the best interests of the government]. *Id.* The authors advised that "[g]enerally, if DHS has met its regulatory burden, the oral motion to dismiss may be granted. A 10-day response period is not required. *Id.* The email concludes by instructing, "[p]lease ensure your judges are aware of the above guidance." *Id.*

## III.    ICE Civil Immigration Courthouse Arrest Policies

### A.  Pre-2025 ICE Policies

#### 1.    The March 2014 Guidance

Since at least 2014, ICE policy has permitted its officers and agents to conduct civil immigration enforcement actions in or near courthouses. In a March 19, 2014 memorandum issued to field offices and entitled "Enforcement Actions at or Near Courthouses" (the "March 2014 Guidance"), ICE stated that "[e]nforcement actions at or near courthouses will only be undertaken against Priority 1 aliens," including aliens engaged in or suspected of terrorism or espionage or who otherwise pose a danger to national security, and those aliens who pose a serious risk to public

safety as shown by certain criminal activity.  *See* Declaration of Jeffrey S. Oestericher, dated August 20, 2025 ("Oestericher Decl.") Ex. A.

2.    The January 2015 Guidance

After March 2014, ICE's guidance with respect to courthouse arrests has been amended several times to reflect changes in DHS enforcement priorities.  In a January 26, 2015, guidance addressed to field offices ("January 2015 Guidance"), ICE revised the March 2014 Guidance to reflect enforcement priorities set forth in then-DHS Secretary Jeh Johnson's November 20, 2014, memorandum, titled "Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants."  Oestericher Decl. Ex. B.

3.    The January 2018 Directive

On January 25, 2017, then-President Trump issued Executive Order 13,768, which expanded the categories of aliens to be prioritized for removal.  82 Fed. Reg. 8799 (Jan. 25, 2017). To implement the Executive Order, on January 10, 2018, ICE issued a memorandum titled Directive 11072.1: Civil Immigration Enforcement Actions Inside Courthouses (the "2018 Directive"), *see* https://perma.cc/DL4S-JTCM/, which revised ICE's policy "regarding civil immigration enforcement actions inside federal, state, and local courthouses."  *Id.* at 1.  The 2018 Directive indicated that "civil immigration enforcement actions taken inside courthouses can reduce safety risks to the public, targeted alien(s) and ICE officers and agents," because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband."  *Id.*

Lawsuits challenging the 2018 Directive were filed in this Court (the "SDNY case") and the District of Massachusetts.  In June 2020, the Honorable Jed S. Rakoff entered judgment enjoining ICE "from conducting any civil arrests on the premises or grounds of New York State courthouses, as well as such arrests of anyone required to travel to a New York State courthouse

6

as a party or witness to a lawsuit." *New York v. ICE*, 466 F. Supp. 3d 439, 449-50 (S.D.N.Y. 2020).  In September 2020, in connection with the District of Massachusetts litigation, the First Circuit vacated a district court order which had preliminarily enjoined ICE from implementing the 2018 Directive on the grounds that plaintiffs had failed to show a likelihood of success on the merits and remanded to the district court for further proceedings.  *Ryan v. ICE*, 974 F.3d 9, 33-34 (1st Cir. 2020).[1]

### 4.    The April 2021 Guidance

On January 20, 2021, then-President Biden issued Executive Order 13,993, "Revision of Civil Immigration Enforcement Policies and Priorities," 86 Fed. Reg. 7051 (Jan. 20, 2021), which revoked Executive Order 13,768.  On the same day, then-Acting Secretary of Homeland Security David Pekoske issued a memorandum which amended the agency's immigration enforcement priorities.  *See* https://perma.cc/2TJK-HTMS.  In accordance with the changed immigration enforcement priorities, DHS revoked the 2018 Directive and issued interim guidance "governing [ICE] civil immigration enforcement actions in or near courthouses" ("2021 Guidance").  *See* https://perma.cc/ZQB5-56GF.  The 2021 Guidance provided that a civil immigration enforcement action may be taken in or near a courthouse if there was a national security threat; an imminent risk of death, violence or harm to any person; or other public safety threats.  *Id.* at 2.  In the absence of hot pursuit and subject to advance supervisory approval, ICE officers were permitted to undertake a civil immigration enforcement action in or near a courthouse against an individual

---

[1] On February 28, 2023, the Second Circuit vacated the judgment and injunction in the SDNY case, *see New York v. ICE*, No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023).  On May 21, 2021, plaintiffs in the *Ryan* case voluntarily dismissed their case.  *See Ryan v. ICE*, 19 Civ. 11003 (D. Mass. May 21, 2021) (Dkt. No. 115).

posing a threat to public safety if there was no other safe alternative location or it would be too difficult to undertake the action elsewhere. *Id.*

### B.    2025 Courthouse Arrest Guidance

On January 20, 2025, President Trump issued Executive Order 14,159, which, *inter alia*, revoked the prior administration's civil immigration enforcement policies and priorities and stated that it "is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people."  90 Fed. Reg. 8443, 8443 (Jan. 20, 2025).  The next day, then-acting Director of ICE Caleb Vitello issued a memorandum titled, "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses."  *See* https://perma.cc/AGN9-24UK.  Shortly thereafter, on May 27, 2025, Todd M. Lyons, Acting Director of ICE, issued a revised memorandum titled, "Civil Immigration Enforcement Actions In or Near Courthouses" (the "2025 Courthouse Arrest Guidance") which superseded the January 21, 2025 Guidance.  *See* https://www.ice.gov/doclib/foia/policy/11072.4.pdf.

