

**Office of the New York State
Attorney General**

**Letitia James
Attorney General**

August 25, 2025

Hon. P. Kevin Castel
U.S. District Court for the Southern District of New York
500 Pearl St.
New York, NY 10007-1312

Re:     *African Communities Together v. Lyons*, No. 1:25-cv-06366
        Motion to File Amicus Curiae Brief

Dear Judge Castel:

Pursuant to Section 3.A of this Court's Individual Practices in Civil Cases, I write to inform the Court that the State of New York intends to file a motion for leave to file an amicus curiae brief in support of the plaintiffs' pending stay motion in this case (ECF No. 22). In the alternative, the State respectfully requests that the Court treat this letter as a motion for leave to file the proposed amicus brief, a copy of which is attached to this letter. The initial pretrial conference in this case is currently scheduled for October 10, 2025, at 10:30 am.

Plaintiffs consent to the State's proposed relief, and defendants take no position on the State's proposed relief. Accordingly, no briefing schedule is necessary for the State's motion.

Although the Federal Rules of Civil Procedure and this Court's local rules provide no standard for amicus participation, federal appellate courts recognize the value of States' participation as amici, permitting States to file amicus briefs as of right. *See* Fed. R. App. P. 29(a)(2).

In any event, this Court should exercise its discretion to accept an amicus brief where, inter alia, the proposed amicus has "'unique information or perspective that can help the court beyond the help that lawyers for the parties are able to provide.'" *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, No. 11-cv-6746, 2011 WL 5865296, at *2 (S.D.N.Y. Nov. 22, 2011) (quoting *Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*, 471 F. Supp. 2d 295, 311 (W.D.N.Y. 2007)).

The State readily satisfies that standard, because its proposed brief draws on the State's unique perspective to elaborate on some critical harms to the State and to the public interest that result from the policies plaintiffs are challenging—which are directly relevant to plaintiffs'

pending stay motion. Those harms include chilling participation in court proceedings; arbitrarily depriving States, communities, and families of noncitizens' important contributions; and pushing noncitizens into the shadows, thus harming public safety and community welfare.

Respectfully submitted,

/s/ Philip J. Levitz

Philip J. Levitz
Senior Assistant Solicitor General
(212) 416-6325

cc: Counsel of record (by ECF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AFRICAN COMMUNITIES TOGETHER; and
THE DOOR,

        *Plaintiffs*,

    v.

Todd LYONS, in his official capacity as Acting
Director, U.S. Immigration and Customs
Enforcement; Kristi NOEM, in her official capacity
as Secretary of the United States Department of
Homeland Security; Sirce E. OWEN, in her official
capacity as Acting Director, Executive Office of
Immigration Review; and Pamela BONDI, in her
official capacity as Attorney General, U.S.
Department of Justice,

        *Defendants*.

Case No. 1:25-cv-6366-PKC

---

**[PROPOSED] BRIEF FOR STATE OF NEW YORK AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFFS' MOTION TO STAY**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION AND INTERESTS OF AMICUS ................................................................... 1

ARGUMENT .................................................................................................................................. 3

    I.    Defendants' Policies Harm the Public Interest by Chilling Participation in
        Immigration Court and State, Local, and Other Court Proceedings................................. 3

    II.   Defendants' Policies Harm the Public Interest by Arbitrarily Depriving States,
        Communities, and Families of Noncitizens' Important Contributions. .......................... 7

    III.  Defendants' Policies Harm the Public Interest by Pushing Noncitizens into the
        Shadows, Thus Harming Public Safety and Community Welfare. ................................ 11

CONCLUSION............................................................................................................................. 16

## TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*New York v. U.S. Immigr. & Customs Enf't*,
    431 F. Supp. 3d 377 (S.D.N.Y. 2019)...................................................................................1, 3

**Laws**

Protect Our Courts Act, Ch. 322, 2020 N.Y. Laws 3563 .............................................................1

**Miscellaneous Authorities***

Abigail F. Kolker & Holly Straut-Eppsteiner, Cong. Rsch. Serv., *Unauthorized Immigrants:
    Frequently Asked Questions* (2022), https://www.congress.gov/
    crs_external_products/R/PDF/R47218/R47218.3.pdf ............................................................9

Alejandro Portes et al., *The U.S. Health System and Immigration: An Institutional
    Interpretation*, 24 Sociol. Forum 487 (2009), https://www.researchgate.net/publication/
    46443215_The_American_Health_System_and_Immigration_An_Institutional_Interpret
    ation#full-text..........................................................................................................................14

American Civ. Liberties Union, *Freezing Out Justice: How Immigration Arrests at
    Courthouses Are Undermining the Justice System* (2018),
    https://www.aclu.org/report/freezing-out-justice......................................................................7

American Immigr. Council, *Immigrants in the United States* (2021),
    https://www.americanimmigrationcouncil.org/fact-sheet/immigrants-in-the-united-
    states/................................................................................................................................... 8-10

American Immigr. Council, *U.S. Citizen Children Impacted by Immigration Enforcement*
    (June 24, 2021), https://www.americanimmigrationcouncil.org/wp-content/uploads/
    2025/01/us_citizen_children_impacted_by_immigration_enforcement_0.pdf ................11, 15

Ana Martinez-Donate et al., *Between the Lines: A Mixed-Methods Study on the Impacts of
    Parental Deportation on the Health and Well-Being of U.S. Citizen Children*, 9 J.
    Migration & Health art. 100233 (2024),
    https://pmc.ncbi.nlm.nih.gov/articles/PMC11133918/pdf/main.pdf .......................................10

Angela Irvine et al., Ceres Pol'y Rsch., *The Chilling Effect of ICE Courthouse Arrests: How
    Immigration and Customs Enforcement (ICE) Raids Deter Immigrants from Attending
    Child Welfare, Domestic Violence, Adult Criminal, and Youth Court Hearings* (2019),
    https://www.cerespolicyresearch.com/s/icereportfinal21oct2019-aytp.pdf.......................... 4-5

---

*All websites were last visited August 25, 2025.

