UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

AFRICAN COMMUNITIES TOGETHER; and
THE DOOR,

                    Plaintiffs,

                                                    25-cv-6366 (PKC)

                  -against-                          OPINION AND ORDER

TODD LYONS, in his official capacity as Acting
Director, U.S. Immigration and Customs
Enforcement; KRISTI NOEM, in her official
Capacity as Secretary of the United States
Department of Homeland Security; SIRCE E.
OWEN, in her official capacity as Acting Director,
Executive Office of Immigration Review; and
PAMELA BONDI, in her official capacity as
Attorney General, U.S. Department of Justice,

                    Defendants.

---------------------------------------------------------------x

CASTEL, U.S.D.J.

        African Communities Together ("ACT") and The Door bring this challenge to a policy implemented by Immigration and Customs Enforcement ("ICE") to effectuate arrests in and around immigration "courthouses," i.e., facilities where Immigration Judges preside over proceedings.[1]  Plaintiffs allege that the arrest policy acts in tandem with a separate Department of Justice ("DOJ") policy advising Immigration Judges that at a hearing they may grant oral motions by representatives of the Department of Homeland Security ("DHS") to dismiss removal proceedings without setting a schedule for a written response by the noncitizen.  The dismissal of the removal proceedings is an apparent legal predicate for arrest and detention under an

---

[1] In this District, facilities are located at federal office buildings in Manhattan at 290 Broadway, 26 Federal Plaza and 201 Varick Street.

expedited removal procedure.  ACT and The Door allege that the two combined policies on dismissals and courthouse arrests are unlawful and that they and their members are adversely affected by these policies.

Plaintiffs' complaint seeks judicial review of the two policies pursuant to section 705 of the Administrative Procedure Act ("APA").  5 U.S.C. § 705.  Pending the Court's review, plaintiffs seek an Order staying both polices under the authority of section 705 of the APA, which permits a court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  Id.  ACT and The Door urge that they are likely to succeed on the merits of their challenges and that they satisfy all other requirements for the grant of a stay.

These are the Court's principal conclusions on this motion:

1. Neither ACT nor The Door has made an adequate evidentiary showing that they have "representational" standing.  The Door, but not ACT, has demonstrated "organizational" standing by showing the likelihood of injury to it.

2. The Door has shown a probability of success on the merits of its challenge to the EOIR Dismissal Policy and all other requirements for a stay.  A stay will be granted.

3. The Door has neither shown a likelihood of success in establishing a common law privilege against courthouse arrests that was incorporated into the Immigration and Naturalization Act ("INA") upon its adoption in 1952 nor a showing that the ICE Courthouse Arrest Policies are arbitrary, capricious or otherwise contrary to law.  A stay will be denied.

Concluding, as this Court does, that there has not been a showing of a probability of success on the merits of a challenge to final agency guidance on courthouse arrests does not answer all questions raised by the several declarations submitted by plaintiffs on this stay motion. How the arrest guidance is being implemented, who is being arrested and why are issues not fully developed on this record and beyond the present application, which does not purport to challenge the exercise of discretion by ICE officials in individual cases.

For the purposes of the stay motion, the parties confirmed at the hearing held on September 2, 2025 that the factual record is closed. (Sept. 2, Tr. at 2-3.) The Court will set forth the interests of the parties, plaintiffs' standing or lack thereof, the legal framework for the system in which Immigration Judges function, the challenged policies and their predecessors, the standard for a stay under section 705, and an assessment of the probability of success on the merits and the other elements for a stay.

THE PARTIES

    A.  <u>Plaintiffs.</u>

        ACT is a section 501(c)(3) organization that seeks to "empower" African immigrants and assists them in finding free or low-cost legal services, job placement and other services.  (Konaté Decl. ¶¶ 3-4 (ECF 23-8).)  Each year it provides hundreds of its members with free immigration legal services.  (<u>Id.</u> ¶ 4.)  The declaration of ACT's Deputy Executive for Policy and Advocacy describes how four unidentified members of ACT have been impacted as a result of the challenged policies.  (<u>Id.</u> ¶¶ 16-43.)

        John Doe 7 filed an asylum application, has no criminal record, received an "Employment Authorization Document" and began working at Amazon.  (<u>Id.</u> ¶ 17.)  He attended a "master calendar hearing" at 26 Federal Plaza and after the proceeding concluded, he was arrested outside the courtroom near the elevator.[2]  (<u>Id.</u> ¶¶ 19-21.)  He is presently in ICE custody at a detention facility in Texas.  (<u>Id.</u> ¶ 20.)  The declaration does not disclose whether he was in removal proceedings or the status of his asylum application.

        John Doe 8 is in removal proceedings and has an asylum application pending. (<u>Id.</u> ¶ 24.)  He has a forthcoming master calendar hearing and fears that he will be detained.  (<u>Id.</u> ¶¶ 27-28.)  Because of his concerns, he has applied to appear virtually (via Webex) and as of the date of the submission the application had not been acted upon by the presiding Immigration Judge.  (<u>Id.</u> ¶ 27.)

---

[2] "Master calendar hearings generally address preliminary procedural matters including issues of removability and whether the alien is eligible for any relief or protection from removal.  A single case may have multiple master calendar hearings before it is scheduled for an individual hearing.  Individual hearings are generally reserved for an alien's application for relief or protection from removal with witness testimony and consideration of exhibits." (Owen Decl. ¶ 3 (ECF 40).)

Jane Doe 1 is in removal proceedings with an asylum application pending. (Id. ¶ 30.) The first disposition of her application to appear via Webex resulted in an adjournment, not a grant of a remote appearance. (Id. ¶ 33.) Her second request to appear remotely was denied by the Immigration Judge. (Id.)

Jane Doe 2 is in removal proceedings with an asylum application pending. (Id. ¶ 36.) She applied to appear at a master calendar hearing remotely but the motion was not decided before the hearing date and she thus appeared in person.[3] (Id. ¶ 39.) The case was adjourned to February 2026. (Id. ¶ 39.) The Immigration Judge reportedly said that individuals appearing without counsel could not appear at a hearing by virtual means. (Id.)

The Door is a section 501(c)(3) organization that assists young people ages 12 to 24 in Manhattan and the Bronx with a comprehensive array of services, including health care, education, mental health counseling, legal services, housing, nutritional needs, and sports and recreation. (Baltimore Decl. ¶ 4 (ECF 23-1).) Attorneys at its Legal Services Center assist a growing population of young noncitizens with their immigration cases, including providing legal representation in removal proceedings. (Id. ¶ 5.) The Door asserts that "many of our members are now at risk of having their removal proceedings dismissed, causing them to lose the opportunity to seek relief from removal, and being arrested and detained when they attend mandatory immigration court proceedings." (Id. ¶ 13.) This, in turn, has caused an increase in noncitizens not appearing at immigration proceedings, resulting in the grants of orders of removal by default. (Id. ¶ 14.) The Door states that "[t]he increased volume and urgency of Door members' need for legal assistance relating to the [challenged policies] has required The

---

[3] No information is supplied as to how far in advance Jane Doe 2 made the application to appear remotely.

Door to bring more staff to the Drop-In Legal Clinic, taking these staff away from their pre-existing work providing direct, full-scope representation of members." (Id. ¶ 25.)

The declaration of the deputy director of The Door's Legal Services Center describes how six of The Door's members have been impacted or are presently at risk as a result of the challenged policies. (Id. ¶¶ 37-42.) It describes one member who was arrested in Immigration Court after dismissal of his removal petition and five members who are fearful of attending in-person proceedings due to their possible arrests. (See id.)

John Doe 1 filed a timely asylum application and a I-360 Special Immigrant Juvenile Status ("SIJS") application. (Id. ¶ 37.) During a Webex hearing for his removal proceedings, the Immigration Judge ordered him to appear in person. (Id.) Later that day, John Doe 1 appeared in person at 290 Broadway, and the government successfully moved to dismiss the case, over John Doe 1's objection. (Id.) John Doe 1 was then arrested by ICE, transferred to 26 Federal Plaza, then to the Nassau County Correctional Facility, and finally to the Metropolitan Detention Center (the "MDC") in Brooklyn, where he remains. (Id.)

John Doe 2 has a pending asylum application. (Id. ¶ 38.) He successfully applied to virtually appear at an August 2025 removal proceeding but may be required to attend future proceedings in person. (Id.) He is fearful of attending an in-person proceeding due to the possibility that he will be arrested. (Id.)

John Doe 3 has a pending asylum application. (Id. ¶ 39.) He appeared virtually at a July 2025 removal proceeding, where the case was continued to February 2026, when there will be an in-person hearing. (Id.) He is fearful of attending an in-person proceeding due to the possibility that he will be arrested. (Id.)

John Doe 4 has a pending asylum application.  (Id. ¶ 40.)  As of August 10, 2025, his application to appear virtually at an August 2025 removal proceeding was undecided.  (Id.) He is fearful of attending an in-person proceeding due to the possibility that he will be arrested. (Id.)

John Doe 5 has a pending asylum application and is pursuing SIJS status.  (Id. ¶ 41.)  He is fearful of attending an in-person removal proceeding scheduled for September 2025 due to the possibility that he will be arrested and has a pending application to attend the proceeding virtually.  (Id.)

John Doe 6 has a pending asylum application.  (Id. ¶ 42.)  As of August 10, 2025, he was fearful of attending an in-person removal proceeding scheduled for August 2025 and submitted an unadjudicated application to appear virtually at the proceeding.  (Id.)

B.  Defendants.

Defendants in this action are the following federal officials sued in their official capacities: Attorney General Pamela Bondi, Secretary of Homeland Security Kristi Noem, Acting Director of ICE Todd Lyons, and Acting Director of the Executive Office of Immigration Review Sirce E. Owen.  The duties and responsibilities of these officials do not require elaboration, except as to the responsibilities of Ms. Owen and the agency that she heads.

