P92sAFRc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

AFRICAN COMMUNITIES TOGETHER, et al.,

              Plaintiffs,

        v.                            25 Civ. 6366 (PKC)

LYONS, et al.,

              Defendants.

-------------------------------x
                                      New York, N.Y.
                                      September 2, 2025
                                      3:30 p.m.

Before:

                   HON. P KEVIN CASTEL,

                                      District Judge

                        APPEARANCES

AMERICAN CIVIL LIBERTIES UNION
     Attorneys for Plaintiffs
BY:  AMY BELSHER
     MICHAEL T. TAN

NEW YORK CIVIL LIBERTIES UNION
     Attorneys for Plaintiffs
BY:  ROBERT A. HODGSON

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
TOMOKO ONOZAWA
JEFFREY S. OESTERICHER
     Assistant United States Attorneys

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

(Case called)

THE DEPUTY CLERK:  For the plaintiff.

MS. BELSHER:  Good afternoon, your Honor.

Amy Belsher from the New York Civil Liberties Union on behalf of the plaintiff.  I'm here with my co-counsel, Rob Hodgson, also from the New York Civil Liberties, and Michael Tan from the American Civil Liberties Union.

THE COURT:  All right.  Good afternoon.  Thank you for coming in on short notice.

Appearing for the defendants.

MS. ONOZAWA:  Tomoko Onozawa from the U.S. Attorney's Office for the Southern District of New York, and with me at counsel table is Jeffrey Oestericher.

THE COURT:  All right.  Good afternoon to you both. Again, thanks for being here on short notice.  I wouldn't have been shocked if I got a desperate plea to put this off a couple of days, but I appreciate your coming in to help me do my job.

So, the first thing I want to ask is, is there agreement that with regard to the motion for a preliminary injunction, the record is now closed?

MS. BELSHER:  Your Honor, the motion is actually for a stay.

THE COURT:  Stay, I'm sorry, Under Section 705 of the APA.  I know that.

MS. BELSHER:  That's correct, your Honor.

P92sAFRc

So, with respect to that motion, yes, I believe all parties have put in their evidence.

THE COURT:  OK.  And does the defendant, do the defendants agree with that?

MS. ONOZAWA:  Yes, your Honor.

THE COURT:  OK.  So the record is closed on the stay motion.

I have some fact questions that I'm going to ask, and then I'm going to give each side an opportunity to argue.  And I can't promise that I won't interrupt with questions, but if I do, I'll certainly give you an opportunity at the end to finish any thoughts or the like.

So, first of all, with regard to a removal proceeding, is it correct that once a removal proceeding is commenced, a noncitizen may not be removed until the proceeding is brought to conclusion?

In fact and in practice, it operates as a stay until the removal proceeding is concluded, is that accurate?

MR. OESTERICHER:  I believe that is accurate, your Honor.

THE COURT:  OK.  All right.  Any dispute with that?

MS. BELSHER:  None, your Honor.  That's also my understanding.

THE COURT:  OK.  Also, there are, as I understand it, two types of asylum applications.  There is an affirmative

application which is directed to the DHS and then there is a defensive application, which is raised in the context of a removal proceeding, something akin to an affirmative defense. And that the impact of a dismissed removal proceeding is the dismissal of a defensive asylum application that's raised in the context of the removal proceeding.

Is that correct?

MS. BELSHER:  That's correct, your Honor.

MR. OESTERICHER:  We agree, your Honor.

THE COURT:  OK.  And the next question, I don't know whether there will be agreement on, but I think it's John Doe No. 7 that's raised in the ACT evidence, the evidence put forth by African Communities Together.

John Doe No. 7, as I read it, was detained or is detained in Texas at an ICE facility, is that correct?

MS. BELSHER:  I believe he is still there, your Honor, yes.

THE COURT:  OK.  And John Doe No. 1, for the Door, what I read, if I understood it correctly, is that he was placed in a Nassau County Correctional Facility and then transferred to the Metropolitan Detention Center which, of course, is not an ICE facility.  Some would say it's also not a nice facility.  But it's a facility operated by the U.S. Bureau of Prisons, correct?

That's where he's located as far as you know?

MS. BELSHER:  As far as I'm aware, your Honor, that's where he is.

I do want to clarify that MDC recently expanded detention authority to ICE, so there are now people detained on behalf of ICE at that facility.  There have been issues around that, getting, you know, access to attorneys.  There has been an issue, for example --

THE COURT:  OK.

MS. BELSHER:  -- they are now formally detaining people.

THE COURT:  That's new information and important information that I wanted to know.  The next question I have, relates to that.

Do you know why John Doe 7 was arrested?

MS. BELSHER:  No, your Honor.

As with many of these courthouse arrests, the people who are being arrested are not given any explanation at the time of their arrest.  Often they are not even served with administrative warrants at the time of arrest.

So I do know that there are attorneys actively trying to seek his release.  But as far as I'm aware, we don't know the government's justification.

THE COURT:  And the same question will be asked as to John Doe No. 1, of the Door and the Door application.  He's the MDC guy.

MS. BELSHER:  Sure.  I believe this is somebody who was actually a high school student in New York City who was detained by ICE at his immigration court proceeding.  And, again, no reason was given.  This is somebody who has applied for immigration relief and those applications remained pending at the time that he was arrested.

THE COURT:  What was pending at the time he was arrested?

MS. BELSHER:  Sorry, your Honor.  So I believe that this person in particular, this high school student, had applied for immigration relief.  He had intended at least to seek asylum.  He filed a pro se asylum application and that was pending at the time of his arrest.

THE COURT:  That was a defensive application, is that correct?

MS. BELSHER:  You know, I'm not sure in what posture it was timely.  It may have been affirmative, but I'm not certain of that.

THE COURT:  If it was affirmative, then it would still remain pending.

MS. BELSHER:  I would have to go and check what we have in the record on that, your Honor.

THE COURT:  Sure.  Take a moment.  That's fine.

MS. BELSHER:  There is one other application for relief that this particular person had applied for, and that's

something called Special Immigrant Juvenile Status, SIJS for short, and that is with a different agency, with USCIS, with DHS.

But once somebody is detained and, of course, once they are removed, that becomes unavailable to them to pursue it by way of relief. By detaining this person, they have effectively cut off his ability to seek that relief.

THE COURT: Right. But if he filed an affirmative application with DHS rather than a defensive application in the context of the removal proceeding, the dismissal of the removal proceeding would have no impact on that application.

