UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AFRICAN COMMUNITIES TOGETHER; and THE DOOR,

              Plaintiffs,

     v.

TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; DARREN K. MARGOLIN, in his official capacity as Director, Executive Office for Immigration Review; and PAMELA BONDI, in her official capacity as Attorney General, U.S. DEPARTMENT OF JUSTICE,

              Defendants.

25 Civ. 6366 (PKC)

---

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR PARTIAL MOTION TO DISMISS AND PARTIAL MOTION FOR SUMMARY JUDGMENT

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2695/2721
Fax:  (212) 637-0033
Email: jeffrey.oestericher@usdoj.gov
        tomoko.onozawa@usdoj.gov

JEFFREY S. OESTERICHER
TOMOKO ONOZAWA
Assistant United States Attorneys

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND .................................................................................................... 3

   I.   FEDERAL STATUTORY REMOVAL AND ARREST AUTHORITY ................................. 3

   II.   ICE CIVIL IMMIGRATION COURTHOUSE ARREST POLICIES .................................. 4

      A.  Pre-2025 ICE Courthouse Arrest Policies ................................................ 4

         1.   The March 2014 Guidance.................................................................. 4

         2.   The January and October 2015 Guidance ......................................... 4

         3.   The January 2018 Directive ............................................................... 5

         4.   The April 2021 Guidance.................................................................... 6

      B.  2025 ICE Guidance Regarding Courthouse Arrests .................................. 7

   III.  IJ ADJUDICATION PROCEDURES AND THE WITHDRAWN EOIR GUIDANCE EMAIL .............. 9

ARGUMENT ...................................................................................................... 10

   I.   LEGAL STANDARDS .......................................................................................... 10

      A.   Summary Judgment ................................................................................ 10

      B.   Rule 12(b)(1) Motion to Dismiss................................................................ 11

   II.   THE ICE GUIDANCE IS NOT SUBJECT TO APA REVIEW ...................................... 12

   III.  THE ICE GUIDANCE IS NOT ARBITRARY AND CAPRICIOUS ................................. 15

      C.   The ICE Guidance Is Not Contrary to Law ................................................ 17

         1.   There Is No Common-Law Privilege Against Federal Immigration Enforcement in and Around Courthouses ................................................ 17

         2.   The INA Cannot Be Read to Incorporate the Common-Law Privilege Against Courthouse Arrest .......................................................................... 21

         3.   The INA Displaced any State Common-Law Privilege to the Contrary ................. 22

IV.  THIS ACTION IS MOOT AS TO THE EOIR DEFENDANTS BECAUSE THE EOIR GUIDANCE
     EMAIL HAS BEEN WITHDRAWN ......................................................................................... 23

CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
 815 F.3d 105 (2d Cir. 2016).................................................................................. 24

*Arizona v. United States*,
 567 U.S. 387 (2012)............................................................................................... 3

*Baker Botts LLP v. ASARCO LLC*,
 576 U.S. 121 (2015)............................................................................................. 21

*Bechtel v. Administrative Review Bd.*,
 710 F.3d 443 (2d Cir. 2013)................................................................................. 15

*Bennett v. Spear*,
 520 U.S. 154 (1997)............................................................................................. 14

*Beta Upsilon Chi Upsilon Chapter at the Univ. of Florida v. Machen*,
 586 F.3d 908 (11th Cir. 2009) ............................................................................. 24

*Blackwater v. Safnauer*,
 866 F.2d 548, 550 (2d Cir. 1989)......................................................................... 23

*Block v. Cmty Nutrition Inst.*,
 *467 U.S.* 340 (1984) ............................................................................................. 12

*Bowen v. Michigan Academy of Family Physicians*,
 476 U.S. 667 (1986)............................................................................................. 12

*Carver v. Bank of New York Mellon*, 15 Civ.,
 10180 (JPO), 2017 WL 1208598 (S.D.N.Y. Mar. 31, 2017)............................... 12

*Chrysler Corp. v. Brown*,
 441 U.S. 281 (1979)............................................................................................. 14

*Church of Scientology of California v. United States*,
 506 U.S. 9 (1992).................................................................................................. 23

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
 401 U.S. 402 (1971)............................................................................................. 11

*City of Erie v. Pap's A.M.*,
 529 U.S. 277 (2000)............................................................................................. 24

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ................................................................................................ 25

*Cty of Los Angeles v. Davis,*
    440 U.S. 625 (1979) .............................................................................................. 24

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014) .............................................................................................. 19

*Deakins v. Monaghan,*
    484 U.S. 193 (1988) .............................................................................................. 23

*Deposit Guaranty Nat'l Bank v. Roper,*
    445 U.S. 326 (1980) .............................................................................................. 23

*Disability Law Ctr. v. Millcreek Health Ctr.,*
    428 F.3d 992 (10th Cir. 2005) .............................................................................. 25

*Do No Harm v. Pfizer Inc.,*
    126 F.4th 109 (2d Cir. 2025) .................................................................................. 1

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) .............................................................................................. 15

*Friends of Animals v. Romero,*
    948 F.3d 579 (2d Cir. 2020) .................................................................................. 11

*Friends of Ompompanoosuc v. FERC,*
    968 F.2d 1549 (2d Cir. 1992) ................................................................................ 11

*Gardner v. United States,*
    246 F. Supp. 1014 (S.D.N.Y. 1965) ..................................................................... 20

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
    564 U.S. 915 (2011) .............................................................................................. 19

*Guertin v. United States,*
    743 F.3d 382 (2d Cir. 2014) .................................................................................. 15

*Heckler v. Chaney,*
    470 U.S. 821 (1985) .............................................................................................. 12

*Herrera-Inirio v. INS,*
    208 F.3d 299 (1st Cir. 2000) ................................................................................. 22

*In re Arthur Treacher's Franchise Litigation,*
    92 F.R.D. 398 (E.D. Pa. 1981) ............................................................................. 20

*J.S. ex rel. N.S. v. Attica Cent. Sch.*,
   386 F.3d 107 (2d Cir. 2004) ............................................................................... 12

*Kansas v. Colorado*,
   533 U.S. 1 (2001) .............................................................................................. 19

*Karpova v. Snow*,
   497 F.3d 262 (2d Cir. 2007) ............................................................................... 11

*Lamb v. Schmitt*,
   285 U.S. 222 (1932) ........................................................................................... 18

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
   104 F.3d 1349 (D.C. Cir. 1997) ......................................................................... 13

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ..................................................................................... 12, 14

*Liranzo v. United States*,
   690 F.3d 78 (2d Cir. 2012) ................................................................................. 11

*Mantena v. Johnson*,
   809 F.3d 721 (2d Cir. 2015) ............................................................................... 11

*Motient Corp. v. Dondero*,
   529 F.3d 532 (5th Cir. 2008) .............................................................................. 23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ....................................................................................... 11, 15

