**Declaration of William Botsch**

I, William Botsch, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. Since May 22, 2025, I have regularly observed immigration court proceedings at the Miami Immigration Court. I tend to observe 4 days a week from 8:15am to 4pm. I started observing immigration court because I heard about arrests of noncitizens appearing for their mandatory court hearings earlier that week.

2. I am aware of at least 194 arrests of respondents by U.S. Immigration and Customs Enforcement (ICE) that occurred during my time spent observing. ICE continues to arrest respondents at immigration court to this day. Just today, on December 2, 2025, I witnessed three respondents arrested.

3. ICE typically tends to arrest respondents whose removal proceedings were dismissed after an Immigration Judge (IJ) grants a motion to dismiss by counsel from the ICE Office of the Principal Legal Advisor (OPLA).

4. In the beginning of ICE's new arrest policy, groups of between 4 and 12 ICE enforcement agents were stationed in the hallway outside the courtroom. These ICE agents would arrest noncitizens and appeared to have photos and descriptions of the noncitizens, sometimes relayed from other ICE agents who are inside the courtroom; for example, I once was stopped when I was wearing the same color shirt as someone whose case had been dismissed.

5. Now, teams of ICE agents are permitted by the court to set up their operations in an empty courtroom. When they hear that a particular respondents' case is called, they will begin to amass outside the courtroom where the respondent the officers are targeting for arrest is in proceedings. Once the respondent exits the courtroom, ICE officers will accost the noncitizen leaving the court room and ask if they are a particular person (by name). Once the respondent confirms their identity, ICE agents will quickly move to put the noncitizen's hands behind their back and put cuffs on their wrists.

6. During some arrests, I have witnessed ICE agents asking the respondent if they have their passport or travel documents with them or if their family members could bring such documents to the ICE field office prior to their transfer to detention. These agents say that if they have these documents, the noncitizen can avoid long-term detention by agreeing to be removed from the country.

7. These arrests can be very disruptive to ongoing proceedings in courtrooms as well as the courthouse generally. Family members of the respondent being arrested often become very upset and emotional and cry or yell. I have also witnessed ICE agents unable to communicate what was occurring to the respondent's family members because they did

not have an agent who could speak the language they were speaking. In some cases, yells or wails outside the courtroom have forced IJs to pause proceedings. Outside the courtrooms, ICE has now requested that security clear the hallways during an arrest, meaning all people in the hallways must move into the lobby or stay in the courtroom until the arrest has finished and the respondent is moved off the floor. When ICE transports the person arrested via the elevator, no one on that floor can use the elevators until the arrest is complete.

8. Since I began my observing of Miami Immigration Court, I have noticed an increase in the number of noncitizens designated as having failed to appear.

9. I have also helped noncitizens and their family members who did not expect their arrest at immigration court. Specifically, I have helped family members retrieve cars that were impounded after the respondent was arrested in court and had not made arrangements for someone else to take the car.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 2, 2025

_____
William Botsch