I, Olivia Cassin, state the following under the provisions of 28 U.S.C. § 1746, and declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

I. **Background**

1. I was appointed as an Immigration Judge in June 2015. I served first at the New York Federal Plaza Immigration Court, located at 26 Federal Plaza, New York City. Starting in November 2021, I began serving as an immigration judge nearby at the Broadway Immigration Court located at 290 Broadway. My docket included the juvenile docket which is comprised of unaccompanied children (children who entered the country without a legal guardian) and youth ages 19-21. During my tenure as an IJ of over 10 years, I decided thousands of cases. On November 21, 2025, I was abruptly terminated without a stated cause.
2. I received my Juris Doctor in 1988 from Brooklyn Law School. I am a member of the District of Columbia and New York State Bars.
3. I have practiced immigration law for over 30 years, representing a range of clients in proceedings before the Executive Office for Immigration Review (EOIR), the Department of Homeland Security (DHS) through its subagencies, U.S. Citizenship and Immigration Service (USCIS), Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE).
4. From 2006 to 2015, I was a lecturer in law at Columbia Law School in New York City where I co-taught an externship on the intersection of criminal and immigration law.
5. I provide this declaration based on my personal knowledge and experience and review of publicly available information.

II. **EOIR Dismissals Policy and ICE Courthouse Arrests**

6. Prior to this administration's change in policy, during my over 30 years of practice and over a decade on the bench, I have never witnessed nor heard of ICE arrests occurring inside an immigration courthouse, outside of exceptional circumstances.
7. Very few noncitizens in removal proceedings on the non-detained docket have criminal convictions. Most are asylum seekers who the government previously determined could pursue their case at liberty. ICE typically detains noncitizens when initiating proceedings, to execute a final order, or where there are changed circumstances—like a criminal conviction. Arrests of noncitizens appearing at immigration court, mid-way through removal proceedings, makes little sense and is very disruptive to their case.
8. That changed on May 21st, 2025. ICE counsel began making motions to dismiss in removal proceedings. These motions were made pursuant to a new policy we were made aware of only later through email guidance issued on May 30, 2025. The email explained these motions were being made pursuant to a new policy due to two new developments in

    non-detained cases over the last few weeks: (1) DHS was carrying out enforcement actions in EOIR spaces and (2) DHS attorneys were moving to dismiss currently pending cases. In light of these developments, and to ensure expeditious disposal of cases, IJs were instructed to permit DHS attorneys to make oral motion to dismiss, without the requirement of additional documentation or briefing, and to issue oral rulings the same day from the bench.

9. The new dismissals policy was contrary to EOIR regulations, the Immigration Court Practice Manual ("ICPM") and typical DHS practice. First, it misstated the standard for granting these motions, omitting the requirement of a changed circumstance in the *noncitizen's* case. Second, EOIR regulations and the ICPM, provide that most motions be made in writing by the moving party in advance of the hearing. The opposing party is then granted ten days to respond to the motion. Then the IJ will then issue a written decision on the motion. Oral motions are disfavored and the general policy is to ask the nonmoving party if they would like ten days to respond to the oral motion. If they requested time to respond, I would not rule on the oral motion, sometimes ask that the motion be made in writing, and allow the opposing party ten days to reply.

10. The first of these motions before me was in the case of a Bronx high school student, Dylan. On May 21, another IJ at the court, originally assigned the case had granted the motion orally on the same day it was made, without providing Dylan, who was unrepresented, the time or information necessary to make an informed and knowing decision about the consequences of that dismissal. He was detained by ICE as he exited the courtroom. The IJ who decided that case retired days later and the case was reassigned to me. On a motion to re-consider, I reversed the dismissal and reinstated his full removal proceedings. However, because Dylan was detained in Pennsylvania, the case was transferred from my docket.

11. Shortly thereafter, ICE also sought dismissal in the case of a young pro se noncitizen before me. I denied the motion in writing but ICE detained him anyway as he left my courtroom.

12. ICE's presence at the courthouse was obvious and intimidating. The agents were always in large groups. They dressed in plain clothing and masks with no badges or other identifying information visible. After several complaints, they began to wear bulletproof vests over their plain clothing which had federal agencies (CBP, FBI, HSI, etc.) written on them. They carried visible weapons including knives and guns. Their presence was very frightening and intimidating not only to noncitizens attending court as respondents—most of whom were seeking asylum from state violence in their home countries—, witnesses, or as familial support but also to court staff, including immigration judges. Their presence disturbed and terrified me. My legs would shake as I walked past them to my courtroom. It was alarming to have these armed officers in my workplace; I did not feel comfortable adjudicating cases with armed agents waiting at my courtroom door.

13. ICE's presence was especially frightening for court staff who might be mistaken for noncitizen respondents. On or around June 2025, I was speaking with a Spanish language interpreter in the hallway when three agents jumped on him and attempted to detain him. I intervened explaining that he worked at the court. The officers released him after the interpreter produced his building badge. The interpreter presented as Latino.
14. When I complained to my boss, I was told that I should not leave my courtroom and office. This was untenable. I often went into spaces where ICE was present to meet with court staff, exit or enter the building, get food, and use the restroom.
15. These officers waited in groups by the elevators and often lined the narrow hallways. The courthouse at 290 Broadway is small. My courtroom was on the 15th floor, which had narrow hallways, two elevator banks, a waiting room which served three courtrooms and an information desk. ICE arrests occurred in those public spaces in full view of the people attending court, including invariably children.
16. The arrests were disruptive. We could plainly hear the yelling, screaming, and crying resulting from the arrests from inside of my courtroom. I witnessed an arrest in the hallway outside my courtroom in which ICE dragged a man into the elevators as his wife, holding a baby in a carrier on her chest, cried and tried to say a rushed goodbye.
17. The dramatic arrests also drew a large media presence, court observers, and politicians. It was a chaotic and volatile environment.
18. Many Respondents began to request remote appearances, which I broadly permitted, both for master calendar hearings and individual hearings. Some would appear from just across the street, from their homes or their lawyers' offices.
19. ICE arrests also impacted my ability to manage my docket. For example, one young person with a U.S. Citizen father was transferred to my docket at his master calendar hearing before another IJ but was detained on his way out of the courtroom. Once detained, noncitizens are moved to the detained docket, and, given most are detained in Louisiana or Texas, ICE will attempt to transfer venue.
20. An increasing number of respondents stopped attending court. There was a precipitous rise in absenteeism for the children on my docket. Some of the children who failed to appear had attended hearings just a few weeks prior where they had witnessed ICE's presence or even arrests. Typically, on a docket of 70 kids, about 5 or 6 would fail to appear; by the end of my time on the court it was closer to 30.
21. Other noncitizens who used to come to the court for information also stopped coming. The help desk at the courthouse used to have a steady line down the hallway. In the final months of my time at the court, very few people availed themselves of that resource.
22. IJs who continued to exercise independent judgement and grant remote appearance or deny the governments motions to dismiss knew these decisions were being scrutinized. We saw our colleagues who did not act as an extension of ICE's removal effort being fired all around us. It was only a matter of time.

I certify under penalty of perjury that the foregoing statement is true and correct.

Executed on December 1, 2025.

_____

Olivia Cassin