I, Florence Chamberlin, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

I. **Background**
1. I was appointed as an Immigration Judge in September 2023 and served at the Concord Immigration Court in Concord, California until September 2025, when I was abruptly placed on administrative leave as a probationary employe and then terminated without cause. My docket included individuals as well as families in removal proceedings.
2. I have practiced immigration law for over 25 years, representing a range of clients in proceedings before EOIR, USCIS, DHS and the Department of State in both the private and public sectors.
3. I received my Juris Doctor in 1996 from the University of California Law San Francisco, (formerly University of California, Hastings) I am a member in good standing of the State Bar of Florida.
4. I provide this declaration based on my personal knowledge and experience and review of publicly available information.

II. **EOIR Dismissals Policy and ICE Courthouse Arrests**
5. As an Immigration Judge at the Concord courthouse, I completed over 1714 cases during my two years on the bench, all of which involved non-detained Respondents.
6. In my decades practicing before immigration courts and serving as an immigration judge, I have never witnessed or had a client arrested by ICE at an immigration court.
7. People on the non-detained docket are generally not targets for ICE detention because, at the initiation of proceedings, the government has already determined they can pursue their removal from liberty in light of their lack of risk of flight or danger.
8. Starting in late May 2025, DHS began aggressively implementing two new policies. These policies undoubtably disrupted proceedings at the Concord Immigration Court, creating confusion, chaos, and hindering my ability to fairly adjudicate cases.
9. The first was an increase in oral motions to dismiss made by DHS attorneys. We learned in an email EOIR sent to myself and other Immigration Judges on May 30, 2025 that these motions were being made pursuant to a new policy. The email explained that there had been two new developments in non-detained cases over the last few weeks: (1) DHS was carrying out enforcement actions in EOIR spaces and (2) DHS attorneys were moving to dismiss currently pending cases. In light of these developments, and to ensure expeditious dispose of cases, IJs were instructed to permit DHS attorneys to make oral motion to dismiss, without the requirement of additional documentation or briefing, and to issue oral rulings the same day from the bench.
10. The new dismissals policy was a marked departure from EOIR regulations, the Immigration Court Practice Manual ("ICPM") and typical DHS practice. EOIR regulations and the ICPM, provide that most motions be made in writing by the moving party in advance of the hearing. The opposing party is then granted ten days to respond to

1

the motion. Then the IJ will then issue a written decision on the motion. Occasionally, oral motions may be entertained, but the general policy is to ask the nonmoving party if they would like ten days to respond to the oral motion. If they requested time to respond, I would not rule on the oral motion, sometimes ask that the motion be made in writing, and allow the opposing party ten days to reply.

11. I presided over two such motions to dismiss. I granted one and reserved decision on the second to give the Respondent—who I believed had competency issues—the opportunity to obtain counsel and oppose the motion. It is my understanding that both Respondents were arrested by ICE upon leaving my courtroom, effectively denying the second Respondent the opportunity to return for the return hearing date I had set out.

12. At Master Calendar Hearings, DHS counsel would request that I hear their motions to dismiss first on the docket when the courtroom was full. I was loathe to do so because everyone in the courtroom knew what these motions meant and it was terrifying for those impacted. I had already been made aware by other colleagues in my court and at other courts that Respondents faced with these motions would appear confused, some begging and explaining that they did not wish to have their cases dismissed. I did not want the children Respondents present with their families to witness these scenes. I believe it is important for Immigration Judges to appear impartial and maintain decorum in the courtroom. The dismissals and arrests left the impression that the immigration courts were working together with DHS to remove the noncitizen.

13. These arrests were pursuant to ICE's new, unprecedented practice of conducting arrests at the immigration courthouse. The presence of ICE officers conducting arrests in courthouses created fear amongst Respondents and their families and general chaos for the public, court staff, and judges.

14. ICE officers in plain clothing would wait inside a courtroom, while others, often armed and/or in tactical gear, would wait outside the courtroom in the hallways, stairwells, and lobbies to arrest Respondents as they left their hearings. I felt it was important to know prior the start of hearings if anyone was present in the courtroom who was not there for a required hearing. My courtroom was on the 9th floor of a 10 floor building. The actual courtroom was smaller in size than some of the other courtrooms. Often, my busy Master hearings had only standing room available inside the courtroom. Outside of the courtroom, the hallways were narrow. There was a central lobby waiting room area with seating. There are no non-public spaces within the courthouse where ICE officers might initiate the arrest of a noncitizen Respondent. Some noncitizens would try to hide from ICE officers in a room reserved for pro bono attorney counseling. ICE would try to conduct the arrest in this very small room. On one occasion I was told that that Respondents had locked themselves in this room to avoid an arrest. Respondents waiting in this central waiting area were able to witness all of these activities.

15. Noncitizen Respondents, and their families and witnesses, would often have to walk into the courthouse building past ongoing arrests. One couple locked themselves in a

      bathroom outside of the courtroom while suffering a panic attack due to fear of arrest. Emergency services had to be called and hearings put on hold. Large, loud protests began to gather daily outside the courthouse. It felt unsafe to leave the courthouse while those were ongoing. We were put on a building lockdown on at least one occasion in approximately June of 2025 because of the chaos caused by the arrests.

16. After ICE began moving to dismiss and making arrests in the courthouse, I noticed a dramatic decline in attendance at the Master Calendar Hearings I presided over. Prior to these policies, I would often have about 45-60 Respondents appear for a typical master calendar hearing; after the policies' enactment, this number dropped to around 10. These failures to appear, if not cured, result in *in absentia* removal orders. I attribute the significant increase in absenteeism in immigration court to these policies.

17. The courthouse arrests impacted my ability to fairly administer my cases in other ways. They undermined the effectiveness of the advisals I was legally required to provide Respondents. For example, I would advise people of their right to obtain counsel of their choosing and the requirement that they attend their next hearing and/or file certain applications for relief by certain deadlines. Their immediate arrest outside my courtroom rendered that advisal illusory and unreliable. It was difficult to advise the Respondents before me when they were unable to focus and so anxious about possible detentions that they were witnessing or hearing in their communities. An arrest also meant that the case would be transferred to an IJ on the "detained docket" depriving me of jurisdiction over the case, no matter what stage of proceedings.

18. I was fired on September 19, 2025. There was no cause for my firing and no reason stated.

I certify under penalty of perjury that the foregoing statement is true and correct.

Executed on December 1, 2025.

_____

Florence Chamberlin

3