I, Chloe Dillon, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

I. **Background**
1. I was appointed as an Immigration Judge in September 2022 and served at the San Francisco Immigration Court at 100 Montgomery Street until August 22, 2025, when I was abruptly terminated.
2. I have practiced immigration law my entire career, beginning as an attorney advisor in the Los Angeles Immigration Court. In the decade prior to my appointment as an Immigration Judge, I was a federal public defender in San Diego with a specialization in the intersection of criminal and immigration law.
3. I graduated from the University of Arizona James E. Rogers College of Law in June 2010, and I am a member of the State Bar of California.
4. I provide this declaration based on my personal knowledge and experience and review of publicly available information.

II. **EOIR Dismissals Policy and ICE Courthouse Arrests**
5. During my time as an Immigration Judge in San Francisco, I completed over 1500 cases, most of which involved non-detained respondents.
6. In my three years serving as an immigration judge, I had neither witnessed nor heard of any civil immigration arrests conducted by Immigration and Customs Enforcement (ICE) at the San Francisco Immigration Court prior to May 2025.
7. Starting in late May 2025, there was an increase in motions to dismiss made by DHS attorneys at the San Francisco Immigration Court.
8. These oral motions were being made pursuant to a new policy that the Department of Justice announced to the court via email to myself and other Immigration Judges on May 30, 2025. The email explained that there had been two new developments in non-detained cases over the last few weeks: (1) DHS was carrying out enforcement actions in EOIR spaces and (2) DHS attorneys were moving to dismiss currently pending cases. In light of these developments, and to ensure expeditious disposition of cases, IJs were instructed to permit DHS attorneys to make oral motions to dismiss, without the requirement of additional documentation or briefing, and to issue oral rulings the same day from the bench.
9. The new dismissals policy was a marked departure from prior guidance and conflicted with the Immigration Court Practice Manual ("ICPM"). The ICPM provides that most motions be made in writing by the moving party in advance of the hearing. The nonmoving party is then given ten days to respond to the motion. The IJ then issues either an oral or a written decision on the motion. Oral motions to dismiss have been entertained, but the rule that the nonmoving party has ten days to respond still applies. Both prior to May 2025 and after, if the nonmoving party requested time to respond, I would not rule on the oral motion and would allow the opposing party ten days to respond in accordance with the ICPM and due process.

10. I presided over two such oral motions to dismiss. I deferred decision on both, granting the respondents a brief amount of time to obtain counsel and submit any opposition to the motion. I was fired less than two days after the second of these determinations. It is my understanding that the latter respondent was detained upon leaving my courtroom, effectively denying them the opportunity to return for the hearing date I had set out.
11. At the same time as the new dismissals policy, ICE began a practice of conducting arrests at the courthouse. ICE agents, dressed in plain clothes, would wait in the 8th floor lobby or hallway where my courtroom was located, or they would wait in the downstairs 1st floor lobby to arrest respondents as they left their hearings. There would also occasionally be ICE officers waiting right outside the front doors of the building, in tactical gear and with vans ready.
12. There are no non-public spaces within the courthouse at 100 Montgomery where ICE officers might initiate the arrest of a noncitizen respondent. The presence of officers in the hallways and lobby was very apparent and alarming to both court staff and people attending court.
13. In particular, during one confrontation with ICE at the entrance to the courthouse in July 2025, a person was thrown from the hood of an ICE van onto the street as it accelerated with the person on the hood of the van. During that same confrontation, an ICE agent exited a vehicle nearby and in view, with what looked like a semi-automatic rifle. This photo and video recordings of the incident made local news.
14. Following that event and the photo of the agent with a rifle in the local news, many attorneys would express fear of attending hearings at the courthouse. I received motions in which the attorneys expressed not only fear for their client's safety and concern that their clients would be arrested if they attended their hearings, but also that they feared for their own physical safety.
15. Many immigration attorneys who represent people who appeared in front of me are immigrants themselves, or look like immigrants and speak another language. I had attorneys tell me frequently about occasions when they had previously been mistaken by ICE or court personnel for an immigrant attending a hearing that day. Certain members of court staff also feared that they could be mistaken for people appearing for their hearings and detained, as they also come from immigrant families and speak other languages.
16. The resulting protests, which have continued on a weekly basis up until the present, and which occur directly outside the courthouse, are extremely loud and distracting for court staff working near the windows. Many judges, including myself, had offices that faced the street with the protests and could not work in their offices due to the noise.
17. After ICE began moving to dismiss and making arrests in the courthouse, I noticed a marked decline in attendance at master calendar hearings I presided over. At one master calendar hearing during the summer of 2025, only three people appeared on a calendar of twenty. These failures to appear, if not cured, result in *in absentia* removal orders. I attribute the significant increase in absenteeism to these policies.

18. The presence of ICE officers conducting arrests in the courthouse also created fear amongst respondents and their families and general chaos for the public, court staff, and judges.
19. In my opinion, the courthouse arrests impacted the orderly administration of justice, and specifically affected my ability to fairly administer my cases. First, they undermined the decisions I made to ensure that people were provided with due process and access to counsel. I would advise people of their right to obtain counsel of their choosing and the requirement that they attend their next hearing before me at a specific date and time, and/or file certain applications for relief by certain deadlines. Their immediate arrest outside my courtroom rendered that advisal illusory and unreliable. I felt unable to effectively advise the respondents before me and to set deadlines in their cases.
20. From speaking with other judges who were also handling these motions to dismiss, I know that people were arrested in the courthouse even when the judge denied the motion the same day it was made. Thus, whether the decision was deferred for another hearing, granted, or denied, the person was arrested by ICE for removal purposes. Using the courthouse as a dragnet for arresting people for removal, regardless of the decision that the judge made in the individual case, affected the perception of the court as separate from the enforcement function, and it was injurious to the court's role as the impartial arbiter and neutral decisionmaker, whose decisions are respected and followed by the parties.
21. I was fired on August 22, 2025. There was no cause for my firing and no reason stated.

I certify under penalty of perjury that the foregoing statement is true and correct.

Executed on November 25, 2025.

*Chloe Dillon*

Chloe Dillon