# DECLARATION OF DEBORAH FLEISCHAKER

I, Deborah Fleischaker, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

## I. Background

1. I began working on immigration enforcement issues in 2011, when I was a career employee at the U.S. Department of Homeland Security's (DHS) Office for Civil Rights and Civil Liberties (CRCL). I was employed by CRCL from March 2011 until September 2021. I spent one year (May 2019 - May 2020) on a temporary detail to Senator Patrick J. Leahy's Judiciary Committee staff. I spent an additional four months on a temporary detail at the DHS Office of Policy and three months at U.S. Immigration and Customs Enforcement (ICE). I worked on immigration issues in all of these temporary assignments.

2. Between September 2021 and November 2023, I was employed as a political appointee by DHS's ICE. I was an Assistant Director at ICE and headed the Office of Regulatory Affairs and Policy from September 2021 to November 2023. From November 2022 until November 2023, I served as the Acting ICE Chief of Staff.

3. As the Assistant Director for the Office of Regulatory Affairs and Policy, I spearheaded policy and regulatory initiatives for the agency, with a significant focus on immigration enforcement, detention, and removal. In that position, I worked on a number of enforcement and detention policies, including DHS Secretary Alejandro Mayorkas' immigration enforcement priorities; the DHS sensitive locations and protected areas and courthouse enforcement policies; and policies relating to the detention of pregnant people, crime victims, and parents.

4. As the Acting ICE Chief of Staff and senior agency political appointee, I oversaw agency-wide activities, including the approximately $8 billion budget and 8,000 employees across law enforcement and immigration services. This included significant work on immigration enforcement, detention, and removals. In my role, I collaborated extensively with the leadership of ICE Enforcement and Removal Operations (ERO).

5. I provide this declaration based on my personal knowledge and experience as well as my review of the documents referenced below.

6. Based on my experience, I have been asked to assess the government's new guidance regarding civil immigration enforcement in or near courthouses and its new policy of arresting noncitizens who appear for their hearings in immigration court.

7. I have reviewed the following documents related to these policies:
    - "Enforcement Actions at or Near Courthouses" (Mar. 19, 2014), ECF No. 41-1 ("2014 Guidance").

- "Guidance Update: Enforcement Actions at or Near Courthouses" (Jan. 26, 2015), ECF No. 41-2 ("2015 Guidance").

- U.S. Immigration and Customs Enforcement ("ICE") Directive Number 11072.1: Civil Immigration Enforcement Actions Inside Courthouses (Jan. 18, 2018) (hereinafter, "2018 Directive"), *available at* https://www.ice.gov/doclib/foia/policy/directive11072.1.pdf.

- Memorandum for U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) RE Civil Immigration Enforcement Actions in or near Courthouses (Apr. 27, 2021) (hereinafter, "2021 Guidance"), *available at* https://www.ice.gov/sites/default/files/documents/ciEnforcementActionsCourthouses2.pdf.

- ICE Policy No. 11072.3, Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses (Jan. 21, 2025) (hereinafter "2025 Interim Guidance"), *available at* https://www.ice.gov/doclib/foia/policy/11072.3_CivilImmEnfActionsCourthouses_01.21.2025.pdf.

- ICE Policy No. 11072.4, Civil Immigration Enforcement Actions In or Near Courthouses (May 27, 2025) (hereinafter, "2025 Guidance"), *available at* https://www.ice.gov/doclib/foia/policy/11072.4.pdf.

8. I am also familiar with ICE's new practice of more regularly arresting individuals in immigration court, based on public reporting and public statements by the Trump Administration.

## II.    Courthouse Arrest Guidance Before 2021

9. Historically, ICE most often arrests noncitizens when initiating removal proceedings or executing a final order of removal. ICE does not often arrest noncitizens in the midst of proceedings absent a change in circumstances, such as a change in the information ICE has about a noncitizen, a noncitizen's noncompliance with their conditions of release, or new criminal charges or convictions.

