## DECLARATION OF LAURA FLORES-DIXIT

I, Laura Flores-Dixit, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. My name is Laura Flores-Dixit, and I am the Managing Attorney of American Gateways' San Antonio Office. American Gateways is a 501(c)(3) nonprofit organization that provides legal representation, advocacy, and education services to low-income noncitizens and their families in 23 central Texas counties. It has offices in Austin (principal office), San Antonio, and Waco, Texas. Annually American Gateways provides critical information and legal services to over 12,000 individuals.
2. I am admitted as an attorney in California. I have been practicing immigration law since 2015, and I have been practicing in San Antonio Immigration Court since March 2020.
3. As part of my work as Managing Attorney of American Gateways' San Antonio Office, I am often at San Antonio Immigration Court to represent my clients, advise *pro se* respondents, and supervise staff attorneys and accredited representatives. I also oversee the *Pro Se* Assistance Program of American Gateways (PAPA), which has been providing resources and advice to noncitizens in the parking lot of San Antonio Immigration Court since early July 2025 on Mondays through Thursdays from 7:45 a.m. until 11 a.m. Because of our visibility and regular presence, volunteers from other organizations and groups who conduct court observations often check in with us before and after their observations to ask which judges have hearings and share their observations.
4. Prior to May 2025, I had never in my five years of practicing in San Antonio Immigration Court witnessed an arrest of a noncitizen respondent by U.S. Immigration and Customs Enforcement ("ICE").
5. My staff began to witness arrests of noncitizen respondents after their immigration proceedings had concluded in San Antonio Immigration Court during the last week of May 2025. I personally witnessed these arrests beginning in early June 2025 and through providing *pro se* services once a week since then have seen them continuing until today. Collectively, between my staff and myself, we have witnessed over 100 people who have been arrested by ICE in the courthouse. Since my staff and I are often only in or near the courthouse in the mornings of four weekdays, there are many other arrests and detentions that we have not witnessed or heard of.
6. San Antonio Immigration Court is housed on the third floor of a commercial building with other private, non-governmental offices. When ICE first began conducting arrests at court, ICE officers were arresting noncitizens in the downstairs lobby of the building. But after these arrests caused tensions in the building, ICE began conducting arrests only on the third floor of the building, which is rented out exclusively to the Executive Office for Immigration Review ("EOIR"). To facilitate their arrests, ICE took over the office space on the third floor for *pro bono* practitioners and use it as their staging room now.
7. My and my staff's observations of ICE's presence at immigration court and their arrests have been profoundly disturbing. While it was rare to witness ICE agents in the immigration court prior to May 2025, we now regularly see 2-14 ICE agents present in the courthouse. These agents will question every person on or passing through the third floor, which can scare and intimidate respondents, their family members, attorneys and my own staff and volunteers.

8. Many of the ICE agents station themselves outside the courtrooms and communicate by phone with agents who are stationed inside the courtrooms observing proceedings. While attorneys, respondents and the public are not allowed to have their phones out in courtrooms, ICE agents are often texting on their cell phones from inside the courtroom to notify agents stationed outside which noncitizens are about to exit the courtroom and their physical appearance.
9. When respondents leave the courtroom, ICE agents will swarm the individuals they are targeting and arrest them. In one instance, one of the community volunteers witnessed a respondent who was body-slammed to the ground by an ICE officer during the respondent's arrest. The ICE officers had called the respondent by an incorrect name. When he did not answer to the incorrect name and sought to leave, the officer violently arrested him, resulting in trash cans being knocked over.
10. In some instances, when ICE is seeking to arrest respondents who appear as a family (*e.g.* two parents and their children), the ICE officer will tell the family that one of the adults must be arrested on the spot and the family can pick which adult it will be. The family is forced to make the painful decision of which parent or adult will be separated from everyone else and forced to endure the trauma of immigration detention.
11. These arrests and the presence of ICE in the courthouse have disrupted the normal operation of the immigration court. For example, at certain points, when ICE was seeking to arrest many noncitizens simultaneously, my staff witnessed some bailiffs of the immigration court, specifically those who are working on a contract, hold respondents inside the courtroom after the Immigration Judge (IJ) had ordered them to leave. The purpose of this was to give ICE officers enough time to conclude their ongoing arrest and then be able to arrest the person(s) trapped inside the courtroom. In other instances, ICE agents have grabbed paperwork out of the hands of noncitizens as they were seeking to file papers (*e.g.* asylum applications) at the immigration court window. ICE agents have also heckled attorneys in the hallways of the immigration court and made disparaging comments about IJs and their orders.
12. Due to the dramatic increase in arrests, I have also noticed a dramatic uptick in respondents not appearing for their hearings. Now, I would estimate 50% of *pro se* respondents do not appear for their hearings. Due to this, I have also noticed an increase in *in absentia* orders.
13. Respondents who are arrested often did not expect to be arrested in immigration court because they are appearing for a required hearing. Some parents had children who were in school at the time of their arrest and did not make arrangement for the children's care, including pickup from school, in the event of their arrest. Many noncitizens have had their cars impounded because they were arrested and did not arrange for their family or friends to drive their cars out of the parking lot. In one instance a week or so ago, a family was forced to decide that the father should be arrested on the day of their hearing. But when the mother and her children got to their car in the parking lot, the mother realized that she did not have a driver's license and could not drive the car home.
14. This new policy of arresting noncitizens at their mandatory immigration court hearings has also impacted me and my staff. We fear that we could be attacked or present for a violent incident due to the increased tensions in immigration court.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my

knowledge.

Signed,                                                                                            December 3, 2025

*Laura Flores-Dixit*
_____
Laura Flores-Dixit
Managing Attorney, San Antonio Office
American Gateways