**Declaration of David Hausman**

I, David Hausman,[1] hereby declare:

I make this declaration based on my own personal knowledge. If called, I could and would competently testify hereto:

1. I am an assistant professor of law at UC Berkeley and Faculty Director of the Deportation Data Project. I have also published scholarly research using immigration enforcement datasets, evaluating, for example, the effect of sanctuary policies (Proceedings of the National Academy of Sciences), the effect of an algorithmic no-release policy (Journal of Law and Economics), the effect of the first Trump administration's efforts to control the immigration courts (Journal of Law, Economics and Organization), and the effect of appeals on immigration court outcomes (University of Pennsylvania Law Review). I received my J.D. and Ph.D. in political science from Stanford University and clerked for Judge Stephen Williams on the D.C. Circuit Court of Appeals.

2. For my calculations in this declaration, I used the CASE dataset posted by the Executive Office for Immigration Review ("EOIR") in its FOIA Library in mid-November 2025 (covering the period through the end of October 2025). I am familiar with the spreadsheets and the data contained therein.

3. Counsel for Plaintiff first asked me to summarize the data in the CASE dataset for cases where an arrest took place in an immigration court in New York City, either at the Federal Plaza or Broadway court. I considered only cases in standard removal proceedings.[2]

---

[1] I practiced as an attorney at the ACLU Immigrants' Rights Project in New York from 2016 to 2019 and worked as a volunteer briefly at the project in early 2025.

[2] In the data, this means case types flagged "removal" or, for the few cases begun before 1996, "exclusion" or "deportation."

4.     To obtain this information, I counted the number of times in the data in which a detention date (logged in the custody history or proceedings table) occurred within the seven days before or after a hearing date (logged in the schedule table). I included this seven-day margin for error because, in my experience, detention dates in the CASE dataset may be approximate, and because it is unlikely (though not impossible) that an individual would be apprehended elsewhere within this brief period before or after an immigration court hearing.

5.     This method of counting immigration court arrests is imperfect. First, as just mentioned, it might incorrectly include a small number of arrests that took place soon before or after a hearing but did not occur at the immigration court. Second, and more important, this method may omit immigration court arrests either if the court fails to record the detention date or if an individual's case was dismissed and the individual was placed in expedited removal proceedings (ending immigration court proceedings).

6.     Despite these limitations, this method of counting immigration court arrests shows a large increase in such arrests shortly before this lawsuit began. Figure 1 shows the number of arrests per week at immigration court in New York City in 2024 and 2025, ending with the last full week in September 2025. (I omit October 2025, the period during the government shutdown.) Figure 1 shows that the large uptick in arrests at immigration courts in New York City began in late May 2025. Figure 2 then shows the same trend monthly, over the period from 2014 to September 2025.

**Figure 1: Immigration Court Arrests in NYC 2024-2025**



**Figure 2: Immigration Court Arrests in NYC 2014-2025**



7. The monthly arrest figures at immigration courts in New York City from May through September 2025 are significantly higher than the figures from the same period in 2024 (see Table 1).

**Table 1: Comparison of 2024 and 2025 Immigration Courthouse Arrest Figures**

| Month | 2024 | 2025 |
|---|---|---|
| **May** | 8 | 69 |
| **June** | 2 | 148 |
| **July** | 7 | 254 |
| **August** | 6 | 108 |
| **September** | 8 | 89 |

At the request of Plaintiff's counsel, I also looked at trends in the rate at which cases in immigration court ended with in absentia decisions in 2025. I found that the rate of in absentia court decisions in New York City began to rise at the beginning of the new administration and rose further after the end of May 2025, when immigration court arrests suddenly increased. See Figure 3 (showing the rate of absentia decisions from the beginning of 2024 through the last full week of September 2025).

**Figure 3: In Absentia Decisions in New York City Immigration Court 2024-2025**



8.  Finally, at the request of Plaintiffs' counsel, I also used data from Immigration and Customs Enforcement (ICE) to look at the frequency of criminal convictions among those arrested at immigration court. Specifically, I used the dataset of ICE arrests released by ICE to the Deportation Data Project (see https://deportationdata.org/data/ice.html).

9.  The ICE arrests data set includes a field called "Apprehension Site Landmark." I analyzed all ICE arrests where that field read "NDD - 26 FEDERAL PLAZA NY, NY." ICE does not release a codebook for this field, so I cannot be sure what it refers to, but my guess is that "NDD" is short for "nondetained docket" and that this field marks arrests of people whose cases are pending on the nondetained docket at 26 Federal Plaza. I therefore expect these arrests to include arrests made at the 26 Federal Plaza immigration court—but potentially also to include other arrests, such as arrests made at check-ins at 26 Federal Plaza.

10.     The ICE data, unlike the immigration court data, include an indicator for whether an individual has any criminal conviction (including minor convictions). Of 2,134 arrests made at the NDD - 26 FEDERAL PLAZA NY, NY landmark between January 20, 2025 and September 30, 2025, 291 (under 14%) had any criminal conviction.

I declare under penalty of perjury under the laws of the United States and 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on December 2, 2025 in Berkeley, California.

*/s/ David Hausman*

DAVID HAUSMAN  
Berkeley, California