**DECLARATION OF MARIA JOSE TUMBA HUAMANI**

I, Maria Jose Tumba Huamani, hereby declare under penalty of perjury pursuant to 28 U.S.C. Sec. 1746 that the following is true and correct.

1. My name is Maria Jose Tumba Huamani. I was born on July 8, 2005 in Lima, Peru.

2. I came to the United States with my mother in May 2024 to apply for asylum. When we entered the United States, we were briefly detained and then released on our own recognizance.

3. After that, we moved to New York because we had family living there.

4. I applied for asylum on July 3, 2025. I did this by going to an organization called La Jornada NYC in Queens, NY. The volunteer there listened to our stories and helped us fill out the application. I was a derivative on my mom's application. The volunteer mailed the application to the court.

5. My mom and I both had court scheduled for September 30, 2025, but my mom's hearing was virtual and mine was scheduled for in-person. I didn't want to go to court because I had seen everything that was happening on the news in the court building and I was afraid that ICE would arrest me. We went back to La Jornada NYC, and they helped me file a motion requesting that my hearing be virtual. I thought appearing virtually would save me from being detained. However, we never heard back from the court and my hearing was still scheduled for in-person in the online immigration court portal.

6. Around the same time, my mother and I were working to see if I could secure immigration relief through a separate process called "Special Immigrant Juvenile Status" (SIJS). My understanding of SIJS is that it's a special kind of status for young people like me who have suffered some kind of abuse, neglect, or abandonment from at least one parent. An organization helped me fill out forms to start the process, which initially required a petition in family court to have my mom appointed as my guardian. My birth father had abandoned me, and I wanted the security of having my mother be my legal guardian, especially because we were in a new country and I wanted my mother to be responsible for me should anything happen. This process took place in Family Court. A lawyer was appointed for me in the Family Court proceeding.

7. While I was going through the family court process, I was also preparing to attend my immigration court hearing on September 30, 2025. On that day, I went to my first immigration court hearing at 26 Federal Plaza. I was very afraid to go to court but I also

felt obligated to go because, to my knowledge, my motion requesting a virtual hearing was never ruled on. Not going would have jeopardized my ability to obtain immigration relief, but going in person also meant I could be detained all of a sudden. I was torn, but in the end I felt like I had to go. Still, I was terrified to go to court because I had seen in the news that ICE was arresting people, but I knew I had an obligation to be there, so I went.

8. At the hearing, I did not have an attorney. The judge gave me a list of free attorneys and said I had to bring an attorney to the next hearing. At first it seemed to go well; the judge reset my case for a later date. Things seemed normal.

9. But as I was leaving the courtroom, several masked men got into the elevator with me and my aunt Elizabeth, who had accompanied me. I felt very afraid because they were armed and I couldn't see their faces. Based on what I'd seen in the news, I knew they were ICE and I thought they would try to deport me, which also made me afraid because I am scared to return to Peru. As the masked men got onto the elevator, some people with cameras tried to get on as well. All of a sudden, one of the armed, masked men shoved one of the people with the cameras out of the elevator. That person fell into another person and they crashed to the ground. Then the doors of the elevator closed and I was alone with the armed men. It all happened so quickly—it was terrifying to be in the middle of such violence. The agents then took me to a detention room within 26 Federal Plaza.

10. I had done nothing wrong. Yet, the ICE agents made me spend two and a half days in the holding cell at 26 Federal Plaza. From what I could see, it was a large room divided into multiple spaces: some for men, some for women, and there was a third extra space. In the room I was in, I was with 4 other women. There was an open toilet and a camera above the toilet; there was no privacy. I had only a thin sheet and a hard mat on the floor to sleep on. The only food I got was water and a small sandwich, three times a day. The food was barely edible, almost rotten. Every time I ate it, I got stomach pains.

11. I was only allowed to make one phone call, when I was being registered immediately after my arrest, during the fingerprint process.

12. After approximately 2 and a half days, I was transferred to an airport in New Jersey. I was shackled together with other women–we were each handcuffed, and then we were connected by chains around our waist. Then we flew to Louisiana, where I was moved to another detention center. I was afraid, and I felt depressed and anxious. I cried a lot. I hadn't been able to communicate with my family and I felt horrible. I missed my mother.

13. I wasn't able to make any phone calls for approximately one week after I arrived in Louisiana.

14. In the detention center, I felt very bad, physically. I had a persistent stomach ache and tooth ache. I asked to see the doctor. A nurse asked me questions about the pain, but I didn't see a doctor. They didn't give me any medicine other than a pill that I think was acetaminophen.

15. After spending more than a month detained, I was finally released on November 5, 2025, when a federal court granted my habeas petition.

_____
Maria Jose Tumba Huamani