## DECLARATION OF BENJAMIN REMY

I, Benjamin Remy, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. The facts set forth in this declaration are based on my personal knowledge, and if called as a witness, I would testify thereto. I am over eighteen years of age and of sound mind to declare the facts stated herein.

2. I am a Senior Coordinating Attorney for New York Legal Assistance Group's ("NYLAG") Pro Se Plus Project ("PSPP") in the Immigration Protection group. I have worked within NYLAG's Immigration Protection group for approximately four years. I have been a licensed attorney practicing immigration law since 2020.

3. The PSPP is a collaboration between immigration legal services providers and community-based organizations that provides aid to newly arrived immigrants in New York City. It is a collaborative effort that seeks to bridge the gap in immigration service provision that results in many noncitizens proceeding with immigration-based applications without direct representation. In this program, NYLAG provides educational clinics to pro se asylum applicants so that these individuals can file asylum petitions, attend their scheduled court appearances, and litigate their claims on their own.

4. In my role as a Senior Coordinating Attorney for PSPP, I would regularly work with noncitizens to prepare and file asylum applications; prepare pro se litigants for their hearings before immigration courts; and provide education to community partners on preparing pro se asylum applications through community-based legal clinics. For noncitizens not held in immigration detention, I would often appear in-person on behalf of these persons as a friend of the court before immigration judges at 26 Federal Plaza.

5. As a result of my role as a Senior Coordinating Attorney with PSPP, I was familiar with the routine operation of immigration court proceedings at 26 Federal Plaza before federal immigration officers began their campaign of courthouse arrests in May 2025. Noncitizen asylum applicants would be processed through security, attend their court proceedings, receive a subsequent court date while their asylum petition was pending, and exit the courthouse without incident. It was not necessary for me to regularly attend court dates in-person alongside pro se litigants because they were not at risk of arrest and detention.

6. That changed in May 2025 when ICE began, to my knowledge and experience, for the first time, conducting federal immigration enforcement at the Immigration Courthouse at 26 Federal Plaza. On May 27, 2025, a pro se applicant from one of PSPP's community-based partners was arrested while attending a master calendar hearing. After this arrest, I began regularly going to 26 Federal Plaza to provide assistance to noncitizens attending their court dates.

7. This campaign of arrest and detention has had a dramatic impact on the operation of immigration courts. Noncitizens arriving for their court dates are wracked with anxiety

1

and fear. It is not uncommon that I see noncitizens burst into tears when they step outside of the elevators and into the court waiting rooms. It is not uncommon to see noncitizens sobbing throughout the duration of their court appearances. On more than one occasion, I have witnessed noncitizens faint as a result of panic attacks. Because detentions often occur in the waiting rooms of the courtrooms, noncitizens waiting for their appearances must watch as ICE officers violently detain noncitizens exiting the courtroom, and they must then attend their court dates with the knowledge that they too could be subjected to that kind of violence upon completing their court date. These detentions disrupt court proceedings, as the detentions often occur in the threshold of the courtroom. Judges, court staff, and noncitizens alike must continue with their proceedings over the sounds of physical beatings and screams of pain.

8. On one occasion, I witnessed ICE officers wrestle a noncitizen to the ground for approximately one minute after he exited his court appearance. ICE handcuffed him so poorly that the handcuffs dug into his wrists, causing him to bleed profusely.

9. On another occasion, I witnessed ICE put a six-month old infant at risk of serious injury when they arrested the infant's father in a courthouse waiting room. Prior to the arrest, the father, mother, and infant arrived for the father's master calendar hearing. I watched the mother silently sob while holding her infant for the three hours that they waited for the father's appearance. She sobbed so much that pools of tears collected in her collarbones. After the father exited the courtroom, I watched ICE officers swarm him and begin to physically assault the father. Several ICE officers grabbed the mother and tried to pull her away from her child's stroller. I put myself between the ICE officers and the stroller to try to protect the infant from physical violence. At one point, I was thrown by an ICE officer into a nearby bench. I felt my leg cut and begin to bleed. Eventually, I was able to get ICE to back away from the mother and stroller so I could get the mother to calm down. At the same time, we heard the father scream in pain as he was thrown into the stairwell. ICE created an incredibly dangerous situation by arresting the father in the courtroom waiting room. Their actions put children at risk of harm.

10. This campaign has impacted the inside of immigration courts too. Before May 2025, I had not seen an ICE officer inside an immigration courtroom in the years that I have been an immigration practitioner. Now, it is common to see ICE officers inside the courtroom. They are typically masked, armed, and present without any identification visually indicating that they are law enforcement.

11. On one occasion, I witnessed a noncitizen who had not yet been called for his appearance attempt to use the bathroom outside of Judge Kahn's courtroom. When he exited the courtroom, ICE officers swarmed him. He went back inside the courtroom, and the ICE officers followed him inside while court proceedings were ongoing. The officers arrested this man inside the courtroom over Judge Kahn's objections.

12. On another occasion, I witnessed ICE officers begin banging on a closed courtroom door during an ongoing appearance. The ICE officers demanded that the GSA security guards unlock the door.

13. On another occasion, ICE officers interrupted an ongoing court proceeding because they were opposed to print journalists sitting inside the courtroom. The clerk stated that it was permitted by the judge that the journalists be inside the courtroom and shut the door. ICE officers began banging on the door and complaining loudly until the clerk came back out. ICE officers asked the clerk where she was from and refused to listen to her directions.

Executed on this 3rd day of December, 2025 in New York, New York.

Benjamin Remy