I, Carmen Maria Rey Caldas, state the following under the provisions of 28 U.S.C. § 1746, and declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

## I. Background

1. I was appointed as an Immigration Judge in March 2022. While undergoing training, I briefly served at the Varick Immigration Court in New York City. In April of 2022, I was transferred to a permanent assignment at the Stewart Immigration Court, a detained court in Lumpkin, Georgia. I served as a judge there until late October of 2024. At my request, I was then transferred to serve as an Immigration Judge at the New York Federal Plaza Immigration Court, located at 26 Federal Plaza, New York City. I served as an immigration judge there from November 2024 until August 2025. From approximately July to August 2025, I was also detailed, one day per week, to hear cases on the detained docket at the Batavia Immigration Court in Batavia, NY. On August 21, 2025, I was abruptly terminated without a stated cause.
2. I received my Juris Doctor in 2006 from Brooklyn Law School. I am a member of the State Bar of New York, and am also admitted to practice in the Eastern District of New York and the United States Court of Appeals for the Second Circuit.
3. I have practiced immigration law for 20 years, representing a range of clients in proceedings before the Executive Office for Immigration Review (EOIR), the U.S. Department of State (DOS), and the Department of Homeland Security (DHS) through its subagencies, U.S. Citizenship and Immigration Service (USCIS), Customs and Border Protection (CBP), and Immigration and Customs Enforcement (ICE). I specialize in humanitarian immigration, namely refugee and asylum law and protections developed for migrants who are victims of domestic violence and other crimes, including human trafficking.
4. Over the course of the last 20 years, I have represented clients before EOIR's immigration courts across the country, in locations as varied as Tucson, AZ, Buffalo, NY, and Baltimore, MA.
5. I have also worked extensively in partnership with federal and local investigative agencies, including the Federal Bureau of Investigation, ICE Homeland Security Investigations, and the New York City Police Department as they investigated crimes of domestic violence and human trafficking networks. In the course of that work, I also supported prosecutorial efforts at the Eastern District of New York, and the Brooklyn, Queens, Manhattan and Bronx District Attorney's offices.
6. I provide this declaration based on my personal knowledge and experience and review of publicly available information.

II.     **EOIR Dismissals Policy and ICE Courthouse Arrests**

7. Over the course of over 3 and a half years as an Immigration Judge, I decided thousands of cases. In the approximately 10 months I sat at the New York Federal Plaza immigration Court, I heard an average of three cases per day (via full trials), an average of 50 status hearings (*aka* master calendar hearings) per week, and a varying number of special hearings on less-common issues, like a respondent's competence to proceed to trial. While at this court, all but perhaps 50 of these cases were for non-detained respondents.
8. In my decades of practicing immigration law, I have never had a client arrested at immigration court. I had heard of such arrests occurring only in rare cases where a noncitizen respondent had a serious criminal matter pending or in cases in which a noncitizen's presence implicated serious national security interests. Prior to this administration's change in policy, I had never advised a client or witnesses that they might risk civil ICE arrest when appearing at immigration court.
9. I understand from my former colleagues that ICE began aggressively implementing two new policies in late May 2025. At the time, I was on annual leave; when I returned on June 9, 2025, it was to a transformed courthouse.

A.  **Oral Motions to Dismiss**

10. First, ICE began making oral motions to dismiss at Master Calendar Hearings, referring solely to the Department's authority to move to dismiss a proceeding under 8 CFR§ 239.2(a) (7). I heard my first such motion on Thursday, June 12th, 2025. As other Judges had commented to me, the Department initially offered no justification for the motion. Only when I inquired what the Department's justification was did the Department refer directly to a change in interpretation of ICE's expedited removal authority that, ICE counsel argued, subjected the Respondent to expedited removal.
11. While some judges were satisfied that this broad change in ICE policy met the requirements of 8 C.F.R.§ 239.2(a)(7), I and some others did not believe these oral motions complied with the regulations' default requirements, and refused to dismiss cases on DHS' oral motions.
12.  For one, oral motions are disfavored by the immigration court. 8 C.F.R. § 1003.23(a); see also *Immigration Court Practice Manual,* Chapter 5.2(b), *available at* https://www.justice.gov/eoir/reference-materials/ic/chapter-5/2.
13. Also, DHS was filing these without attempting to discern the position of the other party, as required by the Immigration Court Practice Manual. *Id* at 5.2(i), which requires that the party filing a motion should make a good faith effort to ascertain the opposing party's position on the motion, state such position in the motion, and if unable to do so, describe efforts made to ascertain the other party's position.

