UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AFRICAN COMMUNITIES TOGETHER; and THE DOOR,

Plaintiffs,

v.

TODD LYONS, in his official capacity as Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; DARREN K. MARGOLIN, in his official capacity as Director, Executive Office for Immigration Review; and PAMELA BONDI, in her official capacity as Attorney General, U.S. DEPARTMENT OF JUSTICE,

Defendants.

25 Civ. 6366 (PKC)

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2695/2721
Fax: (212) 637-0033
Email: jeffrey.oestericher@usdoj.gov
        tomoko.onozawa@usdoj.gov

JEFFREY S. OESTERICHER
TOMOKO ONOZAWA
Assistant United States Attorneys
*Of Counsel*

**TABLE OF CONTENTS**

ARGUMENT ...................................................................................................................1

    I.    The Court Should Decline to Consider Plaintiffs' Extra-Record Evidence ............1

    II.    The ICE Guidance Is Not Arbitrary and Capricious................................................5

        A.    The ICE Guidance Applies to Immigration Courts ......................................5

        B.    ICE Reasonably Justified its Courthouse Arrest Guidance .........................6

    III.    The ICE Guidance Is Not Contrary to Law ............................................................11

    IV.    This Court Should Dismiss Plaintiffs' Claims Against the EOIR
        Defendants For Lack of Subject Matter Jurisdiction .............................................16

        A.    The Withdrawal of the Challenged EOIR Guidance E-mail Moots
            Plaintiffs' APA Claims Against the EOIR Defendants .............................16

        B.    Plaintiffs Lack Standing to Sue the EOIR Defendants ..............................17

CONCLUSION..............................................................................................................20

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Aleutian Capital Partners, LLC v. Hugler*,
No. 16 Civ. 5149 (ER), 2017 WL 4358767 n.3 (S.D.N.Y. Sept. 28, 2017) .............................. 4

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998) .................................................................................................... 13

*American Steamship Owners v. United States*,
489 F. Supp. 3d 106 (E.D.N.Y. 2020) ................................................................................. 4

*Andrews v. Martin*,
425 Victoria 371 (1862) ................................................................................................ 12

*Bar MK Ranches v. Yeutter*,
994 F.2d 735 (10th Cir. 1993) ......................................................................................... 2

*Blight v. Fisher*,
3 F. Cas. 704 (C.C.D.N.J. 1809) .................................................................................... 12

*Branch v. Smith*,
538 U.S. 254 (2003) .................................................................................................... 13

*Bridges v. Sheldon*,
7 F. 17 (C.C.D. Vt. 1880) ............................................................................................. 12

*Cameron v. Roberts*,
58 N.W. 376 (Wis. 1894) .............................................................................................. 12

*Chamber of Commerce of U.S. v. Securities and Exchange Commission*,
412 F.3d 133 (D.C. Cir. 2005) ...................................................................................... 10

*Chen v. Rollins*,
No. 23-CV-1440 (VEC), 2025 WL 2476930 (S.D.N.Y. Aug. 28, 2025) ................................. 3

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) ...................................................................................................... 2

*City & County of San Francisco v. USCIS*,
944 F.3d 773 (9th Cir. 2019) ....................................................................................... 10

*Conn. Parents Union v. Russell-Tucker*,
8 F.4th 167 (2d Cir. 2021) ..................................................................................... 17, 19

*County of Oneida v. Oneida Indian Nation of N.Y.*,
470 U.S. 226 (1985)..................................................................................................... 14

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008)..................................................................................................... 17

*Defenders of Wildlife v. Jewell*,
Civil Action No. 13-0919 (RC), 2014 WL 9883926 (D.D.C. Mar. 20, 2014) ....................... 1, 4

*Do No Harm v. Pfizer, Inc.*,
126 F.4th 109 (2025).................................................................................................... 19

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016)................................................................................................... 9

*Erlenbaugh v. United States*,
409 U.S. 239 (1972)..................................................................................................... 14

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)..................................................................................................... 13

*Florida Power & Light Co. v. Lorion*,
470 U.S. 729 (1985)................................................................................................... 2, 3

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)..................................................................................................... 18

*Hill Dermaceuticals v. FDA*,
709 F.3d 44 (D.C. Cir. 2013).......................................................................................... 2

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)..................................................................................................... 17

*Irish Lesbian & Gay Org. v. Giuliani*,
143 F.3d 638 (2d Cir. 1998)...................................................................................... 17, 19

*Larned v. Griffin*,
12 F. 590 (C.C.D. Mass. 1882)....................................................................................... 13

*Las Americas Immigration Advocacy Center v. Wolf*,
507 F. Supp. 3d 1  (D.D.C. 2020).................................................................................... 4

*Lopez Benitez v. Francis*,
795 F. Supp. 3d 475 (S.D.N.Y. 2025)................................................................................ 8

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)..................................................................................................... 20

*Matter of Sugay*,
   17 I. & N. Dec. 637 (BIA 1981) ......................................................................... 8

*Meekins v. Smith*,
   126 Eng. Rep. 363 (1791) ................................................................................ 12

*Miles v. McCullough*,
   1 Binn. 77 (Pa. 1803) ...................................................................................... 13

*Nat'l Audubon Society v. Hoffman*,
   132 F.3d 7 (2d Cir. 1997) .............................................................................. 2, 3

*New York v. FERC,*
   783 F.3d 946 (2d Cir. 2015).............................................................................. 10

*New York v. ICE*,
   466 F. Supp. 3d, 439 (S.D.N.Y. 2020)............................................................... 14

*New York v. U.S. Dep't of Justice*,
   951 F.3d 84 (2d Cir. 2020)................................................................................. 9

