UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; and THE DOOR,<br><br>      Plaintiffs,<br><br>      v.<br>TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; DAREN K. MARGOLIN, in his official capacity as Director, Executive Office of Immigration Review; and PAMELA BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>      Defendants. | 25 Civ. 6366 (PKC) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
PARTIAL MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................................1

STANDARD.....................................................................................................................................2

ARGUMENT.....................................................................................................................................3

    I.     ICE'S IMMIGRATION COURT ARREST POLICY IS SUBJECT TO APA REVIEW......3

    II.    ICE'S IMMIGRATION COURT ARREST POLICY IS ARBITRARY AND
           CAPRICIOUS AND CONTRARY TO LAW. ...........................................................................6

       A.    The Immigration Court Arrest Policy is Arbitrary and Capricious. ....................................6

          1.    The Immigration Court Arrest Policy is An Unprecedented Deviation From Prior
               Written Guidance And Practice..................................................................................................6

          2.    Defendants Fail to Provide Good Reasons for the Policy Change...................................8

          3.    Defendants Did Not Consider Chilled Access to Courts. ....................................................9

       B.    The Immigration Court Arrest Policy Is Ultra Vires. ..............................................................12

          1.    The Common-Law Privilege Against Civil Arrests In and Around
               Courthouses Applies. ....................................................................................................................12

          2.    The INA Incorporates The Common-Law Privilege.........................................................15

    III.   PLAINTIFFS' CLAIMS AGAINST THE EOIR DISMISSAL POLICY ARE  NOT
          MOOT. ...............................................................................................................................................17

       A.    EOIR Has Not Fully and Effectively Rescinded the Dismissal Policy...............................17

       B.    The Voluntary Cessation Doctrine Precludes Defendants' Claim of Mootness. ................22

CONCLUSION ................................................................................................................................25

**TABLE OF AUTHORITIES**

**Cases**.................................................................................................................................Page(s)

*Ahrens v. Bowen,*
     852 F.2d 49 (2d Cir. 1988)........................................................................................................23

*All. For the Wild Rockies v. Petrick,*
     68 F.4th 475 (9th Cir. 2023) ....................................................................................................8

*Am. Council of Blind of N.Y., Inc. v. City of New York,*
     495 F. Supp. 3d 211 (S.D.N.Y. 2020) ...............................................................................17, 18

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.,*
     815 F.3d 105 (2d Cir. 2016) ................................................................... 17, 20, 22, 25

*Batalla Vidal v. Duke,*
     295 F. Supp. 3d 127 (E.D.N.Y. 2017), *aff'd in part and remanded sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California,* 140 S. Ct. 1891 (2020) ............................................................3, 4

*Bennett v. Spear,*
     520 U.S. 154, (1997) ................................................................................................................5

*Blight v. Fisher,*
     3 F. Cas. 704 (C.C.D.N.J. 1809)..............................................................................................16

*Bridges v. Sheldon,*
     7 F. 17 (C.C.D. Vt. 1880)........................................................................................................16

*Camp v. Pitts,*
     411 U.S. 138 (1973)..................................................................................................................2

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez,*
     561 U.S. 661 (2010)................................................................................................................22

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
     401 U.S. 402 (1971)..................................................................................................................2

*City of Erie v. Pap's A.M.,*
     529 U.S. 277 (2000)................................................................................................................24

*Cole v. Hawkins,*
     (1738) 95 Eng. Rep. 396, 396 Andrews 275...........................................................................16

*Cont'l Indus. Grp., Inc. v. Altunkilic*,
    633 F. App'x 61 (2d Cir. 2016)............................................................................................13

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
    452 F.3d 798 (D.C. Cir. 2006)................................................................................................5

*Ctr. for Biological Diversity v. Haaland*,
    58 F.4th 412 (9th Cir. 2023) ..................................................................................................5

*Daniels v. Moores*,
    Nos. 24-30-pr; 24-785-pr, 2025 WL 883035 (2d Cir. Mar. 21, 2025) ........................................21

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)................................................................................................................3

*Doe v. U.S. Immigr. & Customs Enf't*,
    490 F. Supp. 3d 672 (S.D.N.Y. 2020) ....................................................................................6

*Dunlop v. Bachowski*,
    421 U.S. 560 (1975)................................................................................................................3

*Dwelle v. Allen*,
    193 F. 546 (S.D.N.Y. 1912)..............................................................................................12, 13

*Ellis v. Bhd. of Ry. Clerks*,
    466 U.S. 435 (1984)..............................................................................................................17

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)..................................................................................................7, 8, 9, 10

*Esch v. Yeutter*,
    876 F.2d 976 (D.C. Cir. 1989)................................................................................................2

*Ex Parte Helsby*,
    (1832) 1 Dea. & C. 16 ......................................................................................................16, 17

*Ex Parte Russell*,
    (1812) 19 Ves. Jr. 162............................................................................................................16

*Ex Parte Temple*,
    (1814) 2 V. & B. 391 ..............................................................................................................16

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ...........................................................................................7, 10

*Fed. Bureau of Investigation v. Fikre*,
  601 U.S. 234 (2024) ...........................................................................................22, 23, 24

*Gardner v. United States*,
  246 F. Supp. 1014 (S.D.N.Y. 1965) .................................................................14

*Greer v. Young*,
  120 Ill. 184 (1887)..............................................................................................16

*Gualandi v. Adams*,
  385 F.3d 236 (2d Cir. 2004) ..............................................................................2

*Haitian Evangelical Clergy Ass'n v. Trump*,
  789 F. Supp. 3d 255 (E.D.N.Y. 2025) ..............................................................4

*Haley v. Pataki*,
  60 F.3d 137 (2d Cir. 1995)..................................................................................23

*Halsey v. Stewart*,
  4 N.J.L. 366 (1817)..............................................................................................16

*Heckler v. Chaney*,
  470 U.S. 821 (1985)..............................................................................................3

*Hilton v. Wright*,
  235 F.R.D. 40 (N.D.N.Y. 2006)........................................................................25

*Holland v. Goord*,
  758 F.3d 215 (2d Cir. 2014)...............................................................................20

*In re Arthur Treacher's Franchise Litig.*,
  92 F.R.D. 398 (E.D. Pa. 1981) ...........................................................................13

*In re City of Utica*,
  26 N.Y.S. 564 (Gen. Term 1893)......................................................................17

*In re Kimball*,
  14 F. Cas. 474 (S.D.N.Y. 1867).........................................................................12

iv

*International Shoe Co. v. Washington*,
    326 U.S. 310 (1945)..................................................................................................13

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018)...................................................................................................4

*Johnson, Trs. of Charley E. Johnson Revocable Living Tr. v. United States*,
    145 F.4th 1158 (9th Cir. 2025) .................................................................................3

*Jones v. Knauss*,
    31 N.J. Eq. 211 (Ch. 1879) ......................................................................................17

*Kurtz v. Kimberly-Clark Corp.*,
    321 F.R.D. 482 (E.D.N.Y. 2017) .............................................................................24

*Lackey v. Stinnie*,
    604 U.S. 192 (2025).................................................................................................23

*Liranzo v. United States*,
    690 F.3d 78 (2d Cir. 2012).........................................................................................2

*Make the Rd. N.Y. v. Pompeo*,
    475 F. Supp. 3d 232 (S.D.N.Y. 2020) .................................................................19, 23

*Make the Rd. New York v. Noem*,
    No. 25-CV-190, 2025 WL 2494908 (D.D.C. Aug. 29, 2025) ....................................21

*Mantena v. Johnson*,
    809 F.3d 721 (2d Cir. 2015).......................................................................................2

*Mhany Mgmt., Inc. v. County of Nassau*,
    819 F.3d 581 (2d Cir. 2016)..................................................................................22, 24

*Mobile & O. R. Co. v. Union City*,
    137 Tenn. 491, 194 S.W. 572 (1917).......................................................................16

*Murphy v. Benson*,
    270 F.2d 419 (2d Cir. 1959)......................................................................................24

*N. Light Tech., Inc. v. N. Lights Club*,
    236 F.3d 57 (1st Cir. 2001) ......................................................................................14

