UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AFRICAN COMMUNITIES TOGETHER; and THE DOOR,

                Plaintiffs,

        v.

TODD LYONS, in his official capacity as Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; DARREN K. MARGOLIN, in his official capacity as Director, Executive Office for Immigration Review; and PAMELA BONDI, in her official capacity as Attorney General, U.S. DEPARTMENT OF JUSTICE,

                Defendants.

25 Civ. 6366 (PKC)

---

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
THEIR PARTIAL MOTION TO DISMISS AND
PARTIAL MOTION FOR SUMMARY JUDGMENT**

        JAY CLAYTON
        United States Attorney for the
        Southern District of New York
        86 Chambers Street, 3rd Floor
        New York, New York 10007
        Tel.: (212) 637-2695/2721
        Fax: (212) 637-0033
        Email: jeffrey.oestericher@usdoj.gov
                tomoko.onozawa@usdoj.gov

JEFFREY S. OESTERICHER
TOMOKO ONOZAWA
 Assistant United States Attorneys
*Of Counsel*

**TABLE OF CONTENTS**

ARGUMENT ..................................................................................................................................1

    I.    The ICE Guidance Is Not Subject to APA Review ................................................................1

    II.    The ICE Guidance Is Not Arbitrary and Capricious............................................................2

    III.    The ICE Guidance Is Not Contrary to Law ........................................................................4

        A.  There is No Common Law Privilege Against Courthouse Arrests...............................4

        B.  The INA Did Not Incorporate a Common-Law Privilege ............................................6

    IV.    Plaintiffs' Claims Against the EOIR Defendants Should Be Dismissed as Moot...............7

CONCLUSION................................................................................................................................10

i

**TABLE OF AUTHORITIES**

Page(s)

Cases

*American Farm Bureau Federation v. EPA*,
  984 F. Supp. 2d 289 (Md. Pa. 2013) ....................................................................... 8

*Arizona v. United States*,
  567 U.S. 387 (2012) ................................................................................................ 3

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................ 2

*Broadgate Inc. v. USCIS*,
  730 F. Supp. 2d 240 (D.D.C. 2010) ........................................................................ 2

*Comer v. Cisneros*,
  37 F.3d 775 (2d Cir. 1994) ................................................................................... 10

*Cont'l Indus. Grp., Inc. v. Altunkilic*,
  633 F. App'x 61 (2d Cir. 2016) .............................................................................. 5

*Delaware Dep't of Natural Resources v. EPA*,
  785 F.3d 1 (D.C. Cir. 2015) .................................................................................... 8

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) ................................................................................................ 3

*Evans v. New York City Dep't of Education*,
  No. 22 Civ. 7901 (ER), 2023 WL 8034449 (S.D.N.Y. Nov. 20, 2023) ................... 7

*Ex Parte Helsby* (1832)
  1 Dea. & C. 16 ....................................................................................................... 7

*Ex Parte Russell* (1812),
  19 Ves. Jr. 162 ....................................................................................................... 7

*Ex Parte Temple* (1814),
  2 V. & B. 391 ........................................................................................................ 7

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ................................................................................................ 1

*Motor Vehicles Manufacturers' Ass'n v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983) .................................................................................................. 4

*NASL Mktg., Inc. v. de Vries*,
  94 F.R.D. 309 (S.D.N.Y. 1982) ................................................................................. 5

*Netograph Mfg. Co. v. Scrugham*,
  197 N.Y. 377 (1910) ................................................................................................. 5

*New York v. ICE*,
  466 F. Supp. 3d 439 (S.D.N.Y. 2020) ...................................................................... 5

*Pablo Sequen v. Albarran*,
  25-CV-6487-PCP, 2025 WL 3724878 (N.D. Cal. Dec. 24, 2025) ......................... 1, 2

*Paskar v. U.S. Dep't of Transp.*,
  714 F.3d 90 (2d Cir. 2013) ........................................................................................ 2

*Pasquantino v. U.S.*,
  544 U.S. 349 (2005) .................................................................................................. 6

*Pavlo v. James*,
  437 F. Supp. 125 (S.D.N.Y. 1977) ........................................................................... 5

*Perez v. Mort. Bankers Ass'n*,
  575 U.S. 92 (2015) .................................................................................................... 2

*Ryan v. ICE*,
  974 F.3d 9 (1st Cir. 2020) ................................................................................. 4, 5, 7

*Samma v. Dep't of Defense*,
  136 F.4th 1108 (D.C. Cir. 2025) ............................................................................... 7

