**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; and THE DOOR, | |
| Plaintiffs, | |
| v. | 25 Civ. 6366 (PKC) |
| TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; DAREN K. MARGOLIN, in his official capacity as Director, Executive Office of Immigration Review; and PAMELA BONDI, in her official capacity as Attorney General, U.S. Department of Justice, | |
| Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ......................................................................................... i

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT ...........................................................................................................1

   I.   THE COURT SHOULD CONSIDER PLAINTIFFS' EXTRA-RECORD EVIDENCE...1

   II.   DEFENDANTS FAIL TO IDENTIFY REASONED DECISIONMAKING. ....................3

   III.   THE IMMIGRATION COURT ARREST POLICY IS ULTRA VIRES...............................7

   IV.   PLAINTIFFS HAVE STANDING. ........................................................................9

CONCLUSION .....................................................................................................10

# TABLE OF AUTHORITIES

**Cases** .................................................................................................................... Page(s)

*Andrews v. Martin,*
  (1862) 25 Victoria 371 ...........................................................................................7

*Blight v. Fisher,*
  3 F. Cas. 704 (C.C.D.N.J. 1809) ...........................................................................7

*Branch v. Smith,*
  538 U.S. 254 (2003) ...............................................................................................8

*Bridges v. Sheldon,*
  7 F. 17 C.C.D. Vt. 1880) ........................................................................................7

*Cameron v. Roberts,*
  58 N.W. 376 (1894) ...............................................................................................7

*Cole v. Hawkins,*
  (1738) 95 Eng. Rep. 396, Andrews 275 ................................................................7

*County of Suffolk v. Sec'y of the Interior,*
  562 F.2d 1368 (2d Cir. 1977) ................................................................................1

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
  140 S. Ct. 1891 (2020) ...................................................................................4, 5, 7

*Do No Harm v. Pfizer Inc.,*
  126 F.4th 109 (2d Cir. 2025) ...............................................................................10

*Doe v. McDonald,*
  128 F.4th 379 (2d Cir. 2025) ............................................................................9, 10

*Encino Motorcars v. Navarro,*
  136 S. Ct. 2117 (2016) .........................................................................................4, 5

*Erlenbaugh v. United States,*
  409 U.S. 239 (1972) ...............................................................................................8

*F.C.C. v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ...............................................................................................6

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ...............................................................................................8

*Fed. Defs. of N.Y. v. Fed. BOP*,
    954 F.3d 118 (2d Cir. 2020). ................................................................................10

*Hispanic Affairs Project v. Acosta*,
    901 F.3d 378 (D.C. Cir. 2018) ..............................................................................2

*Larned v. Griffin*,
    12 F. 590 (C.C.D. Mass. 1882) ..........................................................................7, 8

*Lopez Benitez v. Francis*,
    795 F. Supp. 3d 475 (S.D.N.Y. 2025)....................................................................6

*Miles v. McCullough*,
    1803 WL 810 (Pa. 1803) ........................................................................................7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .....................................................................................3, 4, 6, 7

*N.Y. v. FERC*,
    783 F.3d 946 (2d Cir. 2015) ...................................................................................7

*Nat. Res. Def. Council, Inc. v. FDA*,
    598 F. Supp. 3d 98 (S.D.N.Y. 2022).......................................................................2

*Nat'l Audubon Soc'y v. Hoffman*,
    132 F.3d 7 (1997).................................................................................................1, 2

*Nat'l Cable & Telecommunications Ass'n. v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ...............................................................................................4

*New York v. ICE*,
    466 F. Supp. 3d 439 (S.D.N.Y. 2020),
    *vacated as moot*, No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023)...............3, 9

*New York v. U.S. Dep't of Commerce*,
    351 F. Supp. 3d 502 (S.D.N.Y.),
    *aff'd in part, rev'd in part and remanded sub nom. Dep't of Com. v. New York*, 588 U.S. 752 (2019) ...1

*New York v. U.S. DOJ*,
    951 F.3d 84 (2d Cir. 2020), ...................................................................................5

*Oneida Cnty., N.Y. v. Oneida Indian Nation of N.Y.*,
    470 U.S. 226 (1985) ...............................................................................................8

