UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AFRICAN COMMUNITIES TOGETHER, and THE DOOR,

Plaintiffs,

v.

TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; MARKWAYNE MULLIN, in his official capacity as Secretary of the United States Department of Homeland Security; DAREN K. MARGOLIN, in his official capacity as Director, Executive Office of Immigration Review; and TODD BLANCHE, in his official capacity as Acting Attorney General, U.S. DEPARTMENT OF JUSTICE,

Defendants.

25 Civ. 6366 (PKC)

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO REVISE THE COURT'S OPINION AND ORDER DATED SEPTEMBER 12, 2025**

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2695/2721
Email: jeffrey.oestericher@usdoj.gov
            tomoko.onozawa@usdoj.gov

JEFFREY S. OESTERICHER
TOMOKO ONOZAWA
Assistant United States Attorneys
*Of Counsel*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND .................................................................................................................3

    I.     Statutory Background ...........................................................................................3

    A.    DHS Guidance Regarding Civil Immigration Enforcement Actions ......................4

    B.    DHS Guidance Regarding Civil Immigration Enforcement Actions In and Near Courthouses..............................................................................................4

        1.    Pre-2021 Courthouse Arrest Guidance .........................................................4

        2.    The 2021 Courthouse Arrest Guidance.........................................................6

        3.    The 2025 Courthouse Arrest Guidance.........................................................7

ARGUMENT .....................................................................................................................9

    I.     Legal Standards...................................................................................................9

    II.    Plaintiffs Cannot Demonstrate a Clear Likelihood of Success on the Merits of Their Claim Under the APA..............................................................................10

    III.   Plaintiffs Fail To Make a Strong Showing of Irreparable Harm ...........................12

    IV.   The Balance of Equities and Public Interest Weigh in Favor of the Government....................................................................................................13

    V.    The Scope of Plaintiffs' Requested Stay Should Be Limited to Immigration Courts in New York City ................................................................14

    VI.   Plaintiffs Should Be Required To Post A Bond.....................................................17

CONCLUSION..................................................................................................................18

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Able v. United States,*
    44 F.3d 128 (2d Cir. 1995)......................................................................................... 9

*Ahmed v. Cissna,*
    327 F. Supp. 3d 650 (S.D.N.Y. 2018)........................................................................ 12

*Arizona v. United States,*
    567 U.S. 387 (2012).................................................................................................... 3

*Banco San Juan Internacional, Inc. v. Federal Reserve Bank,*
    762 F. Supp. 3d 247 (S.D.N.Y. 2025)........................................................................ 10

*Bionpharma Inc. v. CoreRx, Inc.,*
    582 F. Supp. 3d 167 (S.D.N.Y. 2022)........................................................................ 13

*Block v. Cmty Nutrition Inst.,*
    467 U.S. 340 (1984)................................................................................................... 10

*Borey v. Nat'l Union Fire Ins. Co.,*
    934 F.2d 30 (2d Cir. 1991)........................................................................................ 13

*Bowen v. Michigan Academy of Family Physicians,*
    476 U.S. 667 (1986)................................................................................................... 10

*Davis v. Pension Ben. Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009)................................................................................. 14

*E. Air Lines, Inc. v. Civil Aeronautics Bd.,*
    261 F.2d 830 (2d Cir. 1958)........................................................................................ 9

*Heckler v. Chaney,*
    470 U.S. 821 (1985)................................................................................................... 10

*Kamerling v. Massanari,*
    295 F.3d 206 (2d Cir. 2002)................................................................................. 12, 13

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State,*
    104 F.3d 1349 (D.C. Cir. 1997)................................................................................. 11

*Lincoln v. Vigil,*
    508 U.S. 182 (1993)................................................................................................... 10

*Lunney v. United States*,
  319 F.3d 550 (2d Cir. 2003)..................................................................................... 10

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994)............................................................................................... 14

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)................................................................................................. 9

*Miranda v. Garland*,
  34 F.4th 338 (4th Cir. 2022) .................................................................................. 14

*Munaf v. Geren*,
  553 U.S. 674 (2008)................................................................................................. 9

*New York v. DHS*,
  969 F.3d 42 (2d Cir. 2020)............................................................................... 15, 16

