UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
AFRICAN COMMUNITIES TOGETHER and
THE DOOR,

                        Plaintiffs,


                                                            25-cv-6366 (PKC)


                -against-                                    OPINION AND ORDER

TODD LYONS, in his official capacity as Acting
Director, U.S. Immigration and Customs Enforcement;
MARKWAYNE MULLIN, in his official capacity
as Secretary of the United States Department of
Homeland Security; DAREN K. MARGOLIN, in his
official capacity as Director, Executive Office of
Immigration Review; and TODD BLANCHE, in his
official capacity as Acting Attorney General, U.S.
Department of Justice,

                        Defendants.
-----------------------------------------------------------------x

CASTEL, U.S.D.J.

        On March 24, 2026, the Court received a letter from two Assistant United States

Attorneys for this District, who wrote "respectfully and regrettably to correct a material mistaken

statement of fact that the Government made to the Court and Plaintiffs."  (ECF 77.)  The letter

withdrew portions of four briefs (ECF 39, 66, 70 and 74) and "statements" made at oral

argument.  These statements went to the heart of a motion to stay under section 705 of the

Administrative Procedure Act ("APA") which this Court heard and decided six months earlier.

See African Communities Together v. Lyons, 799 F. Supp. 3d 362, 377 (S.D.N.Y. 2025).

        Defendants' March 24, 2026 letter announced an abrupt change of position.  It

advised that "this morning, counsel from U.S. Immigration and Customs Enforcement ("ICE")

informed the undersigned of the following: the memorandum entitled Civil Immigration Enforcement Actions in or Near Courthouses, dated May 27, 2025 – which the Government relied on in presenting its arguments in this case and referred to as the '2025 ICE Guidance' – does not and has never applied to civil immigration enforcement actions in or near . . . immigration courts." (ECF 77.) The letter further stated that prior to March 24, 2026 "[t]he undersigned were specifically informed by ICE that the 2025 ICE Guidance applied to immigration courthouse arrests" and that "we discussed with and obtained the approval of assigned ICE counsel before filing every brief in this case and making any oral representations to the Court and Plaintiffs." (Id.)

In August 2025, two not-for-profit immigrant-assistance groups moved for a stay pending the determination of their APA challenge to the agency action issued on January 21, 2025 (interim guidance) and May 27, 2025 (final guidance) by Acting Directors of ICE (collectively, the "2025 ICE Courthouse Arrest Policies"). (ECF 24-3 & 24-4.) These policies broadened the circumstances in which civil enforcement actions, specifically arrests, could be made in or near courthouses. The 2025 ICE Courthouse Arrest Policies, according to plaintiffs, worked in tandem with a directive to Immigration Judges ("IJs") issued three days after the May 27 final guidance by the Executive Office of Immigration Review, part of the Department of Justice (the "EOIR Dismissal Policy"). The directive advised IJs of the expected increase in arrests in or near immigration courts and informed the IJs that they had the power to dismiss a pending removal action orally and without providing the noncitizen an opportunity to make a written submission. (ECF 24-12.)

In practice this meant that a noncitizen could be summoned to appear before an IJ for a "master calendar hearing," have his removal proceeding and any defensive asylum

application dismissed by oral application from a representative of the Department of Homeland Security ("DHS"), and, minutes after the conclusion of the proceedings before the IJ, be arrested in the corridor of the immigration courthouse and placed in fast-track "expedited removal proceedings." 8 U.S.C. § 1225. The 2025 ICE Courthouse Arrest Policies departed from an April 27, 2021 ICE memorandum providing interim guidance on Civil Immigration Enforcement Actions in or near Courthouses (the "April 2021 Policy") that severely restricted courthouse arrests but allowed them under certain enumerated circumstances. (See ECF 24-1.)

This Court, after full argument and briefing, issued an Opinion and Order on September 12, 2025 granting a stay of the EOIR Dismissal Policy but denying a stay of the 2025 ICE Courthouse Arrest Policies. See 799 F. Supp. 3d at 396–97.

