UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AFRICAN COMMUNITIES TOGETHER; and THE DOOR,

                      Plaintiffs,

               v.

TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; DAREN K. MARGOLIN, in his official capacity as Director, Executive Office of Immigration Review; and PAMELA BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

                    Defendants.

25 Civ. 6366 (PKC)

---

**PLAINTIFFS' REPLACEMENT MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................................1

STATEMENT OF MATERIAL FACTS .............................................................................................2

    1.    The Government's Long-standing Policy Restricting Immigration Court Arrests ...........2

    2.    DHS Abruptly Changes Course, Begins Conducting Mass Immigration Court Arrests..4

    3.    DHS Issues New, Facially Inapplicable Memorandum on Courthouse Arrests ..............6

    4.    The Immigration Court Arrest Policy Dramatically Chills Court Attendance..................7

    5.    EOIR Authorizes IJs To Dismiss Removal Proceedings in Violation of Agency Rules..8

    6.    The Government Admits to Making and Perpetuating a Material Misrepresentation .....9

    7.    The Challenged Policies Continue to Severely Harm Plaintiffs and Their Members .....10

STANDARD ...............................................................................................................................................12

ARGUMENT .............................................................................................................................................13

  I.    The Immigration Court Arrest Policy Violates the APA. ..................................................13

    A.    The Policy Fails To Consider Important Aspects of the Problem and Alternatives. .....13

    B.    The Immigration Court Arrest Policy Lacks a Reasoned Explanation. ...........................16

    C.    The Immigration Court Arrest Policy Is Ultra Vires. .........................................................19

II. The EOIR Dismissal Policy Is Contrary to Law and Arbitrary and Capricious. .............................22

    A.    The EOIR Dismissal Policy Is Reviewable. .......................................................................22

    B.    The EOIR Dismissal Policy Is Contrary to Law. ...............................................................22

    C.    The EOIR Dismissal Policy Is Arbitrary and Capricious. ................................................23

    D.    The EOIR Dismissal Policy Violates Accardi and Due Process. ....................................24

CONCLUSION ..........................................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998)..................................................................................................21

*Am. Pub. Health Ass'n v. NIH*,
145 F.4th 39 (1st Cir. 2025).....................................................................................19

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017)..................................................................................17

*Andrews v. Martin*,
25 Victoria 371 (1862).............................................................................................20

*Black v. Decker*,
103 F.4th 133 (2d Cir. 2024) ...................................................................................25

*Blight v. Fisher*,
3 F. Cas. 704 (C.C.D.N.J. 1809)..............................................................................20

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)..................................................................................................22

*Bridges v. Sheldon*,
7 F. 17 (C.C.D. Vt. 1880).........................................................................................20

*Califano v. Sanders*,
430 U.S. 99 (1977)....................................................................................................12

*Cameron v. Roberts*,
87 Wis. 291, 58 N.W. 376 (1894).............................................................................20

*Camp v. Pitts*,
411 U.S. 138, (1973).................................................................................................12

*Ceesay v. Kurzdorfer*,
781 F. Supp. 3d 137 (W.D.N.Y. 2025).....................................................................25

*Citizens Against Casino Gambling in Erie Cnty. v. Stevens*,
814 F. Supp. 2d 261 (W.D.N.Y. 2011).....................................................................12

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)..................................................................................................12

*Cole v. Hawkins*,
95 Eng. Rep. 396......................................................................................................20

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
603 U.S. 799 (2024)..................................................................................................25

*DHS v. Regents of the U.C.*,
591 U.S. 1 (2020)................................................................................................*passim*

*Do No Harm v. Pfizer Inc.*,
126 F.4th 109 (2d Cir. 2025) ...................................................................................11

*Drs. for Am. v. OPM*,
  793 F. Supp. 3d 112 (D.D.C. 2025)........................................................................................19

*Dwelle v. Allen*,
  193 F. 546 (S.D.N.Y. 1912) ...................................................................................................21

*Encino Motorcars v. Navarro*,
  579 U.S. 211 (2016) .......................................................................................... 16, 17, 18, 23

*Ex Parte Jackson*,
  15 Ves. Jun. 117 (1808) .........................................................................................................20

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)......................................................................................................... 18, 19

*Heckler v. Chaney*,
  470 U.S. 821 (1985)...............................................................................................................22

*Hispanic Affs. Project v. Acosta*,
  901 F.3d 378 (D.C. Cir. 2018)................................................................................................12

*James Madison Ltd. by Hecht v. Ludwig*,
   82 F.3d 1085 (D.C. Cir. 1996)...............................................................................................12

*Larned v. Griffin*,
  12 F. 590, 594 (C.C.D. Mass. 1882) ......................................................................................20

*Lewis-Mota v. Secretary of Labor*,
  469 F.2d 478 (2d Cir. 1972)....................................................................................................15

*Lopez Benitez v. Francis*,
  795 F. Supp. 3d 475 (S.D.N.Y. 2025) .................................................................................. 2, 7

*Manufacturers Ry. Co. v. Surface Transp. Bd.*,
  676 F.3d 1094 (D.C. Cir. 2012)..............................................................................................16

*Mathews v. Eldridge*,
  424 U.S. 319 (1976).................................................................................................................25

*Matter of Sugay*,
  17 I. & N. Dec. 637 (BIA 1981) ...............................................................................................2

*Meekins v. Smith* (1791),
  126 Eng. Rep. 363....................................................................................................................20

*Miles v. McCullough*,
  1803 WL 810 (Pa. 1803)..........................................................................................................20

*Montilla v. I.N.S.*,
  926 F.2d 162 (2d Cir. 1991).............................................................................................. 24, 25

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
  463 U.S. 29 (1983).............................................................................................................*passim*

*Munoz Materano v. Arteta*,
  No. 25-CV-6137, 2025 WL 2630826 (S.D.N.Y Sept. 12, 2025) ...........................................25

*N.W. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
  477 F.3d 668 (9th Cir. 2007) ..................................................................................................17

iii

*Nat'l Audubon Soc'y v. Hoffman*,
  132 F.3d 7 (2d Cir. 1997) ..................................................................................12

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005).........................................................................................24

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998)........................................................................25

*Nat'l Wildlife Fed'n v. Benn*,
  491 F. Supp. 1234 (S.D.N.Y. 1980)..................................................................16

*Netograph Mfg. Co. v. Scrugham*,
  197 N.Y. 377 (1910) .........................................................................................20

*New York v. ICE*,
  No. 19-cv-08876 (S.D.N.Y. 2020).....................................................................15

*New York v. Trump*,
  767 F. Supp. 3d 44 (S.D.N.Y. 2025) ............................................................ 16, 22

*New York v. U.S. Immigr. & Customs Enf't*,
  466 F. Supp. 3d 439 (S.D.N.Y. 2020) ........................................................... 4, 21

*Norris v. Beach*,
  2 Johns. 294 (1807) ..........................................................................................20

*Orchard's Case* (1828),
  38 Eng. Rep. 987...............................................................................................20

*People of State of Cal. v. F.C.C.*,
  39 F.3d 919 (9th Cir. 1994)........................................................................ 14, 16

*R.F.M. v. Nielsen*,
  365 F. Supp. 3d 350 (S.D.N.Y. 2019) ............................................................ 12, 17

*Rainwater v. United States*,
  356 U.S. 590 (1958).........................................................................................21

*Rural & Migrant Ministry v. EPA*,
  565 F. Supp. 3d 578 (S.D.N.Y. 2020) ........................................................... 12, 25

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019)...............................................................17

*Salazar v. King*,
  822 F.3d 61 (2d Cir. 2016) ...............................................................................22

*Saravia v. Sessions*,
  280 F. Supp. 3d 1168 (N.D. Cal. 2017) ..............................................................2

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947).................................................................................... 13, 14

*State v. ICE*,
  431 F. Supp. 3d 377 (S.D.N.Y. 2019) .................................................... 20, 21, 22

*Stewart v. Ramsay*,
  242 U.S. 128 (1916) ..........................................................................................20

*Tumba Huamani v. Francis*,
   No. 25-CV-8110, 2025 WL 3079014 (S.D.N.Y. Nov. 4, 2025) ...................................................... 2, 5
*United States ex rel. Accardi v. Shaughnessy*,
   347 U.S. 260 (1954)........................................................................................................................1, 24, 25
*Velazquez-Hernandez v. ICE*,
   500 F. Supp. 3d 1132 (S.D. Cal. 2020).......................................................................................................21
*Velesaca v. Decker*,
   458 F. Supp. 3d 224 (S.D.N.Y. 2020) .................................................................................................. 12, 16
*Venetian Casino Resort, L.L.C. v. E.E.O.C.*,
   530 F.3d 925 (D.C. Cir. 2008)..................................................................................................................... 12, 15
*Walpole v. Alexander* (1782),
   99 Eng. Rep. 530................................................................................................................................................20

