UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AFRICAN COMMUNITIES TOGETHER; and THE DOOR,

        Plaintiffs,

        v.

DAVID VENTURELLA, in his official capacity as Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; MARKWAYNE MULLIN, in his official capacity as Secretary of the United States Department of Homeland Security; DARREN K. MARGOLIN, in his official capacity as Director, Executive Office for Immigration Review; and TODD BLANCHE, in his official capacity as Acting Attorney General, U.S. DEPARTMENT OF JUSTICE,[1]

        Defendants.

No. 25 Civ. 6366 (PKC)

---

**DEFENDANTS' CORRECTED MEMORANDUM OF LAW IN SUPPORT OF THEIR PARTIAL MOTION TO DISMISS AND PARTIAL MOTION FOR SUMMARY JUDGMENT, AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

                              JAY CLAYTON
                              United States Attorney for the
                              Southern District of New York
                              86 Chambers Street, 3rd Floor
                              New York, New York 10007
                              Tel.: (212) 637-2695/2721
                              Email: jeffrey.oestericher@usdoj.gov
                                      tomoko.onozawa@usdoj.gov

JEFFREY S. OESTERICHER
TOMOKO ONOZAWA
Assistant United States Attorneys

---

[1] Pursuant to Fed. R. Civ. P. 25(b)(1), David Venturella is automatically substituted for his predecessor Todd Lyons as the Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; Markwayne Mullin is automatically substituted for his predecessor Kristi Noem as the Secretary of the Department of Homeland Security; and Todd Blanche is automatically substituted for his predecessor Pam Bondi as the Acting Attorney General.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

    I.    STATUTORY BACKGROUND.................................................................................... 3

    II.   DHS GUIDANCE REGARDING CIVIL IMMIGRATION ENFORCEMENT ACTIONS AT OR NEAR COURTHOUSES .................................................................................................... 4

        A.  Pre-2021 Courthouse Arrest Guidance........................................................ 4

        B.  The 2021 Courthouse Arrest Guidance ....................................................... 6

        C.  The 2025 Courthouse Arrest Guidance ....................................................... 7

    III.  IJ ADJUDICATION PROCEDURES AND THE WITHDRAWN EOIR GUIDANCE EMAIL ............... 8

ARGUMENT....................................................................................................................... 10

    I.    LEGAL STANDARDS ............................................................................................. 10

        A.  Summary Judgment ..................................................................................... 10

        B.  Rule 12(b)(1) Motion to Dismiss................................................................ 11

    II.   THE RESCISSION OF THE 2021 GUIDANCE IS NOT SUBJECT TO APA REVIEW .................... 12

    III.  COURTHOUSE ARRESTS ARE NOT CONTRARY TO LAW ...................................................... 14

        A.  There Is No Common-Law Privilege Against Federal Immigration Enforcement in and Around Courthouses ............................................................................ 14

        B.  The INA Cannot Be Read to Incorporate the Common-Law Privilege Against Courthouse Arrest............................................................................................ 17

        C.  The INA Displaced any State Common-Law Privilege to the Contrary................ 18

    IV.  THIS ACTION IS MOOT AS TO THE EOIR DEFENDANTS BECAUSE THE EOIR GUIDANCE EMAIL HAS BEEN WITHDRAWN ........................................................................................... 19

    V.   PLAINTIFFS LACK STANDING TO SUE THE EOIR DEFENDANTS......................................... 22

        A.   Plaintiffs Have Failed to Establish Organizational Standing............................... 22

B.    Plaitniffs Have Failed to Establish Associational Standing ................................... 24

CONCLUSION ................................................................................................................................ 25

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Ahmed v. Cissna*,
    327 F. Supp. 3d 650 (S.D.N.Y. 2018) ...................................................................................... 14

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
    815 F.3d 105 (2d Cir. 2016) ................................................................................................... 20

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................................................................. 3

*Baker Botts LLP v. ASARCO LLC*,
    576 U.S. 121 (2015) ............................................................................................................... 17

*Banco San Juan Internacional, Inc. v. Federal Reserve Bank*,
    762 F. Supp. 3d 247 (S.D.N.Y. 2025) .................................................................................... 12

*Beta Upsilon Chi Upsilon Chapter v. Machen*,
    586 F.3d 908 (11th Cir. 2009) ............................................................................................... 20

*Blackwater v. Safnauer*,
    866 F.2d 548 (2d Cir. 1989) ................................................................................................... 19

*Block v. Cmty Nutrition Inst.*,
    467 U.S. 340 (1984) ............................................................................................................... 12

*Bowen v. Michigan Academy of Family Physicians*,
    476 U.S. 667 (1986) ............................................................................................................... 12

*Carver v. Bank of New York Mellon*, 15 Civ.,
    15 Civ. 10180 (JPO), 2017 WL 1208598 (S.D.N.Y. Mar. 31, 2017) ..................................... 11

*Church of Scientology of California v. United States*,
    506 U.S. 9 (1992) ................................................................................................................... 19

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ............................................................................................................... 11

*City of Erie v. Pap's A.M.*,
    529 U.S. 277 (2000) ............................................................................................................... 20

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)..................................................................................... 21

*Conn. Parents Union v. Russell-Tucker*,
  8 F.4th 167 (2d Cir. 2021) ............................................................... 22, 23, 24

*Cty of Los Angeles v. Davis*,
  440 U.S. 625 (1979)................................................................................... 20

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014)................................................................................... 15

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008)................................................................................... 22

*Deakins v. Monaghan*,
  484 U.S. 193 (1988) .................................................................................. 19

*Deposit Guaranty Nat'l Bank v. Roper*,
  445 U.S. 326 (1980).................................................................................. 19

*Disability Law Ctr. v. Millcreek Health Ctr.*,
  428 F.3d 992 (10th Cir. 2005) ................................................................... 21

*Do No Harm v. Pfizer, Inc.*,
  126 F.4th 109 (2025)................................................................................. 24

*Friends of Animals v. Romero*,
  948 F.3d 579 (2d Cir. 2020)...................................................................... 11

*Friends of Ompompanoosuc v. FERC*,
  968 F.2d 1549 (2d Cir. 1992)..................................................................... 11

*Gardner v. United States*,
  246 F. Supp. 1014 (S.D.N.Y. 1965)........................................................... 17

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011).................................................................................. 16

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982).................................................................................. 23

*Heckler v. Chaney*,
  470 U.S. 821 (1985).................................................................................. 12

*Herrera-Inirio v. INS*,
   208 F.3d 299 (1st Cir. 2000) .................................................................................. 18

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ............................................................................................. 22

*International Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ............................................................................................. 16

*Irish Lesbian & Gay Org. v. Giuliani*,
   143 F.3d 638 (2d Cir. 1998) ........................................................................... 22, 24

*J.S. ex rel. N.S. v. Attica Cent. Sch.*,
   386 F.3d 107 (2d Cir. 2004) ................................................................................. 11

