# Exhibit A

Exhibit A was generated with the Compare function in Microsoft Word, and displays the differences between Defendants' Memorandum of Law in Support of Their Partial Motion to Dismiss and Partial Motion for Summary Judgment (Dkt. No. 66), and Defendants' Corrected Memorandum of Law in Support of Their Partial Motion to Dismiss and Partial Motion for Summary Judgment, and in Opposition to Plaintiffs' Motion for Summary Judgment, filed on June 12, 2026.  This comparative blackline is filed pursuant to the Court's order on the record on April 15, 2026.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AFRICAN COMMUNITIES TOGETHER; and THE DOOR,

Plaintiffs,

v.

TODD LYONSDAVID VENTURELLA, in his official capacity as ActingSenior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; KRISTI NOEMMARKWAYNE MULLIN, in herhis official capacity as Secretary of the United States Department of Homeland Security; DARREN K. MARGOLIN, in his official capacity as Director, Executive Office for Immigration Review; and PAMELA BONDITODD BLANCHE, in herhis official capacity as Acting Attorney General, U.S. DEPARTMENT OF JUSTICE,[1]

Defendants.

No. 25 Civ. 6366 (PKC)

**DEFENDANTS' CORRECTED MEMORANDUM OF LAW IN SUPPORT OF THEIR PARTIAL MOTION TO DISMISS AND PARTIAL MOTION FOR SUMMARY JUDGMENT, AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2695/2721
Fax: (212) 637-0033

---

[1] Pursuant to Fed. R. Civ. P. 25(b)(1), David Venturella is automatically substituted for his predecessor Todd Lyons as the Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; Markwayne Mullin is automatically substituted for his predecessor Kristi Noem as the Secretary of the Department of Homeland Security; and Todd Blanche is automatically substituted for his predecessor Pam Bondi as the Acting Attorney General.

Email: jeffrey.oestericher@usdoj.gov
tomoko.onozawa@usdoj.gov

JEFFREY S. OESTERICHER
TOMOKO ONOZAWA
Assistant United States Attorneys

1

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................... 1

BACKGROUND .................................................................................................... 3

I.    FEDERAL STATUTORY REMOVAL AND ARREST AUTHORITYBACKGROUND ...................... 3

II.   ICE DHS GUIDANCE REGARDING CIVIL IMMIGRATION ENFORCEMENT ACTIONS AT OR NEAR COURTHOUSES ...................................................................................... 4

      A.   Pre-2021 Courthouse Arrest Guidance ............................................................. 4

      B.   The 2021 Courthouse Arrest POLICIES .............................................4Guidance 6

      C. ......................................................... The A.   Pre-2025 ICE Courthouse Arrest Policies .................................................................................................. 4

            1.    The March 2014 Guidance .................................................................... 4

            2.    The January and October 2015 Guidance ................................................ 4

            3.    The January 2018 Directive ................................................................. 5

            4.    The April 2021 Guidance .................................................................... 6

            B.    2025 ICE Guidance Regarding Courthouse Arrests ................................. 7

III.  IJ ADJUDICATION PROCEDURES AND THE WITHDRAWN EOIR GUIDANCE EMAIL ............. 98

ARGUMENT ..................................................................................................... 10

I.    LEGAL STANDARDS ..................................................................................... 10

      A.   Summary Judgment ............................................................................... 10

      B.   Rule 12(b)(1) Motion to Dismiss .............................................................. 11

II.   THE ICERESCISSION OF THE 2021 GUIDANCE IS NOT SUBJECT TO APA REVIEW ............. 12

III.  THE ICE GUIDANCE IS NOT ARBITRARY AND CAPRICIOUS ....................................... 15

> **Formatted:** Not Small caps
> **Formatted:** Indent: Left: 0.5", Tab stops: 0.81", Left + Not at 0.5"
> **Formatted:** Ligatures: None
> **Formatted:** Indent: Left: 0.5", Tab stops: 0.81", Left + Not at 0.67"
> **Formatted:** Indent: Left: 0.56", Tab stops: 0.88", Left + Not at 0.67"

C.    The ICE Guidance IsCOURTHOUSE ARRESTS ARE NOT CONTRARY TO LAW................ 1714

    1A.    There Is No Common-Law Privilege Against Federal Immigration Enforcement in and Around Courthouses.................................................................................. 1714

    2B.    The INA Cannot Be Read to Incorporate the Common-Law Privilege Against Courthouse Arrest........................................................................................... 2117

    3C.    The INA Displaced any State Common-Law Privilege to the Contrary............ 2218

IV.    THIS ACTION IS MOOT AS TO THE EOIR DEFENDANTS BECAUSE THE EOIR GUIDANCE EMAIL HAS BEEN WITHDRAWN ...................................................................... 2319

V.    PLAINTIFFS LACK STANDING TO SUE THE EOIR DEFENDANTS........................................... 22

    A.    Plaintiffs Have Failed to Establish Organizational Standing................................ 22

    B.    Plaitniffs Have Failed to Establish Associational Standing .................................. 24

CONCLUSION.................................................................................................................... 25

**Formatted:** Small caps

**Formatted:** Indent: Left: 0.17", Tab stops: 0.5", Left + Not at 0.67"

**Formatted:** Indent: Left: 0.56", Hanging: 0.38", Tab stops: 0.94", Left + Not at 0.83"

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Ahmed v. Cissna*,
   327 F. Supp. 3d 650 (S.D.N.Y. 2018)...................................................................... 14

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
   815 F.3d 105 (2d Cir. 2016)................................................................................ 2420

*Arizona v. United States*,
   567 U.S. 387 (2012)............................................................................................. 3

*Baker Botts LLP v. ASARCO LLC*,
   576 U.S. 121 (2015)......................................................................................... 2117

*Bechtel v. Administrative Review Bd.*,
   710 F.3d 443 (2d Cir. 2013)............................................................................... 15
*Bennett v. Spear*,
   520 U.S. 154 (1997)........................................................................................... 14
*Banco San Juan Internacional, Inc. v. Federal Reserve Bank*,
   762 F. Supp. 3d 247 (S.D.N.Y. 2025)................................................................. 12

*Beta Upsilon Chi Upsilon Chapter at the Univ. of Florida v.v. Machen*,
   586 F.3d 908 (11th Cir. 2009) ........................................................................ 2420

*Blackwater v. Safnauer, Safnauer,*
   866 F.2d 548 (2d Cir. 1989)............................................................................... 19

   866 F.2d 548, 550 (2d Cir. 1989)...................................................................... 23
*Block v. Cmty Nutrition Inst.,*
   467 U.S. 340 (1984)........................................................................................... 12

*Bowen v. Michigan Academy of Family Physicians*,
   476 U.S. 667 (1986)........................................................................................... 12

*Carver v. Bank of New York Mellon*, 15 Civ.,
   15 Civ. 10180 (JPO), 2017 WL 1208598 (S.D.N.Y. Mar. 31, 2017)................................... 1211

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979)........................................................................................... 14

Formatted: Tab stops: 0.97", Left

Formatted: Font: Not Bold

Formatted: Font color: Black

Formatted: Font color: Black

Formatted: Font: Not Italic

*Church of Scientology of California v. United States,*
   506 U.S. 9 (1992)................................................................................... ~~23~~19

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971)............................................................................... 11

*City of Erie v. Pap's A.M.,*
   529 U.S. 277 (2000)............................................................................... ~~24~~20

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983)................................................................................. ~~25~~21

*Conn. Parents Union v. Russell-Tucker,*
   8 F.4th 167 (2d Cir. 2021) ........................................................ 22, 23, 24

*Cty of Los Angeles v. Davis,*
   440 U.S. 625 (1979)............................................................................... ~~24~~20

*Daimler AG v. Bauman,*
   571 U.S. 117 (2014)............................................................................... ~~19~~15

*Davis v. Fed. Election Comm'n,*
   554 U.S. 724 (2008)............................................................................... 22

*Deakins v. Monaghan,*
   484 U.S. 193 (1988)............................................................................... ~~23~~19

*Deposit Guaranty Nat'l Bank v. Roper,*
   445 U.S. 326 (1980)............................................................................... ~~23~~19

*Disability Law Ctr. v. Millcreek Health Ctr.,*
   428 F.3d 992 (10th Cir. 2005) ............................................................. ~~25~~21

*Do No Harm v. Pfizer, Inc.,*
   126 F.4th 109 (~~2d Cir.~~ 2025) ............................................................. ~~1~~24

*~~FCC v. Prometheus Radio Project,~~*
   ~~592 U.S. 414 (2021)................................................................................. 15~~

*Friends of Animals v. Romero,*
   948 F.3d 579 (2d Cir. 2020)................................................................. 11

*Friends of Ompompanoosuc v. FERC,*
   968 F.2d 1549 (2d Cir. 1992)............................................................... 11

iv

*Gardner v. United States*,
246 F. Supp. 1014 (S.D.N.Y. 1965).......................................................................... ~~20~~17

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011).......................................................................................... ~~19~~16

*Guertin v. United States*,
743 F.3d 382 (2d Cir. 2014)................................................................. 15

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)................................................................................ 23

*Heckler v. Chaney*,
470 U.S. 821 (1985)........................................................................................... 12

*Herrera-Inirio v. INS*,
208 F.3d 299 (1st Cir. 2000)............................................................................. ~~22~~18

*In re Arthur Treacher's Franchise Litigation*,
92 F.R.D. 398 (E.D. Pa. 1981)................................................... 20

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)...................................................................... 22

*International Shoe Co. v. Washington*,
326 U.S. 310 (1945)............................................................................ 16

*Irish Lesbian & Gay Org. v. Giuliani*,
143 F.3d 638 (2d Cir. 1998)............................................................ 22, 24

*J.S. ex rel. N.S. v. Attica Cent. Sch.*,
386 F.3d 107 (2d Cir. 2004).............................................................................. ~~12~~11

