UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AFRICAN COMMUNITIES TOGETHER; and THE DOOR,

Plaintiffs,

v.

TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; DAREN K. MARGOLIN, in his official capacity as Director, Executive Office of Immigration Review; and PAMELA BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

Defendants.

25 Civ. 6366 (PKC)

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PARTIAL MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS .......................................................................................................i

TABLE OF AUTHORITIES ...............................................................................................ii

PRELIMINARY STATEMENT ...........................................................................................1

STANDARD ........................................................................................................................2

ARGUMENT .......................................................................................................................3

I.    ICE'S CHANGE IN ARREST POLICY IS SUBJECT TO APA REVIEW. ...........................3

II.   ICE'S IMMIGRATION COURT ARREST POLICY IS ARBITRARY AND CAPRICIOUS
      AND CONTRARY TO LAW. ....................................................................................5

      A.    The Immigration Court Arrest Policy is Arbitrary and Capricious. ........................5

      B.    The Immigration Court Arrest Policy Is Ultra Vires. ...........................................7

            1.    Common-Law Privilege Against Civil Arrests In and Around Courthouses Applies. .....7

            2.    The INA Incorporates the Common-Law Privilege. ...........................................10

III.  PLAINTIFFS' CLAIMS AGAINST THE EOIR DISMISSAL POLICY ARE NOT
      MOOT. ................................................................................................................13

      A.    EOIR Has Not Fully and Effectively Rescinded the Dismissal Policy. ................13

      B.    The Voluntary Cessation Doctrine Precludes Defendants' Claim of Mootness. ....18

      C.    Plaintiffs Have Standing to Sue the EOIR Defendants. ....................................21

      D.    The Court Should Grant Full Vacatur. ...........................................................24

CONCLUSION ..................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Ahmed v. Cissna*,
327 F. Supp. 3d 650 (S.D.N.Y. 2018) ........................................................................................3

*Ahrens v. Bowen*,
852 F.2d 49 (2d Cir. 1988) ........................................................................................................20

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998) ...................................................................................................................11

*Am. Council of Blind of N.Y., Inc. v. City of New York*,
495 F. Supp. 3d 211 (S.D.N.Y. 2020) ......................................................................................14

*Am. Fed'n of Tchrs. v. Dep't of Educ.*,
796 F. Supp. 3d 66 (D. Md. 2025) ...........................................................................................25

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
815 F.3d 105 (2d Cir. 2016) ...............................................................................................passim

*Banco San Juan Internacional, Inc. v. Federal Reserve Bank*,
762 F. Supp. 3d 247 (S.D.N.Y. 2025) ........................................................................................3

*Batalla Vidal v. Duke*,
295 F. Supp. 3d 127 (E.D.N.Y. 2017) *aff'd in part and remanded sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California, 140 S. Ct. 1891 (2020)* ...........................................4

*Blight v. Fisher*,
3 F. Cas. 704 (C.C.D.N.J. 1809) ........................................................................................... 7, 13

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ...................................................................................................................25

*Bridges v. Sheldon*,
7 F. 17 (C.C.D. Vt. 1880) ....................................................................................................... 7, 13

*Cameron v. Roberts*,
58 N.W. 376 (1894) .....................................................................................................................7

*Camp v. Pitts*,
411 U.S. 138 (1973) .....................................................................................................................2

*Career Colls. & Schs. of Tx. v. U.S. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) .....................................................................................................24

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*,
561 U.S. 661 (2010) ...................................................................................................................18

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
        401 U.S. 402 (1971) ................................................................................................................2

*City of Erie v. Pap's A.M.*,
        529 U.S. 277 (2000) ..............................................................................................................20

*Cole v. Hawkins*,
        95 Eng. Rep. 396, 396, Andrews 275 ...................................................................... 12, 13

*Cont'l Indus. Grp., Inc. v. Altunkilic*,
        633 F. App'x 61 (2d Cir. 2016) ............................................................................................9

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
        603 U.S. 799 (2024) ..............................................................................................................24

*Daniels v. Moores*,
        Nos. 24-30-pr; 24-785-pr, 2025 WL 883035 (2d Cir. Mar. 21, 2025) ........................17

*Do No Harm v. Pfizer Inc.*,
        126 F.4th 109 (2d Cir. 2025) ..............................................................................................22

*Doe v. McDonald*,
        128 F.4th 379 (2d Cir. 2025) ........................................................................................ 22, 23

*Dunlop v. Bachowski*,
        421 U.S. 560 (1975) ................................................................................................................3

*Dwelle v. Allen*,
        193 F. 546 (S.D.N.Y. 1912) ............................................................................................ 7, 9

*Ellis v. Bhd. of Ry. Clerks*,
        466 U.S. 435 (1984) ..............................................................................................................13

*Encino Motorcars v. Navarro*,
        579 U.S. 211 (2016) ................................................................................................................6

*Esch v. Yeutter*,
        876 F.2d 976 (D.C. Cir. 1989) ..............................................................................................2

*Ex Parte Helsby*,
        (1832) 1 Dea. & C. 16 ..................................................................................................... 12, 13

*Ex Parte Russell*,
        (1812) 19 Ves. Jun. 163 ................................................................................................... 12, 13

*Ex Parte Temple*,
        (1814) 2 V. & B. 391 ............................................................................................................12

iii

*F.C.C. v. Fox Television Stations*,
  556 U.S. 502 (2009) ..............................................................................................................6

*Fed. Bureau of Investigation v. Fikre*,
  601 U.S. 234 (2024) ..................................................................................................18, 19, 20

*Fed. Defs. of N.Y. v. Fed. BOP*,
  954 F.3d 118 (2d Cir. 2020) ..............................................................................................22

*Gardner v. United States*,
  246 F. Supp. 1014 (S.D.N.Y. 1965) ...................................................................................9

*Gomez v. Trump*,
  485 F. Supp. 3d 145 (D.D.C. 2020) .................................................................................25

*Greer v. Young*,
  120 Ill. 184 (1887) ..............................................................................................................13

*Gualandi v. Adams*,
  385 F.3d 236 (2d Cir. 2004) ...............................................................................................3

*Haitian Evangelical Clergy Ass'n v. Trump*,
  789 F. Supp. 3d 255 (E.D.N.Y. 2025) ...............................................................................4

*Haley v. Pataki*,
  60 F.3d 137 (2d Cir. 1995) ...............................................................................................19

*Halsey v. Stewart*,
  4 N.J.L. 366 (1817) ............................................................................................................13

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ...........................................................................................................24

*Heckler v. Chaney*,
  470 U.S. 821 (1985) .............................................................................................................4

*Hilton v. Wright*,
  235 F.R.D. 40 (N.D.N.Y. 2006) ......................................................................................21

*Holland v. Goord*,
  758 F.3d 215 (2d Cir. 2014) .............................................................................................17

*I.N.S. v. Yueh-Shaio Yang*,
  519 U.S. 26 (1996) ...............................................................................................................4

*In re Arthur Treacher's Franchise Litig.*,
  92 F.R.D. 398 (E.D. Pa. 1981) ...........................................................................................9

*In re City of Utica,*
        26 N.Y.S. 564 (N.Y.S. Gen. Term 1893) ...................................................................13

*In re Kimball,*
        14 F. Cas. 474 (S.D.N.Y. 1867) ..................................................................................7

*International Shoe Co. v. Washington,*
        326 U.S. 310 (1945) ................................................................................... 9, 10

*Jones v. Knauss,*
        31 N.J. Eq. 211 (Ch. 1879) ........................................................................................13

*Kurtz v. Kimberly-Clark Corp.,*
        321 F.R.D. 482 (E.D.N.Y. 2017) ..............................................................................20

*Lackey v. Stinnie,*
        604 U.S. 192 (2025) ....................................................................................................19

*Larned v. Griffin,*
        12 F. 590 (C.C.D. Mass. 1882) ....................................................................................8

*Liranzo v. United States,*
        690 F.3d 78 (2d Cir. 2012) ...........................................................................................3

*Lujan v. Nat'l Wildlife Fed'n,*
        497 U.S. 871 (1990) ....................................................................................................24

*Lunney v. United States,*
        319 F.3d 550 (2d Cir. 2003) .........................................................................................3

*Madsen v. Women's Health Ctr., Inc.,*
        512 U.S. 753 (1994) ....................................................................................................25

*Make the Rd. N.Y. v. Pompeo,*
        475 F. Supp. 3d 232 (S.D.N.Y. 2020) ............................................................... 15, 19

*Make the Rd. New York v. Mullin,*
        No. 25-5320, 2026 WL 1792978 (D.C. Cir. June 23, 2026) ......................................17

*Make the Rd. New York v. Noem,*
        No. 25-CV-190 (JMC), 2025 WL 2494908(D.D.C. Aug. 29, 2025)...........................17

