UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
AFRICAN COMMUNITIES TOGETHER and
THE DOOR,
Plaintiffs,

25-cv-6366 (PKC)

-against-

OPINION AND ORDER

DAVID J. VENTURELLA, in his official capacity as Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; MARKWAYNE MULLIN, in his official capacity as Secretary of the United States Department of Homeland Security; SIRCE E. OWEN, in her official capacity as Acting Director, Executive Office of Immigration Review; and TODD BLANCHE, in his official capacity as Attorney General, U.S. Department of Justice,

Defendants.
---------------------------------------------------------------x

CASTEL, U.S.D.J.

Plaintiffs African Communities Together ("ACT") and The Door, organizations that provide services to noncitizens, brought this action under the Administrative Procedure Act ("APA") to challenge two policies related to civil immigration enforcement. The first is a policy implemented by the Executive Office of Immigration Review ("EOIR"), part of the Department of Justice, that instructed Immigration Judges that they had the authority to dismiss a noncitizen's removal proceeding on an oral motion by the Department of Homeland Security ("DHS") without affording the noncitizen an opportunity to submit a written response if circumstances had changed such that it was no longer in the government's interest for the case to

remain pending (the "EOIR Dismissal Policy").[1] The second policy was implemented by U.S. Immigration and Customs Enforcement ("ICE"), part of DHS, and expanded the circumstances in which an arrest of a noncitizen could be made in or near a courthouse (the "2025 ICE Courthouse Arrest Policy"). According to plaintiffs, the two policies worked in tandem: the dismissal of a removal proceeding against the noncitizen was the prelude to the individual's immediate arrest at or near immigration court and the institution of an alternate path to removal, expedited removal proceedings.

Plaintiffs previously moved to stay the two policies under section 705 of the APA, 5 U.S.C. § 705. In an Opinion and Order dated September 12, 2025 (the "First Stay Opinion"), this Court determined that The Door possessed "organizational" standing to challenge the policies, while ACT had not established standing. African Communities Together v. Lyons, 799 F. Supp. 3d 362 (S.D.N.Y. 2025). On the merits, the Court concluded that the EOIR Dismissal Policy conflicted with the regulatory provisions governing dismissal of removal proceedings, and the Court stayed that policy. At that juncture, however, the Court declined to stay the 2025 ICE Courthouse Arrest Policy, determining that plaintiffs had failed to make a showing that they were likely to succeed on their claim that the policy was arbitrary and capricious or contrary to law.

Following the First Stay Opinion, there were two important developments in this case. First, shortly after this Court issued its First Stay Opinion, EOIR issued a policy memorandum withdrawing the EOIR Dismissal Policy. Second, after the parties' cross-motions for summary judgment had been briefed, defendants submitted a letter informing the Court that the memoranda setting out the 2025 ICE Courthouse Arrest Policy in fact did not apply to immigration courthouses, despite defendants' earlier representations to the contrary and the

[1] The guidance was in conflict with the regulation permitting dismissal only if the "[c]ircumstances of the case have changed," 8 C.F.R. § 239.2(a)(7) (emphasis added).

Court's reliance on those representations in its First Stay Opinion. Following the abrupt change of position, this Court issued a second Opinion and Order, dated May 18, 2026 (the "Second Stay Opinion"), which modified its First Stay Opinion and stayed the 2025 ICE Courthouse Arrest Policy, to the extent it rescinded an earlier 2021 policy as to arrests at immigration courts, as arbitrary and capricious. African Communities Together v. Lyons, 833 F. Supp. 3d 348 (S.D.N.Y. 2026).

Plaintiffs now move for summary judgment on their claims and seek an order vacating the two policies pursuant to section 706 of the APA, 5 U.S.C. § 706(2). Defendants oppose the motion and have cross-moved for summary judgment in their favor as to the 2025 ICE Courthouse Arrest Policy. They have also moved under Rule 12(b)(1), Fed. R. Civ. P., to dismiss plaintiffs' claims as to the EOIR Dismissal Policy on grounds of mootness.

The Court's principal holdings are as follows:

1. Plaintiffs' challenge to the EOIR Dismissal Policy is dismissed as moot. The policy has been formally withdrawn by EOIR. (ECF 73-1.) Significantly, EOIR's withdrawal communication acknowledges that the policy "could not direct or bind any Immigration Judge to make a specific decision in a case in a particular way" and that no individual within EOIR has such authority. (Id. at 2–3.) It describes the policy as "poorly drafted" and states that "no competent Immigration Judge would have understood [the policy] to represent . . . a directive with binding effect to decide a case or issue a particular way." (Id. at 3–4.) The Court concludes that there is no reasonable expectation that the alleged violation will recur and that the Court's grant of interim relief and the

subsequent withdrawal have completely and irrevocably eradicated the effects of the policy.

2. With the belated acknowledgement by defendants that the 2025 ICE Courthouse Arrest Policy has no application to arrests in or near immigration courts, ICE's policy for such arrests, under well-established principles, reverts to the pre-existing policy, a guidance memorandum issued on April 27, 2021. That earlier policy permitted arrests at or near immigration courts but only under limited circumstances. The purported rescission of the 2021 policy was ineffectual because it neither acknowledged the effect of the rescission on arrests at or near immigration courts nor explained why having no policy whatsoever was better than the 2021 policy. The Court rejects defendants' argument that an arrest policy, or absence of an arrest policy, is beyond judicial review because the place of an arrest is entirely left to the discretion of the agency. The Court concludes that the 2025 ICE guidance was a continuation of ICE's practice of explaining how discretion should be exercised in making arrests in sensitive areas, including in or near courthouses, and therefore the 2025 ICE guidance may be measured against pre-existing standards and is subject to APA review.

Accordingly, the Court will grant defendants' motion to dismiss plaintiffs' challenge to the EOIR Dismissal Policy as moot. It will grant summary judgment to plaintiffs insofar as they challenge the rescission of the April 27, 2021 policy as applied to arrests in or near immigration courts and, accordingly, so much of the 2025 ICE Courthouse Arrest Policy as purported to rescind the April 27, 2021 policy as applied to immigration courts will be vacated.

BACKGROUND AND PROCEDURAL POSTURE

A. The Challenged Policies.

A removal proceeding, with some exceptions, is "the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3). Such proceedings afford noncitizens with an opportunity to present evidence on their own behalf and provide some trappings of the judicial process. See, e.g., id. § 1229a(a)(1) (removal proceedings overseen by an Immigration Judge), (b)(4)(B) (alien given reasonable opportunity to examine and present evidence). At the end of removal proceedings, Immigration Judges decide whether or not a noncitizen is removable from the country. Id. § 1229a(c)(1)(A). An individual against whom a removal proceeding has been brought may assert an asylum claim that will be heard by the Immigration Judge in the removal proceeding. See 8 C.F.R. §§ 1208.2, 1208.4. If the removal proceeding is dismissed, the asylum application is also dismissed. See id. § 1208.4; 799 F. Supp. 3d at 376 n.7.

In May 2025, EOIR and ICE instituted two policies that plaintiffs contend worked together to facilitate the dismissal of noncitizens' removal proceedings so that they could be detained by ICE and removed from the United States. The EOIR Dismissal Policy, according to plaintiffs, encouraged Immigration Judges to grant DHS attorneys' oral motions to dismiss removal proceedings without requiring written briefing or issuing a written decision. (ECF 24-12.) The 2025 ICE Courthouse Arrest Policy, in turn, loosened restrictions on the circumstances when ICE officers could make arrests in courthouses. (ECF 64 at 6–8.)