The 2025 Courthouse Arrest Guidance explains that civil immigration enforcement actions taken inside courthouses "can reduce safety risks to the public, targeted alien(s) and ICE officers and agents," because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband."  *Id.* at 1.  It affirms ICE's understanding that its civil immigration enforcement actions in or near courthouses are consistent with the actions of "[f]ederal, state and local law enforcement officials" who "routinely engage in enforcement activities in or near courthouses because many individuals appear in courthouses for unrelated criminal or civil violations."  *Id.*  The Guidance further explains that courthouse arrests "are often required when jurisdictions refuse to cooperate with ICE," such as refusing "to honor immigration detainers and transfer aliens directly to ICE custody."  *Id.*

Consistent with Executive Order 14,159's broadened enforcement priorities, the Guidance provides that "targeted aliens" include, but are not limited to: national security or public safety threats; specific aliens with criminal convictions; gang members; aliens ordered removed from the United States who have failed to depart; and/or aliens who have re-entered the country illegally after being removed." *Id.* at 2. The Guidance advises that "[w]hen practicable," ICE officers should "conduct civil immigration enforcement actions targeted aliens discreetly to minimize their impact on court proceedings." *Id.* at 2. It further provides that enforcement actions inside courthouses "should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits." *Id.* ICE officers and agents are also advised to "exercise sound judgment" and "make substantial efforts to avoid unnecessarily alarming the public or disrupting court operations," and to "make every effort to limit their time at courthouses while conducting civil immigration enforcement actions." *Id.* at 3.

## ARGUMENT

### I.    Legal Standards

Although, as discussed *infra*, Plaintiffs' request for a stay of the 2025 Courthouse Guidance and the EOIR Dismissal Guidance under 5 U.S.C. § 705 should be denied as moot, the "standard for a stay under 5 U.S.C. § 705" "is the same as the standard for a preliminary injunction." *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 294 (S.D.N.Y. 2020); *see also E. Air Lines, Inc. v. Civil Aeronautics Bd.*, 261 F.2d 830, 830 (2d Cir. 1958). A preliminary injunction is an "an extraordinary and drastic remedy," which "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quotation marks omitted). An injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original; quotation marks omitted).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC,* 555 U.S. 7, 20 (2008).  Where "the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," the plaintiffs "must establish a clear or substantial likelihood of success on the merits." *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quotation marks omitted); *see Able v. United States*, 44 F.3d 128, 130 (2d Cir. 1995) ("sufficiently serious questions" standard is inapplicable to a request for injunction against governmental action).

## II.    Plaintiffs Fail to State an APA Claim and Cannot Demonstrate a Clear Likelihood of Success on the Merits

Plaintiffs' motion rests on a fundamental misunderstanding of the nature of APA review. The APA does not permit "judicial review over everything done by an administrative agency." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (quotation omitted).  Rather, review is permitted only as expressly provided by statute.  In particular, agency action is not subject to judicial review where the action "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) *see also Heckler v. Chaney*, 470 U.S. 821, 830 (1985) ("[B]efore any [judicial] review at all may be had, a party must first clear the hurdle of § 701(a).").   Thus, "even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

In addition, APA review is limited to "final agency action." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61-62 (2004) (quoting 5 U.S.C. § 704).  Agency action is final only when it

"mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Day-to-day operations of federal agencies are generally not considered final agency action, and thus not subject to APA review. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 899 (1990) (plaintiffs "cannot demand a general judicial review of the [agency]'s day-to-day operations" under the APA); *Fund for Animals*, 460 F.3d 13 at 20 (APA does not authorize courts to oversee "the common business of managing government programs"); *see also Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (APA does not permit sweeping, programmatic review and judicial superintendence of the manner in which an agency conducts its work). Rather, judicial review under the APA is limited to discrete agency actions or inactions that cause harm to the particular plaintiff. *Norton*, 542 U.S. at 62-63; *Americans for Immigrant Justice v. U.S. Dep't of Homeland Security,* Civil Action No. 22-3118 (CKK), 2023 WL 1438376, at *18 (D.D.C. Feb. 1, 2023).

Moreover, the APA does not apply where there is "[an]other adequate remedy in a court." 5 U.S.C. § 704. This statutory provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Accordingly, "[w]hen another statutory vehicle provides an adequate remedy in a court, claims brought under the APA are properly dismissed." *Panjiva, Inc. v. U.S. Customs & Border Prot.*, 342 F. Supp. 3d 481, 494 (S.D.N.Y. 2018) (quoting *Pereira v. U.S. Dep't of Justice*, No. 16-cv-2599 (NRB), 2016 WL 2745850, at *13 (S.D.N.Y. May 11, 2016).

A. **The 2025 Courthouse Arrest Guidance and Case Adjudication Email Are Not Subject to APA Review**

The 2025 Courthouse Arrest Guidance and the Case Adjudication Guidance are not subject to review under the APA.