**Miscellaneous Authorities**          **Page(s)**

Angelica S. Reina et al., *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593 (2013) ...................................................................................13

Assemb. Mem. in Support, in Bill Jacket for ch. 322 (2020), https://digitalcollections.archives.nysed.gov/index.php/Detail/objects/88569#.......................3

Ben Markus & Allison Sherry, *ICE Detention, Deportation Can Deny Justice in Local Criminal Cases, Frustrating Prosecutors*, CPR News (Apr. 10, 2025), https://www.cpr.org/2025/04/10/ice-detention-deportation-impacts-victims-rights-judicial-system/....................................................................................................11

Bryan Baker & Robert Warren, Off. of Homeland Sec. Stat., *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018-January 2022* (2024), https://ohss.dhs.gov/sites/default/files/2024-06/2024_0418_ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united-states-january-2018%25E2%2580%2593january-2022.pdf .........................................................8

Bureau of Lab. Stat., U.S. Dep't of Lab., *Labor Force Characteristics of Foreign-born Workers Summary* (2025), https://www.bls.gov/news.release/forbrn.nr0.htm.........................8

Carl Davis et al., Inst. on Tax'n & Econ. Pol'y, *Tax Payments by Undocumented Immigrants* (2024), https://sfo2.digitaloceanspaces.com/itep/ITEP-Tax-Payments-by-Undocumented-Immigrants-2024.pdf...............................................................9

Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation.*, N.Y. Times (June 3, 2018), https://www.nytimes.com/2018/06/03/us/immigrants-houston-domestic-violence.html.................................................4

Daniel Costa et al., *Immigrants and the Economy*, Econ. Pol'y Inst. (Apr. 15, 2025), https://www.epi.org/publication/immigrants-and-the-economy/..............................................8

David Dyssegaard Kallick, *New Yorkers Who Are Undocumented: Occupations, Taxes Paid, and Long-Term Economic Benefits*, Immigr. Rsch. Initiative (July 29, 2024), https://immresearch.org/publications/new-yorkers-who-are-undocumented-occupations-taxes-paid-and-long-term-economic-benefits/.........................................................8

Elizabeth Fussell, *The Deportation Threat Dynamic & Victimization of Latino Migrants: Wage Theft & Robbery*, 52 Socio. Q. 593 (2011), https://onlinelibrary.wiley.com/doi/epdf/10.1111/j.1533-8525.2011.01221.x...................................................... 13-14

Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165 (2016), https://law.lclark.edu/live/files/22081-lcb201art4mccormickpdf ..............................15

**Miscellaneous Authorities**                                           **Page(s)**

ICE Out of Cts. Coal., *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* (2019), https://www.immigrantdefenseproject.org/wp-content/uploads/Safeguarding-the-Integrity-of-Our-Courts-Final-Report.pdf ........................................................... 4-5

Irene Gibson, Off. of Homeland Sec. Stat., *Annual Flow Report: Refugees and Asylees: 2022* (Nov. 2023), https://ohss.dhs.gov/sites/default/files/2024-03/2023_0818_plcy_refugees_and_asylees_fy2022_v2_0.pdf .................................................................8

Jacob Bucher et al., *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164 (2010), https://www.swacj.org/_files/ugd/4d13c6_4055b291cb2c46e2a2c3e6a9491ca767.pdf ........13

James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), http://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html.................................................4

Jeffrey S. Passel & Jens Manuel Krogstad, *What We Know About Unauthorized Immigrants Living in the U.S.*, Pew Rsch. Ctr. (2024), https://www.pewresearch.org/short-reads/2024/07/22/what-we-know-about-unauthorized-immigrants-living-in-the-us/ ..............8

Jennifer Van Hook, *Analysis: Who Are the Immigrants Who Come to the U.S.? Here's the Data*, PBS News (Feb. 6, 2025), https://www.pbs.org/newshour/nation/analysis-who-are-the-immigrants-who-come-to-the-u-s-heres-the-data.........................................8

Jill Cowan & Orlando Mayorquín, *In L.A., Fear of ICE Raids Created a Tense First Day of School*, N.Y. Times (Aug. 14, 2025), https://www.nytimes.com/2025/08/14/us/los-angeles-raids-school-patrols.html .........................................................................15

Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement:Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328 (2015), https://www.researchgate.net/publication/276911374_Latinas%27_Perceptions_of_Law_Enforcement_Fear_of_Deportation_Crime_Reporting_and_Trust_in_the_System#full-text ...13

Leonard Greene & Rocco Parascandola, *NYPD Commissioner Reminds Cops to Ignore President Trump's Immigrant Deportation Orders*, N.Y. Daily News (Feb. 23, 2017), https://www.nydailynews.com/2017/02/23/nypd-commissioner-reminds-cops-to-ignore-president-trumps-immigrant-deportation-orders/ .....................................................12

Letter from Former Judges to Ronald D. Vitiello, Acting Dir. of U.S. Immigr. & Customs Enf't (Dec. 12, 2018), https://www.scribd.com/document/395488473/Letter-From-Former-Judges-Courthouse-Immigration-Arrests ...................................................7