The Executive Office of Immigration Review ("EOIR") is part of the Department of Justice.  It asserts that its primary mission is "to adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws. Under delegated authority from the Attorney General, EOIR conducts immigration court proceedings, appellate reviews, and administrative hearings."  (Owen Decl. ¶ 1 (ECF 40).)  The

Chief Immigration Judge, who establishes operating policies and oversees policy implementation for the immigration court, is part of EOIR, as are Immigration Judges.  (Id. ¶ 3.)

Notably for the purpose of this action, EOIR is not part of the Department of Homeland Security in which ICE and Citizenship and Immigration Services are situated.

THE CHALLENGED POLICIES

With some exceptions, a removal proceeding is, by statute, "the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States."  8 U.S.C.§ 1229a(a)(3). Generally, once a removal proceeding has been commenced by DHS, an alien may not be removed until the proceeding concludes.[4]

Plaintiffs challenge two new policies that they allege were unlawfully adopted by EOIR and ICE that combine in their effect to adversely impact their members who are in a removal proceeding before an Immigration Judge.  The first was set forth in a May 30, 2025 email from two Regional Deputy Assistant Chief Immigration Judges to all Assistant Chief Immigration Judges for the guidance of all Immigration Judges.[5]  (Belsher Decl. Ex 12 (ECF 24).)  The email informed them that Immigration Judges have the authority to dispense with written briefing on a motion to dismiss, dispense with a written decision and grant a motion to dismiss a removal proceeding on oral application of a DHS representative (the challenged email is referred to as the "EOIR Policy on Dismissal").  (Id.)  The second challenged policy is the ICE

---

[4] The parties agreed at the hearing that a non-detained individual at liberty who has a pending removal proceeding could not be detained or put in expedited removal proceedings during the pendency of the removal proceeding. (Sept. 2, Tr. at 3.)  Yet there is anecdotal evidence in the record of detentions during the continued pendency of a removal proceeding.  (Cortes Decl. ¶¶ 7-8 (ECF 23-3).)  In their briefing on summary judgment, the parties should further address this issue.

[5] As of August 20, 2025, the Office of the Chief Immigration Judge ("OCIJ") has three Acting Regional Deputy Chief Immigration Judges.  (Owen Decl. ¶ 4.)  Regional Deputy Chief Immigration Judges report to the Chief Immigration Judge, who leads OCIJ.  (Id.)

revised courthouse arrest policy of May 27, 2025, which was an update and expansion of a January 21, 2025 revision to policy that expanded the permissible occasions in which an ICE agent could arrest a noncitizen at a courthouse (the challenged ICE policies are referred to as the "ICE Courthouse Arrest Policies").  (Belsher Decl. Ex. 3, 4.)  As plaintiffs urge, there is little doubt about the interrelationship between the EOIR and ICE policies because the EOIR Policy on Dismissal was issued three days after the May 27, 2025 ICE Courthouse Arrest Policy and the EOIR Policy attached the ICE Policy.

Plaintiffs allege that their members are being compelled under force of law to attend proceedings seeking their removal from the country and that, if they do not appear, they risk that the petition for removal will be granted "*in absentia*."[6]  If they do appear, they risk that their removal petitions will be orally dismissed on the spot by the Immigration Judge, which results in the dismissal of any pending defensive asylum petition they have made,[7] and they then will be immediately arrested and detained by ICE agents at or near where the proceedings were held.  Plaintiffs rely on the synergistic and negative effect of the EOIR Policy on Dismissals and the ICE Policies on Courthouse Arrests: one permitting and encouraging immediate dismissal of a removal proceeding on oral application of the DHS and the other permitting ICE agents to arrest those who came to immigration court, as required, in order to be heard on their now-dismissed removal proceedings.  They characterize the combination of the two policies as a "dismiss and detain" policy.

---

[6] 8 U.S.C. § 1229a(b)(5)(A) ("Any alien who . . . does not attend a proceeding under this section, shall be ordered removed in absentia . . . .").  There are other consequences of a failure to appear, including a ten-year restriction on seeking certain discretionary relief under the immigration laws.  Id. at 1229a(b)(7).

[7] There are two types of asylum applications: affirmative and defensive.  An affirmative application is filed with the DHS Asylum Office by an alien not in removal proceedings.  A defensive application is filed by the noncitizen in the context of a pending removal proceeding and is adjudicated by the Immigration Judge to whom the removal proceeding is assigned.  See generally 8 C.F.R. § 1208.4.  Implicit in the rule is that the dismissal of a removal proceeding results in the dismissal of a defensive asylum application.  Thus, an oral motion to dismiss a removal proceeding, if granted, results in the dismissal of the accompanying defensive asylum application.  (Sept. 2, Tr. at 4.)

There is scant information before the Court on the reasons for any particular ICE arrest and detention of a noncitizen after dismissal of a removal proceeding. ACT's John Doe 7 is assertedly in an ICE detention center in Texas. The Door's John Doe 1 is located at the MDC in Brooklyn, a facility operated by the Department of Justice's Bureau of Prisons, principally for persons who either have been convicted of a crime or are in pre-trial detention status in connection with a criminal prosecution. Plaintiffs' counsel represents that this year, the MDC began housing detained noncitizens on behalf of ICE. (Sept. 2, Tr. at 5.)

There is an alternative to formal removal proceedings that may be applicable to some whose removal proceedings are orally dismissed. By statute a person who is in the country less than two years who did not enter the country through a port of entry or otherwise present themselves to a DHS agent, may be placed in "expedited removal," which does not entail a proceeding before an Immigration Judge. 8 U.S.C. § 1225; 8 C.F.R. § 235.3. At the hearing, the parties confirmed that an alien subject to expedited removal, "shall be detained pending a final determination of credible fear of persecution and, if found not to have such fear, until removed."[8] 8 U.S.C. § 1225; (Sept. 2, Tr. at 44; see also EOIR Policy on Dismissals, Belsher Decl. Ex. 12 (noncitizens "in expedited removal proceedings are subject to mandatory detention")).

---

[8] Credible fear evaluations are initially conducted by ICE and then referred to U.S. Citizenship and Immigration Services ("USCIS"). (Sept. 2, Tr. at 8.) If denied at the USCIS level, an alien may have that determination reviewed by an Immigration Judge, but plaintiffs assert that the process does not have the same protections as a removal proceeding. (Id. at 8-9; see also Burr Decl. ¶ 19 (ECF 23-2).)

THE AUTHORITY OF IMMIGRATION JUDGES

The Office of the Chief Immigration Judge ("OCIJ") resides within the EOIR, which, as noted, is part of the DOJ. Immigration Judges are appointed by the Attorney General as administrative judges functioning within the EOIR. 8 CFR § 1003.10(a). By longstanding rule, Immigration Judges "shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the Act and regulations that is necessary or appropriate for the disposition or alternative resolution of such cases. Such actions include administrative closure, termination of proceedings, and dismissal of proceedings." Id. § 1003.10(b). They are required "to resolve the questions before them in a timely and impartial manner consistent with the Act and regulations." Id.

With some exceptions, decisions of an Immigration Judge are subject to review by the Board of Immigration Appeals ("BIA"). Id. §§ 1003.1(b), 1003.10(c). Cases are typically heard by a three-judge panel of the BIA. Id. §1003.1(a)(3). While fact finding is reviewed under a clearly erroneous standard, the BIA "may review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo." Id. §1003.1(d)(3)(ii).

The power to appoint Immigration Judges and members of the BIA is found in the Appointments Clause. Duenas v. Garland, 78 F.4th 1069, 1072-73 (9th Cir. 2023) (citing U.S. Const. art. II, § 2, cl. 2). These officials are "inferior officers" who may be removed by the Attorney General, the appointing authority who is a head of a department. Id. at 1074.

The Chief Immigration Judge has the "the power, in his discretion, to set priorities or time frames for the resolution of cases, to direct that the adjudication of certain cases be deferred, to regulate the assignment of immigration judges to cases, and otherwise to manage the

docket of matters to be decided by the immigration judges . . . ."  8 C.F.R. § 1003.9(b)(3).  As is germane to the present motion, the Chief Immigration Judge may "[i]ssue operational instructions and policy, including procedural instructions regarding the implementation of new statutory or regulatory authorities . . . ."  Id. §1003.9(b)(1).

The EOIR issues an EOIR Policy Manual (the "EPM") that contains an Immigration Court Practice Manual (the "ICPM").  (Owen Decl. ¶ 8.)  It expressly provides that the ICPM is not controlling if "the Immigration Judge directs otherwise in a particular case" and that "[n]othing in this manual shall limit the discretion of Immigration Judges to act in accordance with law and regulation."  (Id. (quoting ICPM 1.1(b) & (c)).)

Neither a supervisory Immigration Judge nor the Director of EOIR may direct an Immigration Judge to rule in a particular way in a particular case.  (Id. ¶ 7); see 8 C.F.R. § 1003.0(c) ("[Subject to exceptions not relevant to the above captioned case], the Director shall have no authority to adjudicate cases arising under [Title 8 of the United States Code] or regulations or to direct the result of an adjudication assigned to . . . an immigration judge . . . ."); 8 C.F.R. § 1003.9(c) ("The Chief Immigration Judge shall have no authority to direct the result of an adjudication assigned to another immigration judge . . . .").

The director of EOIR "may designate immigration judges to serve as Deputy and Assistant Chief Immigration Judges as may be necessary to assist the Chief Immigration Judge in the management of the" Office of the Chief Immigration Judge.  8 C.F.R. § 1003.9(a).  In practice, Assistant Chief Immigration Judges are Immigration Judges with administrative responsibility over other Immigration Judges.  (Owen Decl. ¶ 4.)  A Regional Deputy Chief Immigration Judge has administrative responsibility over Assistant Chief Immigration Judges.  (Id.)