MS. BELSHER: The dismissal in and of itself, your Honor. But the detention, which is done in conjunction with these dismissals and the government's efforts to similarly remove people, which is why they are seeking these dismissals, prevent people who have pending applications for relief with other agencies, including USCIS, from actually obtaining that relief.

THE COURT: I don't know about that. I'm talking about asylum.

MS. BELSHER: Sure, your Honor. And because this --

THE COURT: So the question is, is it not correct that a dismissal of a removal proceeding, though it has the effect of dismissing a defensive asylum petition, it does not have the effect of dismissing an affirmative asylum petition, is that

correct?

MS. BELSHER:  I believe so, your Honor.

And to clarify, just looking now at the declaration, it appears that he did file for asylum within the court proceedings themselves.  So his application for asylum filed with immigration court would have been dismissed along with those proceedings.

THE COURT:  OK.  And if a person is placed in expedited removal proceedings, they have the right to file an affirmative asylum application with DHS, is that correct?

MS. BELSHER:  Not quite, your Honor.  When somebody is placed into expedited removal proceedings, they are given what's called a credible fear screening.

THE COURT:  Yes.

MS. BELSHER:  And then if there is a credible fear, and this is determined by ICE, then they are referred to USCIS. They are able to try to demonstrate that they have credible fear of return.

THE COURT:  Right.

MS. BELSHER:  But the difference, the key difference there is that if they are denied at the USCIS level, they get one chance at review of that denial before immigration court, and then that is the only type of review they are entitled to on that.

THE COURT:  This is if a credible fear determination

is made in their favor, then it's adjudicated by DHS, and there's one level of review then, is that what you're saying?

MS. BELSHER:  So if they are found to not have a credible fear --

THE COURT:  Oh, to not have a credible fear.

MS. BELSHER:  -- they are able to go before immigration court.  They don't have the same robust protections that they have in full removal proceedings in that process.

THE COURT:  I understand.

MS. BELSHER:  They don't have the right to present evidence, time to get counsel, or put on their full presentation in support.

So it's a very truncated process that, in our view, doesn't comply with due process if they are granted.

THE COURT:  Credible fear.

MS. BELSHER:  If they are found to have a credible fear, they are placed back into normal Section 244 removal proceedings.

THE COURT:  Can I take judicial notice that most credible fear determinations are in favor of the applicant?

MS. BELSHER:  I do not believe that is the case, your Honor.

THE COURT:  OK.

MS. BELSHER:  Especially in this administration.  I think that there's been --

P92sAFRc

We don't have those numbers.  The government is best situated to have them.  Perhaps this is better directed to them.

THE COURT:  OK.

MS. BELSHER:  That's not my understanding.

THE COURT:  OK.  All right.  And then who, if they are turned down on the credible fear determination, who then reviews it, or what is their review --

What is the review process open to the individual?

MS. BELSHER:  This is still in the context of expedited removal, your Honor?

THE COURT:  Yes.

MS. BELSHER:  So in expedited removal process, once somebody is determined not to have a credible fear by USCIS, then it is referred to an immigration judge, where they have an opportunity to have the judge review whether or not there was error in that determination.

THE COURT:  OK.

MS. BELSHER:  But, again, that is not a full asylum hearing.  It is not the same process that you would receive if you were in full removal proceedings and putting forward an asylum claim.

THE COURT:  It's an entirely different track.

MS. BELSHER:  That's correct.

THE COURT:  OK.  Does the expedited removal

P92sAFRc

proceeding -- and this may not have anything to do with this case. I'm not asking just for general information, I'm trying to get this clear in my mind. I'm looking at the regulations and it looks like expedited removal is for individuals in the country fewer than two years who did not enter through a port of entry or did not otherwise present themselves and were paroled into the country, people who were not so presented, not so paroled and in the country for fewer than two years.

They are the ones who would be sent to the expedited removal process, is that right?

MS. BELSHER: So the government recently expanded expedited removal to include people who have been here fewer than two years, within the interior of the country. Whereas in prior years, it had been applied only to people detained at the border.

THE COURT: Right.

MS. BELSHER: So yes, I think that is generally...

THE COURT: Where does overstaying a visa fit in?

Is that a circumstance that could trigger expedited removal, or is that you presented to a custom and border parole agent at the airport or port of entry and so it doesn't apply to you?

MS. BELSHER: I don't believe it would, just on the text.

THE COURT: Right.

P92sAFRc

MS. BELSHER:  I will note to your Honor's earlier point about how this all relates to the claims here, that the government's policies that we challenge here are not limited either on their face or in practice to people who are being subjected to expedited removal.  That is certainly a motivating factor behind all of this, the expansion of that method of removal for the government.  But it is not the only thing that is motivating and part of this case.

THE COURT:  Right.

Do immigration judges ever conduct a criminal proceeding?

MS. BELSHER:  Not to my knowledge, your Honor.

THE COURT:  And let me inquire of the defendant of that.

MR. OESTERICHER:  I don't believe so, your Honor.

THE COURT:  That would have to be before an Article III court or magistrate judge sitting in an Article III court.

MR. OESTERICHER:  Right, for federal charges.

THE COURT:  Yes, or equivalent state court mechanism.

All right.  And where is ACT located?

MS. BELSHER:  ACT has offices in three different states, and New York is one of them, DC is one of them, and the third I would have to refer to the declaration for.

THE COURT:  OK.  And how about the Door?

P92sAFRc

MS. BELSHER:  The Door is in New York City.

THE COURT:  OK.

MS. BELSHER:  But both organizations have thousands of members that span several states.

THE COURT:  Say what?

MS. BELSHER:  Both organizations have several, thousands of members that span several states.

And Pennsylvania, your Honor, is the third state where ACT has physical presence.

THE COURT:  Thank you.

All right.  So what I'm going to do at this point, I'm going to ask you, on behalf of the plaintiffs, to tell me --

I know your claims.  You have five claims for relief. I want to make sure I know what you're moving on with regard to the stay as to the EOIR, EOIR dismissal policy, and what grounds you're moving for a stay as to the ICE courthouse arrests policy.

MS. BELSHER:  Sure, your Honor.  And apologies for all of the acronyms.

THE COURT:  Yes.  Well, you don't have to apologize.

MS. BELSHER:  I'll spell out the names.

THE COURT:  Whoever gave that executive agency the nickname EOIR is the person who should be apologizing to someone.

Anyway, go ahead.

P92sAFRc

MS. BELSHER:  Sure.

So there are two separate policies challenged here that the plaintiffs seek a stay against.  First is the courthouse arrest policy.  And there, we are raising claims under --

THE COURT:  Just for injunction, not for your underlying complaint, yeah?