*National Assoc. of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007) ........................................................................................... 15

*National Black Police Association v. District of Columbia*,
   108 F.3d 346 (D.C. Cir. 1997) ........................................................................... 24

*National Lifeline Ass'n v. FCC*,
   983 F.3d 498 (D.C. Cir. 2020) ........................................................................... 15

*National Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ........................................................................... 14

*Nat'l Audubon Soc. v. Hoffman*,
   132 F.3d 7 (2d Cir. 1997) ................................................................................... 11

*New York v. ICE*,
   466 F. Supp. 3d 439 (S.D.N.Y. 2020) .................................................................. 6

*New York v. ICE*,
No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023) ........................................ 6

*Noel v. Chapman*,
508 F.2d 1023 (2d Cir. 1975) ........................................................................... 14

*Northern Light Technology, Inc. v. Northern Lights Club*,
236 F.3d 57 (1st Cir. 2001) ............................................................................. 21

*NRDC v. EPA*,
658 F.3d 200 (2d Cir. 2011) ............................................................................. 15

*Pacific Gas & Electric Co. v. Federal Power Comm'n*,
506 F.2d 33 (D.C. Cir. 1974) ........................................................................... 14

*Page Co. v. MacDonald*,
261 U.S. 446 (1923) ....................................................................................... 18

*Pavlo v. James*,
437 F. Supp. 125 (S.D.N.Y. 1977) .................................................................... 20

*Pennoyer v. Neff*,
95 U.S. 714 (1878) ........................................................................................ 19

*Phifer v. City of New York*,
289 F.3d 49 (2d Cir. 2002) .............................................................................. 12

*Preiser v. Newkirk*,
422 U.S. 395 (1975) ....................................................................................... 23

*Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs*,
31 F. Supp. 3d 571 (S.D.N.Y. 2014) ................................................................. 11

*Rosebrock v. Mathis*,
745 F.3d 963 (9th Cir. 2014) ........................................................................... 24

*Rosenblatt v. American Cyanamid Co.*,
86 S. Ct. 1 (1965) ......................................................................................... 19

*Ryan v. ICE*,
974 F.3d 9 (1st Cir. 2020) ........................................................................ 6, 18, 21

*Samantar v. Yousuf*,
560 U.S. 305 (2010) ....................................................................................... 21

*Shaffer v. Heitner*,
433 U.S. 186 (1977) ....................................................................................... 19

*Shakhnes v. Berlin*,
    689 F.3d 244 (2d Cir. 2012).................................................................. 14

*Sossamon v. Lone Star State of Texas*,
    560 F.3d 316 (5th Cir. 2009) ................................................................ 24

*Stewart v. Ramsay*,
    242 U.S. 128 (1916)...................................................................... 18, 19

*Tann v. Bennett*,
    807 F.3d 51 (2d Cir. 2015)..................................................................... 23

*Texas Clinical Labs v. Sebelius*,
    612 F.3d 771 (5th Cir. 2010) ................................................................ 15

*Textile Workers Union of America v. Lincoln Mills of Ala.*,
    353 U.S. 448 (1957)............................................................................. 22

*United States v. Craft*,
    535 U.S. 274 (2002)...................................................................... 18, 21

*United States v. Denedo*,
    556 U.S. 904 (2009)............................................................................. 19

*United States v. Seminole Nation of Okla.*,
    321 F.3d 939 (10th Cir. 2002) .............................................................. 25

*UPMC Mercy v. Sebelius*,
    793 F. Supp. 2d 62 (D.D.C. 2011) ....................................................... 11

*Westchester v. HUD*,
    778 F.3d 412 (2d Cir. 2015).................................................................. 12

*White v. Colorado*,
    82 F.3d 364 (10th Cir.1996) ................................................................. 25

**Statutes**

5 U.S.C. § 701(a)(1) ................................................................................... 13

5 U.S.C. § 704 ............................................................................................ 14

5 U.S.C. § 705 ............................................................................................ 10

5 U.S.C. § 706 ............................................................................................ 15

5 U.S.C. § 706(2)(C) ................................................................................. 17

8 U.S.C. § 1226(a) .......................................................................... 3, 13, 20

8 U.S.C. § 1226(e) ................................................................................................. 13

8 U.S.C. § 1229(e) ................................................................................................. 22

8 U.S.C. § 1229a(b)(1) ............................................................................................. 9

8 U.S.C. § 1357(a)(2) ............................................................................................. 22

8 U.S.C. § 1182 ....................................................................................................... 1

8 C.F.R. § 239.2(a) .................................................................................................. 9

8 C.F.R. § 239.2(c) .............................................................................................. 9, 10

8 C.F.R. § 287.5(c) .................................................................................................. 20

8 C.F.R. § 1003.0 ..................................................................................................... 3

8 C.F.R. § 1003.10(b) .............................................................................................. 9

8 C.F.R. § 1003.23(a) .............................................................................................. 9

**Rules**

Fed. R. Civ. P. 12(b)(1) ....................................................................................... 1, 11

Fed. R. Civ. P. 56 ............................................................................................... 1, 10

**Other Authorities**

82 Fed. Reg. 8799 (Jan. 25, 2017) ...................................................................... 5, 6

86 Fed. Reg. 7051 (Jan. 20, 2021) ........................................................................... 6

90 Fed. Reg. 8443 (Jan. 20, 2025) ........................................................................... 7

Defendants respectfully submit this memorandum of law in support of: (1) their motion for summary judgment as to Plaintiffs' claims against defendants Todd Lyons, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement ("ICE"), and Kristi Noem, in her official capacity as Secretary of the United States Department of Homeland Security ("DHS" and together, the "ICE Defendants"), pursuant to Fed. R. Civ. P. 56; and (2) their motion to dismiss the complaint as against defendants Daren K. Margolin, in his official capacity as Director of the Executive Office for Immigration Review ("EOIR"), and Pamela Bondi, in her official capacity as Attorney General of the United States (together, "the EOIR Defendants"), pursuant to Fed. R. Civ. P. 12(b)(1).[1]

## PRELIMINARY STATEMENT

Congress has codified in the Immigration and Nationality Act ("INA") the Executive Branch's constitutional and inherent authority to investigate, arrest, and detain aliens who are suspected of being, or found to be, unlawfully present in the United States to effectuate their removal. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1231, 1357. ICE has long exercised its arrest authority in and around courthouses given its strong interest in enforcing federal immigration