10. ICE has long had a de facto policy and practice of severely limiting arrests of noncitizens at immigration courthouses.

11. Prior to 2021, DHS issued memoranda addressing immigration arrests at local, state and federal courthouses hearing criminal and civil matters and other sensitive locations, but my understanding is that none of the memoranda—including the 2014 Guidance, 2015 Guidance, and 2018 Directive—applied to immigration courts.

12. On March 19, 2014, the then-Assistant Director for Field Operations for ICE, Philip T. Miller, sent a message to ICE Field Office Directors and Deputy Field Office Directors

with "important guidance concerning [Enforcement and Removal Operations ("ERO")]'s enforcement actions at courthouses." March 19, 2014 Guidance, at 1. My understanding is that this guidance did not apply to immigration courthouses, as it said nothing explicit about immigration courts and contemplates the arrest of noncitizens who are in criminal proceedings or have been convicted of a crime.

13. The 2014 Guidance directed that "[e]nforcement actions at or near courthouse will only be undertaken against Priority 1 aliens, as described in ICE Policy Number 10072.1, Civil Immigration Enforcement: Priorities for Apprehension, Detention, and Removal of Aliens (Mar. 2, 2011)." *Id.* At the time, Priority 1 aliens consisted of specific categories of people whom the agency deemed to pose a threat to public safety. The guidance lists these aliens as "includ[ing], but . . . not limited to" "aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security," "aliens convicted of crimes, with a particular emphasis on violent criminal, felons, and repeat offenders," "aliens not younger than 16 years of age who participated in organized criminal gangs," "aliens subject to outstanding criminal warrants," and "aliens who otherwise pose a serious risk to public safety." *Id.* The 2014 Guidance limited arrests to these targeted aliens and exempts others "who may be 'collaterally' present, such as family members or friends." *Id.*

14. The 2014 Guidance also directed that these "enforcement actions at or near courthouses will, wherever practicable: (1) take place outside public areas of the courthouse; (2) be conducted in collaboration with court security staff; and (3) utilize the court building's non-public entrances and exits." *Id.*

15. On January 26, 2015, Philip T. Miller sent another message to ICE Field Office Directors and Deputy Field Office Directors providing "important guidance concerning ERO enforcement actions at courthouses," which had been "updated to incorporate the enforcement priorities as set forth in [then-]Secretary [Jeh] Johnson's November 20, 2014 memorandum, Policies for the Apprehension, Detention, and Removal of Undocumented Immigration." January 26, 2015 Guidance, at 1. As with the 2014 Guidance, my understanding is that this 2015 guidance did not apply to immigration courthouses, as it said nothing explicit about immigration courts or other types of courthouses dedicated to purely civil matters and contemplated the arrest of noncitizens who were in criminal proceedings or had been convicted of a crime.

16. The January 26, 2015 Guidance contained a slightly different list of Priority 1 aliens whom ICE may arrest in and around courthouses, but was similarly focused on threats to public safety. *See id.* Specifically, instead of "aliens not younger than 16 years of age who participated in organized criminal gangs," the January 26, 2015 Guidance directed that ICE could only arrest "aliens convicted of an offense for which an element was active participation in a criminal street gang, as defined in the November 20, 2014 Johnson memorandum" in and around courthouses. *Id.* Instead of "aliens convicted of crimes, with a particular emphasis on violent criminal, felons, and repeat offenders," the January 26, 2015 Guidance directed that ICE could only arrest "aliens convicted of an offense classified as a felony in the convicting jurisdiction, other than a state or local

offense for which an essential element was the alien's immigration history" and "aliens convicted of a 'aggravated felon,' as that term is defined in section 101(a)(43) of the Immigration and Nationality Act at the time of the conviction" in and around courthouses. *Id.* The January 26, 2015 Guidance no longer targeted "aliens subject to outstanding criminal warrants" and "aliens who otherwise pose a serious risk to public safety." *See id.*

17. Both the March 19, 2014 Guidance and January 26, 2015 Guidance formalized and reduced to writing the government's long-standing policy of limiting arrests at courthouses to specific categories of noncitizens deemed to pose a risk to public safety. They both recognized that there are legitimate law enforcement and operational and practical reasons that might require ICE to conduct certain arrests in and around courthouses. But they also balanced those law enforcement interests against the deterrent effect that more widespread arrests at or near courthouses might have on noncitizens seeking to assert their rights in court proceedings and the fair administration of justice.