14. Lastly, the Department was filing these almost uniformly on cases of unrepresented Respondents, who, by virtue of being unrepresented and having the motion raised orally in open court, had little opportunity to understand the consequences of such motion and were therefore largely incapable of meaningfully stating a position.
15. When, to address this issue and any potential undermining of Respondent's due process, Judges ordered Respondents be given the standard 10 days to consult with counsel before returning to court to state a position on the motion, Judges were advised that leadership wanted us to decide the motions immediately. *See* Roman Chaban, Acting Deputy Director, EOIR PM 25-51, *Withdrawal of May 30, 2025 E-mail*, September 23, 2025.
16. After I denied multiple of these motions for the aforestated reasons, ICE stopped attempting to obtain such dismissals in my courtroom.

**B. Courthouse Arrests**

17. Second, ICE concurrently began arresting noncitizens immediately outside of my courtroom irrespective of how I ruled on the motion to dismiss. These arrests caused enormous disruption to the courthouse. EOIR leases the 12th and 14th floors of 26 Federal Plaza for courtrooms. Because of the desperate need for space, every available room (except for the hallways and small waiting areas which are open to the public) is used as office or court space.
18. Beginning in early 2025, noncitizens enter 26 Federal Plaza through a single lobby entrance on Broadway. Although court staff, including judges, are able to use staff-only entrances into the building, both noncitizens and staff must proceed to one of the public elevator banks to reach the 12th and 14th floors.
19. Once the noncitizen arrives on the 12th or 14th floors, they exit the elevators and then proceed down narrow hallways to courtrooms. Certain courtrooms are set back from the hallway by small waiting areas with a handful of chairs where the parties are allowed to await the initiation of hearings.
20. The majority of courtrooms lack waiting areas. Respondents awaiting hearings in those courtrooms line up outside the courtrooms in narrow hallways, the broadest of which accommodate, at best, four people walking abreast.
21. Waiting rooms and hallways at 26 Federal Plaza are often packed with noncitizen adults, children, and their attorneys. As there are no private elevators for staff, Judges and court staff use those same hallways to enter and exit the courtrooms, travel between floors, transport files, and travel to and from bathrooms. ICE presence in these spaces—often 5-12 agents at a time—was obvious and intimidating. ICE's arrests of noncitizens necessarily occurred in these small public spaces, in front of other noncitizens and often Respondents' minor children.
22. There are no non-public areas in these two floors where ICE might encounter a noncitizen attending court to effectuate an arrest, hence, every arrest was effectuated in

public. The resulting chaos was clearly heard in courtrooms where judges, including me, attempted to proceed with court hearings as though we were unable to discern the chaos outside our courtrooms.

23. Although agents wore plain clothing, most also covered their entire faces, wore hats and bulletproof vests, and wore visible weapons. Moreover, the arrests caused public uproar, drawing members of the press who further crowded the spaces outside courtrooms. The situation was palpably volatile. Often, as I looked up from my bench during hearings, I witnessed masked and armed ICE officers, whose counsel was appearing as a party before me, patrolling back and forth outside my courtroom. Respondents were visibly terrified to leave the courtroom.

24. ICE's large-scale arrests at 26 Federal Plaza effectively chilled participation in Immigration Court proceedings. Once the arrests started, fewer and fewer respondents appeared for their scheduled Master Calendar Hearings before me. On one remarkable day in late July of 2025, only 10 of the 60-plus respondents scheduled to appear before me for their master calendar hearings attended their hearing. For those that failed to appear, I entered *in absentia* orders of removal, as required by regulation. For comparison, in early 2025, about 10 respondents would fail to appear for their hearings on an average master calendar day.

25. Starting in June of 2025, as the courthouse arrests began receiving media attention, I also saw a marked increase in requests for remote appearance by Respondents. I granted these motions when appropriate. Some Respondents wrote to the court to request being allowed to appear remotely for their master calendar hearings by telephone or Webex and specifically remarked that the request was predicated on their fear of arrest. Others appeared via Webex from directly outside of 26 Federal Plaza and asked that I not make them come into the building to appear in person because they feared being arrested if they were forced to do so. Invariably, for the first time in recent memory, ICE counsel raised objections to Respondent's remote appearance at master calendar hearings.