*Pablo Sequen v. Albarran*,
   No. 25-cv-06487-PCP, 2025 WL 3724878 (N.D. Cal. Dec. 24, 2025) ................... 11

*Simon v. E. Ky. Welfare Rts. Org.*,
   426 U.S. 26 (1976)............................................................................................ 18

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)........................................................................................... 17

*Stillwell v. Office of Thrift Supervision*,
   569 F.3d 514 (D.C. Cir. 2009)............................................................................ 10

*Summers v. Earth Island Institute*,
   555 U.S. 488 (2009)........................................................................................... 20

*Teleanu v. Koumans*,
   480 F. Supp. 3d 567 (S.D.N.Y. Aug. 20, 2020).................................................... 4

*Town of Chester v. Laroe Ests., Inc.,*
   581 U.S. 433 (2017)........................................................................................... 17

*Tumba Huamani v. Francis*,
   No. 25 Civ. 8110, 2025 WL 3079014 (S.D.N.Y. Nov. 4, 2025) ............................. 8

*U.S. Navy Seals 1–26 v. Biden*,
   72 F.4th 666 (5th Cir. 2023) ............................................................................. 16

*United States v. Fausto*,
  484 U.S. 439 (1988)...................................................................................................... 14

*United States v. Green*,
  305 F. Supp. 125 (S.D.N.Y. 1969)............................................................................... 13

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951)...................................................................................................... 10

*Venetian Casino Resort, LLC v. EEOC*,
  530 F.3d 925 (D.C. Cir. 2008) ....................................................................................... 3

*Walpole v. Alexander*,
  99 Eng. Rep. 530 (1782).............................................................................................. 12


Statutes

5 U.S.C. § 706............................................................................................................ passim

8 U.S.C. § 1226(a) ............................................................................................................. 8

8 U.S.C. § 1226(c) ............................................................................................................. 8

8 U.S.C. § 1229(e) ................................................................................................. 13, 15, 16

8 U.S.C. § 1231(a)(2)......................................................................................................... 8

8 C.F.R. § 1003.19............................................................................................................. 8

8 C.F.R. § 1236.1(c)(8)...................................................................................................... 8

Fed. R. Civ. P. 12(b)(1)................................................................................................... 16

Fed. R. Civ. P. 56.............................................................................................................. 1


Other Authorities

Executive Order 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025)........................................... 7

H.R. Rep. 109–233 (2005)............................................................................................... 15

Defendants Daren K. Margolin, in his official capacity as Director of the Executive Office for Immigration Review ("EOIR"), Pamela Bondi, in her official capacity as Attorney General of the United States (together, "the "EOIR Defendants"), Todd Lyons, in his official capacity as the Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement ("ICE"), and Kristi Noem, in her official capacity as Secretary of the United States Department of Homeland Security ("DHS" and together, the "ICE Defendants"), respectfully submit this memorandum of law in opposition to Plaintiffs' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

ARGUMENT

## I.     The Court Should Decline to Consider Plaintiffs' Extra-Record Evidence

To begin, the Court should consider its APA review based on the certified administrative record of the memorandum issued by ICE dated May 27, 2025, and titled "Civil Immigration Enforcement Actions In or Near Courthouses" (the "ICE Guidance") (ECF No. 64-1), rather than the substantial extra-record evidence—18 declarations, one of which appends 16 exhibits—that plaintiffs proffer in support of their motion for summary judgment. *See* ECF Nos, 69 and 69-1 through 69-16.[1]

It is well-established that judicial review in APA cases is presumptively limited to the administrative record. *See* 5 U.S.C. § 706 (review shall be based on "the whole record or those

---

[1] Defendants acknowledge that Plaintiffs have permissibly relied on portions of certain extra-record submissions—namely, ECF Nos. 68-1, 68-2, 68-3, 68-4, and 68-14—to establish Article III standing. *Defenders of Wildlife v. Jewell*, Civil Action No. 13-0919 (RC), 2014 WL 9883926, at *1 (D.D.C. Mar. 20, 2014) ("[T]he plaintiffs may supplement the administrative record with material to support their claim of standing."). Section IV.B of Defendants' opposition brief addresses the sufficiency of these extra-record submissions regarding Plaintiffs' standing to sue the EOIR Defendants. However, Plaintiffs have gone "beyond this permitted use by applying extra-record evidence to their merits arguments in their memorandum in support of their motion for summary judgment." *Defenders of Wildlife*, 2014 WL 9883926, at *1.

parts of it cited by a party"); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (in an APA case, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court").  In light of this "record rule," courts generally should consider extra-record evidence only where there is a "strong showing of bad faith or improper behavior" on the part of the agency in assembling the record. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *accord Nat'l Audubon Society v. Hoffman*, 132 F.3d 7, 14–15 (2d Cir. 1997); *Hill Dermaceuticals v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013).  Indeed, given the "presumption of administrative regularity" afforded to agency actions, a "court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary." *Bar MK Ranches v. Yeutter*, 994 F.2d 735, 740 (10th Cir. 1993); *see also Overton Park*, 401 U.S. at 415 ("the Secretary's decision is entitled to a presumption of regularity").  In addition to instances of bad faith or improper behavior, supplementation may be permissible "when the record does not support the agency action, when the agency has not considered all relevant factors, or when the reviewing court simply cannot evaluate the challenged action on the basis of the record before it."  *Nat'l Audubon Society*, 132 F.3d at 14 (citing *Florida Power & Light Co.*, 470 U.S. at 744).