*N.Y. State Nat'l Org. for Women v. Terry,*
 159 F.3d 86 (2d Cir. 1998) ................................................................................................23

*NASL Mktg., Inc. v. de Vries,*
 94 F.R.D. 309 (S.D.N.Y. 1982) .........................................................................................13

*Nat. Res. Def. Council v. U.S. Dep't of Energy,*
 362 F. Supp. 3d 126 (S.D.N.Y. 2019) ...............................................................................23

*Nat'l Audubon Soc'y v. Hoffman,*
 132 F.3d 7 (2d Cir. 1997) .....................................................................................................2

*Nat'l Min. Ass'n v. McCarthy,*
 758 F.3d 243 (D.C. Cir. 2014) .............................................................................................6

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
 508 U.S. 656 (1993) ...........................................................................................................17

*New York v. U.S. Immigr. & Customs Enf't,*
 466 F. Supp. 3d 439 (S.D.N.Y. 2020) ...............................................................................12

*Pablo Sequen v. Albarran,*
 No. 25-CV-06487, 2025 WL 3724878 (N.D. Cal. Dec. 24, 2025) .................................*passim*

*Pasquantino v. United States,*
 544 U.S. 349 (2005) ...........................................................................................................15

*Pavlo v. James,*
 437 F. Supp. 125 (S.D.N.Y. 1977) ...............................................................................12, 13

*Phifer v. City of New York,*
 289 F.3d 49 (2d Cir. 2002) ...................................................................................................2

*Richards v. Goodson,*
 4 Va. 381 (Va. Gen. Ct. 1823) ...........................................................................................16

*Ryan v. U.S. Immigr. & Customs Enf't,*
 974 F.3d 9 (1st Cir. 2020) ..................................................................................................12

*Saba v. Cuomo,*
 535 F. Supp. 3d 282 (S.D.N.Y. 2021) ...............................................................................23

*Salazar v. King,*
    822 F.3d 61 (2d Cir. 2016)..................................................................................................3, 4, 6

*Salem v. Pompeo,*
    432 F. Supp. 3d 222 (E.D.N.Y. 2020) ..................................................................................25

*Sharkey v. Quarantillo,*
    541 F.3d 75 (2d Cir. 2008)....................................................................................................3

*State v. Boone Cnty.,*
    78 Neb. 271, 110 N.W. 629 (1907) .....................................................................................17

*State v. Buck,*
    62 N.H. 670 (1883) .............................................................................................................16

*State v. U.S. Immigr. & Customs Enf't,*
    431 F. Supp. 3d 377 (S.D.N.Y. 2019) ..............................................................................6, 12

*Sughrim v. New York,*
    690 F. Supp. 3d 355 (S.D.N.Y. 2023) .................................................................................24

*Thomas v. Ariel W.,*
    242 F. Supp. 3d 293 (S.D.N.Y. 2017) .................................................................................18

*United States v. Green,*
    305 F. Supp. 125 (S.D.N.Y. 1969) .....................................................................................14

*United States v. New York,*
    No. 1:25-CV-744, 2025 WL 3205011 (N.D.N.Y. Nov. 17, 2025) .........................................16

*Velasco Lopez v. Decker,*
    978 F.3d 842 (2d Cir. 2020)..................................................................................................5

*Velazquez-Hernandez v. U.S. Immigr. & Customs Enf't,*
    500 F. Supp. 3d 1132 (S.D. Cal. 2020) ...............................................................................12

*Velesaca v. Decker,*
    458 F. Supp. 3d 224 (S.D.N.Y. 2020) ...................................................................................5

*Venetian Casino Resort, L.L.C. v. EEOC,*
    530 F.3d 925 (D.C. Cir. 2008) ..............................................................................................2

vii

**Statutes, Rules and Regulations**

8 C.F.R. § 1226(c)(4) ..............................................................................................................11

8 U.S.C. § 1229a(b)(5)(A)........................................................................................................11

**Other Authorities**

Robert Kry, *Dialogue*, 72 Brook. L. Rev. 493, (2007) ..............................................................16

## PRELIMINARY STATEMENT

In their cross motion for summary judgment, Defendants argue that ICE's recent, unprecedented policy change permitting unrestricted arrests at immigration courts merely reflects an unremarkable shift in agency priorities. In reality, prior this change, ICE conducted civil immigration arrests in immigration courthouses only in limited circumstances out of recognition that such arrests would chill access to those courts. The new Immigration Court Arrest Policy is a radical and unreasoned departure not only from the preceding decades of agency practice but also prior agency memoranda. Defendants have failed to identify any good—or even relevant—reason for this change. Nor have Defendants identified any place in their limited administrative record where the agency considered the profound chilling effects on noncitizens' access to the courts that were sure to result— and indeed have resulted—from their new policy. The government's admission in another case that ICE's 2025 memorandum purporting to authorize immigration court arrests fails to even mention chill led that court, among other reasons, to recently find the policy arbitrary and capricious. *See Pablo Sequen v. Albarran,* No. 25-CV-06487, 2025 WL 3724878, at *10–14 (N.D. Cal. Dec. 24, 2025).

Moreover, because those arrests undisputedly chill access to the courts and impede the fair administration of justice, the Immigration Court Arrest Policy separately violates the common-law privilege against courthouse arrests. Defendants have incorrectly characterized the privilege as both narrow and a relic of history, all while relying on caselaw showing the privilege's continuing application. Defendants have further failed to grapple with the many authorities demonstrating the privilege's broad scope, incorporation into American common law, and application to arrests on behalf of a sovereign.

Defendants' motion to dismiss Plaintiffs' claims related to the EOIR Dismissal Policy fares no better. Defendants' decision—only after this Court ordered EOIR to stay its unlawful policy—to issue a combative and confusing memorandum "withdrawing" its guidance does not moot Plaintiffs'

claims. This Court should deny Defendants' meritless motions.

**STANDARD**

APA review for purposes of summary judgment ordinarily proceeds on "the full administrative record" before the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). Nevertheless, Defendants overstate the proposition that APA claims are decided only "as a matter of law" on an administrative record. ECF 66 at 11. The Second Circuit's "record rule" is not absolute. *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997); *see also* ECF 68 at 11–12. Where limiting review to the filed record would "frustrate effective judicial review," courts routinely consider extra-record materials. *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973); *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (collecting circumstances where extra-record evidence may be considered to enable meaningful review); *see also* ECF 68 at 11–12. Here, the extra-record materials Plaintiffs submit are both permissible and necessary to ensure meaningful review, including by clarifying the scope and operation of the challenged policies and supplying context about how the policies function in practice; it does not invite *de novo* factfinding on the merits. *See Nat'l Audubon*, 132 F.3d at 14, 15; *Camp*, 411 U.S. at 142–43; *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 928–29 (D.C. Cir. 2008).

Similarly, on a Rule 12(b)(1) motion, the Court proceeds by "accepting all material facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Mantena v. Johnson,* 809 F.3d 721, 727 (2d Cir. 2015) (quoting *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012). And in adjudicating a 12(b)(1) motion based on mootness grounds, the Court may consider extrinsic evidence beyond the pleadings, as Defendants themselves acknowledge, ECF 66 at 12. *See Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004) ("In resisting a motion to dismiss under Rule 12(b)(1), plaintiffs are permitted to present evidence (by affidavit or otherwise) of the facts on which jurisdiction rests."); *Phifer v. City of New York,* 289 F.3d 49, 55 (2d Cir. 2002).

## ARGUMENT

### I. ICE'S IMMIGRATION COURT ARREST POLICY IS SUBJECT TO APA REVIEW.

Defendants contend that this Court cannot review the Immigration Court Arrest Policy under the APA because (1) arrests are committed to agency discretion; (2) the INA precludes review; and (3) ICE's policy is not final agency action. ECF 66 at 12. For the reasons discussed below, Defendants have not—and cannot—meet "the heavy burden of overcoming the strong presumption" of judicial review. *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975).