*Sierra Club v. Costle*,
  657 F.2d 298 (D.C. Cir. 1981) .................................................................................. 3

Statutes

5 U.S.C. § 704 ................................................................................................................. 2

8 U.S.C. § 1229a(b)(5)(A) .............................................................................................. 6

8 U.S.C. § 1357(a)(2) ..................................................................................................... 1

8 C.F.R. § 239.2(a)(7) ..................................................................................................... 8

8 C.F.R. § 1003.0(c) ..................................................................................................... 10

8 C.F.R. § 1003.9(c) ..................................................................................................... 10

**ARGUMENT**

**I.      The ICE Guidance Is Not Subject to APA Review**

The ICE Guidance is not subject to APA review because there is no meaningful standard against which to judge the agency's exercise of discretion.  Subject to limited exceptions not relevant here, *see* 8 U.S.C. § 1357(a)(2), (3), the INA does not indicate *where* a civil immigration enforcement action should or should not occur.  Plaintiffs have cited no statutory language or legislative history evincing Congressional intent to circumscribe the ICE Defendants' discretion to choose the locations of specific civil immigration enforcement actions and to define "meaningful standards for defining the limits of that discretion."  *Heckler v. Chaney*, 470 U.S. 821, 834–35 (1985).

Plaintiffs claim incorrectly that ICE's prior guidance documents "suppl[y] this Court with ample 'law to apply.'"  Pls.' Mem. of Law in Opp. to Defs.' Partial Mots. to Dismiss and for Summ. J. (ECF No. 72) ("Pls.' Opp. Br.") at 4 (citing *Pablo Sequen v. Albarran*, 25-CV-6487-PCP, 2025 WL 3724878, at *9 (N.D. Cal. Dec. 24, 2025), *appeal filed, Garcia v. Albarran*, No. 25-8055 (9th Cir.)).  Even if this Court were to consider ICE's prior guidance documents— which by their terms, have no legally binding effect and so cannot serve as law to apply (*see* AR 6, 17, 23, 27, 33, 49, 50)—they do not provide a meaningful standard for review.  As the administrative record demonstrates, DHS has long developed, revised, and/or rescinded guidance regarding various locations for civil immigration enforcement actions, which has balanced the government's interests in enforcing immigration law against the potential effects of its enforcement activities.  (AR 4–6, 7–19, 29–50).  The administrative record further shows that the 2018 Guidance, like the 2025 Guidance, *permitted* civil immigration enforcement actions in courthouses.  (AR 1–3, 21–24).  Plaintiffs fail to identify any justiciable standard in ICE's prior guidance documents that the Court could apply to evaluate where ICE may conduct civil

immigration enforcement actions.

Moreover, the ICE Guidance is not final agency action within the meaning of 5 U.S.C. § 704 because it fails the second prong of the test under *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). On its face, the Guidance does not direct ICE personnel to arrest all aliens encountered at immigration court or other courts. It also does not compel any action, determine any rights or obligations, or create legal consequences for Plaintiffs' members. The Guidance merely explains what ICE may do, and does not create substantive rules or rights, *see Perez v. Mort. Bankers Ass'n*, 575 U.S. 92, 96 (2015), or "bind" ICE officers, *Broadgate Inc. v. USCIS*, 730 F. Supp. 2d 240, 246 (D.D.C. 2010). Consequently, the Guidance itself does not constitute final agency action subject to immediate judicial review under the APA. *Paskar v. U.S. Dep't of Transp.,* 714 F.3d 90, 99 (2d Cir. 2013). It is only when that Guidance is applied that "rights or obligations" may in fact be determined, sufficient to establish finality. *Bennett*, 520 U.S. at 177–78 (internal quotation marks omitted). Plaintiffs' claims, which present a facial attack to the Guidance, *see* Compl. ¶¶ 3, 30, 35, fail on this basis. *Id.*; *but see Pablo Sequen*, 2025 WL 3724878, at *7, *appeal filed*, *Garcia v. Albarran*, No. 25-8055 (9th Cir.) (holding that ICE Guidance is a "final agency action" and subject to judicial review under the APA).

## II.    The ICE Guidance Is Not Arbitrary and Capricious

Plaintiffs argue that the Guidance is arbitrary and capricious because like the 2018 Guidance, it "applied only to criminal courts, not immigration courts." Pls.' Opp. Br. at 7. However, as Defendants have explained, the reference to "non-criminal proceedings" or "non-criminal matters" in the 2018 Directive—which was incorporated in the 2025 Guidance— referred to non-criminal proceedings in state and local courts, not to federal immigration courts. Defs.' Mem. of Law in Opp. to Pls.' Cross-Mot. for Summ. J. (ECF No. 70) ("Defs.' Opp. Br."), at 5–6.