*Orchard's Case,*
    (1828) 38 Eng. Rep. 987 ................................................................................7

*Ostroski v. Town of Southold,*
    443 F. Supp. 2d 325 (E.D.N.Y. 2006) ........................................................9

*Pablo Sequen v. Albarran,*
    No. 25-cv-06487, 2025 WL 3724878 (N.D. Cal. Dec. 24, 2025) .......................3, 4, 6

*Parker v. Hotchkiss,*
    18 F. Cas. 1137 (C.C.E.D. Pa. 1849) ........................................................8

*R.F.M. v. Nielsen,*
    365 F. Supp. 3d 350 (S.D.N.Y. 2019)......................................................1, 3

*S.F. v. USCIS,*
    944 F.3d 773 (9th Cir. 2019)...................................................................7

*Sampson v. Graves,*
    208 A.D. 522 (App. Div. 1924),
    *overruled on other grounds by Chase Nat. Bank of City of New York v. Turner,* 269 N.Y. 397, 199
    N.E. 636 (1936) ....................................................................................8

*Sierra Club v. U.S. Army Corps of Eng'rs,*
    772 F.2d 1043 (2d Cir. 1985) ..................................................................2

*Stilwell v. Off. of Thrift Supervision,*
    569 F.3d 514 (D.C. Cir. 2009) ................................................................6

*United States v. Fausto,*
    484 U.S. 439 (1988) ..............................................................................8

*United States v. Price,*
    361 U.S. 304 (1960) ..............................................................................8

*United States v. Wise,*
    370 U.S. 405 (1962) ..............................................................................9

*Velesaca v. Decker,*
    458 F. Supp. 3d 224 (S.D.N.Y. 2020).......................................................3

*Venetian Casino Resort, L.L.C. v. EEOC,*
    530 F.3d 925 (D.C. Cir. 2008) ................................................................2

**Statutes, Rules and Regulations**

8 C.F.R. § 1239.1(a) ............................................................................................................9

8 U.S.C. § 1229(a) ..............................................................................................................9

8 U.S.C. § 1229(e)(2)(B). ...................................................................................................9

**Other Authorities**

Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 Yale L. J. Forum 410 (2017) ............................................................8

## PRELIMINARY STATEMENT

In opposing summary judgment, Defendants do not contest, or even address, Plaintiffs' central argument—that ICE's unprecedented immigration court arrest policy is arbitrary and capricious because the agency did not consider the core principle animating its prior policy: chilled access to the courts. Nor have Defendants located a "good reason" in the administrative record for this policy change. Similarly, Defendants neither dispute nor address the caselaw demonstrating the common-law privilege against civil arrests protects the courthouse as a *place* and that the privilege's application is governed by the purpose-based test. Finally, Defendants do not dispute the merits of Plaintiffs' claims against the EOIR Dismissal Policy, arguing only that Plaintiffs lack standing for reasons overlapping entirely, and impermissibly, with their mootness arguments.

## ARGUMENT

## I.    THE COURT SHOULD CONSIDER PLAINTIFFS' EXTRA-RECORD EVIDENCE.

Defendants argue this Court should disregard Plaintiffs' extra-record evidence relevant to the Immigration Court Arrest Policy.[1] ECF 70 at 1–4. This evidence is not submitted to "substitute a new record," *id.* at 3 (citation omitted),[2] but for three purposes, recognized under Second Circuit precedent.[3] *See* ECF 68 at 11–12 (identifying several exceptions to the record rule). First, Courts may consider contextual material where "helpful in understanding the problem faced by the agency" and to provide an adequate baseline for what is "relevant" or "important" in its decision-making. *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 633 (S.D.N.Y.), *aff'd in part, rev'd in part and remanded sub nom. Dep't of Com. v. New York*, 588 U.S. 752 (2019). Plaintiffs' evidence provides precisely this type of

---

[1] Defendants do not contest that the Court may consider Plaintiffs' evidence on the EOIR Dismissal Policy for which no administrative record was produced. *See, e.g., R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 373–75 (S.D.N.Y. 2019); *see also Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (1997) (extra-record review permitted when the court "cannot evaluate the challenged action on the basis of the record before it").