*New York v. U.S. Dep't of Educ.*,
  No. 20 Civ. 4260 (JGK), 2020 WL 4581595 (S.D.N.Y. Aug. 9, 2020) ..................... 9

*Nken v. Holder*,
  556 U.S. 418 (2009)............................................................................................... 13

*Ryan v. ICE*,
  974 F.3d 9 (1st Cir. 2020)...................................................................................... 12

*Sussman v. Crawford*,
  488 F.3d 136 (2d Cir. 2007)..................................................................................... 9

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025)......................................................................................... 14, 15

*Tucker Anthony Realty Corp. v. Schlesinger*,
  888 F.2d 969 (2d Cir. 1989)................................................................................... 13

*Webster v. Doe*,
  486 U.S. 592 (1988)............................................................................................... 10

*Westchester v. HUD*,
  778 F.3d 412 (2d Cir. 2015)................................................................................... 10

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008)............................................................................................... 9, 13

iii

**Statutes**

5 U.S.C. § 701(a)(2)...................................................................................................... 2

5 U.S.C. § 705................................................................................................ 1, 3, 9, 15

8 U.S.C. § 1225............................................................................................................ 1

8 U.S.C. § 1226(a) ................................................................................................. 1, 3, 11

8 U.S.C. § 1231 ............................................................................................................ 1

8 U.S.C. § 1357(e) .................................................................................................... 1, 11

8 U.S.C. § 1182........................................................................................................... 1

8 U.S.C. § 1226(a) ...................................................................................................... 3

**Rules**

Fed. R. Civ. P. 54(b) ................................................................................................... 1

Fed. R. Civ. P. 65(c) ................................................................................................. 17

**Regulations**

8 C.F.R. § 1003.38(a)............................................................................................... 13

**Other Authorities**

Executive Order 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017)...................................... 5, 6

Executive Order 13,993, 86 Fed. Reg. 7051 (Jan. 20, 2021)......................................... 6

Executive Order 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025)......................................... 7

Executive Order 14,165, 90 Fed. Reg. 8467 (Jan. 20, 2025)...................................... 7, 8

H.R. Rep. No. 1980, 79th Cong., 2d Sess. 43 (1946) ................................................. 15

Defendants respectfully submit this memorandum of law in opposition motion filed by plaintiffs African Communities Together ("ACT") and The Door (jointly, "Plaintiffs") pursuant to Fed. R. Civ. P. 54(b) to revise that part of the Court's Opinion and Order dated September 12, 2025 (ECF No. 51), which denied Plaintiffs' prior stay motion under Section 705 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 705.

## PRELIMINARY STATEMENT

Under the Constitution and the Immigration and Nationality Act ("INA"), the Executive Branch has the authority to arrest and detain aliens unlawfully present in the United States to effectuate their removal. Congress has codified in the INA the Executive Branch's constitutional and inherent authority to investigate, arrest, and detain aliens who are suspected of being, or found to be, unlawfully present in the United States to effectuate their removal. 8 U.S.C. §§ 1182, 1225, 1226, 1231, 1357. In accordance with its plenary arrest authority under the INA, the U.S. Department of Homeland Security ("DHS") and its component agencies have long exercised their discretion to determine where and how to exercise that authority, given the government's strong interest in enforcing federal immigration laws that authorize the removal of aliens who do not have a legal right to remain in the United States. Consistent with that discretion, for decades, DHS and its component and predecessor agencies have issued internal guidance to agency law enforcement officers regarding the factors they should consider and approvals, if any, they should obtain before conducting civil immigration enforcement actions in certain public locations. As shown in the Administrative Record ("AR") in this case (ECF No. 64), that guidance has frequently changed to adapt to changes in enforcement priorities.

Plaintiffs challenge under the APA a January 2025 change in internal guidance previously issued by U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs

and Border Protection ("CBP") to their immigration officers. On April 27, 2021, ICE and CBP had jointly issued a guidance memorandum ("2021 Guidance"), which governed civil immigration enforcement actions in or near courthouses. (AR 25–27). Unlike previous guidance memoranda, the 2021 Guidance expressly defined courthouses to include, for the first and only time, "immigration courts" maintained by the Executive Office for Immigration Review. (AR 26). The 2021 Guidance reflected the prior administration's policy determination that civil immigration enforcement actions could only be taken in or near courthouses if specific limited circumstances were present. (AR 26).