The 2025 ICE Courthouse Arrest Policies, on their face, appear to apply to all courthouses. (See ECF 24-4 ("ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses . . . .").) As recently as January 7, 2026, defendants unequivocally stated that "[t]he ICE Guidance Applies to Immigration Courts," forcefully arguing that plaintiffs were proceeding from "the mistaken premise that the reference to 'non-criminal' courts in the ICE Guidance was intended to exclude immigration courts." (ECF 70 at 11.)[1]

The "material mistaken statement of fact" reported in the March 24, 2026 letter prompted plaintiffs' application to revise the Court's Opinion and Order of September 12, 2025. (ECF 85.) Plaintiffs embrace defendants' concession that the 2025 ICE Courthouse Arrest

---

[1] Defendants' memorandum in opposition to the stay motion made similar arguments: "Plaintiffs maintain that ICE failed to consider how the Guidance 'will chill access to immigration courts and impede the fair administration of justice, including by disturbing immigration courts' dockets and decorum in courthouses.' . . . However, the Guidance addresses those concerns by including provisions designed to ensure that enforcement actions within courthouses are conducted in an orderly, safe, and non-disruptive manner." (ECF 39 at 32–33.)

Policies do not apply to immigration courts and ask the Court to grant a stay of so much of the policies that rescinded the April 2021 Policy.  (ECF 24-1.)  The April 2021 Policy expressly applied to immigration courthouses.  (Id. ("For the purposes of this memorandum, a courthouse includes any . . . federal . . . courthouse, including immigration courts.").)

The Court will apply the standard governing plaintiffs' motion to revise the September 12 Opinion and Order and the standard governing a stay to defendants' newly conceded fact.  The Court will treat the motion as one to modify the September 12 Opinion and Order.  The motion will be granted, staying so much of the 2025 ICE Courthouse Arrest Policies that rescinded the April 2021 Policy as applied to immigration courts.

Modifying the September 12 Opinion and Order

Interlocutory orders "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Rule 54(b), Fed. R. Civ. P. In exercising its discretion to modify a prior order, a district court considers the law of the case doctrine.  See Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Board, 956 F.2d 1245, 1255 (2d Cir. 1992); Vornado Realty Trust v. Castlton Environmental Contractors, LLC, 08-cv-4823 (WFK), 2013 WL 5719000, at *2 (E.D.N.Y. Oct. 18, 2013) (Kuntz, J.).

A prior ruling ought not be modified without a good reason, such as an intervening change of law, new evidence, correction of a clear error or the need to prevent a manifest injustice.  Virgin Atlantic Airways, 956 F.2d at 1255.

Here, defendants' concession that the 2025 ICE Courthouse Arrest Policies never applied to immigration courts warrants reexamination of the prior ruling, both to correct a clear error and prevent a manifest injustice.  First, the Court's stay decision relied upon the clearly erroneous premise that the 2025 policies applied to immigration courthouses.  Second, revisiting

the stay decision prevents a manifest injustice by allowing the plaintiffs to reargue that portion of their stay motion that was predicated on the government's now-withdrawn assertion that the 2025 ICE Courthouse Arrest Policies applied to immigration courts.

Substantial Portions of the Court's Prior Ruling Will Not Be Disturbed

The Court need not revisit its prior findings that plaintiff The Door had demonstrated Article III organizational standing but plaintiff African Communities Together had not and that neither group satisfied the standard for representational standing. See 799 F. Supp. 3d at 377–82. The Court proceeds on the premise that The Door is the only plaintiff with standing to pursue the stay. The Court also does not disturb its holding that The Door demonstrated the appropriateness of a stay as to the EOIR Dismissal Policy. Id. at 385–88.

Also, in the course of adjudicating the stay application as applied to the 2025 ICE Courthouse Arrest Policies, the Court found that The Door had not shown a probability of success on its argument asserting the existence of a purported common law privilege against courthouse civil arrests by agents of the sovereign, which The Door urged was incorporated into the 1952 enactment of the Immigration and Naturalization Act. Id. at 389–92. There is no reason to disturb that conclusion.