## Statutes

5 U.S.C. § 701 ..................................................................................................................................................22
5 U.S.C. § 706 .............................................................................................................................................. 2, 13
8 U.S.C. § 1226 ..................................................................................................................................................2
8 U.S.C. § 1229 ................................................................................................................................................21
8 U.S.C. § 1229a ................................................................................................................................................2
8 U.S.C. § 1231 ..................................................................................................................................................2

## Regulations

8 C.F.R. § 1003.0.......................................................................................................................................... 8, 25
8 C.F.R. § 1003.10........................................................................................................................................ 8, 22, 24
8 C.F.R. § 1003.18..........................................................................................................................................24
8 C.F.R. § 1003.19...........................................................................................................................................2
8 C.F.R. § 1003.23..........................................................................................................................8, 22, 23, 24
8 C.F.R. § 1003.29..........................................................................................................................................24
8 C.F.R. § 1003.9........................................................................................................................................ 8, 22, 25
8 C.F.R. § 1236.1...............................................................................................................................................2
8 C.F.R. § 1239.2.............................................................................................................................................22
8 C.F.R. § 239.2 ........................................................................................................................................*passim*

## Other Authorities

3 William Blackstone, *Commentaries on the Laws of England* 289 (1768).......................................................20

## PRELIMINARY STATEMENT

Plaintiffs submit this supplemental brief in response to the Court's Order directing the parties to submit replacement summary judgment briefing in light of the government's recent change in position in this case. ECF 87. Eight months ago, this Court considered a motion to stay the two policies Plaintiffs now seek to vacate: (1) an "Immigration Court Arrest Policy" pursuant to which U.S. Immigration and Customs Enforcement ("ICE") conducts widespread arrests at immigration courts; and (2) an "EOIR Dismissal Policy" pressuring Immigration Judges ("IJs") to dismiss noncitizens' full removal proceedings without cause or meaningful process. ECF 51 ("Op."). The Court has now stayed both challenged policies and held that, even on a preliminary record, Plaintiffs were likely to succeed on their APA claims against each. *See id.*; ECF 90 ("Rev. Op."). The corrected record on summary judgment requires the same result, and the Court should grant Plaintiffs' motion.

*First*, for the same reasons discussed in the Court's revised stay opinion, the Immigration Court Arrest Policy is arbitrary and capricious. The corrected record now plainly demonstrates the government 1) reversed a decades-long general prohibition on arrests at *immigration* courts specifically without reflecting "a conscious awareness that the new policy did not apply to immigration courthouses," and 2) "failed to offer even a rudimentary reason" why unfettered ICE discretion was better than the policy it was rescinding. Rev. Op. at 10. The record further shows ICE's *actual policy* "of allowing arrests unfettered by any agency guidance," *id.*, in fact has chilled access and disrupted proceedings.

*Second*, the record confirms the EOIR Dismissal Policy is contrary to law and arbitrary and capricious for the same reasons this Court issued a stay: it is an unjustified deviation from the agency's own regulations. The Dismissal Policy also violates the *Accardi* doctrine and due process, depriving people of fundamental fairness in proceedings.

For all these reasons, Plaintiffs African Communities Together ("ACT") and The Door—whose members are being irreparably harmed—are entitled to summary judgment and an order vacating the government's unlawful policies pursuant to 5 U.S.C. § 706.

## STATEMENT OF MATERIAL FACTS

### 1. *The Government's Long-standing Policy Restricting Immigration Court Arrests*

ICE typically arrests noncitizens when *initiating* proceedings, 8 U.S.C. § 1226(a), or executing a final order of removal, 8 U.S.C. § 1231(a)(2). Fleischaker Decl. (ECF 68-10) ¶ 9. At the point of arrest, ICE evaluates whether detention is mandated or warranted based on flight risk or danger, subject to IJ review. *See* 8 U.S.C. §§ 1226(a), (c), 1231(a)(2); 8 C.F.R. §§ 1003.19, 1236.1(c)(8). Thus, noncitizens in non-detained immigration proceedings have already received a determination that detention is unnecessary. *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017); Cassin Decl. (ECF 68-6) ¶ 7. ICE may only arrest that noncitizen where there is a "change of circumstance" relevant to flight or danger during ongoing removal proceedings. *See Matter of Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981); *Tumba Huamani v. Francis*, No. 25-CV-8110, 2025 WL 3079014, at *6–7 (S.D.N.Y. Nov. 4, 2025) (immigration court arrest violated due process where no assessment of "a change in custody status was warranted"); *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 495 (S.D.N.Y. 2025) (immigration court arrest violated due process where no "individualized assessment" of "change in circumstances" (citation omitted)).

Generally, such a "change in circumstances" is rare for people attending their ongoing immigration court proceedings. Fleischaker Decl. ¶ 9. This group is not evading ICE; they are complying with the immigration process and appearing in proceedings where ICE is the opposing party. *See* 8 U.S.C. § 1229a. In addition, ICE may enroll noncitizens in its Intensive Supervision Appearance Program which "support[s] [noncitizens'] compliance with release conditions while on ICE's non-detained docket" and "increases court appearance rates." Belsher Decl. Ex. J (ECF 69-10); Ex. K (ECF 69-11) (ICE data noting over 182,115 enrolled in ISAP between Oct. 1 and Nov. 16,

2025 and reflecting a 98.6% attendance rate at hearings). Should an arrest be warranted, ICE may—and regularly does—arrest noncitizens at mandated ICE "check-ins," or at their home or work addresses, which noncitizen respondents must provide to ICE and EOIR. Rey Caldas Decl. (ECF 68-16) ¶¶ 33–34; Belsher Decl. Exs. G–I (ECFs 69-7–69-9).

In the decades preceding the policies challenged here, Department of Homeland Security ("DHS") agents largely refrained from conducting civil arrests of people attending proceedings at immigration courthouses. *See* Hausman Decl. (ECF 68-12) ¶¶ 6–7; Fleischaker Decl. ¶¶ 9–10, 29; ECF 23-2 ¶ 33; ECF 23-10 ¶ 5; ECF 23-7 ¶¶ 8, 19; Chamberlin Decl. (ECF 68-7) ¶ 6; Rey Caldas Decl. ¶¶ 7–9; Dillon Decl. (ECF 68-9) ¶ 6; Cassin Decl. ¶ 6. DHS has issued exactly one written policy applicable specifically to civil arrests at immigration courts, which prohibited such arrests with limited exceptions. On April 27, 2021, DHS issued a memorandum prohibiting agents from conducting "civil immigration enforcement action . . . in or near a courthouse," including immigration courts, except in limited exigent circumstances.[1] A.R. 25-27 ("2021 Memo"). The memo notes law enforcement's "special responsibility to ensure [] access to the courthouse," and cites as a "core principle" underlying this policy that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses, and as a result, impair the fair administration of justice." *Id.* at 25; *see* Fleischaker Decl. ¶¶ 23–34. EOIR likewise issued a 2023 memorandum stating, absent the limited circumstances in DHS's 2021 Memo, it would prohibit civil immigration enforcement actions in or near immigration courts. *See* ECF 23-2 at 13 (finding arrests at immigration court would "inevitably produce a 'chilling effect' on noncitizens who appear [in] immigration courts," hinder the court's efficiency and mission, and endanger people at court). EOIR's 2023 memo superseded a 1996 policy limiting such arrests to noncitizens with final removal orders. *Id.* ¶¶ 24–29. These memoranda confirm,

---

[1] Even in those exigent circumstances, courthouse arrests were permitted only "at the conclusion of the judicial proceeding that brought the individual to the courthouse." A.R. 27.

3

in the decades preceding the current policy, DHS had a policy of severely limiting arrests at immigration courts. Thus, during this period, arrests at immigration courts remained extremely rare. Fleischaker Decl. ¶ 10; Chamberlin Decl. ¶ 6; Rey Caldas Decl. ¶¶ 7–8; Dillon Decl. ¶ 6; Hausman Decl. ¶¶ 6–7.

In the decades that this general prohibition on arrests at immigration courts was in effect, DHS issued memoranda addressing civil arrests at *other* courthouses and certain sensitive locations, limiting arrests to people understood to be public safety risks or otherwise evading ICE. *See generally* A.R. For example, in 2015, ICE issued guidance limiting enforcement actions at or near courthouses to noncitizens who posed a serious risk to public safety, but did not mention immigration courts or other types of courthouses dedicated to purely civil matters. *See* A.R. 20; Fleischaker Decl. ¶ 11.