*Karpova v. Snow*,
   497 F.3d 262 (2d Cir. 2007) ................................................................................. 11

*Lamb v. Schmitt*,
   285 U.S. 222 (1932) ............................................................................................. 15

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
   104 F.3d 1349 (D.C. Cir. 1997) ........................................................................... 13

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ............................................................................................. 12

*Liranzo v. United States*,
   690 F.3d 78 (2d Cir. 2012) ................................................................................... 11

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................. 24

*Lunney v. United States*,
   319 F.3d 550 (2d Cir. 2003) ................................................................................. 13

*Mantena v. Johnson*,
   809 F.3d 721 (2d Cir. 2015) ................................................................................. 11

*Motient Corp. v. Dondero*,
   529 F.3d 532 (5th Cir. 2008) ............................................................................... 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................................... 11

*National Black Police Association v. District of Columbia*,
   108 F.3d 346 (D.C. Cir. 1997) ................................................................................... 21

*Nat'l Audubon Soc. v. Hoffman*,
   132 F.3d 7 (2d Cir. 1997) .......................................................................................... 10

*Netograph Mfg. Co. v. Scrugham*,
   197 N.Y. 377 (1910) ................................................................................................. 18

*Northern Light Technology, Inc. v. Northern Lights Club*,
   236 F.3d 57 (1st Cir. 2001) ....................................................................................... 17

*Page Co. v. MacDonald*,
   261 U.S. 446 (1923) ................................................................................................. 15

*Pavlo v. James*,
   437 F. Supp. 125 (S.D.N.Y. 1977) ........................................................................... 17

*Phifer v. City of New York*,
   289 F.3d 49 (2d Cir. 2002) ....................................................................................... 12

*Preiser v. Newkirk*,
   422 U.S. 395 (1975) ................................................................................................. 19

*Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs*,
   31 F. Supp. 3d 571 (S.D.N.Y. 2014) ........................................................................ 10

*Rosebrock v. Mathis*,
   745 F.3d 963 (9th Cir. 2014) .................................................................................... 20

*Rosenblatt v. American Cyanamid Co.*,
   86 S. Ct. 1 (1965) .................................................................................................... 16

*Ryan v. ICE*,
   974 F.3d 9 (1st Cir. 2020) .................................................................................. 15, 17

*Salazar v. King*,
   822 F.3d 61 (2d Cir. 2016) ....................................................................................... 14

*Samantar v. Yousuf*,
   560 U.S. 305 (2010) ............................................................................................ 17, 18

*Shaffer v. Heitner*,
   433 U.S. 186 (1977) ................................................................................................. 16

*Simon v. E. Ky. Welfare Rts. Org.*,
  426 U.S. 26 (1976)........................................................................................................ 23

*Sossamon v. Lone Star State of Texas*,
  560 F.3d 316 (5th Cir. 2009) ........................................................................................ 20

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)....................................................................................................... 22

*Stewart v. Ramsay*,
  242 U.S. 128 (1916)................................................................................................. 15, 16

*Summers v. Earth Island Institute*,
  555 U.S. 488 (2009)....................................................................................................... 25

*Tann v. Bennett*,
  807 F.3d 51 (2d Cir. 2015)............................................................................................ 20

*Textile Workers Union of America v. Lincoln Mills of Ala.*,
  353 U.S. 448 (1957)....................................................................................................... 18

*Town of Chester v. Laroe Ests., Inc.*,
  581 U.S. 433 (2017)....................................................................................................... 22

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954)....................................................................................................... 20

*United States v. Craft*,
  535 U.S. 274 (2002).................................................................................................. 15, 18

*United States v. Denedo*,
  556 U.S. 904 (2009)....................................................................................................... 16

*United States v. Green*,
  305 F. Supp. 125 (S.D.N.Y. 1969) ............................................................................... 17

*United States v. Seminole Nation of Okla.*,
  321 F.3d 939 (10th Cir. 2002) ...................................................................................... 21

*UPMC Mercy v. Sebelius*,
  793 F. Supp. 2d 62 (D.D.C. 2011) ............................................................................... 10

*Webster v. Doe*,
  486 U.S. 592 (1988)....................................................................................................... 13

*Westchester v. HUD,*
778 F.3d 412 (2d Cir. 2015)..................................................................................... 12

*White v. Colorado,*
82 F.3d 364 (10th Cir. 1996) .................................................................................... 21

Statutes

5 U.S.C. § 701(a)(2)................................................................................................... 12

5 U.S.C. § 705 ......................................................................................................... 8, 9

8 U.S.C. § 1226(a) ............................................................................................... 13, 17

8 U.S.C. § 1229(e) ...................................................................................................... 19

8 U.S.C. § 1229a(b)(1).................................................................................................. 9

8 U.S.C. § 1357(e) ................................................................................................. 13, 19

8 U.S.C. § 1182 ............................................................................................................. 1

8 U.S.C. § 1226.......................................................................................................... 3, 18

Rules

Fed. R. Civ. P. 12(b)(1)............................................................................................ 1, 11

Fed. R. Civ. P. 56...................................................................................................... 1, 10

Regulations

8 C.F.R. § 239.2(a)........................................................................................................ 9

8 C.F.R. § 239.2(c)........................................................................................................ 9

8 C.F.R. § 287.5(c)...................................................................................................... 17

8 C.F.R. § 1003.0 .......................................................................................................... 3

8 C.F.R. § 1003.10(b) ................................................................................................... 9

Other Authorities

Executive Order 13,993,
86 Fed. Reg. 7051 (Jan. 20, 2021) ........................................................................ 6, 7

Executive Order 13,768,
    82 Fed. Reg. 8799 (Jan. 25, 2017) ......................................................................... 5, 6

Executive Order 14,159
    90 Fed. Reg. 8443 (Jan. 20, 2025) ........................................................................... 7

Executive Order 14,165
    90 Fed. Reg. 8467 (Jan. 20, 2025) ........................................................................... 7

Defendants respectfully submit this memorandum of law: (1) in support of their motion for summary judgment as to Plaintiffs' claims against defendants David Venturella, in his official capacity as Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement ("ICE"), and Markwayne Mullin, in his official capacity as Secretary of the United States Department of Homeland Security ("DHS" and together, the "ICE Defendants"), pursuant to Fed. R. Civ. P. 56; (2) in support of their motion to dismiss the complaint as against defendants Daren K. Margolin, in his official capacity as Director of the Executive Office for Immigration Review ("EOIR"), and Todd Blanche, in his official capacity as Acting Attorney General of the United States (together, "the "EOIR Defendants"), pursuant to Fed. R. Civ. P. 12(b)(1); and (3) in opposition to Plaintiffs' motion for summary judgment.