*Kansas v. Colorado*,
533 U.S. 1 (2001)................................................................................. 19

*Karpova v. Snow*,
497 F.3d 262 (2d Cir. 2007)........................................................................... 11

*Lamb v. Schmitt*,
285 U.S. 222 (1932).................................................................................... ~~18~~15

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
104 F.3d 1349 (D.C. Cir. 1997).................................................................. 13

*Lincoln v. Vigil*,
508 U.S. 182 (1993)........................................................................................ 12, ~~14~~

v

*Liranzo v. United States*,
690 F.3d 78 (2d Cir. 2012)................................................................................. 11

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)................................................................................. 24

*Lunney v. United States*,
319 F.3d 550 (2d Cir. 2003)................................................................................. 13

*Mantena v. Johnson*,
809 F.3d 721 (2d Cir. 2015)................................................................................. 11

*Motient Corp. v. Dondero*,
529 F.3d 532 (5th Cir. 2008) ................................................................................. ~~23~~19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)................................................................................. 11~~, 15~~

*~~National Assoc. of Home Builders v. Defenders of Wildlife,~~*
~~551 U.S. 644 (2007)................................................................................. 15~~
*National Black Police Association v. District of Columbia*,
108 F.3d 346 (D.C. Cir. 1997)................................................................................. ~~24~~21

*~~National Lifeline Ass'n v. FCC,~~*
~~983 F.3d 498 (D.C. Cir. 2020)................................................................................. 15~~
*~~National Mining Ass'n v. McCarthy,~~*
~~758 F.3d 243 (D.C. Cir. 2014)................................................................................. 14~~
*Nat'l Audubon Soc. v. Hoffman*,
132 F.3d 7 (2d Cir. 1997)................................................................................. ~~11~~10

*~~New York~~Netograph Mfg. Co. v. ~~ICE,~~*
~~466 F. Supp. 3d 439 (S.D.~~Scrugham,
197 N.Y. ~~2020)~~ ................................................................................. 6

*~~New York v. ICE,~~*
~~No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023) ................................................................................. 6~~
*~~Noel v. Chapman,~~*
~~508 F.2d 1023 (2d Cir. 1975)................................................................................. 14~~377 (1910)
................................................................................. 18

*Northern Light Technology, Inc. v. Northern Lights Club*,
236 F.3d 57 (1st Cir. 2001)................................................................................. ~~21~~17

*~~NRDC v. EPA,~~*
~~658 F.3d 200 (2d Cir. 2011)................................................................................. 15~~

*Pacific Gas & Electric Co. v. Federal Power Comm'n,*
  506 F.2d 33 (D.C. Cir. 1974) .................................................................... 14

Page Co. v. MacDonald,
  261 U.S. 446 (1923).......................................................................... 1815

Pavlo v. James,
  437 F. Supp. 125 (S.D.N.Y. 1977) .................................................... 2017

*Pennoyer v. Neff,*
  95 U.S. 714 (1878)............................................................................... 19

Phifer v. City of New York,
  289 F.3d 49 (2d Cir. 2002)................................................................... 12

Preiser v. Newkirk,
  422 U.S. 395 (1975)......................................................................... 2319

Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs,
  31 F. Supp. 3d 571 (S.D.N.Y. 2014).............................................. 1110

Rosebrock v. Mathis,
  745 F.3d 963 (9th Cir. 2014) .......................................................... 2420

Rosenblatt v. American Cyanamid Co.,
  86 S. Ct. 1 (1965)............................................................................ 1916

Ryan v. ICE,
  974 F.3d 9 (1st Cir. 2020)................................................ 6, 18, 2115, 17

*Salazar v. King,*
  822 F.3d 61 (2d Cir. 2016)................................................................... 14

Samantar v. Yousuf,
  560 U.S. 305 (2010)..................................................................... 2117, 18

Shaffer v. Heitner,
  433 U.S. 186 (1977)......................................................................... 1916

*Shakhnes v. Berlin,*
  689 F.3d 244 (2d Cir. 2012)................................................................. 14
*Simon v. E. Ky. Welfare Rts. Org.,*
  426 U.S. 26 (1976)............................................................................... 23

Sossamon v. Lone Star State of Texas,
  560 F.3d 316 (5th Cir. 2009) ......................................................... 2420

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)................................................................................................ 22

*Stewart v. Ramsay*,
    242 U.S. 128 (1916).............................................................................. ~~18, 19~~15, 16

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009)................................................................................................ 25

*Tann v. Bennett*,
    807 F.3d 51 (2d Cir. 2015)................................................................................ ~~23~~20

~~*Texas Clinical Labs v. Sebelius*,~~
    ~~612 F.3d 771 (5th Cir. 2010)~~ .............................................................................. 15
*Textile Workers Union of America v. Lincoln Mills of Ala.*,
    353 U.S. 448 (1957)............................................................................................ ~~22~~18

*Town of Chester v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017)................................................................................................ 22

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954)................................................................................................ 20

*United States v. Craft*,
    535 U.S. 274 (2002)................................................................................ 15, 18, ~~21~~

*United States v. ~~United States v.~~ Denedo*,
    556 U.S. 904 (2009).......................................................................................... ~~19~~16

*United States v. Green*,
    305 F. Supp. 125 (S.D.N.Y. 1969) ...................................................................... 17

*United States v. ~~United States v.~~ Seminole Nation of Okla.*,
    321 F.3d 939 (10th Cir. 2002) .......................................................................... ~~25~~21

*UPMC Mercy v. Sebelius*,
    793 F. Supp. 2d 62 (D.D.C. 2011) .................................................................... ~~11~~10

*Webster v. Doe*,
    486 U.S. 592 (1988)................................................................................................ 13

*Westchester v. HUD*,
    778 F.3d 412 (2d Cir. 2015)................................................................................ 12

*White v. Colorado,*
    82 F.3d 364 (10th Cir. 1996) ............................................................................ ~~25~~21

viii

## Statutes

5 U.S.C. § 701(a)(1) ............................................................................................ 132)
.......................................................................................................................... 12

5 U.S.C. § 704 ..................................................................................................... 14
5 U.S.C. § 705 ................................................................................................. 108, 9

5 U.S.C. § 706 ..................................................................................................... 15
5 U.S.C. § 706(2)(C) ........................................................................................... 17
8 U.S.C. § 1226(a) .............................................................................. 3, 13, 2017

8 U.S.C. § 1226(e) ............................................................................................... 13
8 U.S.C. § 1229(e) ......................................................................................... 2219

8 U.S.C. § 1229a(b)(1) .......................................................................................... 9

8 U.S.C. § 1357(a)(2) ....................................................................................... 22e)
.................................................................................................................... 13, 19

8 U.S.C. § 1182 ..................................................................................................... 1

8 U.S.C. § 1226 ............................................................................................... 3, 18

8 C.F.R. § 239.2(a) ................................................................................................ 9

8 C.F.R. § 239.2(c) ........................................................................................... 9, 10
8 C.F.R. § 287.5(e) .............................................................................................. 20
8 C.F.R. § 1003.0 ................................................................................................... 3
8 C.F.R. § 1003.10(b) ............................................................................................ 9
8 C.F.R. § 1003.23(a) ............................................................................................ 9

## Rules

Fed. R. Civ. P. 12(b)(1) .................................................................................... 1, 11

Fed. R. Civ. P. 56 ........................................................................................... 1, 10

## Other Authorities

82 Fed. Reg. 8799 (Jan. 25, 2017) ................................................................... 5, 6
86 Fed. Reg. 7051 (Jan. 20, 2021) ....................................................................... 6

90 Fed. Reg. 8443 (Jan. 20, 2025) ....................................................................... 7

## Regulations

8 C.F.R. § 239.2(a)........................................................................................................... 9

8 C.F.R. § 239.2(c)........................................................................................................... 9

8 C.F.R. § 287.5(c)......................................................................................................... 17

8 C.F.R. § 1003.0 ............................................................................................................ 3

8 C.F.R. § 1003.10(b) ..................................................................................................... 9

Other Authorities

Executive Order 13,993,
    86 Fed. Reg. 7051 (Jan. 20, 2021) ......................................................................... 6, 7

Executive Order 13,768,
    82 Fed. Reg. 8799 (Jan. 25, 2017) ......................................................................... 5, 6

Executive Order 14,159
    90 Fed. Reg. 8443 (Jan. 20, 2025) ............................................................................. 7

Executive Order 14,165
    90 Fed. Reg. 8467 (Jan. 20, 2025) ............................................................................. 7

**Formatted:** Tab stops: 0.85", Left + Not at 0.97"

x

Defendants respectfully submit this memorandum of law: (1) in support of: (1) their motion for summary judgment as to Plaintiffs' claims against defendants ~~Todd Lyons~~David Venturella, in his official capacity as ~~Acting~~Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement ("ICE"), and ~~Kristi Noem~~Markwayne Mullin, in ~~her~~his official capacity as Secretary of the United States Department of Homeland Security ("DHS" and together, the "ICE Defendants"), pursuant to Fed. R. Civ. P. 56; ~~and~~ (2) in support of their motion to dismiss the complaint as against defendants Daren K. Margolin, in his official capacity as Director of the Executive Office for Immigration Review ("EOIR"), and ~~Pamela Bondi~~Todd Blanche, in ~~her~~his official capacity as Acting Attorney General of the United States (together, "the "EOIR Defendants"), pursuant to Fed. R. Civ. P. 12(b)(1)~~.²~~); and (3) in opposition to Plaintiffs' motion for summary judgment.