*Mantena v. Johnson,*
        809 F.3d 721 (2d Cir. 2015) .........................................................................................2

*Mhany Mgmt., Inc. v. County of Nassau,*
        819 F.3d 581 (2d Cir. 2016) ............................................................................... 18, 20

v

*Miles v. McCullough*,
     1803 WL 810 (Pa. 1803) ................................................................................................7

*Mobile & O. R. Co. v. Union City*,
     137 Tenn. 491, 194 S.W. 572 (1917)..........................................................................13

*Murphy v. Benson*,
     270 F.2d 419 (2d Cir. 1959) ........................................................................................20

*N. Light Tech., Inc. v. N. Lights Club*,
     236 F.3d 57 (1st Cir. 2001)..........................................................................................10

*N.Y. State Nat'l Org. for Women v. Terry*,
     159 F.3d 86 (2d Cir. 1998) ..........................................................................................19

*NASL Mktg., Inc. v. de Vries*,
     94 F.R.D. 309 (S.D.N.Y. 1982) .....................................................................................9

*Nat. Res. Def. Council v. U.S. Dep't of Energy*,
     362 F. Supp. 3d 126 (S.D.N.Y. 2019)..........................................................................19

*Nat'l Audubon Soc'y v. Hoffman*,
     132 F.3d 7 (2d Cir. 1997) ..............................................................................................2

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
     145 F.3d 1399 (D.C. Cir. 1998) ...................................................................................24

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
     508 U.S. 656 (1993)......................................................................................................14

*New York v. U.S. Immigr. & Customs Enf't*,
     466 F. Supp. 3d 439  (S.D.N.Y. 2020)..........................................................................11

*O.A. v. Trump*,
     404 F. Supp. 3d 109 (D.D.C. 2019).............................................................................25

*Pablo Sequen v. Albarran*,
     No. 25-cv-06487, 2026 WL 1805114 (N.D. Cal. June 23, 2026)........................ 4, 5, 6

*Pablo Sequen. See Purl v. Health & Human Servs.*,
     787 F. Supp. 3d 284 (N.D. Tex. 2025).........................................................................25

*Parker v. Hotchkiss*, 18 F. Cas. 1137
      (C.C.E.D. Pa. 1849) ......................................................................................................8

*Pasquantino v. United States*,
     544 U.S. 349 (2005).......................................................................................................11

*Pavlo v. James*,
    437 F. Supp. 125 (S.D.N.Y. 1977) ........................................................................................8

*Phifer v. City of New York*,
    289 F.3d 49 (2d Cir. 2002) ...................................................................................................3

*Richards v. Goodson*,
    4 Va. 381 (Va. Gen. Ct. 1823) ...........................................................................................13

*Rural & Migrant Ministry v. EPA*,
    565 F. Supp. 3d 578 (S.D.N.Y. 2020) ...............................................................................24

*Saba v. Cuomo*,
    535 F. Supp. 3d 282 (S.D.N.Y. 2021) ...............................................................................19

*Salazar v. King*,
    822 F.3d 61 (2d Cir. 2016) ............................................................................................. 4, 5

*Salem v. Pompeo*,
    432 F. Supp. 3d 222 (E.D.N.Y. 2020) ...............................................................................21

*Sampson v. Graves*,
    208 A.D. 522 (App. Div. 1924) ...........................................................................................8

*State v. Boone Cnty.*,
    78 Neb. 271, 110 N.W. 629 (1907) ....................................................................................13

*State v. Buck*,
    62 N.H. 670 (1883) .............................................................................................................12

*Sughrim v. New York*,
    690 F. Supp. 3d 355 (S.D.N.Y. 2023) ...............................................................................21

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................................................................23

*Thomas v. Ariel W.*,
    242 F. Supp. 3d 293 (S.D.N.Y. 2017) ...............................................................................15

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ............................................................................................................24

*United States v. Green*,
    305 F. Supp. 125 (S.D.N.Y. 1969) ....................................................................................10

*United States v. New York*,
    810 F. Supp. 3d 329 (N.D.N.Y. 2025) ...............................................................................12

*United States v. Price,*
        361 U.S. 304 (1960) ........................................................................................................11

*United States v. Texas,*
        599 U.S. 670 (2023) ........................................................................................................25

*United States v. Wise,*
        370 U.S. 405 (1962) ........................................................................................................11

*Venetian Casino Resort, LLC v. EEOC,*
        530 F.3d 925 (D.C. Cir. 2008) ........................................................................................2

*Webster v. Doe,*
        486 U.S. 592 (1988) ..........................................................................................................3

*Whitman-Walker Clinic, Inc. v. Health and Human Servs.,*
        485 F. Supp. 3d 1 (D.D.C. 2020) ..................................................................................25

**Statutes**

5 U.S.C. § 706 ..........................................................................................................................24

8 C.F.R. § 1226 ...........................................................................................................................6

8 C.F.R. § 1239.1 .......................................................................................................................12

8 C.F.R. § 239.2 ............................................................................................... 14, 16, 17, 20

8 U.S.C. § 1229a ...................................................................................................... 6, 11

**Other Authorities**

Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 Yale L. J. Forum 410, 428 (2017) ......................................................................8

Robert Kry, *DIALOGUE,* 72 Brook. L. Rev. 493 (2007) ......................................................12

**PRELIMINARY STATEMENT**

In their cross-motion for summary judgment and opposition to Plaintiffs' motion for summary judgment, Defendants abandon the majority of their arguments in defense of their decision to rescind U.S. Immigration and Customs Enforcement's ("ICE") April 2021 Courthouse Arrest Memo ("2021 Memo") and to instead permit unprecedented, unrestricted arrests at immigration courts. Now Defendants raise just one argument: that ICE had unreviewable discretion to make this change in policy. But, as this Court has now twice held, the agency's decades-long practice and policy of limiting its arrest authority, including most recently in the 2021 Memo, provides the Court with a judicially manageable standard under which to review the change in policy. ECF 90, at 8-10 (citing ECF 88, previous Stay Opinion).

Defendants now effectively concede (as they must on the corrected record) that their decision to rescind the protections in the 2021 Memo in favor of unrestricted arrests was entirely unreasoned and unjustified. Indeed, relying in part on this Court's revised decision granting a stay of the policy, a district court for the Northern District of California recently held that Defendants' decision to rescind the 2021 Memo was arbitrary and capricious as an unreasoned departure from prior longstanding agency policy and practice. This Court should likewise confirm its preliminary findings and hold the government's policy change arbitrary and capricious.

Defendants' motion to dismiss Plaintiffs' claims related to the Executive Office for Immigration Review ("EOIR") Dismissal Policy fares no better. Defendants' decision—only after this Court ordered EOIR to stay its unlawful policy—to issue a combative and confusing memorandum "withdrawing" its guidance neither moots Plaintiffs' claims nor vitiates their standing. This Court should deny Defendants' meritless motions.[1]

---

[1] Pursuant to the original briefing schedule, the parties submitted simultaneous cross-motions, oppositions, and replies. *See* ECF 51. However, because Defendants only sought leave to file their revised cross-motion well after Plaintiffs had filed their opening brief, ECF 94, Plaintiffs have been required to brief both their opposition to Defendants' motions and

**STANDARD**

Administrative Procedure Act ("APA") review for purposes of summary judgment ordinarily proceeds on "the full administrative record" before the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). Nevertheless, Defendants overstate the proposition that this Court's review is "confined to the administrative record." ECF 97 at 10. The Second Circuit's "record rule" is not absolute. *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997); *see also* ECF 68 at 11–12. Where limiting review to the filed record would "frustrate effective judicial review," courts routinely consider extra-record materials. *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973); *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (collecting circumstances where extra-record evidence may be considered to enable meaningful review); *see also* ECF 92 at 12. Here, the extra-record materials Plaintiffs submit are both permissible and necessary to ensure meaningful review, including by clarifying the scope and operation of the challenged policies and supplying context about how they function in practice. *See Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 928–29 (D.C. Cir. 2008). Defendants maintain their objection to Plaintiffs' extra-record evidence, ECF 97 at 10 n.3, but do not address Plaintiffs' arguments as to why extra-record evidence is appropriate here, ECF 92 at 12; ECF 75 at 1–3. Defendants' position is all the more unfounded now that they have admitted that there is no written explanation or justification for their change in position nor a description of the new policy in its place at immigration courts. Indeed, the *only* evidence of the new policy's scope, and attendant harms, is found in Plaintiffs' extra-record evidence.

Similarly, on a Rule 12(b)(1) motion, the Court proceeds by "accepting all material facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Mantena v. Johnson*, 809 F.3d 721, 727 (2d Cir. 2015) (quoting *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir.