Plaintiffs assert that the combined effect of the two policies was to create a dilemma for noncitizens in removal proceedings. A noncitizen could attend scheduled hearings

for his removal proceedings in immigration court, but in doing so risked having the removal proceeding orally dismissed on the spot without any prior notice and then being immediately arrested in the immigration courthouse by ICE officers and placed into expedited removal proceedings. If a noncitizen did not attend his scheduled hearing for fear of being detained, then the Immigration Judge would be required by statute to order the noncitizen be "removed in absentia." 8 U.S.C. § 1229a(b)(5)(A).

The statutory and regulatory background of the policies and procedural history of this action are presented in detail below.

B. The Pending Motions.

After the Court issued the First Stay Opinion, defendants filed a 55-page administrative record for the 2025 ICE Courthouse Arrest Policy. (ECF 64.) Defendants have not filed any administrative record for the EOIR Dismissal Policy.

Thereafter, defendants moved to dismiss plaintiffs' claims as to EOIR Dismissal Policy pursuant to Rule 12(b)(1), Fed. R. Civ. P., urging that the Court should dismiss those claims as moot. (ECF 65.) At the same time, defendants moved for summary judgment on the claims as to the 2025 ICE Courthouse Arrest Policy. (Id.) Plaintiffs in turn moved for summary judgment in their favor on all claims. (ECF 67.) All briefing on the motions was completed by January 21, 2026.

On March 24, 2026, two Assistant United States Attorneys representing defendants wrote to the Court to advise that ICE had informed them that day that it was now ICE's position that the 2025 ICE Courthouse Arrest Policy never applied to arrests at or near immigration courts. (ECF 77.) The attorneys for the government acknowledged that they had, in consultation with ICE, embraced a contrary position throughout the litigation. (Id. at 2.) The

changed position resulted in the Court's issuance of the Second Stay Opinion staying enforcement of the 2025 ICE Courthouse Arrest Policy.

Confronted by the changed position, the Court ordered replacement briefing on plaintiffs' motion for summary judgment. (ECF 87.) After plaintiffs submitted their initial replacement brief, defendants then requested leave to file corrected briefs as to their own motion for summary judgment and motion to dismiss. (ECF 94.) The Court permitted defendants to file such corrected briefs, "without prejudice to the plaintiffs' right to argue that the government has forfeited any argument raised in this belated round of briefing." (ECF 95.)

LEGAL STANDARDS

A. Rule 12(b)(1) Standard.

Rule 12(b)(1), Fed. R. Civ. P., permits a defendant to move to dismiss an action for lack of subject matter jurisdiction. A Rule 12(b)(1) motion may be either fact-based or facial. Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56 (2d Cir. 2016). When the motion is directed to the face of the complaint, the court must accept all uncontroverted allegations as true and draw every reasonable inference in favor of the plaintiff. Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014). However, as here, where "jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." Id. (internal quotation marks omitted). The party asserting subject matter jurisdiction must prove its existence by a preponderance of the evidence. Id.

B. Summary Judgment Standard

Under Rule 56(a), Fed. R. Civ. P., summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the burden of demonstrating there is no genuine dispute of material fact. Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A fact is "material" when it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). There is a genuine issue of fact if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In reviewing a summary judgment motion, a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." Anderson, 477 U.S. at 247–48 (emphasis omitted). The nonmoving parties "must do more than simply show that there is some metaphysical doubt as to the material facts and they may not rely on conclusory allegations or unsubstantiated speculation." Jeffreys, 426 F.3d at 554 (internal citations and quotation marks omitted).

I. THE DOOR HAS ARTICLE III STANDING.

In the First Stay Opinion, the Court concluded that The Door had demonstrated organizational standing but not representational standing to challenge the two policies, while

ACT had not adequately shown standing under either an organizational or representational theory of standing. 799 F. Supp. 3d at 377–82. At this stage, defendants bring no challenge to plaintiffs' standing.[2] Even if they had made such a challenge, the Court would again conclude that The Door possesses standing premised on its "diversion of resources" as a result of the challenged policies. 799 F. Supp. 3d at 380–82; see Do No Harm v. Pfizer Inc., 126 F.4th 109, 113–14 (2d Cir. 2025) ("The evidentiary burden for establishing Article III standing for the purposes of a motion for a preliminary injunction is at least as onerous as the burden for establishing standing to secure a summary judgment.").

In their briefing in support of their motion for summary judgment, plaintiffs briefly argue that ACT and The Door have shown that they also possess representational standing on behalf of their members. (ECF 92 at 17; ECF 99 at 31.) Along with their briefing, they have submitted declarations in support of their assertion of representational standing on behalf of named members of their organizations. (See ECF 68-3, Baltimore Decl. ¶ 20; ECF 68-14, Konaté Decl. ¶ 10.)

When, as here, "multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017) (quoting Rumsfeld v. Forum for Acad. and Inst. Rights, Inc., 547 U.S. 47, 52 n.2 (2006)). Plaintiffs provide no reason why, at this stage, the Court need determine whether The Door and ACT have adequately asserted standing to challenge the policies under a representational theory.

[2] Defendants, in their opening brief on their motion for summary judgment and motion to dismiss, contended that plaintiffs lacked standing as to the EOIR Dismissal Policy. (ECF 97 at 32–35.) Defendants withdrew those arguments in their reply brief and have conceded that their attacks against plaintiffs' standing were in fact arguments in favor of mootness. (ECF 106 at 11–12.) Defendants also conceded that The Door possessed organizational standing as to the EOIR Dismissal Policy claims in their initial set of summary judgment briefs. (ECF 74 at 12 n.2.)

See New Jersey v. Bessent, 149 F.4th 127, 141 (2d Cir. 2025) ("If at least one plaintiff has standing, the suit may proceed." (quoting Biden v. Nebraska, 600 U.S. 477, 489 (2023))); see also Centro, 868 F.3d at 109 ("We conclude that the district court correctly held that [the first organizational plaintiff] has standing. Because this conclusion is a sufficient predicate for federal jurisdiction, we are not called on to consider, and therefore do not reach, the question of whether [the second organizational plaintiff] has standing."); Kwong v. Bloomberg, 723 F.3d 160, 162 n.4 (2d Cir. 2013) ("Because we are persuaded that the individual plaintiffs have standing, we need not address the standing arguments . . . regarding the two organizational plaintiffs."); Rural & Migrant Ministry v. EPA, 565 F. Supp. 3d 578, 596 (S.D.N.Y. 2020) (Liman, J.) ("[T]he Court at this stage declines to evaluate whether the other named plaintiffs have standing under either applicable theory" where "at least two [organizational] plaintiffs . . . have established standing—the former as a representative and the latter on its own behalf.")

The Court thus concludes there is no need to revisit the issue of standing at this juncture.

## II. THE CLAIMS ADDRESSED TO THE EOIR DISMISSAL POLICY ARE MOOT.

### A. The EOIR Dismissal Policy.

EOIR is an agency within the United States Department of Justice. 8 C.F.R. § 1003.0(a). EOIR contains the Office of the Chief Immigration Judge ("OCIJ"). Id. §§ 1003.0(a), 1003.9(a). Immigration Judges serve as administrative judges within OCIJ. Id. § 1003.10(a).