1. The 2025 Courthouse Arrest Guidance Is Unreviewable Under the APA

The INA, from which ICE's civil arrest authority derives, provides no "meaningful standard" by which a court can evaluate the appropriateness of ICE's discretionary choice of public locations for targeted immigration enforcement actions. *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States"); *id.* § 1357(a)(2) ("Any officer or employee . . . authorized under regulations prescribed by the Attorney General shall have the power without warrant . . . (2) . . . to arrest any alien in the United States, if he has reason to believe the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, . . . ."). The INA's broad language grants ICE discretion to determine the location of a civil enforcement action against an alien present in the United States. *See Salazar v. King*, 822 F.3d 61, 76–77 (2d Cir. 2016) (noting that courts look at statutory text, the agency's regulations, and informal agency guidance that govern the challenged action in considering whether actions are discretionary); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (State Department policy relating to location of processing overseas immigrant visa applications was not reviewable under the APA, because the "broad language" of the INA "grants to the Secretary discretion to prescribe the place at which aliens apply for immigrant visas without providing substantive standards against which the Secretary's determination could be measured"). And with respect to arrests by ICE with a warrant, ICE's decisions about the location of such arrests are

12

unreviewable for the separate reason that another statute "preclude[s] judicial review," 5 U.S.C. § 701(a)(1), as the INA provides that immigration authorities' "discretionary judgment regarding the application of [§ 1226, authorizing arrests with a warrant] shall not be subject to [judicial] review," 8 U.S.C. § 1226(e).

Plaintiffs have cited no law or standard that would limit ICE's discretion, except the common-law privilege against courthouse arrest, which, as explained below, does not apply. Moreover, the 2025 Courthouse Arrest Guidance memo which Plaintiffs seek to challenge (ECF No. 24-4) reflects ICE's balancing of several discretionary factors. For example, the Guidance discusses various factors that ICE considered which favor conducting arrests in or around courthouses, including that (1) arrestees appear at courthouses at scheduled times, (2) individuals entering courthouses are typically screened by law enforcement personnel for weapons and other contraband and therefore enforcement actions in or near courthouses can reduce safety risks to the public, targeted aliens, and ICE officers and agents, and (3) such arrests may be required in jurisdictions that refuse to honor immigration detainers. ECF No. 24-4 at 1. Without any privilege or other applicable restriction on where ICE can make arrests, there is no "meaningful standard against which to judge the agency's exercise of discretion," *Heckler*, 470 U.S. at 830; its policy therefore is unreviewable.

### 2.    The Case Adjudication Email Is Unreviewable Under the APA

The Case Adjudication Email (Belsher Decl. Ex. 12) is also unreviewable under the APA. As a threshold matter, Plaintiffs mischaracterize the email as EOIR policy. *See* Plaintiffs' Memorandum of Law in Support of Motion to Stay Effective Date of Agency Action or Preserve Status of Rights (ECF No. 23) ("Pls. Br.") at 1, 5. The email is not agency policy and is not binding. Owen Decl. ¶ 13. Regional Deputy Chief Immigration Judges, such as the ones who sent the email, do not have the authority to set or make EOIR policy. Owen Decl. ¶ 13. Moreover,

because the email was not published in the EOIR Policy Manual it is not – and could not be – EOIR policy. *Id.* As such, the email does not "mark the consummation of the agency's decisionmaking process" and is not "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs*, 578 U.S. at 597 (internal quotation marks and citation omitted). Therefore, the email is not final agency action subject to review under the APA. *See* 5 U.S.C. § 704.

In addition, Plaintiffs' challenge to the Case Adjudication Email fails because they are seeking to pursue a broad programmatic challenge to the day-to-day operation of the immigration courts. That is not permissible under the APA. *See Lujan*, 497 U.S. at 899 (plaintiffs "cannot demand a general judicial review of the [agency]'s day-to-day operations" under the APA); *Cobell*, 240 F.3d at 1095 (APA does not permit sweeping, programmatic review and judicial superintendence of the manner in which an agency conducts its work). Rather, Plaintiffs must challenge a discrete and final agency action. *Americans for Immigrant Justice*, 2023 WL 1438376, at *18 (instructing that "an on-going program or policy is not, in itself, a 'final agency action'") (internal citation omitted).

Plaintiffs' APA claim also fails as a matter of law because decisions regarding how IJs manage their docket and adjudicate motions to dismiss are "committed to agency discretion" and therefore not reviewable. *See* 5 U.S.C. § 701(a)(2); *Lunney v. U.S.,* 319 F.3d 550, 557 (2d Cir. 2003). Plaintiffs do not, and cannot, dispute that IJs have broad discretion to manage their dockets. *See, e.g.*, 8 C.F.R. § 1003.18 ("Immigration Court shall be responsible for scheduling cases."); 8 C.F.R. § 1003.10(b); *Morgan v. Gonzales*, 445 F.3d 549, 551 (2d Cir. 2006) ("IJs are accorded wide latitude in calendar management."); *Sanusi v. Gonzales*, 445 F.3d 193, 199 (2d Cir. 2006) (same); *Gonzalez-Caraveo v. Sessions*, 882 F.3d 885, 890 (9th Cir. 2018) (same). IJ's adjudicate

cases, including deciding how to address motions, based on their own independent discretion and judgment under the law, and not at the direction of a supervisor or pursuant to any purported "policy" of a supervisor.  *See* Owen Decl. ¶ 9; 8 C.F.R. § 1003.10(b) ("immigration judges shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the [INA] and regulations that is necessary or appropriate for the disposition or alternative resolution of such cases.  Such actions include administrative closure, termination of proceedings, and dismissal of proceedings.").  With respect to pre-decision motions, including motions to dismiss removal proceedings, IJs have discretion regarding their timing, whether they can be made orally, and when they are decided.  *See* 8 C.F.R. § 1003.23(a) ("*Unless otherwise permitted by the Immigration Judge*, motions submitted prior to the final order of an Immigration Judge shall be in writing and shall state, with particularity the grounds therefor, the relief sought, and the jurisdiction.")  (emphasis added).