**Miscellaneous Authorities**                                                      **Page(s)**

Letter from Mary E. Fairhurst, Chief Justice, Wash., to John F. Kelly, Sec'y, Dep't of
    Homeland Sec. (March 22, 2017), https://www.courts.wa.gov/content/publicUpload/
    Supreme%20Court%20News/KellyJohnDHSICE032217.pdf ................................................7

Liz Robbins, *Police Fear Trump Immigration Orders May Handcuff Effort to Fight Gangs*,
    N.Y. Times (Feb. 22, 2017), https://www.nytimes.com/2017/02/22/nyregion/police-fear-
    trump-immigration-orders-may-handcuff-effort-to-fight-gangs.html ....................................12

Luis Ferré-Sadurní et al., *Inside the Epicenter of ICE Detentions in NYC*, N.Y. Times (Aug.
    4, 2025), https://www.nytimes.com/video/nyregion/100000010299370/inside-the-
    epicenter-of-ice-detentions-in-nyc.html..................................................................5

Mark Greenberg et al., Migration Pol'y Inst., *Immigrant Families and Child Welfare
    Systems: Emerging Needs and Promising Policies* (2019),
    https://www.migrationpolicy.org/sites/default/files/publications/ImmigrantFamiliesChild
    Welfare-Final.pdf...............................................................................................11

Matthew Lisiecki & Gerard Apruzzese, Ctr. for Migration Stud., *Proposed 2024 Mass
    Deportation Program Would Socially and Economically Devastate American Families*
    (2024), https://cmsny.org/wp-content/uploads/2024/10/CMS-REPORT-Proposed-2024-
    Mass-Deportation-Program-Would-Socially-and-Economically-Devastate-American-
    Families.pdf ......................................................................................................9

Matthew Lisiecki et al., *What Will Deportations Mean for the Child Welfare System?*
    Brookings Inst. (2025), https://www.brookings.edu/articles/what-will-deportations-
    mean-for-the-child-welfare-system/ ....................................................................11

Miguel Pinedo & Christian Escobar, *Childhood Parental Deportations, Immigration
    Enforcement Experiences, and Posttraumatic Stress Disorder Among US-Born Latino
    Adults, 2021*, 114 Am. J. Pub. Health S495 (2024), https://ajph.aphapublications.org/
    doi/pdf/10.2105/AJPH.2024.307660?download=true ...................................... 10-11

Nawal H. Ammar et al., *Calls to Police and Police Response: A Case Study of Latina
    Immigrant Women in the USA*, 7 Int'l J. Police Sci. & Mgmt. 230 (2005),
    https://niwaplibrary.wcl.american.edu/wp-content/uploads/2015/IMM-Article-
    PoliceResponse-3.5.05.pdf...............................................................................13

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in
    Immigration Enforcement* (2013), http://www.policylink.org/sites/default/files/
    INSECURE_COMMUNITIES_REPORT_FINAL.PDF ........................................................12

Off. of N.Y. State Att'y Gen. et al., *Setting the Record Straight on Local Involvement in
    Federal Civil Immigration Enforcement: The Facts and the Laws* (2017),
    https://ag.ny.gov/sites/default/files/setting_the_record_straight.pdf.......................................13

**Miscellaneous Authorities**                                                   **Page(s)**

Omar Martinez et al., *Evaluating the Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. Minor. Health 947 (2015)................................................................................................................14

Pamela Constable, *For Immigrant Women, Domestic Violence Creates a Double Shadow*, Wash. Post (Dec. 2, 2013), https://www.washingtonpost.com/local/for-immigrant-women-domestic-violence-creates-a-double-shadow/2013/12/02/5626b85e-55e6-11e3-8304-caf30787c0a9_story.html ......................................................................13

Randy Capps et al., Migration Pol'y Inst., *Immigration Enforcement and the Mental Health of Latino High School Students* (2020), https://www.migrationpolicy.org/sites/default/files/publications/immigration-enforcement-mental-health-latino-students_final.pdf............15

Randy Capps et al., Urban Inst. & Migration Pol'y Inst., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature* (2015), https://www.migrationpolicy.org/sites/default/files/publications/ASPE-ChildrenofDeported-Lit%20Review-FINAL.pdf...................................10

Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329 (2015), https://ajph.aphapublications.org/doi/epdf/10.2105/AJPH.2014.302218 ..................14

Southern Poverty L. Ctr., *Under Siege: Life for Low-Income Latinos in the South* (2009), https://www.splcenter.org/wp-content/uploads/files/d6_legacy_files/downloads/UnderSiege.pdf ................................................................................................14

Steve Lopez, *LAPD Chief Beck Explains Why He Doesn't Want His Officers to Be Immigration Cops*, L.A. Times (Jan. 28, 2017), https://www.latimes.com/local/california/la-me-0129-lopez-beck-immigration-20170127-story.html...................................12

Tani G. Cantil-Sakauye, *California Chief Justice: The Courthouse Is Not the Place for Immigration Enforcement*, Wash. Post (Apr. 19, 2017), https://www.washingtonpost.com/opinions/california-chief-justice-the-courthouse-is-not-the-place-for-immigration-enforcement/2017/04/19/b35d5320-2054-11e7-be2a-3a1fb24d4671_story.html ...................................................................................7

Victoria D. Ojeda et al., *Deported Men's and Father's Perspective: The Impacts of Family Separation on Children and Families in the U.S.*, 11 Front. Psychiatry art. 148 (2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7092634/pdf/fpsyt-11-00148.pdf .......................10

## INTRODUCTION AND INTERESTS OF AMICUS

The State of New York submits this amicus curiae brief in support of plaintiffs' motion for a stay of enforcement of new and unprecedented U.S. government policies of broadly authorizing arrests of noncitizens when they appear for their scheduled hearings at immigration courts, and permitting summary dismissal of the proceedings in which those noncitizens are seeking to prove their legal entitlement to remain in the United States. This Court should grant a stay of enforcement while this litigation is pending because, for the reasons explained in plaintiffs' motion papers, the new policies are unlawful and irreparably harmful to plaintiffs, and the equities and the public interest weigh heavily against permitting enforcement of the policies pending judicial review. This brief draws on the State's experience to elaborate on some critical harms to the public interest that result from the policies, which defendants arbitrarily failed to take into account in enacting the policies, and which weigh heavily in favor of a stay.