PLAITIFFS' STANDING TO SUE: THE DOOR HAS
DEMONSTRATED ITS "ORGANIZATIONAL" STANDING.

Though subject matter jurisdiction is not raised by the parties, "it is well
established that the court has an independent obligation to assure that standing exists, regardless
of whether it is challenged by any of the parties." Summers v. Earth Island Inst., 555 U.S. 488,
499 (2009). "It is well settled that where, as here, multiple parties seek the same relief, 'the
presence of one party with standing is sufficient to satisfy Article III's case-or-controversy
requirement.'" Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868
F.3d 104, 109 (2d Cir. 2017) (quoting Rumsfeld v. Forum of Academic and Institutional Rights,
Inc., 547 U.S. 47, 52 n.2 (2006)).

There are two ways in which an organization may demonstrate standing. First, it
may have "representational" or "associational" standing to sue on behalf of its members, "in
which case it must show, inter alia, that some particular member of the organization would have
had standing to bring the suit individually." New York Civil Liberties Union v. New York City
Transit Authority, 684 F.3d 286, 294 (2d Cir. 2012). Second, "an organization can 'have standing
in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and
immunities the association itself may enjoy.'" Id. (quoting Warth v. Seldin, 422 U.S. 490, 511
(1975)). This second basis is sometimes called "organizational" standing, under which "only a
perceptible impairment of an organization's activities is necessary for there to be an injury in
fact." Id.

The Court concludes that neither ACT nor The Door has demonstrated
"representational" standing sufficient to support a motion under section 705 for a stay. It also
concludes that The Door but not ACT has demonstrated "organizational" standing.

A.  Neither Plaintiff Has Demonstrated "Representational" Standing
<u>Sufficient to Support a Stay.</u>

"An association may have standing to sue as the representative of its members,

'[e]ven in the absence of injury to itself.'"  <u>Do No Harm v. Pfizer Inc.</u>, 126 F.4th 109, 117 (2d

Cir. 2025) (quoting <u>Warth</u>, 422 U.S. at 511).  "To establish associational standing, an association

must show: (1) 'its members would otherwise have standing to sue in their own right'; (2) 'the

interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim

asserted nor the relief requested requires the participation of individual members in the lawsuit.'"

<u>Id.</u> (quoting <u>Hunt v. Washington State Apple Advertising Commission</u>, 432 U.S. 333, 343

(1977)).

"A plaintiff's burden to demonstrate standing increases over the course of

litigation."  <u>Cacchillo v. Insmed, Inc.</u>, 638 F.3d 401, 404 (2d Cir. 2011).  "When a preliminary

injunction is sought, a plaintiff's burden to demonstrate standing will normally be no less than

that required on a motion for summary judgment."  <u>Id.</u> (quotation marks omitted).  The movant

"'must set forth by affidavit or other evidence specific facts, which for purposes of the summary

judgment motion will be taken to be true.'"  <u>Do No Harm</u>, 126 F.4th at 119 (quoting <u>Lujan v.</u>

<u>Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).[9]

For the purposes of demonstrating "representational" standing to seek interim

injunctive relief,[10] the party must make an evidentiary showing that at least one associational

---

[9] At the pleading stage, by contrast, a plaintiff faces a lower burden to demonstrate standing and may in discovery "identify its allegedly injured member or members by name, and those members could provide more detailed information to establish [injury] in a more particularized way . . . ."  <u>Do No Harm</u>, 126 F.4th at 122; <u>see also</u> <u>Faculty,</u> <u>Alumni, and Students Opposed to Racial Preferences v. New York University</u>, 11 F.4th 68, 75-76 (2d Cir. 2021) ("[E]ven if [plaintiff] is not required to 'name names,' standing pleadings 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, <u>i.e.</u>, with the manner and degree of evidence required at the successive stages of the litigation.'") (quoting <u>Lujan</u>, 504 U.S. at 561).
[10] As will be demonstrated, the standard for a section 705 stay, as is sought here, is at least as stringent as the standard for a preliminary injunction.

member has standing to sue in his or her own right.  Do No Harm, 126 F.4th at 117-18.  The

association must "identify members who have suffered the requisite harm."  Summers, 555 U.S.

at 499.  "To establish individual standing, a plaintiff must show: (1) they suffered an injury in

fact that is (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural

or hypothetical; (2) there is a 'causal connection between the injury and the conduct complained

of'; and (3) it is 'likely, as opposed to merely speculative, that the injury will be redressed by a

favorable decision.'"  Do No Harm, 126 F.4th at 118 (quoting Lujan, 504 U.S. at 560-61 (setting

forth requirements of Article III standing)).

On a motion for injunctive relief such as a section 705 stay, the association must

offer evidence sufficient to identify by name and nature of injury at least one member who has

suffered the requite harm.  Summers, 555 U.S. at 498.  A motion for interim injunctive relief is

properly denied where an association "fail[s] to identify any of its injured members by name."

Do No Harm, 126 F.4th at 116.  It is not enough to identify members as, for example, "Members

A and B . . . ."  Id. at 122.  In Summers, the Supreme Court stated that an affidavit submitted to

establish standing "would be insufficient because it did not name the individuals who were

harmed by" the challenged program.  555 U.S. at 498 (citing FW/PBS, Inc. v. Dallas, 493 U.S.

215, 235 (1990)).  "This requirement of naming the affected members has never been dispensed

with in light of statistical probabilities, but only where all the members of the organization are

affected by the challenged activity."  Id. at 498-99 (emphasis in original).

Here, the Declaration of Diana Konaté has described the claimed injuries of John

Doe 7, John Doe 8, Jane Doe 1 and Jane Doe 2 and her family, all of whom are identified as ACT

members.  (Konaté Decl. ¶¶ 16-43.)  None of the Does are identified by name or docket number

of proceeding and no declaration or affidavit has been submitted from an individual with

- 15 -

personal knowledge that describes their injuries attributable to the challenged policies. In the
case of John Doe 7, who was arrested in or about the location of the immigration proceeding, no
information is provided concerning the nature, circumstance or purported cause for the arrest.
Similarly, Beth Baltimore, deputy director of The Door's Legal Services Center, has described
the claimed injuries of John Does 1 through 6, none of whom is identified by name (Baltimore
Decl. ¶¶ 37-42), and none of whom has submitted a declaration or affidavits that describe
injuries attributable to the challenged policies.[11] Again no docket number or other identifying
information about any proceeding is set forth in any submission. In the case of John Doe 1, who
was arrested in or about the location of the immigration proceeding, no information is provided
concerning the nature, circumstance or purported cause for the arrest. "While it is certainly
possible—perhaps even likely—that one individual will meet all of [the standing] criteria, that
speculation does not suffice." Summers, 555 U.S. at 499.

Because no individual with personal knowledge of the facts has submitted a
declaration or affidavit identifying any affected member of ACT or The Door by name and case-
identifying information setting forth his or her injury in fact, neither plaintiff has made the
necessary showing to demonstrate "representational standing" on a motion for a section 705 stay.
The Court need not address the two other prongs for "representational" standing. See Do No
Harm, 126 F.4th at 117.

---

[11] Indeed, plaintiffs' only evidence of injury to individual members are the Jane and John Doe summaries contained
in the declarations of Konaté and Baltimore. (Sept. 2, Tr. at 29-30.)

B.  The Door Has Demonstrated "Organizational" Standing.

Separate from "representational" standing, an organization may have standing in

its own right if it can show "(i) an imminent 'injury in fact' to itself as an organization (rather

than to its members) that is 'distinct and palpable'; (ii) that its injury is 'fairly traceable' to

enforcement of the [challenged conduct]; and (iii) that a favorable decision would redress its

injuries."  Centro de la Comunidad, 868 F.3d at 109 (quoting Nnebe v. Daus, 644 F.3d 147, 156

(2d Cir. 2011)).

"[O]nly a 'perceptible impairment' of an organization's activities is necessary for

there to be an 'injury in fact'" through "some perceptible opportunity cost expended by" the

plaintiff.  Nnebe, 644 F.3d at 157 (quoting Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898,

905 (2d Cir. 1993)).  In Nnebe, a plaintiff organization brought a section 1983 challenge to a

regulation that automatically suspended yellow-cab drivers arrested on criminal charges.  See id.

at 150-55.  The district court concluded at summary judgment that the plaintiff had not come

forward with evidence sufficient to show that it suffered an injury in fact and dismissed for lack

of standing.  Id. at 153.  The Second Circuit reversed, observing that even "scant" evidence that

plaintiff diverted its resources to aid drivers in navigating the regulation was sufficient to

demonstrate an injury in fact.  Id. at 156-57.  "The deposition testimony of [plaintiff's] executive

director demonstrates that the [plaintiff] has expended resources to assist its members who face

summary suspension by providing initial counseling, explaining the suspension rules to drivers,

and assisting the drivers in obtaining attorneys."  Id. at 157.  "Even if only a few suspended

drivers are counseled by [plaintiff] in a year, there is some perceptible opportunity cost expended

by the [plaintiff], because the expenditure of resources that could be spent on other activities

'constitutes far more than simply a setback to [plaintiff's] abstract social interests.'"  Id. (quoting

Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982)).  It noted that plaintiff had not "manufactured" the litigation and was instead reallocating its own resources to assist members with proceedings initiated by another party.  Id. at 157-58.  "And if [plaintiff's] suit proves successful, it will have secured a permanent benefit for itself, avoiding the need for further lawsuits on the claims presented here . . . ."  Id. at 158.

Centro de la Comunidad Hispana affirmed a ruling on summary judgment that a plaintiff membership organization had standing based on the diversion of its resources in response to a local ordinance.  868 F.3d at 110-11.  The plaintiff was an incorporated membership organization with a mission statement focused on "the full political, economic and cultural participation" of Latino immigrant workers in their Long Island communities.  Id. 109. It brought a claim under 42 U.S.C. § 1983 that challenged a town ordinance barring the solicitation of employment in a public right of way.  Id. at 107-08.  The plaintiff "offered unrebutted testimony that it has already had to devote attention, time, and personnel to prepare its response to the Ordinance.  And, where an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing."  Id. at 110-11 (internal citation omitted).  Plaintiff also demonstrated that the ordinance's effect of dispersing day laborers would "inevitably" cause plaintiff "difficulty in meeting with and organizing those laborers," thus impeding plaintiff's ability to carry out its normal activities.  Id. at 110.