MS. BELSHER:  For a stay, yes, your Honor.

THE COURT:  For a stay, yes.

MS. BELSHER:  So the first, for the immigration courthouse arrest policy, is a claim that that policy is arbitrary and capricious.  And then separate and apart from that is a claim under the APA that it's contrary to law.  And that is our common law privilege claim is another way of thinking about that.

Then with respect to the EOIR dismissal policy, we have a claim also under the APA that is violates --

THE COURT:  Just one second.  Let me catch up as I'm writing here.

All right.  Go ahead.

MS. BELSHER:  So with respect to EOIR's dismissal policy, we have a claim that the policy violates the *Accardi* doctrine because it departs from agency guidance and regulation.

Separate and apart from the *Accardi* claim is a claim

P92sAFRc

that it violates the Administrative Procedure Act as arbitrary and capricious because it departs from agency guidance and regulation without good reason and without considering important aspects of the problem.

THE COURT:  This may be a matter of semantics, but we all in the legal world live in semantics sometimes, or terminology.

In this case, is there any difference between the third prong of the arbitrary capricious standard, which is arbitrary capricious or otherwise contrary to law, and the *Accardi* doctrine in this case?

MS. BELSHER:  Sure.

THE COURT:  Is there a difference between the two in application here?

MS. BELSHER:  I believe so, your Honor.

And we're talking here about the EOIR dismissal policy, is that correct?

THE COURT:  Yes.

MS. BELSHER:  Sure.

So there is the claim that the agency has disregarded its own regulation, has departed from that regulation.  That gives rise to claim of arbitary and capricious under the APA.  But then --

THE COURT:  Arbitrary capricious or otherwise contrary to law, and you would think you would be urging the otherwise

contrary to law point.

MS. BELSHER:  Yes, your Honor.  There are also cases, case law suggesting that an agency departure from its own guidance and regulation is arbitary and capricious, in addition to, perhaps, separate from being contrary to law.

THE COURT:  But that would be, for example, if it departed from guidance, memoranda, policy, something short of what you would call law.

But if it's contrary to a regulation -- I've read your briefs, you take the position that in one instance that, to the extent that it asserted that a ground for dismissal was that there was a change of circumstances, that that was contrary to law because the black letter regulation says change of circumstances in a case.

That would be the contrary to law part of it, correct?

MS. BELSHER:  That's correct, your Honor.

THE COURT:  What would be, with regard to the dismissal policy, what would be the non-contrary to law/*Accardi* portion of it?

MS. BELSHER:  So two other analytical frameworks for arbitrary capricious would apply here.

First is that the agency has departed from prior policy, prior guidance, without providing a reasoned explanation.  When an agency changes course, they are required to provide good reasons, and here, they have not.

THE COURT:  Well, OK.  But here is the question:  What was the change?  What was the change?

You tell me.  I understand, with the ICE arrest policy, there were a number of prior arrest policies.  I got that.

But with regard to the dismissal policy, what policy are you talking about it a departure from?

MS. BELSHER:  Sure.

So, your Honor, there is the regulations themselves which we discussed.

THE COURT:  We talked about that.  That falls into the contrary to law prong.

MS. BELSHER:  Right.

And then separate and apart from that, there are -- there is the EOIR practice manual that's reflected in a separate regulation also that provides for notice and an opportunity to be heard.  And I'm happy to provide the CFR cites for the two different regulations.

But the point is that the agency and the instructions that they have issued here has instructed immigration judges that they can disregard those critical protections for people in immigration proceedings.

THE COURT:  This is in the policy manual?

MS. BELSHER:  Yes, your Honor.

THE COURT:  What's the citation to --

What portion of the policy manual?

MS. BELSHER:  We provide that in the record that we've put in, in this case.  I'm looking for it here.

It's ECF 24-5.  I can find for your Honor the exact cite, or my colleague likely can, but I think it's 3.1 is what is coming to my mind, off the top of my head.

THE COURT:  OK.  Just let me give you a minute and maybe I can find it myself.

Go ahead.

MS. BELSHER:  Sure.  So it's chapter three of the immigration court practice manual, 3.1.  It speaks to a notice period -- a period of time before a hearing that the government is required to provide -- to submit their motions so that the noncitizen respondent has time and an opportunity to review it and time to respond.

There is also a requirement --

THE COURT:  Well, here is what I saw in the regulations.  I might have misread it, and I don't know.  It certainly wasn't quoted in the dismissal policy, but it's in the regulation.  It says, Unless otherwise ordered.  I don't know whether it says the word by the immigration judge, but it's unless otherwise ordered.

Regular procedure, unless otherwise ordered by the immigration judge, is motions are submitted in writing.  It doesn't quite say unless otherwise ordered, the judge will set

a return date.  But it says the judge can set a return date or a response date.

So doesn't that imply that, right off the bat, the regulation permits the judge to depart from what follows after the "unless otherwise ordered"?

MS. BELSHER:  Yes, your Honor.  And in the regulations and in the practice manual, there is this carve-out for the immigration court in the specific case in front of them to look at those facts, to look at that person and decide, in this case, we can dispense with the procedural protections.

THE COURT:  A reasoned exercise of discretion.

MS. BELSHER:  Precisely, your Honor.  But what these instructions have done is flipped that.  Instead of the default rule --

THE COURT:  I understand.

MS. BELSHER:  -- the rule being that immigration judges can, where it's appropriate, disregard those protections.  They have encouraged them to do so in all of these motions to dismiss.

And there are a number of determinations in the record from former immigration judges, including former IJ Marks, former IJ Durkin, and former IJ Burr, and they all speak to this being a departure from not only the language of the regulations and the guidance, but also from past practice.

And the critical difference is, in the past, when

P92sAFRc

these motions to dismiss were presented in immigration court and when IJs in their discretion decided we don't need these substantive procedural protections, it was almost uncontested cases, cases where it was done to benefit the noncitizen.

For example, in a case where somebody had applied for SIJS with USCIS, and in order to give them the opportunity to -- and it takes time, right, those applications -- and to give them the opportunity to get that relief, they dismissed the removal proceedings.

But what the government has done here and why *Accardi* applies is that they've weaponized that discretion and, in fact, I believe taken discretion away from the immigration court by telling them that they can dispense with these protections to the detriment of the noncitizen.

THE COURT:  But when we talk about, for example, the circumstances of the case, no policy can lawfully change that, right?

We agree.  Your argument is it's contrary to law.  If that's what the policy says -- and I understand the defendants say no, it doesn't, it's just paraphrasing and it's not really a policy, it's an e-mail by two regional deputy chief immigration judges.  I understand, but the principle is that if that policy statement varies from what the regulation permits, it's contrary to law.