---

[1] This Court's Opinion and Order dated September 12, 2025 ("Opinion & Order") (Dkt. No. 51), held that, based on the factual record before the Court at that time, plaintiff The Door had demonstrated organizational standing to seek a stay on its own behalf but lacked associational standing to seek relief on its members' behalf, and plaintiff African Communities Together lacked both organizational and associational standing to seek a stay. Opinion & Order, at 13–20. To the extent Plaintiffs' standing arguments on summary judgment rest on their prior submissions supporting their motion for a stay, Defendants submit that only The Door has established organizational standing to obtain relief for the reasons set forth in the Opinion & Order. *Id. See also Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 119 (2d Cir. 2025) (the "evidentiary burden for establishing standing" at the preliminary injunction stage is "at least as rigorous as the standard that applies at the summary judgment stage"). If Plaintiffs introduce supplemental affidavits or other evidence supporting standing that were not included in their complaint nor offered in support of their motion for a stay, Defendants reserve the right to move for dismissal for lack of standing in their opposition brief.

laws and effectuating arrests in a manner that protects the public, the arrestee, and law enforcement officers.  To that end, on May 27, 2025, ICE issued a memorandum titled Civil Immigration Enforcement Actions in or near Courthouses (the "ICE Guidance"), which provided revised policy guidance for the exercise of ICE's discretionary arrest authority in or near federal, state, and local courthouses.  *See* Certified Administrative Record ("AR"), at 1–3 (Dkt. No. 64). Per this guidance, ICE civil enforcement actions in or around courthouses target, among others, aliens convicted of crimes, gang members, national security or public safety risks, aliens subject to final orders of removal, or aliens who have illegally reentered the country after being removed.

Plaintiffs' challenge to the ICE Guidance fails as a matter of law.  As a threshold matter, the ICE Guidance is not reviewable under the Administrative Procedure Act ("APA") because the locations of ICE's civil enforcement authority are a matter committed to agency discretion. As a result, there is no meaningful standard by which a court can evaluate the appropriateness of ICE's discretionary choice of locations for targeted immigration enforcement actions. Furthermore, the ICE Guidance is not arbitrary, capricious, or contrary to law.  The Guidance strikes a reasonable balance between ICE's legitimate interests in enforcing immigration law and protecting the safety of its officers, individuals subject to arrest, and members of the public, while minimizing interference with judicial proceedings.  Furthermore, as this Court has recognized, there is no common-law privilege against courthouse arrests that was incorporated into the INA upon its enactment in 1952.

Separately, Plaintiffs' APA challenge to a May 20, 2025, email sent by two Acting Regional Deputy Chief Immigration Judges ("IJs") to Assistant Chief IJs (the "EOIR Guidance Email") should be dismissed as moot because the email was formally withdrawn in a September 23, 2025 policy memorandum.  EOIR is an agency within the U.S. Department of Justice that oversees the immigration courts and the Board of Immigration Appeals ("BIA").  *See* 8 C.F.R.

§ 1003.0; *see also* https://justice.gov/eoir/about-office (last visited on Dec. 3, 2025).  EOIR is responsible for adjudicating immigration cases, and its mission is to adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws.  *Id.*  On May 30, 2025, two Acting Regional Deputy Chief IJs sent a non-binding, non-authoritative guidance email to Assistant Chief IJs entitled "Guidance on Case Adjudication," which referenced specific statutory and regulatory authority available to IJs and advised Assistant Chief IJs as to what IJs can do with respect to oral motions to dismiss by DHS attorneys.  Declaration of Amy Belsher, dated Aug. 11, 2025 ("Belsher Decl."), Ex. 12 (Dkt. No. 24-12).  On September 12, 2025, this Court granted Plaintiffs' motion under Section 705 of the APA to stay the application of the EOIR Guidance Email to removal proceedings in Manhattan and the Bronx.  On September 23, 2025, EOIR issued Policy Memorandum 25-51, which formally withdrew the EOIR Guidance Email without limitation to geographic area or time.  Because Plaintiffs' alleged injuries have been redressed by voluntary agency action, their APA challenge to the EOIR Guidance Email should be dismissed for lack of subject matter jurisdiction.

## BACKGROUND

### I.    Federal Statutory Removal and Arrest Authority

The federal government "has broad, undoubted power over the subject of immigration and the status of aliens."  *Arizona v. United States*, 567 U.S. 387, 394 (2012); *see* U.S. Const. art. I § 8, cl. 4 (granting Congress the power to "establish a uniform Rule of Naturalization").  Pursuant to that authority, Congress has provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a).  Congress has also provided that "without [a] warrant," a federal officer may "arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any [] law or regulation [regulating the admission,

exclusion, expulsion, or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest." *Id.* § 1357(a)(2). These statutes confer arrest authority that is generally plenary and unqualified. Congress has limited the government's authority to search for aliens in certain specific locations, but none of those locations include courthouses. *Id.* § 1357(a)(3), (e). Accordingly, in the exercise of its long-standing discretionary authority to determine the location of a civil enforcement action against an alien unlawfully present in the United States, DHS has developed, revised, and/or rescinded guidance with regard to certain locations which has balanced the government's legitimate interests in enforcing immigration law against the potential effects of its enforcement activities. (AR 4–6, 7–19, 29–50).

## II.     ICE Civil Immigration Courthouse Arrest Policies

### A. Pre-2025 ICE Courthouse Arrest Policies

#### 1.     The March 2014 Guidance

Since at least 2014, ICE policy has permitted its officers and agents to conduct civil immigration enforcement actions in or near courthouses. In a March 19, 2014 memorandum issued to field offices and entitled "Enforcement Actions at or Near Courthouses" (the "March 2014 Guidance"), ICE stated that "[e]nforcement actions at or near courthouses will only be undertaken against Priority 1 aliens," including aliens engaged in or suspected of terrorism or espionage or who otherwise pose a danger to national security, and those aliens who pose a serious risk to public safety as shown by certain criminal activity. *See* Declaration of Jeffrey S. Oestericher, dated August 20, 2025 ("Oestericher Decl.") Ex. A (Dkt. No. 41-1).

#### 2.     The January and October 2015 Guidance

After March 2014, ICE has amended its guidance with respect to courthouse arrests several times to reflect changes in DHS enforcement priorities. In a January 26, 2015, guidance addressed to field offices ("January 2015 Guidance"), ICE revised the March 2014 Guidance to reflect

enforcement priorities set forth in then-DHS Secretary Jeh Johnson's November 20, 2014, memorandum, titled "Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants." Oestericher Decl. Ex. B (Dkt. No. 41-2). Nine months later, on October 21, 2015 ("October 2015 Guidance"), ICE's then-Assistant Director for Field Operations sent an e-mail reminding all Deputy Field Office Directors and Field Office Directors to limit enforcement actions in or near courthouses to the categories of aliens set forth in Secretary Johnson's November 2014 memorandum. (AR 20; Oestericher Decl. Ex. B). The October 2015 Guidance further instructed that enforcement actions at or near courthouses, "wherever practicable," would occur outside public areas of the courthouse, be conducted in collaboration with court security personnel, and use the courthouses' non-public entrances and exits. (AR 20).