18. By contrast, the 2018 Directive significantly expanded ICE's authority to conduct civil immigration arrests in and around courthouses. Like the 2014 and 2015 guidance, ICE's 2018 Directive applied only to state and federal courthouses and not immigration courts. This is at least in part because the 2018 Directive sought to authorize arrests of noncitizens who were in the custody of "jurisdictions" unwilling "to cooperate with ICE" by transferring them "from their prisons and jails" to ICE's custody. 2018 Directive, at 1. And the 2018 Directive also directed that "ICE officers and agents should generally avoid enforcement in or near courthouses, or areas within courthouses that are dedicated to non-criminal (e.g. family court, small claims court) proceedings," and that such arrests required prior approval. *Id*. at 2.

19. The 2018 Directive broadly permitted arrests that "include"—but are not limited to—"specific, targeted aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed." *Id*. at 1. The 2018 Directive also permitted ICE to arrest family members or friends of noncitizens targeted for arrest when there are "special circumstances, such as where the individual poses a threat to public safety or interferes with ICE's enforcement actions." *Id*.

20. Whereas the March 19, 2014 and January 26, 2015 Guidance subjected only "Priority 1" noncitizens deemed to be a public safety risk to arrest in and around courthouses, the broad language of the 2018 Directive, which did not limit enforcement to the specific enumerated categories, authorized civil immigration arrests of almost any noncitizen in or around courthouses by ICE.[1]

---

[1] The 2018 Directive additionally targeted "aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed." 2018 Directive, at 1.

21. As cases concerning the 2018 Directive have summarized, the 2018 Directive was the formalization of ICE's policy change in 2017 when, pursuant to Executive Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017), ICE began to conduct civil immigration enforcement in and around state courthouses across the country, to target noncitizens it deemed removable from the United States—regardless of whether those noncitizens posed a public safety risk.[2] As a result, pursuant to the 2018 Directive, ICE's arrests of noncitizens in and around state courthouses increased exponentially, sweeping up many noncitizens who may themselves have been the victim of crimes, abuse, or neglect.

22. But even with the 2018 Guidance, civil immigration arrests in and around immigration courthouses remained rare up until this year—including during the period Executive Order No. 13,768 and the 2018 Directive was in effect. ICE applied its expanded authority under the 2018 Directive primarily to arrest people in state court. ICE rarely exercised that authority in the immigration courts. Indeed, for the decades prior to Spring 2025, civil immigration arrests in and around immigration courthouse occurred only in rare and limited circumstances, such as when the enforcement subject was considered to be a specific public safety risk.

### III.     The 2021 Courthouse Guidance

23. In April 2021, Secretary Mayorkas directed ICE and U.S. Customs and Border Protection (CBP) to limit civil immigration enforcement actions in or near courthouses. Following this directive, Acting Director of ICE Tae Johnson and Acting CBP Commissioner Troy Miller issued a memorandum to ICE and CBP personnel setting forth the circumstances in which civil immigration enforcement actions may be carried out in or near a courthouse.[3]

24. Unlike the March 19, 2014 and January 26, 2015 Guidance as well as the 2018 Directive, the 2021 Guidance was the first courthouse enforcement policy to explicitly mention immigration courthouses.