26. Those Respondents who did appear in court were terrified. They had to walk past armed ICE agents, and sometimes ongoing arrests, to enter my courtroom. Those arrests, including the screaming and pleading that accompanied them, were plainly audible from inside my courtroom. I witnessed noncitizen Respondents and witnesses in my courtroom who were testifying in asylum hearings visibly shaking with fear of being arrested by ICE while attempting to recount testimony of the arbitrary state detention and violence they experienced in their country of origin. No one could focus. People refused to leave the safety of the courtroom while ICE remained in the hallway. One woman who was there to support her husband in his proceedings had a panic attack after witnessing another man's arrest. The only way I could convince her to leave my courtroom to seek medical assistance was by removing my judge's robe and personally escorting her to the elevator. I was fired two weeks later.

27. Please understand that these incidents were disturbing, in part because there are few measures in place to help judges if a dangerous situation does arise. The 26 Federal Plaza immigration courts do not have bailiffs. Judges sit alone in their courtrooms except for a few hours per week, during master calendar hearings, when they are joined by a clerk. Otherwise, judges have only a panic button available to rely on in case of emergency.
28. Because it's a secure Federal Building, calling the NYPD in case of an emergency isn't viable, as it will take them too long to respond and enter the building. There are security guards, historically about two per floor, that patrol the hallways of 26 Federal Plaza, but they need to be found and brought to the courtroom to assist, a time-consuming and often impossible process because the Judge is incapable of leaving the courtroom to reach them.
29. I am aware of one incident outside a nearby courtroom where a noncitizen reached for a security guard's gun in the midst of an arrest. In another incident, a Respondent attempted to run past the bench and into the private area that leads to the staff and judge's offices to avoid arrest.
30. Court staff and immigration judges, including me, did not feel safe in this explosive environment. In a series of internal meetings attended by EOIR leadership, including national leadership, Judges and court staff complained of being filmed in hallways and having their identities disclosed in the media. Some judges raised the possibility that it may be necessary for judges to purchase and wear bullet proof vests under their robes, as the ICE officers felt it was necessary to do.
31. Noncitizens appearing for their immigration proceedings are complying with legal requirements to appear before the court. Given delays on the immigration court docket, many have been in the United States for years. As long-term Lawful Permanent Residents may also fall within the jurisdiction of the immigration court, some Respondents have been here for decades. I have personally heard cases for Respondents charged with Removability who have lived in the United States longer than my 45 years of life.
32. Very few respondents on the non-detained docket have any criminal history (those noncitizens with criminal history are typically detained by ICE, often under the broad mandatory detention provisions at 8 USC 1226(c)). No respondent in front of me who ICE arrested at the immigration court had a criminal conviction.
33. There are obvious alternatives to arrest this population. First, ICE and EOIR have the home addresses for every person in removal proceedings, as well as the work addresses of any Respondent presenting a defense against removal. Second, ICE can require that people in removal proceedings attend what are known as "check-ins" at their offices, which, in this case, are on a different floor of 26 Federal Plaza. In fact, it was this check-in process that was historically used to detain respondents when ICE did not wish to detain a Respondent at their home or place of business. *See, e.g.*, *Ragbir v. Homan,* 923 F.3d 53, 61 (2d Cir. 2019) (noting the petitioner was detained at his ICE check-in), *cert.*

*granted, judgment vacated sub nom. Pham v. Ragbir*, 141 S. Ct. 227, 208 L. Ed. 2d 1 (2020).

34. I have reviewed ICE's 2025 Memoranda purporting to authorize courthouse arrests. The justification provided therein—that "enforcement activities in or near courthouses are often required when jurisdictions refuse to cooperate with ICE, including when such jurisdictions refuse to honor immigration detainers and transfer aliens directly to ICE custody"—makes little sense when applied to immigration courts in New York City.

35. While local policies prohibiting local law enforcement cooperation with ICE may be a reason for ICE to attempt to locate someone charged with a crime at their *criminal* court proceedings, noncitizens attending immigration proceedings on the non-detained docket are not evading ICE. They are already known to ICE, have provided the immigration court system and opposing counsel (ICE) with their addresses and the locations of their workplaces, and are complying with the immigration system's requirements to appear for hearings to determine the outcome of their cases.

Dated: Monday, December 1, 2025

Signed: _____
Carmen Maria Rey Caldas
Attorney Reg. Number: 4465126