Here, although Plaintiffs assert that this Court should consider extra-record submissions "when plaintiffs challenge partially unwritten, *de facto* or informal policies and a sparse record," Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment ("Pls.' Br.") at 11, they do not meet the high threshold for supplementation.  They do not, for example, allege any agency bad faith in compiling the administrative record, nor do they argue that the presumption of regularity should not apply.  *Overton Park*, 401 U.S. at 420.  To the contrary,

following Defendants' filing of the administrative record on November 4, 2025, Plaintiffs have never sought extra-record discovery or supplementation of the record.

Plaintiffs further claim that their extra-record submissions are necessary for this Court to "ascertain the contours of the precise policy at issue." Pls.' Br. at 12 (quoting *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 928 (D.C. Cir. 2008)). But Plaintiffs have already identified the "precise policy" it is challenging under the APA—an ICE policy that "broadly authoriz[es] arrests at immigration courthouses." Compl. ¶ 3; *see also id.* ¶¶ 30, 35. In equal measure, this Court has already articulated its understanding of what the challenged ICE policy is: "The second challenged policy is the ICE revised courthouse arrest policy of May 27, 2025, which was an update and expansion of a January 21, 2025 revision to policy that expanded the permissible occasions in which an ICE agent could arrest a noncitizen at a courthouse . . . ." Opinion & Order dated Sept. 12, 2025 (ECF No. 51) at 8–9. This is not a case where the Court has "found the precise terms of the . . . policy at issue quite uncertain" and it "is not clear . . . what the policy of the [agency] is." *Venetian Casino Resort, LLC*, 530 F.3d at 928.

Plaintiffs also never argue that the administrative record as filed fails to support the ICE Guidance, or that the Court cannot evaluate the ICE Guidance on the basis of that record. *Nat'l Audubon Soc'y*, 132 F.3d at 14. Indeed, Plaintiffs barely engage with the record at all. *See* Pls.' Br. 13–14, 17–19 (pages in Plaintiffs' argument section citing to the administrative record). In sum, this Court should not permit Plaintiffs to substitute a "new record," *Florida Power & Light Co.*, 470 U.S. at 743, for the record the agency compiled, whose sufficiency Plaintiffs did not challenge. *See Chen v. Rollins*, No. 23-CV-1440 (VEC), 2025 WL 2476930, at *4 (S.D.N.Y. Aug. 28, 2025) ("The Court concludes it cannot consider Plaintiffs' proffered extra-record evidence to determine whether the [agency] failed to consider an important aspect of the problem

3

. . . when it implemented the challenged agency actions"); *Defenders of Wildlife,* 2014 WL 9883926, at *1 ("[T]he Court will rely *only* on the substantive administrative record in considering the merits of this case, and will not rely on any extra-record exhibits provided by the plaintiffs in considering the merits of the case."); *Las Americas Immigration Advocacy Center v. Wolf,* 507 F. Supp. 3d 1, 17 n.8  (D.D.C. 2020) (where plaintiffs filed "additional materials outside of the administrative record, including declarations from the individual Plaintiffs and documents prescribing standards for ICE detention facilities" in support of motions for a preliminary injunction and summary judgment in APA case, district court would rely "only on the individual Plaintiffs' declarations, in conjunction with its analysis of the individual Plaintiffs' Article III standing, which is entirely permissible.").  Accordingly, the Court should decline to consider Plaintiffs' extra-record submissions, to the extent Plaintiffs rely on them to support their merits arguments under the APA.[2]

---

[2] The fact section of Plaintiffs' brief appears under a heading titled "Statement of Material Facts."  Pls.' Br. at 1–11.  To the extent this section of their brief is intended to serve as a Local Civil Rule 56.1 statement, that rule "does not apply to claims brought under the Administrative Procedure Act."  Local Civ. R. 56.1(a).  That language reflects an established consensus in this Circuit that "Rule 56.1 Statements of Material Facts are not required on APA review" because, again, "whether agency action is arbitrary or capricious is [a] legal question to be resolved on [the] agency record."  *American Steamship Owners v. United States*, 489 F. Supp. 3d 106, 128 & n.14 (E.D.N.Y. 2020); *accord Teleanu v. Koumans*, 480 F. Supp. 3d 567, 575 n.11 (S.D.N.Y. Aug. 20, 2020) ("A Rule 56.1 statement is not required in a case seeking review of an administrative action under the APA because the case only presents a question of law."); *Aleutian Capital Partners, LLC v. Hugler*, No. 16 Civ. 5149 (ER), 2017 WL 4358767, at *2 n.3 (S.D.N.Y. Sept. 28, 2017) ("Because this action turns entirely on the administrative record and presents only legal issues, Rule 56.1 statements are unnecessary.").  Accordingly, the Court should decline to accept Plaintiffs' "Statement of Material Facts" as a Local Civil Rule 56.1 statement.

4

**II.    The ICE Guidance Is Not Arbitrary and Capricious**

**A.    The ICE Guidance Applies to Immigration Courts**

As a preliminary matter, Plaintiffs erroneously assert that the ICE Guidance classifies immigration courts as a category of courthouse that is "wholly dedicated to non-criminal proceedings" and must be generally avoided by ICE officers. Pls.' Br. at 4, 6–7. *See* AR 2 (instructing ICE officers to "generally avoid enforcement actions in or near courthouses, or areas within courthouses that are wholly dedicated to non-criminal proceedings (*e.g.,* family court, small claims court)."). Because immigration courts are not "criminal" courts, Plaintiffs reason that the ICE Guidance plainly instructs ICE officers to "generally avoid enforcement actions in or near" immigration courts. This assertion is wrong for two reasons.