Defendants first argue that the Immigration Court Arrest Policy is unreviewable because the "locations for targeted civil enforcement actions" are a "discretionary choice." ECF 66 at 12–13. Section 701(a)(2)'s exception for agency action "committed to agency discretion" is "very narrow" and applies only where there is "no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (cleaned up). To determine whether there are "judicially manageable standards," courts are not limited to statutes as Defendants suggest, ECF 66 at 13, but look also to "informal agency guidance" governing the challenged action which limit what might once have been "unfettered discretion." *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016).

"This is not the 'rare circumstance' where 'there is no law to apply.'" *Pablo Sequen,* 2025 WL 3724878, at *9 (quoting *Johnson Tr. of Charley E. Johnson Revocable Living Tr. v. United States*, 145 F.4th 1158, 1163 (9th Cir. 2025)). "[T]he government has not established that 'courts traditionally have regarded' immigration enforcement decisions as 'committed to agency discretion' to such a degree that they are beyond judicial review under the APA." *Id.* (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019)); *Sharkey v. Quarantillo*, 541 F.3d 75, 85, 91 (2d Cir. 2008) (holding court can review agency's revocation of noncitizen's lawful permanent resident status); *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 150 (E.D.N.Y. 2017) (holding there is "'law to apply' in reviewing [DHS's] decision" to rescind the Deferred Action for Childhood Arrivals (DACA) program) (citation omitted), *aff'd in part*

3

*and remanded sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1906–07 (2020) (agreeing that the rescission of DACA is subject to review under the APA); *Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255, 275 (E.D.N.Y. 2025) (holding a meaningful standard exists under which to review the Secretary of Homeland Security's "partial vacatur" of Haiti's designation for Temporary Protected Status "as in excess of her authority")).

Here, ICE's longstanding policy restricting courthouse arrests supplies this Court with ample "law to apply."[1] *See Pablo Sequen,* 2025 WL 3724878, at *9 ("ICE and EOIR's *prior* policies governing courthouse arrests . . . provide a standard."). ICE had—for decades—a practice of largely refraining from arrests at immigration courts, which was memorialized in a memorandum issued in 2021 expressly prohibiting civil arrests at immigration courthouses absent limited circumstances. *See* Administrative Record ("A.R."), ECF No. 64-1, at 25–27 ("2021 Memo"). On May 27, 2025, ICE issued a final memorandum, A.R. 1–3 ("2025 Memo"), that explicitly "rescinded" the 2021 Memo and "superseded" it with a new courthouse-enforcement regime. ECF 51 at 41. Thus, ICE's own stated criteria circumscribing courthouse enforcement, including in the 2021 Memo, provides the Court with a workable benchmark to assess the agency's change in policy. *See Salazar*, 822 F.3d at 76 (courts may rely on agency guidance as "law to apply" limiting discretion).

Second, 8 U.S.C. 1226(e) does not "preclude" judicial review as Defendants assert.[2] ECF 66 at 13. That provision limits review of specific "discretionary judgment[s]" in individual custody determinations; it does not bar APA review of a policy-level challenge to "the extent of the Government's detention authority." *Jennings v. Rodriguez*, 583 U.S. 281, 295–96 (2018) (holding § 1226(e) does not foreclose challenges to the extent of detention authority because it is not a

---

[1] As Defendants concede, ECF 66 at 13, the common law privilege would also independently provide the applicable law.  *See infra* Section II.B.
[2] As Defendants admit, this provision is limited to arrests made pursuant to an administrative warrant. ECF 66 at 13. However, Defendants have not attempted to establish what percentage, if any, of these arrests are made pursuant to such a warrant.

"discretionary judgment," "action," or "decision"); *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) (explaining § 1226(e) does not preclude challenges to the "extent of the Government's authority," holding a due process challenge to detention procedures "is not a matter of discretion" and is reviewable); *cf. Velesaca v. Decker*, 458 F. Supp. 3d 224, 236 n.6 (S.D.N.Y. 2020) (explaining § 1226(e) limits review of discretionary, individual detention or release decisions). Plaintiffs do not ask this Court to second-guess ICE's exercise of discretion in any specific arrest as Defendants suggest. ECF 66 at 12–13. "None of [P]laintiffs' APA claims attack a decision to detain or release an individual noncitizen." *Pablo Sequen*, 2025 WL 3724878, at *8. Rather, they challenge a nationwide policy broadly authorizing arrests at immigration courts.

Third, the Immigration Court Arrest Policy is "final agency action." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *see Pablo Sequen,* 2025 WL 3724878, at *7 ("ICE's final courthouse-arrest policy is unquestionably 'final agency action.'"). As this Court found with respect to the EOIR Dismissal Policy, the ICE policy too "mark[s] the 'consummation' of the agency's decision-making process" and is an action "from which legal consequences flow." ECF 51 at 29. Specifically, it "mark[s] the consummation" of ICE's decision-making on whether and how ICE may conduct civil enforcement actions at immigration courthouses; it is memorialized in written guidance issued by ICE leadership and supersedes prior courthouse directives. S*ee* ECF 68 at 12–13. And it carries all too real "legal consequences" for noncitizens and organizations, like Plaintiffs, that have been responding to the harms and disruptions resulting from civil enforcement at immigration courthouses. *Id.* at 4–6, 7–11. ICE has implemented the Immigration Court Arrest Policy aggressively, with "immediate effect on ICE's day-to-day operations." *Pablo Sequen,* 2025 WL 3724878, at *7 (citing *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023)). Defendants cannot defeat finality by relabeling that operative directive a "general statement of policy," ECF 66 at 14; *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 807 (D.C. Cir. 2006) ("'An agency cannot escape its responsibility

5

to present evidence and reasoning supporting its substantive rules by announcing binding precedent in the form of a general statement of policy.'") (citation omitted); *see Salazar*, 822 F.3d at 82–84; *State v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 386 (S.D.N.Y. 2019) ("The factors distinguishing policy statements from rules include 'the actual legal effect (or lack thereof),' 'the agency's characterization of the guidance,' and 'post-guidance events.'") (quoting *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252–53 (D.C. Cir. 2014)); *id.* at 386–88 (holding directive on courthouse arrests was final agency action because civil immigration arrests at state courthouses dramatically increased following directive's promulgation and legal consequences flowed from such arrests); *Doe v. U.S. Immigr. & Customs Enf't*, 490 F. Supp. 3d 672, 688–89 (S.D.N.Y. 2020) (same).

## II.  ICE'S IMMIGRATION COURT ARREST POLICY IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW.

### A.  The Immigration Court Arrest Policy is Arbitrary and Capricious.

ICE's Immigration Court Arrest Policy is arbitrary and capricious for the reasons detailed in Plaintiffs' opening memorandum in support of summary judgment. ECF 68 at 12–19. In arguing otherwise in its cross-motion, Defendants make three unpersuasive arguments.

#### 1.  The Immigration Court Arrest Policy is An Unprecedented Deviation From Prior Written Guidance and Practice.

Defendants first contest that the Immigration Court Arrest Policy is an unprecedented change from its prior policies, arguing that the 2025 Memo, which they claim authorizes arrests at immigration courts, is "little different than its predecessors." ECF 66 at 15–16. This argument ignores both the decades-long practice of limiting arrests at immigration courts which preceded the challenged policy and the plain language of the "predecessor" memoranda.

Defendants' focus on prior agency memoranda—issued in 2015, 2018, and 2021, A.R. 20–27—distracts from a key point that Defendants have never, in several rounds of briefing, disputed: the widespread arrests at immigration courts pursuant to ICE's new policy are an unprecedented

6

deviation from its decades-long practice of avoiding such arrests. *See* ECF 68 at 2–3. Prior to the challenged policy, arrests at immigration courts were rare and largely reserved for noncitizens presenting weighty flight or public safety risks. *Id.* Now, for the first time, every noncitizen who attends immigration court—respondents, witnesses, children—must weigh whether complying with that legal obligation or simply supporting a loved one doing so is worth the risk of being detained. *See id.* 6–8; A.R. 2 (broadly authorizing arrests against "targeted noncitizens"—the definition of which appears to have no limitations—and family and friends on "a case-by-case basis"). Such a radical shift is undoubtably a "policy change" for which the agency must provide "a reasoned explanation." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009)).