Plaintiffs' claim that the Guidance is arbitrary and capricious because noncitizens other than "targeted aliens" "may be subject to civil immigration enforcement action[s]" at immigration courthouses is also without merit. Pls.' Opp. Br. at 8. Plaintiffs in essence are contesting the administration's discretionary expansion of the categories of aliens who are priorities for removal, even though that discretion has been recognized and upheld as a matter of law. *See Arizona v. United States*, 567 U.S. 387, 395–96 (2012) (noting that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," and observing that the decision to either initiate removal proceedings or to grant relief from removal are among the discretionary decisions assigned to federal immigration officials by law). Plaintiffs' disagreement with the administration's expansion of civil immigration enforcement actions at courthouses is not a proper basis for an APA challenge—"[a] court may not set aside an agency's policymaking decision solely because it might have been . . . prompted by an Administration's priorities. Agency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power.'" *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019) (quoting *Sierra Club v. Costle*, 657 F.2d 298, 408 (D.C. Cir. 1981)).

In short, the administrative record shows that the Guidance, among other things, was issued: (1) pursuant to the Executive Order's expansion of categories of aliens to be prioritized for removal; (2) to explain the agency's justifications for conducting civil immigration enforcement actions inside courthouses; and (3) to guide the actions of ICE officers and agents in conducting such enforcement actions. *See* Defs.' Mem. of Law in Supp. of Their Partial Mot. to Dismiss and Partial Mot. for Summ. J. (ECF No. 66) ("Defs.' Br.") at 15–17; Defs.' Opp. Br. at 5–11. The Guidance meets the narrow, deferential standard under the APA which prohibits a

court from substituting its judgment for that of the agency. *Motor Vehicles Manufacturers'*

*Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Accordingly, this Court should

grant Defendants summary judgment on Plaintiffs' APA claims.

**III.    The ICE Guidance Is Not Contrary to Law**

   **C.    There is No Common Law Privilege Against Courthouse Arrests**

Plaintiffs first emphasize that "at common law, the privilege [against courthouse arrests]

applied broadly to *all* civil arrests, and later service of process, so long as its application satisfied

a purpose-based test: 'promot[ing] the purposes of justice.'" Pls.' Opp. Br. at 12. Defendants do

not dispute that the common-law privilege applied both to service of process and civil arrests,

when "a plaintiff in a civil action obtained personal jurisdiction over a defendant" by having that

defendant arrested under a writ of *capias ad respondendum*. *Ryan v. ICE*, 974 F.3d 9, 21 (1st

Cir. 2020). And as Defendants have argued, the privilege against case-initiating arrest and the

privilege against service of process of a person attending court were extensions of a now-

outdated principle that a state court's jurisdiction over a person rested on that person's physical

presence. Defs.' Br. at 18–19. But after the widespread recognition of long-arm jurisdiction,

that physical-presence requirement is now basically obsolete. *Id.* at 19.

To be sure, the privilege against courthouse arrest or service of process served two

purposes: "to remove a disincentive for inhibiting parties and witnesses from coming forward"

and "to ensure that arrests did not disrupt the orderly operation of the courts." *Ryan*, 974 F.3d at

21. Plaintiffs also argue that the privilege had "the purpose of ensuring the administration of

justice." Pls.' Opp. Br. at 13–14. The latter two justifications are not affected by the

obsolescence of the physical-presence requirement, but Plaintiffs rely heavily on them in arguing

that the common-law protection extends even to arrests unrelated to the initiation of a lawsuit.

*Id.* at 12–14. But that proves too much: as the First Circuit has acknowledged, "the privilege has