[2] Plaintiffs need not seek extra-record discovery or request the agency supplement the record as Defendants suggest. ECF 70 at 2. Plaintiffs' extra-record arguments assume the record is the complete universe of records considered by the agency.

[3] Defendants concede multiple exceptions to the extra-record rule, including those invoked here. ECF 70 at 1 n.1, 2.

1

critical "background information" on the complex system at the center of ICE's new policy: removal proceedings. *Id*.; *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1052 (2d Cir. 1985) (allowing extra-record material for limited explanatory purposes); *see, e.g.,* ECF 68-10 ¶ 9 (describing ICE's detention practices for people in removal proceedings); ECF 68-6 ¶ 7 (same); ECF 45-1 ¶¶ 3, 5–6, 8, 13, 14 (explaining operation of immigration court dockets and impact of detention on cases); ECF 69-7 (stating ICE requirements noncitizens attend "check in" appointments); ECF 69-8 (stating EOIR's requirement noncitizens provide current addresses); ECF 69-9 (same but for ICE).

Second, Plaintiffs' extra-record evidence demonstrates that the agency overlooked a critical aspect of immigration court arrests, including obvious alternatives. *Nat. Res. Def. Council, Inc. v. FDA*, 598 F. Supp. 3d 98, 106–07 (S.D.N.Y. 2022) (allowing extra-record evidence "for the limited purpose[] of ascertaining whether the agency considered all the relevant factors," and explaining that the "relevant factors" inquiry targets significant subject matter the agency failed to address); *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14–15 (2d Cir. 1997) (extra-record material may be necessary, including when "the agency has not considered all relevant factors"); *see, e.g.,* ECF 69-10 (outlining ICE's alternative to detention program); ECF 69-1–ECF 69-6 (media coverage noting court arrests disrupt reliance interests and chill access); ECF 68-11 ¶ 13 (discussing noncitizens' reliance interest in prior policy); ECF 68-2 ¶¶ 6–8 (same); ECF 68-4 ¶¶ 7–8, 16–18 (same); ECF 68-5 ¶ 9 (same); *see also* ECF 68 at 8, 18–19 (collecting declarations discussing reliance interest and absenteeism).

Third, Plaintiffs' extra-record evidence is offered to establish the policy's operation and scope including, necessarily, how the policy deviates from prior agency practice. *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 928 (D.C. Cir. 2008) (courts may look beyond record to "ascertain the contours of the precise policy") (cleaned up); *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 386 n.4 (D.C. Cir. 2018) (declarations outside the administrative record are permissible to prove existence of DHS policy); *Velesaca v. Decker*, 458 F. Supp. 3d 224, 237 (S.D.N.Y. 2020) (APA "applies equally to

practices implied from agency conduct") (cleaned up); *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 373–75 (S.D.N.Y. 2019) (same). Defendants argue this Court need look no further than ICE's 2025 Memo,[4] which ICE claims authorizes such arrests. ECF 70 at 3. However, that document says nothing about *immigration* courts, appears to *exclude* them, and differs in critical respects from the policy ICE has implemented. ECF 68 at 6–7, 16–17. Only one document in the record mentions immigration courts, and it largely prohibits arrests at those courts. A.R. 25–27. Plaintiffs' evidence is thus critical and necessary context for the policy change. *See, e.g.,* ECF 68 at 2, 4–5, 7 (citing declarations/data showing arrests at immigration courts were rare prior to policy change and describing nature of new policy).

Nonetheless, even if review is limited to ICE's administrative record, this Court should grant summary judgment on Plaintiffs' claim that the Immigration Court Arrest Policy is arbitrary and capricious. Defendants point to nothing in their sparse administrative record demonstrating that the agency engaged in "reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). The record conclusively shows ICE failed to consider an important issue central to the prior policy: chilled access to the courts. *See* ECF 68 at 12–14. Moreover, the limited explanation for the change—a short few sentences in the 2025 Memo copied and pasted from the 2018 Memo—does not survive basic scrutiny. *See New York v. ICE*, 466 F. Supp. 3d 439, 449 (S.D.N.Y. 2020) (holding "conclusory references to 'reduce[d] safety risks'" insufficient), *vacated as moot*, 2023 WL 2333979 (2d Cir. Feb. 28, 2023); *Pablo Sequen v. Albarran,* 2025 WL 3724878, at *13–14 (N.D. Cal. Dec. 24, 2025) (holding the 2025 Memo's justifications are inapplicable to arrests at immigration courts).