However, on January 21, 2025, then-Acting ICE Director Caleb Vitello issued new internal interim guidance ("2025 Interim Guidance") (AR 51–53) which rescinded the 2021 Guidance for ICE, and thus rescinded the prior guidance's limitation on ICE civil immigration enforcement actions in or near immigration courts. (AR 51). On May 27, 2025, Acting ICE Director Todd Lyons issued a final guidance document ("2025 Final Guidance"), which superseded the January 2021 Guidance. (AR 1–3).

Plaintiffs now move for an order to stay the rescission of the 2021 Guidance "throughout the United States" for the pendency of these proceedings. *See* Proposed Order (ECF No. 85-1) at 2. As demonstrated below, Plaintiffs' stay motion should be denied because they cannot establish a likelihood of success on the merits. As a matter of law, the rescission is not reviewable under the APA because policy choices about where ICE can best exercise its civil immigration enforcement authority are committed to agency discretion by law, and there is no meaningful standard by which the Court can evaluate the appropriateness of ICE's decision to conduct civil immigration enforcement actions in courthouses, which are open to the public. 5 U.S.C. § 701(a)(2).

2

If, nonetheless, this Court were to grant Plaintiffs a stay under 5 U.S.C. § 705, the geographic scope of that stay should not be nationwide but should be limited to the three immigration courts in New York City.[1]

## BACKGROUND

### I.    Statutory Background

The federal government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012); *see* U.S. Const. art. I § 8, cl. 4 (granting Congress the power to "establish an uniform Rule of Naturalization"). Pursuant to that authority, Congress has provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Congress has also provided that "without [a] warrant," a federal officer may "arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any [] law or regulation [regulating the admission, exclusion, expulsion, or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest." *Id.* § 1357(a)(2). These statutes confer arrest authority that is generally plenary and unqualified. Congress has limited the authority to search for aliens in certain specific locations, but none of those locations include courthouses. *Id.* § 1357(a)(3), (e).

---

[1] The Executive Office of Immigration Review ("EOIR") maintains three immigration courts in Manhattan at the following locations: (1) 26 Federal Plaza; (2) 290 Broadway; and (3) 201 Varick Street. There are no EOIR immigration courts in the Bronx, Brooklyn, Queens, or Staten Island.

**A.    DHS Guidance Regarding Civil Immigration Enforcement Actions**

Since at least 1993, DHS, its predecessor, the Immigration and Naturalization Service, and its component agencies have issued guidance memoranda regarding civil immigration enforcement activities in or near specified locations. These memoranda have authorized and provided guidance for civil immigration enforcement actions in or near places of worship (AR 4–6, 13–14, 15, 18), schools (AR 4–6, 12, 15–17, 18–19), religious ceremonies (AR 4–6, 13–14, 15–17, 18–19), public demonstrations (AR 15–17), community centers (AR 18–19), hospitals (AR 18–19), and courthouses (AR 1–3, 20–24, 25–27, 28, 51–55). ICE guidance memoranda have also recognized that under the INA, civil immigration enforcement actions may take place in or near domestic violence shelters, rape crisis centers, supervised visitation centers, family justice centers, victim services or victim services provider locations, community-based organization offices, and courthouses (if the alien is appearing in court in connection with a protection order case, child custody case, or other case relating to domestic violence, sexual assault, trafficking, or stalking), subject to specific statutory confidentiality, disclosure, information use, and certification requirements. (AR 7–11, 35–49). As the-then ICE Director explained in 2011, the agency's guidance was "not intended to categorically prohibit law enforcement operations" but instead was "meant to ensure that ICE officers and agents exercise sound judgment when enforcing federal law." (AR 16).

**B.    DHS Guidance Regarding Civil Immigration Enforcement Actions In and Near Courthouses**

      1.    Pre-2021 Courthouse Arrest Guidance

Since at least 2014, ICE has issued guidance memoranda addressing civil immigration enforcement actions made at or near courthouses. As noted below, with the exception of the 2021 Guidance, these memoranda have not included immigration courts as covered locations.