Standard for a Section 705 Stay

Section 705 of the APA authorizes a district court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The moving party must show that (1) it "is likely to prevail on the merits"; (2) "without a stay it will suffer irreparable injury"; (3) "there is no substantial harm to other interested persons"; and (4) "the public interest

will not be harmed."  Eastern Air Lines, Inc. v. Civil Aeronautics Board, 261 F.2d 830, 830 (2d

Cir. 1958) (per curiam).

With the exception of the absence of a security or bond requirement,[2] the standard

for a section 705 stay is the same or similar to the standard on a preliminary injunction.  See

Rural & Migrant Ministry v. United States Environmental Protection Agency, 565 F. Supp. 3d

578, 595 (S.D.N.Y. 2020) (Liman, J.).  When the government is a party to a lawsuit, the "balance

of the equities" and "public interest" factors of the preliminary injunction standard merge.  New

York v. Dep't of Homeland Security, 969 F.3d 42, 58–59 (2d Cir. 2020).  Because a stay here

will affect government action taken in the public interest pursuant to a statutory or regulatory

scheme, plaintiffs "must establish a clear or substantial likelihood of success on the merits."

Sussman v. Crawford, 488 F.3d 136, 140 (2d Cir. 2007) (quoting Tunick v. Safir, 209 F.3d 67,

70 (2d Cir. 2000)).

Plaintiff Has a Substantial Likelihood of Success in Demonstrating that the 2025 Rescission of
The April 2021 Policy as Applied to Immigration Courts Was Arbitrary and Capricious

The APA authorizes courts to set aside agency action if found to be "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  This "narrow" review ensures that the agency "examine[d] the relevant data and

articulate[d] a satisfactory explanation for its action . . . ."  Motor Vehicle Manufacturers Ass'n

of the United States, Inc. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983).  The

Supreme Court has held that agencies must be permitted, "consistently with the obligations of

---

[2] Unlike a preliminary injunction motion under Rule 65(c), Fed. R. Civ. P., security is not required for the Court to grant a stay under section 705.  See Neguse v. U.S. Immigr. & Customs Enf't, 813 F. Supp. 3d 45, 100 (D.D.C. 2025) (collecting cases); Cabrera v. U.S. Dep't of Labor, 792 F. Supp. 3d 91, 107 n.3 (D.D.C. 2025).  In the September 12 Opinion and Order, the Court cited the transcript of September 2, 2025 (ECF 62, Tr. 46–47) for the proposition that the parties were in agreement that no security was required.  799 F. Supp. 3d at 382 n.12.  The government now appears to argue that a bond is required for a section 705 stay but offers no case law for the proposition.  (ECF 88 at 22.)  The Court adheres to the position that no security is required.

due process, to adapt their rules and policies to the demands of changing circumstances." In re Permian Basin Area Rate Cases, 390 U.S. 747, 784 (1968).  But an agency "changing its course" is "obligated to supply a reasoned analysis for the change."  State Farm, 463 U.S. at 42.

The agency must acknowledge that it is changing position and "show that there are good reasons for the new policy."  Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016) (internal quotation marks and citation omitted).  Further justification is not demanded by the mere existence of a policy change.  F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515–16 (2009).  Rather, "when [an agency's] new policy rests upon factual findings that contradict those which underlay its prior policy . . . a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."  Id.[3] "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  State Farm, 463 U.S. at 43.