Similarly, in 2018, ICE issued guidance ("2018 Memo") expanding courthouse arrest authority to target noncitizens who are public safety risks and evading ICE[2] at "*federal, state and local courthouses*" while largely exempting courthouses "dedicated to non-criminal [] proceedings," absent exceptional circumstances with high-level approval. A.R. 21–22. The 2018 Memo did not apply to immigration courts by its terms or in practice. Fleischaker Decl. ¶¶ 11, 18, 22. Tellingly, this memo did not prompt EOIR to change its policy limiting arrests at its courts as it did after ICE issued the 2021 Memo. And while arrests at state and local courthouses increased in this period,[3] arrests at immigration court remained rare. Hausman Decl. ¶ 6; Chamberlin Decl. ¶ 6; Rey Caldas Decl. ¶ 8; Dillon Decl. ¶ 6.

### 2. DHS Abruptly Changes Course, Begins Conducting Mass Immigration Court Arrests

In a dramatic departure from its decades-long policy, beginning on May 21, 2025, ICE began an unprecedented nationwide campaign of arresting large numbers of people at immigration courts,

---

[2] The 2018 Memo limits "targeted aliens" to noncitizens who are unlikely to be in non-detained removal proceedings or appear for those proceedings, including noncitizens with "criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed." A.R. 21.

[3] *New York v. U.S. Immigr. & Customs Enf't*, 466 F. Supp. 3d 439, 443 (S.D.N.Y. 2020) (noting increase of immigration arrests at state and local courthouses in New York in 2017, 2018, and 2019).

with New York City as its epicenter ("Immigration Court Arrest Policy"). *See* Chamberlin Decl. ¶¶ 8, 13; Rey Caldas Decl. ¶¶ 7–9; Cassin Decl. ¶¶ 6, 8; Hausman Decl. ¶¶ 6–7. Pursuant to this new policy, groups of armed ICE agents station themselves in immigration courts, including in busy hallways, waiting areas, and courtrooms, so that they can apprehend and arrest individuals as they leave the courtroom. ECF 23-2 ¶ 35; Fleischaker Decl. ¶¶ 43–45; ECF 23-4 ¶ 14; Dillon Decl. ¶ 11; Chamberlin Decl. ¶¶ 14–15; ECF 23-11 ¶¶ 17, 22(a)–(e), 27; ECF 23-5 ¶ 5; Cutler Decl. (ECF 68-8) ¶¶ 7, 10; Remy Decl. (ECF 68-15) ¶¶ 7–13; Rey Caldas Decl. ¶¶ 17–22; Botsch Decl. (ECF 68-5) ¶¶ 4–5; Cutler Decl. ¶¶ 10, 12–13; Flores-Dixit Decl. (ECF 68-11) ¶¶ 5–11; ECF 23-9 ¶¶ 12, 21–22; Huamani Decl. (ECF 68-13) ¶ 9. The agents are often masked, wear plain clothing, and fail to identify themselves. *See* ECF 24-16; Belsher Decl. Ex. O (ECF 69-15); ECF 23-11 ¶¶ 17, 22(a)–(e), 27; ECF 23-5 ¶ 12; ECF 23-9 ¶¶ 12–15, 20–21; ECF 23-7 ¶¶ 4, 8, 10–11, 14, 17; ECF 23-10 ¶ 4; Cutler Decl. ¶ 12; Remy Decl. ¶ 10; Rey Caldas Decl. ¶ 23; Cassin Decl. ¶¶ 12–13. This approach has led to confusion and chaos as unidentified armed agents accost people seemingly at random—including court staff and attorneys. Cutler Decl. ¶ 12; Cassin Decl. ¶ 13; Dillon Decl. ¶ 15; ECF 23-9 ¶ 13.

These arrests—which occur in narrow public hallways, elevators, or lobbies—have often resulted in violence, harming press, court staff, noncitizens, and those attempting to accompany them. *See Tumba Huamani*, 2025 WL 3079014, at *7 (describing "violent" immigration courthouse arrest); Huamani Decl. ¶ 9; Cutler Decl. ¶¶ 10–13; Remy Decl. ¶¶ 8–9; Dillon Decl. ¶¶ 13, 15; Rey Caldas Decl. ¶¶ 27–30; Rowland-Kain Decl. (ECF 68-17) ¶¶ 10–11; ECF 23-7 ¶ 17; Belsher Decl. Ex. P (ECF 69-16). The arrests also wreak havoc on IJs' ability to set deadlines, manage dockets, and ensure decorum. *See* ECF 23-4 ¶ 15; ECF 23-12 ¶¶ 9–10; Dillon Decl. ¶¶ 12, 16 19; Chamberlin Decl. ¶ 16; Rey Caldas Decl. ¶¶ 22–23, 26–30; Cassin Decl. ¶¶ 12–13, 17–19. IJs must conduct proceedings and noncitizens must present their asylum cases over audible crying and yelling due to arrests in the hallways outside their courtrooms. Dillon Decl. ¶¶ 12, 16; Rey Caldas Decl. ¶¶ 22–23, 26; Cassin Decl.

¶ 16; Cutler Decl. ¶¶ 10–12; Remy Decl. ¶¶ 11–13; Botsch Decl. ¶ 7. Some noncitizens are so terrified that they refuse to leave the courtroom while ICE is in the hallway. Cutler Decl. ¶¶ 7–9; Rey Caldas Decl. ¶¶ 23, 26; Dillon Decl. ¶ 14; Chamberlin Decl. ¶ 12. An IJ was forced to halt proceedings while ICE chased a noncitizen around the courtroom attempting arrest. Cutler Decl. ¶ 10. ICE arrests individuals *irrespective* of whether their removal proceedings are ongoing, rendering IJs' mandatory advisals of rights illusory and depriving those IJs of jurisdiction, no matter the stage of proceeding. ECF 23-9 ¶¶ 13, 15; ECF 23-11 ¶¶ 22(e), 25; ECF 23-12 ¶¶ 4–5; ECF 23-3 ¶¶ 7–8; Dillon Decl. ¶ 19, 20; Rey Caldas Decl. ¶ 17; Fleischaker Decl. ¶ 44; Chamberlin Decl. ¶ 17.

Immigration arrests in immigration courts have risen at exponential rates. Hausman Decl. ¶¶ 6–7. In July 2025 alone, ICE arrested 254 people at New York City immigration courts—a 3,529 percent increase from the 7 people detained in July 2024. *Id.* ¶ 7. The arrests are not, as in prior administrations, limited to people presenting public safety or flight risks. A.R. 20, 21, 25. They include noncitizens who have established ties to the United States and no criminal history. Fleischaker Decl. ¶ 52; Rey Caldas Decl. ¶¶ 31–32; Cassin Decl. ¶ 7; Hausman Decl. ¶¶ 8–10.

### 3. *DHS Issues New, Facially Inapplicable Memorandum on Courthouse Arrests*

On January 21, 2025, ICE rescinded the 2021 Memo and issued a memorandum to all ICE employees mirroring the 2018 Memo. A.R. 51–53. On May 27, 2025, ICE circulated a final version of the memo (the "2025 Memo").[4] A.R. 1–3. Critically, while revoking the 2021 Memo—which restricted arrests at immigration courts—the 2025 Memo is silent as to immigration courts specifically. Instead, it restates the 2018 Memo's justifications and emphasis on arresting noncitizens at criminal courts who are public safety risks and evading ICE. *Compare* A.R. 1–3 *with* A.R. 21–23. ICE has since conceded that the 2025 Memo does not and never has applied to immigration courts. ECF 77 at 1.

---

[4] This final memo is substantively the same as the interim guidance except it purports to permit courthouse arrests even if doing so would violate local or state law. *Compare* A.R. 1–3 *with* A.R. 51–53.

Likewise, the Administrative Record produced by the agency—certified as "a true and complete copy" of materials considered by ICE in issuing the 2025 Memo—confirms the government's admission that the 2025 Memo does not apply to immigration courts. It contains only the courthouse arrest memoranda discussed above and guidance on immigration enforcement at "sensitive" locations (*e.g.*, schools, places of worship) or against certain crime victims. Apart from its inclusion of the 2021 Memo, the Administrative Record contains no reference to immigration courts at all.