## PRELIMINARY STATEMENT

Congress has codified in the Immigration and Nationality Act ("INA") the Executive Branch's constitutional and inherent authority to investigate, arrest, and detain aliens who are suspected of being, or found to be, removable from the United States to effectuate their removal. 8 U.S.C. §§ 1182, 1225, 1226, 1231, 1357. In accordance with its plenary arrest authority under the INA, DHS and its component agencies have long exercised their discretion to determine where and how to exercise that authority, given the government's strong interest in enforcing federal immigration laws. Consistent with that discretion, for decades, DHS and its component and predecessor agencies have issued internal guidance to agency law enforcement officers regarding the factors they should consider and approvals, if any, they should obtain before conducting civil immigration enforcement actions in certain public locations. As shown in the Administrative Record ("AR") in this case (ECF No. 64), that guidance has frequently changed to adapt to changes in enforcement priorities.

Plaintiffs challenge under the Administrative Procedure Act ("APA") a January 2025 internal guidance issued by ICE and U.S. Customs and Border Protection ("CBP") to their immigration officers which changed ICE's policy with respect to civil immigration enforcement actions in or near courthouses. On April 27, 2021, ICE and CBP jointly issued a guidance memorandum ("2021 Guidance"), which governed civil immigration enforcement actions in or near courthouses. (AR 25–27). Unlike previous guidance memoranda, the 2021 Guidance expressly defined courthouses to include, for the first and only time, "immigration courts" maintained by the Executive Office for Immigration Review. (AR 26).  However, on January 21, 2025, then-Acting ICE Director Caleb Vitello issued new internal interim guidance ("2025 Interim Guidance") (AR 51–53) which rescinded the 2021 Guidance for ICE, and thus rescinded the prior guidance's limitations on ICE civil immigration enforcement actions in or near immigration courts. (AR 51). On May 27, 2025, Acting ICE Director Todd Lyons issued a final guidance document ("2025 Final Guidance"), which superseded the January 2021 Guidance. (AR 1–3).

Plaintiffs' APA challenge to the rescission of the 2021 Guidance fails as a matter of law. As a threshold matter, the rescission is not reviewable under the APA because ICE's policy choices about where the agency can best exercise its civil immigration enforcement authority are committed to agency discretion by law. There is no meaningful standard—including the so-called common-law privilege against courthouse arrests, which was never incorporated in the INA—by which the Court can evaluate the appropriateness of ICE's decision to rescind the agency's prior restrictions on civil immigration enforcement actions in or near immigration courts.

Separately, Plaintiffs' APA challenge to a May 20, 2025, email sent by two Acting Regional Deputy Chief Immigration Judges ("IJs") to Assistant Chief IJs (the "EOIR Guidance Email") should be dismissed as moot because the email was formally withdrawn in a September

2

23, 2025 policy memorandum. EOIR is an agency within the U.S. Department of Justice that oversees the immigration courts and the Board of Immigration Appeals ("BIA"). *See* 8 C.F.R. § 1003.0; *see also* https://justice.gov/eoir/about-office (last visited on Dec. 3, 2025). EOIR is responsible for adjudicating immigration cases, and its mission is to adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws. *Id.* On May 30, 2025, two Acting Regional Deputy Chief IJs sent a non-binding, non-authoritative guidance email to Assistant Chief IJs entitled "Guidance on Case Adjudication," which referenced specific statutory and regulatory authority available to IJs and advised Assistant Chief IJs as to what IJs can do with respect to oral motions to dismiss by DHS attorneys. Declaration of Amy Belsher, dated Aug. 11, 2025 ("Belsher Decl."), Ex. 12 (Dkt. No. 24-12). On September 12, 2025, this Court granted Plaintiffs' motion under Section 705 of the APA to stay the application of the EOIR Guidance Email to removal proceedings in Manhattan and the Bronx. *See* Dkt. No. 51. On September 23, 2025, EOIR issued Policy Memorandum 25-51, which formally withdrew the EOIR Guidance Email without limitation to geographic area or time. Because Plaintiffs' alleged injuries have been redressed by voluntary agency action, their APA challenge to the EOIR Guidance Email should be dismissed for lack of subject matter jurisdiction.

## BACKGROUND

### I. Statutory Background

The federal government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012); *see* U.S. Const. art. I § 8, cl. 4 (granting Congress the power to "establish a uniform Rule of Naturalization"). Pursuant to that authority, Congress has provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Congress has also provided that "without [a] warrant," a federal

3

officer may "arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any [] law or regulation [regulating the admission, exclusion, expulsion, or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest." *Id.* § 1357(a)(2). These statutes confer arrest authority that is plenary and unqualified. Congress has limited the government's authority to search for aliens in certain specific locations, but none of those locations include courthouses. *Id.* § 1357(a)(3), (e). Accordingly, in the exercise of its long-standing discretionary authority to determine the location of a civil enforcement action against an alien unlawfully present in the United States, DHS has developed, revised, and/or rescinded guidance with regard to certain locations which has balanced the government's legitimate interests in enforcing immigration law against the potential effects of its enforcement activities. (AR 4–6, 7–19, 29–50).

A. **DHS Guidance Regarding Civil Immigration Enforcement Actions At or Near Courthouses**

1. Pre-2021 Courthouse Arrest Guidance

Since at least 2014, ICE has issued guidance memoranda specifically addressing civil immigration enforcement actions made at or near courthouses. As noted below, with the exception of the 2021 Guidance, these memoranda have not included immigration courts as covered locations.

In a March 19, 2014 memorandum issued to field offices and entitled "Enforcement Actions at or Near Courthouses" (the "March 2014 Guidance"), ICE stated that "[e]nforcement actions at or near courthouses" "only be undertaken against Priority 1 aliens," which included but were not limited to, aliens engaged in or suspected of terrorism or espionage or who otherwise pose a danger to national security, and aliens who pose a risk to public safety as shown by certain criminal activity. *See* Declaration of Jeffrey S. Oestericher, dated August 20, 2025 ("Oestericher

4

Decl."), Ex. A (ECF No. 41–1). The March 2014 Guidance did not reference or otherwise reference immigration courts.

After the March 2014 Guidance, ICE's guidance with respect to civil immigration enforcement actions in or near courthouses was amended several times to reflect changes in DHS enforcement priorities. In a January 26, 2015, memorandum addressed to field offices ("January 2015 Guidance"), ICE revised the March 2014 Guidance to reflect enforcement priorities set forth in then-DHS Secretary Jeh Johnson's November 20, 2014, memorandum, titled "Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants."[2] Oestericher Decl. Ex. B (ECF No. 41-2). The January 2015 Guidance stated that enforcement actions at or near courthouses "will only be undertaken" against aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security; aliens convicted of felonies or offenses involving active participation in a criminal street gang; or aliens convicted of an aggravated felony, as defined by the INA. *Id.* The January 2015 Guidance did not reference or otherwise mention immigration courts.