### PRELIMINARY STATEMENT

Congress has codified in the Immigration and Nationality Act ("INA") the Executive Branch's constitutional and inherent authority to investigate, arrest, and detain aliens who are suspected of being, or found to be, ~~unlawfully present in~~removable from the United States to

---

² ~~This Court's Opinion and Order dated September 12, 2025 ("Opinion & Order") (Dkt. No. 51), held that, based on the factual record before the Court at that time, plaintiff The Door had demonstrated organizational standing to seek a stay on its own behalf but lacked associational standing to seek relief on its members' behalf, and plaintiff African Communities Together lacked both organizational and associational standing to seek a stay. Opinion & Order, at 13–20. To the extent Plaintiffs' standing arguments on summary judgment rest on their prior submissions supporting their motion for a stay, Defendants submit that only The Door has established organizational standing to obtain relief for the reasons set forth in the Opinion & Order. Id. See also Do No Harm v. Pfizer Inc., 126 F.4th 109, 119 (2d Cir. 2025) (the "evidentiary burden for establishing standing" at the preliminary injunction stage is "at least as rigorous as the standard that applies at the summary judgment stage"). If Plaintiffs introduce supplemental affidavits or other evidence supporting standing that were not included in their complaint nor offered in support of their motion for a stay, Defendants reserve the right to move for dismissal for lack of standing in their opposition brief.~~

effectuate their removal. ~~See~~ 8 U.S.C. §§ 1182, 1225, 1226, 1231, 1357. ~~ICE has long exercised~~ <u>In accordance with</u> its <u>plenary</u> arrest authority ~~in and around courthouses~~<u>under the INA, DHS and its component agencies have long exercised their discretion to determine where and how to exercise that authority,</u> given ~~its~~<u>the government's</u> strong interest in enforcing federal immigration laws ~~and effectuating arrests in a manner that protects the public, the arrestee,~~<u>.</u> <u>Consistent with that discretion, for decades, DHS</u> and <u>its component and predecessor agencies have issued internal guidance to agency</u> law enforcement officers~~.  To that end, on May 27, 2025, ICE issued a memorandum titled Civil Immigration Enforcement Actions in or near Courthouses (the "ICE Guidance"), which provided revised policy guidance for~~ <u>regarding the factors they should consider and approvals, if any, they should obtain before conducting civil immigration enforcement actions in certain public locations. As shown in</u> the ~~exercise of ICE's discretionary arrest authority in or near federal, state, and local courthouses.  See~~ ~~Certified~~ Administrative Record ("AR")~~, at 1 3 (Dkt. No. 64).  Per this guidance, ICE civil enforcement actions in or around courthouses target, among others, aliens convicted of crimes, gang members, national security or public safety risks, aliens subject to final orders of removal, or aliens who have illegally reentered the country after being removed"~~<u>) in this case (ECF No. 64), that guidance has frequently changed to adapt to changes in enforcement priorities.</u>

<u>Plaintiffs challenge under the Administrative Procedure Act ("APA") a January 2025 internal guidance issued by ICE and U.S. Customs and Border Protection ("CBP") to their immigration officers which changed ICE's policy with respect to civil immigration enforcement actions in or near courthouses. On April 27, 2021, ICE and CBP jointly issued a guidance memorandum ("2021 Guidance"), which governed civil immigration enforcement actions in or near courthouses. (AR 25–27). Unlike previous guidance memoranda, the 2021 Guidance expressly defined courthouses to include, for the first and only time, "immigration courts"</u>

2

maintained by the Executive Office for Immigration Review. (AR 26).  However, on January 21, 2025, then-Acting ICE Director Caleb Vitello issued new internal interim guidance ("2025 Interim Guidance") (AR 51–53) which rescinded the 2021 Guidance for ICE, and thus rescinded the prior guidance's limitations on ICE civil immigration enforcement actions in or near immigration courts. (AR 51). On May 27, 2025, Acting ICE Director Todd Lyons issued a final guidance document ("2025 Final Guidance"), which superseded the January 2021 Guidance. (AR 1–3).

Plaintiffs' APA challenge to the ~~ICE~~rescission of the 2021 Guidance fails as a matter of law.  As a threshold matter, the ~~ICE Guidance~~rescission is not reviewable under the ~~Administrative Procedure Act ("APA")~~ APA because ~~the locations of~~ ICE's policy choices about where the agency can best exercise its civil immigration enforcement authority are ~~a matter~~ committed to agency discretion. ~~As a result, there~~ by law. There is no meaningful standard ~~by which a court can evaluate the appropriateness of ICE's discretionary choice of locations for targeted immigration enforcement actions.  Furthermore, the ICE Guidance is not arbitrary, capricious, or contrary to law.  The Guidance strikes a reasonable balance between ICE's legitimate interests in enforcing immigration law and protecting the safety of its officers, individuals subject to arrest, and members of the public, while minimizing interference with judicial proceedings.  Furthermore, as this Court has recognized, there is no~~—including the so-called common-law privilege against courthouse arrests ~~that was incorporated into the INA upon its enactment in 1952~~, which was never incorporated in the INA—by which the Court can evaluate the appropriateness of ICE's decision to rescind the agency's prior restrictions on civil immigration enforcement actions in or near immigration courts.

Separately, Plaintiffs' APA challenge to a May 20, 2025, email sent by two Acting Regional Deputy Chief Immigration Judges ("IJs") to Assistant Chief IJs (the "EOIR Guidance

3

Email") should be dismissed as moot because the email was formally withdrawn in a September 23, 2025 policy memorandum. ̶EOIR is an agency within the U.S. Department of Justice that oversees the immigration courts and the Board of Immigration Appeals ("BIA"). ̶*See* 8 C.F.R. § 1003.0; *see also* https://justice.gov/eoir/about-office (last visited on Dec. 3, 2025).̶ EOIR is responsible for adjudicating immigration cases, and its mission is to adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws. ̶*Id.*̶ On May 30, 2025, two Acting Regional Deputy Chief IJs sent a non-binding, non-authoritative guidance email to Assistant Chief IJs entitled "Guidance on Case Adjudication," which referenced specific statutory and regulatory authority available to IJs and advised Assistant Chief IJs as to what IJs can do with respect to oral motions to dismiss by DHS attorneys. Declaration of Amy Belsher, dated Aug. 11, 2025 ("Belsher Decl."), Ex. 12 (Dkt. No. 24-12). ̶On September 12, 2025, this Court granted Plaintiffs' motion under Section 705 of the APA to stay the application of the EOIR Guidance Email to removal proceedings in Manhattan and the Bronx. *See* Dkt. No. 51. On September 23, 2025, EOIR issued Policy Memorandum 25-51, which formally withdrew the EOIR Guidance Email without limitation to geographic area or time. Because Plaintiffs' alleged injuries have been redressed by voluntary agency action, their APA challenge to the EOIR Guidance Email should be dismissed for lack of subject matter jurisdiction.

**BACKGROUND**

**I.** ~~Federal~~ **Statutory** ~~Removal and Arrest Authority~~**Background**

The federal government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012); *see* U.S. Const. art. I § 8, cl. 4 (granting Congress the power to "establish a uniform Rule of Naturalization"). ̶Pursuant to that authority, Congress has provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the

4

United States." 8 U.S.C. § 1226(a). Congress has also provided that "without [a] warrant," a federal officer may "arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any [] law or regulation [regulating the admission, exclusion, expulsion, or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest." *Id.* § 1357(a)(2). These statutes confer arrest authority that is ~~generally~~ plenary and unqualified. Congress has limited the government's authority to search for aliens in certain specific locations, but none of those locations include courthouses. *Id.* § 1357(a)(3), (e). Accordingly, in the exercise of its long-standing discretionary authority to determine the location of a civil enforcement action against an alien unlawfully present in the United States, DHS has developed, revised, and/or rescinded guidance with regard to certain locations which has balanced the government's legitimate interests in enforcing immigration law against the potential effects of its enforcement activities. (AR 4–6, 7–19, 29–50).

### A.    ~~ICE~~DHS Guidance Regarding Civil Immigration Enforcement Actions At or Near Courthouses

#### ~~II.~~1.    Pre-2021 Courthouse Arrest ~~Policies~~Guidance

**A.   ~~Pre-2025 ICE Courthouse Arrest Policies~~**

1.    ~~The March 2014 Guidance~~

Since at least 2014, ICE ~~policy~~ has ~~permitted its officers and agents to conduct~~issued guidance memoranda specifically addressing civil immigration enforcement actions ~~in~~made at or near courthouses. As noted below, with the exception of the 2021 Guidance, these memoranda have not included immigration courts as covered locations.

In a March 19, 2014 memorandum issued to field offices and entitled "Enforcement Actions at or Near Courthouses" (the "March 2014 Guidance"), ICE stated that "[e]nforcement actions at or near courthouses ~~will~~" "only be undertaken against Priority 1 aliens," ~~including~~which

5

included but were not limited to, aliens engaged in or suspected of terrorism or espionage or who otherwise pose a danger to national security, and those aliens who pose a serious risk to public safety as shown by certain criminal activity. See Declaration of Jeffrey S. Oestericher, dated August 20, 2025 ("Oestericher Decl.")."), Ex. A (Dkt.ECF No. 41-1). The March 2014 Guidance did not reference or otherwise reference immigration courts.

2.      The January and October 2015 Guidance

After the March 2014, ICE has amended its Guidance, ICE's guidance with respect to courthouse arrests civil immigration enforcement actions in or near courthouses was amended several times to reflect changes in DHS enforcement priorities. In a January 26, 2015, guidancememorandum addressed to field offices ("January 2015 Guidance"), ICE revised the March 2014 Guidance to reflect enforcement priorities set forth in then-DHS Secretary Jeh Johnson's November 20, 2014, memorandum, titled "Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants."[3] Oestericher Decl. Ex. B (Dkt.ECF No. 41-2). Nine months later, on October 21, 2015 ("OctoberThe January 2015 Guidance"), ICE's then-Assistant Director for Field Operations sent an e-mail reminding all Deputy Field Office Directors and Field Office Directors to limit enforcement actions in or near courthouses to the categories of aliens set forth in Secretary Johnson's November 2014 memorandum. (AR 20; Oestericher Decl. Ex. B). The October 2015 Guidance further instructed stated that enforcement actions at or near courthouses, "wherever practicable," would occur outside public areas of the courthouse, "will only be conducted in collaboration with courtundertaken" against aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security personnel, and use

---

[3]See https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion_0.pdf.

the courthouses' non-public entrances and exits.  (AR 20).; aliens convicted of felonies or offenses involving active participation in a criminal street gang; or aliens convicted of an aggravated felony, as defined by the INA.  *Id.*  The January 2015 Guidance did not reference or otherwise mention immigration courts.