---

their reply in support of summary judgment herein while Defendants now have the benefit of the last word. In light of this procedural unfairness, Plaintiffs reserve their right to seek leave to file a brief sur-reply to address any new arguments raised in Defendants' reply.

2012). And in adjudicating a 12(b)(1) motion based on mootness grounds, the Court may consider extrinsic evidence beyond the pleadings, as Defendants themselves acknowledge, ECF 97 at 12. *See Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004) ("In resisting a motion to dismiss under Rule 12(b)(1), plaintiffs are permitted to present evidence (by affidavit or otherwise) of the facts on which jurisdiction rests."); *Phifer v. City of New York*, 289 F.3d 49, 55 (2d Cir. 2002).

## ARGUMENT

### I.   ICE'S CHANGE IN ARREST POLICY IS SUBJECT TO APA REVIEW.

Defendants contend that this Court cannot review ICE's decision to rescind the 2021 Guidance and new Immigration Court Arrest Policy under the APA because such arrests are committed to agency discretion.[2] ECF 97 at 12–14. As this Court has now twice held, and for the reasons discussed below, Defendants have not—and cannot—meet "the heavy burden of overcoming the strong presumption" of judicial review. *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975). These prior holdings are law of the case, as Defendants concede, ECF 97 at 12 n.4, and are not overcome by Defendants' untimely attempt to reframe and support their argument.[3]

Defendants first argue that the Immigration Court Arrest Policy is unreviewable because the "locations for targeted civil immigration enforcement actions" are a "discretionary choice." ECF 97 at 13. Section 701(a)(2)'s exception for agency action "committed to agency discretion" is "very narrow" and applies only where there is "no meaningful standard against which to judge the agency's

---

[2] In their revised brief, Defendants have abandoned their arguments that the Immigration and Nationality Act ("INA") precludes review and that ICE's policy is not final agency action. *See* ECF 97-1 at 18–19. Accordingly, Plaintiffs do not address those arguments here.

[3] The Court should disregard Defendants' new arguments and citations, *see* ECF 97-1 at 17–20, as outside the scope of this Court's order permitting revised briefing, ECF 87, as they have no relation to Defendants' change in position regarding the 2025 Memos. In any event, these cases are not persuasive. First, Defendants' cases pre-date the Second Circuit's holding in *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016), that a "judicially manageable standard" can include "informal agency guidance." *See* ECF 97 at 12 (citing *Banco San Juan Internacional, Inc. v. Federal Reserve Bank*, 762 F. Supp. 3d 247, 275 (S.D.N.Y. 2025) (relying on *Lunney v. United States*, 319 F.3d 550, 558 (2d Cir. 2003))) and citing *Webster v. Doe*, 486 U.S. 592, 600 (1988)). Second, Defendants' reliance on *Ahmed v. Cissna*, 327 F. Supp. 3d 650 (S.D.N.Y. 2018), ECF 97 at 14, is misplaced. The policy memorandum at issue there did not restrict or limit agency action but rather "commit[ed]" the decision-making power at issue to "agency discretion." *Id.* at 669, 671.

3

exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (cleaned up). To determine whether there are "judicially manageable standards," courts are not limited to statutes as Defendants suggest, ECF 97 at 13-14, but look also to "informal agency guidance" governing the challenged action which limit what might once have been "unfettered" discretion. *Salazar*, 822 F.3d at 76. As this Court recognized, "[a]rbitrariness review may be appropriate in arenas in which agencies originally had unconstrained discretion but where that discretion has since been cabined by rule or practice." ECF 90 at 9–10 (citing *I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996)).

This case "is not one of those rare instances . . . in which there is truly no law to apply." *Pablo Sequen v. Albarran*, No. 25-cv-06487, 2026 WL 1805114, at *23 (N.D. Cal. June 23, 2026) (cleaned up). "Here, there is no evidence—let alone clear and convincing evidence—that Congress intended to preclude APA review of the challenged polic[y]." *Id.*; *see also Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 150 (E.D.N.Y. 2017) (holding that there is "'law to apply' in reviewing [DHS's] decision" to rescind the Deferred Action for Childhood Arrivals ("DACA") program) (citation omitted), *aff'd in part and remanded sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1906–07 (2020) (agreeing that the rescission of DACA is subject to review under the APA); *Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255, 275 (E.D.N.Y. 2025) (holding a meaningful standard exists under which to review the Secretary of Homeland Security's "partial vacatur" of Haiti's designation for Temporary Protected Status "as in excess of her authority").

Here, as the Court found, ICE previously "followed 'by rule,' i.e., agency guidance, a general policy on courthouse arrest." ECF 90 at 11. That longstanding policy—which severely restricted arrests at immigration courts—supplies this Court with ample "law to apply."[4] *See Pablo Sequen*, 2026 WL 1805114 at *24 ("Here, ICE's prior policy—i.e., its 2021 guidance—provides a meaningful

---

[4] As Defendants concede, ECF 66 at 13, the common law privilege, to the extent the Court finds it applies, would independently provide the applicable law. *See infra* Section II.B.

4

benchmark for judicial review of its 2025 courthouse-arrest policies."). ICE memorialized this decades-old policy and practice in the 2021 Memo, in which it expressly prohibited civil arrests at immigration courthouses absent limited circumstances. *See* Admin. Rec. ("A.R."), ECF 64, at 25–27.

As Defendants now concede, aside from the 2021 Memo, no prior agency memoranda applied to immigration courts. ECF 97 at 3–8. And Defendants have never disputed that the widespread arrests at immigration courts pursuant to ICE's new policy are an unprecedented deviation from its decades-long practice of avoiding such arrests. *See* ECF 92 at 3–4; ECF 90 at 11 (noting none of ICE's prior policies gave ICE "carte blanche" to make civil immigration arrests at courthouses). Thus, "[e]ven if ICE's 'discretion [wa]s unfettered at the outset,' it subsequently 'announce[d] and follow[ed] … a general policy' governing 'its exercise of discretion' by limiting the circumstances under which agents could conduct civil arrests at immigration courthouses." *Pablo Sequen*, 2026 WL 1805114 at *40 (quoting *Yueh-Shaio Yang*, 519 U.S. at 31).

Then, on May 27, 2025, ICE issued superseding memoranda, A.R. at 1–3; 51–53 ("2025 Memos"), that explicitly "rescinded" the 2021 Memo, but did not replace that memo's guidance on arrests at immigration courts with any new written guidance. In that absence, Defendants have claimed unrestricted authority to arrest anyone who appears at immigration court, to devastating effect. Under this new policy, for the first time, every noncitizen who attends immigration court—respondents, witnesses, children—must weigh whether complying with that legal obligation or simply supporting a loved one doing so is worth the risk of being detained. Thus, ICE's own restrictions on courthouse arrests, including in the 2021 Memo, provide the Court with a workable benchmark to assess the agency's policy change. *See Salazar*, 822 F.3d at 76.

## II. ICE'S IMMIGRATION COURT ARREST POLICY IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW.

### A. The Immigration Court Arrest Policy is Arbitrary and Capricious.

ICE's Immigration Court Arrest Policy is arbitrary and capricious for the reasons detailed in

Plaintiffs' revised opening memorandum in support of summary judgment. ECF 92 at 13–19. Defendants make no attempt to dispute these arguments on the merits, conceding them. *See* ECF 97-1 at 20–22 (deleting arguments that policy is not arbitrary). Accordingly, this Court should affirm its preliminary holding that the decision to rescind the 2021 Memo was arbitrary because (1) the 2025 Memos did not "display awareness" that ICE was changing its policy as to immigration courts, ECF 90 at 11-12, and (2) the agency "gave no explanation, rational or otherwise for abandoning the prior policy," *id.* at 12–13.

Though the Court need not reach the issue given the absence of *any* explanation for the change, Defendants' change in policy was also arbitrary and capricious because ICE plainly did not consider the key justifications underlaying the 2021 Memo—that immigration court arrests would chill noncitizens' access to those courts and impede the fair administration of justice.[5] *See Pablo Sequen*, 2026 WL 1805114 at *29 ("ICE's new policies disregard facts and circumstances that underlay the prior policy—namely, the 2021 [Memo's] concerns about the impact of widespread arrests on the functioning of immigration courts—without the requisite reasoned explanation." (cleaned up)). Nor did the agency consider its statutory imperative to *incentivize* attendance at immigration proceedings. *See, e.g.,* 8 U.S.C. § 1229a(b)(5)(A); 8 C.F.R. § 1226(c)(4). Thus, the agency has failed to provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests" stemming from the prior policy. *Encino Motorcars v. Navarro*, 579 U.S. 211, 222 (2016) (citing *F.C.C. v. Fox Television Stations*, 556 U.S. 502 at 515–16 (2009)).