Immigration Judges are charged with "conduct[ing] proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(a)(1). In such removal proceedings, the Immigration Judge "shall administer oaths, receive evidence, and interrogate,

examine, and cross-examine the alien and any witnesses" and "may issue subpoenas." Id. § 1229a(b)(1); see also 8 C.F.R. § 1003.10(b). Immigration Judges are required "to resolve the questions before them in a timely and impartial manner consistent with [statute] and regulations." 8 C.F.R. § 1003.10(b). When deciding the cases before them, "immigration judges shall exercise their independent judgment and discretion and may take any action consistent with their authorities . . . that is necessary or appropriate for the disposition" of such cases. Id. To that end, Immigration Judges are empowered to order "administrative closure, termination of proceedings, and dismissal of proceedings." Id.

During the course of removal proceedings, a DHS attorney may move to dismiss the proceedings. 8 C.F.R. § 239.2(c). As relevant here, DHS attorneys may make such a motion if the "[c]ircumstances of the case have changed after the notice to appear was issued to such an extent that continuation is no longer in the best interest of the government." Id. § 239.2(a)(7), (c). Generally, pre-decision motions, including motions to dismiss, "shall be in writing and shall state, with particularity the grounds therefor, the relief sought, and the jurisdiction" "[u]nless otherwise permitted by the immigration judge." Id. § 1003.23(a). EOIR also issues an EOIR Policy Manual, which contains an Immigration Court Practice Manual that provides for when motions must be submitted and responses filed. (ECF 24-5 at 4–5.)

The Chief Immigration Judge, who is appointed by the Attorney General, is "responsible for the supervision, direction, and scheduling of the immigration judges in the conduct of the hearings and duties assigned to them." 8 C.F.R. § 1003.9(a)–(b). As part of those duties, the Chief Immigration Judge has authority to "[i]ssue operational instructions and policy, including procedural instructions regarding the implementation of new statutory or regulatory authorities." Id. § 1003.9(b)(1). However, the Chief Immigration Judge has "no authority to

direct the result of an adjudication assigned to another immigration judge." Id. § 1003.9(c). The Director of EOIR likewise has "no authority to adjudicate cases arising under [statute] or regulations or to direct the result of an adjudication assigned to . . . an immigration judge." Id. § 1003.0(c).

On May 30, 2025, an email signed by two Acting Regional Deputy Chief Immigration Judges was sent to all Assistant Chief Immigration Judges[3] to provide "guidance" "[g]iven . . . recent developments." (ECF 24-12.) The email noted that "EOIR has experienced significant changes in its caseload," that "DHS is carrying out enforcement actions in or near EOIR space," and that "DHS attorneys have moved to dismiss cases that are currently pending." (Id.) The email advised that "DHS Motions to Dismiss may be made orally and decided from the bench" and that "[n]o additional documentation or briefing is required." (Id.) It went on to state that, "[g]enerally, if DHS has met the regulatory burden, the oral motion to dismiss may be granted" and that "[a] 10-day response period is not required." (Id.) The email also described the basis for a motion to dismiss made under 8 C.F.R. § 239.2(a)(7) as when "circumstances have changed to such an extent that continuation is no longer in the best interest of the government." (Id.)

In the First Stay Opinion, the Court stayed the EOIR Dismissal Policy. The Court concluded that the email's guidance that a case may be dismissed if "circumstances have changed to such an extent that continuation is no longer in the best interest of the government," along with the email's mention of EOIR's increased caseload, effectively instructed that Immigration Judges were permitted to dismiss removal proceedings based on the increased

[3] "The [EOIR] Director may designate immigration judges to serve as Deputy and Assistant Chief Immigration Judges as may be necessary to assist the Chief Immigration Judge in the management of the OCIJ." 8 C.F.R. § 1003.9(a).

caseload. 799 F. Supp. 3d at 385–86. Because that guidance was in conflict with the regulation permitting dismissal only if the "[c]ircumstances of the case have changed," 8 C.F.R. § 239.2(a)(7) (emphasis added), the EOIR Dismissal Policy was contrary to law. Further, the email's instruction that "if DHS has met the regulatory burden, the oral motion to dismiss may be granted" without requiring "[a] 10-day response period" or "additional documentation or briefing" could be read to counsel Immigration Judges to exercise their discretion to waive the requirement that the motions be in writing and grant dismissals without requiring a response from the noncitizen. 799 F. Supp. 3d at 386. This, the Court concluded, conflicted with the regulation providing that the Chief Immigration Judge "shall have no authority to direct the result of an adjudication assigned to another immigration judge." 8 C.F.R. § 1003.9(c).

B. The Withdrawal of the EOIR Dismissal Policy.

On September 23, 2025, shortly after this Court entered the First Stay Opinion, Acting Deputy Director of EOIR Roman Chaban issued a memorandum addressed to "[a]ll of EOIR" entitled "Withdrawal of May 30, 2025 Email" (the "EOIR Withdrawal Memo"). (ECF 73-1.) The memorandum states that "[t]he May 30 [EOIR Dismissal Policy email] was not an EOIR Policy, nor could it have been because it was not contained in the EOIR Policy Manual." (Id.) It goes on to explain that "no [Regional Deputy Chief Immigration Judge] has the authority to set policy for the agency, except (like all Immigration Judges) through adjudications." (Id. (citing 8 C.F.R. §§ 1003.0(b)(1)(i), 1003.9(b)(1)).) And it also stated that the EOIR Dismissal Policy email "could not direct or bind any Immigration Judge to make a specific decision in a case in a particular way" because "[n]o individual in EOIR leadership, including an [Regional Deputy Chief Immigration Judge], may direct an Immigration Judge to decide a case in a particular way." (Id. (citing 8 C.F.R. §§ 1003.0(c), 1003.9(c)).) The memorandum

acknowledged that the EOIR Dismissal Policy email's "attempt to paraphrase relevant law was poorly drafted" and asserted that "no competent Immigration Judge would have understood the [EOIR Dismissal Policy email] to represent either a formal policy of the agency or a directive with binding effect to decide a case or issue a particular way." (Id. at 3–4.)

The memorandum concluded by expressly withdrawing the email:

> Because the May 30 [EOIR Dismissal Policy] Email was never a policy and could never have been legally directive in any event, no Immigration Judge should have relied on it or used it to decide a case, nor should any Immigration Judge be doing so currently. Consequently, the stay of that Email should have no impact on EOIR operations. Nevertheless, to eliminate any remaining uncertainty, this PM now formally withdraws the May 30 Email. All Immigration Judges should continue to not rely on it in adjudicating cases.
>
> (Id. at 4.)

Defendants argue that the EOIR Withdrawal Memo has rendered plaintiffs' challenge to the EOIR Dismissal Policy moot and have accordingly moved under Rule 12(b)(1), Fed. R. Civ. P., to dismiss the claims challenging the policy for lack of subject matter jurisdiction. Plaintiffs oppose the motion.

C. The Claims Based on the EOIR Dismissal Policy Are Moot.

"A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Tann v. Bennett, 807 F.3d 51, 52 (2d Cir. 2015) (internal quotation marks omitted) (quoting Blackwelder v. Safnauer, 866 F.2d 548, 551 (2d Cir. 1989)). "A live controversy remains as long as 'a court can fashion some form of meaningful relief' to award the complaining party, and even 'the availability of a possible remedy is sufficient to prevent a case from being moot.'" Exxon Mobil Corp. v. Healey, 28 F.4th 383, 392 (2d Cir. 2022) (brackets and emphasis omitted) (quoting Church of Scientology v. United States, 506 U.S. 9, 12–13 (1992)); see also American Freedom Defense Initiative v. Metropolitan

Transportation Authority, 815 F.3d 105, 109 (2d Cir. 2016) (per curiam) ("A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." (internal quotation marks omitted)).