Accordingly, there is no meaningful standard against which to judge the Case Adjudication Email.  The email only provides background information and advises Assistant Chief Immigration Judges what IJs can do with respect to oral motions to dismiss.  Belsher Decl. Ex. 12; Owen Decl. ¶ 15.  The email does not require anything and is not binding or authoritative.  Owen Decl. ¶ 15.[2]

---

[2] Plaintiffs baldly assert that "DOJ has made clear that IJs must grant [the oral motions to dismiss] or risk termination."  Pls. Br. at 6.  However, that claim is inconsistent with the permissive language in the Case Adjudication Email as well as the declarations they submitted, which show that IJs are continuing to exercise their independent judgment and discretion in adjudicating oral motions to dismiss.  *See* Declaration of Andres Santamaria Cortes, dated July 31, 2025 (ECF No. 23-3), ¶ 7 (witnessing IJ's denial of oral motion to dismiss); Declaration of Jennifer A. Durkin, dated August 11, 2025 (ECF No. 23-4), ¶ 11 (former IJ stating that she denied oral motions to dismiss); Declaration of Rosanna Eugenio, dated July 31, 2025 (ECF No. 23-5), ¶¶ 11, 13 (witnessing two IJs deny oral motions to dismiss); Declaration of Brad Lander, dated August 8, 2025 (ECF No. 23-9), ¶ 13 (witnessing IJ deny motion to dismiss); Declaration of Rachel Levenson, dated August 1, 2025 (ECF No. 23-10), ¶¶ 9-10 (witnessing IJ reserve decision on oral motions to dismiss).

It therefore is not reviewable under the APA.  5 U.S.C. § 701(a)(2) (no judicial review where the action "is committed to agency discretion by law"); *Lunney*, 319 F.3d at 558-59.

Plaintiffs' APA claim challenge to the Case Adjudication Email fails for the additional, independent reason that there is "[an]other adequate remedy in a court."  5 U.S.C. § 704.  Plaintiffs do not contest that to the extent an alien in removal proceedings feels aggrieved from the dismissal of their case based on an oral motion, the alien can appeal the IJ's decision.  *See* 8 C.F.R. § 1003.38(a).  That adequate remedy bars APA review.

> 3.    Plaintiffs Cannot Bring a Claim Under *Accardi*

Plaintiffs likewise fail to assert a valid claim under *Accardi*.  *See* Pls. Br. at 16-20.  "*Accardi* and its progeny teach generally that federal agencies are required to follow their own regulations and some other formally adopted procedures, including those that govern exercises of an agency's discretion."  *Diaz v. Rosen*, 986 F.3d 687, 690 (7th Cir. 2021).   However, the *Accardi* doctrine is a principle governing review of agency action, not an independent cause of action.  *See, e.g.*, *Velesaca v. Decker*, 458 F. Supp. 3d 224, 236 (S.D.N.Y. 2020) (noting that, "[w]hen agencies fail to [follow their own regulations], the APA (as developed by case law) gives aggrieved parties a cause of action to enforce compliance" (citing *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020))).  Rather, to bring a cause of action based on *Accardi*, Plaintiffs must satisfy the requirements of the APA.  *Id.*; *see also Tendo v. U.S.,* Case No. 2:23-cv-438, 2024 WL 3650462, at *13 (D. Vt. (Aug. 5, 2024) ("Because actions alleging violation of the *Accardi* principle are based upon the APA, they must challenge a "final agency action."); *Damus v. Nelson,* 313 F. Supp. 3d 317, 337 (D.D.C. 2018) (collecting cases for the proposition that *Accardi* claims are actionable under the APA).

Construed as an additional APA claim, Plaintiffs' *Accardi* claim fails for the same reasons discussed above. Furthermore, application of the *Accardi* doctrine is not warranted here because Defendants did not fail to follow their own regulations. Contrary to Plaintiffs' argument (Pls. Br. at 17-20), the Case Adjudication Email does not represent a change in how EOIR adjudicates cases and does not direct IJs how to decide cases. Owen Decl. ¶¶ 13, 15. In particular, by advising that IJs may permit oral motions to dismiss, the email does not contradict 8 C.F.R. § 1003.23 as that section has always permitted IJs to hear oral motions. Owen Decl. ¶¶ 10, 13, 15; 8 C.F.R. § 1003.23(a) ("Unless otherwise permitted by the Immigration Judge . . ."). Nor does the email alter the established response period for a motion to dismiss; IJs retain the discretion to schedule and decide oral motions to dismiss as they see fit. Owen Decl. ¶¶ 13, 15. And the email is not a departure from past practice regarding ruling on oral motions to dismiss at a hearing. *Id.* ¶ 10 ("I am aware that between 2021 and 2024, Immigration Judges granted tens of thousands of motions to dismiss or terminate proceedings made by DHS, including many that were made orally at a hearing.").[3] Accordingly, there is no *Accardi* violation.

**B.      The 2025 Courthouse Arrest Guidance Is Not Arbitrary, Capricious, Or Contrary to Law**

1.      There Is No Common-Law Privilege Against Federal Immigration Enforcement in and Around Courthouses

Plaintiffs argument that the 2025 Courthouse Arrest Guidance is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA, Pls. Br.