The State has a strong interest in this case because it and its residents have already suffered serious harms from federal immigration arrests in the State's courthouses that severely damaged trust in the justice system—and the State is now suffering many similar harms from defendants' new policies at issue in this case. The earlier harms from arrests in state and local courthouses prompted the State to bring a successful lawsuit in this Court, against U.S. Immigration and Customs Enforcement (ICE) and related defendants, to enforce the common-law privilege against courthouse arrests, *New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377 (S.D.N.Y. 2019), and then to enact a state law codifying that common-law privilege as applied to state and local courthouses, the Protect Our Courts Act, Ch. 322, 2020 N.Y. Laws 3563. But now ICE is pursuing large-scale immigration arrests in federal immigration courthouses pursuant to the new

policies challenged in this case. The new policies result in many of the same harms that prompted the State's earlier lawsuit.

*First*, as the State's experience makes clear, arresting individuals attending court proceedings chills participation in those proceedings, and can have spillover chilling effects on participation in other court proceedings. Accordingly, defendants' new policies chill noncitizens from appearing in immigration court to demonstrate their entitlement to remain in the United States, and the policies chill their participation in state and local court proceedings, too, thus harming the State's ability to prosecute crimes and ensure access to justice.

*Second*, indiscriminate courthouse arrests of noncitizens and summary dismissal of the proceedings in which they are seeking to prove their entitlement to remain in the United States arbitrarily deprive the State, communities, and families of these noncitizens' important contributions. Millions of immigrants, including many who are currently undocumented, are critical contributors to the economy, labor force, and tax base in States across the country—and particularly in New York.[1] These immigrants also are critical contributors to their communities in myriad other ways. And they are even more critical to their own families, which very often include U.S. citizens. Defendants' policies will inevitably result in separation of such families, causing grave harms not only to those who are arrested, but also to the children and other family members left behind—and to the State that may bear the costs of supporting them when family cannot.

*Third*, defendants' policies harm public safety and community welfare by forcing noncitizens into the shadows, because they cannot prove their entitlement to remain in the United

---

[1] As used in this brief, "undocumented" immigrants include many who entered the United States through proper ports of entry and are seeking lawful status, for instance, through asylum applications, or whose temporary protected status has ended.

States without risking arrest and deportation. As both the experience of state and local governments and ample social science evidence confirm, fear of immigration enforcement makes noncitizens and their loved ones less likely to report crimes, serve as witnesses, obtain healthcare, and otherwise participate in public life—thus leaving their communities vulnerable to crime, exploitation, and health problems. Such predictable harms to the public interest resulting from defendants' policies counsel strongly in favor of plaintiffs' requested enforcement stay while this litigation is pending.

## ARGUMENT

I. **DEFENDANTS' POLICIES HARM THE PUBLIC INTEREST BY CHILLING PARTICIPATION IN IMMIGRATION COURT AND STATE, LOCAL, AND OTHER COURT PROCEEDINGS.**

Immigration arrests in courthouses severely chill participation in court proceedings, which in turn has a detrimental effect on the justice system and public safety. As New York's Legislature found in enacting the Protect Our Courts Act, use of courthouses to locate and arrest undocumented individuals leaves many immigrant community members, "documented and undocumented, afraid to access the justice system or respond to court summonses for fear of potentially life-changing immigration-related repercussions" for themselves or loved ones. Assemb. Mem. in Support, in Bill Jacket for ch. 322 (2020), at 8. The Legislature emphasized that "[t]his trend has a potentially damaging impact on all New Yorkers, not just immigrant communities, as the operation of our judicial system and public safety are undermined." *Id.*. This harmful chilling effect has always animated the privilege against courthouse arrests codified in the Protect Our Courts Act. *See, e.g.*, *New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d at 389 (privilege has always been intended "to encourage parties and witnesses 'to come forward voluntarily'" (quoting *Walpole v. Alexander* (1782), 99 Eng. Rep. 530, 531)). And, indeed, ICE itself recognized the harmful chilling

3

effect in substantially restricting courthouse arrests, before its recent unexplained reversal of position.[2]

Extensive evidence confirms that immigration arrests in courthouses lead members of immigrant communities to avoid the justice system altogether. One study of mixed immigration status families nationwide found that fear of ICE would cause 60% of respondents to avoid appearing in court as a witness, despite being a victim of a crime.[3] And the study found that fear of ICE would cause around 40% of respondents to avoid appearing as a defendant or on a bench warrant in criminal court, or in a child welfare hearing.[4] Thus, when ICE was previously making a large number of arrests in state and local courthouses, court systems and law enforcement agencies reported substantial declines in immigrant community members' participation in the justice system. For instance, domestic violence reports and requests for protective orders dropped significantly.[5]

---

[2] *Compare* Belsher Decl. Ex. 1, at 1, ECF Nos. 24-1 (2021 ICE policy severely restricting courthouse arrests because "[e]xecuting civil immigration enforcement actions in or near a court-house may chill individuals' access to courthouses and, as a result, impair the fair administration of justice"), *with id.* Exs. 3-4, at 1, ECF Nos. 24-3, 24-4 (2025 ICE interim and final policies substantially broadening courthouse arrest authority without acknowledging previously recognized chilling effect).