Other Second Circuit decisions have upheld organizational standing based on a similar diversion of resources caused by a challenged rule or conduct.  See, e.g., Moya v. United States Dep't of Homeland Sec., 975 F.3d 120, 129-30 (2d Cir. 2020) (organization adequately alleged standing where its sole DOJ-accredited representative was required to spend "twice as

much time servicing" clients due to a regulation, "leaving less time for [plaintiff's] other

clients"); New York State Citizens' Coalition for Children v. Poole, 922 F.3d 69, 75 (2d Cir.

2019) (plaintiff adequately alleged organizational standing based on state conduct that "cost it

hundreds of hours in the form of phone calls from aggrieved foster families").

   The Door has adequately demonstrated injury in fact based on the diversion of

resources caused by the challenged policies.  As noted, The Door provides an array of services to

low-income youth in Manhattan and the Bronx.  (Baltimore Decl. ¶ 4.)  It specializes in working

with young people who lack housing.  (Id.)  Its work includes supporting young people who are

not citizens and seek immigration relief.  (Id. ¶ 16.)  The "core work" of its Legal Services

Center is full-scope representation of The Door's members.  (Id. ¶ 20.)  The Door also holds a

weekly drop-in legal clinic for members who live in shelters or are unstably housed.  (Id. ¶ 21.)

   The Door has described how the challenged policies have diverted it from

carrying out its core work.  (Id. ¶¶ 24-34.)  Since May 2025, the volume of members seeking

legal advice at The Door's drop-in clinics has required expanded hours in order to advise

members in advance of upcoming court appointments.  (Id. ¶ 25.)  As a result, The Door's staff

has been diverted from the core work of providing full-scope representation of members.  (Id.)

The nature of services provided has also expanded to more time-consuming and intensive

activities, including "panicked" calls and requests for assistance.  (Id. ¶ 26.)  The Door has

developed new "know-your-rights materials" and has devoted time and resources to screening

members as to their vulnerability for courthouse arrest or dismissal.  (Id. ¶ 28.)  It has assisted

members with drafting motions to appear remotely.  (Id. ¶ 29.)  In addition, The Door staff have

filed members' pro se applications in person on the members' behalf in order to minimize their

risk of detention.  (Id.)  Legal staff have advised members about the details of the new policies

and the risks related to the dismissal of a removal proceeding.  (<u>Id.</u> ¶ 30.)  "The time required to undertake all of the above-mentioned projects—including filing motions in person on behalf of Door members, developing new [know-your-rights] resources, dealing with the increased volume of members seeking advice about how to respond to the government's new arrest and removal policies—all take Door staff away from working on their individual cases, the core work of the Legal Services Center staff that The Door was able to do before the government implemented the Courthouse Arrest and Dismissal Policies."  (<u>Id.</u> ¶ 31.)

  The Door has come forward with facts in the Baltimore Declaration that describe how the challenged policies have caused a significant diversion of resources from the core work of its Legal Services Center.  The declaration has adequately described how the challenged policies caused this diversion and how a favorable decision would redress its injuries.  <u>See</u> <u>Nnebe</u>, 644 F.3d at 157.

  ACT, however, has not made such a showing.  ACT broadly refers to providing "a variety of free services to its members, including immigration legal services . . . ." (Konaté Decl. ¶ 11) but it does not describe a diversion of resources caused by the challenged policies.

  The Court therefore concludes that for the purpose of pursuing a stay, The Door has demonstrated its standing to proceed with the claims, but that ACT has not.  Going forward in this opinion, the Court will refer to the plaintiff singularly as The Door.

STANDARD FOR A STAY UNDER SECTION 705

> The relief sought by The Door in this action is a stay under section 705 of the

APA.  The statute provides as follows:

> When an agency finds that justice so requires, it may postpone the
> effective date of action taken by it, pending judicial review.  On such
> conditions as may be required and to the extent necessary to prevent
> irreparable injury, the reviewing court . . . may issue all necessary
> and appropriate process to postpone the effective date of an agency
> action or to preserve status or rights pending conclusion of the
> review proceedings.

5 U.S.C. § 705.

> To obtain a stay pending judicial review of a final administrative action, the

moving party must show that it (1) "is likely to prevail on the merits"; (2) "without a stay it will

suffer irreparable injury"; (3) "there is no substantial harm to other interested persons"; and (4)

"the public interest will not be harmed." Eastern Air Lines v. Civil Aeronautics Board, 261 F.2d

830, 830 (2d Cir. 1958) (citing Virginia Petroleum Jobbers Assoc. v. Federal Power Comm'n,

259 F.2d 921, 925 (D.C. Cir. 1958)).  Judge Liman has observed that the standard under section

705 is "the same as or similar to the standard for a preliminary injunction."[12]  Rural & Migrant

Ministry v. United States Environmental Protection Aency, 565 F. Supp. 3d 578, 595 (S.D.N.Y.

2020); see also The State of Colorado v. Environmental Protection Agency, 989 F.3d 874, 883

(10th Cir. 2021) (preliminary injunction "factors . . . determine when a court should grant a stay

of agency action under section 705 of the APA") (citation omitted); Cook County, Illinois v.

Wolf, 962 F.3d 208, 221 (7th Cir. 2020) (same).  In an action challenging agency action, the third

prong (no substantial harm to others) and fourth prong (no harm to the public interest) merge.

Nken v. Holder, 556 U.S. 418, 435 (2009).

---

[12] However, unlike a preliminary injunction under Rule 65(c), Fed. R. Civ. P., the parties agree that security is not
required for the Court to grant a stay.  (Sept. 2, Tr. at 46-47.)

Generally, "'a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" Daileader v. Certain Underwriters at Lloyds London Syndicate 1861, 96 F.4th 351, 356 (2d Cir. 2024) (quoting JTH Tax, LLC v. Agnant, 62 F.4th 658, 667 (2d Cir. 2023)). "Where, as here, the government is a party to the suit, the final two factors merge." New York v. U.S. Department of Homeland Security, 969 F.3d 42, 58-59 (2d Cir. 2020). Moreover, "'[w]hen, as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.'" Sussman v. Crawford, 488 F.3d 136, 140 (2d Cir. 2007) (quoting Wright v. Giuliani, 230 F.3d 543, 547 (2d Cir. 2000)). "That is, plaintiffs 'must establish a clear or substantial likelihood of success on the merits.'" Id. (quoting Tunick v. Safir, 209 F.3d 67, 70 (2d Cir. 2000)).

As a threshold matter, defendants' argument that the Court cannot enter a section 705 stay after an agency action has already taken effect does not have merit. Courts have routinely, and quite recently, rejected the same argument. See, e.g., Haitian Evangelical Clergy Association v. Trump, 25-cv-1464 (BMC), 2025 WL 1808743, at *10 (E.D.N.Y. July 1, 2025); Cabrera v. U.S. Department of Labor, 25-cv-1909 (DLF), 2025 WL 2092026, at *8 (D.D.C. July 25, 2025); Kingdom v. Trump, 1:25-cv-691 (RCL), 2025 WL 1568238, at *5 (D.D.C. June 3, 2025); Coalition for Humane Immigrant Rights v. Noem, 25-cv-872 (JMC), 2025 WL 2192986, at *15 (D.D.C. Aug. 1, 2025); Immigrant Defenders Law Center v. Noem, 781 F. Supp. 3d 1011, 1042-43 (C.D. Cal. 2025); Texas v. Biden, 646 F. Supp. 3d 753, 769-71 (N.D. Tex. 2022).

In essence, defendants contend that because section 705's use of the term "postpone the effective date" as it relates to agencies' own stays of their agency actions has been interpreted to prohibit agencies from "suspend[ing] a rule that has already taken effect," courts are subject to the same restriction.  <u>Natural Resources Defense Council v. U.S. Department of Energy</u>, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019) (Sweet, J.). "[A]uthorizing an agency to stay an already-taken action would allow the agency to evade notice-and-comment requirements." <u>Immigrant Defenders Law Center</u>, 781 F. Supp. 3d at 1042.  "[T]hat reasoning plainly does not apply to courts." <u>Cabrera</u>, 2025 WL 2092026, at *8.  The language in section 705 as applied to a reviewing court is "broader" in scope than the language applicable to an agency.  <u>Texas</u>, 646 F. Supp. 3d at 770.  It provides that "the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action <u>or to preserve status or rights</u> pending conclusion of the review proceedings."  5 U.S.C. § 705 (emphasis added).

Defendants also contend that an order staying a policy after it is already in effect would alter rather than maintain the status quo.  But this argument also lacks merit because in the context of a preliminary injunction "the 'status quo' is really the 'status quo *ante*'– that is, the last actual, peaceable, uncontested status which preceded the pending controversy." <u>Daileader</u>, 96 F.4th at 356 (internal quotation marks and brackets omitted).  This common sense interpretation applies with equal force to a section 705 stay application.[13]  The "status quo" in this case is therefore ICE's exercise of its arrest authority around immigration courthouses prior to its January 21 and May 27 memoranda and the standards governing motions to dismiss removal petitions prior to the May 30 email.  "In other words, 'the relief sought here would simply suspend *administrative* alteration of [that] *status quo.*'" <u>Texas</u>, 646 F. Supp. 3d at 771

---

[13] If section 705 were interpreted otherwise, the instant a policy is promulgated, it would be too late to seek the stay of that policy.