Now, that's the wind-up to my question, which is, if

P92sAFRc

the policy statement or even the manual says something different than the regulation, it's the regulation that controls, right?

MS. BELSHER:  I believe that's correct, your Honor.

THE COURT:  So the regulation, that's why I'm saying the policy manual strikes me as maybe informative, but they couldn't put in the policy manual, you will always exercise your discretion thusly, or you will never exercise your discretion thusly.  It's entrusted to the immigration judge to be free from this to lawfully exercise their discretion and their authority under the regulation, unimpeded by a contrary policy statement, manual, anything.  In other words, it wouldn't be any more lawful if it were put in the policy manual tomorrow.

MS. BELSHER:  Sorry.  Just to clarify, you're speaking of the instructions, the dismissal policy that we changed here?

THE COURT:  Yes.

MS. BELSHER:  Yes.  In our view, it would be unlawful no matter how it's presented.

THE COURT:  I think I have the point.

So let me give you an opportunity to say what you want to say on your arguments, to make your argument, whatever you would like to say, and then I'm going to turn the floor over to the defendants as well.

MS. BELSHER:  Thank you, your Honor.

P92sAFRc

So this case, as we've been discussing, challenges two new policies, unprecedented policies, in recent months. And immigration courts around the country, including right across the street at 26 Federal Plaza here, no citizens have been appearing for their mandatory immigration court proceedings, only to have those proceedings denied to them inside the courtroom, have their opportunity to have a full and fair hearing taken away from them, and then being subject to summary arrest as they are attempting to leave the courtroom.

These policies are unprecedented and they are shocking. They deprive noncitizens of their ability to access the immigration courts, including plaintiffs' members who are terrified of attending legally mandated immigration court proceedings, and suffering irreparable harm as a result.

So we have spoken about EOIR's dismissal policy. I would like to speak first and a bit more about the arrest policy which marks an abrupt departure from decades of agency practice.

The government has suggested that this is just reflective of normal shifts in enforcement priorities, but it does not deny that ICE has for decades refrained from conducting the type of arrests that we are seeing today at immigration courthouses across the country.

And the agency memorializes the reasons for that in a memorandum that said that the agency in the prior

P92sAFRc

administration, the agency was going to refrain from conducting those types of courthouse arrests because it chills access to the immigration courts, it deters people from showing up, and it also interferes with the fair administration of justice. It prevents courts from being able to run their courtrooms and hold fair hearings.

THE COURT: What you're talking about is the April 27, 2021 policy.

MS. BELSHER: Yes, your Honor.

THE COURT: Does it make any reference --

This is just a factual point. Does it make any reference to immigration courts?

MS. BELSHER: I believe that courthouses are defined as including immigration courthouses.

THE COURT: Here is what I'm getting at.

So you have the January 2025 and the May 2025 policy. You have the April 2021 policy. They apply to courthouses, correct?

MS. BELSHER: Yes, your Honor.

THE COURT: Neither, none of the three policies refer specifically to immigration courthouses is my point, right?

MS. BELSHER: I don't believe on the face of the policy, I think you're right, your Honor.

I think there might be a reference to a definition elsewhere that includes immigration courts.

P92sAFRc

THE COURT:  Well, yes.  I'm not suggesting that it doesn't apply to immigration courts, but what I thought I heard you say, and forgive me, I would just say I might phrase it differently.  You said that the April 2021 policy said that we're not going to chill access to immigration courts.  I don't think it said that.  I think it said we're not going to chill access to courts.

MS. BELSHER:  I think that's a fair correction, your Honor.  It doesn't say specifically immigration courts.

THE COURT:  All right.  And the January 2025 and May 2025 policies themselves do not refer specifically to courts.  That's the question.  It's a question.  Maybe it does, but ...

MS. BELSHER:  I'm sorry, your Honor.  I'm seeing now that in the April 2021 memorandum, they do say specifically it includes immigration courts.

THE COURT:  OK.

MS. BELSHER:  It's on page two.

THE COURT:  So that policy, which I think you'll fairly agree permits some arrests at courts which, by definition now, would mean immigration courts and excludes others.  That's the way it's been going back to 2014, at least.

MS. BELSHER:  In written form, your Honor, yes.

THE COURT:  Yes.

MS. BELSHER:  But I think the practice here is also really important because even where the written policy has

changed in prior administrations to broadly permit courthouse arrests, it was still fairly rare to see arrests at immigration courthouses.

So it's both applicable to immigration courts in the written form, as we've been discussing --

THE COURT:  This is the April 2021?

MS. BELSHER:  Yes, your Honor.

But also in practice there are, again, declarations from, I think, three immigration judges in a former political appointee with ICE who testified, and numerous practitioners, we have at least I think seven immigration practitioners who testify on the record here that this is unprecedented, what we're seeing here, the scale of the arrests.

Who they are targeting is very important, as your Honor was alluding to.  In the 2021 guidance, there are carve-outs for public safety risks.  People who present some type of national security concern or otherwise would be dangerous for the government to try to apprehend elsewhere.

So those arrests were incredibly rare and also limited to a very specific group of people.  So it didn't cause the widespread chill we are seeing today resulting from the type of indiscriminate courthouse arrests happening in the immigration courts.

So under the analysis we've been discussing for arbitrary and capricious agency policy here, the government has

P92sAFRc

failed to consider an important aspect of the problem.  In fact, the new guidance doesn't speak at all to this chilled access that's resulting from these courthouse arrests, doesn't try to address it or engage with that prior reasoning.

And so, I mean, it also fails to consider adequate alternatives.  The government in its papers here says they have very broad discretion to arrest people in all kinds of places.  And that's true, they can arrest people elsewhere.  There is no reason why they need to target people who have done nothing wrong other than attend immigration court proceedings.

But the government's true reason for this policy is ease.  They have decided that they are going to target, to me, a 3,000 percent a day arrest quota with the, quote/unquote, low-hanging fruit, people who are easy to find, people who are doing exactly what the government has told them to do and appeared for their immigration court proceedings.

So that is not a good reason for the new policy.  And even if ease of arrests would be a good reason, it fails to consider serious reliance interests both of the noncitizens who have long relied on the availability of seeking relief from removal in immigration court, but also on the part of the courthouses themselves which rely on ICE not conducting widespread arrests in the courthouses to ensure decorum in their courtrooms and manage their dockets.