3.    The January 2018 Directive

On January 25, 2017, then-President Trump issued Executive Order 13,768, which expanded the categories of aliens to be prioritized for removal. 82 Fed. Reg. 8799 (Jan. 25, 2017). To implement the Executive Order, on January 10, 2018, ICE issued a memorandum titled Directive 11072.1: Civil Immigration Enforcement Actions Inside Courthouses (the "2018 Directive") (AR 21–24), which revised ICE's policy "regarding civil immigration enforcement actions inside federal, state, and local courthouses." AR 21. The 2018 Directive advised that "civil immigration enforcement actions taken inside courthouses can reduce safety risks to the public, targeted alien(s) and ICE officers and agents," because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband." *Id.*[2]

---

[2] As this Court is aware, lawsuits challenging the 2018 Directive were filed in this Court (the "SDNY case") and the District of Massachusetts. In June 2020, the Honorable Jed S. Rakoff entered judgment enjoining ICE "from conducting any civil arrests on the premises or grounds of New York State courthouses, as well as such arrests of anyone required to travel to a New York

4.      The April 2021 Guidance

On January 20, 2021, then-President Biden issued Executive Order 13,993, "Revision of

Civil Immigration Enforcement Policies and Priorities," 86 Fed. Reg. 7051 (Jan. 20, 2021), which

revoked Executive Order 13,768.  On the same day, then-Acting Secretary of Homeland Security

David Pekoske issued a memorandum which amended the agency's immigration enforcement

priorities.  *See* https://perma.cc/2TJK-HTMS.  In accordance with the changed immigration

enforcement priorities, on April 27, 2021, DHS revoked the 2018 Directive and issued interim

guidance "govern[ing] [ICE] civil immigration enforcement actions in or near courthouses" ("2021

Courthouse Guidance").  (AR 25–28).  The 2021 Courthouse Guidance provided that a civil

immigration enforcement action may be taken in or near a courthouse if there was a national

security threat; an imminent risk of death, violence or harm to any person; or other public safety

threats.  (AR 26).  In the absence of hot pursuit and subject to advance supervisory approval, ICE

officers were permitted to undertake a civil immigration enforcement action in or near a courthouse

against an individual posing a threat to public safety if there was no other safe alternative location

or it would be too difficult to undertake the action elsewhere.  *Id.*

On October 27, 2021, DHS separately issued a memorandum entitled "Guidelines for

Enforcement Actions in or Near Protected Areas" ("2021 Protected Areas Guidance") (AR 29–

34). The guidance advised that ICE and U.S. Customs and Border Protection ("CBP") officers

---

State courthouse as a party or witness to a lawsuit." *New York v. ICE*, 466 F. Supp. 3d 439, 449-
50 (S.D.N.Y. 2020).  In September 2020, in connection with the District of Massachusetts
litigation, the First Circuit vacated a district court order which had preliminarily enjoined ICE from
implementing the 2018 Directive on the grounds that plaintiffs had failed to show a likelihood of
success on the merits and remanded to the district court for further proceedings. *Ryan v. ICE*, 974
F.3d 9, 33-34 (1st Cir. 2020).  On February 28, 2023, the Second Circuit vacated the judgment and
injunction in the SDNY case, *see New York v. ICE*, No. 20-2622, 2023 WL 2333979 (2d Cir. Feb.
28, 2023).  On May 21, 2021, the *Ryan* plaintiffs voluntarily dismissed their case. *See Ryan v.
ICE*, 19 Civ. 11003 (D. Mass. May 21, 2021) (Dkt. No. 115).

"should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities," which the memorandum referred to as "protected areas."  (AR 30).  The 2021 Protected Areas Guidance offered some examples of "protected areas"—*e.g.*, schools, medical facilities, places of worship, playgrounds and childcare centers, social services establishments, disaster or emergency response and relief locations, and parades—but did not include a defined term and did not include courthouses in its list of examples. (AR 30–31).

      **B.**      **2025 ICE Guidance Regarding Courthouse Arrests**

On January 20, 2025, President Trump issued Executive Order 14,159, which, *inter alia*, revoked the prior administration's civil immigration enforcement policies and priorities and stated that it "is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people."  90 Fed. Reg. 8443, 8443 (Jan. 20, 2025).  On the same day, the then-Acting Secretary of Homeland Security issued a memorandum which superseded and rescinded the 2021 Protected Area Guidance.  This memorandum stated that, as a policy matter, it was "not necessary" for the agency to "create bright line rules regarding where our immigration laws are permitted to be enforced," because on a daily basis, "officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location."  (AR 50).  The memorandum further provided that ICE and CBP "may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion."  (AR 50).

In accordance with this memorandum, on January 20, 2025, ICE issued a memorandum titled, "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses" ("Interim Guidance"), which rescinded and superseded the 2021 Courthouse Guidance. (AR 51–

53).   In the Interim Guidance and an accompanying cover e-mail, ICE reiterated that civil immigration enforcement actions in or near courthouses "should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits."  (AR 52, 54). The Interim Guidance and the cover e-mail also urged that, "[w]hen practicable," civil immigration enforcement actions "against targeted aliens" should be done "discreetly to minimize their impact on court proceedings."  (AR 52, 54).

On May 27, 2025, Todd M. Lyons, Acting Director of ICE, issued a revised memorandum titled, "Civil Immigration Enforcement Actions In or Near Courthouses" (the "ICE Guidance") which superseded the January 21, 2025 Guidance.  (AR 1–3).  The ICE Guidance explains that civil immigration enforcement actions taken inside courthouses "can reduce safety risks to the public, targeted alien(s) and ICE officers and agents," because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband." (AR 1).  It affirms ICE's understanding that its civil immigration enforcement actions in or near courthouses are consistent with the actions of "[f]ederal, state and local law enforcement officials" who "routinely engage in enforcement activities in or near courthouses because many individuals appear in courthouses for unrelated criminal or civil violations."  *Id.*  The ICE Guidance further explains that courthouse arrests "are often required when jurisdictions refuse to cooperate with ICE," such as refusing "to honor immigration detainers and transfer aliens directly to ICE custody."  *Id.*

Consistent with Executive Order 14,159's broadened enforcement priorities, the ICE Guidance provides that "targeted aliens" include, but are not limited to: national security or public safety threats; specific aliens with criminal convictions; gang members; aliens ordered removed from the United States who have failed to depart; and/or aliens who have re-entered the country

illegally after being removed.  (AR 2).  Like the January 2025 Interim Guidance and its cover e-mail, the ICE Guidance advises that "[w]hen practicable," ICE officers should "conduct civil immigration enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings."  *Id*.  It further provides that enforcement actions inside courthouses "should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits."  *Id*.  ICE officers and agents are also advised to "exercise sound judgment" and "make substantial efforts to avoid unnecessarily alarming the public or disrupting court operations," and to "make every effort to limit their time at courthouses while conducting civil immigration enforcement actions."  (AR 3).