25. This guidance was designed to balance access to the courts and the fair administration of justice with legitimate civil immigration enforcement interests. It was motivated in part to respond to the civil immigration enforcement at state and federal courthouses under the prior administration.[4] As Secretary Mayorkas explained upon announcing the new guidance: "Ensuring that individuals have access to the courts advances the fair

---

[2] *See State v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 381–82, 385–86 (S.D.N.Y. 2019); *Doe v. U.S. Immigr. & Customs Enf't*, 490 F. Supp. 3d 672, 679–80 (S.D.N.Y. 2020); *New York v. U.S. Immigr. & Customs Enf't*, 466 F. Supp. 3d 439, 442–44 (S.D.N.Y. 2020), vacated and remanded on other grounds sub nom. *New York v. United States Immigr. & Customs Enf't*, No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023).

[3] Press Release: *DHS Announces New Guidance to Limit ICE and CBP Civil Enforcement Actions In or Near Courthouse*, U.S. Dep't of Homeland Security, Apr. 27, 2021, https://www.dhs.gov/archive/news/2021/04/27/dhs-announces-new-guidance-limit-ice-and-cbp-civil-enforcement-actions-or-near.

[4] These enforcement actions were governed by the 2018 Directive.

administration of justice, promotes safety for crime victims, and helps to guarantee equal protection under the law . . . .The expansion of civil immigration arrests at courthouses during the prior administration had a chilling effect on individuals' willingness to come to court or work cooperatively with law enforcement. Today's guidance is the latest step in our efforts to focus our civil immigration enforcement resources on threats to homeland security and public safety."[5]

26. The 2021 Guidance, in articulating its "Core Principle," recognized that "[t]he courthouse is a place where the law is interpreted, applied, and justice is to be done." "[A]s law enforcement officers and public servants," ICE and CBP officers thus bear "a special responsibility to ensure that access to the courthouse—and therefore access to justice, safety for crime victims, and equal protection under the law—is preserved." 2021 Courthouse Guidance at 1.

27. The 2021 Guidance sought to balance two competing interests: instances where "there may be legitimate need to execute a civil immigration enforcement action in or near a courthouse" with the fact that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair administration of justice." *Id*.

28. The 2021 Guidance balanced these interests by laying out "when and how civil immigration enforcement actions can be executed in or near a courthouse so as not to unnecessarily impinge upon the core principle of preserving access to justice." *Id*. The Guidance permits such actions only when warranted based on an identified and/or imminent threat to national security or public safety: that is, if (1) the action "involves a national security threat; or (2) there is an imminent risk of death, violence, or physical harm to any person; or (3) the action involves hot pursuit of an individual who poses a threat to public safety; or (4) there is an imminent risk of destruction of evidence material to a criminal case." *Id*. at 2.

29. The 2021 Guidance also permits an enforcement action against an individual who poses a threat to public safety "in the absence of hot pursuit," if: "(1) it is necessary to take the action in or near the courthouse because a safe alternative location does not exist or would be too difficult to achieve the enforcement action at such a location, and (2) the action has been approved in advance by a Field Office Director, Special Agent in Charge, Chief Patrol Agent, or Port Director." *Id*.

30. Finally, the Guidance provides that, "to the fullest extent possible, an enforcement action in the courthouse will be taken in a non-public area, outside of public view, be conducted in collaboration with courthouse security personnel, utilize the courthouse's non-public entrances and exits, and be conducted at the conclusion of the judicial proceeding that brought the individual to the courthouse." *Id*.

---

[5] Press Release: *DHS Announces New Guidance to Limit ICE and CBP Civil Enforcement Actions In or Near Courthouse*.

31. The 2021 Guidance applies to any civil immigration enforcement action in or near a courthouse that involves an enforcement encounter between ICE or CBP personnel and an individual other than a courthouse official or employee. Examples of enforcement actions include civil apprehensions, service of subpoenas, searches, seizures, interviews, and surveillance. *Id*.

32. The 2021 Guidance does not apply to criminal immigration enforcement actions. *Id*.

33. The 2021 Guidance defines a "courthouse" to include "any municipal, county, state, federal, tribal, or territorial courthouse, including immigration courts." *Id*. The 2021 Guidance defines "near" the courthouse as "in the close vicinity of the courthouse, including the entrance and exit of a courthouse, and in adjoining or related areas such as an adjacent parking lot or transportation point (such as a bus stop right outside a courthouse)." *Id*.