First, nothing on the face of the ICE Guidance expressly offers immigration courts as an example of a "non-criminal" court in any way. (AR 1–3). Second, Plaintiffs' assertion is based on the mistaken premise that the reference to "non-criminal" courts in the ICE Guidance was intended to exclude immigration courts. To the contrary, the reference to "non-criminal proceedings" on the second page of the ICE Guidance is identical to a reference to "non-criminal proceedings" that first appeared in the 2018 Directive (*compare* AR 2 *with* AR 52). As explained in the Administrative Record and in the government's briefs filed in *New York v. ICE,* No. 19 Civ. 8876 (JSR), the reference to "non-criminal proceedings" in the 2018 Directive came from language proposed to ICE by the Chief Administrative Judge of the New York State Unified Court System to limit immigration enforcement actions in "[s]tate and local courthouses." Onozawa Decl. Ex. A. *See also New York v. ICE*, No. 19 Civ. 8876 (JSR) (ECF No. 98), Defs.' Mem. of Law in Opp. to Pls.' Cross-Mot. for Summ. J., at 5, *available at* 2020 WL 3166816. Specifically, the proposed language read: "In addition, absent exigent circumstances, agents should avoid enforcement actions in court facilities and/or during

scheduled proceedings which are dedicated to non-criminal matters." Onozawa Decl. Ex. A. *See also New York v. ICE*, Defs.' Mem. of Law in Opp. to Pls.' Cross-Mot. for Summ. J., at 5, *available at* 2020 WL 3166816. The 2018 Directive incorporated elements of this proposed language and instructed ICE officers to avoid courthouses where "non-criminal proceedings" are held. *Id.* In light of the context in which the term "non-criminal proceedings" appeared in the 2018 Directive—and was later adopted verbatim in the current ICE Guidance— "non-criminal proceedings" refers to non-criminal proceedings in state and local courts, not federal immigration courts. Immigration courts are therefore not subject to the ICE Guidance's limitations on conducting civil immigration enforcement actions in courthouses where "non-criminal proceedings" are held.

### B.    ICE Reasonably Justified its Courthouse Arrest Guidance

Plaintiffs allege that the ICE Guidance constitutes "a dramatic departure from its decades-long policy," Pls.' Br. at 4, and that ICE failed to "display any awareness of the sea change" that the challenged Guidance "triggered in ICE arrest practices at *immigration courts*." *Id.* at 16 (emphasis in original). That argument fails for several reasons.

The administrative record demonstrates that for years before the challenged Guidance was issued, ICE has been conducting civil immigration arrests and other enforcement activities at or near courthouses pursuant to established policies. The administrative record further establishes that the ICE Guidance evolved out of ICE's prior policies with respect to civil immigration enforcement actions at or near courthouses, which were first issued in March 2014, and revised in January 2015, October 2015, January 2018, April 2021, January 2025, and May 2025. *See* Defendants' Memorandum of Law in Support of Their Partial Motion to Dismiss and Partial Motion for Summary Judgment ("Defs.' Br.") at 4–9; *see also* Declaration of Jeffrey S. Oestericher, dated August 20, 2025 ("Oestericher Decl."), Exs. A & B (ECF Nos. 41-1, 41-2);

6

AR 1–3, 20–28, 51–53.[3]  Plaintiffs fail to explain why it was unreasonable for ICE to revise its civil immigration enforcement policies in or around courthouses, consistent with its broad discretion under the INA to determine the location of a civil immigration enforcement action, and to comport with changes in local compliance with ICE detainers and DHS enforcement priorities.  Defs.' Br. at 12–13, 16.  Indeed, the administrative record demonstrates ICE's past practice of revising its courthouse policies to reflect changing enforcement priorities.  *See, e.g.,* AR 1–3, 20–28, 51–53.

The 2021 Courthouse Guidance (AR 25–28) reflected the prior administration's immigration enforcement priorities and chose to limit the circumstances in which civil immigration enforcement actions could occur in courthouses, but notably still *permitted* enforcement actions to take place in "any municipal, county, state, federal, tribal, or territorial courthouse, including immigration courts." (AR 26).  After President Trump issued Executive Order 14,159 on January 20, 2025, which revoked the prior administration's civil immigration enforcement policies and declared that it "is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens," 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025), ICE revised its courthouse arrest guidance to expand civil immigration enforcement actions in courthouses to a broader category of aliens who are subject to removal. (AR 2).

Plaintiffs assert that ICE's immigration court arrests are occurring amid regulations and caselaw holding that such arrests are unwarranted, "unnecessary," or in violation of due process, Pls.' Br. at 1–2, but these regulations and decisions relate to ICE's authority to *detain* individuals

---

[3] All references to "AR" are to the certified administrative record filed on November 4, 2025 (ECF No. 64-1).

once arrested, not to the agency's discretion under the INA to determine the location of the arrest. *See, e.g.,* 8 U.S.C. §§ 1226(a) ("an alien may be arrested and detained pending a decision on whether the alien is to be removed"), 1226(c) (relating to the Attorney General's authority to "take into custody" certain aliens), 1231(a)(2) (relating to the Attorney General's authority to "detain the alien" during the removal period); 8 C.F.R. §§ 1003.19 (regulations relating to "custody status and bond determinations"), 1236.1(c)(8) ("[a]ny officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not described in section 236(c)(1) of the Act"). *See also Matter of Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981) (dismissing appeal challenging immigration judge's custody and bond determination); *Tumba Huamani v. Francis*, No. 25 Civ. 8110, 2025 WL 3079014, at *6–7 (S.D.N.Y. Nov. 4, 2025) (analyzing whether petitioner's detention violated her due process rights); *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 495 (S.D.N.Y. 2025) (analyzing whether petitioner's detention violated her due process rights). Plaintiffs are therefore incorrect in claiming that courts have held that "immigration court arrest[s] violated due process." Pls.' Br. at 2.