Moreover, as this prior agency practice confirms, *none* of the memos cited by Defendants authorized virtually unrestricted arrests at immigration courts. *See* ECF 68 at 3–4. In fact, the only memo to even *mention* immigration courts—the 2021 Memo—prohibited such arrests absent five exigent or dangerous circumstances.[3] A.R. 26. The 2025 Memo—authorizing virtually unrestricted arrests—is therefore nearly a complete reversal from its immediate predecessor.

And while the 2025 Memo largely copies a 2018 ICE directive concerning immigration enforcement priorities ("2018 Memo"), that earlier memo differs in three critical respects. First, the 2018 Memo applied only to criminal courts, not immigration courts.[4] *See* ECF 68 at 4. Thus, "while the policies' reasoning may be sound as to *criminal* courts, there is no 'rational connection between the facts' on which the policies rely 'and the choice made' to expand courthouse arrests at *immigration*

---

[3] The 2015 Memo similarly authorized arrests at courthouses only in limited circumstances. A.R. 20 (authorizing arrests at or near courthouses *only* where the target falls within one of four targeted priorities).

[4] Throughout their briefing, Defendants elide the difference between arrests at courthouses generally and the arrests at *immigration* courthouses that are the subject of this litigation.

courts." *Pablo Sequen,* 2025 WL 3724878, at \*13 (emphasis in original) (quoting *All. For the Wild Rockies v. Petrick,* 68 F.4th 475, 493 (9th Cir. 2023)).

Second, the 2018 Memo limited "targeted aliens" to an enumerated list while the 2025 Memo expressly states "targeted aliens" are "not limited" to these groups and that other noncitizens "may be subject to civil immigration enforcement action[s]" at courthouses even absent exigent or other special circumstances. *Compare* A.R. 21 (authorizing "actions against specific, targeted aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed") *with* A.R. 2 (authorizing arrests "against targeted aliens, including *but not limited to*" the same enumerated list) (emphasis added).

Third, unlike the 2025 Memo, the 2018 Memo limited arrests of "other aliens encountered," including family or friends accompanying someone else to court absent "special circumstances." *Compare* A.R. 21 *with* A.R. 2 (permitting such arrests on "a case-by-case basis"). The 2015 Memo contains a similar limitation. A.R. 20 (advising that ICE may not arrest "individuals who may be "collaterally" present, such as family members or friends who may accompany the target alien to court appearances or functions"). Thus, far from an unremarkable shift in agency priorities, the 2025 Memo is an unprecedented expansion of arrest authority to cover virtually any noncitizen who sets foot in or near an immigration court.

### 2. Defendants Fail to Provide Good Reasons for the Policy Change.

Defendants next argue that the 2025 Memo "explain[s] the agency's justifications." ECF 66 at 16 (citing A.R. 1). Defendants do not bother arguing these justifications are "'*good* reasons'" for the policy change, *Encino Motorcars*, 579 U.S. at 221 (emphasis added and citation omitted), or even explain the relevance of those "justifications" to arrests at *immigration* courts, ECF 66 at 16. Nor could they. As noted *supra* Section II.A.1 and in Plaintiffs' opening brief, ECF 68 at 16–19, these justifications

8

were not written with immigration courts in mind and make little sense applied to noncitizens voluntarily appearing in proceedings.

The first justification—that "law enforcement agencies routinely engage in enforcement activities in or near courthouses" against individuals appearing for violations that are "unrelated" to the offense for which the authorities seek to arrest them, A.R. 1—has no application here. ICE arrests at immigration courts are not unrelated to the court appearance but are "based on the very offenses for which the noncitizen is appearing." *Pablo Sequen*, 2025 WL 3724878, at *13.

ICE's second justification—that civil enforcement at courthouses "can reduce safety risks"— also has little application to a noncitizen appearing for immigration court given that ICE has previously determined that such "noncitizen is neither a flight risk nor a threat to the public." *Id.* (citations omitted). And the agency has not explained why the prior memos' exceptions, which allowed courthouse arrests of noncitizens deemed to threaten public safety, did not sufficiently address these concerns. *See id.*

Nor is there any rational connection between ICE's third justification—that noncitizens are able to evade ICE arrest in jurisdictions that refuse to cooperate with ICE—and the arrest of noncitizens voluntarily appearing in proceedings where ICE is a party. *See id.* at *14; ECF 68 at 18. These "justifications" cannot, and do not, provide the "reasoned explanation" the APA demands. *Encino Motorcars*, 579 U.S. at 221.

### 3. Defendants Did Not Consider Chilled Access to Courts.

Finally, Defendants contend that ICE adequately considered the key justifications underlaying the 2021 Memo—the fact that immigration court arrests would chill noncitizens' access to immigration courts and impede the fair administration of justice—because the 2025 Memo includes provisions encouraging officers "when practicable," to conduct "enforcement actions within

courthouses [] in an orderly, safe, and non-disruptive manner,"[5] and in "non-public" areas. ECF 66 at 16–17 (citing A.R. 2). As a threshold matter, this largely optional guidance on how officers should implement courthouse arrests is a far cry from "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests" stemming from the prior policy. *Encino Motorcars,* 579 U.S. at 222 (citing *Fox Television Stations*, 556 U.S. at 515–16).

Moreover, none of these provisions address the chill resulting from the threat of arrest at proceedings. Even if the provisions Defendants point to impliedly reflect reasoned decision-making not evident on the face of the memo or present elsewhere in the administrative record, at most, the provisions concern, as Defendants note, "minimizing interference with judicial proceedings." ECF 66 at 17. But, as Defendants have conceded in related litigation, the 2025 Memo says nothing about the chill resulting from the Immigration Court Arrest Policy authorizing the arrest of virtually any noncitizen attending immigration court. *See Pablo Sequen* 2025 WL 3724878, at *11 (noting the government acknowledged the 2025 Memo does not address chilled access to the courts). And that's because "the chilling effect contemplated by the 2021 guidance arises from the *fact* of courthouse arrests, not the *manner* in which such arrests are conducted . . . [I]t is the desire to avoid arrest entirely, not merely to avoid disorderly or disruptive arrests, that disincentivizes noncitizens from appearing in immigration court." *Id.* at *12. Thus, the 2025 Memo "simply do[es] not address, either expressly or

---

[5] It bears noting that is not possible to conduct "discreet[]" arrests in "non-public" areas of immigration courts and ICE has not attempted to follow this guidance, ECF 66 at 16–17. *See* ECF 68 at 4–6. ICE necessarily arrests noncitizens in narrow hallways directly outside the courtroom, in the elevator, or in the lobby as they enter or exit their hearings. *See, e.g.,* ECF 68-7 ¶¶ 13–15; ECF 68-9 ¶¶ 11–19; ECF 68-6 ¶¶ 12–17; ECF 68-8 ¶¶ 7–15; ECF 68-16 ¶¶ 17–29; ECF 68-11 ¶¶ 9–11. While this provision may make sense applied to the federal or state criminal courthouses for which it was originally drafted, because those courthouses have non-public areas such as holding rooms, it has no application to immigration courts.

impliedly, one of the primary concerns raised in the 2021 guidance—a concern that the record amply demonstrates has come to pass in the time since ICE began conducting such arrests." *Id.*

Setting aside the agency's failure to consider the 2021 Memo's reasoning, Defendants also fail to point to any evidence in the administrative record that the agency considered its statutory imperative to *incentivize* attendance at immigration proceedings. The government's statutory and regulatory authority to detain noncitizens makes clear that such detention is intended to ensure participation in immigration proceedings. *See, e.g.,* 8 C.F.R. § 1226(c)(4) (permitting release only where the government determines the noncitizen is "likely to appear for any scheduled proceeding"); *Pablo Sequen*, 2025 WL 3724878 *12 (collecting statutory and regulatory authority "reflect[ing] a fundamental concern with ensuring noncitizens' appearance and participation in immigration proceedings"). Conversely, the INA penalizes noncitizens who fail to appear with *in absentia* orders of removal. *See* 8 U.S.C. § 1229a(b)(5)(A). "That widespread civil arrests at immigration courts could have a chilling effect on noncitizens' attendance at removal proceedings (as common sense, the prior guidance, and the actual experience in immigration court since May 2025 make clear) and thereby undermine this central purpose is thus 'an important aspect of the problem' that ICE was required, but failed, to consider." *Pablo Sequen*, 2025 WL 3724878, at *12.