4

never been thought to protect against criminal arrests or other forms of criminal process." *Ryan*, 974 F.3d at 27.  There is no reason to conclude that criminal arrests in courthouses would impede "the administration of justice" or be less disruptive to the functioning of courts than civil arrests. *See Ryan*, 974 F.3d at 27 ("[A]lthough criminal arrests in courthouses risk deterring parties and witnesses from coming forward and also risk disrupting ongoing proceedings, courts have refrained from extending the privilege to criminal arrests due to the overriding sovereign interests in enforcing the penal laws and protecting the public.").  Moreover, the fact that the privilege has been recognized in the context of service of process—whose "relatively small burden" is "far-less disruptive" to the operation of courts than an arrest under a writ of *capias ad respondendum*, *New York v. ICE*, 466 F. Supp. 3d 439, 445 (S.D.N.Y. 2020), *vacated and remanded by New York v. ICE*, No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023)— suggests that encouraging traveling witnesses and litigants to voluntarily appear in court is the more important of the two rationales.  *See Netograph Mfg. Co. v. Scrugham*, 197 N.Y. 377, 380 (1910) (under New York state common law, "the obvious reason of the rule is to encourage voluntary attendance upon courts and to expedite the administration of justice, [but] that reason fails when a suitor or witness is brought into the jurisdiction of a court while under arrest or other compulsion of law.  Such a suitor or witness does nothing to encourage or promote voluntary submission to judicial proceedings.").[1]

---

[1] As Defendants have argued, Defs.' Br. at 20, and Plaintiffs point out, *see* Pls.' Opp. Br. at 13, since the dawn of long-arm jurisdiction, courts have applied the privilege only where non-domiciliary witnesses not otherwise subject to a jurisdiction's long-arm statutes have been served with civil process while *voluntarily* attending court in that jurisdiction.  *See, e.g., Pavlo v. James*, 437 F. Supp. 125, 126 (S.D.N.Y. 1977); *NASL Mktg., Inc. v. de Vries*, 94 F.R.D. 309 (S.D.N.Y. 1982); *Cont'l Indus. Grp., Inc. v. Altunkilic*, 633 F. App'x 61, 63 (2d Cir. 2016).  Plaintiffs, by analogy, argue that the privilege therefore applies to immigration courthouse arrests because "appearances in immigration court are voluntary," not mandatory.  Pls.' Opp. Br. at 13 n.7.  But this flatly contradicts Plaintiffs' repeated allegations that the INA mandates an alien's

### D.    The INA Did Not Incorporate a Common-Law Privilege

As set forth in Defendants' brief, the INA could not have codified any purported common-law privilege because by the time Congress established a comprehensive immigration-arrest statutory scheme in the INA, any such privilege was a historical artifact, it never applied to arrests by the government for law-enforcement purposes, and the scope of the privilege was ambiguous at best. *See* Defs.' Br. at 21. Plaintiffs disregard these obstacles, simply declaring, based on now-defunct English common law and general policy statements, that "[a]ll evidence . . . points to the privilege clearly applying to sovereign arrests at English common law and such caselaw's incorporation into American common law well before the passage of the INA in 1952." Pls.' Opp. Br. at 17. But as the Supreme Court observed in *Pasquantino v. United States*, "the early English cases rest on a far different foundation from that on which the . . . rule came to rest." 544 U.S. 349, 366 (2005); *see id.* at 363 ("[d]rawing sure inferences regarding Congress' intent from such foreign citations is perilous"). And none of the cases would "plainly prevent" courthouse arrests by the government for law-enforcement purposes. *Id.* at 364. Though Plaintiffs insist that "caselaw at English common law clearly demonstrates that Crown-initiated arrests were covered by the privilege," Pls.' Opp. Br. at 16, those cases involved civil arrests against bankrupt debtors that were initiated by the Crown as a creditor; they were not

---

appearance at a removal proceeding. *See* 8 U.S.C. § 1229a(b)(5)(A). *See also* Compl. ¶¶ 1 ("These profoundly unfair practices undermine the rule of law and the integrity of immigration courts by effectively turning mandatory court hearings into traps."); 16 (alleging that immigration courthouse arrests "could deter noncitizens from attending mandatory court proceedings"); 49 (alleging that "DHS attorneys move to dismiss individuals' full removal proceedings . . . during noncitizens' mandatory master calendar hearings"); 55 (alleging that immigration court arrests place Plaintiffs' members "at risk of arrest" "[i]n attending their mandatory hearings," and chilling members "from appearing for those mandatory court proceedings").

arrests conducted in furtherance of a sovereign law-enforcement interest. *See, e.g., Ex Parte Russell* (1812), 19 Ves. Jr. 162, 165 (Crown could not civilly arrest a bankruptcy debtor "for a debt due by him to the Crown"); *Ex Parte Helsby* (1832), 1 Dea. & C. 16, 26 (same); *Ex Parte Temple* (1814), 2 V. & B. 391, 394 (same).