## II.    DEFENDANTS FAIL TO IDENTIFY REASONED DECISIONMAKING.

Defendants do not dispute that ICE failed to consider chilled access to immigration courts in

---

[4] Defendants claim Plaintiffs "challenge the Memo solely." ECF 70 at 3. Not so. Plaintiffs challenge the government's sweeping campaign of immigration-court arrests—of which the 2025 Memo is, at most, one written articulation and piece of evidence. The Complaint repeatedly alleges the "ICE Courthouse Arrest Policy," which differs in critical respects from the memo, including the highly disruptive and public nature of the arrests. *See* Compl. ¶¶ 1, 3, 27, 35, 52–54.

changing their arrest policy at those courts. Nor could they. The government admitted the 2025 Memo does not address chilled access in *Pablo Sequen*.[5] 2025 WL 3724878, at *11.[6] And Defendants have never disputed that chilled access—central to ICE's prior policy—is an "important aspect of the problem." *State Farm*, 463 U.S. at 43. The policy is arbitrary and capricious on this basis alone. *Id.*; *see Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (agency must provide "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy").

Defendants also fail to identify good reasons for the Immigration Court Arrest Policy, a separate basis on which this Court should find the policy arbitrary and capricious. While Defendants argue the 2025 Memo's carve-out limiting arrests at "non-criminal" courts should be read to only apply to state courts,[7] ECF 70 at 5–6, Defendants do not deny, consistent with the 2025 Memo's plain text, immigration courts are "non-criminal or specialized courts . . . wholly dedicated to non-criminal proceedings," A.R. 2, or point to anything in the administrative record explaining their disparate treatment. That ICE has decided to exclude immigration courts from the protections afforded to other non-criminal courts only renders the policy more arbitrary. *Nat'l Cable & Telecommunications Ass'n. v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("[U]nexplained inconsistency . . . is a reason for holding [the policy] to be an arbitrary and capricious change from agency practice.").

Defendants next suggest that it was reasonable for ICE to change its courthouse arrest policy because it had changed its policy previously. ECF 70 at 6–7. This fact alone does not supply a "good

---

[5] The remainder of the administrative record is similarly devoid of any consideration of chill, including, notably, prior decisions finding the predecessor 2018 Memo chilled access to the courts, and public reporting on how immigration court arrests in particular would chill attendance and disturb noncitizens' reliance on the prior policy. *See* ECF 68 at 14; *e.g.*, ECF 69-2 at 3, ECF 69-3 at 4, ECF 69-4 at 3, ECF 69-5 at 6, ECF 69-6 at 5.

[6] Defendants urge this Court to disregard *Pablo Sequen*—the only other decision addressing Plaintiffs' claim—without explanation and without addressing their relevant admissions in that case. ECF 70 at 11 n.4.

[7] Specifically, Defendants urge the Court to make this atextual inference because the provision was adapted from language proposed by the New York Chief Administrative Judge. ECF 70 at 5-6. The Court should disregard this argument as an "impermissible 'post-hoc rationalization,'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1908 (2020) (citation omitted), unsupported in *this* administrative record and because the provision was not adapted word-for-word from that proposed language.

reason" for the policy change or relieve ICE of its obligation to explain the change. Critically, Defendants do not dispute that the new policy is an unprecedented departure from ICE's longstanding policy and practice of largely avoiding arrests at immigration courts, ECF 68 at 1–6, 16–17; ECF 72 at 6–8. Contrary to Defendants' unsubstantiated suggestion otherwise[8], ECF 70 at 8–9, the vast majority of the public could, in reliance on that past policy and practice, attend immigration court without fear of arrest, ECF 68 at 1–3; A.R. 20–28 (limiting courthouse arrests to enumerated categories); *Encino Motorcars*, 136 S. Ct. at 2126.[9] Now, as Defendants admit, the new policy contains no limiting principle, expanding courthouse arrest authority to all noncitizens "who are subject to removal,"—*i.e.* everyone in removal proceedings—in alignment with the President's directive to take enforcement actions "against all inadmissible and removable aliens." ECF 70 at 7 (citation omitted).