4

In a March 19, 2014 memorandum issued to field offices and entitled "Enforcement Actions at or Near Courthouses" (the "March 2014 Guidance"), ICE stated that "[e]nforcement actions at or near courthouses" "only be undertaken against Priority 1 aliens," namely, aliens engaged in or suspected of terrorism or espionage or who otherwise pose a danger to national security, and those aliens who pose a serious risk to public safety as shown by certain criminal activity. *See* Declaration of Jeffrey S. Oestericher, dated August 20, 2025 ("Oestericher Decl.") Ex. A (ECF No. 41–1).

After the March 2014 Guidance, ICE guidance with respect to civil immigration enforcement actions in courthouses was amended several times to reflect changes in DHS enforcement priorities. In a January 26, 2015, memorandum addressed to field offices ("January 2015 Guidance"), ICE revised the March 2014 Guidance to reflect enforcement priorities set forth in then-DHS Secretary Jeh Johnson's November 20, 2014, memorandum, titled "Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants."[2] Oestericher Decl. Ex. B (ECF No. 41-2). The January 2015 Guidance stated that enforcement actions at or near courthouses "will only be undertaken" against aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security; or, further restricting the category of aliens who pose a threat to public safety, aliens convicted of felonies or offenses involving active participation in a criminal street gang.  *Id.*

On January 25, 2017, then-President Trump issued Executive Order 13,768, which expanded the categories of aliens to be prioritized for removal. 82 Fed. Reg. 8799 (Jan. 25, 2017). The Executive Order directed DHS to prioritize for removal aliens who had criminal

---

[2]*See* https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion_0.pdf.

convictions or who had been charged with a criminal offense; engaged in fraud or willful misrepresentation before a governmental agency; abused public benefits programs; failed to comply with a final order of removal; or posed a risk to public safety or national security. *Id.* at 8800. In addition, the Executive Order directed DHS to "review agency regulations, policies, and procedures for consistency with this order," and to "consider whether to withdraw or modify any inconsistent policies and procedures, as appropriate and consistent with the law." *Id.* at 8801. To implement the Executive Order, on January 10, 2018, ICE issued a memorandum titled Directive 11072.1: Civil Immigration Enforcement Actions Inside Courthouses (the "2018 Directive"), (AR 21–24), which revised ICE's policy "regarding civil immigration enforcement actions inside federal, state, and local courthouses." (AR 21).

### 2. The 2021 Courthouse Arrest Guidance

On January 20, 2021, then-President Biden issued Executive Order 13,993, which revoked Executive Order 13,768, and directed the Secretary of Homeland Security and other cabinet officials to review any agency actions developed pursuant to Executive Order 13,768 and "take action, including issuing revised guidance" consistent with the new Executive Order. 86 Fed. Reg. 7051, 7051 (Jan. 20, 2021). On the same day, then-Acting Secretary of Homeland Security David Pekoske issued a memorandum which amended the agency's immigration enforcement priorities to individuals who were: engaged in or suspected of terrorism or espionage, or whose apprehension, arrest and/or custody was otherwise necessary to protect national security; apprehended at the border or points of entry while trying to unlawfully enter the United States, or who were not physically present in the United States before November 1, 2020; and incarcerated following an aggravated felony conviction, released after the date of the new memorandum, and posed a public safety threat. *See* https://perma.cc/2TJK-HTMS.

6

In accordance with changed immigration enforcement priorities, on April 27, 2021, ICE and CBP revoked the 2018 Directive and issued interim guidance governing "civil immigration enforcement actions in or near courthouses." (AR 25–27). The 2021 Guidance defined "courthouses" to include "any municipal, county, state, federal, tribal, or territorial courthouse, including immigration courts." (AR 26). It also provided that a civil immigration enforcement action "may be taken in or near a courthouse" if there was a national security threat; an imminent risk of death, violence or harm to any person; involved "hot pursuit" of a person posing a public safety threat; or if there was an imminent risk of destruction of evidence material to a criminal case. (AR 26). Absent hot pursuit and subject to advance supervisory approval, ICE officers were permitted to undertake a civil immigration enforcement action in or near a courthouse against an individual posing a threat to public safety if there was no other safe alternative location or it would be too difficult to undertake the action elsewhere. (AR 26). The 2021 Guidance made clear that its purpose was to provide "management guidance to ICE and CBP personnel exercising discretionary law enforcement functions and does not affect the statutory authority of ICE or CBP employees." (AR 27).