The January 21, 2025 interim guidance expressly acknowledged that it was rescinding the April 2021 Policy.  (ECF 24-3 ("the April 27, 2021 [Policy] . . . is now rescinded for ICE and is superseded by this interim guidance.").)  The January 21, 2025 interim guidance, read in conjunction with the May 27, 2025 final guidance (ECF 24-4), made a plausible case that ICE had a reduced opportunity to take an individual into custody upon release from a secure prison facility because many jurisdictions "refuse to honor immigration detainers and transfer aliens directly to ICE custody."  (ECF 24-3 & 24-4.)  "[W]hen ICE engages in civil immigration

---

[3] Neither the April 2021 Policy nor the 2025 ICE Courthouse Arrest Policies rested upon fact finding and no reasoned explanation for disregarding prior fact finding was necessary.

enforcement actions in or near courthouses it can reduce safety risks to the public, targeted alien(s), and ICE officers and agents." (Id.) This is because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband." (Id.) This was a plausible explanation for a new policy permitting courthouse arrests at courthouses to which the policy applied. But as reported to the Court on March 24, 2026, this policy change does not include immigration courts.

The 2025 ICE Courthouse Arrest Policies—inapplicable to immigration courts— limited arrests of a noncitizen at or near a courthouse to (1) a targeted alien in either an enumerated or non-enumerated category in the 2025 policy; or (2) other aliens encountered in the course of a civil enforcement action if an ICE officer decides to make an arrest based on the totality of circumstances. The 2025 Policies cautioned ICE agents that they must act "discreetly" when operating in or about a functioning courthouse: "civil immigration enforcement actions in or near courthouses should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits. When practicable, ICE officers and agents will conduct civil immigration enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings." (Id.)

Defendants' newly adopted position appears to be that the rescission of the April 2021 Policy, insofar as it relates to immigration courthouses, has not been replaced by any policy whatsoever. They argue that any arrest policy is beyond the Court's power to review, a position the Court previously rejected in the September 12 Opinion and Order. 799 F. Supp. 3d at 393. Thus, in the government's view there is no ICE policy—or, at least, no announced policy— governing arrests in or near immigration courts:

- 8 -

> [T]he rescission [of the April 2021 Policy] is not reviewable under the APA because policy choices about where ICE can best exercise its civil immigration enforcement authority are committed to agency discretion by law, and there is no meaningful standard by which the Court can evaluate the appropriateness of ICE's decision to conduct civil immigration enforcement actions in courthouses, which are open to the public.

(ECF 88 at 7.)

The Court disagrees. "Under the APA, a party aggrieved by agency action is generally 'entitled to judicial review thereof.'" Westchester v. U.S. Dep't of Housing and Urban Development, 778 F.3d 412, 418 (2d Cir. 2015) (quoting 5 U.S.C. § 702). "There is a strong presumption favoring judicial review of administrative action." Salazar v. King, 822 F.3d 61, 75 (2d Cir. 2016). It is true that agency action that "is committed to agency discretion by law" is exempt from judicial review under the APA. 5 U.S.C. § 701(a)(2). But a claim of exemption for discretionary action is available "only in those rare instances where statutes are drawn in such broad terms that . . . there is no law to apply." Westchester, 778 F.3d at 419 (quoting Sharkey v. Quarantillo, 541 F.3d 75, 91 (2d Cir. 2008)).

"To determine whether there is 'law to apply' that provides 'judicially manageable standards' for judging an agency's exercise of discretion, the courts look to the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action." Salazar, 822 F.3d at 76. Here, the statutory scheme provides that "an alien may be arrested" on a warrant, 8 U.S.C. § 1226(a), or if an officer "has reason to believe" the alien has violated an enumerated category of laws or regulations and "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2).

Arbitrariness review may be appropriate in arenas in which agencies originally had unconstrained discretion but where that discretion has since been cabined by rule or practice.

The point was made by a unanimous Supreme Court in a challenge to the manner in which a discretionary waiver of deportation was denied:

> Though the agency's discretion is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as "arbitrary, capricious, [or] an abuse of discretion" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

I.N.S. v. Yueh-Shaio Yang, 519 U.S. 26, 32 (1996).[4]  See Salazar, 822 F.3d at 76.

The Court concludes that ICE has "follow[ed]—by rule" a general policy on civil enforcement actions in or near courthouses.  It further concludes that the January 2025 rescission was arbitrary and capricious in two respects: first, it failed to display a conscious awareness that it was rescinding an arrest policy applicable to immigration courts; and second, it failed to offer even a rudimentary reason why a policy of allowing arrests unfettered by any agency guidance whatsoever was better than the policy it was rescinding.