### 4. The Immigration Court Arrest Policy Dramatically Chills Court Attendance

The Immigration Court Arrest Policy has severely chilled access to immigration court—the precise harm the agency's decades-long policy of limiting these arrests was designed to prevent. ICE's new policy has made immigration courts sites of uncertainty and terror. *See* ECF 23-4 ¶ 15; ECF 23-2 ¶¶ 34–35; ECF 23-9 ¶¶ 10, 12, 19, 21–22; ECF 23-11 ¶ 33; ECF 23-7 ¶¶ 26–27; ECF 23-5 ¶ 15; ECF 23-12 ¶¶ 8–12; Dillon Decl. ¶ 18; Rey Caldas Decl. ¶¶ 26, 29–30; Cassin Decl. ¶¶ 12–13, 16–17; Cutler Decl. ¶¶ 7–13; Remy Decl. ¶¶ 6–13; Rowland-Kain Decl. ¶¶ 14–16; Botsch Decl. ¶ 8; Fleischaker Decl. ¶ 53. Noncitizens nationwide, including Plaintiffs' members, attending their mandatory hearings are now at risk of arrest, detention, loss of employment, family separation, medical care interruption, and even deportation, all for complying with legal obligations. *Lopez Benitez*, 795 F. Supp. 3d at 499 (such arrests appear "arbitrary," transforming "attendance in immigration court [into] a game of detention roulette"). Those relying on ICE's past policy are ambushed, unprepared to be arrested—leaving their families and employers behind with no notice. A. Bah Decl. (ECF 68-1) ¶¶ 8–14; Barry Decl. (ECF 68-4) ¶¶ 7–16. Others who know the risks must make an impossible choice: participate in their immigration cases at their peril or live in the shadows with an *in absentia* removal order over their heads. Huamani Decl. ¶¶ 5, 7–10; *see* ECF 23-2 ¶ 34; ECF 23-4 ¶ 15; ECF 23-11 ¶¶ 29–32; ECF 23-7 ¶¶ 27–31; ECF 23-1 ¶ 14. Rates of absenteeism and *in absentia* removal orders have predictably

skyrocketed. Hausman Decl. ¶ 7; Dillon Decl. ¶ 17; Chamberlin Decl. ¶ 16; Rey Caldas Decl. ¶ 24; Cassin Decl. ¶¶ 20–21; Rowland-Kain Decl. ¶¶ 14–16; Flores-Dixit Decl. ¶ 12; ECF 23-4 ¶ 15. Noncitizens may later seek to reopen those orders under a high standard, prolonging the removal process. Fleischaker Decl. ¶ 51.

### 5. EOIR Authorizes IJs To Dismiss Removal Proceedings in Violation of Agency Rules

At the same time ICE enacted its Immigration Court Arrest Policy, DHS began moving to dismiss large categories of noncitizens' full removal proceedings, often orally and without advance notice, on the basis that such proceedings were no longer in the government's interest. Dillon Decl. ¶ 7; Chamberlin Decl. ¶¶ 8–9; Rey Caldas Decl. ¶ 10; Cassin Decl. ¶ 8. Governing regulations and the Immigration Court Practice Manual generally require that these motions be "in writing" and "state with particularity the grounds" for the request and that IJs provide the opposing party the opportunity to "timely respond." 8 C.F.R. § 1003.23(a); *see also* ECF 24-5 (subsections 3.1(b)(1)(A)–(B)). These regulations apply "[u]nless otherwise permitted by the immigration judge," 8 C.F.R. § 1003.23(a), who "shall exercise their *independent* judgment and discretion," 8 C.F.R. § 1003.10(b) (emphasis added), in making any such determinations. *See also* 8 C.F.R. § 1003.9(c) ("The Chief Immigration Judge shall have no authority to direct the result of an adjudication assigned to another immigration judge"); 8 C.F.R. § 1003.0(c). Critically, DHS may only move to dismiss under INA 239.2(a)(7) if they can show that "[c]ircumstances of *the case*"—*i.e.* "a new fact or condition that is specific to the case at hand"— have changed . . . to such an extent" that it warrants dismissal. *Id.*; Op. at 27.

On May 30, 2025, EOIR issued guidance informing IJs that DHS had begun "carrying out enforcement actions in or near EOIR space" and moving to dismiss pending cases due to the government's new enforcement priorities and case backlog reduction efforts. ECF 24-12. In light of these "recent developments," and to "ensure the expeditious adjudication of cases," the guidance advises that "DHS Motions to Dismiss may be made orally and decided from the bench. No additional

8

documentation or briefing is required." *Id.* Further, it instructs that "[g]enerally, if DHS has met the regulatory burden, the oral motion to dismiss may be granted. A 10-day response period is not required." *Id.* Lastly, the advisal states that pursuant to "INA 239.2(a)(7)" [*sic*] (8 C.F.R. § 239.2(a)(7)), DHS need only prove that "circumstances have changed to such an extent that continuation is no longer in the best interest of the government," omitting key language—"circumstances of the *case*"— from the regulation and misrepresenting the government's burden. *Id.* This guidance was issued as the Trump Administration began firing scores of IJs. ECF 45-3 ¶¶ 12–13. The message was clear—grant DHS's motions to dismiss or risk termination. *See* ECF 24-14; ECF 24-15; ECF 45-3 ¶¶ 12–15; ECF 46-1 ¶¶ 2–5; Dillon Decl. ¶¶ 10, 21; Cassin Decl. ¶ 22.

Accordingly, pursuant to the EOIR Dismissal Policy, IJs began (1) permitting DHS attorneys to orally move to dismiss without advance written notice or showing of individualized "changed circumstances;" (2) adjudicating these motions on the spot without allowing the noncitizen to file a written opposition; and (3) granting the motions irrespective of the noncitizen's pending applications for relief from removal. ECF 24-13; ECF 23-11 ¶¶ 14, 20–21, 22(f), 23; *see, e.g.*, ECF 23-5 ¶¶ 9–10; ECF 23-10 ¶¶ 7, 18, 21, 22, 24; ECF 23-7 ¶¶ 9–10, 12; ECF 23-9 ¶¶ 5, 7, 9, 22; Dillon Decl. ¶¶ 7–11.

On September 12, 2025, this Court found that Plaintiffs were likely to succeed in showing that the EOIR Dismissal Policy is contrary to law, staying the policy. Op. at 26–31.[5] EOIR has since failed to produce *any* administrative record shedding light on this policy.

6. *The Government Admits to Making and Perpetuating a Material Misrepresentation*

On March 24, 2026, over two months after briefing for the parties' summary judgment motions was complete, the government notified Plaintiffs' counsel and the Court of a "material mistaken statement of fact" at the core of their case. ECF 77 at 1. The government conceded that the

---

[5] Defendants later purported to withdraw this policy, claiming it did not reflect official policy and was merely guidance. ECF 58.

May 27, 2025 Memo "does not and has *never* applied to" civil immigration arrests at immigration courts and accordingly, that their only defense to Plaintiffs' arbitrary and capricious claim must be "withdraw[n]." *Id.* (emphasis added). The government has since clarified that its position now is that the 2025 Memo rescinded the 2021 Memo, *see* ECF 88 at 8, but does not itself contain any guidance regarding civil immigration arrests at immigration courts.

In light of this development, on May 18, 2026, the Court granted Plaintiffs' motion to modify the Court's September 12, 2025 Opinion on Plaintiffs' Motion to Stay, held that Plaintiffs were likely to succeed in showing that the Immigration Court Arrest Policy violates the APA, and stayed the policy. Rev. Op. at 6–13. The Court held that the rescission of the 2021 Memo was arbitrary and capricious on two independent grounds: (1) it "did not reflect a conscious awareness that the new policy did not apply to immigration courthouses;" and (2) it "failed to offer even a rudimentary reason" why unfettered ICE discretion was better than the policy it was rescinding. *Id.* at 10.

### 7. *The Challenged Policies Continue to Severely Harm Plaintiffs and Their Members*

Plaintiff The Door is a membership-based organization with more than 9,000 members, many of whom are noncitizens in removal proceedings. ECF 23-1 ¶¶ 6–13. The challenged policies have forced The Door to divert staff and resources from its core activity of providing full-scope immigration representation to members, frustrated its mission, and resulted in at least three members being detained. *Id.* ¶¶ 24–35; Baltimore Decl. (ECF 68-3) ¶¶ 6–7, 11, 31–34. One member was detained at the Broadway Immigration Court in June 2025 after the government successfully moved to dismiss his full removal proceedings despite his pending applications for asylum and Special Immigrant Juvenile Status. ECF 23-1 ¶ 37. He was released after a federal court granted his habeas petition in November 2025. Baltimore Decl. ¶ 14. Another Door member, Abdoul Gadiri Bah, was detained at the Broadway Immigration Court on May 29, 2025, following his hearing. *Id.* ¶ 20. He remains detained

in Louisiana. *Id.* A third Door member was detained at the immigration court at 26 Federal Plaza after his immigration hearing. *Id.* ¶ 21. He was detained for 3 months until he was granted asylum and released. *Id.* The Door is aware of at least forty-six members with immigration hearings scheduled between December 3, 2025 and December 29, 2026 who could be subject to the challenged policies. *Id.* ¶ 12. Door members are terrified to attend court because of this risk. ECF 23-1 ¶ 43; Baltimore Decl. ¶ 22.