On January 25, 2017, then-President Trump issued Executive Order 13,768, which expanded the categories of aliens to be prioritized for removal. 82 Fed. Reg. 8799 (Jan. 25, 2017). The Executive Order directed DHS to prioritize for removal broad categories of aliens, including aliens who had criminal convictions or who had been charged with a criminal offense; engaged in fraud or willful misrepresentation before a governmental agency; abused public benefits programs; failed to comply with a final order of removal; or posed a risk to public safety or national security. *Id.* at 8800. In addition, the Executive Order directed DHS to "review agency regulations, policies,

---

[2]*See*
https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion_0.
pdf.

and procedures for consistency with this order," and to "consider whether to withdraw or modify any inconsistent policies and procedures, as appropriate and consistent with the law." *Id.* at 8801. In accordance with changed immigration enforcement priorities, on January 10, 2018, ICE issued a memorandum titled Directive 11072.1: Civil Immigration Enforcement Actions Inside Courthouses (the "2018 Directive") (AR 21–24), which set forth ICE's policy "regarding civil immigration enforcement actions inside federal, state, and local courthouses." (AR 21). The 2018 Directive did not reference or otherwise mention immigration courts.  (AR 21–24).

2.    The 2021 Courthouse Arrest Guidance

On January 20, 2021, then-President Biden issued Executive Order 13,993, which revoked Executive Order 13,768, and directed the Secretary of Homeland Security and other cabinet officials to review any agency actions developed pursuant to Executive Order 13,768 and "take action, including issuing revised guidance" consistent with the new Executive Order. 86 Fed. Reg. 7051, 7051 (Jan. 20, 2021). On the same day, then-Acting Secretary of Homeland Security David Pekoske issued a memorandum which amended the Department's immigration enforcement priorities to prioritizing individuals who were: engaged in or suspected of terrorism or espionage, or whose apprehension, arrest and/or custody was otherwise necessary to protect national security; apprehended at the border or points of entry while trying to unlawfully enter the United States, or who were not physically present in the United States before November 1, 2020; and incarcerated following an aggravated felony conviction, released after the date of the new memorandum, and posed a public safety threat. *See* https://perma.cc/2TJK-HTMS.

In accordance with changed immigration enforcement priorities, on April 27, 2021, ICE and CBP revoked the 2018 Directive and issued interim guidance governing "civil immigration enforcement actions in or near courthouses." (AR 25–27). For the first time, the 2021 Guidance defined "courthouses" to include "immigration courts." (AR 26). It also provided that a civil

6

immigration enforcement action "may be taken in or near a courthouse" if there was a national security threat; an imminent risk of death, violence or harm to any person; involved "hot pursuit" of a person posing a public safety threat; or an imminent risk of destruction of evidence material to a criminal case. (AR 26). Absent hot pursuit and subject to advance supervisory approval, ICE officers could undertake a civil immigration enforcement action in or near a courthouse against an individual posing a threat to public safety if there was no other safe alternative location or it would be too difficult to undertake the action elsewhere. (AR 26). The 2021 Guidance's purpose was to provide "management guidance to ICE and CBP personnel exercising discretionary law enforcement functions." (AR 27). The 2021 Guidance "does not affect the statutory authority of ICE or CBP employees." (*Id.*).

### 3. The 2025 Courthouse Arrest Guidance

On January 20, 2025, President Trump issued Executive Order 14,159, which *inter alia*, revoked the prior administration's civil immigration enforcement policies and priorities and established that it "the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people." 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025). The Executive Order directed the Secretary of Homeland Security to "take all appropriate action to enable" ICE and other agencies to establish agency priorities to "protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal." *Id.* at 8444. On the same day, President Trump also issued Executive Order 14,165, which further directed the Secretary of Homeland Security to "take all appropriate action to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States." 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025).

On January 20, 2025, then-Acting Secretary of Homeland Security Benjamine Huffman issued a memorandum titled "Enforcement Actions in or Near Protected Areas," which addressed ICE and CBP enforcement actions "in or near areas that the [DHS Secretary] previously determined require special protection." (AR 50). The memorandum observed that "officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location," and determined that on a going-forward basis, "officers should continue to use that discretion along with a healthy dose of common sense." (AR 50). As a result, the memorandum concluded that as a matter of policy, "[i]t is not necessary . . . to create bright line rules regarding where our immigration laws are permitted to be enforced," but added that ICE and CBP leadership "may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion." (AR 50).

ICE subsequently issued further guidance. On January 21, 2025, then-Acting ICE Director Caleb Vitello issued a memorandum titled "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses" ("2025 Interim Guidance"), which rescinded and superseded the 2021 Guidance for ICE officers. (AR 51–53). On May 27, 2025, Acting ICE Director Todd M. Lyons issued a revised memorandum titled "Civil Immigration Enforcement Actions In or Near Courthouses" (the "2025 Final Guidance"), which superseded the 2025 Interim Guidance. (AR 1–3). On May 18, 2026, this Court granted Plaintiffs' motion under 5 U.S.C. § 705 to stay the rescission of the 2021 Guidance as it applied to civil immigration enforcement actions to the three immigration courthouses in Manhattan principally "serving the members of The Door" at 26 Federal Plaza, 201 Varick Street, and 290 Broadway.  Opinion & Order dated May 18, 2026 ("2026 Opinion & Order") (Dkt. No. 90), at 15.

8

**B.      IJ Adjudication Procedures and the Withdrawn EOIR Guidance Email**

The INA requires IJs presiding over removal proceedings to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1); *see also* 8 C.F.R. § 1003.10(b). In deciding the individual cases before them, IJs "shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the [INA] and regulations that is necessary or appropriate for the disposition . . . of such cases." 8 C.F.R. § 1003.10(b).

With respect to pre-decision motions, including motions to dismiss removal proceedings, "[u]nless otherwise permitted by the immigration judge, motions submitted prior to the final order of an immigration judge shall be in writing and shall state, with particularity the grounds therefor the relief sought, and the jurisdiction." *Id*. § 1003.23(a). The governing regulations further provide that after commencement of proceedings, a DHS attorney may move to dismiss removal proceedings on the grounds set forth in 8 C.F.R. § 239.2(a).  *See* 8 C.F.R. § 239.2(c); Compl. ¶ 43.

On May 30, 2025, two Acting Regional Deputy Chief IJs sent an email to Assistant Chief IJs entitled "Guidance on Case Adjudication." Belsher Decl., Ex. 12. In the EOIR Guidance Email, the authors reported that there had been an increase in caseload in the detained docket and several developments with non-detained cases in the past few weeks, including that "DHS is carrying out enforcement actions in or near EOIR space" and "DHS attorneys have moved to dismiss cases that are currently pending in court." *Id*. "Given the recent developments," the email provided guidance regarding the handling of DHS motions to dismiss "to ensure the expeditious adjudication of cases." *Id*.