### 3.    The January 2018 Directive

On January 25, 2017, then-President Trump issued Executive Order 13,768, which expanded the categories of aliens to be prioritized for removal.  82 Fed. Reg. 8799 (Jan. 25, 2017). To implement the Executive OrderThe Executive Order directed DHS to prioritize for removal broad categories of aliens, including aliens who had criminal convictions or who had been charged with a criminal offense; engaged in fraud or willful misrepresentation before a governmental agency; abused public benefits programs; failed to comply with a final order of removal; or posed a risk to public safety or national security. *Id.* at 8800. In addition, the Executive Order directed DHS to "review agency regulations, policies, and procedures for consistency with this order," and to "consider whether to withdraw or modify any inconsistent policies and procedures, as appropriate and consistent with the law." *Id.* at 8801. In accordance with changed immigration enforcement priorities, on January 10, 2018, ICE issued a memorandum titled Directive 11072.1: Civil Immigration Enforcement Actions Inside Courthouses (the "2018 Directive") (AR 21–24), which revisedset forth ICE's policy "regarding civil immigration enforcement actions inside federal, state, and local courthouses." AR 21.  The 2018 Directive advised that "civil immigration enforcement actions taken inside courthouses can reduce safety risks to the public, targeted alien(s) and ICE officers and agents," because "[i]ndividuals entering courthouses are typically screened

7

by law enforcement personnel to search for weapons and other contraband." *Id.*[4] (AR 21). The 2018 Directive did not reference or otherwise mention immigration courts.  (AR 21–24).

**Formatted:** Font color: Black

**Formatted:** Justified, Indent: Left: 0.5", Tab stops: 1", List tab + 1.06", Left + Not at 1.5"

4.2.	The April 2021 Courthouse Arrest Guidance

On January 20, 2021, then-President Biden issued Executive Order 13,993, "Revision of Civil Immigration Enforcement Policies and Priorities," Executive Order 13,993, 86 Fed. Reg. 7051 (Jan. 20, 2021), which revoked Executive Order 13,768 Executive Order 13,768, and directed the Secretary of Homeland Security and other cabinet officials to review any agency actions developed pursuant to Executive Order 13,768 and "take action, including issuing revised guidance" consistent with the new Executive Order. 86 Fed. Reg. 7051, 7051 (Jan. 20, 2021). On the same day, then-Acting Secretary of Homeland Security David Pekoske issued a memorandum which amended the agency's Department's immigration enforcement priorities. to prioritizing individuals who were: engaged in or suspected of terrorism or espionage, or whose apprehension, arrest and/or custody was otherwise necessary to protect national security; apprehended at the border or points of entry while trying to unlawfully enter the United States, or who were not physically present in the United States before November 1, 2020; and incarcerated following an

---

[4] As this Court is aware, lawsuits challenging the 2018 Directive were filed in this Court (the "SDNY case") and the District of Massachusetts.  In June 2020, the Honorable Jed S. Rakoff entered judgment enjoining ICE "from conducting any civil arrests on the premises or grounds of New York State courthouses, as well as such arrests of anyone required to travel to a New York State courthouse as a party or witness to a lawsuit." *New York v. ICE*, 466 F. Supp. 3d 439, 449-50 (S.D.N.Y. 2020).  In September 2020, in connection with the District of Massachusetts litigation, the First Circuit vacated a district court order which had preliminarily enjoined ICE from implementing the 2018 Directive on the grounds that plaintiffs had failed to show a likelihood of success on the merits and remanded to the district court for further proceedings.  *Ryan v. ICE*, 974 F.3d 9, 33-34 (1st Cir. 2020).  On February 28, 2023, the Second Circuit vacated the judgment and injunction in the SDNY case, *see New York v. ICE*, No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023).  On May 21, 2021, the *Ryan* plaintiffs voluntarily dismissed their case.  *See Ryan v. ICE*, 19 Civ. 11003 (D. Mass. May 21, 2021) (Dkt. No. 115).

aggravated felony conviction, released after the date of the new memorandum, and posed a public safety threat. *See* https://perma.cc/2TJK-HTMS.

In accordance with ~~the~~ changed immigration enforcement priorities, on April 27, 2021, ~~DHS~~ICE and CBP revoked the 2018 Directive and issued interim guidance ~~"govern[ing] [ICE]~~ governing "civil immigration enforcement actions in or near courthouses~~" ("~~." (AR 25–27). For the first time, the 2021 ~~Courthouse~~ Guidance~~")~~. ~~(AR 25–28). The 2021 Courthouse Guidance~~ defined "courthouses" to include "immigration courts." (AR 26). It also provided that a civil immigration enforcement action "may be taken in or near a courthouse" if there was a national security threat; an imminent risk of death, violence or harm to any person; ~~or other~~involved "hot pursuit" of a person posing a public safety ~~threats.~~ threat; or an imminent risk of destruction of evidence material to a criminal case. (AR 26). ~~In the absence of~~Absent hot pursuit and subject to advance supervisory approval, ICE officers ~~were permitted to~~could undertake a civil immigration enforcement action in or near a courthouse against an individual posing a threat to public safety if there was no other safe alternative location or it would be too difficult to undertake the action elsewhere. ~~*Id.*~~ (AR 26). The 2021 Guidance's purpose was to provide "management guidance to ICE and CBP personnel exercising discretionary law enforcement functions." (AR 27). The 2021 Guidance "does not affect the statutory authority of ICE or CBP employees." (*Id.*).

~~On October 27, 2021, DHS separately issued a memorandum entitled "Guidelines for Enforcement Actions in or Near Protected Areas" ("2021 Protected Areas Guidance") (AR 29–34). The guidance advised that ICE and U.S. Customs and Border Protection ("CBP") officers "should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities," which the memorandum referred to as "protected areas." (AR 30). The 2021 Protected Areas Guidance offered some examples of "protected areas" — *e.g.*, schools, medical facilities, places of worship, playgrounds and childcare~~

centers, social services establishments, disaster or emergency response and relief locations, and parades—but did not include a defined term and did not include courthouses in its list of examples. (AR 30–31).

### B.    2025 ICE Guidance Regarding Courthouse Arrests

### 3.    The 2025 Courthouse Arrest Guidance

On January 20, 2025, President Trump issued Executive Order 14,159, which,Executive Order 14,159, which *inter alia*,  revoked the prior administration's civil immigration enforcement policies and priorities and statedestablished that it "is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people." 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025). The Executive Order directed the Secretary of Homeland Security to "take all appropriate action to enable" ICE and other agencies to establish agency priorities to "protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal." *Id.* at 8444. On the same day, President Trump also issued Executive Order 14,165, which further directed the Secretary of Homeland Security to "take all appropriate action to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States." 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025).

On January 20, 2025, then-Acting Secretary of Homeland Security Benjamine Huffman issued a memorandum titled "Enforcement Actions in or Near Protected Areas," which addressed ICE and CBP enforcement actions "in or near areas that the [DHS Secretary] previously determined require special protection." (AR 50).  90 Fed. Reg. 8443, 8443 (Jan. 20, 2025).  On the same day, the then-Acting Secretary of Homeland Security issued a memorandum which superseded and rescinded the 2021 Protected Area Guidance.  This memorandum stated that, as a

**Formatted:** Font color: Black

10

policy matter, it was "not necessary" for the agency to "create bright line rules regarding where our immigration laws are permitted to be enforced," because on a daily basis, The memorandum observed that "officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location." "," and determined that on a going-forward basis, "officers should continue to use that discretion along with a healthy dose of common sense." (AR 50). As a result, the memorandum concluded that as a matter of policy, "[i]t is not necessary . . . to create bright line rules regarding where our immigration laws are permitted to be enforced," but added that ICE and CBP leadership, (AR 50). The memorandum further provided that ICE and CBP "may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion." (AR 50).

In accordance with this memorandum, on January 20, 2025, ICE subsequently issued further guidance. On January 21, 2025, then-Acting ICE Director Caleb Vitello issued a memorandum titled, "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses" ("2025 Interim Guidance"), which rescinded and superseded the 2021 Courthouse Guidance. for ICE officers. (AR 51–53). In the Interim Guidance and an accompanying cover e-mail, ICE reiterated that civil immigration enforcement actions in or near courthouses "should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits." (AR 52, 54). The Interim Guidance and the cover e-mail also urged that, "[w]hen practicable," civil immigration enforcement actions "against targeted aliens" should be done "discreetly to minimize their impact on court proceedings." (AR 52, 54).