---

[5] Relatedly, there is also no evidence that, in rescinding the 2021 Memo, Defendants considered the common-law privilege against courthouse arrests, which was developed to prevent chilled access to the courts in furtherance of the fair administration of justice. *See Section* II.B.

### B. The Immigration Court Arrest Policy Is Ultra Vires.

#### 1. Common-Law Privilege Against Civil Arrests In and Around Courthouses Applies.

Should this Court hold that Plaintiffs prevail on their claim that the new arrest policy is arbitrary and capricious, it need not reach whether Defendants' new arrest policy is ultra vires because it violates the common-law privilege.[6] But the policy does violate the privilege for principally the same reasons it is arbitrary—it chills access to the courts and impedes the fair administration of justice.

Defendants contend that the common-law privilege against courthouse arrests is narrowly confined to the "privilege against case-initiating arrest and . . . against service of process of a person attending court." ECF 97 at 15. But Defendants get the history wrong and fail to even engage with the many authorities on the privilege's broad scope. First, at common law, the privilege applied broadly to *all* civil arrests, and later service of process, so long as its application satisfied a purpose-based test: "promot[ing] the purposes of justice." *Dwelle v. Allen*, 193 F. 546, 548–49 (S.D.N.Y. 1912); *see* ECF 45 at 7–8; *see also, e.g.*, *In re Kimball*, 14 F. Cas. 474, 474–75, 476 (S.D.N.Y. 1867) (applying the privilege to civil arrest and discussing application of the privilege to arrest pursuant to a *capias ad satisfaciendum*). Caselaw and treatises before the INA's enactment in 1952 reflect this broad conception of the privilege. *See* ECF 45 at 8.

The privilege's distinct application to courthouses, which squarely applies to the *immigration courthouse* arrests at issue here, remained broad and unaltered at common law prior to 1952.[7] In fact, as

---

[6] Plaintiffs recognize this Court previously held Plaintiffs were unlikely to succeed on this claim and set forth their arguments concerning the common-law privilege to preserve them for appeal.

[7] *See, e.g.*, *Blight v. Fisher*, 3 F. Cas. 704, 704–05 (C.C.D.N.J. 1809) ("service of process, whether a capias or summons, in the actual or constructive presence of the court, is a contempt"); *Cameron v. Roberts*, 58 N.W. 376, 376 (1894) ("The service of process upon a justice while holding court, or upon a party and witnesses in attendance upon, and in the presence of, the court, was a contempt of court."); *Bridges v. Sheldon*, 7 F. 17, 44 (C.C.D. Vt. 1880) ("This service, so near the time of commencement of proceedings, was probably in the constructive presence of the authority acting under the order, which would of itself be a contempt." (citing *Blight*, 3 F. Cas. at 704–05)); *Miles v. McCullough*, 1803 WL 810, at *1 (Pa. 1803) (extending the privilege from arrests to service of process for a party served a summons while attending court); *Larned v. Griffin*, 12 F. 590, 594 (C.C.D. Mass. 1882) (explaining "the older and narrower view" of the privilege is an "offender may be punishable for contempt if the arrest is made in the actual or constructive presence of the court" because "this is wholly the privilege of the court").

7

American courts have recognized, the "older" view of the privilege was that it protects courthouses as a place, likely to ensure the King's peace. *Larned v. Griffin*, 12 F. 590, 594 (C.C.D. Mass. 1882); ECF 45 at 9 n.5; *see also Sampson v. Graves*, 208 A.D. 522, 524 (App. Div. 1924) (explaining the privileges dates as far back as "the Year Book of 13 Henry IV, I, B."); Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 Yale L. J. Forum 410, 428 (2017). The privilege later applied to persons, *see* Lasch, *A Common-Law Privilege*, 127 Yale L. J. Forum at 424, and expanded to service of process and summons, *see, e.g., Parker v. Hotchkiss*, 18 F. Cas. 1137, 1138 (C.C.E.D. Pa. 1849) (discussing the "necessities of the judicial administration" in extending privilege to summonses). The privilege's expansion from protecting a place to include persons against many types of actions all conform with the privilege's purpose. *See id.*

Further, the caselaw on which Defendants rely to contend that the common-law privilege "no longer carries any force" due to the rise of long-arm statutes, ECF 97 at 16–17, actually demonstrates that the purpose-based test for the application of the privilege continues to govern today, *see* ECF 45 at 8–9. Specifically, *Pavlo v. James*, 437 F. Supp. 125, 127 (S.D.N.Y. 1977), which Defendants cite, in fact *applied* the privilege to a service of process because (1) "[the] defendant's appearance was not compelled or involuntary,"[8] (2) the plaintiff failed to show that the state's long-arm statute could reach the defendant otherwise, and (3) the privilege's application there met its purpose of "enhanc[ing] the administration of judicial operations by fostering voluntary appearances of parties and witnesses," *id.* at 126, 128-29. *Pavlo* was not an outlier. Courts have continued to apply the privilege to service of process on nondomicilaries when the purpose-based test is met, including when a nondomiciliary would not have been subject to a state's long-arm statute. *See, e.g., NASL Mktg., Inc. v. de Vries*, 94

---

[8] "The New York courts have held . . . that for purposes of immunity a defendant's presence in the state is involuntary only when his absence would have subjected him either to fine or imprisonment." *Pavlo*, 437 F. Supp. at 126–27. Likewise, noncitizens who fail to appear for their immigration court appearances are not directly punished by fines or imprisonment, but rather an *in absentia* order of removal; their appearances in immigration court are voluntary. *See* ECF 92 at 2–3, 7.

F.R.D. 309, 310–11 (S.D.N.Y. 1982) ("Granting immunity from service of process to [the defendant] would serve judicial administration by encouraging participation in arbitration proceedings free from the fear that doing so would subject one to the jurisdiction of a foreign court."); *see also Cont'l Indus. Grp., Inc. v. Altunkilic*, 633 F. App'x 61, 63 (2d Cir. 2016) (holding district court was required to consider if defendant could have been subjected to state's long-arm statute in determining if privilege applied to service on the defendant). The privilege's application to service of process in these cases—the most likely and frequent context for the privilege—after the INA's passage in 1952 demonstrates that it survives at common law and was incorporated into the INA, *see infra* Section II.B.2; *Dwelle*, 193 F. at 548 (explaining that it is the purpose-based test, and not frequency of application of the privilege to specific fact patterns, that governs the privilege's operation).

Accordingly, courts have refused to apply the privilege to service of process after *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), abrogated the physical-presence requirement for personal jurisdiction only after concluding the privilege's application would not further the administration of justice. *See, e.g., In re Arthur Treacher's Franchise Litig.*, 92 F.R.D. 398, 404–405 (E.D. Pa. 1981) (explaining the privilege is meant "to ensure the efficient administration of justice," was "designed for the benefit of the court rather than the individual," and would not serve its purpose if applied to service of process when people can be served under a long-arm statute); *Gardner v. United States*, 246 F. Supp. 1014, 1015 (S.D.N.Y. 1965) (privilege not applicable to person doing business in New York because "nondomiciliary [] could be served outside the state").

The purpose-based test is undoubtedly met here with respect to civil immigration arrests effectuated pursuant to the Immigration Court Arrest Policy. *See* ECF 23 at 15; ECF 45 at 8–9. Defendants' argument that the privilege should not apply to such courthouse arrests because noncitizens are subject to immigration enforcement everywhere, ECF 97 at 17, not only misapprehends the privilege's scope and underlying rationale, *see* ECF 45 at 8–9, but is also irrelevant.

9

In the context of service of process pre-*International Shoe*, the privilege did not apply *for the purpose* of protecting nondomiciliaries traveling to foreign fora for required proceedings from service in foreign fora; rather, it applied for the purpose of ensuring the administration of justice, as caselaw on which Defendants rely acknowledges, *see, e.g.*, *N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 62 (1st Cir. 2001) ("[P]rivilege exists for the convenience of the district court in its exercise of judicial administration."). The reason for this immunity was to assure the attendance of parties or witnesses who might otherwise refuse to appear and whose absence might obstruct or delay judicial proceedings, as Defendants impliedly concede. *See* ECF 97 at 16; *N. Light Tech*, 236 F.3d at 62–63; *United States v. Green*, 305 F. Supp. 125, 128 (S.D.N.Y. 1969) (application of privilege considered "the fear that out-of-state counsel might have of being served with process in a foreign jurisdiction"). In other words, in the context of personal jurisdiction, the privilege was concerned with *chill* to individuals' access to courts and subsequent disruption to court proceedings and thus was applied to shield people from the specific cause of the chill—service of process in foreign fora. And even after the development of long-arm statutes, the privilege *still* applies to nondomiciliaries traveling to foreign fora if the state's long-arm statute could *not* reach them, as discussed above, because they could be chilled from attending judicial proceedings due to fear of service at court. The chill to noncitizens' access to immigration courts due to fear of civil immigration arrest at immigration court, and its subsequent disruption of court proceedings, is no different than the chill that the privilege sought to ameliorate pre-*International Shoe*, and continues to target to this day, with respect to service of process. The chill to court access exists irrespective of the fact that noncitizens may be arrested elsewhere and has indeed come to pass. *See* ECF 68-12 ¶ 7. The privilege must thus apply here to civil immigration arrests made pursuant to the Immigration Court Arrest Policy. *See* ECF 92 at 4–6.