"Mootness is a jurisdictional matter relating to the Article III requirement that federal courts hear only 'cases' or 'controversies.'" Blackwelder, 866 F.2d at 550 (citing Preiser v. Newkirk, 422 U.S. 395, 401 (1975)). "Whenever mootness occurs, the court . . . loses jurisdiction over the suit, which therefore must be dismissed." Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet, 260 F.3d 114, 118–19 (2d Cir. 2001).

Under the so-called voluntary cessation doctrine, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)). That rule "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." MHANY Mgmt., Inc. v. Cnty. of Nassau, 819 F.3d 581, 603 (2d Cir. 2016) (quoting City News & Novelty, Inc. v. City of Waukesha, 531 U.S. 278, 284 n. 1 (2001)).

In the Second Circuit, "courts will find a case moot after a defendant voluntarily discontinues challenged conduct only if (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." American Freedom Defense Initiative, 815 F.3d at 109 (internal quotation marks omitted) (quoting County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)). "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting

mootness." Friends of the Earth, 528 U.S. at 189 (internal quotation marks and brackets omitted).

When the defendant is a government entity, "some deference must be accorded to [the] governmental entity's representations that certain conduct has been discontinued." Clear Channel Outdoor, Inc. v. City of New York, 594 F.3d 94, 111 (2d Cir. 2010) (brackets omitted) (quoting Lamar Advertising of Penn, LLC v. Town of Orchard Park, 356 F.3d 365, 376 (2d Cir. 2004)). Indeed, "[a] significant amendment or repeal of a challenged provision that obviates the plaintiff's claims ordinarily moots a litigation, absent evidence that the [government] defendant intends to reinstate the challenged [provision] after the litigation is dismissed." Doe v. McDonald, 128 F.4th 379, 385 (2d Cir. 2025); see also Samma v. Dep't of Defense, 136 F.4th 1108, 1113 (D.C. Cir. 2025) ("[T]he government's abandonment of a challenged regulation is just the sort of development that can moot an issue.").

Defendants assert that the EOIR Withdrawal Memo withdrew the challenged EOIR Dismissal Policy, such that the Court cannot afford any effectual relief to plaintiffs as to that policy. Plaintiffs, in response, contend that the EOIR Withdrawal Memo did not in fact withdraw the EOIR Dismissal Policy and, even if it did, the "voluntary cessation" doctrine prevents the Court from finding its claims as to that policy moot. The Court agrees with defendants that plaintiffs' claims as to the EOIR Dismissal Policy are moot.

First, the court must "determine whether the challenged conduct has, in fact, ceased." American Freedom Defense Initiative, 815 F.3d at 109. "A claim will not be found moot if the defendant's change in conduct is merely superficial or suffers from similar infirmities as it did at the outset." Id. (internal quotation marks and ellipsis omitted). As the Court discussed in the First Stay Opinion, the legal defects in the EOIR Dismissal Policy, on which all

of plaintiffs' claims as to that policy rely, were that (1) it "counsel[ed] the Immigration Judge to exercise his or her discretion" to permit oral motions to dismiss and grant oral dismissals without the opportunity for a written response from the noncitizen, in contradiction of 8 C.F.R. §§ 1003.9(c) & 1003.23(a) and the Immigration Court Practice Manual, and (2) it "communicate[d] to the Immigration Judge that the significant change in caseload" could be a "changed circumstance" supporting dismissal, in contradiction of 8 C.F.R. § 239.2(a)(7). 799 F. Supp. 3d at 385–86. (See ECF 1 ¶¶ 45–46, 83, 86, 90; ECF 92 at 28–31.) That challenged conduct has clearly ceased here.

The EOIR Withdrawal Memo stated that the EOIR Dismissal Policy email "could not direct or bind any Immigration Judge to make a specific decision in a case in a particular way," nor could any "individual in EOIR leadership . . . direct an Immigration Judge to decide a case in a particular way." (ECF 73-1 at 2–3.) As to those propositions, the memo cited two regulatory provisions and a policy memorandum. (Id. at 3 (citing 8 C.F.R. §§ 1003.0(c), 1003.9(c)).) The memo also admitted that the EOIR Dismissal Policy email's "attempt to paraphrase relevant law was poorly drafted," and that even if it "had been more precisely drafted . . . it still would not have represented an EOIR policy or a directive to an Immigration Judge to decide a case a particular way." (Id. at 3–4.) The memo repeatedly emphasized that the EOIR Dismissal Policy was not intended to represent an EOIR policy and that Immigration Judges should never have relied on it. And removing any doubt, the memo concluded by stating that it "formally withdraws the May 30 Email." (Id.)

Plaintiffs quibble with some of the language used in the memo and the fact that it did not make certain clarifications about Immigration Judges' powers to dismiss removal proceedings. But the EOIR Withdrawal Memo is unmistakably clear: the entire EOIR Dismissal

Policy is withdrawn and in no way may be relied on by Immigration Judges. That is enough to conclude that the EOIR Dismissal Policy has ceased.

Finally, in arguing that the EOIR Dismissal Policy is still in effect, plaintiffs put forth three declarations from individuals who observed immigration court hearings in Miami, Florida; Fort Snelling, Minnesota; and El Paso, Texas. (ECF 72-2, Botsch Decl. ¶¶ 3–8; ECF 72-3, Lange Decl. ¶¶ 2–6; ECF 72-4, Miller Decl. ¶¶ 4–8.) See Daniels v. Moores, 24-30-PR, 2025 WL 883035, at *2 (2d Cir. Mar. 21, 2025) (summary order) (claim not moot when "the district court made the factual finding that the [challenged] [p]olicy was still de facto in place, despite being formally rescinded"). Each of the declarants describe instances following this Court's First Stay Opinion of DHS attorneys making oral motions to dismiss based on changed circumstances without providing case-specific explanations of what those changed circumstances were, Immigration Judges having granted such motions from the bench without considering any written response from noncitizens, and Immigration Judges (incorrectly) stating that they lacked authority to deny such motions or require written briefing.

But these declarations, at most, "present a substantially different controversy from the one that existed when suit was filed." American Freedom Defense Initiative, 815 F.3d at 109 (internal quotation marks and ellipsis omitted). As explained, plaintiffs' APA, Accardi doctrine and due process claims take issue with the EOIR Dismissal Policy because it presented a view of the permissible bases for motions to dismiss that conflicted with existing regulations and counseled Immigration Judges to use their discretion as to motions to dismiss in a specific way in violation of controlling regulations. Now that such policy has been revoked and expressly disclaimed by EOIR in a memorandum issued to "[a]ll of EOIR," plaintiffs' remaining qualms are that some Immigration Judges in some locations around the country, in spite of EOIR's

withdrawal of its Dismissal Policy, are incorrectly applying the regulations governing their authority to dismiss cases and to forgo the procedural requirements as to pre-decision motions. (ECF 73-1 at 2.) But plaintiffs' evidence does not support the conclusion that EOIR itself maintains a policy of encouraging such conduct. See, e.g., Daniels, 2025 WL 883035, at *2 (challenged policy had not ceased because "prisoners in . . . custody continued to have their . . . medications systematically denied" (emphasis added)). The remaining dispute here is "qualitatively different" from that alleged in the Complaint and is thus a "sufficiently different controversy for mootness purposes." American Freedom Defense Initiative, 815 F.3d at 110.