---

[3] To the extent that Plaintiffs attempt to assert an *Accardi* claim based on an alleged failure to follow the Immigration Court Practice Manual ("ICPM") by entertaining oral motions to dismiss, Pls. Br. at 19-20, that claim fails as well. The ICPM is sub-regulatory guidance and is not controlling if the IJ directs otherwise in a particular case. *See* Owen Decl. ¶ 8 (citing IPCM 1.1(b)). Moreover, the default motion filing and response time frames on which Plaintiffs rely, Pls. Br. at 19, can be waived in the IJ's discretion. *See* Owen Decl. ¶ 9 (citing 8 C.F.R. § 1003.10(b)).

at 13 (quoting 5 U.S.C. § 706(2)(C)), is mistaken.  Plaintiffs' argument rests on an alleged common-law privilege against courthouse arrests and an assertion that such a privilege was incorporated into the INA upon its enactment in 1952.  Pls. Br. at 13-16.  However, there has never been a privilege, either when the INA was adopted or at any time before, resembling the one alleged by Plaintiffs—much less one that was "so well established" that the INA should be deemed to have included it.  *United States v. Craft*, 535 U.S. 274, 288 (2002) (holding that, to conclude that Congress meant to incorporate a common-law rule, that rule must have been "so well established" that it can be "assume[d]" that Congress considered it).  To the contrary, historical cases demonstrate only a much narrower common-law immunity from certain types of civil arrest, which itself rests on rationales that no longer exist.

As the First Circuit recognized in a challenge to ICE's prior courthouse arrest guidance, the "hoary common law privilege against civil arrests for parties and witnesses attending court proceedings" arose at a time when "a plaintiff in a civil action obtained personal jurisdiction over a defendant" by having that defendant arrested under a writ of *capias ad respondendum*.  *Ryan*, 974 F.3d at 15.  But parties and witnesses attending court proceedings in other matters were protected from such civil case-initiating arrests by an immunity devised by the courts, "both to remove a disincentive for inhibiting parties and witnesses from coming forward (especially the risk of arrest in connection with another matter) and to ensure that arrests did not disrupt the orderly operation of the courts."  *Id*. at 21.  As long as personal jurisdiction was obtained through arrest, courts "continued to recognize the vitality of the common law privilege against courthouse arrests." *Id*. at 22.

As "arrests in civil suits fell largely out of fashion" and were replaced by service of summonses to obtain personal jurisdiction and initiate a civil action, courts "ruled that a similar

privilege against service of a summons should extend to at least some parties and witnesses." *Id.* Thus, in cases now nearly a century old, the Supreme Court recognized an immunity from service of process in a private civil suit when the person to be served entered a jurisdiction solely to attend a court proceeding as a witness or party. *See Lamb v. Schmitt*, 285 U.S. 222, 225 (1932); *Page Co. v. MacDonald*, 261 U.S. 446, 446–47 (1923); *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916).

Both the privilege against case-initiating arrest and the privilege against service of process of a person attending court were extensions of the now-outdated principle that a state court's jurisdiction over a person rested on that person's physical presence. *See Daimler AG v. Bauman*, 571 U.S. 117, 125–26 (2014) (under rule of *Pennoyer v. Neff*, 95 U.S. 714, 727, 733 (1878), "a tribunal's jurisdiction over persons reaches no farther than the geographic bounds of the forum," and noting later abrogation of that doctrine). Because physical presence was historically the key to state-court personal jurisdiction, potential defendants had a strong incentive not to attend court proceedings in states in which potential plaintiffs might seek to serve them with civil process— just as they had the same incentive not to attend when they might be subject to arrest to subject them to a state court's jurisdiction. *See Stewart*, 242 U.S. at 130–31 ("Witnesses would be chary of coming within our jurisdiction . . . if they might be punished with a lawsuit for displeasing parties by their testimony; and even parties in interest . . . might be deterred from the rightfully fearless assertion of a claim or the rightfully fearless assertion of a defense, if they were liable to be visited on the instant with writs from the defeated party." (quotation marks omitted)).

But that physical-presence requirement is now obsolete. In *International Shoe Co. v. Washington*, the Supreme Court announced the modern rule that a defendant need only have "certain minimum contacts" with a forum state to be sued there. 326 U.S. 310, 316 (1945). That decision broadly "increase[d] the ability of the state courts to obtain personal jurisdiction over

nonresident defendants," *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977), and many states responded by enacting long-arm statutes enabling their courts to exercise personal jurisdiction over out-of-state defendants, *see Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 926 (2011); *Rosenblatt v. American Cyanamid Co.*, 86 S. Ct. 1, 3 (1965) (Goldberg, J., in chambers).  Thus, the rationale for immunity against service of process or arrest to initiate a civil action has disappeared, given that neither physical presence nor physical custody is required any longer for a court to obtain personal jurisdiction.  With that rationale no longer present, the common-law rule that resulted from it no longer carries any force.  *See United States v. Denedo*, 556 U.S. 904, 911 (2009) (noting change in common-law rule when rationale has been superseded); *Kansas v. Colorado*, 533 U.S. 1, 10 (2001) (rejecting common-law rule that rested on unsound distinction).

Accordingly, since the dawn of long-arm jurisdiction, judicial decisions have not applied the common-law privilege.  To the contrary, courts have explained that when an out-of-jurisdiction defendant is subject to civil process under a forum state's long-arm statute, the privilege does not apply.  *In re Arthur Treacher's Franchise Litigation*, 92 F.R.D. 398, 405 (E.D. Pa. 1981) ("'it makes little sense to grant immunity to a person who can be served in his home jurisdiction under the forum's long-arm statute'" (quoting 4A Wright & Miller, Federal Practice and Procedure: Civil § 1076 (1969)); *accord Gardner v. United States*, 246 F. Supp. 1014, 1015 (S.D.N.Y. 1965) ("A nondomiciliary who could be served outside the state cannot claim immunity from service if he is served in New York, even if he is here voluntarily and in the aid of justice."); *Pavlo v. James*, 437 F. Supp. 125, 127 (S.D.N.Y. 1977) ("the reason for the immunity—encouraging voluntary appearances—disappears if a defendant is otherwise subject to the extra-territorial reach of [the forum state's long-arm statute]").