[3] Angela Irvine et al., Ceres Pol'y Rsch., *The Chilling Effect of ICE Courthouse Arrests: How Immigration and Customs Enforcement (ICE) Raids Deter Immigrants from Attending Child Welfare, Domestic Violence, Adult Criminal, and Youth Court Hearings* 8 (2019). (For sources available on the internet, full URLs appear in the Table of Authorities.)

[4] *Id.* at 8-9.

[5] *See, e.g.*, ICE Out of Cts. Coal., *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* 22 (2019) ("*Safeguarding Report*") (analyzing data from the New York State Unified Court System showing a decline in the issuance of orders of protection against intimate partners and family members at the same time ICE increased its presence in New York courthouses); James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017); Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation.*, N.Y. Times (June 3, 2018).

New York's court system also reported a significant decline in participation in problem-solving courts and Family Justice Centers.[6]

ICE's recent policies at issue in this case have focused on facilitating arrests in immigration courthouses, and are therefore likely to have a particularly strong chilling effect on participation in immigration proceedings—leading many immigrants to abandon their efforts to prove their legal entitlement to remain in the United States, or to avoid supporting loved ones seeking to prove such legal entitlement.

But the chilling effect will not end there. Immigrant community members are unlikely to draw sharp distinctions between immigration courts and other courts, or to have confidence that ICE's courthouse arrests will be limited to immigration courts. In one study, nearly 50% of court-involved immigrant community members reported a belief that local judges and prosecutors help ICE with arrests.[7] And the immigration court that has been the epicenter of recent courthouse arrests in New York (at 26 Federal Plaza in Manhattan)[8] is within a block or two of numerous other state, local, and federal courts—amplifying the likelihood that noncitizens will fear, and therefore avoid, appearances at any of these courts.

Accordingly, district attorneys across New York report that, due to recent ICE arrests in immigration courthouses, many noncitizen victims and witnesses are expressing fears of

---

[6] *Safeguarding Report*, *supra*, at 23 (10% fewer foreign-born clients sought assistance in the State's Family Justice Centers in 2017 as compared to 2016, before increased ICE courthouse arrests).

[7] Irvine et al., *supra*, at 10 (reporting 48% of court-involved respondents believed that judges were helping ICE arrest people and 49% believed that prosecutors were helping ICE make arrests).

[8] *See* Luis Ferré-Sadurní et al., *Inside the Epicenter of ICE Detentions in NYC*, N.Y. Times (Aug. 4, 2025).

participating in *criminal* court proceedings. For example, the New York County District Attorney (DA) has found that the number of calls to its Immigrant Affairs and Worker Protection hotlines has almost completely dried up in recent months. The Albany County DA has had to send witness advocates to accompany investigators when they pick up victims to testify in court so that the victims are confident that the investigators are not immigration officials. And the Kings County DA has reported that multiple victims of domestic violence ceased cooperating with the prosecution out of fear that they would be arrested by ICE if they came to court to testify.[9] Legal services providers have reported similar recent fears of participation in civil court proceedings that have, for instance, deterred noncitizen clients from pursuing orders of protection in family court or claims against landlords in housing court.[10]

The State's justice system cannot effectively function in the face of this chilling effect. As a group of leading former New York judges recently explained, "[t]o properly function, courts must be places where individuals from all backgrounds and statuses can safely access the justice system."[11] If any such individuals do not see courts as safe spaces, "courts will be unable to provide the protection and services on which individuals depend, and courts' promise of equal justice under the law will remain unfulfilled."[12]

---

[9] *See* Amicus Brief of N.Y. District Attorneys in Support of Defs.' Mot. to Dismiss the Compl. 5, *United States v. New York*, No. 1:25-cv-744 (N.D.N.Y. Aug. 17, 2025), ECF No. 41.

[10] *See* Proposed Brief of Amici Curiae The Legal Aid Society et al. in Support of Defs.' Mot. to Dismiss 5-6, *United States v. New York*, No. 1:25-cv-744 (N.D.N.Y. Aug. 17, 2025), ECF No. 38.

[11] Brief of Amici Cur[i]ae Eight Former N.Y. York Judges & Justices in Support of Defs.' Mot. to Dismiss 8, *United States v. New York*, No. 1:25-cv-744 (N.D.N.Y. Aug. 17, 2025), ECF No. 39 ("Former Judges Brief").

[12] *Id.*

Moreover, when victims, witnesses, or defendants fail to appear because they are afraid, the State bears much of the cost because state employees—judges, prosecutors, public defenders, court reporters, interpreters, and security personnel—must spend their time and resources addressing otherwise unnecessary disruptions. In one study during ICE's earlier push to make state and local courthouse arrests, over half of the judges surveyed nationwide reported interruptions in their cases due to an immigrant crime survivor's fear of coming to court.[13] And judges around the country have raised concerns about the drain on scarce judicial resources caused by ICE arrests in or near courthouses.[14]

## II. DEFENDANTS' POLICIES HARM THE PUBLIC INTEREST BY ARBITRARILY DEPRIVING STATES, COMMUNITIES, AND FAMILIES OF NONCITIZENS' IMPORTANT CONTRIBUTIONS.

Other serious harms to the public interest result from defendants' new policies through unnecessary arrest, detention, and deportation of noncitizens. By encouraging broad arrests of noncitizens and facilitating dismissal of their legitimate applications for immigration relief, the policies deprive the States of those noncitizens' contributions, and harm the families and communities of which they are—and often long have been—a crucial part.