(quoting <u>Wages and White Lion Investments, L.L.C. v. U.S. Food and Drug Administration</u>, 16 F.4th 1130, 1144 (5th Cir. 2021)).

Plaintiff's underlying claims are for judicial review under section 704 of the APA of the actions of the DOJ defendants in adopting the May 30, 2025 guidance (referred to by plaintiff as the "EOIR Dismissal Policy") and the January and May 2025 memoranda of the Acting Director of ICE regarding arrests in or around courthouses (referred to by plaintiff as the "ICE Courthouse Arrest Policy").  Plaintiff challenges the policies as arbitrary and capricious, in excess of the agencies' authority and, in the case of the May 30, 2025 EOIR Dismissal Policy, violative of due process of law.  Plaintiff also claims that obedience to the EOIR Dismissal Policy would violate the <u>Accardi</u> doctrine that generally requires agencies to follow their own regulations.  <u>United States ex rel. Accardi v. Shaughnessy</u>, 347 U.S. 260 (1954).

Judicial review under the APA "is limited to (1) final agency action (2) not committed to agency discretion by law (3) where Congress has not implicitly or explicitly precluded judicial review."  <u>Larson v. United States</u>, 888 F.3d 578, 587 (2d Cir. 2018) (citing <u>Sharkey v. Quarantillo</u>, 541 F.3d 75, 87 (2d Cir. 2008)).  Plaintiff could only have a probability of success in seeking review if these requirements are satisfied.

The Court considers whether the ICE Courthouse Arrest Policy and the EOIR Dismissal Email constitute "final agency action" reviewable under the APA.  5 U.S.C. § 704 ("[F]inal agency action for which there is no other adequate remedy in a court are subject to judicial review.").  "There is a strong presumption favoring judicial review of administrative action."  <u>Salazar v. King</u>, 822 F.3d 61, 75 (2d Cir. 2016) (citing <u>Mach Mining, LLC v. E.E.O.C.</u>, 575 U.S. 480, 487 (2015)).  "Any person adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof, as long as the action is a final agency action for which there is

no other adequate remedy in a court."  Heckler v. Chaney, 470 U.S. 821, 828 (1985) (internal quotation marks omitted).

Defendants argue that the ICE Courthouse Arrest Policies and the EOIR Dismissal Policy are unreviewable because they fall within the APA's exception to judicial review for "agency action . . . committed to agency discretion by law."  5 U.S.C. § 701(a)(2). This exception applies only where "a court would have no meaningful standard against which to judge the agency's exercise of discretion" such as where the statute granting the agency authority "can be taken to have 'committed' the decision[-]making to the agency's judgment absolutely." Heckler, 470 U.S. at 830.  The Court, therefore, considers "whether the statutes and regulations at issue in this case 'are drawn in such broad terms that there is no law to apply.'"  Salazar, 822 F.3d at 76 (quoting Westchester v. U.S. Dept. of Housing and Urban Development, 778 F.3d 412, 419 (2d Cir. 2015)).  To determine whether there are "judicially manageable standards" for judging an agency's exercise of discretion, courts look to "the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action."  Id.

> A. The Door Has Established the Likelihood of Success
>    on the Merits and the Other Required Elements
>    Necessary for a Stay of the EOIR Dismissal Policy.

On May 30, 2025, an email was sent to all Assistant Chief Immigration Judges signed by two Acting Regional Deputy Chief Immigration Judges with the subject line "Guidance on Case Adjudication."  (Belsher Decl. Ex. 12.)  The first numbered paragraph of the guidance advised Immigration Judges that "[o]ral decisions must be completed within the same hearing slot on the day testimony and argument are concluded."  (Id. ¶ 1.)  If an oral decision is not rendered that day, the case may not be reset for an oral decision and a written decision must be issued.  (Id.)  The second numbered paragraph advised that "DHS Motions to Dismiss may be

made orally and decided from the bench.  No additional documentation or briefing is required."

(Id. ¶ 2.)  It also states that,

> The Motion to Dismiss is regulatory based on INA 239.2(a)(6)
> ([Notice to Appear] improvidently issued)[14] or INA 239.2(a)(7)
> (circumstances have changed to such an extent that continuation is
> no longer in the best interest of the government).  Generally, if the
> DHS has met the regulatory burden, the oral motion to dismiss may
> be granted.  A 10-day response period is not required.

(Id.)  The third numbered paragraph referred to and attached a DHS Policy Memo on "actions at

or near EOIR facilities," asking that Immigration Judges be informed of the May 27 ICE

Courthouse Arrest Policy and that any "unusual circumstance with an enforcement action"

should be discussed with a Regional Chief Immigration Judge.  (Id. ¶ 3.)

Plaintiff asserts that there is a contradiction between the challenged policy and

existing law.  It argues that the policy permits dismissals when there has been a change in

circumstance, such as a change in conditions faced by DHS, but the controlling regulation only

permits a dismissal based upon a change of circumstance of the case.

The Court agrees that the EOIR Policy on Dismissals instructs Immigration

Judges that a case may be dismissed if "circumstances have changed to such an extent that

continuation is no longer in the best interest of the government."  (Belsher Decl. Ex. 12 ¶ 2.)

When combined with the statement in the preamble to the Policy that "EOIR has experienced

significant changes in its caseload.  EOIR's detained caseload has greatly increased in the past

few months . . . ," it communicates to the Immigration Judge that the significant change in

---

[14] The concept of a an "improvidently issued" notice to appear implies that DHS has an articulable reason why the notice should not have been issued.  Once the Immigration Judge assumes jurisdiction over the removal, the proceeding may not be unilaterally terminated by DHS and requires the judge's assessment of the bona fides of the motion.  See, e.g., Gilkes v. Attorney General, 617 F. App'x 168, 172 (3d Cir. 2015) ("The first [Notice to Appear] was dismissed without prejudice by the [Immigration Judge] after it was determined to be 'improvidently issued' because it incorrectly identified Gilkes as being in the United States without legal status.").

caseload is a change that could support dismissal.  (Id.)  The preamble also cites as a changed circumstance that "[t]here have also been several developments with non-detained cases in the past few weeks.  DHS is carrying out enforcement actions in or near EOIR space."  (Id.)

In this respect, the EOIR Dismissal Policy is in conflict with the regulation that permits a dismissal when the "[c]ircumstances of the case have changed . . . to such an extent that continuation is no longer in the best interest of the government."  8 C.F.R. § 239.2(a)(7) (emphasis added).  Neither the increase in the detained caseload nor the implementation of the ICE Courthouse Arrests Policies represent a change in the circumstances of a case.  A change of circumstances of a case is a new fact or condition that is specific to the case at hand, e.g., vacatur of a conviction, a pardon, a change in marital status, or a change in country conditions if a defensive asylum is sought.  (See Burr Decl. ¶ 20 (ECF 23-2).)  This contradiction alone renders the EOIR Policy on Dismissals contrary to law.  5 U.S.C. § 706(2)(A) (the court shall set aside agency action found to be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law").

Plaintiff also urges that the EOIR Dismissal Policy overrides an Immigration Judge's discretion in certain matters.  The May 30 email instructs that "DHS Motions to Dismiss may be made orally and decided from the bench.  No additional documentation or briefing is required."  (Belsher Decl. Ex. 12 ¶ 2; Burr Decl. Ex. A.)  The email further notes, "[g]enerally, if DHS has met the regulatory burden, the oral motion to dismiss may be granted.  A 10-day response period is not required."  (Id.)  Whether to permit an oral motion without written submissions, whether to refrain from requiring a written response and whether to issue a ruling orally or in writing are discretionary acts entrusted to the sound discretion of an Immigration Judge.  The May 30 email does not expressly state that it is overriding the discretion of an

Immigration Judge but, at the section 705 stay stage, plaintiff has shown that the guidance may be fairly read to counsel the Immigration Judge to exercise his or her discretion to waive the necessity of a written motion by DHS and grant on-the-spot oral dismissals without permitting a response from the respondent because of the exigencies of higher caseloads in detained cases. "If the word 'discretion' means anything in a statutory or administrative grant of power, it means that the recipient must exercise his authority according to his own understanding and conscience." Accardi, 347 U.S. at 266-67. The regulation gives discretion to Immigration Judges and that discretionary authority cannot be restricted at the direction of the Acting Chief Immigration Judge or his or her designee. 8 C.F.R. § 1003.9(c) ("The Chief Immigration Judge shall have no authority to direct the result of an adjudication assigned to another immigration judge . . . ."). Formal "guidance" from two Acting Regional Deputy Chief Immigration Judges to all Immigration Judges on how an Immigration Judge ought to exercise his or her discretion is "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Defendants do not defend the purported EOIR Dismissal Policy as an authentic and binding policy position. According to the Acting Director of EOIR, the May 30 email "has been mischaracterized as both an EOIR policy and a departure from EOIR regulations and practices. . . . [The author did] not have any authority to set or make EOIR or [Office of Chief Immigration Judge] policy and he would not have had such authority on May 30, 2025. Even if [he] had such authority, because the [May 30 email] was not published in the [Manual], it is not—and could not be—an operative EOIR policy." (Owen Decl. ¶ 13.)

The Acting Director observes that the email was "[a]t most . . . inartfully-drafted" and an attempt to be "helpful." (Id. ¶ 15.) Defendants note that the email was paraphrasing the applicable rules and not quoting them in a misleading fashion. But defendants' central argument

is that the email cannot and does not change any principles set forth in the governing regulations: "[m]ore fundamentally, the Case Adjudication Email [i.e., the May 30 email] does not alter the standard for an [Immigration Judge] ruling on motions to dismiss; [Immigration Judges] must continue to apply the regulation as written." (ECF 39 at 25-26.) On this point, all parties agree. But an erroneous guidance to Immigration Judges to depart from the text of an existing regulation is not saved because it is, indeed, erroneous and ought to be ignored.