So, separate and apart from the arbitrary and

capricious claim, there is the ultra vires claim that these arrests violate a common law privilege against courthouse arrests that was incorporated into the Immigration and Nationality Act, and that privilege aligns very closely with the justifications we have already been discussing.

There is a purpose-based test that the Supreme Court has applied to determine whether the privilege applies, and it's whether it would interfere with or impede the fair administration of justice.

For the reasons we would just, or I was just discussing, the arrests authorized by this policy plainly do just that. They chill people from attending immigration courts and also impede the day-to-day operations within those immigration courts.

So if there are no further questions on the ICE immigration...

THE COURT: I have one.

Am I correct that the 2025 policies require specific approval of the field office director, the special agent in charge or his designee, prior to conducting the enforcement action?

MS. BELSHER: I don't believe that there is a requirement for that level of approval to conduct, maybe a specific type of enforcement action. I would have to look back at the policy.

P92sAFRc

THE COURT:  Well, this is what I see, and maybe I'm reading too much in or maybe I'm not reading it correctly, but it says, ICE officers and agents should generally avoid enforcement actions in or near courthouses or areas within courthouses that are wholly dedicated to noncriminal proceedings, e.g. family courts, small claims court.  When an enforcement action in the above situations is operationally necessary, an enforcement action -- notice singular -- the approval of the respective field office director, special agent in charge, or his or her designee, is required prior to conducting the enforcement action.

Now, as I understand it, there are no proceedings that an immigration judge presides over that's criminal in nature, so these are inherently noncriminal proceedings and, therefore, would seem to me --

Now, maybe they are violating this, I have no idea.  But it seems to me that the policy requires a specific approval for the specific enforcement action.  I guess it's a two-sided question.  One side of it is, isn't that a protection and isn't a requirement that may or may not be followed?

That's one side of the coin.

The other side of the coin is, isn't that a limitation on the policy that reduces the risk of chilling and the like?

MS. BELSHER:  So, your Honor, if that protection applies to immigration courts, then the government has not

P92sAFRc

claimed that it applies here.  I would be curious to hear their response eventually.

But first I would make the point that if that's a requirement, then it is not being taken very seriously because of the types of arrests we are seeing at these immigration courthouses.  They appear indiscriminate, often not even asking for people's names.  We have in the record examples in the Austin declaration, for example, of women with infants being detained as they try to leave the courtroom, children are detained with their parents as they try to leave the courtroom.

So to the extent that there is some approval required, I would imagine it's being granted freely.

THE COURT:  But here is an important point in the preliminary injunction context.  There are two plaintiffs.  You claim representational standing and you claim organizational standing.  Although, as you probably know from the Second Circuit's decision in the *Do No Harm* case, the standard is different at the preliminary injunction stage than it is at the motion to dismiss stage.

And in the declarations from the two agencies, they lay out -- I don't know the number -- eight, 12 instances of specific members whose circumstances they put forward to this court, right?

MS. BELSHER:  Yes, the two plaintiffs.  That's right.

THE COURT:  The two plaintiffs.  And each of the

P92sAFRc

plaintiffs have one instance of an arrest, am I correct?

MS. BELSHER:  I'm sorry.  It was that one of the plaintiffs --

I can say how many of the plaintiffs' members have been arrested, if that's helpful to your Honor.

THE COURT:  No, I'm dealing with a record.

MS. BELSHER:  Right.

THE COURT:  The evidence that has been put in by ACT and the Door identify John Doe No. 7 in the case of ACT and John Doe No. 1 in the case of the Door as individuals who have been arrested at an immigration location who are members of these organizations.

Am I accurate about that?

MS. BELSHER:  That's correct that that is what is in the record.

There has been another member who has been detained. We would be happy to put in a supplemental.  I know we had already asked whether the record was closed.

THE COURT:  The record is closed.

But, otherwise, go ahead.

MS. BELSHER:  Separate and apart from the members already affected by these policies which are new, there is also in those declarations evidence of the chilling effect broadly to the membership.

THE COURT:  I understand.  I understand.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MS. BELSHER:  So those are also cognizable harms for standing purposes.

THE COURT:  All right.

MS. BELSHER:  So if there are no further...

THE COURT:  There are no further questions.

Let's put the government on the hot seat here.

MS. BELSHER:  Thank you, your Honor.

THE COURT:  So the EOIR dismissal policy is in an e-mail sent by one of the two Rileys who are a regional deputy acting chief immigration judge, but it's signed by two regional deputies.

And from what I can tell from the record, I think what I have in the record is, actually, looks to me like a photograph of an e-mail.  Maybe I'm wrong, but that's what it looks like, because my eyes have been strained on trying to read it.  I know there is a retyped version in some other document, but it's not the original.

And here is the question about the original:  Did it go to all assistant chief immigration judges in the country, or was it certain regions?

Who did it go to?

MR. OESTERICHER:  I do have, if it would assist the court, I do have the e-mail.  But it went to all, all of the -- let me get the title -- all of the intermediate, above the intermediate immigration judges below the regional and above

the line immigration judges.

THE COURT:  Right, right.  OK.  All right.

What can you tell me about the basis for the arrests of these people at the courthouses?

MR. OESTERICHER:  I'm doing the dismissal policy and my colleague --

THE COURT:  All right.  We'll be back to you.  There will be enough for you to do, also.

MR. OESTERICHER:  I see that.

MS. ONOZAWA:  Your Honor, I think precisely because the members who are listed in the complaint and the declarations are anonymized, we do not have a basis to be able to explicate the reasons for their arrests.  So that was sort of an issue that was touched on in *Do No Harm v. Pfizer*.

Based on the information there, we can't identify who these are, without any accuracy or provided relevant background of the circumstances of the arrest and the reasons for it.

THE COURT:  All right.  While you're sort of quasi up, you heard what I said about my reading of the January and May policy statements on courthouse arrests.

Am I reading them correctly that for a courthouse which is principally for noncriminal matters, there is this, if you will, extra hurdle, whatever you want to call it, extra clearance required?

MS. ONOZAWA:  Yes, I understand.  I have looked at the

paragraph, page two from the 2025 guidance which you read on the record, which is identical to a similar paragraph in the 2018 guidance.

The best I can say is that ICE clearly, based on its practices, has construed the noncriminal or specialized courts to refer to family court, small claims court, and something similar. And I cannot explain that, but it does not construe federal immigration courts to fall within the category of noncriminal or specialized courts for which additional approvals are operationally needed.

THE COURT: Is that problematic, if it's not consistent with the words of the policy?

What's the argument -- maybe I'm springing this on you. It's not in the briefing and it's not in the motion. So in that sense, it's maybe --

What do you have to say about it?