## III.    IJ Adjudication Procedures and the Withdrawn EOIR Guidance Email

The INA requires IJs presiding over removal proceedings to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses."  8 U.S.C. § 1229a(b)(1); *see also* 8 C.F.R. § 1003.10(b).  In deciding the individual cases before them, IJs "shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the [INA] and regulations that is necessary or appropriate for the disposition . . . of such cases."  8 C.F.R. § 1003.10(b).

With respect to pre-decision motions, including motions to dismiss removal proceedings, "[u]nless otherwise permitted by the immigration judge, motions submitted prior to the final order of an immigration judge shall be in writing and shall state, with particularity the grounds therefor the relief sought, and the jurisdiction."  8 C.F.R. § 1003.23(a).  The governing regulations further provide that after commencement of proceedings, a DHS attorney may move to dismiss removal proceedings on the grounds set forth in 8 C.F.R. § 239.2(a).  *See* 8 C.F.R. § 239.2(c); Compl. ¶ 43.

On May 30, 2025, two Acting Regional Deputy Chief IJs sent an email to Assistant Chief IJs entitled "Guidance on Case Adjudication." Belsher Decl., Ex. 12. In the EOIR Guidance Email, the authors reported that there had been an increase in caseload in the detained docket and several developments with non-detained cases in the past few weeks, including that "DHS is carrying out enforcement actions in or near EOIR space" and "DHS attorneys have moved to dismiss cases that are currently pending in court." *Id.* "Given the recent developments," the email provided guidance regarding the handling of DHS motions to dismiss "to ensure the expeditious adjudication of cases." *Id.*

On September 12, 2025, the Court granted Plaintiffs' motion under Section 705 of the APA, 5 U.S.C. § 705, to stay the application of the EOIR Guidance Email, but limited the stay to "removal proceedings conducted in the geographic areas served by The Door, *i.e.*, Manhattan and the Bronx, pending full review on the merits of all policies challenged in this action." Opinion & Order dated Sept. 12, 2025 (Dkt. No. 51), at 46.

On September 23, 2025, EOIR issued Policy Memorandum 25-51 (the "Policy Memo") (Dkt. No. 58, at Ex. A), which formally withdrew the EOIR Guidance Email, without limitation to geographic area or time. The Policy Memo reiterated that the EOIR Guidance Email "was not an EOIR policy" and "could not direct or bind any Immigration Judge to make a specific decision in a case in a particular way," and directed all IJs to "continue to not rely on it in adjudicating cases." *Id.* at 1, 3.

## ARGUMENT

### I. Legal Standards

#### A. Summary Judgment

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "Where, as here, a party seeks judicial review of agency action, summary judgment is appropriate, since 'whether an agency action is supported by the administrative record and consistent with the APA standard of review' is decided 'as a matter of law.'" *Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs*, 31 F. Supp. 3d 571, 586 (S.D.N.Y. 2014) (quoting *UPMC Mercy v. Sebelius*, 793 F. Supp. 2d 62, 67 (D.D.C. 2011)). "Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).

"Under the APA, courts review agency action to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Animals v. Romero*, 948 F.3d 579, 585 (2d Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)). This "narrow" standard does not allow a court "'to substitute its judgment for that of the agency.'" *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1554 (2d Cir. 1992) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Rather, a court may overturn an agency's action only if it finds that the agency has relied on factors which Congress "has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

**B.    Rule 12(b)(1) Motion to Dismiss**

On a Rule 12(b)(1) motion to dismiss, Plaintiffs bear the burden of "'proving subject matter jurisdiction by a preponderance of the evidence.'" *Mantena v. Johnson*, 809 F.3d 721, 727 (2d Cir. 2015) (quoting *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012)). In considering challenges to subject matter jurisdiction under Rule 12(b)(1), the court "must accept as true all the

material factual allegations contained in the complaint," but is "'not to draw inferences from the complaint favorable to plaintiffs.'"  *Carver v. Bank of New York Mellon*, 15 Civ. 10180 (JPO), 2017 WL 1208598, at *2 (S.D.N.Y. Mar. 31, 2017) (quoting *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004)).  In adjudicating a 12(b)(1) motion, the Court may consider evidence extrinsic to the pleadings.  *Phifer v. City of New York*, 289 F.3d 49, 55 (2d Cir. 2002).

## II.    The ICE Guidance Is Not Subject to APA Review

As a threshold matter, the ICE Guidance is unreviewable under the APA for two reasons: the circumstances and location of an arrest are committed to agency discretion by law, and the ICE Guidance is a general statement of agency policy rather than a final agency decision within the meaning of the APA.

First, while the APA embodies a presumption of judicial review, *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986), "[t]his is 'just' a presumption," *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (quoting *Block v. Cmty Nutrition Inst.*, 467 U.S. 340, 349 (1984)), and "under [5 U.S.C.] § 701(a)(2) agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law,'" *id.* (quoting § 701(a)(2)). "[E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  "In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely."  *Id.*

 "To determine the extent of [the agency's] discretion and whether there is 'law to apply'" in a particular case, this Court "look[s] to the statutory provisions that govern" the agency's enforcement actions.  *Westchester v. HUD*, 778 F.3d 412, 419 (2d Cir. 2015).  The INA, from which ICE's civil arrest authority derives, provides no "meaningful standard" by which a court

can evaluate the appropriateness of ICE's discretionary choice of public locations for targeted immigration enforcement actions. *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States"); *id.* § 1357(a)(2) ("Any officer or employee . . . authorized under regulations prescribed by the Attorney General shall have the power without warrant . . . (2) . . . to arrest any alien in the United States . . . ."). The INA's broad language grants ICE the discretion to determine the location of a civil enforcement action against an alien removable from the United States. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (State Department policy relating to location of processing overseas immigrant visa applications was not reviewable under the APA, because the "broad language" of the INA "grants to the Secretary discretion to prescribe the place at which aliens apply for immigrant visas without providing substantive standards against which the Secretary's determination could be measured"). And with respect to arrests by ICE with a warrant, ICE's decisions about the location of such arrests are unreviewable for the separate reason that another statute "preclude[s] judicial review," 5 U.S.C. § 701(a)(1), as the INA provides that immigration authorities' "discretionary judgment regarding the application of [§ 1226, authorizing arrests with a warrant] shall not be subject to [judicial] review." 8 U.S.C. § 1226(e). Plaintiffs have cited no law or standard that would limit ICE's discretion, except the common-law privilege against courthouse arrest, Compl. ¶¶ 4, 23–24, 80, and this Court has already held that Plaintiffs have not demonstrated the existence of such a privilege against civil enforcement actions in or near courthouses. Opinion & Order, 32–37. Absent such privilege or other applicable restriction on where ICE can make arrests, its decisions or policies in that regard are unreviewable.