34. The 2021 Guidance also requires that ICE and CBP personnel receive training on the Guidance and provides for the internal reporting of planned or executed civil immigration enforcement actions in or near courthouses. *Id*.

## IV. The 2025 Courthouse Guidance

35. ICE's 2025 Guidance departs almost completely from the guidance on courthouse enforcement actions previously adopted by DHS in 2021. Because the 2025 Interim Guidance is substantially identical to the final guidance, I focus on the final Guidance here.

36. First and foremost, the 2025 Guidance does not even acknowledge the competing interests that DHS sought to balance in its previous guidance: namely, the instances where there is a legitimate need for an enforcement action in or near a courthouse and the reality that such enforcement actions may chill individuals from accessing the courts and interfere with the fair administration of justice. Likewise, the Guidance offers no explanation for why ICE decided to stop limiting its enforcement actions to ensure they do not impinge unnecessarily on access to justice. The 2025 Guidance simply ignores the importance of ensuring that courthouses remain open to all.

37. Second, as explained above, the 2021 Guidance primarily sought to balance these competing interests by prohibiting courthouse enforcement actions except when justified based on an identified and/or imminent threat to national security or public safety. The 2025 Guidance abandons this approach. Instead, it provides that ICE officers or agents may conduct a courthouse enforcement action whenever they have "credible information that leads them to believe the targeted alien(s) is or will be present at a specific location." 2025 Guidance at 2.

38. Moreover, "targeted aliens" are defined very broadly. The term includes not only individuals who are considered national security or public safety threats, but also individuals who have been ordered removed from the United States but have failed to depart, and individuals who have reentered the country illegally after being removed. *Id*.

And this list is not exhaustive. The 2025 Guidance places no limits on the categories of noncitizens whom ICE may subject to an enforcement action in or near a courthouse. Indeed, as explained in Section IV, *infra*, ICE is regularly arresting people outside these categories at immigration courthouses.

39. The 2025 Guidance additionally explicitly authorizes collateral arrests and provides that ICE may subject "[o]ther aliens" encountered in a courthouse enforcement action—such as "family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding"— to an enforcement action "on a case-by-case basis considering the totality of the circumstances," a term that is undefined. *Id*.

40. In effect, the 2025 Guidance gives almost complete discretion to ICE officers and agents to pursue enforcement actions in or near courthouses, with little to no regard for protecting access to justice, the fair administration of court proceedings, and individuals' ability to comply with their legal obligations.

41. The only provision limiting arrests at courthouses appears to be the 2025 Guidance's directive that "ICE officers and agents should generally avoid enforcement actions in or near courthouses, or areas within courthouses that are wholly dedicated to non-criminal proceedings (e.g., family court, small claims court)." 2025 Guidance, at 2. For such arrests, "approval of the respective Field Office Director (FOD), Special Agent in Charge (SAC), or his or her designee is required prior to conducting the enforcement action." *Id*. On its face, this provision should apply to immigration courts. *See infra*.

V.   **ICE's Unprecedented Arrests at Immigration Courts**

42. Despite that plain language in the 2025 Guidance, over the past few months, ICE's arrests at immigration courts in New York City and across the country have increased significantly.

43. ICE officers are stationing themselves outside the courthouse buildings, inside the courthouse hallways, and inside the courtrooms so that they can arrest and detain individuals who appear for their court hearings. The officers are dressed in plain clothes and sometimes masked.

44. These ICE arrests are part of a coordinated effort by the agency. In some immigration court hearings, DHS is orally moving to dismiss their removal proceedings under 8 U.S.C. § 1229a, with no advance notice, on the grounds that there are "changed circumstances" such that the proceedings are no longer in the best interests of the government, without identifying any specific changes in the individual's facts and circumstances. If the immigration judge grants the government's motion to dismiss, ICE agents generally detain the individual. And even if an immigration judge denies the motion to dismiss, the individuals are often arrested and detained.