Plaintiffs also erroneously claim that the issuance of the ICE Guidance was arbitrary and capricious because ICE failed to consider "prior policy" and "serious reliance interests" engendered by those prior policies. Pls.' Br. at 16. Past ICE policies and the general longstanding presence of law enforcement agents performing lawful enforcement activities in courthouses could not have led the public to assume that ICE never conducted civil immigration activities in courthouses at any time. As a matter of public record, ICE has issued several courthouse arrest policies since 2014 (AR 20–28, 51–55), and ICE has never deemed courthouses to be "sensitive community locations" or "protected areas." (AR 13–19, 29–34). Plaintiffs also do not and cannot dispute that, unlike "sensitive locations" such as schools,

hospitals and places of worship, federal, state, and local law enforcement agencies have regularly entered courthouses to arrest targeted subjects and conduct other law enforcement activities. This is not a case where a brand-new policy completely upended serious reliance interests along the lines of what the Supreme Court recognized, for example, in *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)—*e.g.,* "decades of industry reliance" on an agency's "prior policy," where the agency's "new position could necessitate systemic, significant changes" with those who fail to comply facing "substantial . . . liability," "even if this risk of liability" could be reduced by applicable statutory exemptions or defenses. *See New York v. U.S. Dep't of Justice*, 951 F.3d 84, 123 (2d Cir. 2020) (finding *Encino* inapposite in immigration-related APA challenge).

Plaintiffs also claim that the ICE Guidance is arbitrary and capricious because the agency's stated rationale for reducing "safety risks" "cannot justify this Policy." Pls.' Br. at 17–18. The administrative record shows that ICE has conveyed the indisputable and reasonable observation that courthouse visitors are subject to weapons screening in a way that individuals generally in the public are not, and that the confirmed absence of weapons in courthouses reduces potential safety risks when conducting civil immigration enforcement activities there. *See* AR 1, 21 ("Individuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband. Accordingly, when ICE engages in civil immigration enforcement actions in or near courthouses it can reduce safety risks to the public, targeted alien(s), and ICE officers and agents."). To the extent Plaintiffs assert that ICE was subject to a heightened burden of explanation and had to "present [] facts or analysis establishing the purported 'safety risks' related to people attending immigration court or that the policy change would reduce any such risks," *see* Pls.' Br. at 17, "[t]he APA imposes no general

obligation on agencies to produce empirical evidence" for its policy judgments.  *Stillwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009); *see also Chamber of Commerce of U.S. v. Securities and Exchange Commission*, 412 F.3d 133, 142 (D.C. Cir. 2005) ("we are acutely aware that an agency need not—indeed cannot—base its every action upon empirical data").

Plaintiffs nonetheless fault the ICE Guidance for failing to "consider obvious reasonable alternatives uniquely applicable to people appearing in immigration court," such as "enrolling noncitizens in ICE's supervision program or conducting lawful arrests at an ICE check-in or at their home address which the immigration court has on file."  Pls.' Br. at 13.  But Plaintiffs' objections are nothing more than policy disagreements about where ICE officers should conduct civil immigration enforcement actions.  Plaintiffs may balance the various considerations concerning the appropriate locations for civil immigration enforcement actions and determine that such actions should take place at ICE check-ins or an alien's home address rather than at immigration courts, but that preference does not require ICE to follow their lead.  *See New York v. FERC*, 783 F.3d 946, 959 (2d Cir. 2015) ("[W]e may not displace an agency's 'choice between two fairly conflicting views, even though we would justifiably have made a different choice had the matter been before us *de novo*.'" (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); alterations omitted)); *City & County of San Francisco v. USCIS*, 944 F.3d 773, 799 (9th Cir. 2019) ("And whether the change in policy results from changing circumstances or a change in administrations, the wisdom of the policy is not a question we can review.").  In short, ICE adequately and reasonably justified the changes it made to its courthouse arrest guidance.

Moreover, the ICE Guidance demonstrates that ICE undertook its best efforts to balance its statutory enforcement authority and priorities against concerns about safety to its officers, arrestees, and members of the public, by including provisions designed to ensure that enforcement actions within courthouses are conducted in an orderly, safe, and non-disruptive manner. The ICE Guidance instructs that "civil immigration enforcement actions inside courthouses should, to the extent practicable": "continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits." (AR 2). The ICE Guidance further instructs ICE officers to, "[w]hen practicable . . . conduct civil immigration enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings." (AR 2). Thus, the ICE Guidance strikes a balance between ICE's legitimate interests in enforcing immigration law; protecting the safety of its officers, the arrestee, and members of the public; and minimizing interference with judicial proceedings.[4]

## III.    The ICE Guidance Is Not Contrary to Law

Plaintiffs argue that they are entitled to summary judgment because the INA has incorporated a so-called common-law privilege against courthouse arrests. Pls.' Br. at 19–21. As explained in Defendants' opening brief, which is incorporated herein by reference, there is no

---

[4] Defendants are aware that a judge in the Northern District of California recently held that a putative "courthouse-arrest class" was likely to succeed on the merits of its APA claims challenging, *inter alia*, the same courthouse arrest guidance at issue in this case. *See generally Pablo Sequen v. Albarran*, No. 25-cv-06487-PCP, 2025 WL 3724878 (N.D. Cal. Dec. 24, 2025). Accordingly, the district court granted plaintiffs' motion to stay immigration courthouse arrests within ICE's San Francisco area of responsibility pending the final resolution of plaintiffs' APA claims. *Id.* at *1, 20. Defendants respectfully submit that the Court should not apply *Pablo Sequen* here, because the Court fully considered the merits of Plaintiffs' motion to temporarily stay immigration courthouse arrests and declined to grant such a stay for the reasons set forth in its Opinion & Order. The district court's ruling in *Pablo Sequen* also did not consider the merits of plaintiffs' APA claims based on a certified administrative record.