There is similarly no evidence in the administrative record that Defendants considered the common-law privilege against courthouse arrests, which developed to prevent chilled access to the courts in furtherance of the fair administration of justice. As discussed *infra* Section II.B, that privilege applies here, but even if it does not, "it nevertheless should have alerted ICE to the possibility that removing limits on civil arrests at immigration courts would chill attendance at removal proceedings and thereby vitiate a core purpose of the statutory and regulatory scheme governing noncitizens' detention." *Pablo Sequen,* 2025 WL 3724878, at *13. ICE cannot disclaim awareness of the privilege in light of the multiple recent decisions issued while the 2018 Memo was in effect finding ICE arrests at

courthouses chill access to the courts, implicating the privilege. *See New York v. U.S. Immigr. & Customs Enf't*, 466 F. Supp. 3d 439, 443, 447 (S.D.N.Y. 2020); *Velazquez-Hernandez v. U.S. Immigr. & Customs Enf't*, 500 F. Supp. 3d 1132, 1145–46 (S.D. Cal. 2020); *State*, 431 F. Supp. 3d at 388–93.[6]

### B.  The Immigration Court Arrest Policy Is Ultra Vires.

#### 1.  The Common-Law Privilege Against Civil Arrests In and Around Courthouses Applies.

Defendants contend that the common-law privilege against courthouse arrests is narrowly confined to the "privilege against case-initiating arrest and . . . against service of process of a person attending court." ECF 66 at 18. But Defendants get the history wrong and fail to even engage with the many authorities on the privilege's broad scope. First, at common law, the privilege applied broadly to *all* civil arrests, and later service of process, so long as its application satisfied a purpose-based test: "promot[ing] the purposes of justice." *Dwelle v. Allen*, 193 F. 546, 548–49 (S.D.N.Y. 1912); *see* ECF 45 at 7–8; *see also, e.g.*, *In re Kimball*, 14 F. Cas. 474, 474–75, 476 (S.D.N.Y. 1867) (applying the privilege to civil arrest and in so doing, discussing application of the privilege to arrest pursuant to a *capias ad satisfaciendum*). Caselaw and treatises before the INA's enactment in 1952 reflect this broad conception of the privilege. *See* ECF 45 at 8.

Further, the very caselaw on which Defendants rely to contend that the common-law privilege "no longer carries any force" due to the rise of long-arm statutes, ECF 66 at 19–20, actually demonstrates that the purpose-based test for the application of the privilege continues to govern today, *see* ECF 45 at 8–9. Specifically, *Pavlo v. James*, 437 F. Supp. 125, 127 (S.D.N.Y. 1977), which Defendants cite, in fact *applied* the privilege to a service of process because (1) "[the] defendant's

---

[6] Even the First Circuit in *Ryan v. U.S. Immigr. & Customs Enf't*, which ultimately held the INA did not incorporate the privilege, recognized "ICE's policy of conducting civil courthouse arrests may inhibit parties and witnesses from attending court proceedings." 974 F.3d 9, 27 (1st Cir. 2020).

appearance was not compelled or involuntary," [7] (2) the plaintiff failed to show that the state's long-arm statute could reach the defendant otherwise, and (3) the privilege's application there met its purpose of "enhance[ing] the administration of judicial operations by fostering voluntary appearances of parties and witnesses," *id.* at 127, 128, 129. *Pavlo* was not an outlier. Courts have continued to apply the privilege to service of process on nondomicilaries when the purpose-based test is met, including when a nondomiciliary would not have been subject to a state's long-arm statute. *See, e.g.*, *NASL Mktg., Inc. v. de Vries*, 94 F.R.D. 309, 310–11 (S.D.N.Y. 1982) ("Granting immunity from service of process to [the defendant] would serve judicial administration by encouraging participation in arbitration proceedings free from the fear that doing so would subject one to the jurisdiction of a foreign court."); *see also Cont'l Indus. Grp., Inc. v. Altunkilic*, 633 F. App'x 61, 63 (2d Cir. 2016) (holding the district court was required to consider if the defendant could have been subjected to the state's long-arm statute in determining if the privilege applied to service on the defendant while in the state as witness in another proceeding). The privilege's application to service of process in these cases—the most likely and frequent context for the privilege—after the INA's passage in 1952 demonstrates that it survives at common law and was incorporated into the INA, *see infra* Section II.B.2; *Dwelle*, 193 F. at 548 (explaining that it is the purpose-based test, and not frequency of application of the privilege to specific fact patterns, that governs the privilege's operation).

Accordingly, courts have refused to apply the privilege to service of process after *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), abrogated the physical-presence requirement for personal jurisdiction only after concluding the privilege's application would not further the administration of justice. *See, e.g.*, *In re Arthur Treacher's Franchise Litig.*, 92 F.R.D. 398, 404–405 (E.D. Pa. 1981) (explaining

---

[7] "The New York courts have held . . . that for purposes of immunity a defendant's presence in the state is involuntary only when his absence would have subjected him either to fine or imprisonment." *Pavlo*, 437 F. Supp. at 126–27. Likewise, noncitizens who fail to appear for their immigration court appearances are not directly punished by fines or imprisonment, but rather an *in absentia* order of removal; their appearances in immigration court are voluntary. *See* ECF 68 at 1–2, 8.

13

the privilege is meant "to ensure the efficient administration of justice," was "designed for the benefit of the court rather than the individual," and would not serve its purpose if applied to service of process when people can be served under a long-arm statute); *Gardner v. United States*, 246 F. Supp. 1014, 1015 (S.D.N.Y. 1965) (privilege not applicable to person doing business in New York because "nondomiciliary [] could be served outside the state").

The purpose-based test is undoubtedly met here with respect to civil immigration arrests effectuated pursuant to the Immigration Court Arrest Policy. *See* ECF 23 at 15; ECF 45 at 8–9. Defendants' argument that the privilege should not apply to such courthouse arrests because noncitizens are subject to immigration enforcement everywhere, ECF 66 at 20, not only misapprehends the privilege's scope and underlying rationale, *see* ECF 45 at 8–9, but is also irrelevant. In the context of service of process pre-*International Shoe*, the privilege did not apply *for the purpose* of protecting nondomiciliaries traveling to foreign fora for required proceedings from service in foreign fora; rather, it applied for the purpose of ensuring the administration of justice, as caselaw on which Defendants rely acknowledges, *see, e.g.*, *N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 62 (1st Cir. 2001) ("[P]rivilege exists for the convenience of the district court in its exercise of judicial administration."). The reason for this immunity was to assure the attendance of parties or witnesses who might otherwise refuse to appear and whose absence might obstruct or delay judicial proceedings, as Defendants impliedly concede. *See* ECF 66 at 19; *N. Light Tech*, 236 F.3d at 62–63; *United States v. Green*, 305 F. Supp. 125, 128 (S.D.N.Y. 1969) (application of privilege considered "the fear that out-of-state counsel might have of being served with process in a foreign jurisdiction"). In other words, in the context of personal jurisdiction, the privilege was concerned with *chill* to individuals' access to courts and subsequent disruption to court proceedings and thus was applied to shield people from the specific cause of the chill—service of process in foreign fora. And even after the development of long-arm statutes post-*International Shoe*, the privilege *still* applies to nondomiciliaries traveling to foreign

14

fora if the state's long-arm statute could not reach them, as discussed above. The chill to noncitizens' access to immigration courts due to fear of civil immigration arrest at immigration court, and its subsequent disruption of court proceedings, is no different than the chill that the privilege sought to ameliorate pre-*International Shoe*—and continues to target to this day—with respect to service of process. The chill to court access exists irrespective of the fact that noncitizens may be arrested elsewhere and has indeed come to pass. *See* ECF 68-12 ¶ 7. The privilege must thus apply here to civil immigration arrests made pursuant to the Immigration Court Arrest Policy. *See* ECF 68 at 5–6, 17.