To the contrary, "[h]ad Congress inspected the case law in 1952 with any degree of care, . . . it would have concluded . . . that there was no clear historical precedent for extending the privilege to arrests on behalf of the sovereign," and that there was no basis to infer "that the privilege protected against any and all forms of civil arrest, including the civil immigration arrests that it was authorizing in the INA." *Ryan*, 974 F.3d at 26. As the *Ryan* Court explained, "to assume that a privilege that protected against civil arrests pursuant to a writ of capias ad respondendum would translate to immigration arrests because of a few superficial similarities would be to accept exactly the type of attenuated analogy that the *Pasquantino* Court deemed insufficient to warrant the application of the nonderogation canon." *Id.* at 28. There is thus no reason to conclude that "in 1952, Congress would have considered the civil immigration arrests authorized in the INA to come within the scope of the common law privilege." *Id.*

## IV. Plaintiffs' Claims Against the EOIR Defendants Should Be Dismissed as Moot

Plaintiffs' APA claims against the EOIR Defendants are moot because the Policy Memo withdrew the challenged EOIR Guidance Email. Supplemental Declaration of Amy Belsher, dated Jan. 7, 2025 ("Belsher Supp. Decl.") (ECF No. 73), Ex. A. *See, e.g., Samma v. Dep't of Defense*, 136 F.4th 1108, 1113–14 (D.C. Cir. 2025) (agency's rescission of challenged policy mooted APA challenge, because "no order from this court would have any meaningful effect on the rights of the parties"); *Evans v. New York City Dep't of Education*, No. 22 Civ. 7901 (ER), 2023 WL 8034449, at *4 (S.D.N.Y. Nov. 20, 2023), *aff'd*, 2024 WL 4501963 (2d Cir. Oct. 16, 2024) (challenge to municipal vaccine mandate was moot when mandate was lifted). Plaintiffs'

arguments to the contrary lack merit.  Pls.' Opp. Br. at 17–25.[2]

First, the stated purpose of the Policy Memo was to "withdraw[] an email sent on May 30, 2025," with a directive that "[a]ll Immigration Judges should continue to not rely on it in adjudicating cases."  Belsher Supp. Decl., Ex. A at 1, 3.  Plaintiffs nonetheless insist that their APA claims against the EOIR Defendants are not moot because the Policy Memo "*refuses* to 'cancel'" the EOIR Guidance Email.  Pls.' Opp. Br. at 18 (emphasis in original).  But "cancelling" the EOIR Guidance Email and "withdrawing" it is a distinction without a difference.

Likewise, the Policy Memo withdrew provisions in the EOIR Guidance Email which this Court held were contrary to law.  First, this Court held that because the EOIR Guidance Email was "in conflict with" 8 C.F.R. § 239.2(a)(7), "[t]his contradiction alone renders the EOIR Policy on Dismissals contrary to law."  Opinion & Order, at 27.  The Policy Memo acknowledged that the EOIR Guidance Email's "attempt to paraphrase relevant law was poorly drafted," and formally withdrew the guidance—including its problematic paraphrasing of the regulation—in its entirety.  Belsher Suppl Decl. Ex. A, at 2, 3.  In addition, this Court held that

---

[2] The Door's opposition brief relies on a Second Supplemental Declaration of Beth Baltimore (ECF No. 72-1), which responds to Defendants' argument that all Plaintiffs lack standing to continue pursuing an APA claim against the EOIR Defendants.  Defs.' Opp. Br. at 17–20.  While acknowledging that it is "impossible for The Door to determine how many of [its] members had their immigration case dismissed as a result of the Dismissal Policy," Baltimore nevertheless claims that the Door has continued to suffer harm as a result of the Dismissal Policy.  Baltimore 2d Supp. Decl. ¶¶ 6–9.  Although The Door should have asserted its factual bases for standing in Plaintiffs' opening brief in support of summary judgment, *see Delaware Dep't of Natural Resources v. EPA*, 785 F.3d 1, 7 (D.C. Cir. 2015), courts have also held that the failure to do so does not "automatically divest[] a plaintiff of Article III standing," *American Farm Bureau Federation v. EPA*, 984 F. Supp. 2d 289, 311 (Md. Pa. 2013).  Accordingly, and based on this Court's prior ruling on standing and reliance on similar factual standing assertions previously made by The Door, Opinion & Order, at 17–20, Defendants submit that only The Door has established organizational standing to pursue its APA claim against the EOIR Defendants.

the EOIR Guidance Email "may be fairly read to counsel the Immigration Judge to exercise his or discretion to waive the necessity of a written motion by DHS and grant on-the-spot oral dismissals without permitting a response . . . because of the exigencies of higher caseloads in detained cases." Opinion & Order at 28. As the Policy Memo affirmed, the EOIR Guidance Email "was not an EOIR Policy" and "could not direct or bind any Immigration Judge to make a specific decision in a case in a particular way," and Belsher Suppl Decl. Ex. A, at 1–3, but EOIR nonetheless withdrew the Email and directed immigration judges to not rely on it or use it to decide a case. *Id.* at 3.