Moreover, the 2014, 2015, and 2018 Memos do not provide Defendants with a "reasoned explanation" for permitting arrests of noncitizens dutifully appearing at *immigration* courts, as those memos concerned arrests of noncitizens who were evading ICE and appearing at *criminal* courts. *Regents*, 140 S. Ct. at 1911–13 (rescission of DACA violates APA because, *inter alia*, the agency's reasoning relied largely on legal analysis concerning a different program, DAPA); ECF 68 at 16–17; ECF 72 at 7–8. Defendants ignore this argument and have no answer to the broader point that the agency failed to consider the unique circumstances relevant to arresting noncitizens while in immigration proceedings, including the government's statutory obligation to *incentivize* attendance at those proceedings. ECF 68 at 17–19; ECF 72 at 11. Defendants do not deny it is generally unlawful to arrest noncitizens in removal proceedings absent changed circumstances, *see* ECF 68 at 1–2, arguing only that Plaintiffs' citations concern "ICE's authority to detain individuals," not the location of arrest,

---

[8] Defendants provide no support for their claim that there has been a "longstanding presence of law enforcement agents performing lawful enforcement activities in courthouses," ECF 70 at 8, much less evidence that this has ever been true with respect to *ICE* agents conducting *immigration* enforcement in *immigration* courts.

[9] Defendants' reliance on *New York v. U.S. DOJ*, 951 F.3d 84, 123 (2d Cir. 2020), is misplaced. ECF 70 at 9. That court held only that *Encino* did not apply because the agency had not changed position, an issue not meaningfully in dispute here.

ECF 70 at 7–8. *But see Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 499 (S.D.N.Y. 2025) ("[T]reating attendance in immigration court as a game of detention roulette is not consistent with the constitutional guarantee of due process."). But the relevant and undisputed point remains that ICE's policy vastly, arbitrarily expands arrest authority for noncitizens in proceedings without considering that this group cannot, as a general matter, be lawfully detained. ECF 68 at 1–2.

    In their only attempt to defend the limited justifications in the 2025 Memo,[10] Defendants claim arrests at immigration courts are necessary to reduce "safety risks." ECF 70 at 9–10. But since the prior policies *did* account for safety risks and expressly *permitted* noncitizens posing such risks to be arrested at courthouses, *see* A.R. 20, 21, 26, the agency was required to provide a reasoned and rational explanation for this change. *See State Farm*, 463 U.S. at 43 ("The reviewing court . . . may not supply a reasoned basis for the agency's action that the agency itself has not given"); *cf. F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 517–18 (2009) (discussing "entirely rational" agency reasons for change in enforcement activity). And nothing in the administrative record addresses the purported safety risks posed by people attending immigration court who ICE has "necessarily already determined" are "neither a flight risk nor threat to the public." *Pablo Sequen*, 2025 WL 3724878, at *13. While the parties agree that ICE need not have analyzed "empirical evidence" in coming to its decision, ECF 70 at 9–10, the APA, and Defendants' own caselaw, nonetheless requires ICE to justify its policy change with "a reasoned explanation." *Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009).

    Finally, Defendants neither deny that ICE had obvious reasonable alternatives to broadly authorize arrests at immigration court nor dispute that arrests at other locations are alternatives long utilized by ICE, including under the prior policies. *See* ECF 70 at 10. While "DHS was not required to . . . 'consider all policy alternatives in reaching its decision,'" "when an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing

---

[10] Defendants notably omit any defense of the inapplicable rationale concerning localities that do not cooperate with ICE.

[policy].'" *Regents*, 140 S. Ct. at 1914, 1913 (cleaned up). The administrative record shows it plainly did not. Defendants' characterization of Plaintiffs' arguments as mere "policy disagreements" misses the point, ECF 70 at 10.[11] Plaintiffs do not attack Defendants' ultimate policy choice, but rather, the arbitrary manner in which they arrived at that choice. As "the judgment made in" decades prior was to limit immigration court arrests and use other enforcement methods, the prior policy "may not be abandoned without any consideration whatsoever of" these alternatives. *State Farm*, 463 U.S. at 51.