### 3.    The 2025 Courthouse Arrest Guidance

On January 20, 2025, President Trump issued Executive Order 14,159, which *inter alia*, revoked the prior administration's civil immigration enforcement policies and priorities and stated that it "is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people." 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025). The Executive Order directed the Secretary of Homeland Security to "take all appropriate action to enable" ICE and other agencies to establish agency priorities to "ensur[e] the successful enforcement of final orders of removal." *Id.* at 8443-44. On the same day, President Trump also issued Executive

Order 14,165, which further directed the Secretary of Homeland Security to "take all appropriate action to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States." 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025).

On January 20, 2025, then-Acting Secretary of Homeland Security Benjamine Huffman issued a memorandum titled "Enforcement Actions in or Near Protected Areas," which addressed ICE and CBP enforcement actions "in or near areas that the [DHS Secretary] previously determined require special protection." (AR 50). The memorandum observed that "officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location," and determined that on a going-forward basis, "officers should continue to use that discretion along with a healthy dose of common sense." (AR 50). As a result, the memorandum concluded that as a matter of policy, "[i]t is not necessary . . . to create bright line rules regarding where our immigration laws are permitted to be enforced," but added that ICE and CBP leadership "may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion." (AR 50).

ICE subsequently issued further guidance. On January 21, 2025, then-Acting ICE Director Caleb Vitello issued a memorandum titled "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses" ("2025 Interim Guidance"), which rescinded and superseded the 2021 Guidance for ICE officers. (AR 51–53). On May 27, 2025, Acting ICE Director Todd M. Lyons issued a revised memorandum titled "Civil Immigration Enforcement Actions In or Near Courthouses" (the "2025 Final Guidance") which superseded the 2025 Interim Guidance. (AR 1–3).

8

## ARGUMENT

## PLAINTIFFS' APA CHALLENGE FAILS

### I.   Legal Standards

The "standard for a stay under 5 U.S.C. § 705" "is the same as the standard for a preliminary injunction." *New York v. U.S. Dep't of Educ.*, No. 20 Civ. 4260 (JGK), 2020 WL 4581595, at *5 (S.D.N.Y. Aug. 9, 2020); *see E. Air Lines, Inc. v. Civil Aeronautics Bd.*, 261 F.2d 830, 830 (2d Cir. 1958).

A preliminary injunction is an "an extraordinary and drastic remedy," which "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quotation marks omitted). An injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original; quotation marks omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Where "the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," the plaintiffs "must establish a clear or substantial likelihood of success on the merits." *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quotation marks omitted); *see Able v. United States*, 44 F.3d 128, 130 (2d Cir. 1995) ("sufficiently serious questions" standard is inapplicable to a request for injunction against governmental action).

9

## II.   Plaintiffs Cannot Demonstrate a Clear Likelihood of Success on the Merits of Their Claim Under the APA

ICE's decision to rescind the 2021 Guidance as to civil immigration enforcement actions in immigration courts is unreviewable under the APA because the circumstances and location of a civil immigration enforcement action are committed to agency discretion by law.

First, while the APA embodies a presumption of judicial review, *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986), "[t]his is 'just' a presumption," *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (quoting *Block v. Cmty Nutrition Inst.*, 467 U.S. 340, 349 (1984)), and "under [5 U.S.C.] § 701(a)(2), agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law,'" *id.* (quoting § 701(a)(2)). "[E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). "In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Id.*

"To determine the extent of [the agency's] discretion and whether there is 'law to apply'" in a particular case, this Court "look[s] to the statutory provisions that govern" the agency's enforcement actions. *Westchester v. HUD*, 778 F.3d 412, 419 (2d Cir. 2015). *See also Banco San Juan Internacional, Inc. v. Federal Reserve Bank*, 762 F. Supp. 3d 247, 275 (S.D.N.Y. 2025) ("To show that the APA's judicial-review provisions apply to a defendant agency, a plaintiff 'must specify some statute or regulation' that meaningfully limits the agency's discretion.") (quoting *Lunney v. United States*, 319 F.3d 550, 558 (2d Cir. 2003)).  A preclusion analysis under § 701(a)(2) "requires careful examination of the statute on which the claim of agency illegality is based . . . ." *Webster v. Doe*, 486 U.S. 592, 600 (1988).