Restrictions on civil enforcement actions in courthouses pre-date the April 2021 Policy and were part of a January 2018 policy under the first Trump administration.  (See ECF 24-1 (citing ICE Directive 11072.1, entitled "Civil Immigration Enforcement Inside Courthouses" (Jan. 30, 2018)).)[5]  The 2018 policy permitted arrests in courthouses but restricted the circumstances under which such arrests could take place.  It provided that "[p]lanned civil immigration enforcement actions inside courthouses will be documented and approved consistent with current operational plans and field operations worksheet procedures" and "[c]ivil immigration enforcement actions inside courthouses should, to the extent practicable, continue to

---

[4] In Yang, the Court ultimately concluded that the agency had not "disregarded its general policy."  Id.
[5] https://www.ice.gov/sites/default/files/documents/Document/2018/ciEnforcementActionsCourthouses.pdf (last visited May 17, 2026).

take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits." As outlined herein, the April 2021 Policy was more restrictive and the 2025 Policies less restrictive, but none gave ICE carte blanche to proceed without regard to the restrictions in the applicable guidance. Thus, the agency has followed "by rule," i.e., agency guidance, a general policy on courthouse arrests.

First, the January 2025 rescission was arbitrary because the written guidance did not reflect a conscious awareness that the new policy did not apply to immigration courthouses. The 2025 interim and final guidance were broadly written and declared that "ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses . . . ." (ECF 24-3 & 24-4.) If ICE intended to exclude immigration courts from the term "courthouses," it is not discernible from the text of the policies. As noted, the March 24, 2026 letter stated that the assistants assigned to this case "were specifically informed by ICE that the 2025 ICE Guidance applied to immigration courthouse arrests." (ECF 77.)[6] There were six months of silence between this Court's September 12 Opinion and Order and the 2026 *mea culpa* letter.

Based upon the foregoing, there is substantial reason to believe that when the January 21, 2025 interim guidance rescinded the April 2021 Policy, there was no conscious decision to exclude immigration courthouses from the 2025 ICE Courthouse Arrest Policies. This supports the Court's finding that the position expressed in 2026, i.e., that immigration courts were never within the scope of the 2025 Policies, was a recent invention and not the intent at the time of the issuance of the 2025 Policies. Further support for this conclusion comes from the express language of the April 2021 Policy: "a courthouse includes any municipal, county, state,

---

[6] "In addition, we discussed with and obtained the approval of assigned ICE counsel before filing every brief in this case and making any oral representations to the Court and Plaintiffs." (ECF 77.)

federal, tribal, or territorial courthouse, including immigration courts."   A person of ordinary

intelligence (including counsel for both sides and the Court at the time of the September 12 stay

ruling) would have had no way of knowing that the term "courthouses" in the 2025 ICE

Courthouse Arrest Policies excluded immigration courts but not necessarily, for example,

municipal, tribal or territorial courts.  "[T]he requirement that an agency provide reasoned

explanation for its action would ordinarily demand that it display awareness that it is changing

position."  Fox Television Stations, 556 U.S. at 515 (emphasis in original).  That "awareness"

was lacking in the January 2025 policy rescission.

Second, the guidance rescinding the April 2021 Policy is arbitrary and capricious

within the meaning of the APA because it offered no explanation of why the exercise of

unfettered discretion by ICE officers with no guidance whatsoever was a better option for civil

enforcement actions in or near immigration courthouses than the April 2021 Policy or even the

2025 Policies as applied to courthouses other than immigration courthouses.  Because the

January 2025 rescission failed to "show that there are good reasons for the new policy" it was

arbitrary and capricious.  Encino Motorcars, 579 U.S. at 221.  This certainly is not an instance in

which "the agency's path may reasonably be discerned . . . ."  Fox Television Stations, 556 U.S.

at 513–14 (quoting Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281,

286 (1974)).