Plaintiff ACT is a membership-based organization with thousands of members across three chapters in New York, the D.C. metro area, and Pennsylvania, many of whom are noncitizens in removal proceedings. ECF 23-8 ¶¶ 5, 12. At least five ACT members have been detained pursuant to the Immigration Court Arrest Policy. Konaté Decl. (ECF 68-14) ¶ 6. One member, Mamadou Barry, was arrested immediately after his immigration court hearing, despite a pending asylum application, and transferred to a detention facility in Texas, where he lacks adequate medical care. ECF 23-8 ¶¶ 16–23; Konaté Decl. ¶ 10. Another member was arrested after attending his hearing and released only after his habeas petition was granted over one month later. Konaté Decl. ¶ 11. ACT has identified at least 21 members who have hearings in their immigration cases scheduled to take place next year. *Id.* ¶¶ 7–8.

As this Court found, The Door has demonstrated organizational standing. Op. at 17–20; Rev. Op. at 5. With the identification of harmed members who would "otherwise have standing to sue in their own right," *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 117–18 (2d Cir. 2025), both Plaintiffs have demonstrated associational standing too, *see* Konaté Decl. ¶ 10; Baltimore Decl. ¶¶ 19–20; Barry Decl.; A. Bah Decl.; M. Bah Decl. (ECF 68-2). The Plaintiffs seek to protect interests "germane to the[ir] organization's purpose," 126 F.4th at 117–18, of supporting noncitizens in removal proceedings, *see* ECF 23-8 ¶¶ 3–6; ECF 23-1 ¶¶ 4–5, 11, 13, 24, 32–34. Plaintiffs' claims, which seek set aside relief, do not require participation of individual members. *See Rural & Migrant Ministry v. EPA*, 565 F. Supp.

11

3d 578, 597 (S.D.N.Y. 2020) (finding this element met in APA challenge).

## STANDARD

Judicial review under the APA is ordinarily "based on the full administrative record that was before the [agency] at the time [it] made [its] decision," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), but the "'record rule' is not absolute," *Citizens Against Casino Gambling in Erie Cnty. v. Stevens*, 814 F. Supp. 2d 261, 265 (W.D.N.Y. 2011) (quoting *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997)). Courts may consider extra-record material when: (1) there is "such failure to explain administrative action as to frustrate effective judicial review," *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973); (2) "the record does not support the agency action;" (3) "the agency has not considered all relevant factors;" or (4) "the reviewing court simply cannot evaluate the challenged action on the basis of the record before it," *Nat'l Audubon Soc'y*, 132 F.3d at 14. These principles apply with added force when plaintiffs challenge partially unwritten, *de facto* or informal policies and a sparse record, as courts have emphasized that the APA's requirements are not confined to formal rules or published policies but "applies equally to practices implied from agency conduct." *Velesaca v. Decker*, 458 F. Supp. 3d 224, 237 (S.D.N.Y. 2020) (citation omitted). In such cases, courts must look beyond the record to determine what the agency is actually doing to "ascertain the contours of the precise policy at issue." *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 928 (D.C. Cir. 2008) (citation omitted); *see Velesaca*, 458 F. Supp. 3d at 227, 241–44 (relying on internal guidance, detention statistics, and declarations to find ICE had "adopted and implemented" a no-release policy); *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 373–75 (S.D.N.Y. 2019) (relying on internal instructions and sharp shift in outcomes to identify a new policy); *see also Hispanic Affs. Project v. Acosta*, 901 F.3d 378, 386–87 (D.C. Cir. 2018) (approving use of declarations to prove existence and operation of an unwritten policy); *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996) (district courts may have "to engage in independent fact-finding" in APA cases).

12

## ARGUMENT

### I.     The Immigration Court Arrest Policy Violates the APA.

The APA permits courts to "hold unlawful and set aside agency action" that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C). This Court has held that the Immigration Court Arrest Policy is reviewable under the APA, Rev. Op. at 9–10; that it is arbitrary and capricious for two independent reasons, *id.* at 10–13; and that it should be stayed; *id.* at 15. For those same reasons, and for all those discussed below, it should now be set aside.

### A.  *The Policy Fails To Consider Important Aspects of the Problem and Alternatives.*

Agency action is arbitrary and capricious when the agency has "failed to consider important aspect[s] of the problem." *DHS v. Regents of the U.C.*, 591 U.S. 1, 25 (2020) (cleaned up). To engage in "reasoned decisionmaking," agencies must "look at the costs as well as the benefits" of their actions. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 52, 54 (1983). To "comply with [] procedural requirements," *Regents*, 591 U.S. at 21, agencies reversing course "must [] set forth with such clarity as to be understandable" the action's basis, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*).

ICE's rescission of the 2021 Memo and implementation of its new Immigration Court Arrest Policy—which is final agency action subject to APA review, *see* ECF 45 at 2-3, ECF 86 at 9–10, ECF 89 at 3–4, Rev. Op. at 9–11—is arbitrary and capricious because ICE failed to consider the "core principle" animating its decade-long practice and policy of minimizing arrests at immigration court: preserving access to justice. The 2021 Memo explicitly states law enforcement has a "special responsibility to ensure [] access to the courthouse," and cites as a "core principle" the chilling effect of courthouse arrests on "access to courthouses" and "the fair administration of justice." A.R. 25. Yet, neither the 2025 Memo nor the administrative record consider—or even mention—this "important

aspect of the problem" or the "costs" the government imposed when it rescinded the 2021 Memo's protections as to immigration courts. *State Farm*, 463 U.S. at 43, 52. Since the administrative record is inapplicable to the government's *new* policy at immigration courts, there is thus no evidence the agency considered how mass arrests will undermine the fair administration of justice by deterring noncitizens from attending court and disturbing IJs' dockets mid-way through proceedings. *See supra* Facts at 8; Fleischaker Decl. ¶¶ 36, 49–51.

While the 2025 Memo rescinded the 2021 Memo, on the government's own admission, the 2025 Memo "offers no reason," *Regents*, 591 U.S. at 28, why these concerns—key to the 2021 Memo—are inapplicable or addressed by the new policy, *id.* at 24–33 (holding decision to terminate Deferred Action for Childhood Arrivals arbitrary and capricious because the DHS memo "failed to consider" one key feature of DACA—forbearance of removal). Indeed, the government admits the reasons provided in the 2025 Memo do not apply to immigration courts, *see supra* Facts at 6–7; the memo therefore does not consider chilling access to, or impeding the administration of justice in, *immigration* courts. Nor does it consider obvious reasonable alternatives uniquely applicable to people appearing in immigration court. These include enrolling noncitizens in ICE's supervision program or conducting lawful arrests at an ICE check-in or at their home address which the immigration court has on file. *See id.*.

To the extent the Court considers the bare, largely irrelevant administrative record, it similarly shows *no* consideration of these important aspects or reasonable alternatives. *See generally* A.R.; *People of State of Cal. v. F.C.C.*, 39 F.3d 919, 925 (9th Cir. 1994) ("If the record reveals that the agency has failed to consider an important aspect of the problem . . . , we must find the agency in violation of the APA." (cleaned up)); *see also Chenery II*, 332 U.S. at 196 (requiring agency to set forth basis of its action "with such clarity as to be understandable"); *id.* at 201. The record is mostly comprised of policies restricting ICE arrests at places noncitizens seek essential services, like hospitals, schools, and courts.

14

*See* A.R. 1–6, 12–34, 50–55. And aside from the 2021 Memo, which largely *prohibited* arrests at immigration courts, the record contains nothing specific to immigration courts. As the government now concedes, "with the exception of the 2021 [Memo], these memoranda have not included immigration courts." ECF 88 at 4. Accordingly, the administrative record contains *no* analysis of the likely "costs" of rescinding the 2021 Memo's protections, including chilled access, effects on removal proceedings, or the fact ICE has reasonable alternatives unique to people in immigration proceedings. *See supra* Facts at 6–7; *State Farm*, 463 U.S. at 52.