On September 12, 2025, the Court granted Plaintiffs' initial motion under Section 705 of the APA, 5 U.S.C. § 705, to stay the application of the EOIR Guidance Email, but limited the stay to "removal proceedings conducted in the geographic areas served by The Door, *i.e.*, Manhattan

and the Bronx, pending full review on the merits of all policies challenged in this action." Opinion & Order dated Sept. 12, 2025 ("2025 Opinion & Order") (Dkt. No. 51), at 46. Following the Court's 2025 Opinion and Order, on September 23, 2025, EOIR issued Policy Memorandum 25-51 (the "Policy Memo") (Dkt. No. 58, at Ex. A), which formally withdrew the EOIR Guidance Email, without limitation to geographic area or time. The Policy Memo reiterated that the EOIR Guidance Email "was not an EOIR policy" and "could not direct or bind any Immigration Judge to make a specific decision in a case in a particular way," and directed all IJs to "continue to not rely on it in adjudicating cases." *Id.* at 1, 3.

## ARGUMENT

### I.     Legal Standards

####     A.     Summary Judgment

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where, as here, a party seeks judicial review of agency action, summary judgment is appropriate, since 'whether an agency action is supported by the administrative record and consistent with the APA standard of review' is decided 'as a matter of law.'" *Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs*, 31 F. Supp. 3d 571, 586 (S.D.N.Y. 2014) (quoting *UPMC Mercy v. Sebelius*, 793 F. Supp. 2d 62, 67 (D.D.C. 2011)). "Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).[3]

---

[3] For this reason, the Court should decline to consider the substantial extra-record evidence—18 declarations, one of which appends 16 exhibits—that Plaintiffs proffer in support of their motion for summary judgment. Dkt. Nos, 69 and 69-1 through 69-16. Moreover, the fact section of Plaintiffs' brief appears under a heading titled "Statement of Material Facts." Pls.' Replacement Mem. of Law in Supp. of Mot. for Summ. J. ("Pls.' Br.") (ECF No. 92) at 2–11. To the extent

"Under the APA, courts review agency action to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Animals v. Romero*, 948 F.3d 579, 585 (2d Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)). This "narrow" standard does not allow a court "'to substitute its judgment for that of the agency.'" *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1554 (2d Cir. 1992) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Rather, a court may overturn an agency's action only if it finds that the agency has relied on factors which Congress "'has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## B.    Rule 12(b)(1) Motion to Dismiss

On a Rule 12(b)(1) motion to dismiss, Plaintiffs bear the burden of "'proving subject matter jurisdiction by a preponderance of the evidence.'" *Mantena v. Johnson*, 809 F.3d 721, 727 (2d Cir. 2015) (quoting *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012)). In considering challenges to subject matter jurisdiction under Rule 12(b)(1), the court "must accept as true all the material factual allegations contained in the complaint," but is "'not to draw inferences from the complaint favorable to plaintiffs.'" *Carver v. Bank of New York Mellon*, 15 Civ. 10180 (JPO), 2017 WL 1208598, at *2 (S.D.N.Y. Mar. 31, 2017) (quoting *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d

---

this section of their brief is intended to serve as a Local Civil Rule 56.1 statement, that rule "does not apply to claims brought under the Administrative Procedure Act." Local Civ. R. 56.1(a).

107, 110 (2d Cir. 2004)). In adjudicating a 12(b)(1) motion, the Court may consider evidence extrinsic to the pleadings. *Phifer v. City of New York*, 289 F.3d 49, 55 (2d Cir. 2002).

## II.    The Rescission of the 2021 Guidance Is Not Subject to APA Review

ICE's decision to rescind the 2021 Guidance as to civil immigration enforcement actions in immigration courts is unreviewable under the APA because policy judgments regarding the circumstances and location of a civil immigration enforcement action are committed to agency discretion by law.[4]

First, while the APA embodies a presumption of judicial review, *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986), "[t]his is 'just' a presumption," *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (quoting *Block v. Cmty Nutrition Inst.*, 467 U.S. 340, 349 (1984)), and "under [5 U.S.C.] § 701(a)(2), agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law,'" *id.* (quoting § 701(a)(2)). "[E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). "In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Id.*

"To determine the extent of [the agency's] discretion and whether there is 'law to apply'" in a particular case, this Court "look[s] to the statutory provisions that govern" the agency's enforcement actions. *Westchester v. HUD*, 778 F.3d 412, 419 (2d Cir. 2015). *See also Banco San*

---

[4] This Court's May 18, 2026 order held that the rescission of the 2021 Guidance is reviewable under the APA and that 5 U.S.C. § 701(a)(2) does not apply. 2026 Opinion & Order, at 8–11. While Defendants recognize this holding as the law of the case, this argument is presented here again to preserve their rights of appeal.

*Juan Internacional, Inc. v. Federal Reserve Bank*, 762 F. Supp. 3d 247, 275 (S.D.N.Y. 2025) ("To show that the APA's judicial-review provisions apply to a defendant agency, a plaintiff 'must specify some statute or regulation' that meaningfully limits the agency's discretion.") (quoting *Lunney v. United States*, 319 F.3d 550, 558 (2d Cir. 2003)). A preclusion analysis under § 701(a)(2) "requires careful examination of the statute on which the claim of agency illegality is based . . . ." *Webster v. Doe*, 486 U.S. 592, 600 (1988).

The INA, from which ICE's civil arrest authority derives, provides no "meaningful standard" by which a court can evaluate the appropriateness of ICE's discretionary choice of public locations for targeted civil immigration enforcement actions. *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States"); *id.* § 1357(a)(2) ("Any officer or employee . . . authorized under regulations prescribed by the Attorney General shall have the power without warrant . . . (2) . . . to arrest any alien in the United States . . . ."). The statute imposes few location-based restrictions on DHS's broad authority to investigate and take civil immigration enforcement actions, and it evinces Congress's intent not to further constrain agency discretion with respect to the location of enforcement. For example, the INA limits when immigration enforcement officers may enter a farm or similar agricultural operation for investigative purposes. 8 U.S.C. § 1357(e). The INA also limits officers' authority to "board and search for aliens" in railway cars, aircraft, conveyances, or vehicles "within a reasonable distance from any external boundary of the United States," and further allows officers "to have access to private lands, but not dwellings" that are within 25 miles of an external boundary of the United States. *Id.* § 1357(a)(3). Aside from these limitations, Congress has not placed restrictions, such as whether or under what circumstances immigration officers may enter or approach certain locations, on where or how to conduct civil immigration enforcement actions. *See Legal Assistance for Vietnamese*

13

*Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (State Department policy relating to location of processing overseas immigrant visa applications was not reviewable under the APA, because the "broad language" of the INA "grants to the Secretary discretion to prescribe the place at which aliens apply for immigrant visas without providing substantive standards against which the Secretary's determination could be measured"); *Ahmed v. Cissna*, 327 F. Supp. 3d 650, 669, 671 (S.D.N.Y. 2018) (finding no "judicially discoverable and manageable standard" under the APA for determining "whether petitioners must be permitted to file their I-130 petitions in their countries of residence, rather than being directed to file their petitions" in a U.S. lockbox, because the INA "is silent as to the filing procedures to which petitioners are entitled").