On May 27, 2025, Acting ICE Director Todd M. Lyons, Acting Director of ICE, issued a revised memorandum titled, "Civil Immigration Enforcement Actions In or Near Courthouses" (the "ICE2025 Final Guidance")"), which superseded the January 21, 2025 Interim Guidance. (AR

11

*(margin annotations: Formatted: Font color: Black — appearing four times)*

1–3).  ~~The ICE Guidance explains that civil immigration enforcement actions taken inside courthouses "can reduce safety risks to the public, targeted alien(s) and ICE officers and agents," because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband." (AR 1).  It affirms ICE's understanding that its civil immigration enforcement actions in or near courthouses are consistent with the actions of "[f]ederal, state and local law enforcement officials" who "routinely engage in enforcement activities in or near courthouses because many individuals appear in courthouses for unrelated criminal or civil violations." *Id.*  The ICE Guidance further explains that courthouse arrests "are often required when jurisdictions refuse to cooperate with ICE," such~~ On May 18, 2026, this Court granted Plaintiffs' motion under 5 U.S.C. § 705 to stay the rescission of the 2021 Guidance as ~~refusing~~ "it applied to ~~honor~~ civil immigration ~~detainers and transfer aliens directly to ICE custody." *Id.*

~~Consistent with Executive Order 14,159's broadened~~ enforcement ~~priorities,~~ actions to the ICE Guidance provides that "targeted aliens" include, but are not limited to: national security or public safety threats; specific aliens with criminal convictions; ~~gang~~ three immigration courthouses in Manhattan principally "serving the ~~members; aliens ordered removed from the United States who have failed to depart; and/or aliens who have re-entered the country illegally after being removed. (AR 2). Like the January 2025 Interim Guidance and its cover e-mail, the ICE Guidance advises that "[w]hen practicable," ICE officers should "conduct civil immigration enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings." ~~ of The Door" *Id.*  It further provides that enforcement actions inside courthouses "should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits." *Id.*  ICE officers and agents are also advised to "exercise sound judgment"~~

12

**Formatted:** Body Text, Right:  0.07", Line spacing:  single, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers

and "make substantial efforts to avoid unnecessarily alarming the public or disrupting court operations," and to "make every effort to limit their time, at courthouses while conducting civil immigration enforcement actions."    (AR 3).26 Federal Plaza, 201 Varick Street, and 290 Broadway.  Opinion & Order dated May 18, 2026 ("2026 Opinion & Order") (Dkt. No. 90), at 15,

### III.B.   IJ Adjudication Procedures and the Withdrawn EOIR Guidance Email

The INA requires IJs presiding over removal proceedings to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1); *see also* 8 C.F.R. § 1003.10(b). In deciding the individual cases before them, IJs "shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the [INA] and regulations that is necessary or appropriate for the disposition . . . of such cases." 8 C.F.R. § 1003.10(b).

With respect to pre-decision motions, including motions to dismiss removal proceedings, "[u]nless otherwise permitted by the immigration judge, motions submitted prior to the final order of an immigration judge shall be in writing and shall state, with particularity the grounds therefor the relief sought, and the jurisdiction." *Id.*  8 C.F.R. § 1003.23(a). § 1003.23(a). The governing regulations further provide that after commencement of proceedings, a DHS attorney may move to dismiss removal proceedings on the grounds set forth in 8 C.F.R. § 239.2(a).  *See* 8 C.F.R. § 239.2(c); Compl. ¶ 43.

On May 30, 2025, two Acting Regional Deputy Chief IJs sent an email to Assistant Chief IJs entitled "Guidance on Case Adjudication." Belsher Decl., Ex. 12. In the EOIR Guidance Email, the authors reported that there had been an increase in caseload in the detained docket and several developments with non-detained cases in the past few weeks, including that "DHS is carrying out enforcement actions in or near EOIR space" and "DHS attorneys have moved to

13

dismiss cases that are currently pending in court." *Id.* "Given the recent developments," the email provided guidance regarding the handling of DHS motions to dismiss "to ensure the expeditious adjudication of cases." *Id.*

On September 12, 2025, the Court granted Plaintiffs' initial motion under Section 705 of the APA, 5 U.S.C. § 705, to stay the application of the EOIR Guidance Email, but limited the stay to "removal proceedings conducted in the geographic areas served by The Door, *i.e.*, Manhattan and the Bronx, pending full review on the merits of all policies challenged in this action." Opinion & Order dated Sept. 12, 2025 ("2025 Opinion & Order") (Dkt. No. 51), at 46.

OnFollowing the Court's 2025 Opinion and Order, on September 23, 2025, EOIR issued Policy Memorandum 25-51 (the "Policy Memo") (Dkt. No. 58, at Ex. A), which formally withdrew the EOIR Guidance Email, without limitation to geographic area or time. The Policy Memo reiterated that the EOIR Guidance Email "was not an EOIR policy" and "could not direct or bind any Immigration Judge to make a specific decision in a case in a particular way," and directed all IJs to "continue to not rely on it in adjudicating cases." *Id.* at 1, 3.

**ARGUMENT**

**I.      Legal Standards**

**A.      Summary Judgment**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where, as here, a party seeks judicial review of agency action, summary judgment is appropriate, since 'whether an agency action is supported by the administrative record and consistent with the APA standard of review' is decided 'as a matter of law.'" *Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs*, 31 F. Supp. 3d 571, 586 (S.D.N.Y. 2014) (quoting *UPMC Mercy v. Sebelius*, 793 F. Supp. 2d 62, 67 (D.D.C. 2011)). "Generally, a court reviewing

14

**Formatted:** Font: Not Italic, Font color: Black

**Formatted:** Indent: Left:  0.06", Hanging:  0.44", Outline numbered + Level: 2 + Numbering Style: I, II, III, … + Start at: 1 + Alignment: Right + Aligned at:  1" + Tab after:  1.5" + Indent at:  1.5", Tab stops:  2", List tab + Not at  1.5"

an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).[5]

"Under the APA, courts review agency action to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Animals v. Romero*, 948 F.3d 579, 585 (2d Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)). This "narrow" standard does not allow a court "'to substitute its judgment for that of the agency.'" *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1554 (2d Cir. 1992) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Rather, a court may overturn an agency's action only if it finds that the agency has relied on factors which Congress "'has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

### B.    Rule 12(b)(1) Motion to Dismiss

On a Rule 12(b)(1) motion to dismiss, Plaintiffs bear the burden of "'proving subject matter jurisdiction by a preponderance of the evidence.'" *Mantena v. Johnson*, 809 F.3d 721, 727 (2d Cir. 2015) (quoting *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012)). In considering challenges to subject matter jurisdiction under Rule 12(b)(1), the court "must accept as true all the

---

[5] For this reason, the Court should decline to consider the substantial extra-record evidence—18 declarations, one of which appends 16 exhibits—that Plaintiffs proffer in support of their motion for summary judgment. Dkt. Nos. 69 and 69-1 through 69-16. Moreover, the fact section of Plaintiffs' brief appears under a heading titled "Statement of Material Facts." Pls.' Replacement Mem. of Law in Supp. of Mot. for Summ. J. ("Pls.' Br.") (ECF No. 92) at 2–11. To the extent this section of their brief is intended to serve as a Local Civil Rule 56.1 statement, that rule "does not apply to claims brought under the Administrative Procedure Act." Local Civ. R. 56.1(a).

15

material factual allegations contained in the complaint," but is "'not to draw inferences from the complaint favorable to plaintiffs.'" –*Carver v. Bank of New York Mellon*, 15 Civ. 10180 (JPO), 2017 WL 1208598, at *2 (S.D.N.Y. Mar. 31, 2017) (quoting *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004)). –In adjudicating a 12(b)(1) motion, the Court may consider evidence extrinsic to the pleadings. -*Phifer v. City of New York*, 289 F.3d 49, 55 (2d Cir. 2002).

**II.     The ~~ICE~~Rescission of the 2021 Guidance Is Not Subject to APA Review**

~~As a threshold matter,~~ICE's decision to rescind the ~~ICE~~2021 Guidance as to civil immigration enforcement actions in immigration courts is unreviewable under the APA ~~for two reasons:~~because policy judgments regarding the circumstances and location of ~~an arrest~~a civil immigration enforcement action are committed to agency discretion by law~~, and the ICE Guidance is a general statement of agency policy rather than a final agency decision within the meaning of the APA.~~.[6]

First, while the APA embodies a presumption of judicial review, *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986), "[t]his is 'just' a presumption," *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (quoting *Block v. Cmty Nutrition Inst.*, 467 U.S. 340, 349 (1984)), and "under [5 U.S.C.] § 701(a)(2~~)~~), agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law,'" *id.* (quoting § 701(a)(2)). "[E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." -*Heckler v. Chaney*, 470 U.S. 821, 830 (1985). -"In such a case,

---

[6] This Court's May 18, 2026 order held that the rescission of the 2021 Guidance is reviewable under the APA and that 5 U.S.C. § 701(a)(2) does not apply. 2026 Opinion & Order, at 8–11. While Defendants recognize this holding as the law of the case, this argument is presented here again to preserve their rights of appeal.

the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Id.*

"To determine the extent of [the agency's] discretion and whether there is 'law to apply'" in a particular case, this Court "look[s] to the statutory provisions that govern" the agency's enforcement actions. *Westchester v. HUD*, 778 F.3d 412, 419 (2d Cir. 2015). *See also Banco San Juan Internacional, Inc. v. Federal Reserve Bank*, 762 F. Supp. 3d 247, 275 (S.D.N.Y. 2025) ("To show that the APA's judicial-review provisions apply to a defendant agency, a plaintiff 'must specify some statute or regulation' that meaningfully limits the agency's discretion.") (quoting *Lunney v. United States*, 319 F.3d 550, 558 (2d Cir. 2003)). A preclusion analysis under § 701(a)(2) "requires careful examination of the statute on which the claim of agency illegality is based . . . ." *Webster v. Doe*, 486 U.S. 592, 600 (1988).