### 2. The INA Incorporates the Common-Law Privilege.

Defendants' arguments that the common-law privilege was not incorporated into the INA

also fail. Contrary to Defendants' assertion, the privilege was not "a historical artifact" by the time Congress passed the INA in 1952, ECF 97 at 18, and its contours were clearly and broadly defined. *See* ECF 45 at 9–11; ECF 23 at 13–15. While Defendants claim that the INA displaces the privilege, the INA nowhere mentions the privilege and thus does not "speak directly" to the privilege and override application of the non-derogation canon. *Pasquantino v. United States*, 544 U.S. 349, 359 (2005) (cleaned up). Defendants are incorrect that 8 U.S.C. § 1229(e) explicitly authorizes or recognizes the INA's contemplation of civil arrests at court for all the reasons in Plaintiffs' prior briefing. *See* ECF 45 at 9–10; ECF 92 at 21. Further, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price*, 361 U.S. 304, 313 (1960); *accord United States v. Wise*, 370 U.S. 405, 414 (1962) (collecting cases). Accordingly, the general rule is that later-enacted laws have no interpretive value in reading earlier-enacted statutes, and § 1229(e) does not fall into this rule's limited exceptions. *See Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998).

The legislative history and statutory structure further illuminate how it is not at all clear that the 2006 Congress contemplated that the INA authorized widespread arrests at courthouses. Section 1229(e)(1)'s reference to "an enforcement action leading to a removal proceeding" must be read in the context of subsection (e)(2)(B)'s reference to courthouses. *See* 8 U.S.C. § 1229(e)(2)(B). The provision contemplates that a removal proceeding could result from court appearances arising from abusive conduct. *Id.* The "enforcement action" is thus likely to be a "criminal arrest[] by state [or] local law enforcement." *New York v. U.S. Immigr. & Customs Enf't*, 466 F. Supp. 3d 439, 447, (S.D.N.Y. 2020). And more generally, "an enforcement action leading to a removal proceeding" must be read in the context of the INA, which merely requires service of a Notice to Appear on the noncitizen to commence removal proceedings, not a civil immigration arrest. 8 U.S.C. § 1229(e)(1); 8 C.F.R. § 1239.1(a). As the legislative history demonstrates, *see* ECF 70 at 15–16; ECF 91 at 21 n.10, there is no evidence that the 2006 Congress contemplated civil immigration arrests at courthouses. Instead,

11

Congress was concerned primarily with ensuring that victims of abuse could access justice free of fear of immigration consequences. *See id.* That purpose is not served by making immigration courthouses traps for noncitizens seeking their day in court.

Further, contrary to Defendants' assertion, *see* ECF 97 at 17, the determinative factor of whether the privilege was incorporated into the INA and applies to immigration court arrests is not if the privilege applied to arrests on behalf of a sovereign. Instead, the key question is whether the privilege's application to civil arrests at immigration courts would ensure the fair administration of justice. *See* ECF 45 at 10–11; *supra* Section II.B.1. It undoubtedly would. *See supra* Section II.B.1.

Nonetheless, caselaw at English common law clearly demonstrates that Crown-initiated arrests were covered by the privilege. *See, e.g.*, *Ex Parte Russell*, (1812) 19 Ves. Jun. 163, 166 (applying privilege to arrest of a person for a debt owed to the Crown and holding the person "cannot be arrested by the Crown any more than by a subject"); *Ex Parte Helsby*, (1832) 1 Dea. & C. 16, 21, 22 (holding the privilege applies even though the arrest was "a command to the sheriff by the King to take the defendant"); *Ex Parte Temple*, (1814) 2 V. & B. 391, 394 (re-affirming and explaining *Ex Parte Russell*); *see also United States v. New York*, 810 F. Supp. 3d 329, n. 6 (N.D.N.Y. 2025) (citing *Ex Parte Russell* to state "there is authority that supports the fact that the privilege applied to arrests initiated by the sovereign"). These cases illuminate the precise contours of the privilege at American common law, as American courts incorporated English common law in the late 18th and early 19th Centuries, including caselaw on the privilege.[9] *See, e.g.*, *State v. Buck*, 62 N.H. 670, 670–71 (1883) (citing, *inter alia*, English caselaw, including *Cole v. Hawkins*, 95 Eng. Rep. 396, 396, Andrews 275, 275, in privilege discussion); *Richards v. Goodson*, 4 Va. 381, 381–82 (Va. Gen. Ct. 1823) (same); *Blight v. Fisher*, 3 F. Cas. 704, 705 (C.C.D.N.J. 1809) (citing *Cole* to define scope of privilege); *Halsey v. Stewart*, 4 N.J.L. 366, 368–69

---

[9] *See* Robert Kry, *DIALOGUE: Confrontation Under the Marian Statutes: A Response to Professor Davies*, 72 Brook. L. Rev. 493, 550, 550 fn.269 (2007) (collecting cases showing how "Justices Scalia and Thomas also routinely rely on post-framing English authorities").

(1817) (same); *Greer v. Young*, 120 Ill. 184, 187–88 (1887) (citing English caselaw in privilege discussion); *Bridges v. Sheldon*, 7 F. 17, 43–44 (C.C.D. Vt. 1880) (same).

Indeed, both *Ex Parte Russell* and *Ex Parte Helsby* were incorporated into American common law. *See, e.g.*, *Mobile & O. R. Co. v. Union City*, 137 Tenn. 491, 194 S.W. 572, 573–74 (1917) (relying on, *inter alia*, *Ex parte Russell*, 19 Ves. Jr. 163, for the proposition that "[l]aw was presumed to be made for the subject only, and the crown was not reached, *except by express words or by necessary implication in any case affecting an existing prerogative or interest.*") (emphasis added); *State v. Boone Cnty.*, 78 Neb. 271, 110 N.W. 629, 630 (1907) (same); *In re City of Utica*, 26 N.Y.S. 564, 565–66 (N.Y.S. Gen. Term 1893) (same); *Jones v. Knauss*, 31 N.J. Eq. 211, 214–16, 217 (Ch. 1879) (relying on *Ex parte Helsby*, *1 Dea. & Ch. 16*, to define the scope of the privilege and applying the privilege to a person arrested while at court). All evidence thus points to the privilege clearly applying to sovereign arrests at English common law and such caselaw's incorporation into American common law well before 1952. Thus, the INA's incorporation of the privilege balances competing sovereign interests in (1) gaining custody over noncitizens and (2) ensuring the fair administration of justice in immigration proceedings.

## III. PLAINTIFFS' CLAIMS AGAINST THE EOIR DISMISSAL POLICY ARE NOT MOOT.

### A. EOIR Has Not Fully and Effectively Rescinded the Dismissal Policy.

"A case becomes moot only when it is impossible for a court to grant any effectual relief . . . to the prevailing party." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) (internal citation omitted); *see Ellis v. Bhd. of Ry. Clerks*, 466 U.S. 435, 442 (1984) ("[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."). At the outset, a court must first "determine whether the challenged conduct has, in fact, ceased." *Am. Freedom*, 815 F.3d at 109. "A claim will not be found moot if the defendant's change in conduct is merely superficial or . . . suffers from similar infirmities as it did at the outset." *Id.* (internal citation omitted). In evaluating whether the challenged conduct has ceased, courts look to whether

13

anything has been done to "rectify violations." *Am. Council of Blind of N.Y., Inc. v. City of New York*, 495 F. Supp. 3d 211, 248 (S.D.N.Y. 2020). Only where a defendant has "sufficiently altered" its conduct so as "to present a substantially different controversy from the one that existed when . . . suit was filed" will a court find that it has actually ceased its unlawful activity. *Am. Freedom,* 815 F.3d at 109 (cleaned up); *see also Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 661–62 (1993) (finding minor alterations to ordinance did not render issue moot as the ordinance still impacted plaintiffs in the "same fundamental way").