The remedy for a policy that unlawfully counsels or directs an Immigration Judge to exercise discretion in a particular way would not be a direction to the Immigration Judge to exercise discretion in the opposite manner. The EOIR Withdrawal Memo restores the discretion of an Immigration Judge precisely to the state as it existed before the circulation of the EOIR Dismissal Policy.

For similar reasons, there is no reasonable expectation that EOIR will revert to applying the withdrawn EOIR Dismissal Policy. The EOIR Withdrawal Memo shows that EOIR's position is that a policy that directed Immigration Judges to use their discretion in a specified way would be unlawful. The memo expressly acknowledges the regulatory provisions that prevent such constraints on Immigration Judges' exercise of their authority. (ECF 73-1 at 2–3.) See Holland v. Goord, 758 F.3d 215, 224 (2d Cir. 2014) ("no reasonable expectation" prong satisfied where the agency "amended [the challenged policy] specifically to prohibit the conduct of which [the plaintiff] complains"). EOIR also directed Immigration Judges not to rely on the EOIR Dismissal Policy's admittedly "poorly drafted" paraphrasing of relevant law. (ECF 73-1 at 3–4.) This is not a case where the agency has refused to acknowledge that its prior policy was

illegal. See Ahrens v. Bowen, 852 F.2d 49, 53 (2d Cir. 1988) (agency's "insistence on the validity of the challenged practice . . . makes it 'reasonable' to expect that the conduct will be repeated").

Nor was the EOIR's Withdrawal Memo characterized by "suspicious timing and circumstances." MHANY, 819 F.3d at 604. EOIR's Withdrawal Memo was issued just eleven days after, and evidently in response to, this Court's First Stay Opinion. But the effect of the Withdrawal Memo—which did not limit its withdrawal of the EOIR Dismissal Policy to any geographic location—was broader than the stay issued by the Court, which only applied to removal proceedings taking place in Manhattan and the Bronx. 799 F. Supp. 3d at 396–97. Moreover, a mid-litigation change in policy does not necessarily suggest that an agency may return to an illegal policy. See Holland, 758 F.3d at 220, 223–24 (claim moot despite change in agency policy "after seven years of litigation and while the parties' [summary judgment] motions were fully briefed").

Given EOIR's clear rejection of the EOIR Dismissal Policy, the Court concludes that the EOIR Dismissal Policy is not likely to be reinstated. See Federal Bureau of Investigation v. Fikre, 601 U.S. 234, 244 (2024) ("What matters is not whether a defendant repudiates its past actions, but what repudiation can prove about its future conduct.").

Finally, the EOIR Withdrawal Memo "completely and irrevocably eradicated the effects of the alleged violation." American Freedom Defense Initiative, 815 F.3d at 109. That memo, for all the reasons already discussed, rendered the EOIR Dismissal Policy a "legal nullity." Deide v. Day, 23-cv-3954 (NSR), 2024 WL 3471294, at *3 (S.D.N.Y. July 19, 2024) (Román, J.). No Immigration Judge who reviewed the EOIR Withdrawal Memo could have escaped the conclusion that EOIR's email was withdrawn and did not represent the policy

position of EOIR. See Granite State Outdoor Advertising, Inc. v. Town of Orange, 303 F.3d 450, 452 (2d Cir. 2002) (per curiam) (effects of allegedly unconstitutional but amended regulation were completely and irrevocably eradicated when there was "no reason to believe that any unconstitutional restrictions are currently in place").

Accordingly, the Court concludes that defendants have met their "heavy burden" in showing that plaintiffs' challenge to the EOIR Dismissal Policy is moot. Friends of the Earth, 528 U.S. at 189. The Court will dismiss Counts III, IV and V of the Complaint.

## III. THE 2025 ICE COURTHOUSE ARREST POLICY IS ARBITRARY AND CAPRICIOUS.

### A. The 2025 ICE Courthouse Arrest Policy.

As a general matter, a federal officer has the authority to "to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation [of the immigration laws] and is likely to escape before a warrant can be obtained for his arrest . . . ." 8 U.S.C. § 1357(a)(2).

Between 2014 and 2018, ICE issued a series of memoranda setting certain restrictions on civil immigration enforcement actions (including arrests) within and in the vicinity of courthouses. (ECF 41-1; ECF 41-2; ECF 64 at 25–29.) Those memoranda generally defined which groups of noncitizens ICE could or could not arrest in courthouses and set out guidance on how such arrests should be conducted. These memoranda did not expressly state that they applied immigration courthouses.

On April 27, 2021, DHS issued a guidance memorandum (the "April 2021 Guidance") that restricted courthouse arrests to a set of narrow circumstances. (ECF 64 at 30–32.) Specifically, the April 2021 Guidance provided that "[a] civil immigration enforcement

action may be taken in or near a courthouse if (1) it involves a national security threat, or (2) there is an imminent risk of death, violence, or physical harm to any person, or (3) it involves hot pursuit of an individual who poses a threat to public safety, or (4) there is an imminent risk of destruction of evidence material to a criminal case." (ECF 64 at 31.) The April 2021 Guidance also permitted civil enforcement actions "[i]n the absence of hot pursuit . . . against an individual who poses a threat to public safety if: (1) it is necessary to take the action in or near the courthouse because a safe alternative location for such action does not exist or would be too difficult to achieve the enforcement action at such a location, and (2) the action has been approved in advance by a [designated supervisor]." (ECF 64 at 31.) The April 2021 Guidance specifically stated that it applied to immigration courthouses, providing that, "[f]or the purposes of this memorandum, a courthouse includes any municipal, county, state, federal, tribal, or territorial courthouse, <u>including</u> <u>immigration</u> <u>courts</u>." (<u>Id.</u> (emphasis added).)

On January 21, 2025, following the change in administrations, ICE issued a memorandum entitled "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses" (the "January 2025 Interim Guidance"). (ECF 64 at 56–58.) That memorandum expressly rescinded the April 2021 Guidance. (<u>Id.</u> at 56.) On May 27, 2025, ICE issued a subsequent memorandum entitled "Civil Immigration Enforcement Actions In or Near Courthouses" (the "May 2025 Final Guidance") that superseded the January 2025 Interim Guidance. (<u>Id.</u> at 6–8.) Other than one provision regarding state and local laws that was included in the January 2025 Interim Guidance and not the May 2025 Final Guidance (together, the "2025 ICE Courthouse Arrest Policy"), the two memoranda were functionally identical.[4]

[4] The January 2025 Interim Guidance provided that ICE officers may conduct civil immigration enforcement actions in or near courthouses on the condition that "such action is not precluded by laws imposed by the jurisdiction in which the enforcement action will take place" and that ICE officers coordinate with the Office of the Principal Legal Advisor "to determine whether jurisdiction-specific legal limitations apply." (ECF 64 at 7, 57.)