That same logic vitiates any argument that the privilege should apply against courthouse arrests by ICE. Aliens are subject to federal law enforcement jurisdiction or enforcement actions anywhere in the United States. *See* 8 U.S.C. § 1226(a) (providing for arrests "[o]n a warrant" without geographic limitation), *id.* § 1357 (providing for warrantless arrests without geographic limitation); 8 C.F.R. § 287.5(c) (similar). Given that, an alien does not "giv[e] up the 'safety' of one jurisdiction" when he attends a court proceeding in another state. *Green*, 305 F. Supp. at 128. Because the privilege is not needed "to shield an individual from service of process to encourage his or her travel to the forum state," it "should not be enlarged" beyond that reason. *Northern Light Technology, Inc. v. Northern Lights Club*, 236 F.3d 57, 62–63 (1st Cir. 2001).

2.    The INA Cannot Be Read to Incorporate the Common-Law Privilege Against Courthouse Arrest

Because there was no "long-established and familiar common law rule protecting against civil arrests on behalf of the sovereign" at the time of the INA's enactment (or at any other time), Plaintiffs' assertion that the INA does not authorize such arrests at courthouses lacks merit. *Ryan*, 974 F.3d at 23. Congress is presumed to legislate against the background of the common law and to retain a common-law rule except when it evidently intends not to. *Baker Botts LLP v. ASARCO LLC*, 576 U.S. 121, 126 (2015); *Samantar v. Yousuf*, 560 U.S. 305, 320 & n.13 (2010). However, that presumption of nonderogation of the common law only applies to "long-established and familiar principles." *Samantar*, 560 U.S. at 320 n.13 (quotation marks omitted). When the common-law rule is "not so well established," or there is "not much of a common-law background on the question," it cannot displace "broad statutory language" enacted by Congress. *Craft*, 535 U.S. at 288. Only when the "common-law . . . rule clearly barred" a statute's effects may the courts infer that Congress intended the common-law rule to apply over the text of the statute. *Pasquantino v. United States*, 544 U.S. 349, 359–60 (2005); *accord id.* at 362, 364–65 (only

"classic examples" or "closely analogous" cases lead to presumption that Congress incorporated a common-law rule). Similarly, when the "traditional rationales" for the common-law rule "do not plainly suggest that it swept so broadly," the rule will not supplant the effect of a federal statute. *Id.* at 360.

As the authorities above show, by the time Congress established a comprehensive immigration-arrest statutory scheme in the INA, any privilege against extra-jurisdictional civil arrest was a historical artifact. Even when it was in force, it never applied to arrests by the government for law-enforcement purposes. Thus, at the very least, there is ambiguity as to the scope of the common-law principle at issue. *See Netograph*, 197 N.Y. at 379 ("Volumes of opinions have been written in which one can find all sorts of conflicting decisions and almost any dictum that one may be looking for" regarding privilege against courthouse service of summons.). The INA therefore cannot have codified the purported privilege. *See Pasquantino*, 544 U.S. at 364 (rejecting importation of a common-law rule where no case "clearly establishes" the rule's applicability).

      3.    <u>The INA Displaced any State Common-Law Privilege to the Contrary</u>

Because "Congress possesses plenary authority over immigration-related matters, it may freely displace or preempt state laws in respect to such matters." *Herrera-Inirio v. INS*, 208 F.3d 299, 307 (1st Cir. 2000); *see Textile Workers Union of America v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957) (when Congress enacts a policy, "by implication [it] reject[s] the common-law rule" to the contrary). Exercising that plenary authority, Congress in the INA spoke comprehensively to how the federal government will enforce federal immigration law, thus supplanting any prior federal or state common law on the issue. Specifically, Congress addressed the authority of immigration authorities to effect arrests, allowing those arrests by and large without qualification. 8 U.S.C. §§ 1226 ("an alien may be arrested and detained pending a decision

on whether the alien is to be removed from the United States"), 1357(a) (specifying numerous categories under which immigration authorities can make arrests).  And when Congress intended limitations on ICE's arrest authority, it was explicit, for instance limiting warrantless arrest authority to situations where officers had reason to believe an alien was violating immigration law and was "likely to escape before a warrant can be obtained for his arrest," 8 U.S.C. § 1357(a)(2), or restricting warrantless entry near the border to "the premises of a farm or other outdoor agricultural operation," *id*. § 1357(a)(3), (e).  These provisions show that Congress knew how to limit DHS's arrest authority and made conscious—but limited—choices about when, where, and how to do so.

In addition, Congress amended the INA in 2006 to add 8 U.S.C. § 1229(e), which expressly acknowledges the practice of conducting immigration enforcement actions against aliens at courthouses.  *Id*. § 1229(e)(1)–(2) ("where an [immigration] enforcement action leading to a removal proceeding was taken against an alien at . . . a courthouse (or in connection with that appearance of that alien at a courthouse if the alien is appearing in connection with [certain specified matters or circumstances]").  Section 1229(e) reflects Congress's recognition that courthouse arrests are permitted under the INA.  Had Congress thought in 2006 that there was a privilege against those arrests, it would not have acknowledged the authority to make them or would have clearly distinguished impermissible civil ICE arrests from permissible criminal arrests. The provision is best read to mean that Congress never meant to bar courthouse arrests.