---

[13] Am. Civ. Liberties Union, *Freezing Out Justice: How Immigration Arrests at Courthouses Are Undermining the Justice System* 2 (2018).

[14] *See, e.g.*, Letter from Former Judges to Ronald D. Vitiello, Acting Dir. of U.S. Immigr. & Customs Enf't 2 (Dec. 12, 2018) ("The environment created by these [ICE courthouse] incidents, in addition to the delays and rescheduling that result when fear prevents parties from appearing in court, only makes it more difficult for judges and court staff to do their jobs."); Tani G. Cantil-Sakauye, *California Chief Justice: The Courthouse Is Not the Place for Immigration Enforcement*, Wash. Post (Apr. 19, 2017) ("We encourage the vulnerable to come to our courthouses for help. But immigration arrests, or the fear of arrests at or near courthouses, disrupt court activities and the lives of those seeking justice."); Letter from Mary E. Fairhurst, Chief Justice, Wash., to John F. Kelly, Sec'y, Dep't of Homeland Sec. (Mar. 22, 2017) ("When people are afraid to appear for court hearings, out of fear of apprehension by immigration officials, their ability to access justice is compromised. Their absence curtails the capacity of our judges, clerks and court personnel to function effectively.").

The United States is home to approximately 45 million immigrants,[15] more than two-thirds of whom have lived in the country for over a decade.[16] Nearly 11 million of these immigrants are currently undocumented.[17] New York State, meanwhile, is home to about 4 million immigrants, about 640,000 of whom are currently undocumented.[18] Many of the undocumented immigrants are seeking to prove their legal entitlement to remain in the United States, for instance, through asylum applications. In recent years—before defendants' new policies—New York has had thousands of residents granted asylum each year, the second most of any State.[19]

The indiscriminate arrests of undocumented immigrants and dismissals of their applications for immigration relief resulting from defendants' policies deprive States of these individuals' substantial contributions, economic and otherwise. Immigrants constitute more than 19% of the American workforce,[20] contribute over $2 trillion to the United States' economic output,[21] and contribute over $650 billion in taxes.[22] In 2019, immigrant-owned businesses generated over $86

---

[15] Am. Immigr. Council, *Immigrants in the United States* (2021).

[16] Jennifer Van Hook, *Analysis: Who Are the Immigrants Who Come to the U.S.? Here's the Data*, PBS News (Feb. 6, 2025).

[17] Bryan Baker & Robert Warren, Off. of Homeland Sec. Stat., *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022* (2024); Jeffrey S. Passel & Jens Manuel Krogstad, *What We Know About Unauthorized Immigrants Living in the U.S.*, Pew Rsch. Ctr. (2024).

[18] David Dyssegaard Kallick, *New Yorkers Who Are Undocumented: Occupations, Taxes Paid, and Long-Term Economic Benefits*, Immigr. Rsch. Initiative (July 29, 2024).

[19] *See* Irene Gibson, Off. of Homeland Sec. Stat., *Annual Flow Report: Refugees and Asylees: 2022*, at 15-16 (Nov. 2023).

[20] Bur. of Lab. Stat., U.S. Dep't of Lab., *Labor Force Characteristics of Foreign-born Workers Summary* (2025).

[21] Daniel Costa et al., *Immigrants and the Economy*, Econ. Pol'y Inst. (Apr. 15, 2025).

[22] Am. Immigr. Council, *Immigrants in the United States*, *supra.*

billion in income and immigrant-led households added over $1.3 trillion to the United States economy as consumers.[23]

Undocumented immigrants alone constitute nearly five percent of the total national workforce and a much larger portion of the workforce in key job sectors such as agriculture and construction.[24] In recent years, nearly half of crop workers were undocumented.[25] In 2023, households headed by undocumented immigrants paid nearly $90 billion in taxes, including approximately $34 billion in state and local taxes, and added almost $300 billion to the economy as consumers.[26] Undocumented immigrants also contribute billions of dollars to Social Security and Medicare.[27] All of these contributions would be lost for any undocumented immigrants who are arrested and detained or deported pursuant to defendants' policies, substantially harming the immigrants' States and communities.

In addition, a large majority of households with an undocumented individual also include at least one United States citizen.[28] Indeed, over four million United States citizen children live

---

[23] *Id.*

[24] Abigail F. Kolker & Holly Straut-Eppsteiner, Cong. Rsch. Serv., *Unauthorized Immigrants: Frequently Asked Questions* 14 (2022).

[25] *Id.*

[26] Am. Immigr. Council, *Immigrants in the United States, supra.*

[27] Carl Davis et al., Inst. on Tax'n & Econ. Pol'y, *Tax Payments by Undocumented Immigrants* 3 (2024).

[28] *See* Matthew Lisiecki & Gerard Apruzzese, Ctr. for Migration Stud., *Proposed 2024 Mass Deportation Program Would Socially and Economically Devastate American Families* 3 (2024) (finding 4.7 million mixed-status households in the United States but only 1.1 million households containing only undocumented individuals).

with an undocumented parent,[29] and over nine million United States citizens live in a home with one or more undocumented family members.[30]

Arrest, detention, and deportation of undocumented family members pursuant to defendants' policies will have numerous detrimental effects. In addition to the severe harms imposed on those who are arrested themselves,[31] these individuals' arrest, detention, and deportation is deeply traumatic and disruptive for family members who are left behind. For children, it is linked to "extreme psychological distress, anxiety, depression, posttraumatic stress disorder (PTSD), and externalizing behaviors (such as aggression)."[32] And beyond emotional and psychological harm, these children often face additional hardships, including financial instability and housing and food insecurity resulting from the loss of a wage-earning parent, and disruptions in their education, such as increased school absences and lower academic engagement.[33] The long-term effects extend into adulthood. Adults who experienced parental deportation during childhood

---

[29] Am. Immigr. Council, *Immigrants in the United States, supra*.