Plaintiff is likely to prevail in demonstrating that the May 30 email is a final agency action. Two conditions must be satisfied for agency action to be final: (1) "the action must mark the 'consummation' of the agency's decision[-]making process—it must not be of a merely tentative or interlocutory nature" and (2) "the action must be one by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 178 (1997) (internal citations omitted). "The practical effect of the [agency's] action, not the informal packaging in which it was presented, is the determining factor in evaluating whether the [agency's] action was 'final.'" De La Mota v. U.S. Dep't of Education, 02 Civ. 4276 (LAP), 2003 WL 21919774, at *8 (S.D.N.Y. Aug. 12, 2003).

A guidance document that leads to legal consequences is final agency action. Id. ("[I]t is of no moment that the agency action here came in the form of an 'informal' email . . ." in evaluating whether an agency action is "final"). In Frozen Food Express v. U.S., 351 U.S. 40, 44 (1956), the Supreme Court held that although an Order by the Interstate Commerce Commission "'had no authority except to give notice of how the Commission interpreted' the relevant statute," the Order was immediately reviewable. U.S. Army Corps of Engineers v. Hawkes Co., Inc., 578 U.S. 590, 599-600 (2016) (citing Frozen Food, 351 U.S. at 44). Courts have found that the adoption of a policy that determines an agency's obligations, from which legal consequences

flow, is a final agency action.  See, e.g., New York v. Trump, 767 F. Supp. 3d 44, 78 (S.D.N.Y. 2025) (Vargas, J.) (concluding that an "engagement plan" to allow "agreed-upon levels of access" to Treasury Department systems was a concrete action that effected legal consequences); Venetian Casino Resort, LLC v. EEOC, 530 F.3d 925, 931 (D.C. Cir. 2008) ("Adopting a policy of permitting employees to disclose confidential information without notice is surely a 'consummation of the agency's decision-making process,' and 'one by which the submitter's rights and the agency's obligations have been determined.'").

The Court concludes that The Door has demonstrated a likelihood of irreparable harm in the absence of a stay. [15]  As noted above, The Door is a 501(c)(3) nonprofit that supports young people who are not United States citizens and seek immigration relief.  (Baltimore Decl. ¶ 16.)  Due to its members' fear of their proceedings being dismissed and facing expedited removal, The Door has devoted time to address members' requests for assistance, advise members about the details of the dismissal policy, assist members with drafting motions to appear remotely, file members' pro se applications in-person on the members' behalf, and screen members as to their vulnerability for courthouse dismissal.  (Baltimore Decl. ¶¶ 26, 28-30.)  The Door has detailed how the EOIR Dismissal Policy has diverted resources from its core work on individual cases.  (Id. ¶ 31.)

The Court further concludes that the balance of equities and public interest favors plaintiff.  See New York, 969 F.3d at 58-59 (concluding that when the government is a party, the final two factors for a preliminary injunction merge).  The public interest is served when the enforcement of a governmental policy found not likely to be in accordance with law is stayed.

---

[15] Because the Court has concluded that the EOIR Dismissal Policy is contrary to law, it need not address at the stay stage other challenges to the same policy, including under as an unexplained change in policy or violative of the Accardi doctrine.  5 U.S.C. § 706; Accardi, 347 U.S. at 268.

To protect The Door from injury, the Court will stay the EOIR Dismissal Policy pending full review in removal proceedings in the geographic area served by The Door, which is Manhattan and the Bronx.

### B.  The DHS Policy on Arrests in and Around Immigration Courthouses.

On May 27, 2025, the Acting Director of ICE, defendant Lyons, issued a guidance memorandum to all ICE employees on the subject of "Civil Immigration Enforcement Actions in or Near Courthouses."  (Belsher Decl. Ex. 4.)  The memorandum superseded interim guidance issued by the predecessor Acting Director on January 21, 2025.  (Id. Ex. 3.)  The guidance is not specific to immigration courthouses but has application to all courthouses.

The May 27 guidance states that "ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses when they have credible information that leads them to believe the targeted alien(s) is or will be present at a specific location." (Belsher Decl. Ex. 4.)  "[T]argeted aliens" are described to include "but not limited to:"

> • National security or public safety threats;
> • Specific aliens with criminal convictions;
> • Gang members;
> • Aliens who have been ordered removed from the United States but have failed to depart; and/or
> • Aliens who have re-entered the country illegally after being removed.
>
> Other aliens encountered during a civil immigration enforcement action in or near a courthouse, such as family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding, may be subject to civil immigration enforcement action on a case by-case basis considering the totality of the circumstances.

(Id. (footnote omitted).)

The guidance document makes it plain that other aliens encountered during a civil enforcement action, <u>e.g.</u>, an arrest, need not be a targeted alien and may also be subject to arrest "on a case-by-case basis considering the totality of the circumstances." (<u>Id.</u>) A note informs the reader that the case-by-case determination is made by "ICE officers and agents" who must act in accordance with law. (<u>Id.</u>)

The net effect is that a noncitizen who is subject to civil enforcement may be arrested at a courthouse because they either are (1) a targeted alien in either an enumerated or non-enumerated category; or (2) encountered in the course of a civil enforcement action and an ICE officer makes a determination to do so based on the totality of circumstances.

    1.   Plaintiff Has Not Shown a Probability of Success in
            Demonstrating the Existence of a Common-Law Privilege
            <u>Against Civil Arrests in or Near Courthouses.</u>

Plaintiff argues that when the INA was adopted in 1952 it incorporated a common law privilege against civil arrests in or near courthouses. (ECF 23 at 13.) The argument is not based upon the text of the statute but the premise that civil arrest was a common means of acquiring personal jurisdiction over a defendant and many jurisdictions developed a privilege against such arrests at or near courthouses. (<u>Id.</u> at 13-14.) This privilege, in its more modern iteration, evolved into a privilege against service of civil process when proceeding to or leaving from court. (<u>Id.</u> at 14-16.) The argument is that when Congress enacted the INA it did so with this privilege in the background of the legal landscape and, hence, it was incorporated into the statute <u>sub silencio</u>. <u>See</u> <u>United States v. Texas</u>, 507 U.S. 529, 534 (1993) ("[S]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-

established and familiar principles, except when a statutory purpose to the contrary is evident.")

(quoting Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783 (1952)). [16]

The Court is mindful that two distinguished colleagues have found the existence

of a common law privilege against arrests in and around New York state courthouses was

incorporated into the INA.  New York v. United States Immigration and Customs Enforcement,

466 F. Supp. 3d 439, 446 (S.D.N.Y. 2020) (Rakoff, J.) (concluding upon a grant of summary

judgment "that the INA incorporates the state common-law privilege against civil immigration

arrest for those present in New York state courthouses, or on courthouse grounds, or necessarily

traveling to or from court proceedings"), vacated and remanded sub nom., New York v. United

States Immigration and Customs Enforcement, 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28,

2023); Doe v. U.S. Immigration and Customs Enforcement, 490 F. Supp. 3d 672, 696 (S.D.N.Y.

2020) (Nathan, J.) (denying motion to dismiss).

As noted, the premise of the argument is that there was a longstanding common

law privilege against arrests in or around courthouses that existed when the INA was enacted in

1952.  "[S]tatutes which invade the common law are to be read with a presumption favoring the

retention of long-established and familiar principles . . . ."  Texas, 507 U.S. at 534 (citations

omitted); see also Pasquantino v. U.S., 544 U.S. 349, 360 (2005) (concluding that courts should

examine whether a statute derogates from the common law rule by examining the "state of the

common law as of . . . the year Congress enacted [the at-issue statute]").

But this line of reasoning does not account for the 2006 Amendment to add a

subdivision (e) to section 1229.  See 8 U.S.C. § 1229(e)(2)(B).  The provision mandates that

whenever a notice to appear is served "[a]t a courthouse" upon a person who is a battered person,

---

[16] United States v Texas applied the common law rule of prejudgment interests on debts applied to debts owed by states to the federal government.  507 U.S. at 539.

the alien must receive a written disclosure that, among other things, assures the person that no

information originating with the abuser will be used in the immigration proceedings.  Id.

Congress is presumed to know the law it is amending and if the INA had incorporated a privilege

against service of process at courthouses, it would not have blithely adopted a requirement that a

written disclosure accompany the service at a prohibited location, i.e., a courthouse.[17]

As support for a longstanding common law privilege, plaintiff cites to

Blackstone's Commentaries on the Laws of England that noted:

> Suitors, witnesses, and other persons, necessarily attending any
> courts of record upon business, are not to be arrested during their
> actual attendance, which includes their necessary coming and
> returning.  And no arrest can be made . . . in any place where the
> king's justices are actually sitting.

3 William Blackstone, Commentaries on the Laws of England 289 (1768).[18]  But none of the

sources cited by plaintiff show that the privilege applies to arrests by the sovereign, rather than

merely a protection in suits by private parties.

The Supreme Court has acknowledged a "general rule that witnesses, suitors, and

their attorneys, while in attendance in connection with the conduct of one suit, are immune from

service of process in another . . . ."  Lamb v. Schmitt, 285 U.S. 222, 225 (1932); see also Page

Co. v. MacDonald, 261 U.S. 446, 448 (1923) (concluding that witnesses coming from another

state or jurisdiction are exempt from service of process while in attendance at court and during a

"reasonable time" coming and going); Stewart v. Ramsey, 242 U.S. 128, 129 (1916) (same).

---

[17] The Court respectfully disagrees with the effort to distinguish section 1229(e) as an ineffective attempt to
abrogate the common law privilege.  See, e.g., New York, 466 F. Supp. 3d at 447 n.14.  This Court views
section 1229(e) differently as a legislative recognition that the INA never incorporated such a privilege.
[18] Person "voluntarily" entering the country to appear as a witness in a civil court proceeding was privileged from
arrest.  Walpole v. Alexander, (1782) 99 Eng. Rep. 530, 530-31.  This case neither addresses arrests in or near
courthouses nor arrests at the behest of a sovereign.  Plaintiff has cited other cases from England and Wales that
post-date the 1789 ratification of the Constitution.  Absent some indication that the cases bear on pre-ratification
law, they have no bearing on the issues in this case.