MS. ONOZAWA: Right. I think, best as I can say standing here right now, is that I understand that, as drafted, it can be construed to expressly exclude federal immigration courts, but it does not do so. That certainly would not have been the intent. And as your Honor noted, I believe as your Honor asked, the 2021 guidance specifically defined the scope of courts to include federal immigration courts.

So I do not think, based on this practice, that the intent was to exclude federal immigration courts, though I

P92sAFRc

certainly take your Honor's point that it could be read that way.

THE COURT:  OK.  While you're up, so the argument is made that one of the rationales in the 2021 policy is reducing the chilling effect on people coming to court of an arrest policy.  If the fear of arrest may chill people coming to court, who should come to court, would be required to come to court, how do the 2025 policies state their reason for the change in policy?

MS. ONOZAWA:  So the 2025 guidance essentially echos what was in the 2018 guidance.  And it notes that courthouse, there was a balance that needs to be struck in terms of conducting civil immigration enforcement actions in a way that reduces harm to the public.  So there are certain guidance to ICE officers telling them to, you know, try, when operationally feasible, use nonpublic areas of the courthouse and to exercise sound judgment and to do it discreetly.

I would say that, again, the balance needs to be struck between what your Honor and plaintiffs have proffered as the chilling effect versus ICE's practice to conduct civil immigration enforcement actions as authorized by the INA.

THE COURT:  Right.

I'm engaging in it's a very discrete area of administrative law.  I think it was referred to in the FCC, the *Fox* case and other cases, that the change in policy doctrine, I

P92sAFRc

think it's a doctrine, actually, and that an action, a final agency action, can be arbitrary and capricious if it doesn't explain the change.

So what is your argument that the 2025 policy -- it explains the reasons for its adoption, I see that there. Twofold.  It says one, because it's safer to conduct an arrest in a cleared area, and two, they say they are deprived of one prime cleared area that's not a courthouse, and that's a prison facility, because policies of noncooperation do not enable them to be alerted as to who is going to be released, when and where, so that they can't avail themselves of that alternative. They do make those two points.

How does making those two points acknowledge or recognize or address as a reason for explanation the chilling point, which I think the word chilling comes from the text of the April 2021 policy/directive, whatever it's called?

So what's your argument on that?

How do you address that?

MS. ONOZAWA:  I think it best, and I think, you know, taking the broader view, there has always been a courthouse arrest policy, and we've talked about it in our brief, since 2014.  Those policies have expanded or contracted based on the immigration enforcement priorities of the administration that promulgated the policy at the time.

So here, the 2025 guidance went back to the 2018

guidance and effectively reintroduced the expansion of categories of variance to be priorities for immigration enforcement and in conjunction with that, as your Honor just pointed out, noted that courthouses were appropriate places or could be appropriate places for immigration enforcement for the reasons that we've provided in terms of, again, guaranteeing the safety of all involved, to the extent an immigration enforcement arrest was taking place inside of a courthouse.

It also, like the 2018 guidance, guides the actions of ICE officers and agents. So I understand your point about a chilling effect, but it tries to minimize the disruption to court proceedings by ensuring that ICE officers and agents are doing them in an orderly, safe, and nondisruptive manner.

THE COURT: All right. One second, please.

OK. So anything else you want to argue with regard to the courthouse arrest policy?

And then we'll turn back to the dismissal policy.

MS. ONOZAWA: Certainly, your Honor.

I would like to address the common law privilege against courthouse arrest which plaintiffs have asserted shows that the 2025 courthouse guidance is contrary to law.

Now, when congress enacted the INA in 1952, that privilege applied only to private civil suits, certainly not to sovereign enforcement actions and not to criminal arrests. That privilege incidentally goes back 120, 140 years. It arose

P92sAFRc

at a time, an ancient time, when a plaintiff in a civil action obtained personal jurisdiction over defendant through arrest in the forum district.

And as the practice of using civil arrests to obtain personal jurisdiction fell by the wayside and they were replaced by personal service and summons to obtain jurisdiction, the common law privilege was similarly extended to prohibit service of process when a person was coming inside or leaving from a courthouse.

But, again, that physical presence requirement changed in this country when the Supreme Court issued its decision in 1945, *International Shoe v. Washington*, which recognized minimum contacts with the state, and in turn in the 1950s and 60s, states began to enact long-arm statutes.

Plaintiffs' reply brief on page ten, I would like to address it, cites two English cases. Again, one from 120 years and another from 140 years before the INA was enacted. And they cite them for the proposition that English common law somehow recognized a privilege for arrests made by the sovereign.

So, first of all, I question whether two English common law cases enacted well over a century since the enactment of the INA could clearly inform congress that there was a common law privilege that needed to be incorporated into the INA.

And second, to the extent relevant --

THE COURT:  Well, isn't your point that they weren't, I take it they weren't decided at the time of the big schism, such that they became part of the common law of the United States.

In other words, if the royal sovereign was prohibited from making arrests at a courthouse in 1789, the argument would be made that that was incorporated into the common law of these United States.  But if it wasn't part of the common law of these United States at that juncture, the common law of the United States and the common law of England were destined to evolve separately from that common departure point.

I take it these were post 1789 decisions.

MS. ONOZAWA:  One was from 1812 and the other was from 1832.

THE COURT:  All right.

MS. ONOZAWA:  But I was going to go on --

THE COURT:  Go ahead.

MS. ONOZAWA:  -- to say that these English court cases relate to a common law privilege specific to bankruptcy courts that shielded debtors from civil arrests in bankruptcy proceedings to prevent unhappy creditors from arresting them upon appearance in bankruptcy court.  And the issue in these two cases was whether this common law privilege specific to bankruptcy court proceedings extended to the crown, if the

P92sAFRc

crown itself was a debtor and sought to arrest a debtor going to bankruptcy court to sort its affairs out.

It certainly has no analogy to civil immigration enforcement actions that were recognized and authorized in the INA. And so, since the advent of long-arm jurisdiction, judicial decisions have not applied the common law privilege. And we've cited three cases from 1965, 1969, and 1981 in our brief where courts held that the common law privilege against arrest or process doesn't apply when a defendant is subject to a long-arm statute.

So the same logic doesn't support plaintiffs' claim that the common law privilege --

THE COURT: What courts decided that?

MS. ONOZAWA: That was the Eastern District of Pennsylvania in In Re Arthur Treacher's Franchisee Litigation.

THE COURT: I remember Arthur Treacher's fish restaurants, yes.

MS. ONOZAWA: There is a 1970 --

THE COURT: What's the cite to that?