Second, the ICE Guidance is unreviewable because it is not a "final agency action." 5 U.S.C. § 704. An agency action is "final" only if two conditions are met: "'(1) the action must

mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature,' and (2) 'the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Shakhnes v. Berlin*, 689 F.3d 244, 260 (2d Cir. 2012) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

The ICE Guidance fails the second prong of this test. On its face, the ICE Guidance does not compel any action, determine any rights or obligations, or create legal consequences for aliens who may be the subject of civil enforcement actions. Instead, it is a general statement of policy— that is, a statement "'issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'" *Lincoln v. Vigil*, 508 U.S. 182, 196–97 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)); *accord Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975) ("'general statements of policy' are rules directed primarily at the staff of an agency describing how it will conduct agency discretionary functions" (quotation marks omitted)); *National Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (a "general statement of policy" is an "agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule"). A final agency action would exist only when an immigration officer actually applies the policy and arrests a specific individual alien, thereby taking action that determines that alien's rights and obligations—but the ICE Guidance, standing alone, is not a reviewable agency action. *See National Mining Ass'n*, 758 F.3d at 253; *Pacific Gas & Electric Co. v. Federal Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974) ("A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.").

### III.    The ICE Guidance Is Not Arbitrary and Capricious

Separate and apart from these threshold deficiencies, the ICE Guidance does not violate the APA.  As provided in 5 U.S.C. § 706, a reviewing court must uphold agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See Bechtel v. Administrative Review Bd.*, 710 F.3d 443, 446 (2d Cir. 2013).  Courts applying this "'deferential standard'" "'may not substitute [their] judgment for that of the agency.'"  *Guertin v. United States*, 743 F.3d 382, 385-86 (2d Cir. 2014) (quoting *Bechtel*, 710 F.3d at 446, and *NRDC v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011)); *accord FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("deferential" review "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision").  A court accordingly may set aside agency action "only if [the agency] 'has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Bechtel*, 710 F.3d at 446 (quoting *National Assoc. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007)); *accord Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  "[U]nder the arbitrary and capricious standard, there is a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous."  *Texas Clinical Labs v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010); *accord National Lifeline Ass'n v. FCC*, 983 F.3d 498, 507 (D.C. Cir. 2020) ("[T]he party challenging" an agency's action as arbitrary and capricious "bears the burden of proof").

Plaintiffs assert that the ICE Guidance is arbitrary and capricious because it "overturns longstanding policy restricting civil immigration arrests in or near immigration courts."  Compl. at 6.  However, Plaintiffs erroneously characterize the ICE Guidance as making an unannounced

change to its prior courthouse policies.  As explained in detail above, ICE first issued the March

2014 Directive regarding civil enforcement activities at or near courthouses and that guidance,

over time, has been amended to incorporate changes in DHS enforcement priorities.  The ICE

Guidance is little different than its predecessors; it was issued pursuant to an Executive Order's

change of categories of aliens to be prioritized for removal, and to its mandate that DHS review

existing agency policies and procedures and, as appropriate and consistent with the law, modify

those policies and procedures for consistency with the Executive Order.

Plaintiffs also incorrectly assert that the ICE Guidance "fail[s] to articulate a reasoned

explanation" for its issuance.  Compl. ¶ 77.  The face of the ICE Guidance makes clear that its

purpose was to explain the agency's justifications for continuing to conduct civil enforcement

actions in or near courthouses—*i.e.*, to reduce safety risks to the public, the targeted alien, and ICE

officers and agents; the fact that these enforcement actions were consistent with the practices of

other federal, state and local law enforcement officials who routinely engage in enforcement

activities in courthouses nationwide; and that such enforcement actions are necessary because

jurisdictions have refused to honor immigration detainers and transfer aliens directly to ICE

custody.  (AR 1).

In addition, Plaintiffs' assertion that the ICE Guidance is arbitrary and capricious because

it "failed to consider important aspects of the problem or reasonable alternatives," Compl. ¶ 77,

is also incorrect.  Plaintiffs maintain that ICE failed to consider how the ICE Guidance "may chill

noncitizens' access to the courts and interfere with the administration of justice."  *Id.* ¶ 22.

However, the ICE Guidance addresses those concerns by including provisions designed to ensure

that enforcement actions within courthouses are conducted in an orderly, safe, and non-disruptive

manner.  For example, the ICE Guidance mandates that, "when practicable," ICE officers

"conduct enforcement actions against targeted aliens discreetly to minimize their impact on court

proceedings."  (AR 2).  In line with prior guidance documents relating to the location of civil enforcement actions (AR 20, 22, 32), the ICE Guidance also prioritizes non-public arrests when possible.  (AR 2).  The ICE Guidance further directs ICE officers and agents to "exercise sound judgment" and "make substantial efforts to avoid unnecessarily alarming the public," (AR-22) and requires them to "make every effort to limit their time at courthouses while conducting civil immigration enforcement actions."  (AR 3).  In addition, it provides that to the extent practicable, civil enforcement actions inside courthouses should take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits.  (AR 2).  Thus, the ICE Guidance strikes a balance between ICE's legitimate interests in enforcing immigration law and protecting the safety of its officers, the arrestee, and members of the public, and the goal of minimizing interference with judicial proceedings.

C.    **The ICE Guidance Is Not Contrary to Law**

1.    There Is No Common-Law Privilege Against Federal Immigration Enforcement in and Around Courthouses

Plaintiffs' argument that the ICE Guidance is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA, Compl. ¶ 79 (quoting 5 U.S.C. § 706(2)(C)), is mistaken.  Plaintiffs' argument rests on an alleged common-law privilege against courthouse arrests and an assertion that such a privilege was incorporated into the INA upon its enactment in 1952.  *Id.* ¶ 80.  However, there has never been a privilege, either when the INA was adopted or at any time before, resembling the one alleged by Plaintiffs—much less one that was "so well established" that the INA should be deemed to have included it.  *United States v. Craft*, 535 U.S. 274, 288 (2002) (holding that, to conclude that Congress meant to incorporate a common-law rule, that rule must have been "so well established" that it can be "assume[d]" that Congress

considered it).  To the contrary, historical cases demonstrate only a much narrower common-law immunity from certain types of civil arrest, which itself rests on rationales that no longer exist.

As the First Circuit recognized in a challenge to ICE's prior courthouse arrest guidance, the "hoary common law privilege against civil arrests for parties and witnesses attending court proceedings" arose at a time when "a plaintiff in a civil action obtained personal jurisdiction over a defendant" by having that defendant arrested under a writ of *capias ad respondendum*.  *Ryan*, 974 F.3d at 15.  But parties and witnesses attending court proceedings in other matters were protected from such arrests by an immunity devised by the courts, "both to remove a disincentive for inhibiting parties and witnesses from coming forward (especially the risk of arrest in connection with another matter) and to ensure that arrests did not disrupt the orderly operation of the courts."  *Id*. at 21.