45. These actions—which appear to be driven by the Trump administration's desire to deport as many people as possible as quickly as possible—are unprecedented. I am not aware of

any concerted effort by the agency in the past to arrest large numbers of individuals when they attend their immigration court hearings—especially when they are complying with the immigration court process and do not have a final order of removal.

46. These enforcement actions radically break with past agency policy and practice, as reflected in the 2021 Guidance. Indeed, ICE has historically limited immigration enforcement at courthouses and other locations where people need to access essential services. However, over the past few months, ICE has dramatically increased the number of arrests in and around immigration courthouses to unprecedented levels.

47. Thus, ICE's arrests over the past few months at immigration courts across the country are not simply a garden-variety change in the agency's enforcement priorities. Rather, ICE's arrests over the past few months mark a complete departure from ICE's past policies and practice regarding courthouses.

48. Indeed, for the first time, ICE is using mandatory immigration court proceedings to drive up the number of arrests it accomplishes—and specifically by targeting noncitizens who are seeking to abide by the rules set by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review. In other words, ICE is now effectively penalizing individuals who are complying with their legal obligation to attend court in their immigration cases. I have never before seen the agency contemplate, much less actually rely on, the judicial process to increase its arrest numbers.

49. Additionally, in contrast to earlier agency guidance and policy, the arrests ICE is currently making in immigration court are not tied to any specific and articulable public safety rationale. Instead, ICE is engaging in the mass arrest of people showing up for court for the sake of arresting them and increasing their overall arrest numbers. It is no surprise then that many noncitizens are deterred from attending court and are no longer showing up for their court hearings—which is exactly the outcome that prior DHS policies sought to avoid.

50. ICE's current policy is a complete departure from its earlier policy in at least three ways. First, ICE's strategy of arresting individuals at immigration court, especially those who are actively complying with their immigration obligations (and thus seemingly pose little flight risk), undermines access to justice and the fair and efficient administration of legal proceedings. Advancing the rule of law calls for incentivizing compliance with legal process. ICE's courthouse arrests do the opposite: they chill individuals who have been complying with their legal obligations from coming to court and participating in their removal proceedings. The result is that many individuals will not appear for court and will receive *in absentia* removal orders, instead of a removal order or grant of relief at the conclusion of a fulsome legal proceeding.

51. Second, in addition to undermining access to justice, this strategy is counter to the agency's interests in efficiency and finality. It is likely to have the perverse effect of extending, rather than shortening, the completion of removal proceedings, since

      individuals who are subject to *in absentia* removal orders can move to reopen those orders at a later time.

52. Third, these enforcement actions depart from the agency's previous focus on protecting public safety. Although the 2025 Guidance refers to public safety concerns, *see* 2025 Guidance at 1, ICE's new policy and practices do not seriously focus on ensuring public safety. In contrast to the 2021 Guidance, ICE is not prioritizing threats to national security or public safety, but instead targeting people who are simply seeking to comply with their court proceedings and lack any criminal history. In effect, ICE is now targeting the "lowest hanging fruit"—people who they know will be attending their court hearing on a specific date—to effectuate an "easy arrest" that will count toward daily arrests. The new arrest initiative is focused on numbers—not public safety.

53. Moreover, the situation that has been created at the immigration courts could explode at any moment. With families being separated on the spot with no warning, people are desperate. Immigration judges too have described feeling unsafe and traumatized.

54. In sum, ICE's arrest initiative departs from prior agency policy by undermining, instead of advancing, access to justice, the fair and efficient administration of court proceedings, and public safety. Indeed, by arresting people to meet a numerical quota, rather than for public safety or national security reasons, the government is *creating* a public safety risk.

Executed on this 3rd day of December, 2025 in Washington D.C.

Signed by:

_____
Deborah Fleischaker