11

state or federal common law privilege against federal immigration enforcement arrests. *See* Defs' Br. at 17–23. This Court agreed, holding that The Door "has failed to demonstrate a probability of success in showing that a common law privilege against arrests by the sovereign was incorporated into the INA upon adoption." Opinion & Order at 37.

In response, Plaintiffs insist that this Court "relied on caselaw applying the privilege to *persons*, which does not fully address the scope of the privilege as it applies to *courthouses*." Pls.' Br. at 19–20 (emphasis in original). However, the English and state court cases cited in Plaintiffs' brief, *id.* at 20, consistently recognized a narrower privilege applicable to *persons*: an immunity from service of process in a civil suit based on transient jurisdiction when the only reason that a person is in the jurisdiction is to attend a court proceeding as a witness or a party. *See Andrews v. Martin* (1862), 25 Victoria 371, 372 (directing release of defendant arrested to enforce a civil judgment while defendant was dining near bankruptcy court after court had adjourned, because "defendant was temporarily privileged at the time of his arrest"); *Walpole v. Alexander* (1782), 99 Eng. Rep. 530, 530–31 (witness who voluntarily traveled to England from France to testify at trial was subject to privilege from arrest "to encourage witnesses to come forward voluntarily"); *Meekins v. Smith* (1791), 126 Eng. Rep. 363, 363 ("all persons who had relation to a suit which called for their attendance, whether they were compelled to attend by process or not . . . were intitled to privilege from arrest . . . provided they came bona fide"); *Blight v. Fisher*, 3 F. Cas. 704, 705 (C.C.D.N.J. 1809) ("[T]he privilege of a suitor or witness extends only to exemption from arrest."); *Cameron v. Roberts*, 58 N.W. 376, 376–77 (Wis. 1894) ("It has long been settled that parties and witnesses attending in good faith any legal tribunal . . . are privileged from arrest on civil process during their attendance, and for a reasonable time in going and returning."); *Bridges v. Sheldon*, 7 F. 17, 43 (C.C.D. Vt. 1880)

("The privilege to parties to judicial proceedings, as well as others required to attend upon them, of going to the place where they are held, and remaining so long as is necessary and returning wholly free from the restraint of process in other civil proceedings, has always been well settled and favorably enforced."); *Miles v. McCullough*, 1 Binn. 77, 77 (Pa. 1803) (per curiam) ("A party while attending an appeal from the court of another county to this court is privileged from a summons."); *Larned v. Griffin*, 12 F. 590, 590 (C.C.D. Mass. 1882) ("It has long been settled that parties and witnesses attending in good faith any legal tribunal . . . are privileged from arrest on civil process during their attendance, and for a reasonable time in going and returning."). Yet Plaintiffs fail to address judicial decisions much later in time, which hold that when an out-of-state defendant is subject to civil process under a forum state's long-arm statute, the common-law privilege does not apply.  *See United States v. Green*, 305 F. Supp. 125, 128 (S.D.N.Y. 1969).

Second, Plaintiffs erroneously argue that 8 U.S.C. § 1229(e) "is not legislative recognition that the INA never incorporated the privilege or a direct abrogation of the privilege." Pls.' Br. at 21. According to Plaintiffs, because section 1229(e) was enacted in 2006, well after the INA's enactment in 1952, it is merely a "later enacted" law with no interpretive value.  *Id.* (citing *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998)).  However, "courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes." *Branch v. Smith*, 538 U.S. 254, 281 (2003).  As the Supreme Court explained, "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand," and "a specific policy embodied in a later federal statute should control . . . construction of the [earlier] statute, even though it ha[s] not been expressly amended." *FDA v. Brown & Williamson Tobacco Corp.*,

13

529 U.S. 120, 133, 143 (2000); *accord United States v. Fausto*, 484 U.S. 439, 453 (1988) ("courts frequently . . . interpret a statutory text in the light of surrounding texts that happen to have been subsequently enacted," a task that "necessarily assumes that the implications of a statute may be altered by the implications of a later statute"); *Erlenbaugh v. United States*, 409 U.S. 239, 243–44 (1972) (statutes pertaining to the same subject are "construed as if they were one law," and thus "a later act can . . . be regarded as a legislative interpretation of an earlier act" and "is therefore entitled to great weight in resolving any ambiguities and doubts" (quotation marks and alteration omitted)); *County of Oneida v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 239 (1985) (later enactments demonstrate that Congress "contemplated" a particular result). Section 1229(e) therefore reflects Congress's recognition that courthouse arrests are permitted under the INA.

Plaintiffs further speculate that the reference to courthouse arrests in Section 1229(e) implies that only *criminal arrests* are not subject to the common-law privilege against courthouse arrests. Pls.' Br. at 21 (citing *New York v. ICE*, 466 F. Supp. 3d, 439, 446–47 (S.D.N.Y. 2020), *vacated and remanded by New York v. ICE*, No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28 2023)). But that interpretation makes little sense, given that Section 1229(e) refers to an "enforcement action leading to a removal proceeding," a phrase that on its face contemplates an arrest by immigration authorities to conduct removal proceedings and cannot be naturally read to refer to criminal arrests by federal, state, or local officials. And had Congress thought in 2006 that there was a privilege against "enforcement action[s] leading to a removal proceeding" in courthouses, it would not have acknowledged the authority to make them, or it would have clearly distinguished impermissible civil immigration arrests from permissible criminal arrests.