### 2.   The INA Incorporates The Common-Law Privilege.

Defendants' arguments that the common-law privilege was not incorporated into the INA also fail. Contrary to Defendants' assertion, the privilege was not "a historical artifact" by the time Congress passed the INA in 1952, ECF 66 at 21, and its contours were clearly and broadly defined. *See* ECF 45 at 9–11; ECF 23 at 13–15. While Defendants claim that the INA displaces the privilege, the INA nowhere mentions the privilege and thus does not "speak directly" to the privilege and override application of the non-derogation canon. *Pasquantino v. United States*, 544 U.S. 349, 359 (2005) (cleaned up). Defendants are incorrect that 8 U.S.C. § 1229(e) explicitly authorizes or recognizes the INA's contemplation of civil arrests at courthouses for all the reasons Plaintiffs have laid out in prior briefing. *See* ECF 45 at 9–10; ECF 68 at 21. Rather, the INA's incorporation of the privilege balances the competing sovereign interests in (1) gaining custody over noncitizens and (2) ensuring the fair administration of justice in immigration proceedings.

Further, contrary to Defendants' assertion, *see* ECF 66 at 21, the determinative factor of whether the privilege was incorporated into the INA and applies to immigration arrests is not if the privilege applied to arrests on behalf of a sovereign. Instead, the key question is whether the privilege's application to civil arrests at immigration courthouses would ensure the fair administration of justice. *See* ECF 45 at 10–11; *supra* Section II.B.1. The privilege's purpose-based test is undoubtedly met here.

15

*See supra* Section II.B.1.

Nonetheless, caselaw at English common law clearly demonstrates that Crown-initiated arrests were covered by the privilege. *See, e.g.*, *Ex Parte Russell*, (1812) 19 Ves. Jr. 162, 165 (applying privilege to arrest of a person for a debt owed to the Crown and holding the person "cannot be arrested by the Crown any more than by a subject"); *Ex Parte Helsby*, (1832) 1 Dea. & C. 16, 21, 22 (holding the privilege applies even though the arrest was "a command to the sheriff by the King to take the defendant"); *Ex Parte Temple*, (1814) 2 V. & B. 391, 394 (re-affirming and explaining *Ex Parte Russell*); *see also United States v. New York*, No. 1:25-CV-744, 2025 WL 3205011, at \*9 n.6 (N.D.N.Y. Nov. 17, 2025) (citing *Ex Parte Russell* to state "there is authority that supports the fact that the privilege applied to arrests initiated by the sovereign"). These cases illuminate the precise contours of the privilege at American common law, as American courts incorporated English common law in the late 18th and early 19th Centuries, including caselaw on the privilege.[8] *See, e.g.*, *State v. Buck*, 62 N.H. 670, 670–71 (1883) (citing, *inter alia*, English caselaw, including *Cole v. Hawkins*, (1738) 95 Eng. Rep. 396, 396, Andrews 275, 275, in discussing the privilege); *Richards v. Goodson*, 4 Va. 381, 381–82 (Va. Gen. Ct. 1823) (same); *Blight v. Fisher*, 3 F. Cas. 704, 705 (C.C.D.N.J. 1809) (citing *Cole v. Hawkins* to define scope of privilege); *Halsey v. Stewart*, 4 N.J.L. 366, 368–69 (1817) (same); *Greer v. Young*, 120 Ill. 184, 187–88 (1887) (citing English caselaw when discussing privilege); *Bridges v. Sheldon*, 7 F. 17, 43–44 (C.C.D. Vt. 1880) (same).

Indeed, both *Ex Parte Russell* and *Ex Parte Helsby* were incorporated into American common law. *See, e.g.*, *Mobile & O. R. Co. v. Union City*, 137 Tenn. 491, 194 S.W. 572, 573–74 (1917) (relying on, *inter alia*, *Ex parte Russell*, 19 Ves. Jr. 163, for the proposition that "[l]aw was presumed to be made for the subject only, and the crown was not reached, *except by express words or by necessary implication in any*

---

[8] *See* Robert Kry, *Dialogue*, 72 Brook. L. Rev. 493, 550, 550 fn.269 (2007) (collecting cases showing how "Justices Scalia and Thomas also routinely rely on post-framing English authorities").

*case affecting an existing prerogative or interest*") (emphasis added); *State v. Boone Cnty.*, 78 Neb. 271, 110 N.W. 629, 630 (1907) (same); *In re City of Utica*, 26 N.Y.S. 564, 565–66 (Gen. Term 1893) (same); *Jones v. Knauss*, 31 N.J. Eq. 211, 214–16, 217 (Ch. 1879) (relying on *Ex parte Helsby*, 1 Dea. & Ch. 16, to define the scope of the privilege and applying the privilege to a person arrested while at court). All evidence therefore points to the privilege clearly applying to sovereign arrests at English common law and such caselaw's incorporation into American common law well before the passage of the INA in 1952.

### III. PLAINTIFFS' CLAIMS AGAINST THE EOIR DISMISSAL POLICY ARE NOT MOOT.

#### A.  EOIR Has Not Fully and Effectively Rescinded the Dismissal Policy.

"A case becomes moot only when it is impossible for a court to grant any effectual relief . . . to the prevailing party." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) (internal citation omitted); *see Ellis v. Bhd. of Ry. Clerks*, 466 U.S. 435, 442 (1984) ("[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."). At the outset, a court must first "determine whether the challenged conduct has, in fact, ceased." *Am. Freedom*, 815 F.3d at 109. "A claim will not be found moot if the defendant's change in conduct is merely superficial or . . . suffers from similar infirmities as it did at the outset." *Id.* (internal citation omitted). In evaluating whether the challenged conduct has ceased, courts look to whether anything has been done to "rectify violations." *Am. Council of Blind of N.Y., Inc. v. City of New York*, 495 F. Supp. 3d 211, 248 (S.D.N.Y. 2020). Only where a defendant has "sufficiently altered" its conduct so as "to present a substantially different controversy from the one that existed when . . . suit was filed" will a court find that it has actually ceased its unlawful activity. *Am. Freedom,* 815 F.3d at 109; *see Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 661–62 (1993) (finding that minor alterations to ordinance did not render issue moot as the ordinance still impacted the plaintiffs in the "same fundamental way").

17

Plaintiffs' challenge to the EOIR Dismissal Policy is not moot as the agency has failed to fully and effectively rescind the policy and thus has not ceased its unlawful conduct. On September 12, 2025, this Court stayed the EOIR Dismissal Policy, a policy invoked by email agency guidance issued on May 30, 2025 ("May 30 Guidance"), *see* ECF 24-12, and compounded by explicit job threats, finding Plaintiffs likely to prevail on their claim that it is contrary to law. ECF 51 at 25–31. The Court reasoned that the policy both (1) erroneously suggests that a "change in caseload" and enforcement priorities could warrant dismissal under 8 C.F.R. § 239.2(a)(7) when only a change in circumstances of the *case*— a new fact or condition that is specific to the case at hand—satisfies the regulation and (2) improperly counsels IJs on how to exercise their discretion in procedurally adjudicating motions to dismiss, implying that all of DHS's motions to dismiss may be submitted orally without advance notice and granted from the bench without a response period. *Id.* at 25–29. Shortly thereafter, the Acting Deputy Director of EOIR issued a memo, titled "Withdrawal of May 30, 2025 Email" ("Withdrawal Memo"), to all of EOIR, Ex. A to Supp. Belsher Decl., without limitation to geographic area, ECF 66 at 25. *See also* ECF 58, Ex. A. This combative and confusing memo fails to "rectify," or even acknowledge, the prior policy's failures. *Am. Council of Blind of N.Y., Inc.*, 495 F. Supp. 3d at 248.