Plaintiffs also assert that their claims are not moot because "IJs around the country continue to follow" the EOIR Dismissal Email after the Policy Memo withdrew it on September 23, 2025. Pls.' Opp. Br. at 20–22. In so doing, however, Plaintiffs rely on declarations based on undated incidents, data not provided to the government, and hearsay from three jurisdictions outside of this District. *See* Declaration of William Botsch dated Jan. 7, 2026 (ECF No. 72-2) ¶¶ 6, 8 (alleged hearsay statements from immigration judges in Miami, Florida granting oral motions to dismiss on three dates after September 2025); Declaration of Amy Lange dated Jan. 7, 2026 (ECF No. 72-3) ¶¶ 1–3 (citing unspecified "data" not included with declaration, that "since September 24, 2025, 34 cases have been dismissed by" immigration judges in Fort Snelling, Minnesota); Declaration of Emily Miller dated Jan. 7, 2026 (ECF No. 72-4) ¶¶ 7–8 (alleged hearsay statements from immigration judges in El Paso, Texas, granting oral motions to dismiss on two dates after September 2025, and citing unspecified "data" not included with declaration). Plaintiffs also claim that immigration judges are subject to termination or have been terminated for not relying on the EOIR Dismissal Email despite its withdrawal, but have

9

not provided any concrete evidence to support this claim.  Pls.' Opp. Br. at 21–22.[3]

Finally, Plaintiffs claim that their APA claims are not moot under the voluntary cessation exception because the EOIR Guidance Email could "reoccur."  Pls.' Opp. Br. at 22–24. However, the Policy Memo is clear that the EOIR Guidance Email will not reoccur because it stated that: (1) EOIR never intended to institute a "policy" in the first place, Belsher Supp. Decl. Ex. A, at 1, 3; and (2) "[n]o individual in EOIR leadership . . . may direct an Immigration Judge to decide a case in a particular way" because doing so would violate existing regulations, *id.* at 1–2 (citing 8 C.F.R. §§ 1003.0(c), 1003.9(c)).  In light of these facts, "there is no reasonable expectation that the conduct will recur," and Plaintiffs' APA claims against the EOIR Defendants should be dismissed as moot.  *Comer v. Cisneros*, 37 F.3d 775, 800 (2d Cir. 1994).

## CONCLUSION

Defendants respectfully request that the Court grant their motion for summary judgment as to the ICE Defendants and grant their motion to dismiss as to the EOIR Defendants.

---

[3] For example, Plaintiffs cite to the Declaration of Olivia Cassin, a former immigration judge in New York City who alleges she was terminated on November 21, 2025 "without a stated cause." Declaration of Olivia Cassin dated Dec. 1, 2025 (ECF No. 68-6) ¶ 1. Cassin claims, without any evidence, that "IJs who continued to exercise independent judgement and grant remote appearance or deny the government's motions to dismiss knew these decisions were being scrutinized," and "colleagues who did not act as an extension of ICE's removal effort [were] being fired all around us."  *Id.* ¶ 22.  These vague assertions do not establish "EOIR has tacitly *endorsed* the practice of IJs granting motions to dismiss on improper grounds."  Pls.' Opp. Br. at 20 (emphasis in original).

Dated: January 21, 2026
New York, New York

<div style="margin-left:50%;">

JAY CLAYTON
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By:    ___/s/  Tomoko Onozawa___
JEFFREY S. OESTERICHER
TOMOKO ONOZAWA
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:    (212) 637-2695/2721
Email:  jeffrey.oestericher@usdoj.gov
            tomoko.onozawa@usdoj.gov

</div>

11

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned hereby certifies that, measured by the word processing program used to prepare this brief, this brief complies with the word-count limitation of the rule, which is a maximum of 3,500. Excluding the caption, table of contents, table of authorities, signature blocks, or any required certificates, but including material contained in footnotes or endnotes, there are 3,471 words in this brief.

Dated: New York, New York
      January 21, 2026

                */s/ Tomoko Onozawa*
                TOMOKO ONOZAWA
                Assistant United States Attorney