## III.     THE IMMIGRATION COURT ARREST POLICY IS ULTRA VIRES.

Defendants do not deny that the common-law privilege against courthouse arrests "has two distinct applications," including one that applies "to *courthouses*" in particular and which squarely applies to the *immigration courthouse* arrests at issue here. ECF 68 at 20 (citations omitted). Failing to address the caselaw on this application, *see, e.g., Orchard's Case*, (1828) 38 Eng. Rep. 987, 987–88; *Cole v. Hawkins*, (1738) 95 Eng. Rep. 396, 396, Andrews 275, 275, Defendants instead erroneously suggest that certain English and American caselaw narrowed the privilege to only its application to persons. ECF 70 at 12. That cannot be reconciled with the text and holdings of those cases. *Compare id.* at 12–13 *with* ECF 68 at 20.[12] The caselaw demonstrates that the privilege as to courthouses remains unaltered. *See supra* n.12. Indeed, *Cole*, 95 Eng. Rep. 396, Andrews 275, on which several of the cases cited by Defendants rely, is an English case discussing the privilege as applied to courthouses. *See id.*

---

[11] Defendants' cites on this point are inapposite: in those cases, the agency explained its reasoning and alternatives were not at issue. *N.Y. v. FERC*, 783 F.3d 946, 959 (2d Cir. 2015); *S.F. v. USCIS*, 944 F.3d 773, 805 (9th Cir. 2019).

[12] *See, e.g., Blight v. Fisher*, 3 F. Cas. 704, 704–05 (C.C.D.N.J. 1809) ("service of process, whether a capias or summons, in the actual or constructive presence of the court, is a contempt"); *Cameron v. Roberts*, 58 N.W. 376, 376 (1894) ("The service of process upon a justice while holding court, or upon a party and witnesses in attendance upon, and in the presence of, the court, was a contempt of court."); *Bridges v. Sheldon*, 7 F. 17, 44 (C.C.D. Vt. 1880) ("This service, so near the time of commencement of proceedings, was probably in the constructive presence of the authority acting under the order, which would of itself be a contempt.") (citing *Blight*, 3 F. Cas. at 704–05); *Miles v. McCullough*, 1803 WL 810, at *1 (Pa. 1803) (extending the privilege from arrests to service of process for a party served a summons while attending court); *Larned v. Griffin*, 12 F. 590, 594 (C.C.D. Mass. 1882) (explaining "the older and narrower view" of the privilege as an "offender may be punishable for contempt if the arrest is made in the actual or constructive presence of the court" because "this is wholly the privilege of the court"). Defendants incorrectly assert that the privileged defendant in *Andrews v. Martin*, (1862) 25 Victoria 371, was arrested while "dining near bankruptcy court" after adjournment, ECF 70 at 12. The decision clearly states he was arrested when "leaving the insolvent court" and "just as he reached the outside of the court." *Id.* at 271.

at 396 (holding the privilege applied to an attorney served process in a courthouse).

Notably, Defendants have failed to address the purpose-based test for the privilege's application, even though the privilege's long-term development in caselaw is consistently explained by the test's demands.[13] *See* ECF 68 at 20; ECF 23 at 14–15; ECF 45 at 8–9; ECF 72 at 15–16. And contrary to Defendants' assertion, Plaintiffs have addressed "judicial decisions," ECF 70 at 13, on the privilege after long-arm statutes and incorporate those arguments herein. *See* ECF 72 at 12–15.