10

The INA, from which ICE's civil arrest authority derives, provides no "meaningful standard" by which a court can evaluate the appropriateness of ICE's discretionary choice of public locations for targeted civil immigration enforcement actions. *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States"); *id.* § 1357(a)(2) ("Any officer or employee . . . authorized under regulations prescribed by the Attorney General shall have the power without warrant . . . (2) . . . to arrest any alien in the United States . . . .").

The INA's broad language imposes few location-based restrictions on DHS's broad authority to investigate and take civil immigration enforcement actions, and it evinces Congress's intent not to further constrain agency discretion with respect to the location of enforcement. For example, the INA limits when immigration enforcement officers may enter a farm or similar agricultural operation for investigative purposes. 8 U.S.C. § 1357(e). The INA also limits officers' authority to "board and search for aliens" in railway cars, aircraft, conveyances, or vehicles "within a reasonable distance from any external boundary of the United States," and further allows officers "to have access to private lands, but not dwellings" that are within 25 miles of an external boundary of the United States. *Id.* § 1357(a)(3). Aside from these limitations, Congress has not placed restrictions, such as whether or under what circumstances immigration officers may enter or approach certain locations, on where or how to conduct civil immigration enforcement actions. The INA's relative silence with respect to locations for civil immigration enforcement actions—including immigration courts—leaves this Court with no meaningful or manageable standard to apply to the rescission of the 2021 Guidance. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (State Department policy relating to location of processing overseas immigrant visa

11

applications was not reviewable under the APA, because the "broad language" of the INA "grants to the Secretary discretion to prescribe the place at which aliens apply for immigrant visas without providing substantive standards against which the Secretary's determination could be measured"); *Ahmed v. Cissna*, 327 F. Supp. 3d 650, 669, 671 (S.D.N.Y. 2018) (finding no "judicially discoverable and manageable standard" under the APA for determining "whether petitioners must be permitted to file their I-130 petitions in their countries of residence, rather than being directed to file their petitions" in a U.S. lockbox, because the INA "is silent as to the filing procedures to which petitioners are entitled").

Plaintiffs have cited no law or standard that would limit ICE's discretion, except an alleged common-law privilege against courthouse arrest, Compl. ¶¶ 4, 23–24, 80, and this Court and the First Circuit have previously held that plaintiffs challenging ICE courthouse arrests have not demonstrated the existence of such a privilege against civil enforcement actions in or near courthouses. Opinion and Order at 32–37; *Ryan v. ICE*, 974 F.3d 9, 28 (1st Cir. 2020) ("[T]he plaintiffs are unlikely to succeed in demonstrating a long-established and familiar common law rule barring courthouse arrests that can be presumed to have been incorporated into the INA's civil arrest authority."). Absent such a privilege or other applicable restriction on where ICE can conduct civil immigration enforcement actions, including civil arrests, its decisions or policies in that regard are unreviewable under the APA.

## III.    Plaintiffs Fail to Make a Strong Showing of Irreparable Harm

Plaintiffs also cannot establish that they will be subject to irreparable harm in the absence of injunctive relief. "The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (internal quotation marks and citations omitted). A movant can establish irreparable harm if they show that "there is a continuing harm which cannot be adequately

redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Id.* (internal quotation marks and citations omitted). Monetary harm is insufficient; a party seeking a preliminary injunction must show "evidence of damage that cannot be rectified by financial compensation." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989). Moreover, the irreparable harm alleged must be "actual and imminent, not remote or speculative." *Kamerling*, 295 F.3d at 214. The "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction" or a TRO. *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991); *see also Winter*, 555 U.S. at 22.

Plaintiffs' claim of harm from the rescission of the 2021 Guidance falls short. A return to the 2021 Guidance does not insulate Plaintiffs from civil immigration enforcement actions in immigration courts so long as the criteria in the 2021 Guidance are met. Moreover, to the extent that an individual in removal proceedings believes that the dismissal of their removal proceedings and subsequent arrest are unlawful, they can appeal. 8 C.F.R. § 1003.38(a). And Plaintiffs fail to explain why any unlawful deprivation of liberty could not "rectified by financial compensation." *Tucker*, 888 F.2d at 975.