The standard imposed on an agency to explain its rescission of a policy does not

set a high bar.  The explanation for a changed policy need not be more expansive than that for

the original policy, but it must show that "there are good reasons for the new policy."  Fox

Television Stations, 556 U.S. at 515.  The rescission of the 2021 April Policy gave no

explanation, rational or otherwise, for abandoning the prior policy insofar as it applied to

immigration courts.  The rationale offered in 2025 for expanding the criteria for arrests in or near courthouses simply had no application to immigration courts.

The Door has demonstrated a substantial likelihood that the January 2025 rescission of the April 2021 Policy will be found to be arbitrary and capricious insofar as it relates to immigration courts.

Plaintiff is Likely to Suffer Irreparable Harm

The Door has demonstrated likely irreparable harm from the additional resources it must expend to assist its members faced with the dilemma of appearing at an immigration court for a "master calendar hearing" and risking on-the-spot arrest or, alternatively, not appearing and having a default entered against them in the removal proceeding.  To further its mission, The Door must find a way to advise a noncitizen member facing this dilemma, whose first choice is to attend the master calendar hearing, have his or her case proceed to resolution, and abide by the outcome, whether favorable or unfavorable.  The alternative available to the member advised by The Door is to not attend and face the prospect of removal by default.  Placing the member and its advisor, The Door, in this dilemma is a harm that cannot be recompensed for money damages.

There is No Substantial Harm to Other Interested Persons, and the Public Interest Favors the Stay

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).  The burden rests entirely on the plaintiff to satisfy the required elements. Id. at 20.

There is a strong governmental interest in enforcing immigration laws. There is also a serious interest of The Door to be free to assist its members in defending removal proceedings brought against them and pursuing defensive asylum applications before an IJ without fear of arrest. The Court concludes that the governmental interest is outweighed by that of The Door because ICE retains the ability to pursue civil enforcement actions at locations other than immigration courts. Moreover, the April 2021 Policy permits ICE to pursue arrests at immigration courthouses in instances presenting the most serious threats of physical harm to public safety. The April 2021 Policy provides that:

> A civil immigration enforcement action may be taken in or near a courthouse if (1) it involves a national security threat, or (2) there is an imminent risk of death, violence, or physical harm to any person, or (3) it involves hot pursuit of an individual who poses a threat to public safety, or (4) there is an imminent risk of destruction of evidence material to a criminal case.
>
> In the absence of hot pursuit, a civil immigration enforcement action also may be taken in or near a courthouse against an individual who poses a threat to public safety if: (1) it is necessary to take the action in or near the courthouse because a safe alternative location for such action does not exist or would be too difficult to achieve the enforcement action at such a location, and (2) the action has been approved in advance by [designated officials].

(ECF 24-1 at 3 (footnotes omitted).)

The public interest also favors the stay pending final adjudication because it prevents the arbitrary and capricious rescission of the April 2021 Policy as it applies to immigration courts. "There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." League of Women Voters of the U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks omitted)

- 14 -

(quoting Washington v. Reno, 35 F.3d 1093, 1103 (6th Cir. 1994)); see also A.C.R. v. Noem,

809 F. Supp. 3d 103, 127–28 (E.D.N.Y. 2025) (Komitee, J.).

CONCLUSION

Pursuant to section 705 of the APA, pending full review on the merits of all

policies challenged in this action, the Court ORDERS as follows:

1.    The January 21, 2025 interim guidance and the May 27, 2025 final

guidance of the then-Acting Directors of ICE are STAYED insofar as they rescinded the interim

guidance on Civil Immigration Enforcement Actions in or near Courthouses, issued on April 27,

2021, as it applied to civil enforcement actions in or near immigration courthouses;

2.    The foregoing stay applies to immigration courthouses in the three

locations in Manhattan principally serving the members of The Door: 26 Federal Plaza, 201

Varick Street, and 290 Broadway.

The Clerk of Court is respectfully directed to terminate the pending motion (ECF

85).

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:  New York, New York
        May 18, 2026

- 15 -