Further, ICE began carrying out its Immigration Court Arrest Policy on or around May 21, 2025, Cassin Decl. ¶ 8; *see* Hausman Decl. ¶¶ 6-7, six days before the 2025 Memo rescinding these protections was finalized. Despite these early arrests drawing intense media coverage and an outcry concerning its effects, Belsher Decl. Exs. A–F (ECFs 69-1–69-6), the administrative record shows no consideration of this response or analysis of its practical effects prior to its official retraction of the 2021 Memo, *see generally* A.R. This sharply contrasts with the administrative record filed in *New York v. ICE*, in which the agency considered media coverage of the practical effects and community reaction to the courthouse arrests policy implemented in state courts. No. 19-cv-08876 (S.D.N.Y. 2020) (ECF 55-2 at 26–48; ECF 75-1 at 9–17).

The record here demonstrates ICE's rescission of the 2021 Memo's protections—and its implementation of an actual de facto policy "allowing arrests unfettered by any agency guidance," Rev. Op. at 10—is one of widespread, often violent arrests, which have undisputably alarmed the public. *See supra* Facts at 4–6, 7–8; *see, e.g.*, Rey Caldas Decl. ¶¶ 14, 21–24, 26–30; Chamberlin Decl. ¶¶ 13–15; Dillon Decl. ¶¶ 11–19; Cassin Decl. ¶¶ 12–13, 16–17; Culter Decl. ¶¶ 7–15. *Lewis-Mota v. Secretary of Labor*, 469 F.2d 478, 481–82 (2d Cir. 1972) ("[T]he label that [] agency puts upon its given exercise of administrative power is not . . . conclusive; rather, it is what the agency does in fact."); *Venetian Casino Resort*, 530 F.3d at 928–35 (relying on district court's findings defining contours of de facto agency

15

policy and practices, noting "challenge is not to [agency's] Manual but to the policy underlying it");

*Velesaca*, 458 F. Supp. 3d at 237 (APA requirements "not limited to formal rules or official policies

and applies equally to practices implied from agency conduct") (cleaned up); *id.* at 327 n.7 (collecting

cases); *New York v. Trump*, 767 F. Supp. 3d 44, 76 (S.D.N.Y. 2025) (collecting cases); *Nat'l Wildlife Fed'n*

*v. Benn*, 491 F. Supp. 1234, 1241–42 (S.D.N.Y. 1980).

As the 2021 Memo predicted, the unconsidered "costs" of this policy change—from

conducting minimal arrests at immigration courts under exceptional circumstances to carrying out

mass arrests at immigration courts—have been substantial. Since ICE implemented the policy,

absenteeism has surged, pervasively harming noncitizens, legal service providers, and court operations.

*See, e.g.,* Hausman Decl. ¶ 8; ECF 23-4 ¶ 15; ECF 23-7 ¶ 28; ECF 23-11 ¶¶ 29–31; Rey Caldas Decl.

¶¶ 24–25; Chamberlin Decl. ¶¶ 16–17; Dillon Decl. ¶¶ 17; Rowland-Kain Decl. ¶¶ 14–16; Cassin Decl.

¶¶ 20–21; Culter Decl. ¶ 14. ICE's complete failure to consider or even acknowledge the principal

reason for the prior policy is fatal to the Immigration Court Arrest Policy. *See People of State of Cal.*, 39

F.3d at 925; *Regents*, 591 U.S. at 24–30 (violation of APA when "rescission memorandum contain[ed]

no discussion of" aspect of problem or alternative "option"); *State Farm*, 463 U.S. at 48, 51 (violation

of APA when "[n]ot one sentence of" agency decision "discusses" reasonable alternative).

### B.  The Immigration Court Arrest Policy Lacks a Reasoned Explanation.

Independently, agency action is arbitrary and capricious where an agency changes its previous

position—including when it "abandons [a] decades-old practice"—without (1) "display[ing] awareness

that it is changing position," (2) "show[ing] that there are good reasons for the new policy," or (3)

balancing those good reasons against "engendered serious reliance interests." *Encino Motorcars v.*

*Navarro*, 579 U.S. 211, 221–22 (2016) (citation omitted); *see also Mfrs. Ry. Co. v. Surface Transp. Bd.*, 676

F.3d 1094, 1096 (D.C. Cir. 2012) (court "will set aside agency action if . . . the agency 'reverses its

position in the face of a precedent it has not persuasively distinguished'"); *Am. Wild Horse Pres.*

*Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) (same); *N.W. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) (same); *R.F.M.*, 365 F. Supp. 3d at 379 ("[L]ack of a reasoned explanation for a policy" that was "departure from years of agency practice" is unlawful.) (cleaned up); *Saget v. Trump*, 375 F. Supp. 3d 280, 355 (E.D.N.Y. 2019) ("requirement" to explain "not limited to formal rules or official policies and applies equally to practices implied from agency conduct.").

First, just as the Court recently concluded in its revised opinion, Rev. Op. at 11–12, the 2025 Memo does not display any awareness of the sea change the Immigration Court Arrest Policy triggered in ICE arrest practices at *immigration courts*. *Encino Motorcars*, 579 U.S. at 221 (holding agency must "display awareness that it [was] changing [its] position"); Rev. Op. at 11–12 (holding ICE failed to demonstrate required awareness). Prior to the policy change, arrests at immigration courts were rare; since its enactment, they have skyrocketed. Hausman Decl. ¶¶ 6–7. The "before and after" of the policy is therefore not simply a matter of degree of permissiveness. Under the prior decades-old policy, most people could attend immigration court assured they could return to their families, jobs, and communities; under the new policy, no one is safe. While the January 21, 2025 Memo rescinded the 2021 Memo as a blanket matter, neither the January nor May 2025 Memo addresses the implications of this dramatic policy reversal at immigration courts or even describes what the agency's new policy will be with respect to those courts. ECF 77 at 1. As the administrative record concerns only the 2025 Memo, which the government admits is inapplicable to immigration courts, it also cannot—and does not—demonstrate the agency's awareness of its policy change. This failure to acknowledge the change in policy is fatal under the APA. *See State Farm*, 463 U.S. at 56–57; *Encino Motorcars*, 579 U.S. at 222.

Further, the Court found in its May 18, 2026 Order that the government's recent change in position, namely that immigration courts were never covered by the 2025 Memo, "was a recent invention and not the intent at the time." Rev. Op. at 11. The Court based its finding on the text of the 2025 Memo, which gave no indication immigration courts were excluded and the government's

17

affirmative representation otherwise for six months. That there "was no conscious decision to exclude immigration courthouses from the 2025 ICE Courthouse Arrest Policies" means "'awareness' was lacking in the January 2025 policy rescission." *Id.* at 11, 12 (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). The agency's "*sub silentio*" departure from prior policy is independently arbitrary and capricious. *Fox*, 556 U.S. at 515; *see also Encino*, 579 U.S. at 221–22.

Second, ICE has failed to provide "good reasons" for its policy change towards immigration courts. *Encino*, 579 U.S. at 221. In fact, as this Court held in its May 18, 2026 Order, ICE offered "no explanation of why the exercise of unfettered discretion by ICE officers with no guidance whatsoever was a better option . . . than the April 2021 Policy." Rev. Op. at 12; *id.* at 9–10. And the rationales offered in the 2025 Memo for ICE's other policy changes, courthouse safety and non-cooperative jurisdictions, "had no application to immigration courts." *Id.* at 13. Indeed, non-detained noncitizens attending their own proceedings are neither evading ICE nor presumed dangerous.

Since a "reviewing court should not attempt itself to make up for" an agency's "deficiencies" and "may not supply a reasoned basis for the agency's action that the agency itself has not given," *State Farm*, 463 U.S. at 43, a court cannot uphold an action that the agency "did not analyze or explain" in a reasoned or logical way, *Encino*, 579 U.S. at 224*; see also Regents*, 591 U.S. at 28–29 (agency's explanation for its policy reversal must explicitly and logically articulate reasons for reversal and "[t]he fact that there may be a valid reason" to pursue one choice "does not establish that [the agency] considered that option or that such consideration was unnecessary"). That principle is particularly applicable where, as here, the administrative record is thin and concerns only a memorandum the agency admits is inapplicable to the Immigration Court Arrest Policy. *See State Farm*, 463 U.S. at 57.