In determining whether there is "law to apply" to a challenged agency action, courts may also look to "informal agency guidance that govern the agency's challenged action." *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016). This Court's 2026 Opinion & Order held that the agency "has followed 'by rule,' *i.e.*, agency guidance, a general policy on courthouse arrests," 2026 Opinion & Order, at 11, but ICE's prior location-specific guidance for civil immigration enforcement actions (and the INA generally) does not provide any law for the Court to apply for assessing the agency's discretionary decision to rescind, amend, or promulgate location-specific guidance. Accordingly, the ICE Defendants' decision to rescind the 2021 Guidance as it applied to civil immigration courthouse arrests is unreviewable under the APA.

## III.    Courthouse Arrests Are Not Contrary to Law

### A.    There Is No Common-Law Privilege Against Federal Immigration Enforcement in and Around Courthouses

Plaintiffs contend that there is a common-law privilege against courthouse arrests and assert that such a privilege was incorporated into the INA upon its enactment in 1952. Pls.' Br. at 19–22. However, there has never been a privilege, either when the INA was adopted or at any time

14

before, resembling the one alleged by Plaintiffs—much less one that was "so well established" that the INA should be deemed to have included it. *United States v. Craft*, 535 U.S. 274, 288 (2002) (holding that, to conclude that Congress meant to incorporate a common-law rule, that rule must have been "so well established" that it can be "assume[d]" that Congress considered it). To the contrary, historical cases demonstrate only a much narrower common-law immunity from certain types of civil arrest, which itself rests on rationales that no longer exist.

As the First Circuit recognized in a challenge to ICE's 2018 Directive, the "hoary common law privilege against civil arrests for parties and witnesses attending court proceedings" arose at a time when "a plaintiff in a civil action obtained personal jurisdiction over a defendant" by having that defendant arrested under a writ of *capias ad respondendum*. *Ryan v. ICE*, 974 F.3d 9, 15 (1st Cir. 2020). But parties and witnesses attending court proceedings in other matters were protected from such arrests by an immunity devised by the courts, "both to remove a disincentive for inhibiting parties and witnesses from coming forward (especially the risk of arrest in connection with another matter) and to ensure that arrests did not disrupt the orderly operation of the courts." *Id*. at 21.

As "arrests in civil suits fell largely out of fashion" and were replaced by service of summonses to obtain personal jurisdiction and initiate a civil action, courts "ruled that a similar privilege against service of a summons should extend to at least some parties and witnesses." *Id*. at 22. Thus, the Supreme Court recognized an immunity from service of process in a private civil suit when the person to be served entered a jurisdiction solely to attend a court proceeding as a witness or party. *See Lamb v. Schmitt*, 285 U.S. 222, 225 (1932); *Page Co. v. MacDonald*, 261 U.S. 446, 446–47 (1923); *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916).

Both the privilege against case-initiating arrest and the privilege against service of process of a person attending court were extensions of the now-outdated principle that a state court's

15

jurisdiction over a person rested on that person's physical presence. *See Daimler AG v. Bauman*, 571 U.S. 117, 125–26 (2014). Because physical presence was historically the key to state-court personal jurisdiction, potential defendants had a strong incentive not to attend court proceedings in states in which potential plaintiffs might seek to serve them with civil process—just as they had the same incentive not to attend when they might be subject to arrest to subject them to a state court's jurisdiction. *See Stewart*, 242 U.S. at 130–31 ("Witnesses would be chary of coming within our jurisdiction . . . if they might be punished with a lawsuit for displeasing parties by their testimony; and even parties in interest . . . might be deterred from the rightfully fearless assertion of a claim or the rightfully fearless assertion of a defense, if they were liable to be visited on the instant with writs from the defeated party." (quotation marks omitted)).

That physical-presence requirement is now obsolete. In *International Shoe Co. v. Washington*, the Supreme Court announced the modern rule that a defendant need only have "certain minimum contacts" with a forum state to be sued there. 326 U.S. 310, 316 (1945). That decision broadly "increase[d] the ability of the state courts to obtain personal jurisdiction over nonresident defendants," *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977), and many states responded by enacting long-arm statutes enabling their courts to exercise personal jurisdiction over out-of-state defendants, *see Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 926 (2011); *Rosenblatt v. American Cyanamid Co.*, 86 S. Ct. 1, 3 (1965) (Goldberg, J., in chambers). Thus, the rationale for immunity against service of process or arrest to initiate a civil action has disappeared, given that neither physical presence nor physical custody is required any longer for a court to obtain personal jurisdiction. With that rationale no longer present, the common-law rule that resulted from it no longer carries any force. *See United States v. Denedo*, 556 U.S. 904, 911 (2009) (noting change in common-law rule when rationale has been superseded).

16

Accordingly, since the dawn of long-arm jurisdiction, judicial decisions have not applied the common-law privilege. To the contrary, courts have explained that when an out-of-jurisdiction defendant is subject to civil process under a forum state's long-arm statute, the privilege does not apply. *See, e.g., Gardner v. United States*, 246 F. Supp. 1014, 1015 (S.D.N.Y. 1965) ("A nondomiciliary who could be served outside the state cannot claim immunity from service if he is served in New York, even if he is here voluntarily and in the aid of justice."); *Pavlo v. James*, 437 F. Supp. 125, 127 (S.D.N.Y. 1977) ("the reason for the immunity—encouraging voluntary appearances—disappears if a defendant is otherwise subject to the extra-territorial reach of [the forum state's long-arm statute]").

That same logic vitiates any argument that the privilege should apply against courthouse arrests by ICE. Aliens are subject to federal law enforcement jurisdiction or enforcement actions anywhere in the United States. *See* 8 U.S.C. §§ 1226(a) (providing for arrests "[o]n a warrant" without geographic limitation), 1357 (providing for warrantless arrests without geographic limitation); 8 C.F.R. § 287.5(c) (similar). Given that, an alien does not "giv[e] up the 'safety' of one jurisdiction" when he attends a court proceeding in another state. *United States v. Green*, 305 F. Supp. 125, 128 (S.D.N.Y. 1969). Because the privilege is not needed "to shield an individual from service of process to encourage his or her travel to the forum state," it "should not be enlarged" beyond that reason. *Northern Light Technology, Inc. v. Northern Lights Club*, 236 F.3d 57, 62–63 (1st Cir. 2001).