The INA, from which ICE's civil arrest authority derives, provides no "meaningful standard" by which a court can evaluate the appropriateness of ICE's discretionary choice of public locations for targeted civil immigration enforcement actions. *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States"); *id.* § 1357(a)(2) ("Any officer or employee . . . authorized under regulations prescribed by the Attorney General shall have the power without warrant . . . (2) . . . to arrest any alien in the United States . . . ."). ~~The INA's broad language grants ICE the discretion to determine the location of a civil enforcement action against an alien removable from the United States.~~ The statute imposes few location-based restrictions on DHS's broad authority to investigate and take civil immigration enforcement actions, and it evinces Congress's intent not to further constrain agency discretion with respect to the location of enforcement. For example, the INA limits when immigration enforcement officers may enter a farm or similar agricultural operation for investigative purposes. 8 U.S.C. § 1357(e). The INA also

17

limits officers' authority to "board and search for aliens" in railway cars, aircraft, conveyances, or vehicles "within a reasonable distance from any external boundary of the United States," and further allows officers "to have access to private lands, but not dwellings" that are within 25 miles of an external boundary of the United States. *Id.* § 1357(a)(3). Aside from these limitations, Congress has not placed restrictions, such as whether or under what circumstances immigration officers may enter or approach certain locations, on where or how to conduct civil immigration enforcement actions. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (State Department policy relating to location of processing overseas immigrant visa applications was not reviewable under the APA, because the "broad language" of the INA "grants to the Secretary discretion to prescribe the place at which aliens apply for immigrant visas without providing substantive standards against which the Secretary's determination could be measured"). And with respect to arrests by ICE with a warrant, ICE's decisions about the location of such arrests are unreviewable for the separate reason that another statute "preclude[s] judicial review," 5 U.S.C. § 701(a)(1), as the INA provides that immigration authorities' "discretionary judgment regarding the application of [§ 1226, authorizing arrests with a warrant] shall not be subject to [judicial] review." 8 U.S.C. § 1226(e). Plaintiffs have cited no law or standard that would limit ICE's discretion, except the common-law privilege against courthouse arrest, Compl. ¶¶ 4, 23–24, 80, and this Court has already held that Plaintiffs have not demonstrated the existence of such a privilege against civil enforcement actions in or near courthouses. Opinion & Order, 32–37. Absent such privilege or other applicable restriction on where ICE can make arrests, its decisions or policies in that regard are unreviewable."); *Ahmed v. Cissna*, 327 F. Supp. 3d 650, 669, 671 (S.D.N.Y. 2018) (finding no "judicially discoverable and manageable standard" under the APA for determining "whether petitioners must be permitted to file their I-130 petitions in their countries of residence, rather than being directed to file their

18

petitions" in a U.S. lockbox, because the INA "is silent as to the filing procedures to which petitioners are entitled").

Second, the ICE Guidance is unreviewable because it is not a "final agency action." 5 U.S.C. § 704. An agency action is "final" only if two conditions are met: "'(1) the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature,' and (2) 'the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Shakhnes v. Berlin*, 689 F.3d 244, 260 (2d Cir. 2012) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

The ICE Guidance fails the second prong of this test. On its face, the ICE Guidance does not compel any action, determine any rights or obligations, or create legal consequences for aliens who may be the subject of civil enforcement actions. Instead, it is a general statement of policy—that is, a statement "'issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'" *Lincoln v. Vigil*, 508 U.S. 182, 196–97 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)); *accord Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975) ("'general statements of policy' are rules directed primarily at the staff of an agency describing how it will conduct agency discretionary functions" (quotation marks omitted)); *National Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (a "general statement of policy" is an "agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule"). A final agency action would exist only when an immigration officer actually applies the policy and arrests a specific individual alien, thereby taking action that determines that alien's rights and obligations—but the ICE Guidance, standing alone, is not a reviewable agency action. *See National Mining Ass'n*, 758 F.3d at 253; *Pacific Gas & Electric*In determining whether there is "law to apply" to a challenged

19

agency action, courts may also look to "informal agency guidance that govern the agency's challenged action." *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016). This Court's 2026 Opinion & Order held that the agency "has followed 'by rule,' *i.e.*, agency guidance, a general policy on courthouse arrests," 2026 Opinion & Order, at 11, but ICE's prior location-specific guidance for civil immigration enforcement actions (and the INA generally) does not provide any law for the Court to apply for assessing the agency's discretionary decision to rescind, amend, or promulgate location-specific guidance. Accordingly, the ICE Defendants' decision to rescind the 2021 Guidance as it applied to civil immigration courthouse arrests is unreviewable under the APA.

Courthouse Arrests Are~~*Federal Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974) ("A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.").~~

~~III.   The ICE Guidance Is Not Arbitrary and Capricious~~

~~Separate and apart from these threshold deficiencies, the ICE Guidance does not violate the APA. As provided in 5 U.S.C. § 706, a reviewing court must uphold agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Bechtel v. Administrative Review Bd.*, 710 F.3d 443, 446 (2d Cir. 2013). Courts applying this "'deferential standard'" "'may not substitute [their] judgment for that of the agency.'" *Guertin v. United States*, 743 F.3d 382, 385-86 (2d Cir. 2014) (quoting *Bechtel*, 710 F.3d at 446, and *NRDC v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011)); *accord FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("deferential" review "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision"). A court accordingly may set aside agency action "only if [the agency] 'has relied on factors which Congress had not intended it to consider, entirely failed to consider an~~

**Formatted:** Font: Century Schoolbook

20

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Bechtel*, 710 F.3d at 446 (quoting *National Assoc. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007)); *accord Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. "[U]nder the arbitrary and capricious standard, there is a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous." *Texas Clinical Labs v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010); *accord National Lifeline Ass'n v. FCC*, 983 F.3d 498, 507 (D.C. Cir. 2020) ("[T]he party challenging" an agency's action as arbitrary and capricious "bears the burden of proof").

Plaintiffs assert that the ICE Guidance is arbitrary and capricious because it "overturns longstanding policy restricting civil immigration arrests in or near immigration courts." Compl. at 6. However, Plaintiffs erroneously characterize the ICE Guidance as making an unannounced change to its prior courthouse policies. As explained in detail above, ICE first issued the March 2014 Directive regarding civil enforcement activities at or near courthouses and that guidance, over time, has been amended to incorporate changes in DHS enforcement priorities. The ICE Guidance is little different than its predecessors; it was issued pursuant to an Executive Order's change of categories of aliens to be prioritized for removal, and to its mandate that DHS review existing agency policies and procedures and, as appropriate and consistent with the law, modify those policies and procedures for consistency with the Executive Order.

Plaintiffs also incorrectly assert that the ICE Guidance "fail[s] to articulate a reasoned explanation" for its issuance. Compl. ¶ 77. The face of the ICE Guidance makes clear that its purpose was to explain the agency's justifications for continuing to conduct civil enforcement actions in or near courthouses — *i.e.*, to reduce safety risks to the public, the targeted alien, and ICE officers and agents; the fact that these enforcement actions were consistent with the practices of

21

other federal, state and local law enforcement officials who routinely engage in enforcement activities in courthouses nationwide; and that such enforcement actions are necessary because jurisdictions have refused to honor immigration detainers and transfer aliens directly to ICE custody. (AR 1).

In addition, Plaintiffs' assertion that the ICE Guidance is arbitrary and capricious because it "failed to consider important aspects of the problem or reasonable alternatives," Compl. ¶ 77, is also incorrect. Plaintiffs maintain that ICE failed to consider how the ICE Guidance "may chill noncitizens' access to the courts and interfere with the administration of justice." *Id.* ¶ 22. However, the ICE Guidance addresses those concerns by including provisions designed to ensure that enforcement actions within courthouses are conducted in an orderly, safe, and non-disruptive manner. For example, the ICE Guidance mandates that, "when practicable," ICE officers "conduct enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings." (AR 2). In line with prior guidance documents relating to the location of civil enforcement actions (AR 20, 22, 32), the ICE Guidance also prioritizes non-public arrests when possible. (AR 2). The ICE Guidance further directs ICE officers and agents to "exercise sound judgment" and "make substantial efforts to avoid unnecessarily alarming the public," (AR 22) and requires them to "make every effort to limit their time at courthouses while conducting civil immigration enforcement actions." (AR 3). In addition, it provides that to the extent practicable, civil enforcement actions inside courthouses should take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits. (AR 2). Thus, the ICE Guidance strikes a balance between ICE's legitimate interests in enforcing immigration law and protecting the safety of its officers, the arrestee, and members of the public, and the goal of minimizing interference with judicial proceedings.

22

### ~~C.~~III.    ~~The ICE Guidance Is~~ Not Contrary to Law

#### ~~1.~~A.    There Is No Common-Law Privilege Against Federal Immigration Enforcement in and Around Courthouses

~~Plaintiffs' argument~~Plaintiffs contend that ~~the ICE Guidance~~there is ~~"in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA, Compl. ¶ 79 (quoting 5 U.S.C. § 706(2)(C)), is mistaken.~~ Plaintiffs' argument rests on an ~~alleged~~a common-law privilege against courthouse arrests and ~~an assertion~~assert that such a privilege was incorporated into the INA upon its enactment in 1952. ~~*Id.* ¶ 80.~~ Pls.' Br. at 19–22. However, there has never been a privilege, either when the INA was adopted or at any time before, resembling the one alleged by Plaintiffs—much less one that was "so well established" that the INA should be deemed to have included it. *United States v. Craft*, 535 U.S. 274, 288 (2002) (holding that, to conclude that Congress meant to incorporate a common-law rule, that rule must have been "so well established" that it can be "assume[d]" that Congress considered it). To the contrary, historical cases demonstrate only a much narrower common-law immunity from certain types of civil arrest, which itself rests on rationales that no longer exist.

As the First Circuit recognized in a challenge to ICE's ~~prior courthouse arrest guidance~~2018 Directive, the "hoary common law privilege against civil arrests for parties and witnesses attending court proceedings" arose at a time when "a plaintiff in a civil action obtained personal jurisdiction over a defendant" by having that defendant arrested under a writ of *capias ad respondendum*. *Ryan v. ICE*, 974 F.3d ~~at~~9, 15 (1st Cir. 2020). But parties and witnesses attending court proceedings in other matters were protected from such arrests by an immunity devised by the courts, "both to remove a disincentive for inhibiting parties and witnesses from coming forward (especially the risk of arrest in connection with another matter) and to ensure that arrests did not disrupt the orderly operation of the courts." *Id*. at 21.