Plaintiffs' challenge to the EOIR Dismissal Policy is not moot, as the agency has failed to fully and effectively rescind the policy and thus has not ceased its unlawful conduct. On September 12, 2025, this Court stayed the EOIR Dismissal Policy, a policy invoked by email agency guidance issued on May 30, 2025 ("May 30 Guidance"), *see* ECF 24-12, and compounded by explicit job threats, finding Plaintiffs likely to prevail on their claim that it is contrary to law. ECF 51 at 25–31. The Court reasoned that the policy both (1) erroneously suggests that a "change in caseload" and enforcement priorities could warrant dismissal under 8 C.F.R. § 239.2(a)(7) when only a change in circumstances of the *case*— a new fact or condition that is specific to the case at hand—satisfies the regulation and (2) improperly counsels IJs on how to exercise their discretion in procedurally adjudicating motions to dismiss, implying that all of DHS's motions to dismiss may be submitted orally without advance notice and granted from the bench without a response period. *Id.* at 25–29. Shortly thereafter, the Acting Deputy Director of EOIR issued a memo, titled "Withdrawal of May 30, 2025 Email" ("Withdrawal Memo"), to all of EOIR, ECF 73-1, without limitation to geographic area, ECF 66 at 25. *See also* ECF 58, Ex. A. This combative and confusing memo fails to "rectify," or even acknowledge, the prior policy's failures. *Am. Council of Blind of N.Y., Inc.*, 495 F. Supp. 3d at 248.

First, instead of unequivocally retracting the EOIR Dismissal Policy, the Withdrawal Memo *refuses* to "cancel[]" it. ECF 73-1 at 1 n.1; *Thomas v. Ariel W.*, 242 F. Supp. 3d 293, 297–98 (S.D.N.Y.

14

2017) (finding issue not moot where defendants failed to "voluntarily correct[]" conduct as they contended they were "not legally obligated to do so"). The Withdrawal Memo states that the email was merely instructive "guidance," reminding IJs of their "longstanding" "authority to grant oral motions to dismiss," *not* formal, binding policy. ECF 73-1 at 1–2. Although this Court concluded that the EOIR Dismissal Policy was final agency action that misrepresented the grounds for dismissal and instructed IJs on how to exercise their discretion, ECF 51 at 25–31, the Withdrawal Memo states that only "incompetent" or "corrupt" IJs could interpret it as such, ECF 73-1 at 3. Despite this Court's conclusion otherwise, the Withdrawal Memo claims that there was nothing unlawful about its actions as the May 30 Guidance was not a "policy" and no IJ "should have relied on it or used it to decide a case," and thus, that the stay "should have no impact on EOIR operations." *Id.*

Second, the Withdrawal Memo does not address this Court's concern that the EOIR Dismissal Policy instructs IJs on how to exercise their discretion in adjudicating motions to dismiss. Although the Court found that the May 30 Guidance suggests that IJs should generally permit these motions to "be made orally and decided from the bench" with "[n]o additional documentation or briefing" and "may be granted" without "[a] 10-day response period" given the "exigencies of higher caseloads," *overriding* their independent discretion in how to conduct their proceedings, ECF 51 at 27–28, the Withdrawal Memo does not acknowledge this potential misinterpretation. Nor does it clarify that IJs may not, as a blanket matter, set aside the procedural protections intended to protect the rights of noncitizens in adjudicating these motions. *Compare id. with* ECF 73-1 at 1–3. Instead, the Withdrawal Memo reasserts IJs' legal authority to make these procedural modifications. ECF 73-1 at 2; *see Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 255 (S.D.N.Y. 2020) (finding challenged conduct had not ceased despite minor difference in policies as some of the "alleged harms associated" with the first policy were "still present in the most recent revisions").

Third, the Withdrawal Memo fails to mention, let alone clarify the scope of, 8 C.F.R. §

239.2(a)(7), on which this Court's decision largely centered, *see* ECF 51 at 25–27.[10] The document does not reckon with this Court's conclusion that the May 30 Guidance's preamble and misstatement of the regulation improperly convey that an "increase in the detained caseload nor the implementation of the ICE Courthouse Arrests Policies" represent a change in the circumstances warranting dismissal. *Id.* at 27. Specifically, the Withdrawal Memo fails to clarify 8 C.F.R. § 239.2(a)(7) only permits dismissal where there is evidence that "[c]ircumstances of the case have changed," which is limited to "a new fact or condition that is specific to the case at hand, e.g., vacatur of a conviction, a pardon, a change in marital status, or a change in country conditions if a defensive asylum is sought." *Id.* at 27 (emphasis in original). To the contrary, in asserting this Court's stay "should have no impact," EOIR has tacitly *endorsed* the practice of IJs granting motions to dismiss on improper grounds. ECF 73-1 at 3.

Lastly, the Withdrawal Memo fails to correct the impression left by the prior guidance and mass firing campaign that IJs must grant DHS's motions or risk termination. Defendants discount Plaintiffs' evidence that the present environment at EOIR, in which unprecedented numbers of IJs are being fired, further pressured IJs to grant motions to dismiss, as limited to the unique "troubling[]" experiences of a few IJs. ECF 73-1 at 3 n.6. But instead of assuring IJs of their independence, the Withdrawal Memo alarmingly threatens IJs who deny DHS's recent campaign of motions to dismiss— which, as this Court held, does not meet the regulatory standard—with "ethics and professional responsibility" violations. *Id.* at 2 n.3 (stating IJs "who previously granted oral motions to terminate or dismiss as a matter of routine but now refuse to do so, not based on the law but because they have personal or policy disagreements with what they perceive as the intent behind the motions, are violating ethics and professional responsibility rules"). As the Withdrawal Memo fails to "prohibit the conduct" challenged by Plaintiffs, *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014), and held unlawful

---

[10] The furthest the Withdrawal Memo goes in acknowledging the May 30 Guidance's omission of 8 C.F.R. § 239.2(a)(7) is its vague statement that the email's "attempt to paraphrase relevant law was poorly drafted." ECF 73-1 at 2.

16

by this Court, the purported cessation is "superficial" at best, *Am. Freedom*, 815 F.3d at 109.

Given EOIR's hollow withdrawal of the EOIR Dismissal Policy, it is unsurprising that IJs around the country continue to follow this guidance. Even though the Withdrawal Memo purports to rescind the guidance "without limitation to geographic area or time," ECF 97 at 10, many IJs appear to be operating under the presumption that the May 30 Guidance is still binding. *See* Botsch Decl. (ECF 72-2) ¶¶ 5–8; Miller Decl. (ECF 72-4) ¶¶ 4–8; Lange Decl. (ECF 72-3) ¶¶ 3–6;[11] *see Daniels v. Moores*, Nos. 24-30-pr; 24-785-pr, 2025 WL 883035, at *2 (2d Cir. Mar. 21, 2025) (affirming that despite defendants' formal rescission of the policy, it was still active given that plaintiffs continued to suffer from the same harms). IJs in areas as diverse as Miami, El Paso, and Fort Snelling still blanketly permit DHS attorneys to move to dismiss noncitizens' removal proceedings orally, without a written motion, over noncitizens' objections requesting otherwise. *See* Botsch Decl. ¶¶ 3–8; Miller Decl. ¶¶ 4–6; Lange Decl. ¶¶ 2–4. Likewise, these IJs routinely decide such motions from the bench, depriving noncitizens of the opportunity to submit a written opposition to the motion before issuing a decision. *See* Botsch Decl. ¶¶ 3, 5, 7; Miller Decl. ¶¶ 4–7; Lange Decl. ¶¶ 2–5. In addition, many IJs in these regions continue to grant motions to dismiss under 8 C.F.R. § 239.2(a)(7) where the government has alleged only a generalized change in circumstance unrelated to the noncitizen respondents' case. *See* Botsch Decl. ¶¶ 3–7; Miller Decl. ¶¶ 4–8; Lange Decl. ¶¶ 2–3, 5–6. In fact, as recently as this month, an IJ has indicated that he lacks discretion to deny such a motion where DHS claims only that the

---

[11] To the extent Defendants point to a decrease in IJ adjudications of motions to dismiss as additional grounds for mootness, it is worth noting that after this case was filed, DHS significantly reduced the number of cases it moved to dismiss pursuant to 8 C.F.R. § 239.2(a)(7) likely due to the fact that for the past 10 months, it could not subject most noncitizens whose full removal proceedings were dismissed to expedited removal. *See* May 30 Guidance, ECF 24-12 at 2 (noting the government's motions to dismiss were targeted at noncitizens it wished to place into expedited removal); *Make the Rd. New York v. Noem*, No. 25-CV-190 (JMC), 2025 WL 2494908, at *5-6 (D.D.C. Aug. 29, 2025). However, on June 23, 2026, the D.C. Circuit overturned a stay of the government's expansion of expedited removal in place since August 2025, permitting the government to reinstate that policy. *Make the Rd. New York v. Mullin*, No. 25-5320, 2026 WL 1792978, at *1 (D.C. Cir. June 23, 2026).