The 2025 ICE Courthouse Arrest Policy expanded the circumstances in which ICE officers could make arrests at courthouses and provided that "ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses when they have credible information that leads them to believe the targeted alien(s) is or will be present at a specific location." (ECF 64 at 7.) Such "targeted aliens" include but are "not limited to" those that pose "[n]ational security or public safety threats," "[s]pecific aliens with criminal convictions," "[g]ang members," "[a]liens who have been ordered removed from the United States but have failed to depart," and "[a]liens who have re-entered the country illegally after being removed." (Id.) Under the policy, ICE officers are also permitted to arrest "[o]ther aliens encountered during a civil immigration enforcement action in or near a courthouse, such as family members or friends accompanying the target alien," with such arrest decision decided "on a case-by-case basis considering the totality of the circumstances." (Id.) The memoranda also advised, among other things, that enforcement actions should, "to the extent practicable, continue to take place in non-public areas of the courthouse" and be undertaken "discreetly to minimize their impact on court proceedings." (Id.) Unlike the April 2021 Guidance, neither the January 2025 Interim Guidance nor May 2025 Final Guidance expressly stated that they applied to arrests at immigration courts. However, defendants' position, until March 24, 2026, was that those guidance memoranda did in fact apply to immigration courts. (E.g., ECF 39 at 32–34.)

In the First Stay Opinion, the Court declined to stay the 2025 ICE Courthouse Arrest Policy. The Court held that plaintiffs had failed to demonstrate a probability of success in showing that a common law privilege against civil arrests at courthouses was incorporated into the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 et seq., such that the 2025 ICE Courthouse Arrest Policy was not shown to be "contrary to law" as applied to immigration

courthouses. 799 F. Supp. 3d at 389–92. And because the agency acknowledged and provided an explanation for the change in policy from the April 2021 Guidance in the 2025 guidance memoranda—both of which, as defendants represented at the time, applied to immigration courts—plaintiffs did not make a showing that the 2025 ICE Courthouse Arrest Policy was arbitrary and capricious. Id. at 393–96.

Following the March 24, 2026 change of position, defendants acknowledged that the First Stay Opinion's conclusion that the arrest policy was not arbitrary and capricious relied on the "mistaken" supposition that the May 2025 Final Guidance applied to immigration courts. (ECF 77.)

After briefing by the parties, the Court issued the Second Stay Opinion and held that plaintiffs were likely to succeed on their APA claim challenging the 2025 ICE Courthouse Arrest Policy as arbitrary and capricious. The policy was likely arbitrary and capricious because ICE failed to show any recognition that the rescission of the April 2021 Guidance impacted arrests in or near immigration courts. Nor did it explain why having no policy whatsoever on arrests in or near immigration courts was preferable to the April 2021 policy. 833 F. Supp. 3d at 358–59. The Court thus stayed the 2025 interim and final guidance insofar as they rescinded the April 2021 Guidance as it applied to arrests at or near immigration courthouses. Id. at 360.

Defendants have filed a 55-page administrative record for the May 2025 Final Guidance. (ECF 64.) According to defendants, the administrative record contains "all non-privileged documents and materials considered by ICE in issuing" the May 2025 Final Guidance. (ECF 64 at 3.) In addition to the April 2021 Guidance and January 2025 Interim Guidance and accompanying communications from then-Acting Directors of ICE (id. at 30–33, 56–60), the record also contained a memorandum from 2018 that placed certain restrictions on civil

immigration enforcement actions in and around courthouses but that did not expressly make reference to immigration courthouses (the "January 2018 Guidance"). (Id. at 26–29.) The Court had previously reviewed these memoranda when considering the stay motion. The record also contained a memorandum from 2015 providing guidance on courthouse arrests that was mostly similar to another 2015 memorandum previously provided to the Court in relation to the stay motion. (Id. at 25; see also ECF 41-2.) And the record contains memoranda dating back to 1993 providing for restrictions and guidance on civil immigration enforcement actions in sensitive locations, such as schools and places of worship (ECF 64 at 9–11, 17–24, 34–39), domestic violence shelters (id. at 12–16, 40–54), and medical facilities (id. at 20–24, 34–39), as well as a January 20, 2025 memorandum withdrawing an earlier memorandum addressing enforcement actions in such protected areas. (Id. at 55.) This last set of materials largely does not factor into the parties' arguments or the Court's analysis herein, and the only document in the administrative record that expressly mentions immigration courts is the April 2021 Guidance.

B. The 2025 ICE Courthouse Arrest Policy Is Subject to APA Review.

"Under the APA, a party aggrieved by agency action is generally 'entitled to judicial review thereof.'" Westchester v. U.S. Dep't of Hous. & Urb. Dev., 778 F.3d 412, 418 (2d Cir. 2015) (quoting 5 U.S.C. § 702). "There is a strong presumption favoring judicial review of administrative action" and "the agency bears the heavy burden of overcoming" that presumption. Salazar v. King, 822 F.3d 61, 75 (2d Cir. 2016) (internal quotation marks omitted) (first citing Mach Mining, LLC v. EEOC, 575 U.S. 480, 486 (2015); and then quoting Dunlop v. Bachowski, 421 U.S. 560, 567 (1975)). Judicial review, however, "is not available 'to the extent that . . . agency action is committed to agency discretion by law.'" Westchester, 778 F.3d at 419 (quoting 5 U.S.C. § 701(a)(2)). That limitation on judicial review "applies only in 'those rare instances where statutes are drawn in such broad terms that in a given case there is no law to

apply.'" Sharkey v. Quarantillo, 541 F.3d 75, 91 (2d Cir. 2008) (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410 (1971)).

As they did at the stay stage, defendants contend that ICE's decision to rescind the April 2021 Guidance is not reviewable under the APA because the INA affords ICE the discretion to evaluate the appropriateness of locations of civil enforcement actions. Indeed, the INA provides that officers "shall have power without warrant . . . to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of [the immigration laws] . . . ." 8 U.S.C. § 1357(a)(2). Defendants point to the few specific location-based restrictions on ICE contained in section 1357 of the INA to suggest that it was Congress's intent to not further constrain officers' choice of location in exercising their authority to make arrests. See id. § 1357(a)(3) (officers may board vessels, railway cars, aircraft and vehicles "within a reasonable distance from any external boundary of the United States" and may access private lands "within a distance of twenty-five miles from any such external boundary"); id. § 1357(e) (officers cannot enter farms without consent of owner or warrant to interrogate aliens). Thus, they argue, there is no "law to apply" as to ICE's withdrawal of its April 2021 Guidance and its restrictions on arrests in immigration courthouses.

In its Second Stay Opinion, the Court rejected this argument. ICE's history of providing informal guidance on civil enforcement actions in or near courthouses provides sufficient "law to apply." 833 F. Supp. 3d at 357–58. When determining whether there is sufficient "law to apply," courts may look to "the agency's regulations[] and informal agency guidance that govern the agency's challenged action," in addition to the governing statutory text. Salazar, 822 F.3d at 76. "Agency regulations and guidance can provide a court with law to apply because, . . . where the rights of individuals are affected, it is incumbent upon agencies to follow

their own procedures." Id. (internal quotation marks omitted). "This is so even where the internal procedures are possibly more rigorous than otherwise would be required" under the governing statute. Id. (quoting Montilla v. I.N.S., 926 F.2d 162, 167 (2d Cir. 1991)). In such circumstances, "[t]hough the agency's discretion is unfettered at the outset, if it announces and follows–by rule or by settled course of adjudication–a general policy by which its exercise of discretion will be governed, an irrational departure from that policy . . . must be overturned" as arbitrary and capricious. I.N.S. v. Yueh-Shaio Yang, 519 U.S. 26, 32 (1996).