4.    The 2025 Courthouse Arrest Guidance Is Not Arbitrary and Capricious

Plaintiffs' assertion that the 2025 Courthouse Arrest Guidance is arbitrary and capricious because "it fails to provide an adequate explanation of a policy reversal and to consider all aspects of the problem or reasonable alternatives," Pls. Br. at 9, is also incorrect.  Plaintiffs maintain that ICE failed to consider how the Guidance "will chill access to immigration courts and impede the

fair administration of justice, including by disturbing immigration courts' dockets and decorum in courthouses." *Id.* at 12.   However, the Guidance addresses those concerns by including provisions designed to ensure that enforcement actions within courthouses are conducted in an orderly, safe, and non-disruptive manner.   For example, the Guidance mandates that, "when practicable," ICE officers "conduct enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings." 2025 Courthouse Guidance at 2.  In line with prior policies, the Guidance also prioritizes non-public arrests when possible.  *Id.*   The Guidance further directs ICE officers and agents to "exercise sound judgment" and "make substantial efforts to avoid unnecessarily alarming the public," and requires them to "make every effort to limit their time at courthouses while conducting civil immigration enforcement actions." *Id.* at 3.  In addition, it provides that to the extent practicable, civil immigration enforcement actions inside courthouses should take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits.  *Id.* at 2. Thus, the Guidance strikes a balance between ICE's legitimate interests in enforcing immigration law; protecting the safety of its officers, the arrestee, and members of the public; and the goal of minimizing interference with judicial proceedings.

Plaintiffs' contention that the Guidance is arbitrary and capricious because it "completely reverses a decades-long agency policy that generally prohibited arrests at the immigration courts" is unavailing.  Pls. Br. at 1.  As explained in detail above, ICE first issued the March 2014 Directive regarding civil immigration enforcement activities at or near courthouses and that guidance, over time, has been amended to incorporate changes in DHS enforcement priorities.   The 2025 Courthouse Arrest Guidance is little different than its predecessors; it was issued pursuant to an Executive Order's change of categories of aliens to be prioritized for removal, and to its mandate

that DHS review existing agency policies and procedures and, as appropriate and consistent with the law, modify those policies and procedures for consistency with the Executive Order.

### C. The Case Adjudication Email Is Not Arbitrary, Capricious, Or Contrary to Law

The Case Adjudication Email is not subject to APA review, but even if it were, it would readily pass. Judicial review under the APA is "'highly deferential and presumes the agency action to be valid.'" *Banco San Juan Int'l, Inc. v. Federal Reserve Bank of New York,* 700 F. Supp. 3d 86, 102 (S.D.N.Y. 2023) (quoting *Adler v. U.S. Dep't of Justice*, No. 18 Civ. 2188, 2018 WL 4571677, at *3 (S.D.N.Y. Sept. 24, 2016)). "The Court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). Instead, the Court's task is "to determine whether the agency has considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action." *J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 391 (2d Cir. 2000).

Here, the Case Adjudication Email provides guidance and information in light of a significant change in EOIR's caseload. Belsher Decl. Ex. 12. The email does not change how EOIR adjudicates cases, nor does it direct IJs on how to decide cases. Owen Decl. ¶ 15. Indeed, EOIR has a well-established practice of accepting oral motions during a hearing, and IJs have frequently exercised their discretion to grant oral motions on the day of a hearing, including motions to dismiss or terminate proceedings. *Id.* ¶ 10.

Plaintiffs' assertion that the Case Adjudication Email does not fully quote the basis for a motion to dismiss under 8 C.F.R. § 239.2(a)(7), *see* Pls. Br. at 19, does not show that the guidance is contrary to law. That is because the email does not purport to fully quote or characterize that subsection but is merely paraphrasing it. *See* Belsher Decl. Ex. 12. More fundamentally, the Case Adjudication Email does not alter the standard for an IJ ruling on motions to dismiss; IJs must

continue to apply the regulation as written. Accordingly, Plaintiffs have failed to demonstrate that the Case Adjudication Email is arbitrary, capricious, or contrary to law.

## III.     Plaintiffs Fail to Make a Strong Showing of Irreparable Harm

For the same reasons that Plaintiffs are unlikely to succeed on the merits of their claims, they also cannot establish that they will be subject to irreparable harm in the absence of injunctive relief. "The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (internal quotation marks and citations omitted). A movant can establish irreparable harm if they show that "there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Id.* (internal quotation marks and citations omitted). Monetary harm is insufficient; a party seeking a preliminary injunction must show "evidence of damage that cannot be rectified by financial compensation." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989). Moreover, the irreparable harm alleged must be "actual and imminent, not remote or speculative." *Kamerling*, 295 F.3d at 214. The "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction" or a TRO. *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991); *see also Winter*, 555 U.S. at 22.

Here, Plaintiffs cannot show irreparable harm from the Case Adjudication Email because it does not constitute a change in agency policy. Owen Decl. ¶ 15. The record shows that IJs are continuing to exercise their discretion to deny oral motions to dismiss and providing individuals in removal proceedings an opportunity to respond at a later date. *See supra* n. 4. Thus, Plaintiffs cannot show that the harm is actual and imminent.

Plaintiffs claim of harm from the 2025 Courthouse Arrest Guidance also falls short. To the extent that an individual in removal proceedings believes that the dismissal of their removal

proceedings and subsequent arrest was unlawful, they can appeal. *See* 8 C.F.R. § 1003.38(a). And Plaintiffs fail to explain why any potential unlawful deprivation of liberty could not be "rectified by financial compensation." *Tucker*, 888 F.2d at 975.