[30] *Id.*

[31] For instance, this Court recently was compelled to issue a temporary restraining order in a lawsuit challenging unsanitary, inhumane, and overcrowded conditions and lack of access to legal counsel at a facility where ICE has been holding individuals arrested in immigration court in New York City. *See* TRO, *Barco Mercado v. Noem*, No. 25-cv-6568 (S.D.N.Y. Aug. 12, 2025), ECF No. 65.

[32] Miguel Pinedo & Christian Escobar*, Childhood Parental Deportations, Immigration Enforcement Experiences, and Posttraumatic Stress Disorder Among US-Born Latino Adults, 2021*, 114 Am. J. Pub. Health S495, S496 (2024); *see also* Randy Capps et al., Urban Inst. & Migration Pol'y Inst., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature* 6 (2015); Victoria D. Ojeda et al., *Deported Men's and Father's Perspective: The Impacts of Family Separation on Children and Families in the U.S.*, 11 Front. Psychiatry art. 148, at 10 (2020).

[33] Ojeda et al., *supra*, at 7, 9-10; Ana Martinez-Donate et al., *Between the Lines: A Mixed-Methods Study on the Impacts of Parental Deportation on the Health and Well-Being of U.S. Citizen Children*, 9 J. Migration & Health art. 100233, at 5 (2024).

are more than twice as likely to suffer from PTSD as those who did not endure such separation.[34] Moreover, States inevitably bear much of the cost of family separation, whether through increased need for state support in mental and physical healthcare, housing, and other social services for children and other family members of those who are detained or deported, or, in some cases, through the need to take children left behind into state custody.[35]

Finally, sudden immigration arrests disrupt not only family and economic activity, but also all the other involvement the arrested individuals had in their communities and States, often for many years. For instance, the immigration arrests and subsequent detention and deportation can disrupt ongoing criminal or civil legal proceedings, impeding the ability of state and local courts to resolve cases involving the arrested individual.[36]

## III.    DEFENDANTS' POLICIES HARM THE PUBLIC INTEREST BY PUSHING NONCITIZENS INTO THE SHADOWS, THUS HARMING PUBLIC SAFETY AND COMMUNITY WELFARE.

Because defendants' policies preclude noncitizens from proving their entitlement to remain in the United States without risking arrest at their required immigration court appearances, defendants' policies also encourage noncitizens to abandon their applications for immigration relief and retreat into the shadows—even if they would otherwise be entitled to legal status. In doing so, defendants' policies deter noncitizens and their loved ones from participating in public

---

[34] Pinedo & Escobar, *supra*, at S501.

[35] *See, e.g.*, Am. Immigr. Council, *U.S. Citizen Children Impacted by Immigration Enforcement* 3-4 (June 24, 2021); Matthew Lisiecki et al., *What Will Deportations Mean for the Child Welfare System?* Brookings Inst. (2025); Mark Greenberg et al., Migration Pol'y Inst., *Immigrant Families and Child Welfare Systems: Emerging Needs and Promising Policies* 17-19 (2019).

[36] *See, e.g.*, Ben Markus & Allison Sherry, *ICE Detention, Deportation Can Deny Justice in Local Criminal Cases, Frustrating Prosecutors*, CPR News (Apr. 10, 2025).

life, for instance, reporting crimes or seeking healthcare or other necessary services, out of fear of immigration authorities. This deterrence harms not only the justice system (see *supra* at 3-7), but public safety and community welfare more generally, and not only for noncitizens, but for everyone in their communities.

For instance, in one study conducted before defendants initiated their recent policies, half of immigrants and more than two-thirds of undocumented immigrants reported that they were reluctant to report or offer information about crimes to law enforcement for fear that officers would inquire about their or others' immigration status.[37] Those numbers will likely increase with defendants' new policies heightening immigrants' fears. That result is highly problematic for public safety because, as one New York county police commissioner explained, "[w]e solve crimes based on people coming to us. It's that simple."[38] For that reason, as a New York City police commissioner elaborated, "[i]t is critical that everyone who comes into contact with the [police], regardless of their immigration status, be able to identify themselves or seek assistance without hesitation, anxiety or fear."[39]

Moreover, if noncitizens do not feel comfortable reporting crimes,  as one major city police chief explained, "you create a shadow population" that "become[s] prey for human predators who extort them or abuse them because they know they won't contact the police."[40] Indeed, state and

---

[37] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5-6 (2013).

[38] Liz Robbins, *Police Fear Trump Immigration Orders May Handcuff Effort to Fight Gangs*, N.Y. Times (Feb. 22, 2017).

[39] Leonard Greene & Rocco Parascandola, *NYPD Commissioner Reminds Cops to Ignore President Trump's Immigrant Deportation Orders*, Daily News (Feb. 23, 2017).