Lamb noted that "the privilege should not be enlarged beyond the reason upon which it is founded . . . ." Lamb, 285 U.S. at 225.

    As an example of a case declining to expand the privilege against service of process beyond its limited purpose, Lamb cited Netograph Mfg. Co. v. Scrugham, 197 N.Y. 377 (1910). 285 U.S. at 225. The New York Court of Appeals declined to extend a privilege against service of process to a person in the state attending a court proceeding under compulsory process, as distinguished from voluntary attendance. The individual claiming the privilege had been arrested for a crime while present in New York, was released on bail and returned to his home in Ohio. Netograph, 197 N.Y. at 378-79. Under compulsory process, he returned to New York for the criminal trial and after his acquittal, he planned to return to Ohio the next day. Id. at 379. Before he departed, he was served with process in an unrelated civil dispute. Id. The Court concluded that because he was required to come to New York under pain of revocation of bail and arrest, the policy behind the privilege—encouraging voluntary participation in judicial proceedings—was not fostered and the privilege did not extend to him. Id. at 380-81. Turning to civil arrest at or near an immigration courthouse, a respondent in a removal proceeding is required to attend a removal proceeding with the consequence of non-appearance being the grant of a final order of removal *in abstentia* enforceable by arrest. Such a respondent in a removal proceeding would not likely fall within the Netograph conception of the privilege. Of course, neither Lamb nor Netograph addressed the additional layer of complexity presented by a civil arrest initiated by the government.

    The importance of a rule governing immunity from service of process for persons present in a jurisdiction solely to attend judicial proceedings was diminished with the 1945 holding in International Shoe Co. v. Washington announcing the modern rule that a defendant

need only have "minimum contacts" with a foreign state to be sued there.  326 U.S. 310, 316

(1945).  Post-International Shoe, courts have not applied an immunity to service or arrest when

the defendant is subject to a state's long-arm statute.  Gardner v. United States, 246 F. Supp.

1014, 1014 (S.D.N.Y. 1965) (concluding that "[a] nondomiciliary who could be served outside

the state cannot claim immunity from service if he is served in New York, even if he is here

voluntarily and in the aid of justice" when New York's long-arm statute provided the basis for

exercising in personam jurisdiction); see also In Re Arthur Treacher's Franchisee Litigation, 92

F.R.D. 398, 405 (E.D. Pa. 1981) ("'If a person has committed an act or caused consequences

within a state that are sufficient to subject him to local jurisdiction and the state has enacted a

long-arm statute by which he can be served personally outside the state . . . little purpose is

served by giving him immunity from process while he is participating in some other litigation . . .

.'") (quoting 4 Wright & Miller, Federal Practice and Procedure: Civil § 1076 at 321) (West

1979)).

   Plaintiff has cited no authority preceding the 1952 enactment of the INA that there

was a common law privilege against courthouse arrests that was universal or uniform in its

contours.  The comments of New York's highest court in 1910 discussing the contours of a

privilege against service of process on a person attending judicial proceedings make the point:

> This question, based upon the undisputed facts of this record, is very
> narrow, but it relates to a subject which has for centuries engaged
> the attention of common-law courts under every conceivable variety
> of circumstances.  Volumes of opinions have been written in which
> one can find all sorts of conflicting decisions and almost any dictum
> that one may be looking for.

Netograph, 197 N.Y. at 379.

   The First Circuit has weighed in on the existence of a common law privilege

against courthouse arrest at the time of the enactment of the INA in Ryan v. U.S. Immigration

and Custom Enforcement, 974 F.3d 9 (1st Cir. 2020).  The Court reversed a district court's

finding of a probability of success on the merits on a challenge to a January 2018 ICE courthouse

arrest policy:

> In the case at hand, the plaintiffs have failed to demonstrate that they
> are likely to succeed in showing that the common law privilege
> against courthouse arrests clearly applied to civil immigration
> arrests.  First and foremost, the plaintiffs have not offered any pre-
> 1952 case law from an American court that directly addresses the
> applicability of the privilege either to civil immigration arrests or to
> fairly comparable forms of civil arrest, that is, civil arrests on behalf
> of a sovereign.  Nor (to the extent that they might be probative of
> how Congress would have viewed the common law in 1952) do we
> find direct guidance on this score in the English sources proffered
> by the parties.  None expressly states whether the privilege protected
> against arrests in some or all crown-initiated civil suits.  The same
> lack of clarity is characteristic of the literature: the plaintiffs do not
> identify a single treatise or article directly stating that the common
> law privilege extended to civil arrests on behalf of the sovereign.
>
> What skimpy authority there is tends to suggest that crown-initiated
> suits may well have been exempted from the operation of the
> privileges against arrest in court under English common law.

Ryan, 974 F.3d at 24.

Plaintiff has failed to demonstrate a probability of success in showing that a

common law privilege against arrests by the sovereign was incorporated into the INA upon

adoption.  The Court concludes that the 2006 adoption of section 1229(e) was not a

Congressional abrogation of the incorporated privilege but an acknowledgement that no such

privilege was ever incorporated into the statute.  Thus, there is no need to address whether

section 1229(e) or any other provision of the INA reflects Congress' clear and manifest purpose

to preempt state common law.

2.  Plaintiff Has Not Shown a Probability of Success
in Showing that the ICE Courthouse Arrest Policy
<u>Is Not Arbitrary or Capricious.</u>

Plaintiff also argues that the 2025 ICE Courthouse Arrest Policies are arbitrary

and capricious.  The APA authorizes courts to set aside agency action if found to be "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §

706(2)(A).  This is a "narrow" review that ensures that the agency "examine[d] the relevant data

and articulate[d] a satisfactory explanation for its action."  <u>Motor Vehicle Manufacturers Assoc.</u>

<u>of the United States, Inc. v. State Farm Mutual Auto Insur. Co.</u>, 463 U.S. 29, 43 (1983).  The

Supreme Court has held that an agency must be permitted "consistently with the obligations of

due process, to adapt their rules and policies to the demands of changing circumstances."  <u>In re</u>

<u>Permian Basin Area Rate Cases</u>, 390 U.S. 747, 784 (1968).  But an agency "changing its course"

is "obligated to supply a reasoned analysis for the change."  <u>Motor Vehicle</u>, 463 U.S. at 42.

The agency need not always provide a detailed justification but at least must

acknowledge that it is changing position and "show that there are good reasons for the new

policy."  <u>Encino Motorcars, LLC v. Navarro</u>, 579 U.S. 211, 221 (2016).  Further justification is

not demanded by the mere existence of a policy change.  <u>F.C.C. v. Fox Television Stations</u>, 556

U.S. 502, 515-16 (2009).  But rather, "when [an agency's] new policy rests upon factual findings

that contradict those which underlay its prior policy . . . a reasoned explanation is needed for

disregarding facts and circumstances that underlay or were engendered by the prior policy."

<u>Id.</u> [19]  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on

factors which Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to the evidence

---

[19] Neither the April 2021 policy nor the 2025 policies rested upon fact finding and no reasoned explanation for disregarding prior fact finding was necessary.

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle, 463 U.S. at 43.

As part of their response, defendants argue that the ICE Courthouse Arrest Policies are unreviewable because section 1226(e) of the INA "preclude[s] judicial review." 5 U.S.C. § 701(a)(1). Section 1226(e) provides that immigration authorities' "discretionary judgment regarding the application of [section 1226] will not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole." 8 U.S.C. § 1226(e). However, section 1226(e) only limits review of individual custody determinations, not challenges to the government's custody determination policies. See Jennings v. Rodriguez, 583 U.S. 281, 295 (2018) ("§ 1226(e) precludes an alien from 'challenging . . . a decision that the Attorney General has made regarding his detention or release' . . . [b]ut § 1226(e) does not preclude 'challenges to the statutory framework that permits the alien's detention without bail.'") (citations omitted). Plaintiff's challenge to the policies is not a challenge to any individual exercise of discretion and is not beyond the scope of judicial review.

The Court now turns to the history of courthouse arrest policies as background to the 2025 policies that are challenged by plaintiff. The record includes a memorandum from the Chief Immigration Judge to all Immigration Judges, dated September 30, 1996, informing them of a memorandum of understanding with the Immigration and Naturalization Service ("INS") that some limited arrests could and would be initiated near, but not in, an Immigration Judge's courtroom. (Operation Policy and Procedure Memorandum No 96-6: Arrests by INS Officers In or Near Immigration Court Facilities; ECF 23-2 at 16.) The circumstance addressed was a "newly-instituted policy of arresting individuals denied relief at the conclusion of the individual

calendar hearing . . . ."  (<u>Id.</u>)  The policy provided that there would be "no arrests in the

courtroom, absent exigent circumstances" but "may require arresting . . . aliens [with final orders

of removal] in close proximity to our courtrooms."  (<u>Id.</u>)

A March 19, 2014 memorandum on "Enforcement Actions in or Near

Courthouses" issued by the Assistant Director for Field Operations at ICE to Field

Office Directors and Deputy Field Office Directors, restricted arrests in or near courthouses of

any kind to Priority 1 aliens, including those convicted of crimes, those subject to outstanding

criminal warrants and those who otherwise pose a serious risk to public safety.  (Oestericher

Decl. Ex. A (ECF 41-1).)  The memorandum was revised in January 26, 2015 (Guidance Update:

"Enforcement Actions in or Near Courthouses") but continued to allow arrests at courthouses of

aliens convicted of most felonies or crimes involving active gang membership.  (<u>Id.</u> Ex. B (ECF

41-2).)  Restrictions were continued from the 2014 memorandum on arresting persons other than

the "targeted alien," such as family and friends of the "targeted alien."