MS. ONOZAWA: The cite is 92 F.R.D. 398.

THE COURT: OK.

MS. ONOZAWA: In the Eastern District of Pennsylvania.

THE COURT: That's fine.

MS. ONOZAWA: The second one is *Pavlo v. James*. 437 F.Supp. 1 25. That's the Southern District of New York

P92sAFRc

1977.  And the third is *Gardner v. United States*, 246 F.Supp. 1014.  Also in the Southern District, 1965.

THE COURT:  F.Supp. 14?

MS. ONOZAWA:  1014.

THE COURT:  1014.

OK.  All right.

MS. ONOZAWA:  So that same logic doesn't support plaintiffs' claim that there is a persisting common law privilege that bars courthouse arrests in the immigration context.  And we, again, submit that based on the cases and the history and the context in which this civil, this common law privilege against courthouse arrest evolved and then changed and then disappeared, it could not have been incorporated into the INA.

Before, by the way, your Honor goes to ask about the EOIR guidance, I did want to make some comments about Section 705, but I'm happy to reserve those to the end.

THE COURT:  Yes, please.

MS. ONOZAWA:  So Section 705 allows a court to postpone the effective date of agency action, OK, to preserve status of rights pending conclusion of the proceedings.

We know that the EOIR guidance and the courthouse guidance were issued in May of this year.  So, by its terms, you know, the statute does not authorize to provide nationwide injunctive relief for actions that have already taken place.

There is no canon of statutory interpretation that supports plaintiffs' expansive view of what a court may do under Section 705.

I mean, to the extent the plaintiffs are arguing, as they do today, that the status and rights of the organizational plaintiffs' members have changed because of agency actions that have already occurred, this court logically can't preserve status or rights.  What they are asking the court to do is to revert the current status to the way things were before these actions occurred.

THE COURT:  However, the Second Circuit has grappled with this.  First of all, they say that the standards on a 705 application are substantially the same as on a preliminary injunction, or are the same.  Courts have held that they are the same.  And I would assume -- I don't know, you tell me -- that Rule 65 would apply to a stay because it's in the nature of an injunction.

Given that, the Circuit has said this is a very common issue that arises all the time.  People say about maintaining the status quo, and you're not maintaining the status quo, you're changing the status quo, and that's a mandatory injunction.

The Second Circuit itself has said, no, no, no, no. When folks talk about the status quo, they mean the status quo ante the last peaceable set of affairs.

Why isn't that doctrine absolutely binding here, that a stay preserves rights, and what it's preserving in that sense is the status quo ante?

Otherwise, there could never be review.  There could never be review.  If I announce a new policy at 4:33 this afternoon, at 4:34 you would be too late.

MS. ONOZAWA:  So I want to make a distinction between temporary retraining orders and preliminary injunctions under Rule 65.

Certainly it would be appropriate, should all of the factors be met, to impose an injunction or a TRO against an act or to revert it to the status quo.  But this is not a Rule 65 TRO or a PI motion.  This is a stay under Rule 705 and, you know, the linchpin of statutory interpretation is congressional intent and also looking at the language of the statute.

705 specifically refers to preserving status of rights, not reserving status of rights ex ante.

THE COURT:  Well, under my hypothetical, the 4:33, 4:34.  Nope, it was adopted at 4:33, you rush to the courthouse at 4:34.  I'm sorry.  It was adopted.  In fact, the minute it got filed, that was the incident when it was too late for you to challenge it under 705.  That can't be, I submit.  But anyway.

MS. ONOZAWA:  But in that case, Rule 65 offers an appropriate means, again, should the factors be met, for a

P92sAFRc

court to order that kind of relief.

THE COURT:  No, I don't think so, because I don't think a TRO conceptually differs from a preliminary injunction, except for the temporal limitation on it.

But in order to get that TRO -- and I've heard this argument eloquently made by all kinds of lawyers on all kinds of issues -- it's the same standard.  You have to find probability of success on the merits, irreparable injury, etc., or you, judge, have no business entering a TRO.

There is no such thing, it is said, as an administrative TRO.  I'm just going to -- I just want to put the brakes on this while I can think about it.

Now, maybe if I were to write the rules, I would allow such a thing, but I'm respectfully advised that it doesn't exist in the TRO context.

MS. ONOZAWA:  Understood.

THE COURT:  I hear your argument, but thank you on that.

MS. ONOZAWA:  OK.  Unless your Honor has further questions about that or the court has guidance, I'll give the podium to Mr. Oestericher.

THE COURT:  OK.

MR. OESTERICHER:  Thank you, your Honor.

So, subject to the court's questions, the challenge to the dismissal policy fails for a couple of reasons.

One, the threshold APA arguments were made, this just isn't a policy, it's not a full-time agency action. Both the actors who have sent it don't have the authority to set policy and the wording of the e-mail doesn't set policy. It provides guidance. It provides information that might be helpful. But it does not mark the consummation of a decision-making process by which rights and obligations are impacted.

THE COURT: Let me ask you a factual question about the e-mail. I recall it said something that, in expedited proceedings, detention was mandatory or generally mandatory.

Is it mandatory or generally mandatory and is it right what it said there, as you know?

MR. OESTERICHER: As I know, the agency's policies that detention is mandatory, it kicks into mandatory detention under, I think, Section 1226, if I'm getting it right.

THE COURT: OK.

MR. OESTERICHER: So without final agency action, there is no basis for APA review. How IJs manage their docket and how they adjudicate cases is committed to their discretion. There is no APA review for matters committed to agency discretion. And then in addition, there is an adequate remedy in court. They concede they have a right to appeal. And under 5 U.S.C. Section 704, we have an adequate remedy in court. There is a threshold bar.

More fundamentally, though, on the merits, we submit

P92sAFRc

that there is no -- the e-mail does not change anything or any of the requirements in the regs. They say procedurally it does, but if you look at 8 CFR Section 1003.23(a), it says, unless otherwise permitted by the immigration court when deciding motions to dismiss.

So there has always been discretion, and that is all that's being stated here, that you have this discretion. There was a caseload impact, there is more of these cases of detained folks in the providing guidance that you can entertain these motions. But they are not directing how they are to be adjudicated by the IJs, and that is clearly consistent with the regs.

They also argue that there is a substantive change being made with regard to the criteria for deciding motions to dismiss. I would point two things out about that. First, there is nothing in the e-mail that changes the regs. And, in fact, the paragraph they point to starts with the sentence, The following information regarding DHS motions to dismiss may be generally helpful.