However, as "arrests in civil suits fell largely out of fashion" and were replaced by service of summonses to obtain personal jurisdiction and initiate a civil action, courts "ruled that a similar privilege against service of a summons should extend to at least some parties and witnesses."  *Id*. at 22.  Thus, in cases now nearly a century old, the Supreme Court recognized an immunity from service of process in a private civil suit when the person to be served entered a jurisdiction solely to attend a court proceeding as a witness or party.  *See Lamb v. Schmitt*, 285 U.S. 222, 225 (1932); *Page Co. v. MacDonald*, 261 U.S. 446, 446–47 (1923); *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916).

Both the privilege against case-initiating arrest and the privilege against service of process of a person attending court were extensions of the now-outdated principle that a state court's jurisdiction over a person rested on that person's physical presence.  *See Daimler AG v. Bauman*, 571 U.S. 117, 125–26 (2014) (under rule of *Pennoyer v. Neff*, 95 U.S. 714, 727, 733 (1878), "a tribunal's jurisdiction over persons reaches no farther than the geographic bounds of the forum,"

and noting later abrogation of that doctrine).  Because physical presence was historically the key to state-court personal jurisdiction, potential defendants had a strong incentive not to attend court proceedings in states in which potential plaintiffs might seek to serve them with civil process— just as they had the same incentive not to attend when they might be subject to arrest to subject them to a state court's jurisdiction.  *See Stewart*, 242 U.S. at 130–31 ("Witnesses would be chary of coming within our jurisdiction . . . if they might be punished with a lawsuit for displeasing parties by their testimony; and even parties in interest . . . might be deterred from the rightfully fearless assertion of a claim or the rightfully fearless assertion of a defense, if they were liable to be visited on the instant with writs from the defeated party." (quotation marks omitted)).

That physical-presence requirement is now obsolete.  In *International Shoe Co. v. Washington*, the Supreme Court announced the modern rule that a defendant need only have "certain minimum contacts" with a forum state to be sued there.  326 U.S. 310, 316 (1945).  That decision broadly "increase[d] the ability of the state courts to obtain personal jurisdiction over nonresident defendants," *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977), and many states responded by enacting long-arm statutes enabling their courts to exercise personal jurisdiction over out-of-state defendants, *see Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 926 (2011); *Rosenblatt v. American Cyanamid Co.*, 86 S. Ct. 1, 3 (1965) (Goldberg, J., in chambers).  Thus, the rationale for immunity against service of process or arrest to initiate a civil action has disappeared, given that neither physical presence nor physical custody is required any longer for a court to obtain personal jurisdiction.  With that rationale no longer present, the common-law rule that resulted from it no longer carries any force.  *See United States v. Denedo*, 556 U.S. 904, 911 (2009) (noting change in common-law rule when rationale has been superseded); *Kansas v. Colorado*, 533 U.S. 1, 10 (2001) (rejecting common-law rule that rested on unsound distinction).

Accordingly, since the dawn of long-arm jurisdiction, judicial decisions have not applied the common-law privilege. To the contrary, courts have explained that when an out-of-jurisdiction defendant is subject to civil process under a forum state's long-arm statute, the privilege does not apply. *In re Arthur Treacher's Franchise Litigation*, 92 F.R.D. 398, 405 (E.D. Pa. 1981) ("'it makes little sense to grant immunity to a person who can be served in his home jurisdiction under the forum's long-arm statute'" (quoting 4A Wright & Miller, Federal Practice and Procedure: Civil § 1076 (1969)); *accord Gardner v. United States*, 246 F. Supp. 1014, 1015 (S.D.N.Y. 1965) ("A nondomiciliary who could be served outside the state cannot claim immunity from service if he is served in New York, even if he is here voluntarily and in the aid of justice."); *Pavlo v. James*, 437 F. Supp. 125, 127 (S.D.N.Y. 1977) ("the reason for the immunity—encouraging voluntary appearances—disappears if a defendant is otherwise subject to the extra-territorial reach of [the forum state's long-arm statute]").

That same logic vitiates any argument that the privilege should apply against courthouse arrests by ICE. Aliens are subject to federal law enforcement jurisdiction or enforcement actions anywhere in the United States. *See* 8 U.S.C. § 1226(a) (providing for arrests "[o]n a warrant" without geographic limitation), *id.* § 1357 (providing for warrantless arrests without geographic limitation); 8 C.F.R. § 287.5(c) (similar). Given that, an alien does not "giv[e] up the 'safety' of one jurisdiction" when he attends a court proceeding in another state. *Green*, 305 F. Supp. at 128. Because the privilege is not needed "to shield an individual from service of process to encourage his or her travel to the forum state," it "should not be enlarged" beyond that reason. *Northern Light Technology, Inc. v. Northern Lights Club*, 236 F.3d 57, 62–63 (1st Cir. 2001).

2.    <u>The INA Cannot Be Read to Incorporate the Common-Law Privilege Against Courthouse Arrest</u>

Because there was no "long-established and familiar common law rule protecting against civil arrests on behalf of the sovereign" at the time of the INA's enactment (or at any other time), Plaintiffs' assertion that the INA does not authorize such arrests at courthouses lacks merit. *Ryan*, 974 F.3d at 23. Congress is presumed to legislate against the background of the common law and to retain a common-law rule except when it evidently intends not to. *Baker Botts LLP v. ASARCO LLC*, 576 U.S. 121, 126 (2015); *Samantar v. Yousuf*, 560 U.S. 305, 320 & n.13 (2010). However, that presumption of nonderogation of the common law only applies to "long-established and familiar principles." *Samantar*, 560 U.S. at 320 n.13 (quotation marks omitted). When the common-law rule is "not so well established," it cannot displace "broad statutory language" enacted by Congress. *Craft*, 535 U.S. at 288.

As the authorities above show, by the time Congress established a comprehensive immigration-arrest statutory scheme in the INA, any privilege against extra-jurisdictional civil arrest was a historical artifact. Even when it was in force, it never applied to arrests by the government for law-enforcement purposes. Thus, at the very least, there is ambiguity as to the scope of the common-law principle at issue. *See Netograph*, 197 N.Y. at 379 ("Volumes of opinions have been written in which one can find all sorts of conflicting decisions and almost any dictum that one may be looking for" regarding privilege against courthouse service of summons.). The INA therefore cannot have codified the purported privilege. *See Pasquantino*, 544 U.S. at 364 (rejecting importation of a common-law rule where no case "clearly establishes" the rule's applicability).