14

In addition, the legislative history of Section 1229(e) does not support Plaintiffs' reading of the statute to refer only to criminal arrests.  Rather, Congress's priorities in enacting Section 1229 were to prevent the government from relying solely on information provided by abusers when determining whether to proceed with a removal proceeding, and to ensure that the government would keep information relating to victims of abuse strictly confidential.  The House Report underlying the enactment of the Violence Against Women and Justice Department Reauthorization Act of 2005, Pub. L. No. 109–162, 119 Stat. 2960 (2006), makes clear that Section 1229(e) was:

> [D]esigned to ensure that abusers and criminals cannot use the immigration system against their victims.  Examples include abusers using DHS to obtain information about their victims, including the existence of a VAWA immigration petition, interfering with or undermining their victims' immigration cases, and encouraging immigration enforcement officers to pursue removal actions against their victims.

H.R. Rep. 109–233, at 120 (2005).

The House Report further provides that "[8 U.S.C. § 1229(e)] establishes a system to verify that removal proceedings are not based on information prohibited by section 384 of IIRIRA [the Illegal Immigration Reform and Immigrant Responsibility Act of 1996]," and requires DHS to certify, *inter alia*, that:

> (1) no enforcement action was taken leading to such proceedings against an alien at certain places including . . . a courthouse if the alien is appearing in connection with a protection order or child custody case, or that
>
> (2) such an enforcement action was taken, but that there was no violation of the aforementioned provisions.

*Id.* at 121.  Consistent with that Congressional mandate, since 2007, DHS policies and guidance have required ICE personnel to "certify that the agency has independently verified the inadmissibility or deportability of an alien that was encountered" at specified locations, which

15

include courthouses (AR 9–10).  *See also* AR 36–37 (requiring ICE personnel to "complete a certification of compliance in all cases where enforcement actions are taken at specified locations leading to a noncitizen being placed in removal proceedings.").  Accordingly, nothing in the legislative history of 8 U.S.C. § 1229(e) demonstrates that the ICE Guidance was issued in repudiation of Congressional intent to foreclose courthouses from civil immigration enforcement actions.  Pls.' Br. at 21.

## IV. This Court Should Dismiss Plaintiffs' Claims Against the EOIR Defendants For Lack of Subject Matter Jurisdiction

### A. The Withdrawal of the Challenged EOIR Guidance E-mail Moots Plaintiffs' APA Claims Against the EOIR Defendants

Plaintiffs' brief asks this Court to "vacate in full" the "EOIR Dismissal Policy," which this Court defined as "a May 30, 2025 email from two Regional Deputy Assistant Chief Immigration Judges to all Assistant Chief Immigration Judges for the guidance of all Immigration Judges."  Opinion & Order at 8; *see also* Pls.' Br. at 23.  But as described in Defendants' opening brief, Defs. Br. at 10, on September 23, 2025, EOIR issued Policy Memorandum 25-51 (the "Policy Memo") (ECF No. 58, at Ex. A), which formally withdrew the so-called "EOIR Dismissal Policy" that is the subject of Plaintiffs' APA claims against the EOIR Defendants.  The Policy Memo could not be more clear: "[T]o eliminate any remaining uncertainty, this [Policy Memo] now formally withdraws the May 30 Email.  All Immigration Judges should continue to not rely on it in adjudicating cases."  ECF No. 58, Ex. A, at 7. Because the EOIR Guidance has been withdrawn, there is no effectual relief that this Court may grant and Plaintiffs' APA claims as to the EOIR Defendants must be dismissed as moot under Fed. R. Civ. P. 12(b)(1).  *See* Defs. Br. at 23–25.  *See U.S. Navy Seals 1–26 v. Biden*, 72 F.4th 666, 672 (5th Cir. 2023) (courts are powerless to "enjoin policies that no longer exist").

16

### B.    Plaintiffs Lack Standing to Sue the EOIR Defendants

To the extent Plaintiffs argue that the Policy Memo does not moot their challenge to the "EOIR Dismissal Policy," *see* Pls.' Br. at 9, n.7, their APA claims against the EOIR Defendants must be dismissed because they have failed to establish organizational and associational standing to continue pursuing their challenge to that policy. *Id.* at 10–11.  For this reason, even if this Court were to hold that Plaintiffs' APA claims as to the "EOIR Dismissal Policy" are not moot— although they are—this Court should dismiss Plaintiffs' claims against the EOIR Defendants for lack of standing under Rule 12(b)(1).

To establish standing, Plaintiffs must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  A "plaintiff must demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Ests., Inc.,* 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).  An organizational plaintiff may establish standing in two ways.  It may sue on "its own behalf," *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998), or it may "assert the rights of its members under the doctrine of associational standing." *Id.* (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343–45 (1977)).

#### a.    *Plaintiffs Have Failed to Establish Organizational Standing*

Plaintiffs The Door and African Communities Together ("ACT") have failed to establish organizational standing to challenge the "EOIR Dismissal Policy."  An organization has standing where it can establish "that it was directly injured as an organization." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021).  That showing requires "an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable." *Id.* at

172–73 (citation omitted).  "[T]he challenged action" must do more than "merely harm [the organization's] 'abstract social interests.'"  *Id.* at 173 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  Rather, it must "perceptibly impair[]" the organization's activities by imposing "involuntary and material impacts on core activities by which the organizational mission has historically been carried out," *id.* at 173, 175 (emphasis omitted); *see also Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 (1976) ("organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III").