First, instead of unequivocally retracting the EOIR Dismissal Policy, the Withdrawal Memo *refuses* to "cancel" it. Ex. A to Supp. Belsher Decl. at 1 n.1; *Thomas v. Ariel W.*, 242 F. Supp. 3d 293, 297–98 (S.D.N.Y. 2017) (finding issue not moot where defendants failed to "voluntarily correct[]" conduct as they contended they were "not legally obligated to do so"). The Withdrawal Memo states that the email was merely instructive "guidance," reminding IJs of their "longstanding" "authority to grant oral motions to dismiss," *not* formal, binding policy. Ex. A to Supp. Belsher Decl. at 1–2. Although this Court concluded that the EOIR Dismissal Policy was final agency action that misrepresented the grounds for dismissal and instructed IJs on how to exercise their discretion, ECF 51 at 25–31, the Withdrawal Memo states that only "incompetent" or "corrupt" IJs could interpret it

as such, Ex. A to Supp. Belsher Decl. at 3. Despite this Court's conclusion otherwise, the Withdrawal Memo claims that there was nothing unlawful about its actions as the May 30 Guidance was not a "policy" and no IJ "should have relied on it or used it to decide a case," and thus, that the stay "should have no impact on EOIR operations." *Id.*

Second, the Withdrawal Memo does not address this Court's concern that the EOIR Dismissal Policy instructs IJs on how to exercise their discretion in adjudicating motions to dismiss. Although the Court found that the May 30 Guidance suggests that IJs should generally permit these motions to "be made orally and decided from the bench" with "[n]o additional documentation or briefing" and "may be granted" without "[a] 10-day response period" given the "exigencies of higher caseloads," *overriding* their independent discretion in how to conduct their proceedings, ECF 51 at 27–28, the Withdrawal Memo does not acknowledge this potential misinterpretation. Nor does it clarify that IJs may not, as a blanket matter, set aside the procedural protections intended to protect the rights of noncitizens in adjudicating these motions. *Compare id. with* Ex. A to Supp. Belsher Decl. at 1–3. Instead, the Withdrawal Memo reasserts IJs' legal authority to make these procedural modifications. Ex. A to Supp. Belsher Decl. at 2; *see Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 255 (S.D.N.Y. 2020) (finding challenged conduct had not ceased despite minor difference in policies as some of the "alleged harms associated" with the first policy were "still present in the most recent revisions").

Third, the Withdrawal Memo fails to mention, let alone clarify the scope of 8 C.F.R. § 239.2(a)(7), on which this Court's decision largely centered, *see* ECF 51 at 25–27.[9] The document does not reckon with this Court's conclusion that the May 30 Guidance's preamble and misstatement of the regulation improperly convey that an "increase in the detained caseload or the implementation of the ICE Courthouse Arrests Policies" represent a change in the circumstances warranting dismissal.

---

[9] The furthest the Withdrawal Memo goes in acknowledging the May 30 Guidance's omission of 8 C.F.R. § 239.2(a)(7) is its vague statement that the email's "attempt to paraphrase relevant law was poorly drafted." Ex. A to Supp. Belsher Decl. at 2.

*Id.* Specifically, the Withdrawal Memo fails to clarify that 8 C.F.R. § 239.2(a)(7) only permits dismissal where there is evidence that "[c]ircumstances <u>of the case</u> have changed," which is limited to "a new fact or condition that is specific to the case at hand, <u>e.g.</u>, vacatur of a conviction, a pardon, a change in marital status, or a change in country conditions if a defensive asylum is sought." *Id.* at 27 (emphasis in original). To the contrary, in asserting this Court's stay "should have no impact," EOIR has tacitly *endorsed* the practice of IJs granting motions to dismiss on improper grounds. Ex. A to Supp. Belsher Decl. at 3.

Lastly, the Withdrawal Memo fails to correct the impression left by its prior guidance and mass firing campaign that IJs must grant DHS's motions or risk termination. Defendants discount Plaintiffs' evidence that the present environment at EOIR, in which unprecedented numbers of IJs are being fired, further pressured IJs to grant motions to dismiss, as limited to the unique "troubling[]" experiences of a few IJs. Ex. A to Supp. Belsher Decl. at 3 n.6. Indeed, instead of assuring IJs of their independence, the Withdrawal Memo alarmingly threatens IJs who deny DHS's recent campaign of motions to dismiss—which, as this Court found, do not meet the regulatory standard—with "ethics and professional responsibility" violations. *Id.* at 2 n.3 (stating IJs "who previously granted oral motions to terminate or dismiss as a matter of routine but now refuse to do so, not based on the law but because they have personal or policy disagreements with what they perceive as the intent behind the motions, are violating ethics and professional responsibility rules"). Accordingly, as the Withdrawal Memo fails to actually "prohibit the conduct" challenged by Plaintiffs, *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014), and found unlawful by this Court, its purported cessation is "superficial" at best, *Am. Freedom*, 815 F.3d at 109.

Given EOIR's hollow withdrawal of the EOIR Dismissal Policy, it is unsurprising that IJs around the country continue to follow this guidance. Even though the Withdrawal Memo purports to rescind the guidance "without limitation to geographic area or time," ECF 66 at 12, many IJs appear

20

to be operating under the presumption that the May 30 Guidance is still binding. *See* Botsch Decl. ¶¶ 5–8; Miller Decl. ¶¶ 4–8; Lange Decl. ¶¶ 3–6;[10] *see Daniels v. Moores*, Nos. 24-30-pr; 24-785-pr, 2025 WL 883035, at *2 (2d Cir. Mar. 21, 2025) (affirming that despite defendants' formal rescission of the policy, it was still active given that plaintiffs continued to suffer from the same harms). IJs in areas as diverse as Miami, El Paso, and Fort Snelling still blanketly permit DHS attorneys to move to dismiss noncitizens' removal proceedings orally, without a written motion, over noncitizens' objections requesting otherwise. *See* Botsch Decl. ¶¶ 3–8; Miller Decl. ¶¶ 4–6; Lange Decl. ¶¶ 2–4. Likewise, these IJs routinely decide such motions from the bench, depriving noncitizens of the opportunity to submit a written opposition to the motion before issuing a decision. *See* Botsch Decl. ¶¶ 3, 5, 7; Miller Decl. ¶¶ 4–7; Lange Decl. ¶¶ 2–5. In addition, many IJs in these regions continue to grant motions to dismiss under 8 C.F.R. § 239.2(a)(7) where the government has alleged only a generalized change in circumstance unrelated to the noncitizen respondents' case. *See* Botsch Decl. ¶¶ 3–7; Miller Decl. ¶¶ 4–8; Lange Decl. ¶¶ 2–3, 5–6. In fact, as recently as this month, an IJ has indicated that he lacks discretion to deny such a motion where DHS claims only that the proceedings are no longer in the government's interest. *See* Botsch Decl. ¶ 6; *see also* Miller Decl. ¶ 8; Lange Decl. ¶ 6. IJs also continue to face severe pressure to dismiss cases as the government "slash[es] the ranks of immigration judges." Ex. B to Supp. Belsher Decl.; *see* ECF 68-6 ¶ 22. Those with a history of denying such motions have

---

[10] To the extent Defendants point to a decrease in IJ adjudications of motions to dismiss as additional grounds for mootness, it is worth noting that DHS has significantly reduced the number of cases it moves to dismiss pursuant to 8 C.F.R. § 239.2(a)(7) likely due to the fact it may not presently subject most noncitizens whose full removal proceedings are dismissed to expedited removal. As the May 30 Guidance notes, ECF 24-12 at 2, the government's motions to dismiss full removal proceedings were largely targeted at noncitizens it wished to place into expedited removal, *Make the Rd. New York v. Noem*, No. 25-CV-190, 2025 WL 2494908, at *5-6 (D.D.C. Aug. 29, 2025). On August 29, 2025, the United State District Court of the District of Colombia stayed the government's expansion of expedited removal, *id.* at *23, which the government has since appealed.

been fired as recently as November 2025, *after* the issuance of the Withdrawal Memo. ECF 68-6 ¶ 22; *see also* Ex. C to Supp. Belsher Decl.

As the Withdrawal Memo has failed to clearly rescind the EOIR Dismissal Policy and effectively halt this practice, EOIR's conduct has not been "sufficiently altered so as to present a substantially different controversy from the one that existed when . . . suit was filed," making this issue *not* moot, but live and pressing as ever. *Am. Freedom*, 815 F.3d at 109 (internal citation omitted).