Defendants also do not clearly explain *how*, within the limits of the statutory interpretation canon on later-enacted laws, 8 U.S.C. § 1229(e) "reflects Congress's recognition that courthouse arrests are permitted under the INA." *See* ECF 68 at 21; ECF 70 at 13–14. Instead, Defendants point to inapposite caselaw that only illustrates the limited exceptions to the rule that later-enacted laws have no interpretive value in reading earlier-enacted statutes.[14] What is clear is the 1952 INA never directly addressed courthouse arrests, a common-law privilege against civil arrests at courthouses continues to exist, *see* ECF 23 at 13–16; ECF 45 at 7–9; ECF 72 at 12–14, and "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price*, 361 U.S. 304,

---

[13] As American courts have recognized, the "older" view of the privilege protects courthouses as a place, likely to ensure the King's peace. *Larned*, 12 F. at 594; ECF 45 at 9 n.5; *see also Sampson v. Graves*, 208 A.D. 522, 524 (App. Div. 1924) (explaining the privileges dates as far back as "the Year Book of 13 Henry IV, I. B."), *overruled on other grounds by Chase Nat. Bank of City of New York v. Turner*, 269 N.Y. 397, 199 N.E. 636 (1936); Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 Yale L. J. Forum 410, 428 (2017). The privilege later began to apply to persons, *see* Lasch, *A Common-Law Privilege*, 127 Yale L. J. Forum at 424, and expanded to service of process and summons, *see, e.g., Parker v. Hotchkiss*, 18 F. Cas. 1137, 1138 (C.C.E.D. Pa. 1849) (discussing the "necessities of the judicial administration" in extending privilege to summonses). The privilege's expansion from protecting a place to include protecting persons and later against many types of actions all conform with the privilege's purpose. *See id.*

[14] Several cases cited by Defendants concern statutory interpretation in light of either judicial caselaw or agency actions of which Congress was aware when passing subsequent statutes; such is not the case here. *See, e.g., Branch v. Smith*, 538 U.S. 254, 281 (2003) (interpretation of later enacted statute had to consider Congress's awareness of caselaw interpreting a previously-enacted, relevant provision); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143–44 (2000) (law on an agency's regulatory authority must be guided by subsequent acts passed "against the backdrop" of agency disclaiming regulatory authority, showing Congress "effectively ratified th[is] [agency's] long-held position"). Unlike the 1952 INA's silence on courthouse arrests, *United States v. Fausto* concerned revising a long-standing judicial interpretation of a statutory phrase in light of a later-enacted statute. 484 U.S. 439, 453–54 (1988). In *Erlenbaugh v. United States*, 409 U.S. 239 (1972), the statutes being read together were enacted "by the same legislative body at the same time," unlike here *Id.* at 244. And in *Oneida Cnty., N.Y. v. Oneida Indian Nation of N.Y.*, 470 U.S. 226 (1985), the Court pointed to a subsequent provision's contemplation of common-law remedies to confirm the lack of pre-emption of the common law and correct application of the nonderogation canon. *Id.* at 237–39. The reverse—using a subsequent provision's "contemplation" of common-law violations as evidence of pre-emption—would eviscerate the nonderogation canon. *See* ECF 23 at 13.

313 (1960); *accord United States v. Wise*, 370 U.S. 405, 414 (1962) (collecting cases). What "Congress thought in 2006," ECF 70 at 14, about the 1952 Congress's intentions in passing the INA is irrelevant.

Finally, § 1229(e)'s plain language and legislative history do not conclusively demonstrate that the 2006 Congress contemplated that the INA authorized widespread arrests at courthouses. § 1229(e)'s reference to "an enforcement action leading to a removal proceeding" must be read in context subsection (e)(2)(B)'s reference to courthouses.[15] *See* 8 U.S.C. § 1229(e)(2)(B). The provision contemplates that a removal proceeding could result from court appearances arising from abusive conduct. *Id.* The "enforcement action" is thus likely to be a "criminal arrest[] by state [or] local law enforcement." *New York*, 466 F. Supp. 3d at 447. And more generally, "an enforcement action leading to a removal proceeding" must be read in the context of the INA, which merely requires service of a Notice to Appear on the noncitizen to commence removal proceedings, not a civil immigration arrest. 8 U.S.C. § 1229(a); 8 C.F.R. § 1239.1(a). As the legislative history cited by Defendants demonstrates, *see* ECF 70 at 15–16, there is no evidence that the 2006 Congress contemplated civil immigration arrests at courthouses. Instead, Congress was concerned primarily with ensuring that victims of abuse could access justice free of fear of immigration consequences. *See id.* That purpose is not served by making immigration courthouses traps for noncitizens seeking their day in court.