## IV.     The Balance of Equities and Public Interest Weigh in Favor of the Government

The final two factors, balance of equities and the public interest, also weigh in the Government's favor. *See Nken v. Holder*, 556 U.S. 418, 435–36 (2009) (final two factors merge when the Government is the party opposing a motion for preliminary injunctive relief). "In determining whether the balance of the equities tips in the plaintiff's favor and whether granting the preliminary injunction would be in the public interest, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the consequences in employing the extraordinary remedy of injunction." *Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 178 (S.D.N.Y. 2022)

(internal quotation marks omitted). As an initial matter, given that Plaintiffs cannot establish the first two factors necessary to obtain a preliminary injunction, "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009).

Separately, "Congress has repeatedly shown that it considers immigration enforcement— even against otherwise non-criminal aliens—to be a vital public interest, so vital that it has tried to cabin judicial review of immigration enforcement," and "[t]he enforcement of our immigration laws is the government's 'sovereign prerogative.'" *Miranda v. Garland*, 34 F.4th 338, 364 (4th Cir. 2022) (citation omitted); *see also id*. at 356 (vacating preliminary injunction prohibiting continued detention of aliens pending removal unless specified circumstances applied and mandating factors that immigration judges must consider, because the injunction "infringes upon the discretion of the Attorney General to allow immigration judges to decide which factors are relevant").

## V.    The Scope of Plaintiffs' Requested Stay Should Be Limited to Immigration Courts in New York City

If this Court nonetheless were to stay ICE's rescission of the 2021 Guidance—which it should not, because the rescission is not reviewable under the APA—any stay should be narrowly tailored to afford relief only to Plaintiffs, not to third parties who are not before the Court, and not "throughout the United States," as Plaintiffs request. *See* Proposed Order at 2, ¶ 4(a).

Injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). In *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), the Supreme Court partially stayed three "universal preliminary injunctions" issued by district courts to enjoin the

14

government from implementing an executive order, "to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 838, 861. In so doing, the Supreme Court held that "universal injunctions," where "district courts assert[] the power to prohibit enforcement of a law or policy against *anyone* . . . likely exceed the equitable authority that Congress has granted to federal courts." *Id.* at 837 (emphasis in original). The Supreme Court further noted that under equitable remedies "'traditionally accorded by courts of equity' at our country's inception," "suits in equity were brought by and against individual parties," and injunctions were sought "to restrain the actions of *particular* officers against *particular* plaintiffs." *Id.* at 841–42 (citations omitted) (emphasis in original). The Supreme Court also observed that its own precedents "consistently rebuffed requests for relief that extended beyond the parties," and "are consistent with the party-specific principles that permeate our understanding of equity." *Id.* at 843–44.

In addition, allowing Section 705 to authorize a nationwide stay similarly departs from longstanding remedial principles recognized by Congress when the APA was enacted. Consistent with those principles, the history of Section 705 shows that Congress sought to limit relief under a Section 705 stay to the parties before the court. H.R. Rep. No. 1980, 79th Cong., 2d Sess. 43 (1946) (under Section 705, "relief would normally, if not always, be limited to the parties complainant"). Any stay under Section 705 therefore should be guided by the same equitable considerations that apply in the context of preliminary injunctive relief. *See* 5 U.S.C. § 705 (stay may enter only "to the extent necessary to prevent irreparable injury," and "[o]n such conditions as may be required").

The Second Circuit has recognized that "[t]he issuance of unqualified nationwide injunctions is a less desirable practice where, as here, numerous challenges to the same agency

15

action are being litigated simultaneously in district and circuit courts across the country." *New York v. DHS*, 969 F.3d 42, 88 (2d Cir. 2020). To avoid the prospect of one court "imposing its view of the law within the geographic jurisdiction of courts that have reached contrary conclusions," the Second Circuit has "encourag[ed] district courts to consider crafting preliminary injunctions that anticipate the possibility of conflict with other courts and provide for such a contingency," such as limiting "the injunction to the situation of particular plaintiffs or to similarly situated persons within the geographic jurisdiction of the court." *Id*.