Third, ICE has failed to balance its reasons—again it has none—for the new policy against "engendered serious reliance interests." *Encino*, 579 U.S. at 222 (cleaned up); *Regents,* 591 U.S. at 30–32. Specifically, those pursuing relief in immigration court, as well as court officials, have long expected

18

that noncitizens could appear in immigration court to vindicate their rights and interests without risk of civil arrest. *See* Fleischaker Decl. ¶¶ 17, 22; Rowland-Kain Decl. ¶ 13; ECF 23-2 ¶ 34; ECF 23-3 ¶ 6 (arrested noncitizen had not brought important prescription); ECF 23-7 ¶¶ 18, 25 (arrested noncitizens missed medical care, left cars in parking lots, and had no time to give keys to partner); ECF 23-10 ¶ 14 (noncitizens "quickly text[ing] loved ones or ma[king] brief calls to say goodbye"). Noncitizens, including Plaintiffs' members, have relied on this expectation, based in part on their prior ability to attend and leave immigration proceedings at liberty and/or their release from custody with an order to appear in immigration court, to attend proceedings without making childcare, elder care, healthcare, and employment arrangements in the event of arrest. *See* A. Bah Decl. ¶¶ 8–16; Barry Decl. ¶¶ 7–18; Botsch Decl. ¶ 9; Flores-Dixit Decl. ¶ 13; ECF 23-3 ¶ 6; ECF 23-7 ¶ 18, 25; ECF 23-11 ¶ 20. Courts have relied on this expectation to set deadlines, manage their dockets, and ensure decorum in their courts. *See* Fleischaker Decl. ¶¶ 50–53; Chamberlin Decl. ¶ 17; Rey Caldas Decl. ¶¶ 21–30; Dillon Decl. ¶¶ 19–20; Cassin Decl. ¶¶ 16, 19–22; ECF 23-2 ¶ 34; ECF 23-5 ¶ 15; ECF 23-12 ¶¶ 9–10; ECF 45-1 ¶ 3. The bare administrative record and 2025 Memo show ICE did not acknowledge, let alone take "into account" these "serious reliance interests." *Fox*, 556 U.S. at 515; *see generally* A.R.; *Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39, 47, 54 (1st Cir. 2025) (lack of evidence "in the administrative record that [agency] considered the 'reliance interests'" engendered by prior policy is arbitrary and capricious); *see also Regents*, 591 U.S. at 33 (agency changing course must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns"); *Drs. for Am. v. OPM*, 793 F. Supp. 3d 112, 146 (D.D.C. 2025).

## C.  The Immigration Court Arrest Policy Is Ultra Vires.

This Court previously ruled that the INA did not incorporate a common law privilege against courthouse arrests. Op. at 32–37. Plaintiffs incorporate by reference their prior arguments, ECF 23 at 13–16; ECF 45 at 7–11, and respectfully submit that they should prevail on this issue for three reasons.

19

First, the Court relied on caselaw applying the privilege to *persons*, which does not fully address the scope of the privilege as it applies to *courthouses*. The privilege at English and American common law has two distinct applications that serve one purpose: the fair administration of justice. *See State v. ICE*, 431 F. Supp. 3d 377, 388 (S.D.N.Y. 2019); 3 William Blackstone, *Commentaries on the Laws of England* 289 (1768); ECF 23 at 13–14; *see, e.g.*, *Ex Parte Jackson*, 15 Ves. Jun. 117, 699 (1808) (discussing the privilege as to persons); *Cole v. Hawkins*, 95 Eng. Rep. 396, 396; *Andrews v. Martin*, 25 Victoria 371, 372 (1862) (discussing the privilege as to courthouses); *Stewart v. Ramsay*, 242 U.S. 128, 129–30 (1916) (discussing purpose). The privilege as to *persons* protects all individuals "in coming, in staying, and in returning" from judicial proceedings from civil arrest. *Walpole v. Alexander* (1782), 99 Eng. Rep. 530, 530–31; *see also Meekins v. Smith* (1791), 126 Eng. Rep. 363; *Norris v. Beach*, 2 Johns. 294 (1807). The privilege as to *courthouses* protects individuals in the physical location of a courthouse and its environs from civil arrest, no matter their purpose for being there. *See Orchard's Case* (1828), 38 Eng. Rep. 987, 987–88 (ordering the release of person based on the privilege, who, seeking to evade civil arrest, barely made it to the court's "outer door" where arrest occurred); *Blight v. Fisher*, 3 F. Cas. 704, 704–05 (C.C.D.N.J. 1809) ("The service of process, whether a[n arrest] or summons, in the actual or constructive presence of the court, is a contempt."); *Cameron v. Roberts*, 87 Wis. 291, 58 N.W. 376 (1894) (same); *Bridges v. Sheldon*, 7 F. 17, 44 (C.C.D. Vt. 1880) (same); *Miles v. McCullough*, 1803 WL 810 (Pa. 1803) (same); *Larned v. Griffin*, 12 F. 590, 594 (C.C.D. Mass. 1882) (same). *Netograph Mfg. Co. v. Scrugham*, 197 N.Y. 377 (1910), on which this Court relied, Op. at 35, concerned only the former, as the person claiming the privilege was served "at his hotel," *Netograph Mfg. Co.*, 197 N.Y. at 379. Critically, it notes the privilege serves the fair administration of justice and is "not simply a personal privilege" but also "the privilege of the court." *Id.* at 380. The privilege's protection of both people and courthouses—including immigration courts—ensure that parties and witnesses are not deterred

20

and that courts operate with decorum.[6] *State*, 431 F. Supp. 3d at 391–92; ECF 23 at 15.

Second, 8 U.S.C. § 1229(e)'s discussion of possible "enforcement action[s] leading to a removal proceeding" taking place at, *inter alia*, "a courthouse" in certain circumstances is not legislative recognition that the INA never incorporated the privilege or a direct abrogation of the privilege. *See State*, 431 F. Supp. 3d at 393; *New York*, 466 F. Supp. 3d at 446–47; *Velazquez-Hernandez v. ICE*, 500 F. Supp. 3d 1132, 1144 (S.D. Cal. 2020). Critically, "later enacted laws . . . do not declare the meaning of earlier law" when they "do not seek to clarify an earlier enacted general term," "depend for their effectiveness upon clarification, or a change in the meaning of an earlier statute," and "reflect any *direct* focus by Congress upon the meaning of the earlier enacted provisions." *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (citations omitted, emphasis added). At most, § 1229(e) suggests the 2006 Congress intended to permit arrests *comporting with* the privilege's purpose-based test. *See Rainwater v. United States*, 356 U.S. 590, 593–94 (1958). Since § 1229(e) contemplates arrests at courthouses connected to "a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking," 8 U.S.C. § 1229(e)(1), (2), these arrests are predominately *criminal*, where the privilege does not apply. *See New York*, 466 F. Supp. 3d at 446–47. And the few civil arrests permitted also promote justice as they are aimed at abusers, who raise flight risk and danger concerns. *See* 8 U.S.C. § 1229(e). The legislative history supports such a reading.[7]

Third, English common law in the "late eighteenth and early nineteenth century" on the privilege applying to sovereign arrests, ECF 45 at 10, is relevant in demonstrating that Crown-initiated arrests similar to immigration arrests were covered by the privilege, as "English common law was

---

[6] For this reason, "the proper test" for application of the privilege to both persons and courthouses is "whether the privilege will promote the purposes of justice." *Dwelle v. Allen*, 193 F. 546, 548–49 (S.D.N.Y. 1912).

[7] The provision was inserted into the INA as part of the reauthorization of the Violence Against Women Act ("VAWA") in 2006 to "help[] immigrants subjected to domestic violence to secure their right to stay in the country." 152 Cong. Rec. E353-01, E353; *see also* 152 Cong. Rec. E309-01, E309. Nothing suggests the 2006 Congress contemplated or recognized whether the INA—which was not the focus of the VAWA's reauthorization—incorporated the privilege; instead the clear legislative focus was protecting noncitizen victims from deportation. *See Rainwater v. United States*, 356 U.S. 590, 593–94 (1958) (reviewing legislative history to determine weight of later legislative enactment in interpreting prior one).

being incorporated into" American common law during this period, *State*, 431 F. Supp. 3d at 388.

## II. The EOIR Dismissal Policy Is Contrary to Law and Arbitrary and Capricious.

### A. *The EOIR Dismissal Policy Is Reviewable.*

The EOIR Dismissal Policy is reviewable under the APA. *First*, as this Court recognized, the EOIR Dismissal Policy is a final agency action, reflecting EOIR's final decision on how IJs should address DHS's new wave of dismissal motions by "counsel[ing] the [IJ] to exercise his or her discretion" in a particular way. Op. at 28–29. "[L]egal consequences" clearly flow from it: IJs have relied on the Policy to grant DHS's motions to dismiss and terminate removal proceedings. *Id.* at 29–30; *see also New York*, 767 F. Supp. 3d at 75. While Defendants insist that the guidance is not a "policy" and have failed to produce a corresponding administrative record, this Court recognized that "'[i]t is of no moment that [it] came in the form of an informal email." Op. at 29 (citation omitted). *Second*, the EOIR Dismissal Policy is not shielded by 5 U.S.C. § 701(a)(2). EOIR's own regulations—8 C.F.R. §§ 1003.9(c), 1003.10(b), 1003.23(a), 239.2(a)(7)—and EOIR guidance in its Practice Manual § 3.1(b)(1) constitute "judicially manageable" standards for evaluating EOIR's exercise of discretion. *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016); *see Heckler v. Chaney*, 470 U.S. 821, 830 (1985). *Lastly*, there is no adequate alternative to APA review; an administrative appeal will not permit Plaintiffs' challenge to the Policy as the BIA lacks "the general equitable powers of a district court to grant prospective relief" here. *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988).