### B. The INA Cannot Be Read to Incorporate the Common-Law Privilege Against Courthouse Arrest

Because there was no "long-established and familiar common law rule protecting against civil arrests on behalf of the sovereign" at the time of the INA's enactment (or at any other time), Plaintiffs' assertion that the INA does not authorize such arrests at courthouses lacks merit. *Ryan*,

17

974 F.3d at 23. Congress is presumed to legislate against the background of the common law and to retain a common-law rule except when it evidently intends not to. *Baker Botts LLP v. ASARCO LLC*, 576 U.S. 121, 126 (2015); *Samantar v. Yousuf*, 560 U.S. 305, 320 & n.13 (2010). However, that presumption of nonderogation of the common law only applies to "long-established and familiar principles." *Samantar*, 560 U.S. at 320 n.13 (quotation marks omitted). When the common-law rule is "not so well established," it cannot displace "broad statutory language" enacted by Congress. *Craft*, 535 U.S. at 288.

As the authorities above show, by the time Congress established a comprehensive immigration-arrest statutory scheme in the INA, any privilege against extra-jurisdictional civil arrest was a historical artifact. Even when it was in force, it never applied to arrests by the government for law-enforcement purposes. At the very least, the scope of the common-law principle at issue is ambiguous. *See Netograph Mfg. Co. v. Scrugham*, 197 N.Y. 377, 379 (1910) ("Volumes of opinions have been written in which one can find all sorts of conflicting decisions and almost any dictum that one may be looking for" regarding privilege against courthouse service of summons.). The INA therefore cannot have codified the purported privilege.

### C.    The INA Displaced any State Common-Law Privilege to the Contrary

Because "Congress possesses plenary authority over immigration-related matters, it may freely displace or preempt state laws in respect to such matters." *Herrera-Inirio v. INS*, 208 F.3d 299, 307 (1st Cir. 2000); *see Textile Workers Union of America v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957) (when Congress enacts a policy, "by implication [it] reject[s] the common-law rule" to the contrary). Exercising that plenary authority, Congress in the INA spoke comprehensively to how the federal government will enforce federal immigration law, thus supplanting any prior federal or state common law on the issue. Specifically, Congress addressed the authority of immigration authorities to effect arrests, allowing those arrests by and large

18

without qualification. 8 U.S.C. §§ 1226, 1357(a). And when Congress intended limitations on immigration officers' arrest authority, it was explicit, for instance limiting warrantless arrest authority to situations where officers had reason to believe an alien was violating immigration law and was "likely to escape before a warrant can be obtained for his arrest," *id*. § 1357(a)(2), or restricting warrantless entry near the border to "the premises of a farm or other outdoor agricultural operation," *id*. § 1357(a)(3), (e).

These provisions show that Congress knew how to limit DHS's arrest authority and made conscious choices about when, where, and how to do so. Finally, as this Court has recognized, 2025 Opinion & Order at 33–34, 37, Congress amended the INA in 2006 to add 8 U.S.C. § 1229(e), which expressly acknowledges the practice of conducting immigration enforcement actions against aliens at courthouses, and reflects Congress's recognition that courthouse arrests are permitted under the INA. *Id*. § 1229(e)(1)–(2).

## IV.    This Action Is Moot as to the EOIR Defendants Because the EOIR Guidance Email Has Been Withdrawn

Plaintiffs' claim relating to the EOIR Guidance Email should be dismissed as moot. Under Article III of the Constitution, federal courts are limited to "the adjudication of actual, ongoing controversies between litigants." *Deakins v. Monaghan*, 484 U.S. 193, 199 (1988). As recognized by the Second Circuit, "[m]ootness is a jurisdictional matter" relating to Article III's mandate that "federal courts hear only 'cases' or 'controversies.'" *Blackwater v. Safnauer*, 866 F.2d 548, 550 (2d Cir. 1989) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). Federal courts "cannot give opinions on moot questions or abstract propositions," *Motient Corp. v. Dondero*, 529 F.3d 532, 537 (5th Cir. 2008) (quotation marks omitted), and must therefore dismiss a pending action for lack of jurisdiction when an event occurs that either provides the plaintiff with the requested relief or makes it impossible for the court to grant any effectual relief, *Church of Scientology of*

*California v. United States*, 506 U.S. 9, 12 (1992); *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 335 (1980). A claim becomes moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Tann v. Bennett*, 807 F.3d 51, 52 (2d Cir. 2015) (citations omitted).

The Policy Memo formally withdrew the EOIR Guidance Email. Dkt. No. 58, Ex. A, at 1, 3. To the extent Plaintiffs' complaint challenges the EOIR Guidance Email under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) and the APA, and seeks to "vacate and set aside" that guidance, *see* Compl. at 28, Plaintiffs' claim is moot. As the Supreme Court has explained, "when the challenged conduct ceases," it is no longer possible for the court to grant any effectual relief to the prevailing party and "any opinion as to the legality of the action would be advisory." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).

To the extent Plaintiffs argue that a defendant's "voluntary cessation" of a challenged practice can in certain circumstances allow for an exception to mootness, that exception does not apply here. Under the voluntary cessation exception, a court can adjudicate otherwise moot claims unless: "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) (quoting *Cty of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). While a private party bears a "heavy burden" of showing that voluntarily ceased conduct will not recur, the government's burden is "lighter": cessation of conduct will be treated "with some solicitude . . . [because] government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009). *See also Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (for mootness analysis, "[w]e presume that a government entity is acting in good faith when it changes

20

its policy"); *Beta Upsilon Chi Upsilon Chapter v. Machen*, 586 F.3d 908, 916 (11th Cir. 2009) (where defendant is a government actor, "there is a rebuttable presumption that the objectionable behavior will *not* recur") (emphasis in original). "Although voluntary cessation analysis applies where a challenge to government action is mooted by passage of legislation," or as applicable here, an agency's withdrawal of e-mail guidance to its employees, "the mere power to reenact a challenged law is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists." *National Black Police Association v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997). Instead, "there must be evidence indicating that the challenged law likely will be reenacted." *Id.*

That evidence is lacking here with respect to the EOIR Guidance Email. The Policy Memo voluntarily withdrew the EOIR Guidance Email without any geographic and temporal limitations, and thus exceeded the scope of this Court's order directing the agency to not apply the EOIR Guidance Email in immigration courthouses in Manhattan and the Bronx pending this Court's review of the merits of Plaintiffs' claims. 2025 Opinion & Order, at 46. Moreover, there is no evidence indicating that EOIR will re-issue the EOIR Guidance Email.

Nor can Plaintiffs successfully argue that their case falls within the narrow class of cases exempt from mootness because their asserted claims are "capable of repetition, yet evad[ing] review." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). The "capable of repetition" exception "is only to be used in exceptional situations," *White v. Colorado,* 82 F.3d 364, 366 (10th Cir. 1996), and "arises 'when: (1) the duration of the challenged action is too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party ... [will] be subjected to the same action again,'" *Disability Law Ctr. v. Millcreek Health Ctr.,* 428 F.3d 992, 996 (10th Cir. 2005) (quoting *United States v. Seminole Nation of Okla.,* 321 F.3d 939, 943 (10th Cir. 2002)). Here, Plaintiffs were able to obtain review

21

of the EOIR Guidance Email and there is no reason to believe that any future guidance, if it were issued, would evade review. Accordingly, Plaintiffs' challenge to the EOIR Guidance Email should be dismissed as moot.