23

However, asAs "arrests in civil suits fell largely out of fashion" and were replaced by service of summonses to obtain personal jurisdiction and initiate a civil action, courts "ruled that a similar privilege against service of a summons should extend to at least some parties and witnesses." *Id*. at 22. Thus, in cases now nearly a century old, the Supreme Court recognized an immunity from service of process in a private civil suit when the person to be served entered a jurisdiction solely to attend a court proceeding as a witness or party. *See Lamb v. Schmitt*, 285 U.S. 222, 225 (1932); *Page Co. v. MacDonald*, 261 U.S. 446, 446–47 (1923); *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916).

Both the privilege against case-initiating arrest and the privilege against service of process of a person attending court were extensions of the now-outdated principle that a state court's jurisdiction over a person rested on that person's physical presence. *See Daimler AG v. Bauman*, 571 U.S. 117, 125–26 (2014) (under rule of *Pennoyer v. Neff*, 95 U.S. 714, 727, 733 (1878), "a tribunal's jurisdiction over persons reaches no farther than the geographic bounds of the forum," and noting later abrogation of that doctrine). ). Because physical presence was historically the key to state-court personal jurisdiction, potential defendants had a strong incentive not to attend court proceedings in states in which potential plaintiffs might seek to serve them with civil process— just as they had the same incentive not to attend when they might be subject to arrest to subject them to a state court's jurisdiction. *See Stewart*, 242 U.S. at 130–31 ("Witnesses would be chary of coming within our jurisdiction . . . if they might be punished with a lawsuit for displeasing parties by their testimony; and even parties in interest . . . might be deterred from the rightfully fearless assertion of a claim or the rightfully fearless assertion of a defense, if they were liable to be visited on the instant with writs from the defeated party." (quotation marks omitted)).

That physical-presence requirement is now obsolete. In *International Shoe Co. v. Washington*, the Supreme Court announced the modern rule that a defendant need only have

24

"certain minimum contacts" with a forum state to be sued there. 326 U.S. 310, 316 (1945). That decision broadly "increase[d] the ability of the state courts to obtain personal jurisdiction over nonresident defendants," *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977), and many states responded by enacting long-arm statutes enabling their courts to exercise personal jurisdiction over out-of-state defendants, *see Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 926 (2011); *Rosenblatt v. American Cyanamid Co.*, 86 S. Ct. 1, 3 (1965) (Goldberg, J., in chambers). Thus, the rationale for immunity against service of process or arrest to initiate a civil action has disappeared, given that neither physical presence nor physical custody is required any longer for a court to obtain personal jurisdiction. With that rationale no longer present, the common-law rule that resulted from it no longer carries any force. *See United States v. Denedo*, 556 U.S. 904, 911 (2009) (noting change in common-law rule when rationale has been superseded); *Kansas v. Colorado*, 533 U.S. 1, 10 (2001) (rejecting common-law rule that rested on unsound distinction).

Accordingly, since the dawn of long-arm jurisdiction, judicial decisions have not applied the common-law privilege. To the contrary, courts have explained that when an out-of-jurisdiction defendant is subject to civil process under a forum state's long-arm statute, the privilege does not apply. *In re Arthur Treacher's Franchise Litigation*, 92 F.R.D. 398, 405 (E.D. Pa. 1981) ("'it makes little sense to grant immunity to a person who can be served in his home jurisdiction under the forum's long-arm statute'" (quoting 4A Wright & Miller, Federal Practice and Procedure: Civil § 1076 (1969)); *accord See, e.g., Gardner v. United States*, 246 F. Supp. 1014, 1015 (S.D.N.Y. 1965) ("A nondomiciliary who could be served outside the state cannot claim immunity from service if he is served in New York, even if he is here voluntarily and in the aid of justice."); *Pavlo v. James*, 437 F. Supp. 125, 127 (S.D.N.Y. 1977) ("the reason for the immunity—encouraging voluntary appearances—disappears if a defendant is otherwise subject to the extra-territorial reach of [the forum state's long-arm statute]").

That same logic vitiates any argument that the privilege should apply against courthouse arrests by ICE. Aliens are subject to federal law enforcement jurisdiction or enforcement actions anywhere in the United States. *See* 8 U.S.C. §§ 1226(a) (providing for arrests "[o]n a warrant" without geographic limitation), *id.* § 1357 (providing for warrantless arrests without geographic limitation); 8 C.F.R. § 287.5(c) (similar). Given that, an alien does not "giv[e] up the 'safety' of one jurisdiction" when he attends a court proceeding in another state. *United States v. Green*, 305 F. Supp. at 125, 128. (S.D.N.Y. 1969). Because the privilege is not needed "to shield an individual from service of process to encourage his or her travel to the forum state," it "should not be enlarged" beyond that reason. *Northern Light Technology, Inc. v. Northern Lights Club*, 236 F.3d 57, 62–63 (1st Cir. 2001).

### B. The INA Cannot Be Read to Incorporate the Common-Law Privilege Against Courthouse Arrest

Because there was no "long-established and familiar common law rule protecting against civil arrests on behalf of the sovereign" at the time of the INA's enactment (or at any other time), Plaintiffs' assertion that the INA does not authorize such arrests at courthouses lacks merit. *Ryan*, 974 F.3d at 23. Congress is presumed to legislate against the background of the common law and to retain a common-law rule except when it evidently intends not to. *Baker Botts LLP v. ASARCO LLC*, 576 U.S. 121, 126 (2015); *Samantar v. Yousuf*, 560 U.S. 305, 320 & n.13 (2010). However, that presumption of nonderogation of the common law only applies to "long-established and familiar principles." *Samantar*, 560 U.S. at 320 n.13 (quotation marks omitted). When the common-law rule is "not so well established," it cannot displace "broad statutory language" enacted by Congress. *Craft*, 535 U.S. at 288.

As the authorities above show, by the time Congress established a comprehensive immigration-arrest statutory scheme in the INA, any privilege against extra-jurisdictional civil

arrest was a historical artifact. –Even when it was in force, it never applied to arrests by the government for law-enforcement purposes. ~~Thus, at~~At the very least, ~~there is ambiguity as to~~ the scope of the common-law principle at issue~~.~~ is ambiguous. *See Netograph Mfg. Co. v. Scrugham*, 197 N.Y. ~~at~~377, 379 (1910) ("Volumes of opinions have been written in which one can find all sorts of conflicting decisions and almost any dictum that one may be looking for" regarding privilege against courthouse service of summons.). –The INA therefore cannot have codified the purported privilege. ~~*See Pasquantino*, 544 U.S. at 364 (rejecting importation of a common-law rule where no case "clearly establishes" the rule's applicability).~~

### 3.C.   The INA Displaced any State Common-Law Privilege to the Contrary

> **Formatted:** Heading 3, Tab stops: 1", Left

Because "Congress possesses plenary authority over immigration-related matters, it may freely displace or preempt state laws in respect to such matters." -*Herrera-Inirio v. INS*, 208 F.3d 299, 307 (1st Cir. 2000); *see Textile Workers Union of America v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957) (when Congress enacts a policy, "by implication [it] reject[s] the common-law rule" to the contrary). —Exercising that plenary authority, Congress in the INA spoke comprehensively to how the federal government will enforce federal immigration law, thus supplanting any prior federal or state common law on the issue. -Specifically, Congress addressed the authority of immigration authorities to effect arrests, allowing those arrests by and large without qualification. -8 U.S.C. §§ 1226 ~~("an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States"),~~, 1357(a~~) (specifying numerous categories under which immigration authorities can make arrests).~~). And when Congress intended limitations on ~~ICE's~~immigration officers' arrest authority, it was explicit, for instance limiting warrantless arrest authority to situations where officers had reason to believe an alien was violating immigration law and was "likely to escape before a warrant can be obtained for his arrest," 8

27

U.S.C*id*. § 1357(a)(2), or restricting warrantless entry near the border to "the premises of a farm or other outdoor agricultural operation," *id*. §‑ 1357(a)(3), (e).

These provisions show that Congress knew how to limit DHS's arrest authority and made conscious choices about when, where, and how to do so.

Finally, as this Court has recognized, 2025 Opinion & Order at 33–34, 37, Congress amended the INA in 2006 to add 8 U.S.C. § 1229(e), which expressly acknowledges the practice of conducting immigration enforcement actions against aliens at courthouses.~~—~~, and reflects Congress's recognition that courthouse arrests are permitted under the INA. *Id*. § 1229(e)(1)–(2~~)~~ ~~("where an [immigration] enforcement action leading to a removal proceeding was taken against~~ ~~an alien [a]t . . . a courthouse (or in connection with that appearance of that alien at a courthouse)~~ ~~if the alien is appearing in connection with [certain specified matters or circumstances]"). Section~~ ~~1229(e) reflects Congress's recognition that courthouse arrests are permitted under the INA.~~).

**IV.    This Action Is Moot as to the EOIR Defendants Because the EOIR Guidance Email Has Been Withdrawn**

Plaintiffs' claim relating to the EOIR Guidance Email should be dismissed as moot. ~~ ~~Under Article III of the Constitution, federal courts are limited to "the adjudication of actual, ongoing controversies between litigants." ~~ ~~*Deakins v. Monaghan*, 484 U.S. 193, 199 (1988). ~~ ~~As recognized by the Second Circuit, "[m]ootness is a jurisdictional matter" relating to Article III's mandate that "federal courts hear only 'cases' or 'controversies.'" ~~ ~~*Blackwater v. Safnauer*, 866 F.2d 548, 550 (2d Cir. 1989) (~~citing~~quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). ~~ ~~Federal courts "cannot give opinions on moot questions or abstract propositions," *Motient Corp. v. Dondero*, 529 F.3d 532, 537 (5th Cir. 2008) (quotation marks omitted), and must therefore dismiss a pending action for lack of jurisdiction when an event occurs that either provides the plaintiff with the requested relief or makes it impossible for the court to grant any effectual relief, *Church of*

28

*Scientology of California v. United States*, 506 U.S. 9, 12 (1992); *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 335 (1980). A claim becomes moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Tann v. Bennett*, 807 F.3d 51, 52 (2d Cir. 2015) (citations omitted).