17

proceedings are no longer in the government's interest. *See* Botsch Decl. ¶ 6; *see also* Miller Decl. ¶ 8; Lange Decl. ¶ 6. IJs also continue to face severe pressure to dismiss cases as the government "slash[es] the ranks of immigration judges." ECF 73-2; *see* ECF 68-6 ¶ 22.  Those with a history of denying such motions have been fired as recently as November 2025, *after* the issuance of the Withdrawal Memo. ECF 68-6 ¶ 22; *see also* ECF 73-3.

As the Withdrawal Memo has failed to clearly rescind the EOIR Dismissal Policy and effectively halt this practice, EOIR's conduct has not been "sufficiently altered so as to present a substantially different controversy from the one that existed when . . . suit was filed," making this issue *not* moot, but live and pressing as ever. *Am. Freedom*, 815 F.3d at 109 (internal citation omitted).

### B. The Voluntary Cessation Doctrine Precludes Defendants' Claim of Mootness.

Voluntarily ceasing "unlawful conduct does not moot a case in which the legality of that conduct is challenged." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 724 n.3 (2010). Rather, a party that must show that "(1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (internal citation omitted). Ultimately, the party claiming mootness has a "formidable burden"—it must make it "absolutely clear" that the conduct "will never" reoccur. *Id.* at 603–04. Even the government, which is entitled to "some deference," must meet this "stringent" test.[12] *Id.* at 604; *see Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) ("To show that a case is truly moot, a defendant must prove no reasonable expectation remains that it will return to its old ways. That much holds for governmental defendants no less than for private ones." (cleaned up)).

Even if the Court were to find that EOIR had rescinded its Dismissal Policy, the legal

---

[12] Defendants misstate the standard applicable here, omitting the Second Circuit's decisions in favor of other circuits' more lenient standards. ECF 66 at 33.

controversies at issue here still would not be moot. As a threshold matter, the agency's purported rescission of the May 30 Guidance was not "voluntary"; it was, as the Withdrawal Memo acknowledges, ECF 73-1 at 3, in response to this Court's order. However, even assuming the Withdrawal Memo effectively vacated the challenged policy, an issue does not become moot "simply because a court order redressing alleged grievance has been obeyed." *Haley v. Pataki*, 60 F.3d 137, 140–442 (2d Cir. 1995) (cleaned up); *see Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) (explaining that "[p]reliminary" relief "do[es] not conclusively resolve legal disputes"); *N.Y. State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 92 (2d Cir. 1998) ("[V]oluntary cessation of misconduct does not engender mootness where the cessation resulted from a coercive order.").

Next, Defendants have not carried their burden that there is "no reasonable expectation the alleged violation will recur."[13] *See Saba v. Cuomo*, 535 F. Supp. 3d 282, 289 (S.D.N.Y. 2021) (internal citation omitted) (finding no evidence that harm would not reoccur given that the government had not actually changed its unlawful system). Notably, EOIR has not provided any "assurance[s]" that it will not reinstitute the Dismissal Policy the moment this Court's order is lifted. *Fikre*, 601 U.S. at 243; *see Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 138–40 (S.D.N.Y. 2019) (collecting cases and finding government did not demonstrate mootness where it "has not categorically stated" it would not resume the challenged conduct "but only that 'there is no reasonable expectation' that it will"); *Make the Rd.*, 475 F. Supp. 3d at 255 (noting that the government did not argue that it would never revert back to its prior practice). In fact, EOIR has refused to even admit that its guidance misrepresented the scope of 8 C.F.R. § 239.2(a)(7), counseled blanket waiver of procedural protections, and pressured IJs to abandon their discretion in favor of granting DHS attorneys' motions to dismiss, making reoccurrence all the more likely. *See* ECF 73-1; *Ahrens v. Bowen*, 852 F.2d 49, 53 (2d

---

[13] In arguing their burden is met on this point, Defendants again notably rely primarily on cases from outside this Circuit. *See* ECF 66 at 32–34.

19

Cir. 1988) ("It is precisely his insistence on the validity of the challenged practice that makes it 'reasonable' to expect that the conduct will be repeated."); *Fikre*, 601 U.S. at 244 (explaining that "repudiation" is valuable as to what it "can prove about [a defendant's] future conduct"). Instead, the Withdrawal Memo *criticizes* the presumptions underlying this Court's decision, claims the order should have no impact, and veiledly threatens IJs with ethics and professional responsibility violations if they do not follow the original policy. *See* ECF 73-1.

Moreover, the "suspicious timing and circumstances," *Mhany*, 819 F.3d at 604, of the Withdrawal Memo suggests that EOIR issued it for strategic "self-interest[ed]" purposes, *not* because it is committed to abolishing this practice, *Murphy v. Benson*, 270 F.2d 419, 421 (2d Cir. 1959). Rather than comply with the Court's stay, EOIR has attempted to moot the issue and disclaim any liability by issuing the Withdrawal Memo. *Compare* ECF 51 at 25–31 *with* ECF 73-1. This is precisely the type of "manipulat[ion]" that counsels against mootness. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 288 (2000); *Fikre*, 601 U.S. at 241 (explaining that defendants cannot engage in "strategies" that leave them free to "win dismissal[] and later pick up where [they] left off").

Lastly, as discussed above, the effects of the EOIR Dismissal Policy have not been "completely and irrevocably eradicated." *Mhany*, 819 F.3d at 603. Principally, the agency has "not provide[d] the relief [Plaintiffs] [are] actually seeking:" a clear and unconditional revocation of the EOIR Dismissal Policy. *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 546 (E.D.N.Y. 2017). Nor has this unlawful practice entirely ceased "without limitation to geographic area or time" as Defendants claim, ECF 97 at 10, some IJs continue to grant motions to dismiss pursuant to the policy and those who refuse to do so fear termination. *See* Botsch Decl. ¶¶ 3–8; Miller Decl. ¶¶ 4–6; Lange Decl. ¶¶ 2–4; ECF 68-6 ¶ 22; *Sughrim v. New York*, 690 F. Supp. 3d 355, 387 (S.D.N.Y. 2023) (commenting that the issue was still live given that certain harms had not yet been resolved). Indeed, far from curing the issues with the prior guidance, the Withdrawal Memo threatens IJs that if they do not grant these

20

motions, they risk violating "ethics and professional responsibility rules." ECF 73-1 at 2 n.3.

Moreover, Plaintiffs continue to "suffer[] ongoing harm from" the dismissals originally authorized under the EOIR Dismissal Policy. *Am. Freedom*, 815 F.3d at 110. Door members remain fearful of dismissal and confused whether they will be subject to such when attending their immigration proceedings. *See* Baltimore Decl. (ECF 72-1) ¶ 7. Further, Plaintiff The Door has had to shift resources away from its core mission of providing free comprehensive services to youth because of this policy, devoting more resources to assisting its members as well as new clients in both addressing the closure of their cases and assuaging their concerns about potential dismissal. *See id.* ¶¶ 5–12; *Salem v. Pompeo*, 432 F. Supp. 3d 222, 233–34 (E.D.N.Y. 2020) (finding that the interim relief had not "completely and irrevocably eradicated the effects" of the original harm, as it did not "restore" plaintiffs to the "modus operandi" prior to defendants' unlawful conduct). Given that EOIR has failed to *actually* revoke its Dismissal Policy, these predictable consequences are likely to persist. *See Hilton v. Wright*, 235 F.R.D. 40, 50 (N.D.N.Y. 2006) (concluding that defendants' hollow commitment to "review" individuals' eligibility for treatment insufficient given that it did not "clear[ly]" "translate" into providing all eligible individuals with treatment). Thus, as EOIR has not even come close to "completely and irrevocably eradicat[ing] the effects" of the Dismissal Policy, final set aside relief is ultimately necessary here to provide "effectual relief." *Am. Freedom*, 815 F.3d at 109.

### C. Plaintiffs Have Standing to Sue the EOIR Defendants.

Defendants' argument that Plaintiffs have no "standing to continue pursuing their challenge to [the Dismissal Policy]" fails. ECF 97 at 22–25. First, "[s]tanding is determined as of the filing of the complaint" and "[a]ny events occurring after that time do not pertain to standing," but mootness. *Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025). This Court already found that The Door has organizational standing by showing both challenged policies have caused a significant diversion of

resources from its core work. ECF 51 at 17–20 (citation omitted).[14] Thus, Plaintiffs have demonstrated standing to challenge the Dismissal Policy and "[t]hat is the end of [the] standing inquiry." *McDonald*, 128 F.4th at 384. Defendants' argument that Plaintiffs are no longer being harmed after the policy's purported rescission goes solely to mootness. *See Fed. Defs. of N.Y. v. Fed. BOP*, 954 F.3d 118, 126 (2d Cir. 2020). For the reasons set forth above, *supra* at 20–29, Defendants' mootness arguments also fail.