As explained, "ICE has followed—by rule[—]a general policy on civil enforcement actions in or near courthouses." 833 F. Supp. 3d at 357 (brackets and internal quotation marks omitted). The January 2018 Guidance (ECF 64 at 26–29), the April 2021 Guidance (id. at 30–32), and the 2025 interim and final guidance (id. at 6–8, 56–58) each provided some restrictions on the circumstances under which civil enforcement actions in courthouses could take place. Such a "general policy on courthouse arrests" provides sufficient law to apply to permit the Court to analyze ICE's rescission of the April 2021 Guidance as applied to immigration courthouses without any replacement restrictions. 833 F. Supp. 3d at 358. The Court's conclusion is bolstered by other agency guidance on arrests in other sensitive areas such as schools, houses of worship, domestic violence shelters and medical facilities. (ECF 64 at 9–24, 34–54.)

The Court concludes that the record of ICE guidance on arrests in sensitive areas, including courthouses, supplies the "law to apply" to the claim. Accordingly, the 2025 ICE

Courthouse Arrest Policy is reviewable and not barred by the exception for actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).[5]

C. The 2025 ICE Courthouse Arrest Policy Is Arbitrary and Capricious.

Under the APA, a court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of a court's review when determining whether a final agency action is arbitrary and capricious "is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Generally, an agency's action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016). "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position." F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (emphasis omitted). An agency may not "depart from a prior policy sub silentio." Id. And while an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old

[5] At this stage, defendants do not contest that the 2025 ICE Courthouse Arrest Policy constitutes final agency action. (See ECF 97-1 at 32 (showing deletion of argument in initial set of summary judgment briefing).) Accordingly, defendants have waived that defense. See Jackson v. Federal Express, 766 F.3d 189, 196 (2d Cir. 2014) ("[A] partial opposition [to a summary judgment motion] may imply an abandonment of some claims or defenses.").

one," the agency must at a minimum "show that there are good reasons for the new policy." Id. "[W]here the agency has failed to provide even [a] minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." Encino Motorcars, 579 U.S. at 221. Furthermore, "[w]hen an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." Dep't of Homeland Sec. v. Regents of the Univ. of California, 591 U.S. 1, 30 (2020) (internal quotation marks omitted).

Plaintiffs contend that the 2025 ICE Courthouse Arrest Policy is arbitrary and capricious for two reasons. First, they argue that, in rescinding the April 2021 Guidance, ICE displayed no awareness that it was changing its policy to effectively provide unfettered discretion to ICE officers to make arrests in immigration courthouses and also failed to provide a reasoned explanation for that new policy. Second, plaintiffs argue that ICE failed to consider important considerations such as preserving access to justice in immigration courthouses. Defendants do not defend the policy against these attacks and their briefs are silent as to whether the policy is arbitrary and capricious. The Court agrees that the 2025 ICE Courthouse Arrest Policy purported to rescind the April 2021 Guidance that expressly applied to arrests in or near immigration courts but did not provide an acknowledgment of or reasoned explanation for the change in policy. It is therefore arbitrary and capricious. The Court does not reach the second ground argued by plaintiffs.[6] (See ECF 99 at 15.)

---

[6] Plaintiffs, in arguing that the 2025 ICE Courthouse Arrest Policy is arbitrary and capricious, rely extensively on declarations and other evidence outside the administrative record. "Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." Safe Haven Home Care, Inc. v. United States Dep't of Health & Hum. Servs., 130 F.4th 305, 324 (2d Cir. 2025). A court may consider such extra-record evidence, however, if there is a showing of bad faith on the part of agency decisionmakers, if there is an absence of formal administrative findings made by the agency, and when the district court needs to supplement the record with background information to determine whether the agency considered all relevant factors. Id. The administrative record is amply sufficient to enable the Court to determine that the policy was arbitrary and capricious, and the Court does not rely on such extra-record evidence.

As explained, the January 2025 Interim Guidance and the May 2025 Final Guidance purport to rescind the April 2021 Guidance. The April 2021 Guidance expressly applied to immigration courts. (ECF 64 at 31.) That policy provided that civil immigration enforcement actions could take place in or near such courthouses in only a specific set of enumerated circumstances. (Id.) And that policy acknowledged a series of "[c]ore [p]rinciple[s]" guiding the policy, including "ensur[ing] that access to the courthouse – and therefore access to justice . . . – is preserved." (Id. at 30.) Finally, the April 2021 Guidance set certain guidelines as to the manner of courthouse arrests, providing among other things that "[t]o the fullest extent possible, an enforcement action in the courthouse will be taken in a non-public area of the courthouse, outside of public view" and "be conducted in collaboration with courthouse security personnel." (Id. at 32.)

It is now uncontested that, other than rescinding the April 2021 Guidance, the 2025 interim and final guidance do not apply to immigration courthouses. (ECF 77.) Thus, the January 2025 Interim Guidance rescinded the April 2021 Guidance's restrictions on arrests in immigration courthouses without replacing them with any other restrictions. In this Court's view, ICE's policy as to arrests in immigration courthouses is that officers may exercise "unfettered discretion . . . with no guidance whatsoever" from ICE. 833 F. Supp. 3d at 359.

The January 2025 Interim Guidance and the May 2025 Final Guidance, of course, make no mention of this change in policy. Nor does any document in the administrative record make clear that ICE understood that it was changing its policy in this way. As the Court concluded in the Second Stay Opinion, the most likely explanation for this silence is that "the position expressed in 2026, i.e., that immigration courts were never within the scope of the 2025 Policies, was a recent invention and not the intent at the time of the issuance of the 2025

Policies." Id. at 358. Nothing in the administrative record undermines that conclusion. Regardless, the 2025 interim and final guidance and the administrative record evince no "awareness" by ICE "that it [wa]s changing position." Fox Television Stations, 556 U.S. at 515. Such a "sub silentio" policy change is arbitrary and capricious. Id.

Because the January 2025 Interim Guidance and May 2025 Final Guidance do not apply to immigration courts, the rationales for the change in policy as to other types of courthouses provided in those documents cannot be used to supply "a reasoned explanation for the change" in policy as to immigration courts. Encino Motorcars, 579 U.S. at 221. As this Court explained in the Second Stay Opinion, ICE has "offered no explanation of why the exercise of unfettered discretion by ICE officers with no guidance whatsoever was a better option for civil enforcement actions in or near immigration courthouses than the April 2021 [Guidance] or even the 2025 Polic[y] as applied to courthouses other than immigration courthouses." 833 F. Supp. 3d at 359. The Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." State Farm, 463 U.S. at 43 (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)). When, as here, an agency "has failed to provide even [a] minimal level of analysis, its action is arbitrary and capricious." Encino Motorcars, 579 U.S. at 221.

The Court concludes that the 2025 ICE Courthouse Arrest Policy, to the extent it rescinded the April 2021 Guidance as applied to arrests at or near immigration courts, is arbitrary and capricious under the APA.