## IV.    The Balance of Equities and Public Interest Weigh in Favor of the Government

The public interest weighs against granting a preliminary injunction. "Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, those factors favor the Government.

The Government has a recognized public interest in the enforcement of United States law, including the immigration laws. *Nken*, 556 U.S. at 435 ("[i]n considering [the merged final two stay factors], courts must be mindful that the Government's role as the respondent in every removal proceeding does not make the public interest in each individual one negligible."); *see also Huanga v. Decker,* 599 F. Supp. 3d 131, 145 (S.D.N.Y. 2022) ("The Government's interest in the enforcement of immigration laws is considerable. '[I]t must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature.'") (quoting *Landon v. Plasencia,* 459 U.S. 21, 34, (1982)). Furthermore, in the context of detention, the Supreme Court has recognized that "the problems of prisons . . . require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1973).

Moreover, in weighing whether granting a preliminary injunction would be in the public interest, the Court must also consider "the public consequences in employing the extraordinary remedy of injunction." *Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 178 (S.D.N.Y.

2022) (internal quotation marks omitted). Here, Defendants are executing a sovereign prerogative in deciding how best to execute the country's immigration laws. Entering a preliminary injunction, as Plaintiffs request, would have significant consequences and harm the public interest.

## V.      Plaintiffs' Motion for a Stay under Section 705 of the APA Is Moot

Plaintiffs invoke 5 U.S.C. § 705 to "stay" the 2025 Courthouse Arrest Guidance and the Case Adjudication Email "throughout the United States." *See* Proposed Order (ECF No. 22-1) at 2–3. Any request for a "stay" of the challenged actions, however, should be denied as moot under Section 705. Section 705 allows an agency to postpone the effective date "of action taken by it, pending judicial review." 5 U.S.C. § 705. And "on such conditions as may be required and to the extent necessary to prevent irreparable injury," it allows a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending" the court's review. *Id.* Properly interpreted in light of its text, structure, and history, Section 705 does not permit this Court to "postpone" actions that have been in effect before this litigation began.

"When interpreting a statute, we begin by giving effect to the text's plain meaning, which is informed by, but 'does not turn solely on,' dictionary definitions." *J.S. v. New York State Dep't of Corrections*, 76 F.4th 32, 38 (2d Cir. 2023) (citations omitted). To "postpone" means "to defer to a future or later time; to put off; delay." *Webster's New International Dictionary* 1682 (1928) (def. 1); *see Black's Law Dictionary* 1389 (3d ed. 1933) ("To put off; defer; delay"). Section 705 therefore requires that any "postponement" be contemporaneous with or predate the effective date of the challenged agency action; otherwise, a court cannot postpone that effective date. *See, e.g., NRDC v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019) ("Section 705 only allows an agency to 'postpone the effective date of action taken by it.' . . . It does not allow agencies to suspend a rule that has already taken effect.") (citing cases).

The legislative history of the APA also demonstrates that Congress enacted the predecessor statute to Section 705 to "maintain the status quo," not to reverse agency action already in effect. *See* S. Rep. No. 752, 79th Cong., 1st Sess. 27 (1946) ("This section permits either agencies or courts, if the proper is showing be made, to maintain the status quo."); H.R. Rep. No. 1980, 79th Cong., 2d Sess. 43 (1946) ("This section permits either agencies or courts, if the proper showing is made, to maintain the status quo. The section is in effect a statutory extension of rights pending judicial review, although the reviewing court must order the extension."). Shortly after the APA was enacted, the Attorney General similarly observed that the stay authority under Section 705 could not be exercised to reverse agency action that itself was the subject of judicial review: "The subsection does not permit a court to order the grant of an initial license pending judicial review of an agency's denial of such a license . . . . By the same logic, the subsection does not give to reviewing courts the power to order interim payment of grants or benefits the denial of which is the subject of review." U.S. Dep't. of Justice, *Attorney General's Manual on the Administrative Procedure Act* 105 (1947).

In support of their Section 705 stay motion, Plaintiffs cite one case outside this district for the proposition that "courts—including the Supreme Court—routinely stay already-effective agency action under Section 705." Pls. Br. at 9 (quoting *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022)). However, *Texas v. Biden* and the cases upon which it relied did not engage with the arguments above by considering the APA's text and legislative intent, did not apply

Section 705 at all,[4] or refused to consider the merits of a Section 705 argument because it deemed the argument waived.[5]

## VI.    Plaintiffs Should Be Required to Post a Bond

If the Court is inclined to grant a preliminary injunction (which the Court should not do), it may do so "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Accordingly, the Court should require Plaintiffs to post bond pursuant to Rule 65(c).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for a stay.

Dated:  August 20, 2025
        New York, New York

JAY CLAYTON
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By:      */s/   Jeffrey Oestericher*
JEFFREY S. OESTERICHER
TOMOKO ONOZAWA
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:    (212) 637-2695/2721
Fax:    (212) 637-0033
Email:  jeffrey.oestericher@usdoj.gov
          tomoko.onozawa@usdoj.gov

---

[4] *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 610 (5th Cir. 2021) (issuing stay pursuant to application of stay factors under *Nken v. Holder*, 556 U.S. 418, 426 (2009), not 5 U.S.C. § 705).

[5] *See Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) ("Because EPA offers nothing beyond this cursory comment, it has waived any argument about the scope of the stay.").