[40] Steve Lopez, *LAPD Chief Beck Explains Why He Doesn't Want His Officers to Be Immigration Cops*, L.A. Times (Jan. 28, 2017).

local law enforcement leaders agree that "[t]he reluctance of folks to come forward . . . is a much greater public safety problem than having people here who may be undocumented but are not committing other crimes," because "[c]riminals thrive in neighborhoods where people don't trust the police."[41]

Ample social science research confirms that fear of arrest and deportation among noncitizens harms public safety. Studies have repeatedly found that such fear makes noncitizens and their loved ones more likely to become victims of crime and other exploitation.[42] For instance, a number of studies have shown that abusive partners may utilize the threat of deportation in order to maintain power and control.[43] In one study of Latina women, 70% of domestic abuse victims said that fear of immigration authorities was a major reason keeping them from seeking the help needed to stop the abuse.[44]

Lack of trust in law enforcement also facilitates labor exploitation, because employers assume employees fearing immigration consequences will not report labor violations such as wage

---

[41] Pamela Constable, *For Immigrant Women, Domestic Violence Creates a Double Shadow*, Wash. Post (Dec. 2, 2013); *see also* Off. of N.Y. State Att'y Gen. et al., *Setting the Record Straight on Local Involvement in Federal Civil Immigration Enforcement: The Facts and the Laws* 14-17 (2017) (collecting similar commentary from additional law enforcement leaders).

[42] See, e.g., Elizabeth Fussell, *The Deportation Threat Dynamic & Victimization of Latino Migrants: Wage Theft & Robbery*, 52 Socio. Q. 593, 604 (2011); Jacob Bucher et al., *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164, 166 (2010).

[43] *See, e.g.*, Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement:Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 330 (2015) (citing several studies); Angelica S. Reina et al., *''He Said They'd Deport Me'': Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593, 601 (2013).

[44] Reina et al., *supra*, at 600. Another study found that the single largest factor independently affecting the rate at which battered immigrant Latina women called the police was immigration status. *See* Nawal H. Ammar et al., *Calls to Police and Police Response: A Case Study of Latina Immigrant Women in the USA*, 7 Int'l J. Police Sci. & Mgmt. 230, 237 (2005).

theft.[45] Indeed, in a number of studies, between 40% and 80% of mostly undocumented immigrants reported being victims of wage theft.[46]

Other research has concluded that immigrant community members often refrain from seeking vital governmental services other than law enforcement assistance—such as healthcare services—when they fear that accessing those services could result in arrest and deportation.[47] And as communicable diseases like COVID-19 illustrate well, refusal of anyone in the community to seek medical help can harm everyone—and impose major costs on the State—by amplifying the disease's spread.[48] At the same time, encouraging noncitizens to seek care promptly limits the extent to which delayed treatment leads to medical emergencies that further increase costs ultimately borne by the State.

Pushing parents into the shadows pushes their children into the shadows too—even when those children may be citizens or otherwise have lawful status. That means that children, too, may avoid necessary healthcare or other vital services. One study found that nearly a third of Latino

---

[45] *See, e.g.*, Fussell, *supra*, at 610.

[46] *See id.* at 604 (finding that two of five respondents reported wage theft since arriving in New Orleans post-Katrina, and citing Nik Theodore et al., *La Esquina (The Corner): Day Laborers on the Margins of New York's Formal Economy*, 9 WorkingUSA: J. Labor & Soc. 407 (Dec. 2006), finding a wage theft rate of approximately 50% in New York); Southern Poverty L. Ctr., *Under Siege: Life for Low-Income Latinos in the South* 6 (2009) (finding that 41% of those surveyed across the South had experienced wage theft, and 80% had in New Orleans).

[47] *See, e.g.*, Omar Martinez et al., *Evaluating the Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. Minor. Health 947, 964 (2015); Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329, 332 (2015).

[48] *See, e.g.*, Alejandro Portes et al., *The U.S. Health System and Immigration: An Institutional Interpretation*, 24 Sociol. Forum 487, 207 (2009) (failure to treat noncitizens in the community "'increase[s] the risk of disease among all members of the community, not just those without papers'").

student participants—including students born in the United States—altered their routines due to deportation fears. Because of these fears, they did not seek medical care, attend religious services, and participate in afterschool activities, among other things.[49] Children whose families fear immigration authorities sometimes even avoid attending school,[50] and substantial local resources may be required to assuage fears enough to keep children in school.[51] Moreover, the consequences of such fears can be dire: in one disturbing incident, a child died when his parents delayed seeking medical care because they feared that hospital officials might report them to immigration authorities.[52] And such fears, and the resulting harms to public safety and community welfare, will only grow as a result of defendants' latest policies—underscoring the urgent need for plaintiffs' requested stay.

---

[49] Randy Capps et al., Migration Pol'y Inst., *Immigration Enforcement and the Mental Health of Latino High School Students* 2-3 (2020).

[50] *See* Am. Immigr. Council, *U.S. Citizen Children*, *supra*, at 2-3.

[51] *See, e.g.*, Jill Cowan & Orlando Mayorquín, *In L.A., Fear of ICE Raids Created a Tense First Day of School*, N.Y. Times (Aug. 14, 2025).

[52] Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165, 199 (2016).

## CONCLUSION

For all these reasons and those stated in plaintiffs' motion, this Court should grant plaintiffs' requested stay.

Dated:    New York, New York
          August 25, 2025

                                        Respectfully submitted,

                                        LETITIA JAMES
                                          *Attorney General*
                                          *State of New York*
                                        BARBARA D. UNDERWOOD
                                          *Solicitor General*
                                        ESTER MURDUKHAYEVA
                                          *Deputy Solicitor General*

                            By:    */s/ Philip J. Levitz*
                                        PHILIP J. LEVITZ
                                        *Senior Assistant Solicitor General*

                                        28 Liberty Street
                                        New York, New York 10005
                                        (212) 416-6325
                                        philip.levitz@ag.ny.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on August 25, 2025, I filed the foregoing document on the Electronic

Case Filing system which caused the document to be served on all counsel of record.

Dated:    New York, New York
          August 25, 2025

                                            */s/ Philip J. Levitz*
                                            Philip J. Levitz