A January 10, 2018 directive during the first administration of President Trump

expanded the scope of potential courthouse arrests to "include actions against specific, targeted

aliens with criminal convictions, gang members, national security or public safety threats, aliens

who have been ordered removed from the United States but have failed to depart, and aliens who

have re-entered the country illegally after being removed . . . ."  (Fleischaker Decl. ¶ 7 (ECF 23-

6).)

The last guidance memorandum on courthouse arrests before the January 20, 2025

change of administrations was the April 27, 2021 guidance memorandum that revoked the

January 10, 2018 directive and severely restricted courthouse arrests while allowing them in

certain instances:

> A civil immigration enforcement action may be taken in or near a courthouse if (1) it involves a national security threat, or (2) there is an imminent risk of death, violence, or physical harm to any person, or (3) it involves hot pursuit of an individual who poses a threat to public safety, or (4) there is an imminent risk of destruction of evidence material to a criminal case.

(Belsher Decl. Ex. 1; footnotes omitted.)

The April 2021 policy also provided that "in the absence of hot pursuit, a civil immigration enforcement action also may be taken in or near a courthouse against an individual who poses a threat to public safety if: (1) it is necessary to take the action in or near the courthouse because a safe alternative location for such action does not exist or would be too difficult to achieve the enforcement action at such a location, and (2) the action has been approved in advance by a [designated supervisor]."  (Id.)[20]

The January 2025 interim guidance document—the first of the two ICE Courthouse Arrest Policies challenged in this action—expressly acknowledged the previous policy that it was changing.  (Belsher Decl. Ex. 3) ("[T]he April 27, 2021, Civil Immigration Enforcement Actions in or near Courthouses memorandum from Acting ICE Director Tae Johnson and Acting U.S. Customs and Border Protection Commissioner Troy Miller is now rescinded for ICE and is superseded by this interim guidance.")

It set forth the basis for the change succinctly, as is common with its predecessor guidance documents.  As its first basis for expansion of the circumstances when arrests were permissible at a courthouse, it stated: "Individuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband.  Accordingly, when ICE

_____

[20] The 1996 guidance (ECF 23-2 at 16) was also updated on December 11, 2023.  (Id. at 12.)  In the 2023 guidance, the Chief Immigration Judge informed all Immigration Judges of the categories of arrests permitted in the April 2021 policy.  (Id. at 13.)  It noted that permissible arrests in "exigent circumstances" "in or near" space where immigration courts conduct business included "instances in which a safe alternative location for the enforcement action does not exist."  (Id. at 13-14.)

engages in civil immigration enforcement actions in or near courthouses it can reduce safety risks to the public, targeted alien(s), and ICE officers and agents." (Id.) The prior April 27, 2021 policy noted took a similar approach: "a civil immigration enforcement action also may be taken in or near a courthouse against an individual who poses a threat to public safety if: (1) it is necessary to take the action in or near the courthouse because a safe alternative location for such action does not exist or would be too difficult to achieve the enforcement action at such a location, and (2) the action has been approved in advance by a [designated supervisor]." (Belsher Decl. Ex. 1.) The new policy removed the burden of an ICE official including in his analysis the possibility that there was a different, safe alternative location. The prior April 2021 policy did not give examples of safe alternatives. The new policy deemed the security screening required to enter a courthouse made it a readily available safe location. Neither policy proffered statistics on the number of targeted persons arrested at locations other than a courthouse who were found to be carrying weapons, and no such proffer was required.

The second reason proffered was that "enforcement activities in or near courthouses are often required when jurisdictions refuse to cooperate with ICE, including when such jurisdictions refuse to honor immigration detainers and transfer aliens directly to ICE custody." (Belsher Decl. Ex. 3.) The use of the word "required" is hyperbole, in that some enforcement activities could undoubtedly occur if no courthouse arrests were permitted. But the point remains valid. An immigration detainer lodged with a state or local correctional official that directs or requests that ICE be notified of the time and place of a prisoner's release so that he may be taken into custody by ICE, if honored, (1) reduces the risk of harm to ICE agents because

the individual is assuredly unarmed, and (2) reduces the resources necessary to locate the targeted individual if he, instead, were released into the community.[21]

The January 2025 policy was interim guidance, and it was followed by the May 27, 2025 final guidance document.  The principal difference between the January and May guidance is that the May guidance dispensed with the need to comply with state and local law restrictions and the need to consult regarding those restrictions.

The January and May 2025 policies are more expansive in the categories of individuals who may be arrested but are directed to individuals who are targeted in advance: "ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses when they have credible information that leads them to believe the targeted alien(s) is or will be present at a specific location."  (Belsher Decl. Ex. 3, 4.)  The 2025 policies do allow actions against individuals other than "targeted aliens" but on a "case-by-case basis considering the totality of circumstances."  (Id.)

The 2025 policies cautioned ICE agents that they needed to act "discreetly" because they were operating in or about a functioning courthouse: "civil immigration enforcement actions in or near courthouses should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits.  When practicable, ICE

---

[21] According to New York's Attorney General's "Guidance concerning local authorities' participation in immigration enforcement and model provisions," information about the date and location of an inmate's release or his or her home address is not generally to be shared with immigration authorities without a judicial warrant. (https://ag.ny.gov/police-departments-law-enforcement/immigration-enforcement#local-authority) (last accessed September 10, 2025.)  Other restrictions are placed on immigration detainers.  "This guidance recommends that, unless presented with a judicial warrant, [state law enforcement agencies] should not provide sensitive information that is not generally available to the public, such as information about an individual's release details or home address."  (Id.); see also N.Y.C. Administrative Code §§ 9-131, 9-205, 14-154 (on handling of detainers).

officers and agents will conduct civil immigration enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings."  (Id.)

Plaintiff urges that the January and May 2025 Courthouse arrest policies are arbitrary and capricious under the "change of position" doctrine.  When an agency changes a policy position, it must meet three requirements: "it suffices [(1)] that the new policy is permissible under the statute, [(2)] that there are good reasons for it, and [(3)] that the agency believes it to be better, which the conscious change of course adequately indicates."  Fox Television Stations, 556 U.S. at 515.  But, as shown above, there was neither a common law privilege against "courthouse" arrests by government officials in the INA nor other relevant restriction on the location of an arrest in the INA or its implementing regulations and thus the policy is permissible.  Second, the agency has stated grounds that are facially "good reasons" for the change, even though the sufficiency of those reasons may be hotly contested.  And, thirdly, the agency on the face of the January 2025 policy acknowledged the existence and rescinding of the prior policy, which is an implicit and sufficient statement of belief that the new policy is better.

Plaintiff argues that their members have a serious reliance interest in being able to attend immigration proceedings without fear of arrest.  Fox Television Stations, 556 U.S. at 516.  At the section 705 stay juncture, The Door's standing has been found on the injury in fact to it as an organization ("organizational" standing) and not in any "representational" capacity.  Plaintiff has not submitted an affidavit from an individual who claims to have a reliance interest in the 2021 guidance permitting some arrests and prohibiting others.  Do No Harm, 126 F.4th at 116.

The April 27, 2021 guidance observes that "enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair

administration of justice," but the 2021 policy also acknowledges that "[a]t the same time, there may be legitimate need to execute a civil enforcement action in or near a courthouse." (Belsher Decl. Ex. 1.) Read in context, the 2021 guidance balances the possible chilling effect against the need for courthouse arrests in all cases and concludes that some courthouse arrests are appropriate. The 2025 ICE Courthouse Arrest Policies did not abrogate these considerations but balanced them differently.[22]

Plaintiff has not shown at this stage that it is likely to prevail in demonstrating that the 2025 ICE Courthouse Arrest Policies are unexplained, arbitrary and capricious changes in agency policy. Both the 2021 guidance and 2025 guidance allowed arrests at or near an immigration court. The 2025 guidance was more expansive and permissive. The January 2025 interim guidance acknowledged the 2021 guidance and announced a new policy. The agency stated its reason that courthouses were safe places to effectuate arrests because of security screening. It also explained that an alternative safe place to make an arrest, a correctional facility or prison, was not available to it because of state and local policies regarding immigration detainers. Implicitly, the agency asserted its belief that its new policy was better.

On this record, plaintiff has failed to show a probability of success that the January and May ICE Courthouse Arrest Policies are arbitrary, capricious or otherwise not in accordance with law. Accordingly, the Court will deny plaintiff's motion for a stay of the ICE Courthouse Arrest Policies.

---

[22] The 2025 guidance directs ICE personnel "to avoid unnecessarily alarming the public or disrupting court operations" and "limit their time at courthouses while conducting civil immigration enforcement actions." (Belsher Decl. Ex 3, 4.)

CONCLUSION

On this motion, the Court has considered the submissions and arguments of the parties in their entireties, as well as the amicus curiae submissions of the State of New York and the City of New York.

Pursuant to section 705, the Court stays the EOIR Dismissal Policy in removal proceedings conducted in the geographic areas served by The Door, i.e., Manhattan and the Bronx, pending full review on the merits of all policies challenged in this action. To avoid doubt on the subject, this Order does not diminish or expand the discretion or authority accorded to Immigration Judges in the controlling statute and regulations regarding, among other matters, requiring or permitting oral motions, requiring or permitting responses to motions, deciding matters orally or in writing and the grounds for dismissal of a removal petition, except that the exercise of such discretion and authority is unrestrained by the EOIR Dismissal Policy. All other relief sought by any party is denied or denied without prejudice.

The Clerk of Court is respectfully directed to terminate the pending motion (ECF 22).

Within thirty (30) days of this Opinion and Order, the government shall file the administrative record, if any, on all challenged policies. The parties may move for summary judgment thirty (30) days after the administrative record is filed. The parties may file a response to the motion within thirty (30) days of the filing of the motion. The parties may file a reply within fourteen (14) days of the filing of the response. The motions are exempted from the Local Civil Rule 56.1 required statements.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
September 12, 2025