And then they talk about the two bases that are relied on under (a)(6) and (a)(7) and they paraphrase in brackets the basis. and it should have said, Circumstances of the case have changed, to be more complete, but it is not changing the standard. They are not changing the standard for the IJs.

The standard under 239.2(a)(7) remains the same. This

e-mail does not set policy, does not direct them to accept other circumstances that don't comply with the regs. And the wording of the e-mail supports that this is guidance and that they are not claiming the standard.

That knocks out the *Accardi* claim. It knocks out the arbitrary and capricious claim. And with regard to whether there is a reasoned basis, the prefatory paragraph explains what this is about. There is a caseload expansion, we're providing guidance, we need you to work through these cases expeditiously, and so that is what is being done.

As a result, there is both neither APA jurisdiction nor violations that are arbitrary and capricious or a violation of *Accardi*.

THE COURT: OK. Thank you.

MR. OESTERICHER: Thank you.

THE COURT: I notice that Rule 65 does not require, if a court is granting an injunction, it does not require security of the United States or its officers.

Does that apply to a 705 stay?

MR. OESTERICHER: We submit that it does, your Honor, because it's the same standard.

THE COURT: All right. Do you disagree?

MS. BELSHER: We do, your Honor.

As we note in our reply brief, that because it's not an injunction, and the language speaks to injunctions, and in

P92sAFRc

Rule 65 is inapplicable to stay under the APA under Section 705. But even if it were applicable, this honor has broad -- your Honor, this court, has brought discretion to set either a nominal bond or no bond at all.

And here, none is appropriate because the government hasn't even attempted to argue that they would incur any kind of financial penalty.

THE COURT: I understand that.

But are you agreeing with the government or disagreeing with the government?

MS. BELSHER: We believe that it does not apply, the bond requirement.

THE COURT: Oh, OK. That's what I think the government is saying under Rule 65.

So did I read you right?

MR. OESTERICHER: Yes, your Honor.

THE COURT: So you're both in agreement.

MS. BELSHER: They sought a bond in their papers. That is what we were responding to.

THE COURT: Maybe they thought better of it on reflection.

MS. BELSHER: That's great news.

THE COURT: All right. So, last opportunity, if there is anything the plaintiffs wanted to respond to, then we'll conclude for the day.

Thank you.

MS. BELSHER:  Sure, your Honor.

A few quick points starting with where we left on the dismissal policy.

So it is full-time agency action.  It is the consummation of the agency's decision-making around how to deal with DHS new enforcement initiative of filing these motions to dismiss.  And the way that the agency has decided to deal with them is to encourage immigration judges to grant them without notice or an opportunity to respond through issuing this guidance.  And while, to be sure, the guidance itself is couched in vague and discretionary language, it is very hard to see how the guidance would be interpreted as anything other than marching orders, given the broader context.

And that context is that scourges of immigration judges have been fired in recent months, and that at least one immigration judge was told -- this is the former IJ Pappas declaration in the record -- that he was to rubber stamp these motions, the government's motions to dismiss, and that was in fact what the instructions were meant to convey.

So I think that whether or not it says you must grant these motions in the instructions is irrelevant.  And under the analysis for both the *Accardi* and APA courts look beyond the four corners of any written guidance.  I think *Accardi* has the language that it would be naive to assume the agency would be

P92sAFRc

so blunt in instructing, you know, the agency employees to disregard the regulations that way. So it is, in fact, final agency action, not left to the discretion of the immigration judges.

And then as for the point about this misstatement of the regulatory standard being due to, I think the government's phrase was, inartful drafting in the papers. If that were true, then you would expect to see the government issue some kind of correction because now many, many immigration judges have been granting these motions on just generalized circumstances. Because DHS doesn't want to have to adjudicate these cases through full proceedings, not having to do with the individual circumstances of the case, as the regulation requires.

But they have not done that, and that's because the guidance says what they meant it to say, that the immigration judges should be dismissing these motions -- dismissing removal proceedings for that reason.

And then quickly on the point on your Honor's questions about where in the 2025 guidance does it deal with the agency's prior finding that immigration courthouse arrests would chill access to the courts. I believe the government was given many opportunities to explain that and still could not point to anywhere in that policy where they deal with that. That's because it doesn't deal with it at all.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P92sAFRc

And just because an arrest is orderly in a courthouse doesn't mean that -- and to be clear, these arrests have not been orderly.  They have, in fact, alarmed the public.  They have been quite chaotic and traumatic.  And so I think whether or not the policy says that they are meant to be orderly is sort of beside the point.  But an orderly arrest is still an arrest that chills access.

So I think that those were the main points I wanted to respond to --

THE COURT:  OK.

MS. BELSHER:  -- if your Honor has no further questions.

Thank you.

THE COURT:  Let me ask this question, and it's asked best now, because it puts both of you into a difficult spot as to your answer.

I will rule on the preliminary injunction motion in due course, but that does not dispose of the review.  If I deny all stay, I would assume the plaintiffs would want the court to address review promptly so you have a final decision, etc. not an unreasonable request.

If I grant the stay, I would assume the defendants would want a prompt final review, because final review could result in, on further review, finding a different outcome.

Would it be appropriate to set a schedule for -- I

P92sAFRc

think procedurally this is done on cross motions for summary judgment, I would not need 56.1 statements.  But would it be appropriate to say that the cross motions are due 45 days, 60 days after the preliminary injunction order, one way or the other?

MS. BELSHER:  Your Honor, I think 45 days would be welcome.  An expedited review of the summary judgment motion would be important to our clients.

Here, I would also note that we would seek the administrative record from the government in this case.  So we would have to first receive that to be able to move.

THE COURT:  I see.  I see.

So tell me, if you will, what happens with the administrative record.  How does that work?

MR. OESTERICHER:  I can try and help with that, your Honor.

So the agency would have to compile the administrative record, certify it, and file it, and then there would be motions for summary judgment based on the admin record.

I would like to make one side point.

THE COURT:  All right.

MR. OESTERICHER:  It's our position that the dismissal policy is not a policy, such that there would be -- we would argue we would move to dismiss that claim, and there might not be an administrative record for that.

P92sAFRc

THE COURT:  All right.  OK.  I'm going to require any administrative record on any policy to be filed within 30 days of the decision on a preliminary injunction and cross motions for summary judgment filed 30 days thereafter.  So it would be a total of 60 days.  And then 30 days for a response and 14 days for a reply.

So we can't fill in dates because we don't know when his honor is going to rule, but that would be sort of the notion.

All right.  Thank you all very much.

MR. OESTERICHER:  Thank you, your Honor.

MS. BELSHER:  Thank you.

(Adjourned)