3.    The INA Displaced any State Common-Law Privilege to the Contrary

Because "Congress possesses plenary authority over immigration-related matters, it may freely displace or preempt state laws in respect to such matters." *Herrera-Inirio v. INS*, 208 F.3d 299, 307 (1st Cir. 2000); *see Textile Workers Union of America v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957) (when Congress enacts a policy, "by implication [it] reject[s] the common-law rule" to the contrary).    Exercising that plenary authority, Congress in the INA spoke comprehensively to how the federal government will enforce federal immigration law, thus supplanting any prior federal or state common law on the issue.  Specifically, Congress addressed the authority of immigration authorities to effect arrests, allowing those arrests by and large without qualification.  8 U.S.C. §§ 1226 ("an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States"), 1357(a) (specifying numerous categories under which immigration authorities can make arrests).  And when Congress intended limitations on ICE's arrest authority, it was explicit, for instance limiting warrantless arrest authority to situations where officers had reason to believe an alien was violating immigration law and was "likely to escape before a warrant can be obtained for his arrest," 8 U.S.C. § 1357(a)(2), or restricting warrantless entry near the border to "the premises of a farm or other outdoor agricultural operation," *id*. § 1357(a)(3), (e).  These provisions show that Congress knew how to limit DHS's arrest authority and made conscious choices about when, where, and how to do so.

Finally, as this Court has recognized, Opinion & Order at 33–34, 37, Congress amended the INA in 2006 to add 8 U.S.C. § 1229(e), which expressly acknowledges the practice of conducting immigration enforcement actions against aliens at courthouses.  *Id*. § 1229(e)(1)–(2) ("where an [immigration] enforcement action leading to a removal proceeding was taken against an alien [a]t . . . a courthouse (or in connection with that appearance of that alien at a courthouse)

if the alien is appearing in connection with [certain specified matters or circumstances]").  Section

1229(e) reflects Congress's recognition that courthouse arrests are permitted under the INA.

## IV.    This Action Is Moot as to the EOIR Defendants Because the EOIR Guidance Email Has Been Withdrawn

Plaintiffs' claim relating to the EOIR Guidance Email should be dismissed as moot.  Under

Article III of the Constitution, federal courts are limited to "the adjudication of actual, ongoing

controversies between litigants." *Deakins v. Monaghan*, 484 U.S. 193, 199 (1988).  As recognized

by the Second Circuit "[m]ootness is a jurisdictional matter" relating to Article III's mandate that

"federal courts hear only 'cases' or 'controversies.'"  *Blackwater v. Safnauer*, 866 F.2d 548, 550

(2d Cir. 1989) (citing *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)).  Federal courts "cannot give

opinions on moot questions or abstract propositions," *Motient Corp. v. Dondero*, 529 F.3d 532,

537 (5th Cir. 2008) (quotation marks omitted), and must therefore dismiss a pending action for

lack of jurisdiction when an event occurs that either provides the plaintiff with the requested relief

or makes it impossible for the court to grant any effectual relief, *Church of Scientology of

California v. United States*, 506 U.S. 9, 12 (1992); *Deposit Guaranty Nat'l Bank v. Roper*, 445

U.S. 326, 335 (1980).  A claim becomes moot "when the issues presented are no longer live or the

parties lack a legally cognizable interest in the outcome." *Tann v. Bennett*, 807 F.3d 51, 52 (2d

Cir. 2015) (citations omitted).

The Policy Memo formally withdrew the EOIR Guidance Email.  Dkt. No. 58, Ex. A, at 1,

3.  To the extent Plaintiffs' complaint challenges the EOIR Guidance Email under *United States

ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) and the APA, and seeks to "vacate and set

aside" that guidance, *see* Compl. at 28, Plaintiffs' claim is moot.  As the Supreme Court has

explained, "when the challenged conduct ceases," it is no longer possible for the court to grant any

effectual relief to the prevailing party and "any opinion as to the legality of the action would be advisory." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).

To the extent Plaintiffs may argue that a defendant's "voluntary cessation" of a challenged practice can in certain circumstances allow for an exception to mootness, that exception does not apply here.  Under the voluntary cessation exception, a court can adjudicate otherwise moot claims unless: "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016)  (quoting *Cty of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). While a private party bears a "heavy burden" of showing that voluntarily ceased conduct will not recur, the government's burden is "lighter": cessation of conduct will be treated "with some solicitude . . . [because] government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009).  *See also Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (for mootness analysis, "[w]e presume that a government entity is acting in good faith when it changes its policy"); *Beta Upsilon Chi Upsilon Chapter v. Machen*, 586 F.3d 908, 916 (11th Cir. 2009) (where defendant is a government actor, "there is a rebuttable presumption that the objectionable behavior will *not* recur") (emphasis in original).  "Although voluntary cessation analysis applies where a challenge to government action is mooted by passage of legislation," or as applicable here, an agency's withdrawal of e-mail guidance to its employees, "the mere power to reenact a challenged law is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists." *National Black Police Association v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997).  Instead, "there must be evidence indicating that the challenged law likely will be reenacted." *Id.*

24

That evidence is lacking here with respect to the EOIR Guidance Email. The Policy Memo voluntarily withdrew the EOIR Guidance Email without any geographic and temporal limitations, and thus exceeded the scope of this Court's order directing the agency to not apply the EOIR Guidance Email in immigration courthouses in Manhattan and the Bronx pending this Court's review of the merits of Plaintiffs' claims. Opinion & Order, at 46. Moreover, there is no evidence indicating that EOIR will re-issue the EOIR Guidance Email.

Nor can Plaintiffs successfully argue that their case falls within the narrow class of cases exempt from mootness because their asserted claims are "capable of repetition, yet evad[ing] review." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). The "capable of repetition" exception "is only to be used in exceptional situations," *White v. Colorado,* 82 F.3d 364, 366 (10th Cir.1996), and "arises 'when: (1) the duration of the challenged action is too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party ... [will] be subjected to the same action again.'" *Disability Law Ctr. v. Millcreek Health Ctr.,* 428 F.3d 992, 996 (10th Cir. 2005) (quoting *United States v. Seminole Nation of Okla.,* 321 F.3d 939, 943 (10th Cir. 2002)). Here, Plaintiffs were able to obtain review of the EOIR Guidance Email and there is no reason to believe that any future guidance, if it were issued, would evade review. Accordingly, Plaintiffs' challenge to the EOIR Guidance Email should be dismissed as moot.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment as to the ICE Defendants and grant their motion to dismiss as to the EOIR Defendants.

Dated: December 3, 2025
　　　New York, New York

JAY CLAYTON
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By:　　<u>　/s/　Tomoko Onozawa　</u>
JEFFREY S. OESTERICHER
TOMOKO ONOZAWA
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:　(212) 637-2695/2721
Fax:　(212) 637-0033
Email: jeffrey.oestericher@usdoj.gov
　　　　tomoko.onozawa@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the undersigned hereby certifies that, measured by the word processing program used to prepare this brief, this brief complies with the word-count limitation of the rule, which is a maximum of 8,750. Excluding the caption, table of contents, table of authorities, signature blocks, or any required certificates, but including material contained in footnotes or endnotes, there are 8,323 words in this brief.

Dated: New York, New York
       December 3, 2025

                                     */s/ Tomoko Onozawa*
                                 TOMOKO ONOZAWA
                                 Assistant United States Attorney