Plaintiffs' supplemental declarations do not establish the requisite injury in fact.  Based on the declarations before this Court as of September 12, 2025, when it ruled on the merits of Plaintiffs' stay motion, this Court found that plaintiff The Door "has adequately demonstrated injury in fact based on the diversion of resources caused by the challenged policies."  Opinion & Order at 19–20.  However, The Door's supplemental affidavit filed on December 3, 2025, does not establish the requisite injury in fact as to any alleged continuation of the EOIR Dismissal Policy after September 23, 2025.  The Supplemental Declaration of Beth Baltimore, Deputy Director of The Door's Legal Services Center ("Supp. Baltimore Decl.") (ECF No. 68-3) asserts that "[s]ince my August 10, 2025 declaration was filed . . . (the 'Courthouse Arrest Policy'), has continued to impact our members and our work."  Supp. Baltimore Decl. ¶ 6.  The remainder of the Supplemental Baltimore Declaration asserts that immigration court arrests have continued to impact the Door's organizational activities and interests.  *Id.* ¶¶ 7–8, 28–34.  As to the "EOIR Dismissal Policy" specifically, the Supplemental Baltimore Declaration merely asserts that, "[u]ntil this Court stayed . . . (the 'Dismissal Policy') . . . many of our members were also at risk of having their removal proceedings dismissed . . . ." *Id.* ¶ 9.  However, The Door notably does

18

not assert that, after the Policy Memo rescinded the prior guidance e-mail on September 23, 2025, The Door has continued to suffer distinct and palpable harms to itself as an organization. For example, The Door does not allege that an ongoing EOIR policy since September 23, 2025 has led to involuntary costs "in time, money, or danger," such as an "increased demand for [its] services" or the forced expenditure of funds "reasonably necessary to continue an established core activity of the organization." *Conn. Parents*, 8 F.4th, at 173–74 (collecting cases).

This Court previously held that plaintiff ACT "has not made such a showing" of injury in fact sufficient to establish organizational standing. Opinion & Order at 20. The Supplemental Declaration of Diana Konaté ("Supp. Konaté Decl."), the Deputy Executive Director of Policy and Advocacy at ACT (ECF No. 68-14), still fails to establish any requisite injury in fact. As in her first declaration, the Supplemental Konaté Declaration broadly states that ACT "has continued to provide its members with free, high-quality immigration legal services." *Id.* ¶ 3. Both Plaintiffs thus lack standing to challenge any "EOIR Dismissal Policy" on their behalf.

b.    *Plaintiffs Have Failed to Establish Associational Standing*

Plaintiffs also cannot rely on associational standing to challenge an "EOIR Dismissal Policy." "To bring suit on behalf of its membership, the organization must demonstrate," among other requirements, that "its members would otherwise have standing to sue in their own right." *Irish Lesbian & Gay Org.*, 143 F.3d at 649 (citation omitted). Members asserting individual standing are required to show: "(1) they suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical; (2) there is a 'causal connection between the injury and the conduct complained of'; and (3) it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Do No*

*Harm v. Pfizer, Inc.*, 126 F.4th 109, 118 (2025) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

The Door and ACT cannot establish associational standing to challenge an "EOIR Dismissal Policy" because they have not identified any members who have been harmed by such a policy. Both plaintiffs have now named members who have been arrested by ICE in immigration court, to address this Court's prior ruling that an "association must 'identify members who have suffered the requisite harm,'" to establish individual standing. Opinion & Order at 15 (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009)). However, none of the named members of The Door who are mentioned in the Supplemental Baltimore Declaration and who have submitted declarations have asserted injury caused by an "EOIR Dismissal Policy." Supp. Baltimore Decl. ¶¶ 19–20. *See also* Declaration of Abdoul Gadiri Bah, dated Dec. 2, 2025 (ECF No. 68-1); Declaration of Mamadou Saidou Bah, dated Dec. 3, 2025 (ECF No. 68-2). Similarly, the single named member of ACT who is described in the Supplemental Declaration of Diana Konaté and who separately submitted a declaration in his name has not asserted any injury caused by the "EOIR Dismissal Policy." Supp. Konaté Decl. ¶ 10. *See also* Declaration of Mamadou Barry, dated Dec. 3, 2025 (ECF No. 68-4). Plaintiffs therefore have not established standing to bring suit against the EOIR Defendants on behalf of any of its members.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for partial summary judgment and dismiss Plaintiffs' APA claims in their entirety, and deny Plaintiffs' cross-motion for summary judgment.

Dated: January 7, 2026
      New York, New York

                                    JAY CLAYTON
                                    United States Attorney for the
                                    Southern District of New York
                                    *Attorney for Defendants*

By:      */s/  Tomoko Onozawa*
                                    JEFFREY S. OESTERICHER
                                    TOMOKO ONOZAWA
                                    Assistant United States Attorneys
                                    86 Chambers Street, 3rd Floor
                                    New York, New York 10007
                                    Tel.:   (212) 637-2695/2721
                                    Email:  jeffrey.oestericher@usdoj.gov
                                                    tomoko.onozawa@usdoj.gov

21

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the undersigned hereby certifies that, measured by the word processing program used to prepare this brief, this brief complies with the word-count limitation of the rule, which is a maximum of 8,750.  Excluding the caption, table of contents, table of authorities, signature blocks, or any required certificates, but including material contained in footnotes or endnotes, there are 6,546 words in this brief.

Dated: New York, New York
        January 7, 2026

_/s/ Tomoko Onozawa_
TOMOKO ONOZAWA
Assistant United States Attorney