### B. The Voluntary Cessation Doctrine Precludes Defendants' Claim of Mootness.

Voluntarily ceasing "unlawful conduct does not moot a case in which the legality of that conduct is challenged." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 724 n.3 (2010). Rather, a party that must show that "(1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (internal citation omitted). Ultimately, the party claiming mootness has a "formidable burden"—it must make it "absolutely clear" that the conduct "will never" reoccur. *Id.* at 603–04. Even the government, which is entitled to "some deference," must meet this "stringent" test.[11] *Id.* at 604; *see Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) ("To show that a case is truly moot, a defendant must prove no reasonable expectation remains that it will return to its old ways. That much holds for governmental defendants no less than for private ones." (cleaned up)).

Even if the Court were to find that EOIR had rescinded its Dismissal Policy, the legal controversies at issue here still would not be moot. As a threshold matter, the agency's purported rescission of the May 30 Guidance was not "voluntary"; it was, as the Withdrawal Memo acknowledges, Ex. A to Supp. Belsher Decl. at 3, in response to this Court's order. However, even

---

[11] Defendants misstate the standard applicable here, omitting the Second Circuit's decisions in favor of other circuits' more lenient standards. ECF 66 at 33.

assuming the Withdrawal Memo effectively vacated the challenged policy, an issue does not become moot "simply because a court order redressing alleged grievance has been obeyed." *Haley v. Pataki*, 60 F.3d 137, 140–41, 142 (2d Cir. 1995) (cleaned up); *see Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) (explaining that "[p]reliminary" relief "do[es] not conclusively resolve legal disputes"); *N.Y. State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 92 (2d Cir. 1998) ("[V]oluntary cessation of misconduct does not engender mootness where the cessation resulted from a coercive order.").

Next, Defendants have not carried their burden that there is "no reasonable expectation the alleged violation will recur."[12] *See Saba v. Cuomo*, 535 F. Supp. 3d 282, 289 (S.D.N.Y. 2021) (internal citation omitted) (finding no evidence that harm would not reoccur given that the government had not actually changed its unlawful system). Notably, EOIR has not provided any "assurance[s]" that it will not reinstitute the Dismissal Policy the moment this Court's order is lifted. *Fikre*, 601 U.S. at 243; *see Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 138–40 (S.D.N.Y. 2019) (collecting cases and finding government did not demonstrate mootness where it "has not categorically stated" it would not resume the challenged conduct "but only that 'there is no reasonable expectation' that it will"); *Make the Rd.*, 475 F. Supp. 3d at 255 (noting that the government did not argue that it would never revert back to its prior practice). In fact, EOIR has refused to even admit that its guidance misrepresented the scope of 8 C.F.R. § 239.2(a)(7), counseled blanket waiver of procedural protections, and pressured IJs to abandon their discretion in favor of granting DHS attorneys' motions to dismiss, making reoccurrence all the more likely. *See* Ex. A to Supp. Belsher Decl.; *Ahrens v. Bowen*, 852 F.2d 49, 53 (2d Cir. 1988) ("It is precisely his insistence on the validity of the challenged practice that makes it 'reasonable' to expect that the conduct will be repeated."); *Fikre*, 601 U.S. at 244 (explaining that "repudiation" is valuable as to what it "can prove about [a defendant's] future

---

[12] In arguing their burden is met on this point, Defendants again notably rely primarily on cases from outside this Circuit. *See* ECF 66 at 32–34.

23

conduct"). Instead, the Withdrawal Memo *criticizes* the presumptions underlying this Court's decision, claims the order should have no impact, and veiledly threatens IJs with ethics and professional responsibility violations if they do not follow the original policy. *See* Ex. A to Supp. Belsher Decl.

Moreover, the "suspicious timing and circumstances," *Mhany*, 819 F.3d at 604, of the Withdrawal Memo suggests that EOIR issued it for strategic "self-interest[ed]" purposes, *not* because it is committed to abolishing this practice, *Murphy v. Benson*, 270 F.2d 419, 421 (2d Cir. 1959). Rather than comply with the Court's stay, EOIR opted to issue the Withdrawal Memo so that it could dictate the terms of its purported rescission, try to moot the issue, and disclaim any liability. *Compare* ECF 51 at 25–31 *with* Withdrawal Memo. This is precisely the type of "manipulat[ion]" that counsels against mootness. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 288 (2000); *Fikre*, 601 U.S. at 241 (explaining that defendants cannot engage in such "strategies" that leave them free to "win dismissal[] and later pick up where [they] left off").

Lastly, as discussed above, the effects of the EOIR Dismissal Policy have not been "completely and irrevocably eradicated." *Mhany*, 819 F.3d at 603. Principally, the agency has "not provide[d] the relief [Plaintiffs] [are] actually seeking:" a clear and unconditional revocation of the EOIR Dismissal Policy. *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 546 (E.D.N.Y. 2017). Nor has this unlawful practice entirely ceased "without limitation to geographic area or time" as Defendants claim, ECF 66 at 12—some IJs continue to grant motions to dismiss pursuant to the policy and those who refuse to do so fear termination. *See* Botsch Decl. ¶¶ 3–8; Miller Decl. ¶¶ 4–6; Lange Decl. ¶¶ 2–4; ECF 68-6 ¶ 22; *Sughrim v. New York*, 690 F. Supp. 3d 355, 387 (S.D.N.Y. 2023) (commenting that the issue was still live given that certain harms had not yet been resolved). Indeed, far from curing the issues with the prior guidance, the Withdrawal Memo threatens IJs that if they do not grant these motions, they risk violating "ethics and professional responsibility rules." Ex. A to Supp. Belsher Decl. at 2 n.3.

Moreover, Plaintiffs continue to "suffer[] ongoing harm from" the dismissals originally authorized under the EOIR Dismissal Policy. *Am. Freedom*, 815 F.3d at 110. Door members remain fearful of dismissal and confused whether they will be subject to such when attending their immigration proceedings. *See* Baltimore Decl. ¶ 7. Further, Plaintiff The Door has had to shift resources away from its core mission of providing free comprehensive services to youth because of this policy, devoting more resources to assisting its members as well as new clients in both addressing the closure of their cases and assuaging their concerns about potential dismissal. *See id.* ¶¶ 5–12; *Salem v. Pompeo*, 432 F. Supp. 3d 222, 233–34 (E.D.N.Y. 2020) (finding that the interim relief had not "completely and irrevocably eradicated the effects" of the original harm as it did not "restore" plaintiffs to the "modus operandi" prior to defendants' unlawful conduct). Given that EOIR has failed to *actually* revoke its Dismissal Policy, these predictable consequences are likely to persist. *See Hilton v. Wright*, 235 F.R.D. 40, 50 (N.D.N.Y. 2006) (concluding that defendants' hollow commitment to "review" individuals' eligibility for treatment insufficient given that it did not "clear[ly]" "translate" into providing all eligible individuals with treatment). Thus, as EOIR has not even come close to "completely and irrevocably eradicat[ing] the effects" of the Dismissal Policy, final set aside relief is ultimately necessary here to provide "effectual relief." *Am. Freedom*, 815 F.3d at 109.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' partial motions for summary judgment and to dismiss.

Dated: January 7, 2026
New York, New York


/s/Amy Belsher

| | |
|---|---|
| NEW YORK CIVIL LIBERTIES UNION FOUNDATION | AMERICAN CIVIL LIBERTIES UNION FOUNDATION |

| | |
|---|---|
| Amy Belsher<br>Elizabeth Gyori<br>Wafa Junaid<br>Claire Molholm<br>Thomas Munson<br>M. Porter*<br>Robert Hodgson<br>125 Broad Street, 19th Floor<br>New York, NY 10004<br>Tel: (212) 607-3300 | Noor Zafar<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>Tel: (212) 549-2500 |

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

Michael K.T. Tan
Hannah Steinberg*
Oscar Sarabia Roman*
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0770

| | |
|---|---|
| EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP | MAKE THE ROAD NEW YORK |

| | |
|---|---|
| Katherine Rosenfeld<br>Samuel Shapiro<br>Emily Wanger<br>One Rockefeller Plaza, 8th Floor<br>New York, NY 10020<br>Tel: (212) 763-5000 | Harold Solis<br>Paige Austin<br>301 Grove Street<br>Brooklyn, NY 11237<br>Tel: (718) 418-7690 |


| | |
|---|---|
| *Admitted pro hac vice | *Counsel for Plaintiffs* |

26