## IV.    PLAINTIFFS HAVE STANDING.[16]

Defendants' argument that Plaintiffs have no "standing to continue to pursue their challenge to [the Dismissal Policy]" fails.[17] ECF 70 at 17. First, "[s]tanding is determined as of the filing of the complaint" and "[a]ny events occurring after that time do not pertain to standing," but mootness. *Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025). This Court already found that The Door has

---

[15] Defendants misstate Plaintiffs' position as asserting "only criminal arrests" are excluded from the privilege, ECF 70 at 14, but it is § 1229(e) largely contemplates criminal arrests, in conformity with the privilege's protections, *see* ECF 68 at 21.
[16] Defendants do not raise any arguments on the EOIR Dismissal Policy's reviewability or the merits of Plaintiffs' claims against that policy, waiving them. *See Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 340 (E.D.N.Y. 2006).
[17] Defendants do not contest—and have never contested—Plaintiffs' standing to challenge the Immigration Court Arrest Policy. Nor could they. *See* ECF 51 at 17–20; ECF 68 at 10–11.

demonstrated organizational standing by showing both challenged policies have caused a significant diversion of resources from its core work. ECF 51 at 17–20 (citation omitted). Thus, Plaintiffs demonstrated standing to challenge the Dismissal Policy as of the filing of the complaint and "[t]hat is the end of [the] standing inquiry." *McDonald*, 128 F.4th at 384. Defendants' argument that Plaintiffs are no longer being harmed after the policy's purported rescission goes solely to mootness. *See Fed. Defs. of N.Y. v. Fed. BOP*, 954 F.3d 118, 126 (2d Cir. 2020). For the reasons set forth previously in Plaintiffs' opposition, ECF 72 at 17–25, Defendants' mootness arguments also fail.

Second, both Plaintiffs have also demonstrated associational standing to challenge the Dismissal Policy by identifying at least one member who would "otherwise have standing to sue in their own right," *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 117–18, 122 (2d Cir. 2025). *See* ECF 68–2 (Door member describing his ongoing removal proceedings which could be dismissed pursuant to Dismissal Policy); ECF 68-4 (same for ACT member).[18]

Third, in any event, Plaintiff The Door has shown that it continues to suffer ongoing harm as a result of the Dismissal Policy as it has had to divert of resources away from its core mission of providing comprehensive legal and other services to young people in order to address the effects of the policy. This includes devoting resources to meet the increased demand for legal services from members and at The Door's legal clinic; updating know-your-rights materials; and training staff. ECF 72-1 ¶¶ 5–12. These facts are more than sufficient to show that the Dismissal Policy continues to "cause[] a significant diversion of resources from [its] core work." ECF 51 at 20.

## CONCLUSION

For these reasons, this Court should vacate the challenged policies in full under 5 U.S.C. § 706, a remedy Defendants do not dispute is appropriate and necessary for full relief. *See* ECF 68 at 25.

---

[18] Additional allegations and declarations on unnamed members, while not necessary to establish standing, further support the analysis by illustrating the widespread impact of the challenged policy. ECF Nos. 23-1, 23-8, 68-3, 68-14, 72-1.

Dated:  January 21, 2026
        New York, New York

NEW YORK CIVIL LIBERTIES UNION
    FOUNDATION

/s/ Amy Belsher
Amy Belsher
Elizabeth Gyori
Wafa Junaid
Claire Molholm
Thomas Munson
M. Porter*
Robert Hodgson
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3300


EMERY CELLI BRINCKERHOFF ABADY WARD &
    MAAZEL LLP

Katherine Rosenfeld
Samuel Shapiro
Emily Wanger
One Rockefeller Plaza, 8th Floor
New York, NY 10020
Tel: (212) 763-5000

*Admitted pro hac vice

AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION

Noor Zafar
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION

Michael K.T. Tan
Hannah Steinberg*
Oscar Sarabia Roman*
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0770


MAKE THE ROAD NEW YORK

Harold Solis
Paige Austin
301 Grove Street
Brooklyn, NY 11237
Tel: (718) 418-7690

*Counsel for Plaintiffs*

11