For the same reasons, a geographic limitation to a stay is appropriate here. ICE's decision to rescind the 2021 Guidance and proceed with civil immigration enforcement actions in immigration courthouses, without limitation by policy, has been challenged in three other courts besides this one, and none have reached a final adjudication on the merits. *See Immigrant Advocates Response Collaborative v. U.S. Dep't of Justice*, No. 25 Civ. 2279 (D.D.C.) (complaint filed July 16, 2025); *A.M. v. Dep't of Homeland Security*, No. 25 Civ. 2308 (S.D. Cal.) (complaint filed Sept. 4, 2025); *Pablo Sequen v. Albarran*, No. 25 Civ. 6487 (N.D. Cal.) (amended complaint filed Sept. 18, 2025). Consistent with the Second Circuit's guidance in *New York v. DHS*, this Court's September 12, 2025 order stayed the EOIR Dismissal Policy only as to "removal proceedings conducted in the geographic areas served by The Door, *i.e.,* Manhattan and the Bronx, pending full review on the merits of all policies challenged in this action." Opinion and Order at 46. Likewise, any stay of the rescission of the 2021 Guidance should be limited to immigration courts in New York City, which is where Plaintiffs are located and where their members reside, have been arrested, or have upcoming hearings. *See, e.g.,* Declaration of Beth Baltimore, dated Aug. 10, 2025 (ECF No. 23-1), ¶¶ 4, 35 (describing how The Door is "a New York-based 501(c)(3) nonprofit corporation" whose "mission is to empower New York

16

City's diverse population of disconnected youth," and whose "members include noncitizens who are in full removal proceedings and have court appearances in New York City immigration courts at 26 Federal Plaza, 201 Varick Street, and 290 Broadway in Manhattan"); Declaration of Diana Konaté, dated Aug. 11, 2025 (ECF No. 23-8), ¶¶ 3, 21, 25, 27, 31, 37, 39 (representing that ACT is a 501(c)(3) nonprofit "incorporated in New York state in 2013," and describing how one ACT member was arrested at 26 Federal Plaza while other ACT members residing in New York City have upcoming immigration hearings); Declaration of Diana Konaté, dated Dec. 3, 2025 (ECF No. 68-14), ¶¶ 7, 11 ("[a]t least fifteen of ACT's members have upcoming immigration hearings scheduled to take place next year at immigration courthouses in New York City," and one ACT member was arrested at immigration court at 290 Broadway); Declaration of Abdoul Gadiri Bah, dated Dec. 2, 2025 (ECF No. 68-1), ¶¶ 12–13 (describing how a member of The Door was arrested at 290 Broadway); Declaration of Mamadou Saidou Bah, dated Dec. 3, 2025, ¶ 17 (ECF No. 68-2) (describing how a member of The Door attended an immigration calendar hearing at 26 Federal Plaza but was not arrested); Declaration of Mamadou Barry, dated Dec. 3, 2025 (ECF No. 68-4), ¶¶ 9–11 (describing how an ACT member was arrested at 26 Federal Plaza).

## VI.    Plaintiffs Should Be Required to Post a Bond

If the Court is inclined to grant a stay (which the Court should not do), it may do so "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Accordingly, the Court should require Plaintiffs to post bond pursuant to Rule 65(c).

17

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs'

motion for a stay. Alternatively, if the Court grants a stay, the scope of the stay should be limited

to immigration courthouses in New York City.

Dated: May 6, 2026
       New York, New York

JAY CLAYTON
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By:     */s/ Tomoko Onozawa*
        JEFFREY S. OESTERICHER
        TOMOKO ONOZAWA
        Assistant United States Attorney
        86 Chambers Street, 3rd Floor
        New York, New York 10007
        Tel.:   (212) 637-2695/2721
        Email:  jeffrey.oestericher@usdoj.gov
                tomoko.onozawa@usdoj.gov

18

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned hereby certifies that, measured by the word processing program used to prepare this brief, that this brief complies the word-count limitation of the rule, which is a maximum of 8,750. Excluding the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, but including material contained in footnotes or endnotes, there are 5,221 words in this brief.

Dated:  New York, New York
         May 6, 2026

                                          */s/ Tomoko Onozawa*
                                          TOMOKO ONOZAWA
                                          Assistant United States Attorney