### B. *The EOIR Dismissal Policy Is Contrary to Law.*

EOIR's regulations and rules set clear, binding conditions on when and how full removal proceedings may be dismissed. Under 8 C.F.R. § 239.2(a)(7), DHS may seek dismissal based on the government's interests only where "the circumstances of the case have changed after the notice to appear was issued." 8 C.F.R. §§ 239.2(a)(7), 239.2(c), 1239.2(c). Motions must be in "writing," "state with particularity the grounds" for dismissal, and permit the noncitizen an opportunity to respond,

including through briefing deadlines set and extended by the IJ. 8 C.F.R. § 1003.23(a); *see also* ECF 24-5 § 3.1(b)(1)(A)–(B). As this Court has already held, because the Dismissal Policy cannot be reconciled with EOIR's regulations, it is "not in accordance with law." Op. at 28. The Dismissal Policy explicitly instructs IJs on how to exercise their discretion by "counsel[ling]" them to grant on-the-spot oral dismissals without a response to alleviate IJs' "greatly increased" caseload. Op. at 26. It also rewrites § 239.2(a)(7) by omitting the regulation's critical qualifier "of the case," "in conflict" with the governing regulations. *Id.* at 27. "This contradiction alone renders the EOIR Dismissal Policy contrary to law." *Id.* The record here confirms there is no genuine dispute on this point.[8] ECF 23 at 16–22; *see also* Op. at 25–31. That conclusion follows directly from this Court's prior Opinion and is now confirmed by the evidence before it.

### C.  The EOIR Dismissal Policy Is Arbitrary and Capricious.

Even if the Court were to conclude the Dismissal Policy could be reconciled with EOIR's regulatory framework, it would still be arbitrary and capricious as an unexplained *sub silentio* change in policy. *See supra* 16 (stating APA standard). The Policy is a substantive shift requiring a reasoned explanation. *See Encino*, 579 U.S. at 221 (requiring agency "show that there are good reasons for the new policy"). Yet, neither the Policy nor the non-existent administrative record recognize that EOIR is changing course, much less explain why it abandoned the case-specific standard and protective procedures that had governed for years. Nor does the Policy grapple with the "serious reliance interests" and due process concerns on largely *pro se* dockets. *See Regents*, 140 S. Ct. at 1913; *see also* ECF 23-1 ¶¶ 13–14, ECF 23-8 ¶ 41, ECF 23-11 ¶¶ 20–21, 23–24, 26. Noncitizens rely on the expectation that they can fully litigate relief from removal. *Id.* The Policy neither weighs the consequences of stripping those protections nor addresses the obvious alternatives for managing

---

[8] The government asserts only that the omission of the phrase "of the case" was accidental, but this Court correctly recognized that "an erroneous guidance to Immigration Judges to depart from the text of an existing regulation is not saved because it is, indeed, erroneous and ought to be ignored." Op. at 29.

dockets reflected in EOIR's own guidance, like granting continuances, rescheduling, and reprioritizing calendars. *See, e.g.*, 8 C.F.R. §§ 1003.18, 1003.29; Immigration Court Practice Manual ch. 4.

Instead, the government denies any change in policy, minimizing the Dismissal Policy as "inartful[] draft[ing]." Op. at 28–29. But as this Court has recognized, an erroneous instruction to IJs that departs from regulatory text "is not saved" simply because, in theory, it should be ignored. *Id.* The "post hoc rationalization" that nothing has changed is precisely what the APA forbids as "an agency's action must be upheld . . . on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50. This Policy's "unexplained inconsistency" from prior regulatory practice is thus "arbitrary and capricious." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

### D. The EOIR Dismissal Policy Violates Accardi and Due Process.

For essentially the same reasons, the Dismissal Policy violates both the *Accardi* doctrine and the Due Process Clause. Under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), agencies must follow "the rules promulgated by [it], which regulate the rights and interests of others," even where "the internal procedures are possibly more rigorous than otherwise would be required." *Montilla v. I.N.S.*, 926 F.2d 162, 166, 167 (2d Cir. 1991). The EOIR regulations confer important procedural benefits safeguarding fundamental rights to due process in removal proceedings.

As noted *supra* the governing regulations provide that the government may seek dismissal where "[c]ircumstances of the case have changed." 8 C.F.R. § 239.2(a)(7); *see* Op. at 27. This provision, 8 C.F.R. § 1003.23(a), and the Immigration Court Manual's written-motion and response-period requirements, Practice Manual §§ 3.1(b)(1)(A)–(B), "regulate the rights and interests" noncitizens and thus trigger *Accardi's* requirement of strict compliance, because they cabin when DHS may terminate full removal proceedings and protect noncitizens' ability to seek relief in pending immigration proceedings. In addition, the regulations require that IJs "exercise their independent judgment and discretion" in resolving cases, 8 C.F.R. § 1003.10(b), and bar EOIR leadership from "direct[ing] the

24

result of an adjudication," 8 C.F.R. §§ 1003.0(c), 1003.9(c). *See* Op. at 11–12. As this Court has already held, Op. at 28, the Dismissal Policy conflicts with 8 C.F.R. § 239.2(a)(7) and § 1003.9(c). In *Accardi* terms, the Dismissal Policy "formulated, announced, and circulated" new expectations that caused IJs to bypass the very procedural safeguards and discretionary decision-making the regulations and Practice Manual are designed to secure, in violation of the APA. *See Accardi*, 347 U.S. at 267–68.

The same features of the Dismissal Policy also offend due process. As the Second Circuit has explained, "[t]he *Accardi* doctrine is premised on fundamental notions of fair play underlying the concept of due process." *Montilla*, 926 F.2d at 167. "The Fifth Amendment entitles noncitizens to due process in removal proceedings." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). EOIR's new policy fails to comply with this core due process tenet; it strips noncitizens of their right to notice and an opportunity to be heard in their removal proceedings. *See Munoz Materano v. Arteta*, No. 25-CV-6137, 2025 WL 2630826, at *16 (S.D.N.Y Sept. 12, 2025) (due process violation resulting from dismissal of full removal proceedings and arrest). And "while [DHS] might want to enforce this country's immigration laws efficiently, it cannot do that at the expense of fairness and due process." *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 144 (W.D.N.Y. 2025). The Policy disposes of the clear safeguards provided by statute and controlling regulations, summarily depriving noncitizens of the rights afforded to them in removal proceedings.

## CONCLUSION

For the reasons discussed above, and to provide complete relief to Plaintiffs, this Court should vacate the challenged policies in full. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (finding agency action vacated in full, not only as applied to plaintiffs); *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring); *Rural & Migrant Ministry*, 565 F. Supp. 3d at 605–06; *see* Baltimore Decl. ¶ 10; Konaté Decl. ¶ 8.

25

Dated: May 22, 2026
        New York, New York


Respectfully submitted,


NEW YORK CIVIL LIBERTIES UNION
    FOUNDATION

/s/_____
Amy Belsher
Elizabeth Gyori
Wafa Junaid
Claire Molholm
Thomas Munson
M. Porter*
Robert Hodgson
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION

/s/_____
Noor Zafar
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500


AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION

/s/_____
Michael K.T. Tan
Hannah Steinberg*
Oscar Sarabia Roman*
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0770


EMERY CELLI BRINCKERHOFF ABADY WARD &
    MAAZEL LLP

/s/_____
Katherine Rosenfeld
Samuel Shapiro
Emily Wanger
One Rockefeller Plaza, 8th Floor
New York, NY 10020
Tel: (212) 763-5000

MAKE THE ROAD NEW YORK

/s/_____
Harold Solis
Paige Austin
301 Grove Street
Brooklyn, NY 11237
Tel: (718) 418-7690


*Admitted pro hac vice

*Counsel for Plaintiffs*

26

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel hereby certifies that this memorandum complies with the allocated page limit (twenty-five pages) pursuant to Rule 3(D) of this Court's Individual Practices in Civil Cases.

/s/ *Emily Wanger*
Emily Wanger