## V.    Plaintiffs Lack Standing to Sue the EOIR Defendants

Even if this Court were to hold that Plaintiffs' APA claims as to the "EOIR Dismissal Policy" are not moot—although they are—this Court should dismiss Plaintiffs' claims against the EOIR Defendants for lack of standing under Rule 12(b)(1), because they have failed to establish organizational and associational standing to continue pursuing their challenge to that policy.

To establish standing, Plaintiffs must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A "'plaintiff must demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought.'" *Town of Chester v. Laroe Ests., Inc.,* 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).  An organizational plaintiff may establish standing in two ways. It may sue on "its own behalf," *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998), or it may "assert the rights of its members under the doctrine of associational standing," *id.* (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343–45 (1977)).

### A.    Plaintiffs Have Failed to Establish Organizational Standing

Plaintiffs The Door and African Communities Together ("ACT") have failed to establish organizational standing to challenge the "EOIR Dismissal Policy." An organization has standing where it can establish "that it was directly injured as an organization." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021). That showing requires "an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable." *Id.* at 172–

73 (citation omitted). "[T]he challenged action" must do more than "merely harm [the organization's] 'abstract social interests.'" *Id.* at 173 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Rather, it must "perceptibly impair[]" the organization's activities by imposing "involuntary and material impacts on core activities by which the organizational mission has historically been carried out." *Id.* at 173, 175 (emphasis omitted); *see also Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 (1976) ("organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III").

Plaintiffs' supplemental declarations do not establish the requisite injury in fact. Based on the declarations before this Court as of September 12, 2025, when it ruled on the merits of Plaintiffs' stay motion, this Court found that Plaintiff The Door "has adequately demonstrated injury in fact based on the diversion of resources caused by the challenged policies." 2025 Opinion & Order at 19–20. However, The Door's supplemental affidavit filed on December 3, 2025, does not establish the requisite injury in fact as to any alleged continuation of the EOIR Dismissal Policy after September 23, 2025. The Supplemental Declaration of Beth Baltimore, Deputy Director of The Door's Legal Services Center ("Supp. Baltimore Decl.") (Dkt. No. 68-3), asserts that "[s]ince my August 10, 2025 declaration was filed . . . (the 'Courthouse Arrest Policy'), has continued to impact our members and our work." Supp. Baltimore Decl. ¶ 6. The remainder of the Supplemental Baltimore Declaration asserts that immigration court arrests have continued to impact the Door's organizational activities and interests. *Id.* ¶¶ 7–8, 28–34. As to the "EOIR Dismissal Policy" specifically, the Supplemental Baltimore Declaration merely asserts that, "[u]ntil this Court stayed . . . (the 'Dismissal Policy') . . . many of our members were also at risk of having their removal proceedings dismissed . . . ." *Id.* ¶ 9. However, The Door notably does not assert that, after the Policy Memo rescinded the prior guidance e-mail on September 23, 2025, The Door has continued

to suffer distinct and palpable harms to itself as an organization. For example, The Door does not allege that an ongoing EOIR policy since September 23, 2025 has led to involuntary costs "in time, money, or danger," such as an "increased demand for [its] services" or the forced expenditure of funds "reasonably necessary to continue an established core activity of the organization." *Conn. Parents*, 8 F.4th, at 173–74 (collecting cases).

This Court previously held that Plaintiff ACT "has not made such a showing" of injury in fact sufficient to establish organizational standing. 2025 Opinion & Order at 20. The Supplemental Declaration of Diana Konaté ("Supp. Konaté Decl."), the Deputy Executive Director of Policy and Advocacy at ACT (Dkt. No. 68-14), still fails to establish any requisite injury in fact. As in her first declaration, the Supplemental Konaté Declaration broadly states that ACT "has continued to provide its members with free, high-quality immigration legal services." *Id.* ¶ 3. Both Plaintiffs thus lack standing to challenge any "EOIR Dismissal Policy" on their behalf.

### B.    Plaintiffs Have Failed to Establish Associational Standing

Plaintiffs also cannot rely on associational standing to challenge the "EOIR Dismissal Policy." "To bring suit on behalf of its membership, the organization must demonstrate," among other requirements, that "its members would otherwise have standing to sue in their own right."*Irish Lesbian & Gay Org.*, 143 F.3d at 649 (citation omitted). Members asserting individual standing are required to show: "(1) they suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical; (2) there is a 'causal connection between the injury and the conduct complained of'; and (3) it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Do No Harm v. Pfizer, Inc.*, 126 F.4th 109, 118 (2025) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

24

The Door and ACT cannot establish associational standing to challenge the "EOIR Dismissal Policy" because they have not identified any members who have been harmed by such a policy. Both Plaintiffs have now named members who have been arrested by ICE in immigration court in an effort to address this Court's prior ruling that an "association must 'identify members who have suffered the requisite harm'" to establish individual standing. 2025 Opinion & Order at 15 (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009)). However, none of the named members of The Door who are mentioned in the Supplemental Baltimore Declaration and who have submitted declarations have asserted injury caused by the "EOIR Dismissal Policy." Supp. Baltimore Decl. ¶¶ 19–20. *See also* Declaration of Abdoul Gadiri Bah, dated Dec. 2, 2025 (Dkt. No. 68-1); Declaration of Mamadou Saidou Bah, dated Dec. 3, 2025 (Dkt. No. 68-2). Similarly, the single named ACT member described in the Supplemental Declaration of Diana Konaté and who has submitted a declaration has not asserted any injury caused by the "EOIR Dismissal Policy." Supp. Konaté Decl. ¶ 10. *See also* Declaration of Mamadou Barry, dated Dec. 3, 2025 (Dkt. No. 68-4). Plaintiffs therefore have not established standing to bring suit against the EOIR Defendants on behalf of any of its members.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment as to the ICE Defendants, grant their motion to dismiss as to the EOIR Defendants, and deny Plaintiffs' cross-motion for summary judgment as against all defendants.

Dated: June 12, 2026
      New York, New York

JAY CLAYTON
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By:         ___*/s/  Tomoko Onozawa*_____
JEFFREY S. OESTERICHER
TOMOKO ONOZAWA
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:   (212) 637-2695/2721
Fax:   (212) 637-0033
Email:  jeffrey.oestericher@usdoj.gov
          tomoko.onozawa@usdoj.gov

26

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the undersigned hereby certifies that, measured by the word processing program used to prepare this brief, this brief complies with the word-count limitation of the rule, which is a maximum of 8,750. Excluding the caption, table of contents, table of authorities, signature blocks, or any required certificates, but including material contained in footnotes or endnotes, there are 8,165 words in this brief.

Dated:  New York, New York
       June 12, 2026

                                              */s/ Tomoko Onozawa*
                                          TOMOKO ONOZAWA
                                          Assistant United States Attorney