The Policy Memo formally withdrew the EOIR Guidance Email. Dkt. No. 58, Ex. A, at 1, 3. To the extent Plaintiffs' complaint challenges the EOIR Guidance Email under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) and the APA, and seeks to "vacate and set aside" that guidance, *see* Compl. at 28, Plaintiffs' claim is moot. As the Supreme Court has explained, "when the challenged conduct ceases," it is no longer possible for the court to grant any effectual relief to the prevailing party and "any opinion as to the legality of the action would be advisory." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).

To the extent Plaintiffs ~~may~~ argue that a defendant's "voluntary cessation" of a challenged practice can in certain circumstances allow for an exception to mootness, that exception does not apply here. Under the voluntary cessation exception, a court can adjudicate otherwise moot claims unless: "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) (quoting *Cty of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). While a private party bears a "heavy burden" of showing that voluntarily ceased conduct will not recur, the government's burden is "lighter": cessation of conduct will be treated "with some solicitude . . . [because] government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009). *See also Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (for mootness analysis, "[w]e presume that a government entity is acting in good faith when it changes

its policy"); *Beta Upsilon Chi Upsilon Chapter v. Machen*, 586 F.3d 908, 916 (11th Cir. 2009) (where defendant is a government actor, "there is a rebuttable presumption that the objectionable behavior will *not* recur") (emphasis in original). "Although voluntary cessation analysis applies where a challenge to government action is mooted by passage of legislation," or as applicable here, an agency's withdrawal of e-mail guidance to its employees, "the mere power to reenact a challenged law is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists." *National Black Police Association v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997). Instead, "there must be evidence indicating that the challenged law likely will be reenacted." *Id.*

That evidence is lacking here with respect to the EOIR Guidance Email. The Policy Memo voluntarily withdrew the EOIR Guidance Email without any geographic and temporal limitations, and thus exceeded the scope of this Court's order directing the agency to not apply the EOIR Guidance Email in immigration courthouses in Manhattan and the Bronx pending this Court's review of the merits of Plaintiffs' claims. 2025 Opinion & Order, at 46. Moreover, there is no evidence indicating that EOIR will re-issue the EOIR Guidance Email.

Nor can Plaintiffs successfully argue that their case falls within the narrow class of cases exempt from mootness because their asserted claims are "capable of repetition, yet evad[ing] review." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). The "capable of repetition" exception "is only to be used in exceptional situations," *White v. Colorado,* 82 F.3d 364, 366 (10th Cir. 1996), and "arises 'when: (1) the duration of the challenged action is too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party ... [will] be subjected to the same action again.'" *Disability Law Ctr. v. Millcreek Health Ctr.,* 428 F.3d 992, 996 (10th Cir. 2005) (quoting *United States v. Seminole Nation of Okla.,* 321 F.3d 939, 943 (10th Cir. 2002)). Here, Plaintiffs were able to obtain review

30

of the EOIR Guidance Email and there is no reason to believe that any future guidance, if it were issued, would evade review. Accordingly, Plaintiffs' challenge to the EOIR Guidance Email should be dismissed as moot.

**V.      Plaintiffs Lack Standing to Sue the EOIR Defendants**

Even if this Court were to hold that Plaintiffs' APA claims as to the "EOIR Dismissal Policy" are not moot—although they are—this Court should dismiss Plaintiffs' claims against the EOIR Defendants for lack of standing under Rule 12(b)(1), because they have failed to establish organizational and associational standing to continue pursuing their challenge to that policy.

To establish standing, Plaintiffs must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A "'plaintiff must demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought.'" *Town of Chester v. Laroe Ests., Inc.,* 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). An organizational plaintiff may establish standing in two ways. It may sue on "its own behalf," *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998), or it may "assert the rights of its members under the doctrine of associational standing," *id.* (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343–45 (1977)).

**A.      Plaintiffs Have Failed to Establish Organizational Standing**

Plaintiffs The Door and African Communities Together ("ACT") have failed to establish organizational standing to challenge the "EOIR Dismissal Policy." An organization has standing where it can establish "that it was directly injured as an organization." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021). That showing requires "an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable." *Id.* at 172–

31

73 (citation omitted). "[T]he challenged action" must do more than "merely harm [the organization's] 'abstract social interests.'" *Id.* at 173 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Rather, it must "perceptibly impair[]" the organization's activities by imposing "involuntary and material impacts on core activities by which the organizational mission has historically been carried out." *Id.* at 173, 175 (emphasis omitted); *see also Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 (1976) ("organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III").

Plaintiffs' supplemental declarations do not establish the requisite injury in fact. Based on the declarations before this Court as of September 12, 2025, when it ruled on the merits of Plaintiffs' stay motion, this Court found that Plaintiff The Door "has adequately demonstrated injury in fact based on the diversion of resources caused by the challenged policies." 2025 Opinion & Order at 19–20. However, The Door's supplemental affidavit filed on December 3, 2025, does not establish the requisite injury in fact as to any alleged continuation of the EOIR Dismissal Policy after September 23, 2025. The Supplemental Declaration of Beth Baltimore, Deputy Director of The Door's Legal Services Center ("Supp. Baltimore Decl.") (Dkt. No. 68-3), asserts that "[s]ince my August 10, 2025 declaration was filed . . . (the 'Courthouse Arrest Policy'), has continued to impact our members and our work." Supp. Baltimore Decl. ¶ 6. The remainder of the Supplemental Baltimore Declaration asserts that immigration court arrests have continued to impact the Door's organizational activities and interests. *Id.* ¶¶ 7–8, 28–34. As to the "EOIR Dismissal Policy" specifically, the Supplemental Baltimore Declaration merely asserts that, "[u]ntil this Court stayed . . . (the 'Dismissal Policy') . . . many of our members were also at risk of having their removal proceedings dismissed . . . ." *Id.* ¶ 9. However, The Door notably does not assert that, after the Policy Memo rescinded the prior guidance e-mail on September 23, 2025, The Door has continued

32

to suffer distinct and palpable harms to itself as an organization. For example, The Door does not allege that an ongoing EOIR policy since September 23, 2025 has led to involuntary costs "in time, money, or danger," such as an "increased demand for [its] services" or the forced expenditure of funds "reasonably necessary to continue an established core activity of the organization." *Conn. Parents*, 8 F.4th, at 173–74 (collecting cases).

This Court previously held that Plaintiff ACT "has not made such a showing" of injury in fact sufficient to establish organizational standing. 2025 Opinion & Order at 20. The Supplemental Declaration of Diana Konaté ("Supp. Konaté Decl."), the Deputy Executive Director of Policy and Advocacy at ACT (Dkt. No. 68-14), still fails to establish any requisite injury in fact. As in her first declaration, the Supplemental Konaté Declaration broadly states that ACT "has continued to provide its members with free, high-quality immigration legal services." *Id.* ¶ 3. Both Plaintiffs thus lack standing to challenge any "EOIR Dismissal Policy" on their behalf.

### B.    Plaintiffs Have Failed to Establish Associational Standing

Plaintiffs also cannot rely on associational standing to challenge the "EOIR Dismissal Policy." "To bring suit on behalf of its membership, the organization must demonstrate," among other requirements, that "its members would otherwise have standing to sue in their own right."*Irish Lesbian & Gay Org.*, 143 F.3d at 649 (citation omitted). Members asserting individual standing are required to show: "(1) they suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical; (2) there is a 'causal connection between the injury and the conduct complained of'; and (3) it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Do No Harm v. Pfizer, Inc.*, 126 F.4th 109, 118 (2025) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

The Door and ACT cannot establish associational standing to challenge the "EOIR Dismissal Policy" because they have not identified any members who have been harmed by such a policy. Both Plaintiffs have now named members who have been arrested by ICE in immigration court in an effort to address this Court's prior ruling that an "association must 'identify members who have suffered the requisite harm'" to establish individual standing. 2025 Opinion & Order at 15 (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009)). However, none of the named members of The Door who are mentioned in the Supplemental Baltimore Declaration and who have submitted declarations have asserted injury caused by the "EOIR Dismissal Policy." Supp. Baltimore Decl. ¶¶ 19–20. *See also* Declaration of Abdoul Gadiri Bah, dated Dec. 2, 2025 (Dkt. No. 68-1); Declaration of Mamadou Saidou Bah, dated Dec. 3, 2025 (Dkt. No. 68-2). Similarly, the single named ACT member described in the Supplemental Declaration of Diana Konaté and who has submitted a declaration has not asserted any injury caused by the "EOIR Dismissal Policy." Supp. Konaté Decl. ¶ 10. *See also* Declaration of Mamadou Barry, dated Dec. 3, 2025 (Dkt. No. 68-4). Plaintiffs therefore have not established standing to bring suit against the EOIR Defendants on behalf of any of its members.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment as to the ICE Defendants and, grant their motion to dismiss as to the EOIR Defendants, and deny Plaintiffs' cross-motion for summary judgment as against all defendants.

34

Dated: ~~December 3, 2025~~June 12, 2026
New York, New York

JAY CLAYTON
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By:    ___/s/   *Tomoko Onozawa*___
JEFFREY S. OESTERICHER
TOMOKO ONOZAWA
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:   (212) 637-2695/2721
Fax:   (212) 637-0033
Email:  jeffrey.oestericher@usdoj.gov
        tomoko.onozawa@usdoj.gov

35

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the undersigned hereby certifies that, measured by the word processing program used to prepare this brief, this brief complies with the word-count limitation of the rule, which is a maximum of 8,750. Excluding the caption, table of contents, table of authorities, signature blocks, or any required certificates, but including material contained in footnotes or endnotes, there are 8,~~323~~165 words in this brief.

Dated: New York, New York
~~December 3, 2025~~
June 12, 2026

    /s/ Tomoko Onozawa
TOMOKO ONOZAWA
Assistant United States Attorney