Second, Defendants' own prior briefing concedes The Door's organizational standing as to the EOIR claim. ECF 74 at 8 n.2 ("Defendants submit that only The Door has established organizational standing to pursue its APA claim against the EOIR Defendants."). And they raise no new arguments here to suggest otherwise. Having made that concession, Defendants cannot now use this briefing, ordered as a result of their material misrepresentation to this Court, ECF 77, to relitigate issues that they have already conceded. The Court made clear that revised briefing was not an invitation to raise new arguments that could have been raised before. Apr. 15, 2026 Tr. at 17–18.

Third, both Plaintiffs have also demonstrated associational standing to challenge the Dismissal Policy by identifying at least one member who would "otherwise have standing to sue in their own right," *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 117–18, 122 (2d Cir. 2025). *See* ECF 68-1, 68-2 (declarations from The Door members Abdoul Gadiri Bah and Mamadou Saidou Bah describing ongoing removal proceedings which could be dismissed pursuant to the Dismissal Policy); ECF 68-4 (same for ACT member Mamadou Barry). This Court denied associational standing at the stay stage, as the submitted declarations were from organizational officers rather than affected members and did not identify members by name. ECF 51 at 15–16. Plaintiffs have now cured that deficiency.

Defendants argue only that these declarations do not demonstrate injury from the EOIR Dismissal Policy because those members had not been subject to the Dismissal Policy. ECF 97at 24-

---

[14] That finding remains undisturbed as the Court's May 18, 2026 Opinion expressly declined to revisit its prior finding that there was standing to bring this case. ECF 90 at 5 ("The Court need not revisit its prior findings that plaintiff The Door had demonstrated Article III organizational standing.").

25. But standing is assessed at the time of filing, *McDonald*, 128 F.4th at 384, and at that time, each declarant was in active removal proceedings and at risk of having their cases dismissed pursuant to the policy. ECF 68-1, 68-2, 68-4. That these members have not yet had their cases dismissed as a result of the policy does not vitiate standing, not least because the Court stayed the policy nearly 10 months ago. A plaintiff need not await the consummation of a threatened injury to establish standing. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

Fourth, in any event, Plaintiff The Door has demonstrated organizational standing independent of its members' claims. The Door is a direct legal services provider whose core activities include full-scope representation of its members in removal proceedings, provision of limited legal services and advice at its drop-in clinic, and delivery of in-person services including health care, education, mental health counselling, housing support, and crisis intervention to its members. ECF 23-1 ¶ 4. The Dismissal Policy has perceptibly impaired each of these core activities. The dismissal of members' removal proceedings, and the threat of dismissal that persists so long as the Policy could be reinstated, has made it far more difficult to provide both full-scope representation and limited legal assistance to members whose cases are at risk of being extinguished on the spot. ECF 68-3 ¶¶ 9, 34, 21; ECF 23-1 ¶¶ 13, 30; ECF 72-1 ¶¶ 7–12. The removal of members eligible for Special Immigrant Juvenile Status following dismissal of their proceedings directly interferes with The Door's core activity of helping members seek immigration relief. ECF 23-1 ¶ 33. And because members whose proceedings may be orally dismissed are unwilling to appear in person, The Door can no longer effectively help noncitizens apply for and obtain immigration relief in the very forum where such relief is adjudicated. ECF 68-3 ¶¶ 29, 33–34. These concrete impediments to The Door's core programmatic activities are more than sufficient to establish organizational standing, as this Court already held on this record. ECF 51 at 17–20; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

### D.  The Court Should Grant Full Vacatur.

This Court should vacate the challenged policies in full, not just as to Plaintiffs in this case. Section 706 allows courts to "hold unlawful and set aside *agency action*." 5 U.S.C. § 706(2) (emphasis added).[15] "[I]n the APA, Congress . . . depart[ed] from th[e] baseline" that "equitable relief is ordinarily limited to the parties" and "empower[ed] the judiciary to act directly against the challenged agency action." *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring); *see Career Colls. & Schs. of Tx. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (similar). Accordingly, vacatur runs against the agency action itself and is not limited to the parties. *Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring).; *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n. 2 (1990) (when vacatur is granted, "the entire [agency action] . . . would thereby be affected"). "[W]hen a plaintiff 'prevails' on a challenge under the APA to 'a rule of broad applicability,' 'the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Lujan*, 497 U.S. at 913); *see also id.* (adopting this rule and explaining that Justice Blackmun was "in dissent but apparently expressing the view of all nine justices" on this point); *Career Colls. & Schs. of Tx. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (similar); *Rural & Migrant Ministry v. EPA*, 565 F. Supp. 3d 578, 605-06 (S.D.N.Y. 2020) (similar).[16]

The Supreme Court has thus affirmed orders granting full vacatur "over and over and over again," with Chief Justice Roberts explaining that full vacatur was "what the D.C. Circuit and other courts of appeals have been doing all the time," Tr. of Oral Argument at 36, 38, *United States v. Texas*,

---

[15] Though Plaintiffs acknowledge the Court's Section 705 ruling limited relief only to Plaintiffs, Plaintiffs note that the argument for full vacatur is even stronger under Section 706 because, as numerous courts have held, vacatur nullifies the agency action itself, whether in its application to plaintiffs or not. *See, e.g.*, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).

[16] The Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), did not alter this rule. Rather, it explicitly reserved "the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Id.* at 847 n.10; *see also id.* at 869 (Kavanaugh, J., concurring) (recognizing that, under the APA, "plaintiffs may [still] ask a court to preliminarily 'set aside' a new agency rule" under 5 U.S.C. § 706(2)").

599 U.S. 670 (2023); *see, e.g.*, *Bowen v. Massachusetts*, 487 U.S. 879, 911 (1988) (referring to full vacatur as "complete relief"). Accordingly, courts have consistently granted full vacatur as to agency actions. *See, e.g.*, *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 796 F. Supp. 3d 66, 119–123 (D. Md. 2025*)* (granting vacatur of full agency action); *Gomez v. Trump*, 485 F. Supp. 3d 145, 202–03 (D.D.C. 2020) (same); *O.A. v. Trump*, 404 F. Supp. 3d 109, 153-54 (D.D.C. 2019) (same). Therefore, this Court should vacate the challenged agency action in full, not just as to Plaintiffs.[17]

This Court should vacate the 2025 Memos notwithstanding the recent vacatur order in *Pablo Sequen. See Purl v. Health & Human Servs.,* 787 F. Supp. 3d 284, 328 (N.D. Tex. 2025) ("Courts can and do continue to review agency action despite another court's vacatur"); *see, e.g.*, *Whitman-Walker Clinic, Inc. v. Health and Human Servs.*, 485 F. Supp. 3d 1, 63-64 (D.D.C. 2020) (granting APA relief even where "two district courts in other jurisdictions have already issued opinions on preliminary-injunction motions raising similar challenges"); *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) (granting vacatur even where other court already issued nationwide injunction against same policy). A decision by this Court is especially appropriate here given that the *Pablo Sequen* court decided one, but not all, of the claims raised here.[18] Additionally, the government is likely to appeal that decision, as they did with the district court's stay order, and may seek a stay pending appeal. Finally, Plaintiffs remain eager to move forward in this case, including discovery in anticipation of sanctions related to the government's misrepresentation.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' partial motions for summary judgment and to dismiss and grant Plaintiffs' motion.

---

[17] Full vacatur is especially warranted here given that Plaintiff ACT has members outside of New York and spread across the country, including in Pennsylvania and the Washington, DC area. *See* Diana Konaté Decl. (ECF 23-8) ¶ 5. Thus, relief must extend beyond New York in order to "provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).

[18] Namely, the EOIR Dismissal Policy at issue here is not challenged in that case.

Dated: June 26, 2026
       New York, New York


Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION
    FOUNDATION


/s/_____
Amy Belsher
Elizabeth Gyori
Wafa Junaid
Claire Molholm
Thomas Munson
M. Porter*
Robert Hodgson
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION


/s/_____
Noor Zafar
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500


AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION


/s/_____
Michael K.T. Tan
Hannah Steinberg*
Oscar Sarabia Roman*
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0770


EMERY CELLI BRINCKERHOFF ABADY WARD &
    MAAZEL LLP


/s/_____
Katherine Rosenfeld
Samuel Shapiro
Emily Wanger
Sydney Zazzaro
One Rockefeller Plaza, 8th Floor
New York, NY 10020
Tel: (212) 763-5000

MAKE THE ROAD NEW YORK


/s/_____
Harold Solis
Paige Austin
301 Grove Street
Brooklyn, NY 11237
Tel: (718) 418-7690


*Admitted pro hac vice

*Counsel for Plaintiffs*

26

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel hereby certifies that this memorandum complies with the allocated page limit (twenty-five pages) pursuant to Rule 3(D) of this Court's Individual Practices in Civil Cases.

/s/ *Sydney Zazzaro*
Sydney Zazzaro