D. Plaintiffs Have Not Shown that the 2025 ICE Courthouse Arrest Policy Is Contrary to Law.

Plaintiffs acknowledge that, in the event that the Court holds that the 2025 ICE Arrest Policy is arbitrary and capricious, as it does here, "it need not reach whether Defendants'

new arrest policy is ultra vires because it violates the common-law privilege" against civil arrests in and around courthouses. (ECF 99 at 16.)[7] In their opening brief, plaintiffs "incorporate by reference their prior arguments" made in their motion for a stay and limit their argument to addressing points of disagreement with the Court's determination in the First Stay Opinion that no common law privilege against arrests by the sovereign was incorporated into the INA. (ECF 92 at 25.) See 799 F. Supp. 3d at 389–92. In the remainder of their briefing on summary judgment, the parties largely rehash the arguments as to that purported privilege that they presented in their briefing as to the stay motion.

Plaintiffs' argument is that the common law contained a privilege against civil arrests in or near courthouses and that the INA incorporated that privilege. Any adoption of policy in derogation of that privilege is, in their view, ultra vires. The Court's First Stay Opinion explains its disagreement with plaintiffs' position. The Court adopts its reasoning in full in its First Stay Opinion and abides by its prior determination that plaintiffs have not shown that there was a common law privilege against arrest by the sovereign at courthouses that was incorporated in the INA. Id.

E. The Court Will Vacate in Part the 2025 ICE Courthouse Arrest Policy.

Because the Court has determined that the 2025 ICE Courthouse Arrest Policy is arbitrary and capricious as to arrests in or near an immigration court, the Court must decide on the appropriate remedy. Plaintiffs argue that vacatur should apply to the offending portion of the 2025 ICE Courthouse Arrest Policy and not just as to plaintiffs in this case. Defendants raise several objections and argue that the scope of any relief should be limited to plaintiffs. The Court

[7] Plaintiffs acknowledge the Court's rejection of a purported common law privilege against civil arrests in courthouses in the First Stay Opinion; they explain that they "set forth their arguments concerning the common-law privilege to preserve them for appeal." (ECF 99 at 16 n.6.)

concludes that plaintiffs are entitled to vacatur of the January 2025 Interim Guidance and May 2025 Final Guidance to the extent they purport to rescind the April 2021 Guidance as applied to civil immigration enforcement actions in or near immigration courts.

Section 706 of the APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be" arbitrary and capricious. 5 U.S.C. § 706(2)(A) (emphasis added). "In the usual case, when an agency violates its obligations under the APA, [the court] will vacate a judgment and remand to the agency to conduct further proceedings." Guertin v. United States, 743 F.3d 382, 388 (2d Cir. 2014).

Defendants first contend that vacatur of the policy not limited to plaintiffs would conflict with "longstanding remedial principles." (ECF 106 at 13.) They point to the general rule that equitable remedies should be tailored to providing relief as to a plaintiff's complained-of injury. But this argument ignores the established practice of courts awarding vacatur of agency policies determined to be arbitrary and capricious. See, e.g., Corner Post, Inc. v. Board of Governors of Federal Reserve System, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring) ("The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur of unlawful agency rules, including in suits by unregulated plaintiffs who are adversely affected by an agency's regulation of others."); Regents, 591 U.S. at 9, 36 n.7 (affirming vacatur of DHS order determined to be arbitrary and capricious); Guertin, 743 F.3d at 388; Natural Resources Defense Council v. E.P.A., 658 F.3d 200, 218, 220 (2d Cir. 2011) (vacating portions of EPA order determined to be arbitrary and capricious); Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin, 174 F.4th 81, 119 (D.C. Cir. 2026) ("Vacatur is a well-established remedy for unlawful agency action."); Center for Biological Diversity v. Zeldin, 171 F.4th 356, 382

(D.C. Cir. 2026) ("When an agency's action is unlawful, vacatur is the normal remedy." (internal quotation marks omitted)).

Defendants cite concurring opinions from the Supreme Court and Sixth Circuit and argue that vacatur poses the same issues as nationwide injunctions. See, e.g., United States v. Texas, 599 U.S. 670, 703 (2023) (Gorsuch, J., concurring) ("As with universal injunctions, vacatur can stymie the orderly review of important questions, lead to forum shopping, render meaningless rules about joinder and class actions, and facilitate efforts to evade the APA's normal rulemaking processes."). District courts lack authority to issue nationwide or universal injunctions. Trump v. CASA, Inc., 606 U.S. 831, 856 (2025). But in so holding, the Supreme Court expressly noted that its decision did not "resolve[] the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action" pursuant to section 706(2). Id. at 847 n.10.

It certainly could be that vacatur of agency action raises the same concerns as nationwide injunctions. But, as a district court examining controlling precedent as of the date of this Opinion, the Court is bound to follow the rule that courts order vacatur "[i]n the usual case[] when an agency violates its obligations under the APA." Guertin, 743 F.3d at 388. As Judge Subramanian explained in a recent decision, "[i]n the absence of any overriding authority, the Court follows guidance from the Second Circuit in Guertin . . . and vacates the policy" and "leaves it to the Second Circuit (and the Supreme Court) to decide if circuit precedent should be overruled." American Federation of Teachers, AFL-CIO v. Davis, 818 F. Supp. 3d 538, 550 (S.D.N.Y. 2025); see also Catholic Legal Immigration Network, Inc. v. Rubio, 26-cv-858 (JAV), 2026 WL 2455099, at *24 (S.D.N.Y. Aug. 21, 2026) (Vargas, J.) ("Numerous decisions—including by the D.C. Circuit, the Second Circuit, and the Supreme Court—have recognized that

the APA mandates vacatur of unlawful agency actions rather than merely providing injunctive relief enjoining enforcement of the rules against the specific plaintiffs." (ellipsis, brackets and internal quotation marks omitted)); Metropolitan Transportation Authority v. Duffy, 25-cv-1413 (LJL), 2026 WL 588117, at *65 (S.D.N.Y. Mar. 3, 2026) (Liman, J.) ("The Court must vacate the [challenged agency] letters and the actions taken through them." (emphasis added) (citing 5 U.S.C. § 706(2)(A))).

Finally, defendants assert in conclusory fashion that any vacatur of the arrest policy would "create friction" with the vacatur issued against the policy in Pablo Sequen v. Albarran, 835 F. Supp. 3d 1061, 1131 (N.D. Cal. 2026). (ECF 106 at 13.) Defendants provide no explanation for how this Court's order of vacatur would pose any conflict with Judge Pitts' order vacating the January 2025 Interim Guidance and May 2025 Final Guidance and they provide no support for the proposition that two overlapping vacatur orders may not co-exist.

The Court will vacate the January 2025 Interim Guidance and the May 2025 Final Guidance to the extent they purport to rescind the April 2021 Guidance as applied to civil enforcement actions in or near immigration courts.

CONCLUSION

Plaintiffs' motion for summary judgment is GRANTED as to Count I and is otherwise DENIED. Defendants' motion for summary judgment is GRANTED as to Count II and is otherwise DENIED. Defendants' motion to dismiss for lack of subject matter jurisdiction as to Counts III, IV and V is GRANTED.

The Clerk of Court is respectfully directed to enter judgment for plaintiffs on Count I and enter judgment for defendants on Count II, dismissing Counts III, IV and V,

declaring the 2025 ICE Courthouse Arrest Policy arbitrary and capricious, and vacating and setting aside the January 2025 Interim Guidance and the May 2025 Final Guidance to the extent they purport to rescind the April 2021 Guidance as applied to civil enforcement actions in or near immigration courts.

The Clerk is also requested to terminate the motions at ECF 65 & 67.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
September 30, 2026